## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RDA Holding Co., *et al.*,[1] | ) | Case No. 13-22233 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### SECOND AMENDED JOINT PLAN OF REORGANIZATION OF
### CERTAIN DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**WEIL, GOTSHAL & MANGES LLP**

Marcia L. Goldstein
Joseph H. Smolinsky
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

Dated: May 7, 2013
New York, New York

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are RDA Holding Co. (7045); The Reader's Digest Association, Inc. (6769); Ardee Music Publishing, Inc. (2291); Direct Entertainment Media Group, Inc. (2306); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); Reiman Manufacturing, LLC (8760); RD Publications, Inc. (9115); Home Service Publications, Inc. (9525); RD Large Edition, Inc. (1489); RDA Sub Co. (f/k/a Books Are Fun, Ltd.) (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica S.A. (5836); WAPLA, LLC (9272); Reader's Digest Sales and Services, Inc. (2377); Taste of Home Media Group, LLC (1190); Reiman Media Group, LLC (1192); Taste of Home Productions, Inc. (1193); World Wide Country Tours, Inc. (1189); W.A. Publications, LLC (0229); WRC Media Inc. (6536); RDCL, Inc. (f/k/a CompassLearning, Inc.) (6535); RDA Digital, LLC (5603); RDWR, Inc. (f/k/a Weekly Reader Corporation) (3780); Haven Home Media, LLC (f/k/a Reader's Digest Sub Nine, Inc.) (2727); Weekly Reader Custom Publishing, Inc. (f/k/a Lifetime Learning Systems, Inc.) (3276); and World Almanac Education Group, Inc. (3781).

**Table of Contents**

Section 1.        DEFINITIONS AND INTERPRETATION. ..................................................................1

        A.        Definitions. ..................................................................................................1

                1.1.      *2011 Financing Settlement*..................................................................1

                1.1.      *2011 Secured Administrative Agent*. ..................................................1

                1.2.      *2011 Secured Lenders* ..........................................................................1

                1.3.      *2011 Secured Term Loan* ......................................................................1

                1.4.      *2011 Secured Term Loan Claim*...........................................................2

                1.5.      *2012 Senior Credit Agreement* ............................................................2

                1.6.      *2012 Senior Credit Agreement Lenders* ..............................................2

                1.7.      *Acceptable Business Plan* .....................................................................2

                1.8.      *Administrative Agent* ...........................................................................2

                1.9.      *Administrative Expense Claim*. ............................................................2

                1.10.     *Allowed*. ...............................................................................................2

                1.11.     *Amended Organizational Documents* ...................................................2

                1.12.     *Bankruptcy Code*...................................................................................2

                1.13.     *Bankruptcy Court*..................................................................................3

                1.14.     *Bankruptcy Rules*..................................................................................3

                1.15.     *Benefit Plans* .........................................................................................3

                1.16.     *Business Day* .........................................................................................3

                1.17.     *Cash*.......................................................................................................3

                1.18.     *Causes of Action*. ..................................................................................3

                1.19.     *Chapter 11 Cases*..................................................................................3

                1.20.     *Claim*. ....................................................................................................3

                1.21.     *Claims Oversight Committee*. ...............................................................3

                1.22.     *Claims Oversight Committee Reserve* ..................................................3

                1.23.     *Class*. .....................................................................................................4

                1.24.     *Collateral Agent* ...................................................................................4

                1.25.     *Commencement Date*. ...........................................................................4

                1.26.     *Confirmation* .........................................................................................4

                1.27.     *Confirmation Date*. ...............................................................................4

                1.28.     *Confirmation Hearing*. .........................................................................4

                1.29.     *Confirmation Order*. .............................................................................4

                1.30.     *Consenting Lender*.................................................................................4

1.31.   *Consenting Secured Noteholders*. ...................................................................4

1.32.   *Consummation*. .................................................................................................4

1.33.   *Creditors Committee*. .......................................................................................4

1.34.   *Cure*. ..................................................................................................................4

1.35.   *Debtor Affiliates*. ..............................................................................................5

1.36.   *Debtors* ..............................................................................................................5

1.37.   *Debtors in Possession*. ......................................................................................5

1.38.   *Definitive Documents* .......................................................................................5

1.39.   *DEMG* ...............................................................................................................5

1.40.   *DEMG Intercompany Claims* ...........................................................................5

1.41.   *DIP Agent* ..........................................................................................................5

1.42.   *DIP Claim* ..........................................................................................................5

1.43.   *DIP Commitment Letter* ....................................................................................5

1.44.   *DIP Facility* .......................................................................................................5

1.45.   *DIP Lenders* .......................................................................................................6

1.46.   *DIP Loan Agreement* .........................................................................................6

1.47.   *DIP Order* ..........................................................................................................6

1.48.   *DIP Term Sheet* .................................................................................................6

1.49.   *Disbursing Agent* ..............................................................................................6

1.50.   *Disclosure Statement* ........................................................................................6

1.51.   *Disclosure Statement Order* .............................................................................6

1.52.   *Disputed Claim* ..................................................................................................6

1.53.   *Distribution Date* ..............................................................................................6

1.54.   *Distribution Record Date* ..................................................................................6

1.55.   *Effective Date* ....................................................................................................7

1.56.   *Employee Bonus Pool* .......................................................................................7

1.57.   *Estate or Estates* ...............................................................................................7

1.58.   *Exculpated Parties* ............................................................................................7

1.59.   *Existing RDA Holding Interests* ........................................................................7

1.60.   *Exit Financing*. ..................................................................................................7

1.61.   *Fee Claim* ..........................................................................................................7

1.62.   *Final Order* ........................................................................................................7

1.63.   *First Out Exit Term Loan* ..................................................................................8

1.64.   *First Out Exit Letter of Credit Facility* . ..........................................................8

1.65.   *First Out Exit Facilities* ....................................................................................8

1.66.    *First Out Exit Term Sheet* ...................................................................8

1.67.    *FTC* .........................................................................................................8

1.68.    *FTC Action* .............................................................................................8

1.69.    *FTC Claims* ............................................................................................8

1.70.    *FTC Settlement Order* ...........................................................................8

1.71.    *Fully Diluted Basis* ................................................................................8

1.72.    *General Unsecured Claim* ......................................................................8

1.73.    *GUC Distribution* ...................................................................................8

1.74.    *Impaired* ..................................................................................................9

1.75.    *Indenture* .................................................................................................9

1.76.    *Indenture Trustee* ....................................................................................9

1.77.    *Indenture Trustee Charging Lien* ...........................................................9

1.78.    *Indenture Trustee Fees* ...........................................................................9

1.79.    *Initial Distribution* .................................................................................9

1.80.    *Initial Distribution Date* ........................................................................9

1.81.    *Intercompany Interest* ............................................................................9

1.82.    *Interests* ..................................................................................................9

1.83.    *International Restructuring Transactions* .............................................9

1.84.    *Issuing Lender* ........................................................................................9

1.85.    *Lien* .........................................................................................................9

1.86.    *Management Incentive Program* .............................................................9

1.87.    *New Board* .............................................................................................10

1.88.    *New Common Stock* ...............................................................................10

1.89.    *New Money Loans* .................................................................................10

1.90.    *New Money Lenders* ..............................................................................10

1.91.    *Non-Debtor Intercompany Claim* .........................................................10

1.92.    *Non-Dischargeability Deadline* ............................................................10

1.93.    *Other Priority Claim* .............................................................................10

1.94.    *Other Secured Claim* .............................................................................10

1.95.    *PBGC* ....................................................................................................10

1.96.    *Pension Credit* .......................................................................................10

1.97.    *Pension Plan* .........................................................................................10

1.98.    *Person* ....................................................................................................10

1.99.    *Plan Debtor Intercompany Claim* .........................................................11

1.100.  *Plan Supplement* ...................................................................................11

1.101.   *Plan Supplement Filing Date.* ...............................................................................11

1.102.   *Plan Term Sheet* ....................................................................................................11

1.103.   *Priority Non-Tax Claim.* .......................................................................................11

1.104.   *Priority Tax Claim* ................................................................................................11

1.105.   *Pro Rata* .................................................................................................................11

1.106.   *RDA GUC Distribution* .........................................................................................11

1.107.   *RDA Holding* ..........................................................................................................11

1.108.   *Reader's Digest* .....................................................................................................11

1.109.   *Registration Rights Agreement* ............................................................................12

1.110.   *Reinstate, Reinstated or Reinstatement* ..............................................................12

1.111.   *Released Parties.* ...................................................................................................12

1.112.   *Reorganization Plan.* ............................................................................................12

1.113.   *Reorganization Plan Debtors* ...............................................................................12

1.114.   *Reorganization Plan Debtor Affiliates* ................................................................12

1.115.   *Reorganization Plan Debtors in Possession.* .......................................................13

1.116.   *Reorganized Debtors.* ............................................................................................13

1.117.   *Reorganized Debtor Affiliates* ..............................................................................13

1.118.   *Reorganized RDA Holding* ....................................................................................13

1.119.   *Required Consenting Secured Noteholders* ..........................................................13

1.120.   *Required Consenting Secured Parties* ..................................................................13

1.121.   *Restructuring* .........................................................................................................13

1.122.   *Restructuring Expenses* ........................................................................................13

1.123.   *Restructuring Support Agreement* ........................................................................13

1.124.   *Roll-Up Lender* ......................................................................................................13

1.125.   *Roll-Up Loans* ........................................................................................................13

1.126.   *Schedule of Assumed Contracts.* ..........................................................................13

1.127.   *Schedules* ...............................................................................................................13

1.128.   *Second Out Exit Term Loan* ..................................................................................14

1.129.   *Second Out Exit Term Loan Agreement* ...............................................................14

1.130.   *Second Out Exit Term Sheet.* ................................................................................14

1.131.   *Security* ..................................................................................................................14

1.132.   *Secured Claim.* ......................................................................................................14

1.133.   *Security Agreement* ...............................................................................................14

1.134.   *Senior Noteholder Deficiency Claim* .....................................................................14

1.135.   *Senior Noteholder Secured Claim* ........................................................................14

|         | 1.136. | *Senior Noteholders* | 14 |
|---------|--------|----------------------|----|
|         | 1.137. | *Senior Notes*. | 14 |
|         | 1.138. | *Stockholders Agreement*. | 14 |
|         | 1.139. | *Subordinated Securities Claims* | 15 |
|         | 1.140. | *Subsidiary Interests* | 15 |
|         | 1.141. | *Tax Code* | 15 |
|         | 1.142. | *Unimpaired* | 15 |
|         | 1.143. | *Unsecured Administrative Agent* | 15 |
|         | 1.144. | *Unsecured Lenders* | 15 |
|         | 1.145. | *Unsecured Term Loan* | 15 |
|         | 1.146. | *Unsecured Term Loan Claim* | 15 |
|         | 1.147. | *Voting Record Date* | 15 |
| B. | | Interpretation; Application of Definitions and Rules of Construction | 15 |
| C. | | Reference to Monetary Figures | 16 |
| D. | | Controlling Document | 16 |
| Section 2. | | ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS. | 16 |
|         | 2.1. | *Administrative Expense Claims*. | 16 |
|         | 2.2. | *Fee Claims*. | 16 |
|         | 2.3. | *Priority Tax Claims*. | 17 |
|         | 2.4. | *DIP Claims*. | 17 |
|         | 2.5. | *2012 Senior Credit Agreement Claims*. | 17 |
|         | 2.6. | *Roll-Up Loans*. | 18 |
|         | 2.7. | *Indenture Trustee Fees*. | 18 |
| Section 3. | | CLASSIFICATION OF CLAIMS AND INTERESTS. | 18 |
|         | 3.1. | *Summary of Classification*. | 18 |
|         | 3.2. | *Special Provision Governing Unimpaired Claims*. | 19 |
|         | 3.3. | *Elimination of Vacant Classes*. | 19 |
| Section 4. | | TREATMENT OF CLAIMS AND INTERESTS. | 19 |
|         | 4.1. | *Other Priority Claims (Class 1)*. | 19 |
|         | 4.2. | *Other Secured Claims (Class 2)*. | 20 |
|         | 4.3. | *Senior Noteholder Secured Claims (Class 3)*. | 20 |
|         | 4.4. | *General Unsecured Claims (Class 4)*. | 20 |
|         | 4.5. | *Plan Debtor Intercompany Claims (Class 5)*. | 22 |
|         | 4.6. | *Existing RDA Holding Interests (Class 6)*. | 22 |
|         | 4.7. | *Intercompany Interests (Class 7)*. | 22 |

|  | 4.8. | *Subordinated Securities Claims (Class 8).* | 23 |
| Section 5. | | MEANS FOR IMPLEMENTATION. | 23 |
|  | 5.1. | *Compromise and Settlement of Claims, Interests, and Controversies.* | 23 |
|  | 5.2. | *First Out Exit Facilities and Second Out Exit Term Loan.* | 23 |
|  | 5.3. | *Authorization and Issuance of Plan Securities.* | 24 |
|  | 5.4. | *Cancellation of Existing Securities and Agreements.* | 24 |
|  | 5.5. | *Reorganized RDA Holding.* | 24 |
|  | 5.6. | *International Restructuring Transactions.* | 25 |
|  | 5.7. | *Other Transactions.* | 25 |
|  | 5.8. | *Cancellation of Liens.* | 25 |
|  | 5.9. | *Management Incentive Program.* | 25 |
|  | 5.10. | *Employee Matters.* | 26 |
|  | 5.11. | *Withholding and Reporting Requirements.* | 26 |
|  | 5.12. | *Exemption From Certain Transfer Taxes.* | 26 |
|  | 5.13. | *Effectuating Documents; Further Transactions.* | 27 |
|  | 5.14. | *Closing of the Chapter 11 Cases.* | 27 |
| Section 6. | | DISTRIBUTIONS. | 27 |
|  | 6.1. | *Distribution Record Date.* | 27 |
|  | 6.2. | *Date of Distributions.* | 27 |
|  | 6.3. | *Disbursing Agent.* | 28 |
|  | 6.4. | *Powers of Disbursing Agent.* | 28 |
|  | 6.5. | *Cancellation of Senior Notes.* | 28 |
|  | 6.6. | *Delivery of Distributions.* | 28 |
|  | 6.7. | *Manner of Payment Under Plan.* | 29 |
|  | 6.8. | *Fractional Stock.* | 29 |
|  | 6.9. | *Minimum Cash Distributions.* | 29 |
|  | 6.10. | *Setoffs.* | 29 |
|  | 6.11. | *Distributions After Effective Date.* | 29 |
|  | 6.12. | *Allocation of Distributions Between Principal and Interest.* | 30 |
| Section 7. | | PROCEDURES FOR DISPUTED CLAIMS. | 30 |
|  | 7.1. | *Allowance of Claims.* | 30 |
|  | 7.2. | *Objections to Claims.* | 30 |
|  | 7.3. | *Estimation of Claims.* | 30 |
|  | 7.4. | *No Distributions Pending Allowance.* | 31 |
|  | 7.5. | *Distributions After Allowance.* | 31 |

US_ACTIVE:\44191040\16\69252.0040

| | 7.6. | *Resolution of Claims.* | 31 |
|---|---|---|---|
| | 7.7. | *Disallowed Claims.* | 31 |
| | 7.8. | *Debtor Affiliate Claims.* | 31 |
| | 7.9. | *Claims Oversight Procedures* | 31 |
| Section 8. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 32 |
| | 8.1. | *General Treatment.* | 32 |
| | 8.2. | *Payments Related to Assumption of Contracts and Leases.* | 32 |
| | 8.3. | *Rejection Claims.* | 33 |
| | 8.4. | *Survival of the Reorganization Plan Debtors' Indemnification Obligations.* | 33 |
| | 8.5. | *Compensation and Benefit Plans.* | 34 |
| | 8.6. | *Insurance Policies.* | 34 |
| | 8.7. | *Intellectual Property Licenses and Agreements.* | 34 |
| | 8.8. | *Reservation of Rights.* | 34 |
| Section 9. | | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. | 35 |
| | 9.1. | *Conditions Precedent to Confirmation.* | 35 |
| | 9.2. | *Conditions Precedent to the Effective Date.* | 35 |
| | 9.3. | *Waiver of Conditions Precedent.* | 37 |
| | 9.4. | *Effect of Failure of Conditions to Effective Date.* | 37 |
| Section 10. | | EFFECT OF CONFIRMATION. | 37 |
| | 10.1. | *Subordinated Claims.* | 37 |
| | 10.2. | *Vesting of Assets.* | 37 |
| | 10.3. | *Discharge of Claims and Termination of Interests.* | 37 |
| | 10.4. | *Term of Injunctions or Stays.* | 38 |
| | 10.5. | *Injunction Against Interference with Plan.* | 38 |
| | 10.6. | *Releases by the Reorganization Plan Debtors.* | 38 |
| | 10.7. | *Releases By Holders of Claims and Interests.* | 39 |
| | 10.8. | *Exculpation.* | 39 |
| | 10.9. | *Retention of Causes of Action/Reservation of Rights.* | 40 |
| | 10.10. | *Solicitation of the Reorganization Plan.* | 41 |
| | 10.11. | *Section 1145 Exemption.* | 41 |
| | 10.12. | *Plan Supplement.* | 41 |
| | 10.13. | *Corporate and Limited Liability Company Action.* | 41 |
| Section 11. | | RETENTION OF JURISDICTION. | 42 |
| Section 12. | | MISCELLANEOUS PROVISIONS. | 44 |

12.1.    *Payment of Statutory Fees.* ................................................................44

12.2.    *Substantial Consummation.* ..............................................................44

12.3.    *Dissolution of Creditors Committee.* .................................................44

12.4.    *Request for Expedited Determination of Taxes.* ................................44

12.5.    *Amendments.* .....................................................................................44

12.6.    *Effectuating Documents and Further Transactions.* ........................45

12.7.    *Revocation or Withdrawal of the Reorganization Plan.* ...................45

12.8.    *Severability of Plan Provisions upon Confirmation.* ........................45

12.9.    *Governing Law.* .................................................................................45

12.10.  *Time.* ..................................................................................................45

12.11.  *Immediate Binding Effect.* ................................................................46

12.12.  *Successor and Assigns.* ....................................................................46

12.13.  *Entire Agreement.* ............................................................................46

12.14.  *Notices.* .............................................................................................46

Exhibit A        Restructuring Support Agreement

Each of RDA Holding Co., The Reader's Digest Association, Inc., Ardee Music Publishing, Inc.; Pegasus Sales, Inc.; Pleasantville Music Publishing, Inc.; R.D. Manufacturing Corporation; Reiman Manufacturing, LLC; RD Publications, Inc.; Home Service Publications, Inc.; RD Large Edition, Inc.; RDA Sub Co. (f/k/a Books Are Fun, Ltd.); Reader's Digest Children's Publishing, Inc.; Reader's Digest Consumer Services, Inc.; Reader's Digest Entertainment, Inc.; Reader's Digest Financial Services, Inc.; Reader's Digest Latinoamerica, S.A.; WAPLA, LLC; Reader's Digest Sales and Services, Inc.; Taste of Home Media Group, LLC; Reiman Media Group, LLC;  Taste of Home Productions, Inc.; World Wide Country Tours, Inc.; W.A. Publications, LLC; WRC Media, Inc.; RDCL, Inc. (f/k/a CompassLearning, Inc.); RDA Digital, LLC; RDWR, Inc. (f/k/a Weekly Reader Corporation); Haven Home Media, LLC (f/k/a Reader's Digest Sub Nine, Inc.); Weekly Reader Custom Publishing, Inc. (f/k/a Lifetime Learning Systems, Inc.); and World Almanac Education Group, Inc. (collectively, the "**Reorganization Plan Debtors**") propose the following amended joint chapter 11 plan of reorganization for each of the Reorganization Plan Debtors pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.A.

SECTION 1.    **DEFINITIONS AND INTERPRETATION.**

A.    **Definitions.**

1.1.    ***2011 Financing Settlement*** means that certain settlement agreement among the Reorganization Plan Debtors, the Creditors Committee, the Unsecured Administrative Agent, the 2011 Secured Administrative Agent, the Unsecured Lenders and the 2011 Secured Lenders whereby: (i) the Unsecured Administrative Agent, on its own behalf and on behalf of the Unsecured Lenders, shall receive the 2011 Unsecured Term Loan Claim in the total aggregate amount of $16,939,830.55 against Reader's Digest (which amount represents 1.67 times the amount of the outstanding principal and accrued but unpaid interest under the Unsecured Term Loan), for distribution purposes only, and shall waive any and all right to seek any further or additional distributions, on its own behalf or on behalf of the Unsecured Lenders, pursuant to the Reorganization Plan or otherwise, (ii) the Unsecured Administrative Agent, on its own behalf and on behalf of the Unsecured Lenders, shall receive the 2011 Unsecured Term Loan Claim in the total aggregate amount of $1.00 against each of the other Reorganization Plan Debtors for voting purposes only (and not for distribution purposes), (iii) the Unsecured Administrative Agent, the Unsecured Lenders, the 2011 Secured Administrative Agent and the 2011 Secured Lenders shall receive the exculpations contemplated herein and general releases by the Reorganization Plan Debtors, the other Released Parties and, to the extent authorized by the Bankruptcy Court, the holders of Claims against, and Interests in, the Reorganization Plan Debtors; and (iv) on the Effective Date or promptly thereafter (following the approval of the Bankruptcy Court of all other elements of the 2011 Financing Settlement), the 2011 Secured Administrative Agent shall withdraw the 2011 Secured Term Loan Claim.

1.1.    ***2011 Secured Administrative Agent*** means Luxor Capital Group, LP in its capacity as administrative agent under the 2011 Secured Loan.

1.2.    ***2011 Secured Lenders*** means Luxor Capital Partners, LP, Point Lobos Master Fund, L.P., Blackwell Partners LLC and each of the other lenders (including affiliates) from time to time party to the 2011 Secured Loan as lenders thereunder.

1.3.    ***2011 Secured Term Loan*** means that certain term loan credit and guarantee agreement, dated as of August 12, 2011, among RDA Holding, Reader's Digest, the other guarantors named thereunder, the lenders party thereto, and Luxor Capital Group, LP, as administrative agent.

1.4.    ***2011 Secured Term Loan Claim*** means any proof of Claim filed by the 2011 Secured Administrative Agent on its own behalf and on behalf of any 2011 Secured Lenders, on account of Claims, if any, arising under or relating to the 2011 Secured Term Loan.

1.5.    ***2012 Senior Credit Agreement*** means that certain Credit and Guarantee Agreement, dated as of March 30, 2012, by and among Reader's Digest, as borrower, RDA Holding and each of the guarantors named therein, Wells Fargo Principal Lending, LLC, as issuing lender, each of the other banks and lending institutions as lenders thereunder, and Wells Fargo Bank, National Association, as administrative agent.

1.6.    ***2012 Senior Credit Agreement Lenders*** means Wells Fargo Principal Lending, LLC and each of the lenders from time to time party to the 2012 Senior Credit Agreement as lenders thereunder.

1.7.    ***Acceptable Business Plan*** means that certain revised business plan for the Reorganization Plan Debtors or Reorganized Debtors, as applicable, acceptable to the Required Consenting Secured Parties.

1.8.    ***Administrative Agent*** means Wells Fargo Bank, National Association in its capacity as administrative agent under the 2012 Senior Credit Agreement.

1.9.    ***Administrative Expense Claim*** means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Reorganization Plan Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises); (b) Fee Claims; (c) DIP Claims; (d) Restructuring Expenses; and (e) all fees and charges assessed against the Estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-1401.

1.10.    ***Allowed*** means, with reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof, or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Interest as to which the liability of the Reorganization Plan Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court or (c) any Claim or Interest expressly allowed hereunder; *provided, however*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Reorganization Plan.

1.11.    ***Amended Organizational Documents*** means the forms of certification of incorporation, certificate of formation, limited liability company agreement, or other forms of organizational documents and bylaws for the Reorganized Debtors reasonably satisfactory to the Reorganization Plan Debtors and the Required Consenting Secured Parties.  To the extent such Amended Organization Documents reflect material changes to the Reorganizational Plan Debtors' existing forms of organization documents and by laws, substantially final forms of such Amended Organization Documents will be included in the Plan Supplement.

1.12.    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.13.     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.14.     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.15.     ***Benefit Plans*** means all benefit plans, policies, and programs sponsored by the Reorganization Plan Debtors, including all savings plans and health and welfare plans.

1.16.     ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.17.     ***Cash*** means legal tender of the United States of America.

1.18.     ***Causes of Action*** means any action, claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.19.     ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Reorganization Plan Debtors on February 17, 2013, and continuing immediately thereafter, in the Bankruptcy Court and styled *In re RDA Holding Co., et. al.*, Case No. 13-22233 (RDD).

1.20.     ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.21.     ***Claims Oversight Committee*** means a committee of one or more members approved by the Creditors Committee to represent the interests of holders of General Unsecured Claims in connection with the claims oversight procedures set forth in Section 7.9 herein, which committee shall be entitled to retain, without further order of the Bankruptcy Court, legal counsel or other professionals if necessary, including professionals retained in the Chapter 11 Cases; *provided, however,* that any fees, costs and expenses incurred by the Claims Oversight Committee or their professionals in connection with the claims oversight procedures set forth in Section 7.9 herein shall be paid solely from, and limited to, the Claims Oversight Committee Reserve.

1.22.     ***Claims Oversight Committee Reserve*** means $300,000, or such other amount as agreed upon by the Reorganized Debtors, the Claims Oversight Committee and the Consenting Secured Noteholders prior to the Initial Distribution Date, funded solely from the GUC Distribution and RDA GUC Distribution, with the GUC Distribution funding 500/4,375th of the amount and the RDA GUC

Distribution funding 3,875/4,375[th] of the amount, and allocated to the Claims Oversight Committee in an amount determined by the Creditors Committee or the Claims Oversight Committee to satisfy the reasonable costs and expenses of the Claims Oversight Committee and their professionals incurred in connection with the claims oversight procedures set forth in Section 7.9 herein.  Any Cash that is reserved but not used for the costs and expenses of the Claims Oversight Committee shall be returned to the GUC Distribution and RDA GUC Distribution in the same ratio as the initial funding and distributed to holders of Allowed General Unsecured Claims in accordance with Section 4.4 herein.

1.23.    *Class* means any group of Claims or Interests classified by the Reorganization Plan pursuant to section 1122(a)(1) of the Bankruptcy Code, which shall include sub-classes for Class 4 General Unsecured Claims against each of the Reorganization Plan Debtors.

1.24.    *Collateral Agent* means Wilmington Trust, National Association (as successor to Wilmington Trust FSB ) in its capacity as collateral agent under the Indenture, the 2012 Senior Credit Agreement and the related Security Agreement.

1.25.    *Commencement Date* means the date on which each of the respective Debtors filed its voluntary petition for reorganization relief under chapter 11 of the Bankruptcy Code.

1.26.    *Confirmation* means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

1.27.    *Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.28.    *Confirmation Hearing* means the hearing to be held by the Bankruptcy Court regarding confirmation of the Reorganization Plan, as such hearing may be adjourned or continued from time to time.

1.29.    *Confirmation Order* means the order of the Bankruptcy Court confirming the Reorganization Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably satisfactory to the Reorganization Plan Debtors and the Required Consenting Secured Parties.

1.30.    *Consenting Lender* means Wells Fargo Principal Lending, LLC, as issuing lender and lender under the 2012 Senior Credit Agreement and a secured noteholder under the Indenture.

1.31.    *Consenting Secured Noteholders* means those certain holders of Senior Notes party to the Restructuring Support Agreement.

1.32.    *Consummation* means the occurrence of the Effective Date for the Reorganization Plan.

1.33.    *Creditors Committee* means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

1.34.    *Cure* means the payment of Cash by the Reorganization Plan Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Reorganization Plan Debtors in accordance with the terms of an executory contract or unexpired lease of the Reorganization Plan Debtors and (ii) permit the

Reorganization Plan Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.35.    ***Debtor Affiliates*** means the Debtors, other than RDA Holding.

1.36.    ***Debtors*** means RDA Holding, Reader's Digest, Ardee Music Publishing, Inc.; Direct Entertainment Media Group, Inc.; Pegasus Sales, Inc.; Pleasantville Music Publishing, Inc.; R.D. Manufacturing Corporation; Reiman Manufacturing, LLC; RD Publications, Inc.; Home Service Publications, Inc.; RD Large Edition, Inc.; RDA Sub Co. (f/k/a Books Are Fun, Ltd.); Reader's Digest Children's Publishing, Inc.; Reader's Digest Consumer Services, Inc.; Reader's Digest Entertainment, Inc.; Reader's Digest Financial Services, Inc.; Reader's Digest Latinoamerica, S.A.; WAPLA, LLC; Reader's Digest Sales and Services, Inc.; Taste of Home Media Group, LLC; Reiman Media Group, LLC; Taste of Home Productions, Inc.; World Wide Country Tours, Inc.; W.A. Publications, LLC; WRC Media, Inc.; RDCL, Inc. (f/k/a Compasslearning, Inc.); RDA Digital, LLC; RDWR, Inc. (f/k/a Weekly Reader Corporation); Haven Home Media, LLC (f/k/a Reader's Digest Sub Nine, Inc.); Weekly Reader Custom Publishing, Inc. (f/k/a Lifetime Learning Systems, Inc.); and World Almanac Education Group, Inc.

1.37.    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.38.    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated herein and that are otherwise necessary or desirable to implement, or otherwise relate to the restructuring contemplated in the Restructuring Support Agreement, the Reorganization Plan (including the Plan Supplement), any motion seeking the approval thereof, the Confirmation Order, and definitive documentation relating to the DIP Facility, the use of cash collateral and the Exit Financing, Amended Organizational Documents, advisory or management services agreements, shareholder and member related agreements or other related documents, each of which shall contain terms and conditions consistent in all material respects with this Reorganization Plan and shall otherwise be reasonably satisfactory in all respects to the Reorganization Plan Debtors and the Required Consenting Secured Parties.

1.39.    ***DEMG*** means Direct Entertainment Media Group, Inc.

1.40.    ***DEMG Intercompany Claims*** means any Claims against a Reorganization Plan Debtor held by DEMG.

1.41.    ***DIP Agent*** means Wilmington Trust, National Association, as administrative agent for the DIP Lenders under the DIP Loan Agreement, as its permitted successor and assign.

1.42.    ***DIP Claim*** means a Claim of the DIP Lenders or DIP Agent arising under the DIP Financing and the DIP Order.

1.43.    ***DIP Commitment Letter*** means the commitment letter attached to the Restructuring Support Agreement as **Exhibit B** (as may be amended, supplemented or modified from time to time in accordance with the terms thereof).

1.44.    ***DIP Facility*** means that certain consensual, priming, debtor in possession financing facility in the amount of $104,141,267 consisting of the New Money Loans, the Roll-Up Loans and the letters of credit outstanding under the 2012 Senior Credit Agreement and deemed issued thereunder, on the terms and conditions set forth in the DIP Loan Agreement, as approved by the DIP

Order; it being understood that any and all indemnification obligations under the 2012 Senior Credit Agreement will survive as obligations under the DIP Facility and DIP Loan Agreement.

1.45.    ***DIP Lenders*** means the Issuing Lender, the Roll-Up Lender, and New Money Lenders party to the DIP Loan Agreement.

1.46.    ***DIP Loan Agreement*** means that certain credit and guarantee agreement, dated as of February 22, 2013, as amended, supplemented, restated or otherwise modified, by and among, Reader's Digest, as borrower, RDA Holding and each of RDA Holding's direct and indirect domestic subsidiaries party thereto, as guarantors, the DIP Agent, Issuing Lender, the Roll-Up Lender and the New Money Lenders.

1.47.    ***DIP Order*** means the interim and final order(s) of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Loan Agreement, and granting certain rights, protections and liens to and for the benefit of the DIP Lenders.

1.48.    ***DIP Term Sheet*** means the term sheet attached to the DIP Commitment Letter as Annex 1.

1.49.    ***Disbursing Agent*** means any entity (including any applicable Reorganization Plan Debtor if it acts in such capacity) in its capacity as a disbursing agent under Section 6.3 hereof.

1.50.    ***Disclosure Statement*** means the Disclosure Statement for the Reorganization Plan, in form and substance satisfactory to the Required Consenting Secured Parties, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and/or other applicable law.

1.51.    ***Disclosure Statement Order*** means an order entered by the Bankruptcy Court finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code and otherwise in form and substance satisfactory to the Required Consenting Secured Parties.

1.52.    ***Disputed Claim*** means with respect to a Claim or Interest, any such Claim or Interest (a) to the extent neither Allowed nor disallowed under the Reorganization Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) for which a proof of claim or interest for payment has been made, to the extent the Reorganization Plan Debtors or any party in interest has interposed a timely objection or request for estimation before the Confirmation Date in accordance with the Reorganization Plan, which objection or request for estimation has not been withdrawn or determined by a Final Order.

1.53.    ***Distribution Date*** means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of the Reorganization Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.54.    ***Distribution Record Date*** means (i) for Class 3 Senior Noteholder Secured Claims and Class 4 Senior Noteholder Deficiency Claims, the date the Confirmation Order is entered by the Bankruptcy Court or such other date as may be later agreed upon and set forth in the Confirmation Order, and (ii) for all other Allowed Claims, the Effective Date of the Reorganization Plan.

1.55.    ***Effective Date*** means the date on which all conditions to the effectiveness of the Reorganization Plan set forth in Section 9 hereof have been satisfied or waived in accordance with the terms of the Reorganization Plan.

1.56.    ***Employee Bonus Pool*** means the Cash bonus pool to be allocated after the Effective Date by the Chief Executive Officer with the concurrence of the New Board.

1.57.    ***Estate or Estates*** means individually or collectively, the estate or estates of the Reorganization Plan Debtors created under section 541 of the Bankruptcy Code.

1.58.    ***Exculpated Parties*** means collectively: (a) the Reorganization Plan Debtors; (b) the Creditors Committee; (c) the Administrative Agent, the Unsecured Administrative Agent, the 2011 Secured Administrative Agent and the Collateral Agent; (d) the 2012 Senior Credit Agreement Lenders; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the Consenting Lender; (h) the DIP Agent; (i) the arrangers under each of the DIP Facility and the Exit Financing; (j) the administrative agents, collateral agents, and lenders under the Exit Financing; (k) the Consenting Secured Noteholders; (l) the Unsecured Lenders; (m) the 2011 Secured Lenders; and (n) with respect to each of the foregoing entities in clauses (a) through (m), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such; *provided, however,* that any officer, director, principal, shareholder, member, partner, employee, or agent of the Reorganization Plan Debtors that is scheduled by the Reorganization Plan Debtors in the Plan Supplement and designated in such schedule as a non-exculpated party shall not be an Exculpated Party for purposes of the Reorganization Plan.

1.59.    ***Existing RDA Holding Interests*** means all Interests in RDA Holding, including common stock, preferred stock and any options, warrants or rights to acquire any such Interests.

1.60.    ***Exit Financing*** means the First Out Exit Facilities and the Second Out Exit Facility.

1.61.    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Reorganization Plan Debtors or the Creditors Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.62.    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the

Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.63.    ***First Out Exit Term Loan*** means a first out, senior secured exit term loan, in an amount equal to the aggregate amount of the Roll-Up Loans outstanding under the DIP Facility on the Effective Date, in accordance with and subject to the terms and conditions contained in the First Out Exit Term Sheet or otherwise on terms and conditions satisfactory to the Roll-Up Lender; it being understood that any and all indemnification obligations under the DIP Facility and DIP Loan Agreement will survive as obligations under the First Out Exit Term Loan.

1.64.    ***First Out Exit Letter of Credit Facility*** means the aggregate amount of all letters of credit undrawn and outstanding under the DIP Loan Agreement as of the Effective Date, in accordance with and subject to the terms and conditions contained in the First Out Exit Term Sheet or otherwise on terms and conditions satisfactory to the Consenting Lender.

1.65.    ***First Out Exit Facilities*** means the first out**,** senior secured credit facility comprising the First Out Exit Term Loan and the First Out Exit Letter of Credit Facility, in accordance with and subject to the terms and conditions contained in the First Out Exit Term Sheet or otherwise on terms and conditions satisfactory to the Consenting Lender.

1.66.    ***First Out Exit Term Sheet*** means the term sheet for the First Out Exit Term Loan and First Out Exit Letter of Credit Facility attached to the DIP Commitment Letter as Annex 2.

1.67.    ***FTC*** means the United States Federal Trade Commission.

1.68.    ***FTC Action*** means that certain action styled *Federal Trade Commission v. Fitness Brands, Inc., et al.*, Case No. 12-23065-CMA (S.D. Fl. 2012).

1.69.    ***FTC Claims*** means any claims arising under or relating to the FTC Action and the FTC Settlement Order or the subject matter therein.

1.70.    ***FTC Settlement Order*** means the Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief Against Defendants Direct Holdings Americas, Inc., and DEMG, and Relief Defendant Reader's Digest, dated August 27, 2012, entered in the FTC Action.

1.71.    ***Fully Diluted Basis*** means on a fully diluted basis, after taking into account all New Common Stock issued pursuant to the Restructuring, but excluding any New Common Stock issued pursuant to the Management Incentive Program.

1.72.    ***General Unsecured Claim*** means any unsecured Claim against any Reorganization Plan Debtor, other than a Plan Debtor Intercompany Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including without limitation, any FTC Claims, the Unsecured Term Loan Claim, any Non-Debtor Intercompany Claims, any DEMG Intercompany Claim, or any Senior Noteholder Deficiency Claim.

1.73.    ***GUC Distribution*** means, subject to the conditions set forth in Section 4.4, $500,000 to be funded from either the Reorganization Plan Debtors' cash on hand or by the Consenting Secured Noteholders on a *Pro Rata* basis and held in a segregated non-interest bearing account maintained by the Reorganized Debtors, subject to reduction for the Claims Oversight Committee, and distributed *Pro Rata* to the holders of any sub-class of Allowed Class 4 General Unsecured Claims that vote to accept the Reorganization Plan.

1.74. **Impaired** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.75. **Indenture** means that certain Indenture, dated as of February 11, 2010 among RD Escrow Corporation, Reader's Digest, RDA Holding, and the subsidiary guarantors thereunder, the Indenture Trustee, and Wilmington Trust, National Association (as successor to Wilmington Trust FSB), as collateral agent.

1.76. **Indenture Trustee** means Wilmington Trust, National Association (as successor by appointment to Wells Fargo Bank, National Association) in its capacity as the indenture trustee under the Indenture, and its permitted successors and assigns.

1.77. **Indenture Trustee Charging Lien** means any Lien or other priority in payment to which the Indenture Trustees is entitled, pursuant to the Indentures, against distributions to be made to Senior Noteholders for payment of any fees or expenses due to the Indenture Trustee under the Indenture.

1.78. **Indenture Trustee Fees** means the reasonable compensation, fees, expenses, disbursements and indemnity claims arising under the Indenture, including attorneys' and agents' fees, expenses, and disbursements, incurred under the Indenture by the Indenture Trustee, whether prior to or after the Commencement Date and whether prior to or after the Consummation of the Reorganization Plan.

1.79. **Initial Distribution** means the first distribution that the Disbursing Agent makes to holders of Allowed Claims.

1.80. **Initial Distribution Date** means the date occurring on or as soon as reasonably practicable after the Effective Date, but in no event more than sixty (60) days after the Effective Date, on which the Disbursing Agent makes the Initial Distribution to holders of Allowed Claims.

1.81. **Intercompany Interest** means an Interest in a Reorganization Plan Debtor, other than RDA Holding, held by another Reorganization Plan Debtor or an affiliate of a Reorganization Plan Debtor.

1.82. **Interests** means any equity security in a Reorganization Plan Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an ownership interest in any of the Reorganization Plan Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Reorganization Plan Debtor that existed immediately before the Effective Date.

1.83. **International Restructuring Transactions** means those certain transactions with respect to the Reorganization Plan Debtors' direct and indirect foreign subsidiaries and affiliates to be implemented on or after the Effective Date substantially as set forth in the Acceptable Business Plan.

1.84. **Issuing Lender** means Wells Fargo Principal Lending, LLC, as issuing lender, under the DIP Loan Agreement.

1.85. **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.86. **Management Incentive Program** means a post-emergence management incentive program to be approved and implemented by the New Board upon consultation with the Chief Executive Officer, on or after the Effective Date, under which [10%] of the New Common Stock on a

Fully Diluted Basis and after giving effect to the Management Incentive Program shall be reserved for issuance by the New Board to continuing employees of the Reorganization Plan Debtors and members of the New Board, consistent with market terms.

1.87.    **New Board** means the board of directors and/or managers of Reorganized RDA Holding.

1.88.    **New Common Stock** means the shares of common stock, par value $.001 per share, of Reorganized RDA Holding authorized pursuant to the Certificate of Incorporation of Reorganized RDA Holding as set forth in the Plan Supplement.

1.89.    **New Money Loans** means the new money loans in the principal amount of $45,000,000 provided by the New Money Lenders under the DIP Loan Agreement.

1.90.    **New Money Lenders** means the lenders specified on Schedule 2.01 of the DIP Loan Agreement and each other lender that shall become a party thereto from time to time, as NM Lender under the DIP Loan Agreement.

1.91.    **Non-Debtor Intercompany Claim** means any prepetition Claim against a Reorganization Plan Debtor held by one of the Debtors' direct or indirect non-debtor affiliates or subsidiaries.

1.92.    **Non-Dischargeability Deadline** means May 28, 2013 at 5:00 p.m. (Eastern Time) as set pursuant to the Order Pursuant to 11 U.S.C. §§ 502(b)(9) and 105, Fed. R. Bankr. P. 2002, 3003(c)(3) and 4007(c), and Local Rule 3003-1 (i) Establishing Deadline for Filing Proofs of Claim, (ii) Establishing Deadline for Filing Complaints to Determine Dischargeability of Debts and Procedures Relating Thereto, and (iii) Approving Form and Manner of Notice Thereof dated March 25, 2013 (ECF No. 165), by which date complaints to object to the discharge of any Claims against any of the Reorganization Plan Debtors must be filed by all parties in interest, including without limitation, governmental entities, and failure to file such complaints prior to the expiration of the Non-Dischargeability Deadline will result in such Claims being forever discharged against the Reorganization Plan Debtors.

1.93.    **Other Priority Claim** means any Claim against any of the Reorganization Plan Debtors other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.94.    **Other Secured Claim** means a Secured Claim, other than an Administrative Expense Claim, a Priority Tax Claim, a 2012 Senior Credit Agreement Claim, or a Senior Noteholder Secured Claim.

1.95.    **PBGC** means the Pension Benefit Guaranty Corporation.

1.96.    **Pension Credit** means the pension credit to be adopted by Reader's Digest after the Effective Date with the concurrence of the New Board.

1.97.    **Pension Plan** means The Reader's Digest Association, Inc. Retirement Plan.

1.98.    **Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.99.    ***Plan Debtor Intercompany Claim*** means any Claim against a Reorganization Plan Debtor held by another Reorganization Plan Debtor.

1.100.    ***Plan Supplement*** means a supplemental appendix to the Reorganization Plan, in form and substance satisfactory to the Required Consenting Secured Parties, containing, among other things, substantially final forms of the Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Reorganization Plan Debtors' existing organizational documents and by laws), the Schedule of Assumed Contracts, the First Out Exit Facilities, the Second Out Exit Term Loan Agreement, the Registration Rights Agreement, the Stockholders Agreement, and to the extent known, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided, that*, through the Effective Date, the Reorganization Plan Debtors shall have the right to amend the First Out Exit Facilities, the Second Out Exit Term Loan Agreement, the Amended Organizational Documents, the Registration Rights Agreement, the Stockholders Agreement, and any schedules, exhibits or amendments thereto, and the other documents contained in, and exhibits to, the Plan Supplement with the consent of the Required Consenting Secured Parties.  The Plan Supplement shall be filed with the Bankruptcy Court no later than the Plan Supplement Filing Date.

1.101.    ***Plan Supplement Filing Date*** means June 11, 2013 at 5:00 p.m. (Eastern Time).

1.102.    ***Plan Term Sheet*** means the term sheet attached to the Restructuring Support Agreement as Exhibit A including any schedules and exhibits attached thereto and as may be modified in accordance with Section 9.15 of the Restructuring Support Agreement.

1.103.    ***Priority Non-Tax Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.104.    ***Priority Tax Claim*** means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.105.    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Class under the Reorganization Plan.

1.106.    ***RDA GUC Distribution*** means, subject to the conditions set forth in Sections 4.4, $3,875,000 to be funded from either the Reorganization Plan Debtors' cash on hand or by the Consenting Secured Noteholders and held in a segregated non-interest bearing account maintained by the Reorganized Debtors, subject to reduction for the Claims Oversight Reserve, to be distributed *Pro Rata* to the holders of Allowed Class 4 General Unsecured Claims of Reader's Digest; *provided, however,* that in the event the holders of General Unsecured Claims against Reader's Digest vote to reject the Reorganization Plan as a sub-class, there will be no RDA GUC Distribution.

1.107.    ***RDA Holding*** means RDA Holding Co.

1.108.    ***Reader's Digest*** means The Reader's Digest Association, Inc.

1.109. **Registration Rights Agreement** means that certain Registration Rights Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Reorganization Plan, the Restructuring Support Agreement and the Plan Term Sheet and which shall otherwise be in a form and substance reasonably acceptable to the Required Consenting Secured Noteholders; *provided, however,* that the Registration Rights Agreement will not adversely impact the First Out Exit Term Loan and the Consenting Lender's rights thereunder in any manner.

1.110. **Reinstate, Reinstated or Reinstatement** means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that occurred before or after the Commencement Date, other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Reorganization Plan or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

1.111. **Released Parties** means collectively and in each case in their capacity as such: (a) the Reorganization Plan Debtors; (b) the Creditors Committee, (c) the Administrative Agent, the Unsecured Administrative Agent, the 2011 Secured Administrative Agent and the Collateral Agent; (d) the 2012 Senior Credit Agreement Lenders; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the Consenting Lender; (h) the DIP Agent; (i) the arrangers under each of the DIP Facility and the Exit Financing; (j) the administrative agents, collateral agents, and lenders under the Exit Financing; (k) the Consenting Secured Noteholders; (l) the Unsecured Lenders; (m) the 2011 Secured Lenders; and (n) with respect to each of the foregoing entities in clauses (a) through (m), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; *provided, however,* that any officer, director, principal, shareholder, member, partner, employee, or agent of the Reorganization Plan Debtors that is scheduled by the Reorganization Plan Debtors in the Plan Supplement and designated in such schedule as a non-released party shall not be a Released Party for purposes of the Reorganization Plan.

1.112. **Reorganization Plan** means this second amended joint chapter 11 plan of reorganization, including the exhibits hereto, as the same may be amended or modified from time to time in accordance with Section 12.4 herein.

1.113. **Reorganization Plan Debtors** has the meaning set forth in the preamble to the Reorganization Plan.

1.114. **Reorganization Plan Debtor Affiliates** means the Reorganization Plan Debtors, other than RDA Holding.

1.115.   ***Reorganization Plan Debtors in Possession*** means the Debtors in Possession other than DEMG.

1.116.   ***Reorganized Debtors*** means the Reorganization Plan Debtors, as reorganized on the Effective Date in accordance with the Reorganization Plan.

1.117.   ***Reorganized Debtor Affiliates*** means the Reorganization Plan Debtor Affiliates, as reorganized on the Effective Date in accordance with the Reorganization Plan.

1.118.   ***Reorganized RDA Holding*** means RDA Holding, after giving effect to the consummation of the restructuring transactions under the Reorganization Plan.

1.119.   ***Required Consenting Secured Noteholders*** means the Consenting Secured Noteholders holding at such time at least 51% of the Senior Notes that are subject to the terms of the Restructuring Support Agreement.

1.120.   ***Required Consenting Secured Parties*** means the Consenting Lender and the Required Consenting Secured Noteholders.

1.121.   ***Restructuring*** means the proposed financial restructuring the principal terms of which are set forth in the Plan Term Sheet.

1.122.   ***Restructuring Expenses*** means the reasonable and documented fees and expenses incurred by each of the Administrative Agent, the Collateral Agent, the 2012 Senior Credit Agreement Lenders, the Consenting Lender, the Consenting Secured Noteholders, the DIP Agent, and the DIP Lenders  in connection with the Restructuring, including the fees and expenses of their respective legal and financial advisors (limited to one primary counsel for the Consenting Lender, and one primary counsel for the DIP Agent and the Consenting Secured Noteholders, as well as any conflicts counsel, special counsel and local counsel for each of the Consenting Lender, the DIP Agent, and the Consenting Secured Noteholders, and one financial advisor for the Consenting Secured Noteholders) without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Cases, which, in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction or credit of any kind whatsoever.

1.123.   ***Restructuring Support Agreement*** means that certain Restructuring Support Agreement, dated February 17, 2013, by and among the Reorganization Plan Debtors, DEMG, the Consenting Lender, and the Consenting Secured Noteholders (as may be amended, supplemented or modified from time to time in accordance with the terms thereof) annexed hereto as **Exhibit A**.

1.124.   ***Roll-Up Lender*** means Wells Fargo Principal Lending, LLC, as roll-up lender under the DIP Loan Agreement.

1.125.   ***Roll-Up Loans*** means the roll-up term loans deemed made by the Roll-Up Lender under the DIP Loan Agreement.

1.126.   ***Schedule of Assumed Contracts*** means the schedule of contracts and leases to be assumed by the Reorganized Debtors, with the reasonable consent of the Required Consenting Secured Noteholders, to be filed with the Plan Supplement.

1.127.   ***Schedules*** means the schedules of assets and liabilities and the statement of financial affairs filed by the Reorganization Plan Debtors under section 521 of the Bankruptcy Code,

Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended from time to time.

1.128.  **Second Out Exit Term Loan** means a second out, senior secured exit term loan in the an amount equal to the aggregate amount of the New Money Loans outstanding under the DIP Facility on the Effective Date, in accordance with and subject to the terms and conditions contained in the Second Out Exit Term Sheet and otherwise on terms and conditions satisfactory to the New Money Lenders.

1.129.  **Second Out Exit Term Loan Agreement** means the definitive loan agreement evidencing the second out, senior secured exit term loan,  consistent with the Second Out Exit Term Sheet, including all documents, agreements or instruments executed in connection therewith or related thereto, in each case on terms and conditions satisfactory to the New Money Lenders.

1.130.  **Second Out Exit Term Sheet** means the term sheet for the Second Out Exit Term Loan attached to the DIP Commitment Letter as Annex 3.

1.131.  **Security** means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

1.132.  **Secured Claim** means a Claim to the extent (i) secured by property of the estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Reorganization Plan, (B) as agreed to by the holder of such Claim and the Reorganization Plan Debtors or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.133.  **Security Agreement** means that certain Security Agreement, dated as of February 19, 2010, from RDA Holding, Reader's Digest, and the subsidiary guarantors thereunder, to JP Morgan Chase Bank, N.A., as original administrative agent under the "First Priority Agreement" (together with any successor administrative agent), Wells Fargo Bank, National Association (together with any successor trustee), as trustee under the Indenture, and Wilmington Trust FSB (together with any successor collateral agent), as collateral agent for the secured parties thereunder.

1.134.  **Senior Noteholder Deficiency Claim** means the General Unsecured Claims to be Allowed as Class 4 General Unsecured Claims, derived from, based upon, relating to or arising from the Indenture, in the total aggregate amount of $244,923,799.20 against each Reorganization Plan Debtor.

1.135.  **Senior Noteholder Secured Claim** means a Secured Claim, derived from, based upon, relating to or arising from the Indenture, to be Allowed in the total aggregate amount of $231,000,000 against each Reorganization Plan Debtor.

1.136.  **Senior Noteholders** means the respective beneficial holders of the Senior Notes.

1.137.  **Senior Notes** means the Series A and Series B Floating Rate Senior Secured Notes due 2017 issued under the Indenture.

1.138.  **Stockholders Agreement** means that certain Stockholders Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Reorganization Plan, the Restructuring Support Agreement, and the Plan Term Sheet, and which shall otherwise be in a form and substance reasonably acceptable to the required Consenting Secured

Noteholders; *provided, however,* that the Stockholders Agreement will not adversely impact the First Out Exit Term Loan and the Consenting Lender's rights thereunder in any manner.

1.139.  ***Subordinated Securities Claims*** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of any of the Debtors, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.140.  ***Subsidiary Interests*** means the Interests in the Reorganization Plan Debtors (other than RDA Holding).

1.141.  ***Tax Code*** means the Internal Revenue Code of 1986, as amended from time to time.

1.142.  ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.143.  ***Unsecured Administrative Agent*** means Luxor Capital Group, LP in its capacity as administrative agent under the Unsecured Term Loan.

1.144.  ***Unsecured Lenders*** means Luxor Capital Partners, LP, Point Lobos Master Fund, L.P., Blackwell Partners LLC and each of the other lenders (including affiliates) from time to time party to the Unsecured Term Loan as lenders thereunder.

1.145.  ***Unsecured Term Loan*** means that certain unsecured term loan credit and guarantee agreement, dated as of August 12, 2011, among RDA Holding, Reader's Digest, the other guarantors named thereunder, the lenders party thereto, and Luxor Capital Group, LP, as administrative agent.

1.146.  ***Unsecured Term Loan Claim*** means, pursuant to the 2011 Financing Settlement, the General Unsecured Claims to be Allowed as Class 4 General Unsecured Claims, derived from, based upon, relating to or arising from the Unsecured Term Loan, (i) in the total aggregate amount of $16,939,830.55 against Reader's Digest for distribution purposes only and (ii) in the total aggregate amount of $1.00 against each of the other Reorganization Plan Debtors for voting purposes only (and not for distribution purposes).

1.147.  ***Voting Record Date*** means 5:00 p.m. Eastern Time on May 6, 2013.

B.        **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Reorganization Plan are to the respective section in, or exhibit to, the Reorganization Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Reorganization Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Reorganization Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and

conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    **Reference to Monetary Figures**

All references in the Reorganization Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

D.    **Controlling Document**

In the event of an inconsistency between the Reorganization Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). The provisions of the Reorganization Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, that* if there is determined to be any inconsistency between any Reorganization Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Reorganization Plan and shall control and take precedence.

SECTION 2.    **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

2.1.    ***Administrative Expense Claims.***

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Reorganization Plan Debtors or the Reorganized Debtors agrees to different treatment, the Reorganization Plan Debtors (or the Reorganized Debtors, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*, *that*, all DIP Claims shall constitute Allowed Administrative Expense Claims; *provided, further*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Reorganization Plan Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by the Reorganization Plan Debtors, as debtors in possession, whether or not incurred in the ordinary course of business, shall be paid by the Reorganization Plan Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

2.2.    ***Fee Claims.***

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, (b) shall be paid in full from the Reorganization Plan Debtors' or Reorganized Debtors' Cash on hand in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be

mutually agreed upon between the holder of such an Allowed Fee Claim and the Reorganization Plan Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval, including those of the Creditors Committee for which the Creditors Committee remains in existence after the Effective Date as set forth in Section 12.3 herein.

### 2.3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganization Plan Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (b) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; *provided*, that the Reorganization Plan Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option.

### 2.4.    *DIP Claims.*

On the Effective Date, the DIP Facility shall convert to (i) the First Out Exit Facilities in accordance with the terms and conditions set forth in the First Out Exit Term Sheet and (ii) the Second Out Exit Term Loan Agreement in accordance with the terms and conditions in the Second Out Exit Term Sheet (and otherwise on terms and conditions satisfactory to the New Money Lenders), as applicable, or in each case, paid in full in Cash if the terms and conditions required for conversion under the applicable term sheet are not satisfied; *provided, however*, that the obligations under the First Out Exit Facilities will always be paid in full in Cash by the Reorganization Plan Debtors.  All accrued and unpaid interest, fees (including, without limitation, all fees, charges and disbursements of counsels to the Consenting Lender, the DIP Agent and the New Money Lenders), letter of credit fees and commissions, premiums, expenses and indemnification amounts under the DIP Facility as of the Effective Date shall be paid in full in cash on the Effective Date.  Upon compliance with the preceding sentence, all liens and security interests granted to secure the DIP Facility shall be deemed cancelled and shall be of no further force and effect and each Allowed DIP Claim shall be deemed to be fully satisfied, settled, released, and compromised.

### 2.5.    *2012 Senior Credit Agreement Claims.*

All obligations and claims in respect of the 2012 Senior Credit Agreement shall be treated as follows: (i) all amounts owing under the 2012 Senior Credit Agreement on the Commencement Date plus the aggregate amount of any outstanding and unpaid "Reimbursement Obligations" incurred under (and as defined in) the 2012 Senior Credit Agreement shall have become Roll-Up Loans pursuant to the DIP Order and the DIP Loan Agreement; (ii) all outstanding letters of credit under 2012 Senior Credit Agreement shall have become letters of credit deemed issued under the DIP Loan Agreement; and (iii) all accrued and unpaid interest, fees, letter of credit standby fees and commissions, premium, expenses, indemnification amounts and all other obligations arising under or relating to the 2012 Senior Credit Agreement shall have been paid in full in cash on or prior to the Second Effective Date (as defined in the DIP Loan Agreement).

2.6.   ***Roll-Up Loans.***

On the Effective Date, all Roll-Up Loans, outstanding letters of credit and any related obligations shall be converted into the First Out Exit Facilities in accordance with the First Out Exit Term Sheet so long as (and only so long as) the terms and conditions required for such conversion are satisfied in accordance with the provisions of the First Out Exit Term Sheet and otherwise such obligations shall be paid in full in Cash on the Effective Date; *provided, however,* that the Reorganization Plan Debtors may always elect to repay such obligations in full in Cash at any time prior to or after the Effective Date.

Notwithstanding that the scheduled final maturity of the Roll-Up Loans under the DIP Facility extends beyond the date that is 180 days after the Commencement Date, the commitment of the Consenting Lender under the Restructuring Support Agreement and the First Out Exit Term Sheet to provide the First Out Exit Term Loan shall terminate on the date that is 180 days after the Commencement Date.

2.7.   ***Indenture Trustee Fees.***

On the Effective Date, the Reorganized Debtors shall pay in Cash the unpaid and outstanding Indenture Trustee Fees, without the need for the Indenture Trustee to file fee applications with the Bankruptcy Court; *provided, however*, that the Indenture Trustee shall provide the Reorganization Plan Debtors and the Creditors Committee with the invoices for which it seeks payment at least 10 days prior to the Effective Date.  Notwithstanding anything in the Reorganization Plan to the contrary, each Indenture Trustee Charging Lien shall be released and discharged upon (a) payment in full of any fees and expenses due to any Indenture Trustee under an applicable Indenture and (b) the satisfaction of the Indenture Trustee's duties pursuant to the Plan (including with respect to Plan distributions).

SECTION 3.   **CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1.   ***Summary of Classification.***

The following table designates the Classes of Claims against and Interests in each of the Reorganization Plan Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Reorganization Plan, (b) entitled to vote to accept or reject the Reorganization Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Reorganization Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  The classification of Claims and Interests set forth herein shall apply separately to each of the Reorganization Plan Debtors.  All of the potential Classes for the Reorganization Plan Debtors are set forth herein.  Certain of the Reorganization Plan Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.3.

| Class | Designation | Treatment | Entitled to Vote |
|:---:|---|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Impaired | Yes[2] |
| 3 | Senior Noteholder Secured Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Plan Debtor Intercompany Claims | Impaired | Yes |
| 6 | Existing RDA Holding Interests | Impaired | No (deemed to reject) |
| 7 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 8 | Subordinated Securities Claims | Impaired | No (deemed to reject) |

3.2.    ***Special Provision Governing Unimpaired Claims.***

Except as otherwise provided in the Reorganization Plan, nothing under the Reorganization Plan shall affect the rights of the Reorganization Plan Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.3.    ***Elimination of Vacant Classes.***

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Reorganization Plan for purposes of voting to accept or reject the Reorganization Plan, and disregarded for purposes of determining whether the Reorganization Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

SECTION 4.    **TREATMENT OF CLAIMS AND INTERESTS.**

4.1.    ***Other Priority Claims (Class 1).***

(a)    *Classification*:  Class 1 consists of Other Priority Claims against the Reorganization Plan Debtors.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim against any of the Reorganization Plan Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practical thereafter.

(c)    *Voting*:  Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Reorganization Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Reorganization Plan.

---

[2] The Reorganization Plan Debtors reserve the right to argue at the Confirmation Hearing that Class 2 (Other Secured Claims) is Unimpaired.

US_ACTIVE:\44191040\16\69252.0040

4.2.    ***Other Secured Claims (Class 2).***

(a)    *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim against any of the Reorganization Plan Debtors has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Reorganization Plan Debtors or the Reorganized Debtors, (i) payment in full in Cash in full and final satisfaction of such claim, payable on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or, in each case, as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under Section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(c)    *Voting*:  Class 2 is Impaired, and holders of Other Secured Claims in Class 2 are entitled to vote to accept or reject the Reorganization Plan; *provided, however,* that the Reorganization Plan Debtors reserve the right to argue at the Confirmation Hearing that Class 2 (Other Secured Claims) is Unimpaired.

4.3.    ***Senior Noteholder Secured Claims (Class 3).***

(a)    *Classification*:  Class 3 consists of Senior Noteholder Secured Claims against the Reorganization Plan Debtors.

(b)    *Allowance*:  The Senior Noteholder Secured Claims are Allowed in the amount of $231,000,000 pursuant to section 506(a) of the Bankruptcy Code.

(c)    *Treatment*:  On the Effective Date, each holder of an Allowed Class 3 Senior Noteholder Secured Claim shall be entitled to receive, in full and final satisfaction of such Allowed Senior Noteholder Secured Claim, its *Pro Rata* share of 100% of the New Common Stock on a Fully Diluted Basis; *provided*, *however*, that no holder of an Allowed Senior Noteholder Secured Claim shall receive distributions that aggregate to more than the amount of such holder's Allowed Senior Noteholder Secured Claim; *provided, further, that* no dividends, recoveries, securities, distributions, or other form of payments shall be made on account of or in connection with the New Common Stock distributed to the holders of Allowed Senior Noteholder Secured Claims until all amounts owing in connection with the First Out Exit Term Loan have been paid in full in Cash and all commitments thereunder have been terminated.

(d)    *Voting*:  Class 3 is Impaired, and holders of Senior Noteholder Secured Claims in Class 3 are entitled to vote to accept or reject the Reorganization Plan.

4.4.    ***General Unsecured Claims (Class 4).***

(a)    *Classification*:  Class 4 consists of General Unsecured Claims against the Reorganization Plan Debtors.  For purposes of voting and distributions under the Reorganization Plan, Class 4 General Unsecured Claims against each of the Reorganization Plan Debtors shall be deemed to be in separate sub-classes.

(b)    *Treatment*:  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim, including any holder of FTC Claims, the Unsecured Term Loan Claim, any Non-Debtor Intercompany Claims, any DEMG Intercompany Claims or any Senior Noteholder Deficiency Claims, shall receive the following treatment:

(i)    for any sub-class of General Unsecured Claims that votes to accept the Reorganization Plan of any individual Reorganization Plan Debtor, each holder of an Allowed General Unsecured Claim in such accepting sub-class shall receive its *Pro Rata* share of the GUC Distribution and any Senior Noteholder Deficiency Claims in such accepting sub-class shall be deemed waived for the purposes of entitling holders of such Senior Noteholder Deficiency Claims to share in any recovery from the GUC Distribution;

(ii)    in addition to any *Pro Rata* share of the GUC Distribution, provided the sub-class of General Unsecured Claims of Reader's Digest votes to accept the Reorganization Plan, each holder of an Allowed General Unsecured Claim of Reader's Digest shall receive its *Pro Rata* share of the RDA GUC Distribution and any Senior Noteholder Deficiency Claims in such accepting sub-class shall be deemed waived for the purposes of entitling holders of such Senior Noteholder Deficiency Claims to share in any recovery from the RDA GUC Distribution; and

(iii)    in the event any sub-class of General Unsecured Claims votes to reject the Reorganization Plan with respect to any individual Reorganization Plan Debtor, the holders of Allowed General Unsecured Claims in such a rejecting sub-class shall not receive or retain any property under the Reorganization Plan on account of such Claims, including, for the avoidance of doubt, any *Pro Rata* share of the GUC Distribution or the RDA GUC Distribution.  For the further avoidance of doubt, to the extent any sub-class of General Unsecured Claims votes to reject the Reorganization Plan and, therefore, is not entitled to receive any portion of the GUC Distribution, such *Pro Rata* portion attributable to the rejecting sub-class shall be reallocated to the holders of General Unsecured Claims in other sub-classes that have voted to accept the Reorganization Plan.

Notwithstanding anything to the contrary herein, each Allowed Non-Debtor Intercompany Claim shall be Reinstated or alternatively, at the Reorganization Plan Debtors' reasonable discretion, on or prior to the Effective Date, and in consultation with the Creditors Committee or the Claims Oversight Committee as set forth in Section 7.9 herein, as applicable, each holder of an Allowed Non-Debtor Intercompany Claim shall receive either its *Pro Rata* share of the GUC Distribution and the RDA GUC Distribution, if any, or such other treatment as determined by the Reorganization Plan Debtors, which other treatment shall not include a distribution from the GUC Distribution or RDA GUC Distribution.  For the avoidance of doubt, in the event the Reorganization Plan Debtors Reinstate any Allowed Non-Debtor Intercompany Claims, such Allowed Non-Debtor Intercompany Claims will not receive any Cash distribution under the Reorganization Plan, including with respect to any *Pro Rata* shares of the GUC Distribution and RDA GUC Distribution, if applicable.  No holder of an Allowed General Unsecured Claim shall receive distributions that aggregate to more than the amount of such holder's Allowed General Unsecured Claim.  Nothing herein shall prejudice the ability of any party in interest to argue, for purposes of confirming the Reorganization Plan under section 1129 of the Bankruptcy Code, that General Unsecured Claims are not entitled to any value being provided in the

Reorganization Plan prior to Confirmation, including the GUC Distribution or the RDA GUC Distribution.

(c)        *Voting*: Class 4 is Impaired, and holders of General Unsecured Claims in Class 4 are entitled to vote to accept or reject the Reorganization Plan.  For the avoidance of doubt, the holders of Senior Noteholder Deficiency Claims are entitled to vote to accept or reject the Reorganization Plan as holders of General Unsecured Claims in Class 4.

4.5.        ***Plan Debtor Intercompany Claims (Class 5).***

(a)        *Classification*:  Class 5 consists of Plan Debtor Intercompany Claims against the Reorganization Plan Debtors.

(b)        *Treatment*:  On the Effective Date, RDA Holding shall, at its discretion, Reinstate or compromise, as the case may be, all Plan Debtor Intercompany Claims between and among RDA Holding and its Reorganization Plan Debtors Affiliates consistent with the Acceptable Business Plan and the International Restructuring Transactions (as such term is used in the Plan Term Sheet) contemplated thereby.

(c)        *Voting*:  Class 5 is Impaired, and holders of Plan Debtor Intercompany Claims in Class 5 are entitled to vote to accept or reject the Reorganization Plan.

4.6.        ***Existing RDA Holding Interests (Class 6).***

(a)        *Classification*:  Class 6 consists of Existing RDA Holding Interests.

(b)        *Treatment*:  On the Effective Date, all Existing RDA Holding Interests shall be deemed canceled, and the holders of Existing RDA Holding Interests shall not receive or retain any property under the Reorganization Plan on account of such Interests.

(c)        *Voting*:  Class 6 is Impaired by the Reorganization Plan, and the holders of the Allowed Existing RDA Holding Interests are conclusively deemed to have rejected the Reorganization Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of Existing RDA Holding Interests are not entitled to vote to accept or reject the Reorganization Plan.

4.7.        ***Intercompany Interests (Class 7).***

(a)        *Classification*:  Class 7 consists of Intercompany Interests except for Existing RDA Holding Interests.

(b)        *Treatment*:  The Intercompany Interests will be Unimpaired under the Reorganization Plan.

(c)        *Voting*:  Class 7 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Reorganization Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Reorganization Plan.

4.8.    *Subordinated Securities Claims (Class 8).*

(a)    *Classification*: Class 8 consists of Subordinated Securities Claims.

(b)    *Treatment*:  The holders of Subordinated Securities Claims shall not receive or retain any property under the Reorganization Plan on account of such Claims.

(c)    *Voting*:  Class 8 is Impaired by the Reorganization Plan, and the holders of the Subordinated Securities Claims are conclusively deemed to have rejected the Reorganization Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Reorganization Plan.

SECTION 5.    **MEANS FOR IMPLEMENTATION.**

5.1.    *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Reorganization Plan, the provisions of the Reorganization Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, including without limitation, approval of the Restructuring Support Agreement and the 2011 Financing Settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Reorganization Plan Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Reorganization Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, the Reorganization Plan Debtors and after the Effective Date, the Reorganized Debtors, may compromise and settle Claims against the Reorganization Plan Debtors or the Reorganized Debtors, as applicable, and Causes of Action against other Entities.

5.2.    *First Out Exit Facilities and Second Out Exit Term Loan.*

On the Effective Date, subject to Section 2.4 of the Reorganization Plan and the terms and conditions of the First Out Exit Term Sheet and the Second Out Exit Term Sheet, the Reorganization Plan Debtors will enter into (i) the First Out Exit Facilities to refinance the Roll-Up Loans and replace any letters of credit under the DIP Facility and (ii) the Second Out Exit Term Loan to refinance the New Money Loans outstanding under the DIP Facility; *provided, however,* that Reorganized RDA Holding shall have not more than $106,000,000 in funded debt under its secured credit facilities immediately following the Effective Date.

On the Effective Date, documentation evidencing the First Out Exit Facilities and the Second Out Exit Term Loan shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the First Out Exit Facilities and the Second Out Exit Term Loan Agreement without the need for any further corporate action and without further action by the holders of Claims or Interests.  The definitive documentation relating to the First Out Exit Facilities and Second Out Exit Term Loan will be filed as part of the Plan Supplement.

All Liens and security interests granted pursuant to the First Out Exit Facilities or the Second Out Exit Term Loan Agreement, as applicable to (A) in the case of the First Out Exit Facilities, the Consenting Lender, the Roll-Up Lender and the Issuing Lender, and (B) in the case of the Second Out Exit Term Loan Agreement, the New Money Lenders, are intended to be, and shall be (i) valid, binding, perfected, enforceable, Liens, and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.

### 5.3. *Authorization and Issuance of Plan Securities.*

(a)   The Reorganization Plan Debtors or Reorganized RDA Holding and the other Reorganized Debtors, as applicable, are authorized to issue all plan-related securities and documents, including, without limitation, the New Common Stock and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership, or limited liability company action.

(b)   On or prior to the Effective Date, Reorganized RDA Holding shall contribute the New Common Stock as a capital contribution to Reader's Digest in an amount equal to the shares of New Common Stock to be distributed in respect of Allowed Senior Noteholder Secured Claims pursuant to Section 4.3 herein, which shares shall then be distributed pursuant to such section and the provisions herein.

### 5.4. *Cancellation of Existing Securities and Agreements.*

Except as expressly provided herein and in connection with the First Out Exit Facilities and the Second Out Exit Term Loan, on the Effective Date, all notes, instruments, certificates evidencing debt to or interests in, the Reorganization Plan Debtors, including, without limitation, the DIP Loan Agreement (only upon and following the effectiveness of the First Out Exit Facilities and the Second Out Exit Loan Agreement or payment in full in cash), the 2012 Senior Credit Agreement, the Security Agreement, the Indenture, and the Unsecured Term Loan shall be cancelled and obligations of the Reorganization Plan Debtors thereunder shall be discharged; *provided, however*, that any and all indemnification obligations under the 2012 Senior Credit Agreement (including the indemnities provided in section 4.05 thereunder) shall survive as obligations under the DIP Loan Agreement; *provided, further,* that any and all indemnification obligations (and any other obligations surviving per their express terms) under the DIP Facility shall survive as obligations under the First Out Exit Term Loan or Second Out Exit Term Loan, as applicable, notwithstanding in each case the cancellation of the predecessor credit agreement(s); *provided, further,* that nothing herein shall be deemed to constitute a cancellation of any rights arising from or in connection with section 5.5 of the Security Agreement.

Notwithstanding Confirmation or the occurrence of the Effective Date, the Indenture shall continue in effect solely for purposes of:  (a) enabling holders of Allowed Senior Noteholder Secured Claims to receive distributions under the Reorganization Plan; and (b) allowing the Indenture Trustee to make distributions under the Reorganization Plan; *provided further, however*, that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Reorganization Plan or result in any liability or expense to the Reorganized Debtors.

### 5.5. *Reorganized RDA Holding.*

(a)   *Board of Directors.*  Upon and following the Effective Date, the New Board shall be a 7-member board comprised of the Chief Executive Officer and 6 directors designated

by the Required Consenting Secured Noteholders in consultation with the Chief Executive Officer. The members of the New Board will be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code. On the Effective Date, the terms of the current members of the boards of directors and the boards of managers of the Reorganization Plan Debtors shall expire.

(b)    *Directors and Officers of the Reorganized Debtor Affiliates*. Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on or after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents. The members of the board of directors and the board of managing members for each of the Reorganized Plan Debtor Affiliates shall be determined as set forth in the Amended Organizational Documents.

5.6.    *International Restructuring Transactions*.

On or after the Effective Date, the Reorganized Debtors with the concurrence of the New Board shall implement the International Restructuring Transactions and the Reorganized Debtors are authorized to take all actions as may be necessary or appropriate in connection therewith.

5.7.    *Other Transactions*.

On or after the Effective Date, the Reorganization Plan Debtors may (a) cause any or all of the Debtor Affiliates to be liquidated or merged into one or more of the other Debtor Affiliates or any other subsidiaries of the Reorganization Plan Debtors or dissolved all as more specifically described in the Plan Supplement, (b) cause the transfer of assets between or among the Debtor Affiliates, (c) cause any or all of the Amended Organizational Documents of any Reorganized Debtor Affiliates to be implemented, effected, or executed, (d) use the proceeds of the First Out Exit Term Loan and Second Out Exit Term Loan, plus Cash on hand, to pay all Restructuring Expenses, (e) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (f) engage in any other transaction in furtherance of the Reorganization Plan. Subject to the prior written consent of the Required Consenting Secured Parties, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Reorganization Plan Debtors or the Reorganization Plan Debtors in Possession.

5.8.    *Cancellation of Liens*.

Except as otherwise specifically provided herein with respect to Class 2, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Reorganization Plan Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

5.9.    *Management Incentive Program*.

The Management Incentive Program shall be implemented by the New Board and communicated to the participants thereunder promptly following the Effective Date.

US_ACTIVE:\44191040\16\69252.0040

5.10.    *Employee Matters.*

On or after the Effective Date, the Reorganized Debtors shall implement the following employee incentive programs with the concurrence of the New Board: (i) the Pension Credit and (ii) the Employee Bonus Pool.

5.11.    *Withholding and Reporting Requirements.*

(a)    *Withholding Rights.*    In connection with the Reorganization Plan, any party issuing any instrument or making any distribution described in the Reorganization Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Reorganization Plan and all related agreements shall be subject to any such withholding or reporting requirements.    In the case that a distribution of New Common Stock is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.    Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Reorganization Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Reorganization Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.    Any party issuing any instrument or making any distribution pursuant to the Reorganization Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms.*    Any party entitled to receive any property as an issuance or distribution under the Reorganization Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Disbursing Agent.    If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

5.12.    *Exemption From Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Reorganization Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Reorganization Plan or the reinvesting, transfer or sale of any real or personal property of the Reorganization Plan Debtors pursuant to, in implementation of or as contemplated in this Reorganization Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the First Out Exit Term Loan Agreement or the Second Out Exit Term Loan Agreement and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Reorganization Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax,

conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 5.13.    *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Reorganization Plan and the securities issued pursuant to the Reorganization Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Reorganization Plan.

### 5.14.    *Closing of the Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors shall promptly seek authority from the Bankruptcy Court to close each applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

## SECTION 6.    DISTRIBUTIONS.

### 6.1.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Reorganization Plan Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests. The Reorganization Plan Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

### 6.2.    *Date of Distributions.*

Except as otherwise provided herein, the Disbursing Agent shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Disbursing Agent shall from time to time determine, in consultation with the Claims Oversight Committee, the subsequent Distribution Dates, which shall occur no less frequently than semi-annually. In the event that any payment or act under the Reorganization Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Disbursing Agent shall maintain, in consultation with the Claims Oversight Committee, a reserve of Cash from the GUC Distribution and the RDA GUC Distribution (less the Claims Oversight Committee Reserve) sufficient to pay holders of Disputed General Unsecured Claims the amount such holders would be entitled to receive under the Reorganization Plan if such Claims were to become Allowed General Unsecured Claims. In the event the holders of Allowed General Unsecured

Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Reorganized Debtors shall make a final distribution of all remaining Cash out of the GUC Distribution and the RDA GUC Distribution in accordance with Section 4.4 of this Reorganization Plan to all holders of Allowed General Unsecured Claims.

6.3.    ***Disbursing Agent.***

All distributions hereunder shall be made by Reorganized RDA Holding (or such other entity designated by Reorganized RDA Holding), as Disbursing Agent, on or after the Effective Date or as otherwise provided herein; *provided, however*, that the Senior Notes Indenture Trustee shall be the Disbursing Agent for the Senior Noteholder Secured Claims on behalf of Reader's Digest and the Administrative Agent shall be the Disbursing Agent for the 2012 Senior Credit Agreement Claims. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents shall be reimbursed by the Reorganized Debtors.

Except as otherwise herein provided, Reorganized RDA Holding shall serve as Disbursing Agent and authorized representative for, and with respect to, each of the Reorganization Plan Debtors.

6.4.    ***Powers of Disbursing Agent.***

A Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Reorganization Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.5.    ***Cancellation of Senior Notes.***

Each record Holder of a Senior Note Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled except to the extent otherwise provided herein. The Indenture Trustee may (but shall not be required to) request that registered Holders of the Senior Notes surrender their notes for cancellation. Such surrendered Senior Note shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Reorganization Plan Debtor third parties vis-à-vis one another with respect to such Senior Note

6.6.    ***Delivery of Distributions.***

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims. In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter. Undeliverable distributions or unclaimed distributions shall remain in the possession of the Reorganization Plan Debtors until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Reorganization Plan Debtors or Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of

distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.  Distributions of holders of General Unsecured Claims that are deemed unclaimed property pursuant to the preceding sentence shall be redistributed to holders of Allowed General Unsecured Claims in accordance with Section 4.4 herein.

6.7.    *Manner of Payment Under Plan.*

At the option of the Reorganization Plan Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

6.8.    *Fractional Stock.*

If any distributions of New Common Stock pursuant to the Reorganization Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up).  The total number of shares of New Common Stock to be distributed in connection with the Reorganization Plan shall be adjusted as necessary to account for the rounding provided for in this paragraph.

6.9.    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any Initial Distribution or semi-annual distribution of Cash less than $50 to any holder of an Allowed General Unsecured Claim; *provided, however,* that if any distribution is not made pursuant to this Section 6.9, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $25 to any holder of an Allowed Claim.  If either (a) all Allowed General Unsecured Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed General Unsecured Claims would be $25 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Disbursing Agent.

6.10.    *Setoffs.*

The Reorganization Plan Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the Reorganization Plan Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided, that* neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganization Plan Debtors or the Reorganized Debtors of any such claim the Reorganization Plan Debtors or the Reorganized Debtors may have against the holder of such Claim.

6.11.    *Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

US_ACTIVE:\44191040\16\69252.0040

6.12.    ***Allocation of Distributions Between Principal and Interest.***

Except as otherwise provided in this Reorganization Plan, to the extent that any Allowed Claim entitled to a distribution under the Reorganization Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

SECTION 7.    **PROCEDURES FOR DISPUTED CLAIMS.**

7.1.    ***Allowance of Claims.***

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Reorganization Plan Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under this Reorganization Plan.  Except as expressly provided in this Reorganization Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Reorganization Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

7.2.    ***Objections to Claims.***

As of the Effective Date, objections to, and requests for estimation of, Claims against the Reorganization Plan Debtors may be interposed and prosecuted only by the Reorganized Debtors subject to the conditions and rights of the Claims Oversight Committee set forth in Section 7.9 herein.  Such objections and requests for estimation shall be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Reorganized Debtors.

7.3.    ***Estimation of Claims.***

The Reorganization Plan Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Reorganization Plan Debtors or Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganization Plan Debtors or Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.4.    ***No Distributions Pending Allowance.***

If an objection to a Claim is filed as set forth in Section 7.2, no payment or distribution provided under the Reorganization Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.5.    ***Distributions After Allowance.***

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Reorganization Plan.  On the next Distribution Date after the date that any Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise), the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Reorganization Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

7.6.    ***Resolution of Claims.***

Subject to the conditions and rights of the Claims Oversight Committee set forth in Section 7.9 of the Reorganization Plan, on and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.7.    ***Disallowed Claims.***

All claims held by persons or entities against whom or which any of the Reorganization Plan Debtors or Reorganized Debtors has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Reorganization Plan.  Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Reorganization Plan Debtors or the Reorganized Debtors from such party have been paid.

7.8.    ***Debtor Affiliate Claims.***

Notwithstanding anything to the contrary herein, all Debtor Affiliates shall file proofs of claim in connection with the Chapter 11 Cases in accordance with the Reorganization Plan and any order of the Court establishing a deadline for, or other procedure regarding, the filing of claims in the Chapter 11 Cases.

7.9.    ***Claims Oversight Procedures***

Notwithstanding anything herein to the contrary, the Reorganized Debtors shall consult in good faith with the Claims Oversight Committee prior to settling, compromising or allowing (a) any Claim against any of the Reorganization Plan Debtors in a liquidated amount in excess of $500,000 (including any Claim originally scheduled or filed in an unliquidated amount), (b) any Claim filed in the Chapter 11 Cases against any of the Reorganization Plan Debtors that has a positive variance, if scheduled, of more than $50,000 to the corresponding Claim as identified on the Reorganization Plan Debtors' Schedules, or (c) any Non-Debtor Intercompany Claims to the extent such Non-Debtor

Intercompany Claims are to be treated as Class 4 General Unsecured Claims for distribution purposes (collectively, "**Oversight Claims**").

The Reorganized Debtors shall notify the Claims Oversight Committee prior to entering into any settlement or compromise of any Oversight Claims.  The Claims Oversight Committee shall have a period of three (3) Business Days after receipt of such notice to review the proposed settlement or compromise and notify the Reorganized Debtors of objections, if any, to the proposed settlement or compromise of such Oversight Claims.  Thereafter, the Claims Oversight Committee shall have ten (10) Business Days after providing notice to the Reorganized Debtors of any objections to file a motion with the Bankruptcy Court objecting to the proposed settlement or compromise of the Oversight Claims.  In the event the Claims Oversight Committee fails to timely file an objection with the Bankruptcy Court within the proscribed ten (10) Business Day period, the Reorganized Debtors shall be authorized to enter into the settlement or compromise without further order of the Bankruptcy Court.

## SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1.    *General Treatment*.

All executory contracts and unexpired leases to which any of the Reorganization Plan Debtors are parties are hereby rejected, except for an executory contract or unexpired lease that (a) previously has been assumed or rejected pursuant to Final Order of the Bankruptcy Court, (b) is specifically designated by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) as a contract or lease to be assumed on the Schedule of Assumed Contracts to be filed with the Plan Supplement, (c) is otherwise expressly assumed pursuant to the Reorganization Plan, including without limitation, pursuant to Sections 8.4, 8.5, 8.6 and 8.7 of the Reorganization Plan, or (d) is the subject of a separate (i) assumption motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) or (ii) rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) under section 365 of the Bankruptcy Code before the Confirmation Date.

### 8.2.    *Payments Related to Assumption of Contracts and Leases*.

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Reorganization Plan Debtors upon assumption thereof.  Any objection by a counterparty to a proposed assumption of an executory contract or unexpired lease or amount of any Cure must be filed, served, and actually received by the Reorganization Plan Debtors on or before thirty (30) days after the Effective Date of the Reorganization Plan applicable to the Reorganization Plan Debtor that is the counterparty to the executory contract or unexpired lease.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption and assignment of such executory contract or unexpired lease or such Cure amount will be deemed to have assented to such matters and shall be forever barred, stopped and enjoined from asserting such objection against the Reorganization Plan Debtors.  If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of the Reorganization Plan Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; *provided, that* before the Effective Date, the Reorganization Plan Debtors or the Reorganized Debtors, as applicable (with the reasonable consent of the Required Consenting Secured Parties), may settle any dispute regarding the nature or amount of Cure without any further notice to any party or any action, order or approval of the Bankruptcy Court.  If there is a dispute as referred to above, the Reorganization Plan

Debtors reserve the right to reject, or nullify the assumption or assignment of any executory contract or unexpired lease no later than 30 days after a Final Order determining the Cure, any request for adequate assurance of future performance required to assume and assign such executory contract or unexpired lease, and any other matter pertaining to assumption and/or assignment.

Assumption and assignment of any executory contract or unexpired lease pursuant to the Reorganization Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment. Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

8.3.    ***Rejection Claims.***

Unless a contract or lease is (a) specifically assumed or rejected by order of the Bankruptcy Court, (b) listed in the Plan Supplement as an executory contract or lease to be assumed as set forth in Section 8.1, (c) otherwise expressly assumed pursuant to the terms of the Reorganization Plan, or (d) the subject of a separate assumption or rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties), the Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts, in accordance with Section 8.1 of the Reorganization Plan, effective as of the Effective Date. In the event that the rejection of an executory contract or unexpired lease by any of the Reorganization Plan Debtors pursuant to the Reorganization Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Reorganization Plan Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Reorganization Plan Debtors and the Reorganized Debtors no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as Class 4 General Unsecured Claims.

8.4.    ***Survival of the Reorganization Plan Debtors' Indemnification Obligations.***

Any obligations of the Reorganization Plan Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, other organizational documents, employment agreements or other agreements to indemnify current and former officers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Reorganization Plan Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Reorganization Plan Debtors shall not be discharged or impaired by confirmation of the Reorganization Plan provided that the Reorganized Debtors shall not indemnify directors of the Reorganization Plan Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud.

All such obligations shall be deemed and treated as executory contracts to be assumed by the Reorganization Plan Debtors under the Reorganization Plan and shall continue as obligations of the Reorganized Debtors unless any such obligation otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) in accordance with Section 8.1 herein.

US_ACTIVE:\44191040\16\69252.0040

33

For the avoidance of doubt, (i) any and all indemnities provided under the 2012 Senior Credit Agreement (including the indemnities provided in section 4.05 thereunder) shall survive as obligations under the DIP Loan Agreement, and (ii) any and all indemnities (and other obligations surviving per their express terms thereunder ) provided under the DIP Facility shall survive as obligations under the First Out Exit Term Loan or Second Out Exit Term Loan Agreement, as applicable, notwithstanding in each case the cancellation of the predecessor credit agreement(s).

8.5. *Compensation and Benefit Plans*.

Except as otherwise herein provided, all material employee compensation and Benefit Plans of the Reorganization Plan Debtors in effect as of the Effective Date shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Reorganization Plan.

Pursuant to the Reorganization Plan, Reorganized Reader's Digest shall assume the Pension Plan on the Effective Date.  The Pension Plan shall be continued in accordance with, and subject to, its terms, and Reorganized Reader's Digest shall satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, be liable for the payment of PBGC premiums in accordance with Title IV of ERISA, subject to any and all applicable rights and defenses of the Reorganized Debtors, and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code.  Notwithstanding any provision of the Reorganization Plan or the Confirmation Order to the contrary, the Pension Plan shall be continued and administered in accordance with, and subject to, its terms and ERISA and the Internal Revenue Code.  All claims related to the Pension Plan and all proofs of claim filed on account thereof shall be deemed withdrawn as of the Effective Date without any further action.

8.6. *Insurance Policies.*

All insurance policies pursuant to which the Reorganization Plan Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Reorganization Plan and shall be assumed by the respective Reorganization Plan Debtors and Reorganized Debtors and shall continue in full force and effect.  All other insurance policies shall revest in the Reorganized Debtors.

8.7. *Intellectual Property Licenses and Agreements.*

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Reorganization Plan Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Reorganization Plan and shall be assumed by the respective Reorganization Plan Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) in accordance with Section 8.1 herein.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall revest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such revesting as contemplated herein.

8.8. *Reservation of Rights.*

Neither the exclusion nor inclusion of any contract or lease by the Reorganization Plan Debtors on any exhibit, schedule or other annex to the Reorganization Plan or in the Plan Supplement, nor

anything contained in the Reorganization Plan, will constitute an admission by the Reorganization Plan Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Reorganization Plan Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Nothing in the Reorganization Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Reorganization Plan Debtors and the Reorganized Debtors under any executory or non executory contract or any unexpired or expired lease.

Nothing in the Reorganization Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Reorganization Plan Debtors or the Reorganized Debtors under any executory or non executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganization Plan Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

SECTION 9.    **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**

9.1.    ***Conditions Precedent to Confirmation.***

The occurrence of Confirmation is subject to the following conditions precedent:

(a)    the entry of the Disclosure Statement Order;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance satisfactory to the Required Consenting Secured Parties;

(c)    the Bankruptcy Court shall have entered the Confirmation Order;

(d)    the occurrence of the Confirmation Date;

(e)    an order shall have been entered (which may be the Confirmation Order) finding that all Claims against the Reorganization Plan Debtors have been forever discharged, including without limitation, any FTC Claims;

(f)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect and no defaults or event of default thereunder shall have occurred and remain continuing (to the extent not otherwise cured or waived in accordance with the terms of the Restructuring Support Agreement); and

(g)    the DIP Loan Agreement shall not have been terminated, shall be in full force and effect and no default or event of default thereunder shall have occurred and remain occurring (to the extent not otherwise cured or waived in accordance with the terms of the DIP Loan Agreement);.

9.2.    ***Conditions Precedent to the Effective Date.***

The occurrence of the Effective Date of the Reorganization Plan is subject to the following conditions precedent:

(a)    the Definitive Documents shall contain terms and conditions consistent in all material respects with this Reorganization Plan and the Restructuring Support Agreement and shall otherwise be reasonably satisfactory in all respects to the Reorganization Plan Debtors and the Required Consenting Secured Parties;

(b)    all actions, documents and agreements necessary to implement and consummate the Reorganization Plan, including, without limitation, entry into the documents contained in the Plan Supplement, including the Definitive Documents with respect to the First Out Exit Term Loan Agreement, the First Out Letter of Credit Facility, the Second Out Exit Term Loan Agreement, and the Amended Organizational Documents, each in form and substance reasonably satisfactory to the Reorganization Plan Debtors and the Required Consenting Secured Parties, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(c)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall have become a Final Order;

(d)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(e)    no material adverse change shall have occurred regarding the feasibility of the Reorganization Plan or the consummation of the Restructuring including with respect to contingent and unliquidated claims;

(f)    all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Reorganization Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(g)    unless on or prior to the Effective Date, (i) the Roll-Up Loans, the New Money Loans and the obligations under the DIP Facility shall have been paid in full in Cash and the letters of credit under the DIP Loan Agreement shall have been terminated, or (ii) the conditions precedent to the effectiveness of the First Out Exit Facilities, as set forth in the First Out Exit Term Sheet, shall have been satisfied or waived by the Consenting Lender and the conditions precedent to the effectiveness of the Second Out Term Loan Agreement shall have been satisfied or waived by the New Money Lenders;

(h)    All the conditions precedent to the effectiveness of the Second Out Exit Loan Agreement shall have been satisfied or waived by the requisite New Money Lenders;

(i)    the Non-Dischargeability Deadline shall have expired and (i) no non-dischargeability complaint shall have been filed or remain pending, and (ii) no Claim in excess of $50,000 shall have been determined by the Bankruptcy Court to be non-dischargeable under the Bankruptcy Code; and

(j)    the DIP Loan Agreement shall not have been terminated, shall be in full force and effect and no default or event of default thereunder shall have occurred.

9.3.     ***Waiver of Conditions Precedent.***

Each of the conditions precedent in Sections 9.1 and 9.2 may be waived in writing by the Reorganization Plan Debtors together with the prior written consent of the Required Consenting Secured Parties.

9.4.     ***Effect of Failure of Conditions to Effective Date.***

Unless otherwise extended by the Reorganization Plan Debtors with the consent of the Required Consenting Secured Parties, if the Effective Date does not occur on or before July 31, 2013 or if the Confirmation Order is vacated, (i) no distributions under the Reorganization Plan shall be made, (ii) the Reorganization Plan Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Reorganization Plan Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Reorganization Plan Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Reorganization Plan Reorganization Plan Debtors or otherwise.

SECTION 10.    **EFFECT OF CONFIRMATION.**

10.1.     ***Subordinated Claims.***

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Reorganization Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto (including all rights under the Security Agreement), whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganization Plan Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

10.2.     ***Vesting of Assets.***

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Reorganization Plan Debtors' estates, including without limitation, the intellectual property licenses and other agreements set forth above in Section 8.7, shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to this Reorganization Plan, the Confirmation Order, the First Out Exit Term Loan Agreement, or the Second Out Exit Term Loan Agreement.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.

10.3.     ***Discharge of Claims and Termination of Interests.***

Except as otherwise provided in the Reorganization Plan, effective as of the Effective Date: (a) the rights afforded in the Reorganization Plan and the treatment of all claims and interests shall be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever (including any FTC Claims), including any interest accrued on such claims from and after the Commencement Date, against the Reorganization Plan Debtors or any of their assets, property or

estates; (b) the Reorganization Plan shall bind all holders of claims and interests, notwithstanding whether any such holders failed to vote to accept or reject the Reorganization Plan or voted to reject the Reorganization Plan; (c) all claims and interests shall be satisfied, discharged, and released in full, including without limitation, any FTC Claims, and the Reorganization Plan Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities shall be precluded from asserting against the Reorganization Plan Debtors, the Reorganization Plan Debtors' estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other claims or interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

### 10.4.    *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5.    *Injunction Against Interference with Plan.*

From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to the Reorganization Plan or the Confirmation Order.

### 10.6.    *Releases by the Reorganization Plan Debtors.*

**As of the Effective Date, except for the right to enforce the Reorganization Plan and the Definitive Documents that remain in effect after the Effective Date, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Reorganization Plan Debtors and the implementation of the restructuring contemplated by the Reorganization Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Reorganization Plan Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Reorganization Plan Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Reorganization Plan Debtors, the Reorganized Debtors, the Estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Reorganization Plan Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Reorganization Plan Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Reorganization Plan, the business or contractual arrangements between any Reorganization Plan Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Reorganization Plan, or related agreements, instruments or other documents, the solicitation of votes with respect to the Reorganization Plan, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud; *provided,***

*however*, that nothing in the Reorganization Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

10.7.    *Releases By Holders of Claims and Interests.*

As of the Effective Date, except for the right to enforce the Reorganization Plan and the Definitive Documents that remain in effect after the Effective Date and the indemnification obligations that survive the Effective Date, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganization Plan Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Reorganization Plan Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Reorganization Plan Debtors, the Reorganization Plan Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Reorganization Plan Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Reorganization Plan, the business or contractual arrangements between any Reorganization Plan Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Reorganization Plan, or related agreements, instruments or other documents, the solicitation of votes with respect to the Reorganization Plan, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud; *provided, however*, that nothing herein shall be deemed to constitute a release or waiver by the Consenting Lender, the Administrative Agent or the Consenting Secured Noteholders of any rights arising from or in connection with section 5.5 of the Security Agreement; *provided further, however*, that nothing in the Reorganization Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).  No Person shall be discharged, released or relieved from any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases or the Reorganization Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases, the Reorganization Plan's provisions or the Reorganization Plan's Confirmation.

10.8.    *Exculpation.*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, the negotiation and pursuit of the Reorganization Plan, or the solicitation of votes for, or confirmation of, the Reorganization Plan, the funding of the Reorganization Plan, the consummation of the Reorganization Plan, or the administration of the Reorganization Plan or the property to be distributed under the Reorganization Plan, or any other transaction contemplated by the foregoing,  except for willful misconduct or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Reorganization Plan.  The Reorganization Plan Debtors, the Reorganized Debtors, the Creditors Committee, the DIP Lenders, the DIP Agent, the Administrative Agent, the Senior Credit Agreement Lenders, the Consenting Lender, the Consenting Secured

Noteholders, the Indenture Trustee, the Unsecured Administrative Agent, the 2011 Secured Administrative Agent, the Unsecured Lenders, and the 2011 Secured Lenders (and each of their respective affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Reorganization Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Reorganization Plan or such distributions made pursuant to the Reorganization Plan, including the issuance of securities thereunder; *provided, however*, that nothing herein shall be deemed to constitute a release or waiver by the Consenting Lender, the Administrative Agent or the Consenting Secured Noteholders of any rights arising from or in connection with section 5.5 of the Security Agreement; *provided, however*, that nothing in the Reorganization Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).  No Person shall be discharged, released or relieved from any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases or the Reorganization Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases, the Reorganization Plan's provisions or the Reorganization Plan's Confirmation.

10.9.    *Retention of Causes of Action/Reservation of Rights.*

(a)    Except as otherwise provided herein, including Sections 10.6, 10.7, 10.8 and 10.9, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Reorganization Plan Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim and/or Claim for setoff which seeks affirmative relief against the Reorganization Plan Debtors, the Reorganized Debtors, their officers, directors or representatives; and (ii) the turnover of any property of the Reorganization Plan Debtors' estates; *provided, however* that the Reorganized Debtors shall not retain (1) any Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, which Claims or Causes of Action are hereby preserved); or (2) any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures).  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(b)    Except as otherwise provided herein, including Sections 10.6, 10.7, 10.8 and 10.9, nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff or other legal or equitable defense which the Reorganization Plan Debtors had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Reorganization Plan; *provided, however* that the Reorganized Debtors shall not retain any (1) Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, which Claims or Causes of Action are hereby preserved); or (2) any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures).  The Reorganized Debtors

shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Reorganization Plan as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Reorganization Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.10. *Solicitation of the Reorganization Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Reorganization Plan Debtors shall be deemed to have solicited acceptances of the Reorganization Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Reorganization Plan Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Reorganization Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Reorganization Plan or the offer and issuance of any securities under the Reorganization Plan.

### 10.11. *Section 1145 Exemption.*

The issuance of and the distribution under the Reorganization Plan of the New Common Stock to the holders of Senior Noteholder Secured Claims under Section 4.3 of this Reorganization Plan shall be exempt from registration under the Securities Act of 1933 or applicable securities laws without further act or action by any Person pursuant to section 1145(a) of the Bankruptcy Code.

In addition, under section 1145 of the Bankruptcy Code, any securities issued under the Reorganization Plan which are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (2) compliance with any rules and regulations of the Securities and Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments; and (4) applicable regulatory approval.

### 10.12. *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in the Plan Supplement will be posted at the website of the Reorganization Plan Debtors' notice, claims, and solicitation agent as they become available.

### 10.13. *Corporate and Limited Liability Company Action.*

Upon the Effective Date, all actions contemplated by the Reorganization Plan shall be deemed authorized and approved in all respects, including (a) the assumption of all employee compensation and Benefit Plans of the Reorganization Plan Debtors as provided herein, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the distribution of the New

Common Stock, (d) the entry into the First Out Exit Facilities and the Second Out Exit Term Loan Agreement, (e) the approval of the Restructuring Support Agreement, and (f) all other actions contemplated by the Reorganization Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Reorganization Plan involving the corporate or limited liability company structure of the Reorganization Plan Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Reorganization Plan Debtors or the Reorganized Debtors in connection with the Reorganization Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Reorganization Plan Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Reorganization Plan Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Reorganization Plan (or necessary or desirable to effect the transactions contemplated by the Reorganization Plan) in the name of and on behalf of the Reorganized Debtors, including (w) the Amended Organizational Documents, (x) the First Out Exit Facilities, (y) the Second Out Exit Term Loan Agreement, and (z) any and all other agreements, documents, securities and instruments relating to the foregoing.   The authorizations and approvals contemplated by this Section 10.13 shall be effective notwithstanding any requirements under non-bankruptcy law.

SECTION 11.    **RETENTION OF JURISDICTION.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Reorganization Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Reorganization Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Reorganization Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)        to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)        to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Reorganization Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(j)        to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Reorganization Plan or to maintain the integrity of the Reorganization Plan following consummation;

(k)        to hear any disputes arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(l)        to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)        to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)        to adjudicate, decide, or resolve any Causes of Actions;

(o)        to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(p)        to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(q)        to adjudicate any and all disputes arising from or relating to distributions under the Reorganization Plan;

(r)        to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(s)        to enter a final decree closing the Chapter 11 Cases;

(t)        to recover all assets of the Reorganization Plan Debtors and property of the Reorganization Plan Debtors' estates, wherever located; and

(u)        to hear and determine any rights, Claims or causes of action held by or accruing to the Reorganization Plan Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction over any matters arising in connection with the Exit Financing or any transactions related thereto.

SECTION 12.    **MISCELLANEOUS PROVISIONS.**

12.1.    ***Payment of Statutory Fees.***

On the Effective Date and thereafter as may be required, the Reorganized Plan Debtors shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Reorganization Plan Debtor's case, or until such time as a final decree is entered closing a particular Reorganization Plan Debtor's case, a Final Order converting such Reorganization Plan Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing such Reorganization Plan Debtor's case is entered.

12.2.    ***Substantial Consummation.***

On the Effective Date, the Reorganization Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.3.    ***Dissolution of Creditors Committee.***

On the Effective Date, the Creditors Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* the Creditors Committee shall exist, and its professionals shall be retained, after the Effective Date with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order.

12.4.    ***Request for Expedited Determination of Taxes.***

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

12.5.    ***Amendments.***

(a)    *Plan Modifications.*    The Reorganization Plan may be amended, modified or supplemented by the Reorganization Plan Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided, that* such amendments, modifications, or supplements shall be satisfactory in all respects to the Reorganization Plan Debtors, the Creditors Committee and the Required Consenting Secured Parties.  In addition, after the Confirmation Date, the Reorganization Plan Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Reorganization Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Reorganization Plan.

(b)    *Other Amendments.*    Before the Effective Date, the Reorganization Plan Debtors may make appropriate technical adjustments and modifications to the Reorganization Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided, however*, that such technical adjustments and modifications shall be satisfactory to the Required Consenting Secured Parties.

12.6.    ***Effectuating Documents and Further Transactions.***

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers, to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Reorganization Plan.

12.7.    ***Revocation or Withdrawal of the Reorganization Plan.***

The Reorganization Plan Debtors may not revoke or withdraw the Reorganization Plan before the Effective Date without the consent of the Required Consenting Secured Parties; *provided, however*, that the Reorganization Plan Debtors may revoke or withdraw the Reorganization Plan only if it is in the exercise of the Reorganization Plan Debtors' fiduciary duty or as otherwise permitted under the Restructuring Support Agreement.    If the Reorganization Plan Debtors take such action, the Reorganization Plan shall be deemed null and void.    In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Reorganization Plan Debtors or any other person or to prejudice in any manner the rights of the Reorganization Plan Debtors or any person in further proceedings involving the Reorganization Plan Debtors.

12.8.    ***Severability of Plan Provisions upon Confirmation.***

If, before the entry of the Confirmation Order, any term or provision of the Reorganization Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Reorganization Plan Debtors (to be made only with the consent of the Required Consenting Secured Parties), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided, however,* that any such alteration and interpretation shall be acceptable to the Required Consenting Secured Parties.    Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Reorganization Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Reorganization Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Reorganization Plan and may not be deleted or modified without the consent of the Reorganization Plan Debtors or the Reorganized Debtors (as the case may be); and (3) nonseverable and mutually dependent.

12.9.    ***Governing Law.***

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Reorganization Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

12.10.    ***Time.***

In computing any period of time prescribed or allowed by the Reorganization Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

US_ACTIVE:\44191040\16\69252.0040

12.11. *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Reorganization Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganization Plan Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

12.12. *Successor and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Reorganization Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.13. *Entire Agreement.*

On the Effective Date, the Reorganization Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Reorganization Plan.

12.14. *Notices.*

All notices, requests and demands to or upon the Reorganization Plan Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i) if to the Reorganization Plan Debtors or Reorganized Debtors:

RDA Holding Co.
750 Third Avenue
New York, NY 10017
Facsimile:
Attn:  Andrea Newborn, Esq.

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Joseph H. Smolinsky, Esq.
       Marcia L. Goldstein, Esq.
       Matthew P. Goren, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(ii) if to the Creditors Committee:

    Otterbourg, Steindler, Houston & Rosen, P.C.
    230 Park Avenue
    New York, NY 10169
    Attn:   Scott L. Hazan, Esq.
          David M. Posner, Esq.
    Telephone:  (212) 661-9100
    Facsimile:  (212) 682-6104

(iii) if to the Administrative Agent, the Senior Credit Agreement Lenders, the Issuing Lender, the Consenting Lender, the Roll-Up Lender, or the DIP Lender:

    Milbank, Tweed, Hadley & McCloy LLP
    1 Chase Manhattan Plaza
    New York, New York 10005
    Attn:   Abhilash M. Raval, Esq.
          Blair M. Tyson, Esq.
          Michael E. Comerford, Esq.
    Telephone:  (212) 530-5000
    Facsimile:  (212) 530-5219

(iv) if to the New Money Lenders,  the Consenting Secured Noteholders, or the DIP Agent:

    Kirkland & Ellis LLP
    300 North LaSalle
    Chicago, Illinois 60654
    Attn: James H.M. Sprayregen, P.C.
    Telephone:  (312) 862-2000
    Facsimile:  (312) 862-2200

    - and -

    Kirkland & Ellis LLP
    601 Lexington Avenue
    New York, New York 10022
    Attn: Paul M. Basta, Esq.
         Nicole L. Greenblatt, Esq.
    Telephone:  (212) 446-4800
    Facsimile:  (212) 446-4900

After the Effective Date, the Reorganization Plan Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganization Plan Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:  May 7, 2013
       New York, New York

               Respectfully submitted,


               RDA Holding Co., The Reader's Digest Association,
Inc., and each of the Reorganization Plan Debtors


By:  _____
               Name: Robert E. Guth
               Title: President and Chief Executive Officer

**Exhibit A**

**Restructuring Support Agreement**

US_ACTIVE:\44191040\16\69252.0040

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of February 17, 2013 (as amended, supplemented or otherwise modified in accordance with the terms hereof, this "Support Agreement", which defined term shall include all exhibits and schedules annexed hereto including, without limitation, the Term Sheets (as defined below) by and among (i) RDA Holding Co. ("Holding"), The Reader's Digest Association, Inc. (the "Company"), and certain of the Company's subsidiaries set forth on Schedule 1 annexed hereto (together with Holding and the Company, the "Debtors" and excluding Direct Entertainment Media Group, Inc., the "Plan Debtors"), (ii) Wells Fargo Principal Lending, LLC, as issuing lender and sole lender (Wells Fargo Principal Lending, LLC or one of its affiliates, the "Consenting Lender") under that certain Credit Agreement, dated as of March 30, 2012 (the "Credit Agreement") by and among the Debtors, the Consenting Lender and Wells Fargo Bank, N.A., as administrative agent (in such capacity, the "Administrative Agent") and (iii) the undersigned holders (the "Consenting Secured Noteholders") of the $464 million outstanding senior secured notes of the Company due 2017 (the "Secured Notes") issued pursuant to that certain Indenture, dated as February 11, 2010 (as amended, supplemented or otherwise modified, the "Indenture") by and among the Debtors, the holders from time to time (the "Secured Noteholders") of the Secured Notes, Wells Fargo Bank, N.A., as indenture trustee (in such capacity, the "Indenture Trustee") and Wilmington Trust FSB, as collateral agent (the "Collateral Agent"). The Consenting Lender and the Consenting Secured Noteholders are collectively referred to herein as, the "Consenting Secured Parties," and together with the Debtors, the "Parties."

## WHEREAS

A.      The Company and the Consenting Secured Parties have engaged in negotiations to consummate a restructuring of the Company's indebtedness and other obligations, including the Debtors' obligations under the Credit Agreement and the Indenture, pursuant to the terms and conditions set forth in the Restructuring Term Sheet attached hereto as Exhibit A (including the DIP Commitment Letter, the related DIP term sheet (the "DIP Term Sheet"), the interim DIP Order (the "Interim Order"), chapter 11 restructuring term sheet (the "Restructuring Term Sheet"), the first out exit term sheet (the "First Out Exit Term Sheet"), the second out exit term sheet (the "Second Out Exit Term Sheet") and all other exhibits thereto, collectively, the "Term Sheets") and incorporated into this Support Agreement (the "Restructuring Transactions").

B.      The Debtors have requested, and the Consenting Secured Parties have agreed, to provide a debtor-in-possession financing facility under that certain credit agreement (the "DIP Credit Agreement") referred to in the Commitment Letter dated as of February 17, 2013 (the "DIP Commitment Letter", which term shall include the Term Sheets attached thereto) subject to the terms and conditions thereof.

C.      The Parties anticipate that the Restructuring Transactions will be consummated by all of the Debtors filing voluntary petitions (the "Petitions") under

1

chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "<u>Bankruptcy Court</u>") (the date of filing of such voluntary petitions, the "<u>Petition Date</u>", and such cases being the "<u>Chapter 11 Cases</u>").

D.    This Support Agreement and the Term Sheets set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement and support the Restructuring Transactions.

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

## Section 1.  <u>Conditions to Effectiveness of Support Agreement.</u>

This Support Agreement shall become effective and binding upon each of the Parties at 12:01 a.m. prevailing Eastern Time on the date on which all of the following conditions are satisfied (the "<u>Effective Date</u>"):

(a)    The Consenting Secured Parties or their counsel shall have received duly executed signature pages for this Support Agreement signed by the Debtors;

(b)    The Debtors shall have received duly executed signature pages for this Support Agreement from (i) the Consenting Lender and (ii) Consenting Secured Noteholders holding at least 66 2/3% in principal amount of the prepetition outstanding Secured Notes;

(c)    The DIP Commitment Letter and the related fee letters shall have been executed by the Debtors and the Consenting Secured Parties party thereto; and

(d)    All accrued fees and expenses due to the Consenting Secured Parties and their respective counsel (including one prior counsel for the Consenting Lender) will have been paid.

## Section 2.  <u>Plan of Reorganization.</u>

## 2.1    **Support of Acceptable Plan.**

(a)    Subject to Sections 1125 and 1126 of the Bankruptcy Code (if and to the extent applicable), and so long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived or cured in accordance with the terms hereof:

(1) each Plan Debtor severally (and not jointly) agrees to:

2

(i)     (A) support and consummate all of the Restructuring Transactions contemplated by the Term Sheets, this Support Agreement and the Acceptable Plan (as defined in Section 2.1(a)(1)(ii)), (B) take any and all necessary and appropriate actions in furtherance of all of the Restructuring Transactions contemplated under this Support Agreement, the Acceptable Plan and the Term Sheets, (C) complete all of the Restructuring Transactions contemplated under this Support Agreement, the Term Sheet and the Acceptable Plan in accordance with the terms hereof and thereof and take all steps necessary and desirable to obtain the Confirmation Order (as defined in Section 2.1.(b)), and (D) obtain any and all required regulatory and/or third-party approvals for such Restructuring Transactions; and

(ii)    not directly or indirectly (a) propose or support any plan of reorganization or liquidation in the Chapter 11 Cases other than a chapter 11 plan of reorganization incorporating the terms of the Term Sheets and which chapter 11 plan of reorganization and related disclosure statement (including all exhibits thereto) are otherwise in all material respects, in form and substance satisfactory to the Required Consenting Secured Parties (as defined in section 9.14 herein) (as amended, supplemented or otherwise modified subject to the terms hereof, the "<u>Acceptable Plan</u>" and the "<u>Acceptable Disclosure Statement,</u>" as applicable) (b) take any action which is inconsistent with, or that would unreasonably delay or impede approval or confirmation of the Acceptable Plan or that is otherwise inconsistent with the express terms of this Support Agreement including, for the avoidance of doubt, any action that does not support or is otherwise inconsistent with the approval of the Lender Protections (as defined in the DIP Term Sheet), or (c) seek, solicit, support, encourage or participate in any discussions regarding any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, liquidation or restructuring of any of the Plan Debtors that could reasonably be expected to prevent, delay or impede the confirmation of the Acceptable Plan; and

(iii)   provide written notice to the Consenting Secured Parties, within one (1) Business Day of making any determination that its fiduciary duties require it to consider any plan other than the Acceptable Plan.

K&E 25245614.7

        (2)  each Consenting Secured Party, severally (and not jointly) agrees to:

           (i)      (A) support and consummate all of the Restructuring Transactions contemplated by the Term Sheets and this Support Agreement and the Acceptable Plan, (B) take any and all necessary and appropriate actions in furtherance of all of the Restructuring Transactions contemplated under this Support Agreement and the Term Sheets and the Acceptable Plan, (C) complete all of the Restructuring Transactions contemplated under this Support Agreement and the Term Sheet and the Acceptable Plan in accordance with the terms hereof and thereof; and

           (ii)    subject to the receipt by such Consenting Secured Party of the Acceptable Disclosure Statement and other solicitation materials in respect of the Acceptable Plan, which Acceptable Disclosure Statement and solicitation materials reflect the agreement set forth in this Support Agreement and the Term Sheets and have been approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and are in all material respects reasonably satisfactory to the Required Consenting Secured Parties (collectively, the "Solicitation Materials"): (a) vote, to the extent such Consenting Secured Party is entitled to vote under the terms of the Acceptable Plan and the Bankruptcy Code, all of its claims against the Debtors to accept the Acceptable Plan by delivering its duly executed and completed ballot(s) accepting such Acceptable Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot(s) and (b) not change or withdraw (or cause to be changed or withdrawn) such vote.

For the avoidance of doubt, each of the Consenting Lender, the Consenting Secured Noteholders, and the Plan Debtors also agrees, severally and not jointly, that, unless this Support Agreement is terminated in accordance with the terms hereof, it will not take any action that would in any material respect interfere with, delay, or postpone the confirmation or consummation of the Acceptable Plan and implementation of the Restructuring Transactions, including, without limitation, objecting to the debtor-in-possession financing set forth in the DIP Commitment Letter or propose any alternative financing.

Nothing contained in this Support Agreement shall be deemed to (1) prevent any Party from taking, or failing to take, any action that it is obligated to take (or fail to take) in the performance of any fiduciary or similar duty which such Party owes to any other person.

(b)     Upon confirmation of the Acceptable Plan pursuant to an order in all material respects in form and substance reasonably satisfactory to the Required Consenting Secured Parties (the "<u>Confirmation Order</u>"), and so long as it is not subject to a stay and the conditions to effectiveness thereof have been satisfied or waived, the Consenting Secured Parties and the Plan Debtors shall use commercially reasonable efforts to consummate the Acceptable Plan; <u>provided</u> <u>that</u> the Consenting Lender and the Consenting Secured Noteholders shall only provide the First Out Exit Term Loan and the Second Out Exit Term Loan, respectively, subject to satisfaction of the terms and conditions set forth in the First Out Exit Term Sheet and the Second Out Exit Term Sheet, respectively; provided further that if the terms and conditions set forth in the First Out Exit Term Sheet or the Second Out Exit Term Sheet are not satisfied, the Refinancing Loans and the New Money Loans (as each is defined in the DIP Term Sheet) must be repaid in full in cash.

(c)     DIP Commitment Letter attached as <u>Exhibit A</u> to the Restructuring Term Sheet as part of the Term Sheets.

## 2.2     Confirmation of Acceptable Plan.

Without limiting any other provision hereof, the Plan Debtors shall each use their reasonable best efforts to have the Acceptable Plan confirmed by the Bankruptcy Court as expeditiously as possible under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the Bankruptcy Court (the federal and local rules being, the "<u>Bankruptcy Rules</u>") and within the timeframes contemplated by this Support Agreement.

## Section 3.  <u>Releases.</u>

The Acceptable Plan will include a full release from liability by the Plan Debtors in favor of the Debtors and their subsidiaries, the Consenting Lender, the Administrative Agent, the Consenting Secured Noteholders and the DIP Lenders (the "<u>Released Parties</u>") and all current and former direct and indirect equityholders, members, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) of the Released Parties from any claims and causes of action related to or arising on or prior to the Effective Date, except for any claims and causes of action relating to unlawful acts; provided, however, that nothing herein shall be deemed to constitute a release or waiver by the Consenting Lender, the Administrative Agent or the Consenting Secured Noteholders of any rights arising from or in connection with that certain Security Agreement dated February 19, 2010 (the "<u>Security Agreement</u>") by and

among the Debtors, the Consenting Secured Parties, the Collateral Agent, the Administrative Agent and the Indenture Trustee, including, without limitation, all rights arising in connection with section 5.5 of such agreement.

## Section 4.  Termination Events.

### 4.1  Termination Events.

The occurrence of any of the following (without the need for the taking of any action) shall be a "Termination Event":

(a)   Upon the effective date of the Acceptable Plan or a written agreement among the Debtors and the Required Consenting Secured Parties terminating this Support Agreement;

(b)   Upon entry of an order by any court of competent jurisdiction or other competent governmental or regulatory authority making illegal or otherwise restricting, preventing or prohibiting the consummation of the Restructuring Transactions contemplated by the Acceptable Plan or this Support Agreement;

(c)   Upon filing of any motion or other pleading by one or more of the Debtors seeking the entry of an order, or upon entry of an order, by any court of competent jurisdiction authorizing the sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or otherwise;

(d)   The occurrence of any breach of this Support Agreement by any of the Parties (to the extent not otherwise cured or waived in accordance with the terms hereof); provided, that if any Party (other than any Plan Debtor) shall breach its obligations pursuant to this Support Agreement, the Termination Date arising as a result of such act or omission shall apply only to such Party and this Support Agreement shall otherwise remain in full force and effect with respect to the Debtors and all such remaining Parties;

(e)   On the date that any Plan Debtor withdraws the Acceptable Plan, publicly announces its intention not to support the Acceptable Plan or files any plan of reorganization or liquidation and/or disclosure statement that is not consistent with the Acceptable Plan or Acceptable Disclosure Statement, respectively, or publicly announces its support for any such inconsistent plan and/or disclosure statement, gives the notice described in Section 2.1(a)(1)(iii) hereof, or otherwise evinces an intention not to proceed with the Acceptable Plan or to proceed with any alternative plan or form of transaction;

(f)   On the date of entry of any order in the Chapter 11 Cases terminating the Plan Debtors' exclusive right to file a plan or plans of reorganization

6

pursuant to Section 1121 of the Bankruptcy Code; provided that such order is not the result of a motion filed by any Consenting Secured Party;

(g)     On the date any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or the Debtors shall file a motion or other request for such relief;

(h)     On the date of either (1) a filing by any Debtor of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the obligations referred to in the Credit Agreement, the Indenture and the collateral documents related thereto (collectively, the "Secured Obligations") or any other cause of action against and/or with respect to the Secured Obligations, the prepetition liens securing such Secured Obligations and the Consenting Secured Parties (or if the Debtors support any such motion, application or adversary proceeding commenced by any third party or consent to the standing of any such third party) or (2) the entry of an order of the Bankruptcy Court providing relief against the interests of any Consenting Secured Party with respect to any of the foregoing causes of action or proceedings;

(i)     Upon any material adverse change regarding the feasibility of the Acceptable Plan arising on or after the Effective Date of this Support Agreement, including, without limitations, the assertion of material contingent and/or unliquidated liabilities, as determined by the Required Consenting Secured Parties in their reasonable discretion;

(j)     Upon the amendment, modification of, or the filing of a pleading by any of the Plan Debtors that seeks to amend or modify the Acceptable Plan, the Acceptable Disclosure Statement or any documents related to the Acceptable Plan or Acceptable Disclosure Statement, notices, exhibits or appendices, which amendment, modification or filing is inconsistent with this Support Agreement and not otherwise consented to by the Required Consenting Secured Parties;

(k)     Upon failure of the Debtors to commence the Chapter 11 Cases on or before 11:59 p.m. (New York City time) on February 18, 2013;

(l)     11:59 p.m. (New York City time) on the fifth (5th) Business Day after the Petition Date, unless prior thereto the Bankruptcy Court enters an interim order in the Chapter 11 Cases of the Debtors under, inter alia Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code in form and substance satisfactory to the Required Consenting Secured Parties, authorizing the

7

Debtors to incur postpetition financing and use cash collateral, granting adequate protection to the prepetition Secured Parties, and scheduling a final hearing pursuant to Bankruptcy Rule 4001(B) (the "<u>Interim DIP Order</u>");

(m)   11:59 p.m. (New York City time) on the fortieth (40th) day after the date of entry of the Interim DIP Order, unless prior thereto the Bankruptcy Court enters a final order in the Chapter 11 Cases of the Debtors under, <u>inter alia</u> Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code in form and substance satisfactory to the Required Consenting Secured Parties, authorizing the Debtors to incur postpetition financing and use cash collateral and granting adequate protection to the prepetition Secured Parties (the "<u>Final DIP Order</u>" and together with the Interim DIP Order, the "<u>DIP Orders</u>");

(n)   Upon the entry of an order by a court of competent jurisdiction reversing, modifying, amending, staying or vacating either of the Interim DIP Order or the Final DIP Order;

(o)   11:59 p.m. (New York City time) on the date of the occurrence of an "Event of Default" under, and as such term is defined in, the DIP Credit Agreement and the acceleration of the obligations thereunder;

(p)   11:59 p.m. (New York City time) on the date that is 25 days after the Petition Date, if the Plan Debtors shall not have filed the Acceptable Plan and the Acceptable Disclosure Statement with the Bankruptcy Court on or before such time;

(q)   11:59 p.m. (New York City time), on the date that is 75 days after the Petition Date, unless the Bankruptcy Court has entered an order, in form and substance satisfactory to the Required Consenting Secured Parties, approving the Acceptable Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code on or before such time;

(r)   11:59 p.m. (New York City time), on the date that is 15 days following entry of the order approving the Acceptable Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, unless prior thereto the Company commences the solicitation of acceptances of the Acceptable Plan;

(s)   11:59 p.m. (New York City time), on July 5, 2013, if the Plan Debtors shall not have filed with the Bankruptcy Court on or before such time a supplement to the Acceptable Plan containing documents in form and substance reasonably satisfactory to the Required Consenting Secured Parties as contemplated by the Term Sheet (the "Acceptable Plan Supplement");

(t)   11:59 p.m. (New York City time), on July 15, 2013, unless the Bankruptcy Court has entered the Confirmation Order on or before such time;

8

(u)     11:59 p.m. (New York City time) on July 31, 2013, unless the "effective date" of the Acceptable Plan has occurred prior thereto;

(v)     Any of the Lender Protections are not approved in the Interim DIP Order or the Final DIP Order of if such protections or any of the other adequate protection provided to the Consenting Lender is unwound or otherwise successfully challenged at any time after entry of such interim or final order;

(w)     The non-payment of any accrued, unpaid and ongoing expenses incurred by the Consenting Secured Parties in connection with the Restructuring Transactions and any agreements related thereto in accordance with section 9.12 of this Support Agreement; or

(x)     11:59 p.m. (New York City time), on the date that is 60 days after the Petition Date, unless the Bankruptcy Court has entered an order establishing bar dates for submitting proofs of claim and requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code.

## 4.2     Additional Debtor Termination Events.

The Debtors may terminate this Support Agreement upon five (5) Business Days prior written notice to the Consenting Secured Parties upon the occurrence of either of the following events:  (i) the breach by any Consenting Secured Party of the representations, warranties, or covenants of such Consenting Secured Party set forth in this Support Agreement that would be reasonably likely to have a material adverse impact on the Debtors, or the consummation of the Restructuring Transactions, that remains uncured for a period of five (5) Business Days after receipt by such Consenting Secured Party of notice of such breach; provided that this Support Agreement shall otherwise remain in effect with respect to non-breaching Consenting Secured Parties; or (ii) the board of directors of the Company reasonably determines based upon the written advice of outside counsel that proceeding with the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties.

Notwithstanding anything to the contrary herein, the releases provided for in Section 3 hereof shall survive the termination of this Support Agreement under either Section 4.1 or 4.2 hereof; provided, that the releases set forth in Section 3 herein shall automatically be null and void and of no further force and effect as if the release had never been granted with respect to any Party that has breached the terms of the penultimate paragraph of Section 2.1(a) hereof or any other terms herein in any material respect.

## 4.3     Termination Event Procedures.

Upon the occurrence of a Termination Event under (i) Section 4.1 (a), (b), (c), (e), (f), (g), (h), (j), (l), (m), (n), (o) or (u) and (v) of this Support Agreement, this Support Agreement shall automatically terminate without any further action or notice, and

9

(ii) Section 4.1 (d), (i), (k), (p), (q), (r), (s), (t), (w) and (x) of this Support Agreement, five (5) Business Days after Consenting Secured Parties or, with respect to a Termination Event under Section 4.1(c) which has occurred as a result of a breach of this Support Agreement by any Party, the other non-breaching Parties, shall have given written notice of the occurrence of such Termination Event to the other parties hereto and such Termination Event shall not have been cured during such five (5) Business Days after receipt of such notice (or otherwise waived in writing by the requisite Parties in accordance with the terms hereof), this Support Agreement shall terminate (the date of termination under clause (i) or (ii) hereof being the "Termination Date"); provided, however, that any waiver of an event of default under the DIP Credit Agreement that has been granted without the consent of the Consenting Lender shall in no way be deemed to constitute a waiver of any Termination Event hereunder. For the avoidance of doubt, the automatic stay arising pursuant to Section 362 of the Bankruptcy Code in the Chapter 11 Cases shall be deemed waived or modified for purposes of providing notice hereunder or terminating this Support Agreement and, in any event, the giving of notice of termination by any Party pursuant to this Support Agreement shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code. For the further avoidance of doubt, the Debtors acknowledge that the foregoing stipulation is a material and necessary inducement for the Consenting Lender's entry into this Support Agreement.

## Section 5. <u>Remedies.</u>

It is understood and agreed by each of the Parties that any breach of this Support Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and, accordingly, the Parties agree that, in addition to any other remedies, each Party shall be entitled, without the requirement of posting a bond or other security, to specific performance and injunctive or other equitable relief. The Debtors each agree that for so long as any Party has not taken any action to prejudice the enforceability of this Support Agreement (including, without limitation, alleging in any pleading that this Support Agreement is unenforceable), and has taken such actions as are reasonably required or desirable for the enforcement hereof, then such Party shall have no liability for damages hereunder in the event a court determines that this Support Agreement is not enforceable. Without limiting the provisions hereof, the Parties hereby agree that if any Party breaches the terms of the penultimate paragraph of Section 2.1(a) hereof or any other terms herein in any material respect (to the extent not otherwise cured or waived in accordance with the terms hereof), the release contemplated in Section 3 hereof shall not be granted to such breaching Party.

## Section 6. <u>Mutual Representations, Warranties and Covenants.</u>

## 6.1 <u>Power and Authority.</u>

Each Party severally, and not jointly, represents to each other Party that, as of the date of this Support Agreement, (i) such Party has all requisite corporate, partnership, or limited liability company power and authority to enter into this Support Agreement and to carry out the Restructuring Transactions contemplated by, and perform its respective obligations under, this Support Agreement, and (ii) the execution and delivery of this

Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**6.2** **Enforceability.**

Each Party severally, and not jointly, represents to each other Party that this Support Agreement is the legally valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability or ruling of the Bankruptcy Court.

**6.3** **Representation.**

Each of the Parties to this Support Agreement acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Support Agreement and the Restructuring Transactions contemplated by this Support Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Support Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**6.4** **Governmental Consents.**

Each Party severally, and not jointly, represents to each other Party that, as of the date of this Support Agreement, the execution, delivery, and performance by it of this Support Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body, except (i) such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (ii) any filings in connection with the Chapter 11 Cases, including the approval of the Acceptable Disclosure Statement and confirmation of the Acceptable Plan, and (iii) in the case of the Debtors, (A) filings of amended articles of incorporation or formation or other organizational documents with applicable state authorities, and (B) other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Debtors.

**6.5** **Ownership.**

(a)    Each Consenting Secured Party severally, and not jointly, represents and warrants that, as of the date hereof, (i) such Consenting Secured Party either (A) is the sole legal and beneficial owner of its share of the obligations under the Credit Agreement or Secured Notes, as applicable or (B) is the legal owner of its share of the prepetition obligations under the Credit Agreement or Secured Notes, as applicable, and has the

11

power and authority to bind the legal and beneficial owner(s) of such prepetition Secured Notes or Credit Agreement obligations to the terms of this Support Agreement, (ii) such Consenting Secured Party (a) has full power and authority to vote on and consent to or (b) has received direction from the party having full power and authority to vote on and consent to such matters concerning its share of the prepetition Secured Notes or Credit Agreement obligations and to exchange, convert, assign and transfer such prepetition Secured Notes or Credit Agreement obligations and (iii) other than pursuant to this Support Agreement, such prepetition Secured Notes or Credit Agreement obligations are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Secured Party's performance of its obligations contained in this Support Agreement at the time such obligations are required to be performed.

**6.6    Debtors' Reporting Requirements.**

The Debtors shall promptly deliver to the Consenting Lender (i) all documents and reports and (ii) any and all other information delivered to the DIP Lenders (as defined in the DIP Term Sheet) or requested by the DIP Lenders (including scheduling bi-weekly update calls (with question and answer periods) with senior management of the Debtors and their respective representatives and advisors), in each instance as set forth in the section entitled "Affirmative Covenants" in the DIP Term Sheet and within the time periods specified in the DIP Term Sheet (or, if no time period is specified therein, on a prompt basis).

**6.7    Acknowledgments Regarding Exit Financing**

Notwithstanding anything herein to the contrary, the Parties hereto acknowledge and agree that the agreement of the Consenting Lender to provide the financing described in the First Out Exit Term Sheet shall automatically terminate on the date 180 days after the Petition Date.  The Consenting Lender agrees that, on and after such date, and subject to the Consenting Lender receiving customary and acceptable indemnification from the Debtors, the Consenting Lender will use good faith efforts to arrange a credit facility (the "Replacement Facility") to refinance any Refinancing Loans that have not been paid in full on the maturity date of the Facility (as defined in the DIP Term Sheet).  In connection therewith, the Debtors agree to assist the Consenting Lender in its arrangement efforts and to provide such information as the Consenting Lender reasonably requests.  It is understood and agreed that the Replacement Facility shall have terms and conditions (including without limitation structure, pricing, fees, tenor and covenants, due diligence conditions, approvals and any other provisions) satisfactory to the Consenting Lender in its sole discretion and shall be subject to any necessary credit  approvals.  The Debtors acknowledge that the foregoing is neither an expressed nor an implied commitment by the Consenting Lender or any of its affiliates to provide any part of the Replacement Facility or to provide or purchase loans in connection therewith, which commitment, if any, will only be set forth in a separate commitment letter in form and substance satisfactory to the Consenting Lender and approved by the Bankruptcy Court.  The agreement of the Consenting Lender under this Section 6.7 shall automatically terminate

(without the taking of any action) on the earlier of (i) the date that is 270 days after the Petition Date, (ii) the termination of this Support Agreement and (iii) upon any of the conditions precedent set forth in Annex A to the First Out Exit Term Sheet (other than the conditions set forth in clause (d) thereof) being determined not to have been satisfied or no longer capable of being satisfied.

### Section 7. <u>No Material Misstatement or Omission.</u>

The Debtors represent that none of the material and information provided by or on behalf of the Debtors to the Consenting Secured Parties in connection with the Restructuring Transactions contemplated in this Support Agreement, when read or considered together, contains any untrue statement of a material fact or omits to state a material fact necessary in order to prevent the statements made therein from being materially misleading.

### Section 8. <u>Acknowledgement.</u>

This Support Agreement and the Restructuring Transactions contemplated herein are the product of negotiations among the Debtors and the Consenting Secured Parties, together with their respective representatives. This Support Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Acceptable Plan or any plan of reorganization for the purposes of Sections 1125 and 1126 of the Bankruptcy Code or otherwise. The Debtors will not solicit acceptances of the Acceptable Plan from any Consenting Secured Party until such Consenting Secured Party has been provided with copies of the Acceptable Disclosure Statement approved by the Bankruptcy Court.

### Section 9. <u>Miscellaneous Terms.</u>

**9.1 Assignment; Transfer Restrictions.**

(a) Each Consenting Secured Party hereby agrees, for so long as this Support Agreement shall remain in effect as to it, not to sell, assign, transfer, hypothecate or otherwise dispose of any of its pro rata share of the prepetition Secured Notes, Credit Agreement obligations or obligations under the DIP Credit Agreement (the "<u>DIP Loans</u>") (if any) unless prior thereto the transferee thereof executes and delivers a Secured Party Joinder (as defined in section 9.3(a)) to the Administrative Agent at least two (2) Business Days prior to the relevant transfer. Thereafter, such transferee shall be deemed to be a Consenting Secured Party for purposes of this Support Agreement.

(b) Any sale, transfer, assignment, hypothecation or other disposition by any Consenting Secured Party of any or all of its pro rata share of the prepetition Secured Notes, Credit Agreement obligations or DIP Loans (if any) that does not comply with the procedures set forth in Section 9.1(a) shall be deemed void *ab initio*.

13

(c)    Nothing herein shall be construed to restrict any Consenting Secured Party's right to acquire additional prepetition Secured Notes, Credit Agreement obligations or DIP Loans. To the extent any Consenting Secured Party acquires as legal owner additional prepetition Secured Notes, Credit Agreement obligations or DIP Loans, the Parties agree that such prepetition Secured Notes, Credit Agreement obligations and DIP Loans shall be deemed to be subject to the terms of this Support Agreement upon the Consenting Secured Party's acquisition of such additional Secured Notes, Credit Agreement obligations or DIP Loans. Notwithstanding the foregoing provisions of this Section 9.1, any Consenting Secured Party may, at any time and without notice to or consent from any other party, pledge or grant a security interest in all or any portion of its rights (including, without limitation, rights to payment of interest and repayment of principal) under the Indenture, the Credit Agreement or the DIP Credit Agreement to secure obligations of such Consenting Secured Party to a Federal Reserve Bank; provided that no such pledge or grant of a security interest shall release such Consenting Secured Party from any of its obligations hereunder or substitute any such pledgee or grantee for such Consenting Secured Party as a party hereto.

## 9.2    No Third Party Beneficiaries.

Unless expressly stated herein, this Support Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary.

## 9.3    Joinder.

(a)    Any person that receives or acquires a portion of the prepetition Secured Notes, Credit Agreement obligations or DIP Loans pursuant to a sale, assignment, transfer, hypothecation or other disposition of such prepetition Secured Notes, Credit Agreement obligations or DIP Loans by a Consenting Secured Party hereby agrees to be bound by all of the terms of the Term Sheet and this Support Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) (a "Joining Secured Party") by executing and delivering a joinder in the form of Exhibit B hereto (the "Secured Party Joinder") to the Administrative Agent. The Joining Secured Party shall thereafter be deemed to be a "Consenting Secured Party" and a Party for all purposes under this Support Agreement.

(b)    With respect to the aggregate principal amount of prepetition Secured Notes, Credit Agreement obligations or DIP Loans held by the Joining Secured Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such prepetition Secured Notes, Credit Agreement obligations or DIP Loans, the Joining Secured Party hereby makes the representations and warranties of the Consenting

14

Secured Parties set forth in Section 6 of this Support Agreement to each of the other Parties to this Support Agreement.

### 9.4    Entire Agreement.

This Support Agreement constitutes the entire agreement of the Parties with respect to the subject matter of this Support Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Support Agreement.

### 9.5    Counterparts.

This Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Delivery of an executed signature page of this Support Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

### 9.6    Settlement Discussions.

This Support Agreement and the Term Sheets attached hereto as Exhibit A are part of a proposed settlement of disputes among the Parties hereto. Nothing herein shall be deemed to be an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Support Agreement and the Term Sheets annexed hereto as Exhibit A, documents and negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Support Agreement.

### 9.7    Continued Banking Practices.

Notwithstanding anything herein to the contrary, each Consenting Secured Party and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Debtor or any affiliate of any Debtor or any other Person, including, but not limited to, any Person proposing or entering into a transaction related to or involving any Debtor or any affiliate thereof.

### 9.8    Reservation of Rights.

(a)    Except as expressly provided in this Support Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Consenting Secured Parties to protect and preserve all of its rights and remedies under the DIP Credit Agreement, the DIP Orders or any other order of the Bankruptcy Court or other court of competent jurisdiction, or its full participation in the Chapter 11 Cases.

(b)     Without limiting Section 9.8(a) in any way, if the Restructuring Transactions contemplated by this Support Agreement or otherwise set forth in the Acceptable Plan are not consummated as provided herein, if a Termination Date occurs, or if this Support Agreement is otherwise terminated for any reason, the Consenting Secured Parties each fully reserve any and all of their respective rights, remedies and interests under the Indenture, the Credit Agreement, the DIP Credit Agreement and related post petition loan documents, applicable law and in equity.

(c)     Notwithstanding anything herein to the contrary, the Parties acknowledge that the support of each Consenting Secured Party contained in this Support Agreement relates solely to such Consenting Secured Party's rights and obligations as a lender under the Credit Agreement, the Indenture and/or the DIP Credit Agreement (if applicable) with respect to the principal amounts identified on such Consenting Secured Party's signature page and as provided in Section 9.1 and does not bind such Consenting Secured Party or its affiliates with respect to any other indebtedness, obligations or liabilities owed by the Company or any of its subsidiaries and affiliates to such Consenting Secured Party or any affiliate of such Consenting Secured Party (for the avoidance of doubt, if the Consenting Secured Party is specified on the relevant signature page as a particular group or business within an entity, "Consenting Secured Party" shall mean such group or business and shall not mean the entity or its affiliates, or any other desk or business thereof, or any third party funds advised thereby).  For purposes of this Support Agreement, "Consenting Secured Party" shall not include a holder of Loans under the Indenture or DIP Loans signatory hereto in its capacity or to the extent of its holdings as a public-side broker, dealer or market maker of Loans under the Indenture or DIP Loans or any other claim against or security in the Debtors.

(d)     Notwithstanding anything herein to the contrary, the Parties acknowledge that the support of the Consenting Lender contained in this Agreement (and its rights and obligations hereunder) relates solely to its claims set forth on its signature page or hereafter acquired and does not bind the Consenting Lender or any of its affiliates with respect to any other claims, equity, or other indebtedness of the Debtors or any of their subsidiaries and affiliates.  Notwithstanding anything else herein for purposes of this Support Agreement, (x) claims of the Consenting Lender that are held by it in a fiduciary or similar capacity and (y) claims held by the Consenting Lender in its capacity as a broker, dealer or market maker of loans under the Credit Agreement or with respect to any other claim against or security in the Debtors (including any loans or claims held in inventory with respect to such broker, dealer, or market-making activities, provided that the positions with respect to such loans or claims are separately identified on the internal books and records of such Consenting Lender) shall not, in either case (x) or (y), be bound by or subject to this Support Agreement.

16

For the avoidance of doubt, if the Consenting Lender is specified on its signature page as a particular group or business within an entity, "Consenting Lender" shall mean such group or business and shall not mean the entity or its affiliates, or any other desk or business thereof, or any third party funds advised thereby.

**9.9    Successors.**

This Support Agreement is intended to bind the Parties and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 9.9 shall be deemed to permit any transfer, tender, vote or consent, of any claims other than in accordance with the terms of this Support Agreement.

**9.10    Publicity.**

The Parties agree that all public announcements of the entry into or the terms and conditions of this Support Agreement shall be mutually, reasonably acceptable to each of the Parties and no such announcement shall be made before obtaining the consent of the Required Consenting Secured Parties; provided however that the Plan Debtors may publicly disclose this Support Agreement and the contents hereof in their Chapter 11 Cases or other proceedings under the Bankruptcy Code or as otherwise required by applicable law (including rules and regulations promulgated thereunder); provided that in no event shall any Party disclose the specific holdings under the Credit Agreement and/or the Indenture of any signatory to this Support Agreement without such signatory's express consent.

**9.11    Cooperation; Chapter 11 Related Matters.**

The Parties shall, and the Company shall cause each of the Plan Debtors to, cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.  The Company shall provide draft copies of all "first day" motions or applications and other documents the Debtors intend to file with the Bankruptcy Court (including the Plan, Disclosure Statement and all related documents) to counsel for the Consenting Lender and the Consenting Secured Noteholders, if reasonably practicable, at least two (2) days prior to the date when the Company intends to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.

**9.12    Advisors to the Consenting Secured Parties**

The Company shall pay, when due and payable, the respective accrued, unpaid and ongoing expenses incurred by the Consenting Secured Parties in connection with the Restructuring Transactions and any agreements related thereto, including the fees, charges and disbursements of (a) counsel to such parties limited to (i) one primary

17

counsel for the Consenting Lender (presently Milbank, Tweed, Hadley & McCloy LLP and previously Cahill Gordon & Reindel LLP), as well as any conflicts counsel, special counsel and local counsel in any relevant jurisdiction retained by the Consenting Lender, and (ii) one primary counsel for the Consenting Secured Noteholders (presently Kirkland & Ellis LLP), as well as any conflicts counsel, special counsel and local counsel in any relevant jurisdiction retained by the Consenting Secured Noteholders, and (b) any financial advisors, investment bankers and other specialty consultants retained by the Consenting Secured Noteholders (presently Moelis & Company for the Consenting Secured Noteholders).  All such fees, expenses and reimbursements incurred up to the Petition Date shall be paid in full prior to the Petition Date (without deducting any retainers) so long as estimates for such fees, expenses and reimbursements are presented to the Company by February 15, 2013.

**9.13    Governing Law; Waiver of Jury Trial; Indemnity.**

(a)    The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between the Parties under this Support Agreement, whether sounding in contract, tort or otherwise.

(b)    This Support Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Support Agreement, each Party hereby irrevocably and unconditionally agrees for itself that, subject to the following sentence, any action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Support Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

(c)    Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in Section 9.12(a) or (b) shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Support Agreement.

**9.14    Pending Transfers.**

Notwithstanding anything to the contrary provided herein, if a Consenting Secured Party has assigned all or a portion of the Secured Notes or Credit Agreement obligations that it beneficially owns as of the date hereof but such assignment has not settled as of the date hereof (such Secured Notes or Credit Agreement obligations, "Pending Transfer Obligations"), then such Consenting Secured Party shall be permitted

to exclude from the amount of the Secured Notes or Credit Agreement obligations listed on its signature page an amount of Pending Transfer Obligations equal to the Pending Transfer Obligations assigned to any transferee that has instructed such Consenting Secured Party not to execute this Agreement (such excluded Secured Notes or Credit Agreement obligations, the "<u>Excluded Obligations</u>").  Such Consenting Secured Party shall not be bound by the terms hereof with respect to any Excluded Obligations.

**9.15    Amendments, Modifications, Waivers.**

This Support Agreement (including all exhibits and schedules thereto and the Term Sheets) and the Acceptable Plan and the Acceptable Disclosure Statement may only be modified, amended or supplemented, and any of the terms thereof may only be waived, by an agreement in writing signed by each of (i) the Debtors, (ii) the Consenting Lender and (iv) Consenting Secured Noteholders holding at such time at least 51% of the prepetition Secured Notes that are subject to the terms hereof (the "<u>Required Consenting Secured Noteholders</u>," and together with the Consenting Lender, the "<u>Required Consenting Secured Parties</u>").

**9.16    Consideration.**

It is hereby acknowledged by each of the Parties that no consideration shall be due or paid to the Parties for their agreement to support or not interfere with the Acceptable Plan in accordance with the terms and conditions of this Support Agreement, other than the obligations of the other Parties under this Support Agreement.  For the avoidance of doubt, the provision of the Lender Protections constitutes a material inducement to the Consenting Lender's entry into this Support Agreement, without which the Consenting Lender would not have entered into this Support Agreement.  The Company represents that, as of the Effective Date, no payments have been made to any of the Parties hereto that were not permitted to be made under the terms of the Credit Agreement.

**9.17    Severability of Provisions.**

If any provision of this Support Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Support Agreement.

**9.18    Notices.**

All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given when: (a) delivered personally or by overnight courier to the following address of the other Party hereto; (b) sent by fax to the following fax number of the other Party hereto with the confirmatory copy delivered by overnight courier to the address of such Party listed below; or (c) sent by electronic mail with the confirmatory copy delivered by overnight courier to the address of such Party listed below.

19

EXECUTION COPY

If to any Debtor, to counsel at the following address:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn: Joseph H. Smolinsky, Esq.
> Facsimile: (212) 310-8007

If to any Consenting Secured Noteholder, the address set forth on its signature page, with a copy to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attn:  Nicole L. Greenblatt, Esq.
> Facsimile: (212) 446-6460

If to the Consenting Lender, the address set forth on its signature page, with a copy to:

> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, New York 10005
> Attn: Abhilash M. Raval, Esq.
> Blair M. Tyson, Esq.
> Michael E. Comerford, Esq.
> Facsimile: (212) 822-5123

[SIGNATURE PAGES FOLLOW]

Very truly yours,

RDA HOLDING CO.

By: _____
    Name:   Robert Guth
    Title:    President and Chief Executive Officer
    Fax Number: (914) 244-7949


THE READER'S DIGEST ASSOCIATION, INC.

By: _____
    Name:   Robert Guth
    Title:    President and Chief Executive Officer
    Fax Number: (914) 244-7949


EACH OF THE GUARANTORS LISTED ON ANNEX I HERETO

By: _____
    Name:   Paul Tomkins
    Title:    President or Vice President, as applicable
    Fax Number: (914) 244-7949

**ANNEX I**

Ardee Music Publishing, Inc.
Direct Entertainment Media Group, Inc.
Haven Home Media, LLC
Home Service Publications, Inc.
Pegasus Sales, Inc.
Pleasantville Music Publishing, Inc.
R.D. Manufacturing Corporation
RD Publications, Inc.
RD Large Edition, Inc.
RDA Digital, LLC
RDA Sub Co.
RDCL, Inc.
RDWR, Inc. (formerly known as Weekly Reader Corporation)
Reader's Digest Children's Publishing, Inc.
Reader's Digest Consumer Services, Inc.
Reader's Digest Entertainment, Inc.
Reader's Digest Financial Services, Inc.
Reader's Digest Latinoamerica S.A.
Reader's Digest Sales and Services, Inc.
Reiman Media Group, LLC
Reiman Manufacturing, LLC
Taste of Home Media Group, LLC
Taste of Home Productions, Inc.
Travel Publications, Inc.
W.A. Publications, LLC
WAPLA, LLC
Weekly Reader Custom Publishing, Inc.
World Almanac Education Group, Inc.
World Wide Country Tours, Inc.
WRC Media Inc.

**WELLS FARGO PRINCIPAL LENGING, LLC,** as Issuing Lender and Lender under the Credit Agreement and Secured Noteholder under the Indenture

By: _____

Name:  Greg Apkarian
Title:   Vice President

2450 Colorado Avenue, Ste 3000W
Santa Monica, California 90404
Telephone number: 310-453-7393
Facsimile number: 855-813-8309

Very truly yours,

GOLDENTREE ASSET MANAGEMENT, LP
    on behalf of certain funds and accounts managed
    by it

By: _____
Name: George Hartigan
Title: VP
Outstanding Principal Amount of
Prepetition Secured Notes: ████████████

Very truly yours,

EMPYREAN CAPITAL PARTNERS, LP
  on behalf of the funds managed by it

By: _____

Name: RYAN MAYESTANI
Title: CHIEF FINANCIAL OFFICER
Outstanding Principal Amount of
Prepetition Secured Notes: ███████

Very truly yours,

ALM IV, Ltd.

By: Apollo Credit Management (CLO), LLC, as Collateral Manager

By: _____
    Name:     JOSEPH MORONEY
    Title:      Authorized Signatory

Outstanding Principal Amount of
Prepetition Secured Notes: ███████████

Very truly yours,

Apollo Senior Floating Rate Fund Inc.
Account 631203

By: _____

Name: **JOSEPH MORONEY**
Title: Authorized Signatory

Outstanding Principal Amount of
Prepetition Secured Notes: ██████████

Very truly yours,

LeverageSource V Sarl

Laurent Ricci
Manager

By: _____

Name:
Title:

By: _____

Name:
Title:

JOSEPH MORONEY
Class A Manager

Outstanding Principal Amount of
Prepetition Secured Notes: ███████

**Exhibit A to Restructuring Support Agreement**

**Restructuring Term Sheet**

# PROPOSED RESTRUCTURING TERM SHEET

_____

THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF THE COMPANY.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  THIS TERM SHEET CONTAINS MATERIAL NON-PUBLIC INFORMATION ABOUT A PUBLIC COMPANY AND, THEREFORE, IS SUBJECT TO FEDERAL SECURITIES LAWS.

THE TERM SHEET IS PROVIDED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION, INCLUDING ENTRY INTO AN ACCEPTABLE RESTRUCTURING SUPPORT AGREEMENT (THE "RSA").  THIS TERM SHEET IS INTENDED TO BE ENTITLED TO THE PROTECTIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.  FURTHER, NOTHING IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON HOLDING, ITS SUBSIDIARIES, THE ADMINISTRATIVE AGENT OR THE CONSENTING SECURED PARTIES.  THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND MAY BE DISTRIBUTED ONLY WITH THE EXPRESS WRITTEN CONSENT OF THE REQUIRED CONSENTING SECURED PARTIES (AS DEFINED IN THE RSA).

| | OVERVIEW |
|---|---|
| **Transaction Summary** | This term sheet (the "Term Sheet") describes the principal terms of a restructuring transaction (the "Restructuring") pursuant to which RDA Holding Co. ("Holding" and once reorganized, "Reorganized Holding") will restructure its capital structure and global operations in connection with a revised business plan acceptable to the Required Secured Parties (as defined below) (the "Acceptable Business Plan").  The Restructuring will be implemented through a pre-negotiated joint plan of reorganization filed in connection with cases (the "Cases") commenced by Holding, The Reader's Digest Association, Inc., ("RD" or the "Company") and certain of RD's domestic subsidiaries (collectively, the "Debtors"[1] and excluding DEMG, the "Plan Debtors")  under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "Bankruptcy Court").<br><br>This Term Sheet outlines the proposed capital structure, treatment of claims and interests and other material terms and conditions of the Restructuring. The Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation governing the Restructuring, which remain subject to further discussion and negotiation and which must be reasonably acceptable to the Required |

[1]    Debtors to specifically include Direct Entertainment Media Group, Inc. ("DEMG").

| | |
|---|---|
| | Consenting Secured Parties (as defined below). The terms and conditions of this Term Sheet are meant to be part of a comprehensive agreement, each element of which is consideration for the other elements and an integral aspect of the proposed Restructuring.<br><br>This Term Sheet is an exhibit to that certain Restructuring Support Agreement dated February 17, 2013 (the "RSA") executed by the Debtors and each of (i) the Consenting Lender (as defined herein) and (ii) the Secured Noteholders party thereto (the "Consenting Secured Noteholders," and together with the Consenting Lender the "Consenting Secured Parties"). Pursuant to the RSA, "Required Consenting Secured Parties" means the Consenting Lender and the Required Consenting Secured Noteholders. "Required Consenting Secured Noteholders" means the Consenting Secured Noteholders holding at such time at least 51% of the Secured Notes that are subject to the terms of the RSA. |
| **Secured Debt to be Restructured** | Secured debt to be restructured under a plan of reorganization and a disclosure statement (including all exhibits thereto) satisfactory to the Required Consenting Secured Parties (the "Acceptable Plan" and the "Acceptable Disclosure Statement," respectively) will include:<br><br>(i) $49,625,000 in principal, plus outstanding letters of credit, plus all other amounts outstanding (including, for the avoidance of doubt, fees, commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Cases) under that certain Credit and Guarantee Agreement dated as of March 30, 2012 (the "Credit Agreement") among RD, Holding and certain of their affiliates, Wells Fargo Bank, N.A., as administrative agent ("Administrative Agent") and sole lender (the "Consenting Lender"); and<br><br>(ii) $464 million in senior secured notes of RD (the "Secured Notes") issued pursuant to that certain indenture, dated February 11, 2010 (the "Indenture") among RD, certain of its subsidiaries and the lenders party thereto from time to time (the "Secured Noteholders"). |
| **DIP Facility** | To facilitate liquidity during the Cases and after, the Consenting Secured Parties will provide an approximate $105 million consensual, priming, debtor in possession financing facility (the "DIP Facility") that will consist of:<br><br>(i) $45 million in new money loans ("New Money Loans") provided by certain Consenting Secured Noteholders; and<br><br>(ii) a refinancing of all commitments and amounts outstanding (including any and all principal, letters of credit, reimbursement obligations in respect of outstanding letters of credit (assuming drawn), fees, commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Cases, including to the issuing lender) under the Credit Agreement (the "Refinancing Loans");<br><br>all of (i) and (ii) to be paid in full in cash or convert to exit financing facilities on the effective date of the Acceptable Plan (the "Effective Date"), as described further below, in the DIP Commitment Letter, attached hereto as Exhibit A, the DIP Term Sheet, the First Out Exit Term Sheet and the Second Out Exit Term Sheet, attached as Annexes 1, 2 and 3, respectively, to the DIP Commitment Letter.<br><br>All Consenting Secured Noteholders may participate in the New Money loans |

2

| | |
|---|---|
| | on a pro-rata basis based on their holdings under the Indenture. |
| **Lender Protections** | Upon entry of the Interim DIP Order the Lender Protections as defined in Annex 1 to the DIP Commitment Letter.<br><br>Upon entry of the Final DIP Order, the Lender Protections as defined in Annex 1 to the DIP Commitment Letter. |
| **Adequate Protection for Secured Noteholders** | See Annex 1 to the DIP Commitment Letter. |
| **Exit Capital Structure** | The Acceptable Plan will provide for the following capital structure for the Reorganized Debtors:<br><br>First Out Exit Term Loan: Subject to and in accordance with the terms and conditions set forth on Annex 2 to the DIP Commitment Letter, the Refinancing Loans and any obligations arising thereunder will be amended and restated as a first out first priority exit term loan, pari passu with the Second Out Exit Term Loan (the "First Out Exit Term Loan").<br><br>Second Out Exit Term Loan: Subject to and in accordance with the terms and conditions of the DIP Facility, the New Money Loans and any claims arising thereunder will convert to a second out, first priority exit term loan of $45 million, with terms and conditions (set forth on Annex 3 to the DIP Commitment Letter) (the "Second Out Exit Term Loan").<br><br>Reorganized Holding shall have no more than $106 million in funded debt immediately following the Effective Date of the Acceptable Plan.<br><br>New Common Stock: On the Effective Date, the Debtors will issue 100% of the new common stock of Reorganized Holding to the Secured Noteholders on a pro rata basis based on their holdings under the Indenture (subject to any dilution for the Management Incentive Plan), which issuance will be exempt from registration with the Securities and Exchange Commission under section 1145 of the Bankruptcy Code. No dividends, recoveries, securities, distributions or other form of payments shall be made on account of or in connection with the new common stock distributed to the Secured Noteholders until all amounts owing in connection with the First Out Exit Term Loan have been paid in full in cash and all commitments thereunder have been terminated. |
| | **Treatment of Claims and Equity Interests** |
| **DIP Claims** | The DIP Facility shall, on the Effective Date, convert to the (i) First Out Exit Term Loan in accordance with the terms and conditions on Annex 2 to the DIP Commitment Letter and (ii) Second Out Exit Term Loan, as applicable, in accordance with the terms and conditions on Annex 3 to the DIP Commitment Letter, or in each case be paid in full in cash if the terms and conditions required for conversion are not satisfied; provided, however, that the obligations under the First Out Exit Term Loan will always be paid in full in cash by the Debtors.<br><br>Unclassified -- Non-Voting |
| **Administrative Claims** | Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of the Bankruptcy Code, will receive payment in full in cash of the unpaid portion of its allowed administrative claim on the Effective Date or as soon thereafter as practicable (or, if payment is not then |

3

| | due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtors. |
|---|---|
| | Unclassified -- Non-Voting |
| **Priority Tax Claims** | Priority tax claims will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. |
| | Unclassified -- Non-Voting |
| **Other Priority Claims** | All other priority claims will be paid in full (in cash) on the Effective Date, or as soon thereafter as practicable, or treated in any other manner so that such claim will otherwise be rendered unimpaired. |
| | Unimpaired -- Deemed to Accept |
| **Prepetition Credit Agreement Claims** | All obligations under the Credit Agreement shall become Refinancing Loans as set forth above in connection with entry of the Final DIP Order and all Refinancing Loans and related obligations shall, on the Effective Date, be amended and restated as the First Out Exit Term Loan in accordance with Annex 2 to the DIP Commitment Letter so long as (and only so long as) the terms and conditions required for such conversion are satisfied and otherwise such obligations shall be paid in full in cash; provided, however, that the Debtors may always elect to repay such obligations in full in cash. |
| | Unclassified -- Non-Voting |
| **Prepetition Secured Notes Claims** | On the Effective Date, the Secured Noteholders shall convert their claims into 100% (subject to dilution by the Management Incentive Plan [and any equity issued to such other creditor classes as may be agreed to by the Required Consenting Secured Noteholders and the Debtors]) of the new common stock of Reorganized Holding (the "New Common Stock") to be issued and outstanding on the Effective Date of the Acceptable Plan, with such New Common Stock to be distributed on a pro rata basis in accordance with the Secured Noteholders' holdings of such prepetition obligations. |
| | No dividends, recoveries, securities, distributions or other form of payments shall be made on account of or in connection with the new common stock distributed to the Secured Noteholders until all amounts owing in connection with the First Out Exit Term Loan have been paid in full in cash and all commitments thereunder have been terminated. |
| | Impaired -- Entitled to vote. |
| **Other Secured Claims** | Each holder thereof will receive the following treatment: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (c) such other treatment as is necessary to satisfy section 1129 of the Bankruptcy Code. |
| | Impaired -- Entitled to vote. The Debtors reserve the right to argue at confirmation that Other Secured Claims are unimpaired. |
| **Unsecured Claims** | Each holder of an unsecured claim (*i.e.*, all claims not otherwise specifically classified herein including any deficiency claim of the Secured Noteholders) will receive their pro rata share of [TBD]. The Debtors may elect to separate general unsecured claims into appropriate subclasses. |
| | Impaired -- Entitled to vote. |
| **Existing Equity Interests** | All existing common and preferred equity interests in Holding or other |

4

| | |
|---|---|
| **(including warrants)** | existing securities consisting of (or convertible into) equity interests in Holding, including any warrants or vested or unvested options to purchase equity interests in Holding, shall be extinguished as of the Effective Date. All equity interests of Holding's subsidiaries shall continue to be held by Holding and the subsidiaries of Holding that hold such equity interests prior to the commencement of the Cases.<br><br>Impaired; not entitled to vote – deemed to reject. |
| **Intercompany Claims** | On the Effective Date, Holding will, at its discretion, reinstate or compromise, as the case may be, intercompany claims between and among Holding and its subsidiaries consistent with the Acceptable Business Plan and the International Restructuring Transactions contemplated thereby; <u>provided, that</u> each intercompany claim held by a non-debtor shall receive no less favorable treatment than other general unsecured claims.<br><br>Impaired -- Entitled to Vote. |
| **Affiliate Actions** | All subsidiaries and affiliates of Holding shall be required to file proofs of claim in connection with the Cases so that their claims are discharged on the Effective Date. |
| | **General Provisions** |
| **Management Incentive Programs** | The Acceptable Plan will provide that promptly on or after the effective date, equity awards (in the form of restricted stock, options or warrants) for up to 10% of the New Common Stock (on a fully diluted basis) of Reorganized Holding will be granted to continuing employees of the Debtors and members of the new board of directors (consistent with market terms) by the new board of directors of Reorganized Holding, with pricing, vesting and exercise terms to be determined by the new board upon consultation with the CEO. Such equity awards shall be on terms reflective of a policy of rewarding the contribution of management to the long-term financial performance of the reorganized Debtors. |
| **Employee Matters** | The Acceptable Plan will provide that, on or after the Effective Date, Reorganized Holding shall implement the following employee incentive programs on terms and conditions reasonably acceptable to the Required Consenting Secured Noteholders (to be set forth in the Acceptable Plan Supplement): (i) a supplemental pension credit plan, and (ii) a bonus pool to be allocated by the CEO with the concurrence of the newly appointed board. |
| **Cancellation of Instruments, Certificates and Other Documents** | On the Effective Date, except to the extent otherwise provided in the Acceptable Plan, all instruments, certificates and other documents evidencing debt or equity interests in Holding or (as it relates to debt only) RD will be cancelled, and the obligations of RD or Reorganized Holding and its subsidiaries thereunder, or in any way related thereto, will be discharged; <u>provided that</u> any and all indemnities provided in the Credit Agreement (including, for the avoidance of doubt, the indemnities provided at section 4.05 thereunder) shall survive as Refinancing Loans; <u>provided further that</u> any and all indemnities provided in the DIP Facility shall survive as First Out Exit Term Loan obligations or Second Out Exit Term Loan obligations, notwithstanding in each case the cancellation of the predecessor credit agreement(s). |

| | |
|---|---|
| **Issuance of New Securities; Execution of Acceptable Plan Documents** | On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized Holding will issue all securities, instruments, certificates and other documents required to be issued pursuant to the Acceptable Plan. |
| **Executory Contracts and Unexpired Leases** | The Acceptable Plan will specify which executory contracts and unexpired leases will be assumed; all contracts not expressly assumed with the consent of the Required Consenting Secured Noteholders will be deemed rejected under the Acceptable Plan. Executory contracts will be renegotiated or rejected in a manner consistent with the Debtors' Business Plan and reasonably acceptable to the Required Consenting Secured Noteholders. |
| **Resolution of Disputed Claims** | The Acceptable Plan will provide for the resolution of disputed claims and any reserves therefor. |
| **Avoidance Actions and Other Litigation** | The reorganized Debtors will retain all rights to commence and pursue any and all claims and causes of action arising under the sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions") and other litigation. The Acceptable Plan will not provide for any funding of a litigation trust that can be used to fund litigation against the Released Parties. |
| **Exemption from Section 1145** | The issuance of the New Common Stock in Reorganized Holding will be exempted from applicable securities laws and/or from SEC registration under section 1145 of the Bankruptcy Code. |
| **Tax Issues** | The Parties agree to use their commercially reasonable best efforts to complete the financial restructuring of the Debtors contemplated by this Term Sheet and the International Restructuring Transactions in a manner that best preserves the tax attributes of the Debtors in a manner reasonably satisfactory to the Required Consenting Secured Parties. |
| **Retention of Jurisdiction** | The Acceptable Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| | **Corporate Governance/Charter Provisions/Registration Rights** |
| **Board of Directors of Reorganized Holding** | The board of directors of Reorganized Holding shall be comprised of 5 directors, including the CEO. The Required Consenting Secured Noteholders shall designate all such directors in consultation with the CEO. |
| **Reorganized Holding as a private company.** | Reorganized Holding shall be a private company upon the Effective Date. |
| **Description of Capital Stock** | From and after the Effective Date, subject to the right of the stockholders to amend the Certificate of Incorporation of Reorganized Holding after the Effective Date, Reorganized Holding shall have one class and one series of New Common Stock. |
| **Charter; Bylaws** | The charter and bylaws of each Debtor shall be restated consistent with section 1123(a)(6) of the Bankruptcy Code and otherwise in form and substance satisfactory to the Required Consenting Secured Parties. |
| **Registration Rights; Stockholders Agreement** | The supplement to the Acceptable Plan shall provide for a registration rights agreement and stockholders agreement with respect to the New Common Stock in material form and substance reasonably satisfactory to the Required |

6

|  | Consenting Secured Noteholders; provided that the registration rights agreement and stockholders agreement shall not adversely impact the Consenting Lender's First Out Exit Term Loan and its rights thereunder in any manner and the Consenting Lender shall have consultation rights for both documents. |
|---|---|
| **Release and Related Provisions** | |
| **Releases** | The Acceptable Plan will provide for the releases contemplated in the RSA and provide for mutual releases among the Administrative Agent, Consenting Lender, the Consenting Secured Noteholders, the DIP Lenders, the Debtors and their respective current and former directors, officers and professional advisors of any and all claims or causes of action, known or unknown, relating to any prepetition date acts or omissions. <br><br> The Plan Debtors' release of third parties will be provided for in the Acceptable Plan unless, after investigation, the Board of Directors determines such release is inappropriate. |
| **Exculpation** | The Acceptable Plan will contain ordinary and customary exculpation provisions among the Administrative Agent, Consenting Lender, the Consenting Secured Noteholders, the DIP Lenders, the Debtors and their respective directors, officers and professional advisors of any and all claims or causes of action, known or unknown, relating to any prepetition date acts or omissions. |
| **Indemnification** | The Acceptable Plan (i) will contain ordinary and customary indemnification provisions for indemnification of current and former directors and officers of the Debtors to the extent of available D&O coverage and payable from the proceeds of such D&O policies, including the advancing of defense costs prior to final adjudication; provided, that, to the extent proceeds of such policies are deemed property of the Debtors' estates in the Chapter 11 Cases the Debtors will use reasonable best efforts to seek relief from the Bankruptcy Court to have them advanced and (ii) shall provide that the Debtors shall maintain their current D&O insurance coverage in place as of the date of the RSA for current and former directors and officers of the Debtors. |
| **Discharge** | The Acceptable Plan for all Plan Debtors will contain a full and complete discharge from all claims and liabilities. |
| **Injunction** | The Acceptable Plan will contain ordinary and customary injunction provisions. |
| **Compromise and Settlement** | The Acceptable Plan will contain ordinary and customary compromise and settlement provisions. |

7

| | **Acceptable Plan Implementation** |
|---|---|
| **Restructuring Support Agreement & Definitive Documentation** | The parties to the RSA shall have executed such agreement no later than February 17, 2013. The RSA shall be terminable upon the conditions contained therein and the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for termination purposes. |
| | The Company and the Consenting Secured Parties shall, in good faith, negotiate definitive documentation to implement the Restructuring Transactions consistent with this Term Sheet and any related documentation, including the Acceptable Plan, the Acceptable Plan Supplement, the Acceptable Disclosure Statement, all post-Effective Date corporate organization and governance documents and all other documents necessary to effectuate the Restructuring Transactions. |
| **Motions & Other Bankruptcy Filings** | All motions and other filings with the Bankruptcy Court, including any proposed orders (including without limitation the orders authorizing the Debtors' entry into the DIP Facility and approving the Acceptable Disclosure Statement and confirming the Acceptable Plan) shall be in form and substance reasonably acceptable to the Required Consenting Secured Parties. |
| | The Debtors shall provide draft copies of all "first day" motions or applications and other documents the Debtors intend to file with the Bankruptcy Court (including the Plan, Disclosure Statement and all related documents) to counsel for the Consenting Lender and the Consenting Secured Noteholders, if reasonably practicable, at least two (2) days prior to the date when the Debtors intend to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing). |
| | **Conditions** |
| **Certain Conditions** | In addition to satisfaction of the Milestones set forth in the RSA and the requirement that the RSA be in full force and effect and shall not have terminated, the conditions precedent to confirmation and consummation of the Acceptable Plan shall be set forth in the Acceptable Plan and shall include: |
| | • That no material adverse change arises regarding the feasibility of the Acceptable Plan on or after the Effective Date of this Support Agreement including, without limitations, the assertion of material contingent and/or unliquidated liabilities, as determined by the Required Consenting Secured Parties in their reasonable discretion; and |
| | • The negotiation, execution and delivery of definitive documentation with respect to the Restructuring Transactions contemplated by this Term Sheet and the RSA reasonably acceptable to the Required Consenting Secured Parties. |
| | Milestones set forth in RSA to include: |
| | • Interim DIP Order within 5 days of Commencement Date; |
| | • Final DIP Order within 40 days after entry of Interim DIP Order; |
| | • Bar Date Order within 60 days after Petition Date; |
| | • Acceptable Plan filed within 25 days of the Commencement Date; |

K&E 25248023.7

|  | • Acceptable Disclosure Statement is approved by the Bankruptcy Court within 75 days of the Commencement Date; |
|  | • The Acceptable Plan Supplement shall be filed on or before July 5, 2013; |
|  | • Acceptable Plan confirmed by July 15, 2013; and |
|  | • Outside exit date of July 31, 2013. |

9

**Exhibit A to Restructuring Term Sheet**

**DIP Commitment Letter**

**Execution Copy**

February 17, 2013

The Reader's Digest Association, Inc.
750 Third Avenue
New York, New York 10017

Attention:  Paul Tomkins, Chief Financial Officer

Commitment Letter

Ladies and Gentlemen:

You have advised each of (i) Wells Fargo Principal Lending, LLC ("Wells Fargo") and (ii) Apollo Senior Floating Rate Fund Inc. ("Apollo"), Empyrean Capital Partners, LP ("Empyrean"), GoldenTree Asset Management, LP (together with Apollo and Empyrean, the "NM Lenders" and, together with Wells Fargo, the "Commitment Parties", "us" or "we") that RDA Holding, Inc., The Reader's Digest Association, Inc. together with its direct and indirect domestic subsidiaries (collectively, "you" or the "Company"), are considering filing voluntary petitions under title 11 of the United States Code (the "Bankruptcy Code").

Capitalized terms used but not defined herein are used with the meanings assigned to them in the Summary of Terms and Conditions for Senior Secured Priming Debtor-in-Possession Credit Facility attached hereto as Annex 1 (the "Term Sheet" and, together with this letter, collectively, this "Commitment Letter").  As used herein, the term "Transactions" means, collectively, the entering into and funding of a senior secured priming debtor-in-possession financing facility (the "DIP Facilities"), comprised of (a) a term loan in the aggregate principal amount of $45 million (the "New Money Loan") and (b) a "roll-up" term loan and letter of credit facility in the aggregate principal amount specified for the "Refinancing Loans" set forth in clause (b) of the section entitled "Commitments and Availability" in the Term Sheet (collectively, the "Refinancing Loan" and, together with the New Money Loan, the "Loans"), the refinancing of the credit facilities evidenced by the Existing Credit Agreement, the entering into the Restructuring Support Agreement, and all other related transactions, including the payment of fees and expenses in connection therewith.

1.  Commitments

In connection with the Transactions, (i) Wells Fargo is pleased to advise you of its commitment, and hereby commits to provide 100% of the aggregate amount of the Refinancing Loan upon the terms and conditions set forth in this Commitment Letter; and (ii) each of the undersigning NM Lenders is pleased to advise you of its commitment, and hereby commits to provide the percentage of the New Money Loan as set forth next to such NM Lender's name on Schedule I hereto, upon the terms and conditions set forth in this Commitment Letter.  Each Commitment Party's commitment hereunder is on a several, and not joint, basis with any other Commitment Party.

2.   Titles and Roles

It is agreed that an entity designated by the Commitment Parties (in consultation with the Borrower) will act as sole administrative agent and collateral agent for the DIP Facilities.

You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Term Sheet) will be paid in connection with the DIP Facilities unless you and we shall so reasonably agree.

3.   Information

You hereby represent that (a) all information concerning you or any of your subsidiaries, other than the Projections (as defined below), forward looking information and information of a general economic or industry specific nature (the "Information"), that has been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time) and (b) the financial and/or business projections and other forward-looking information (the "Projections") that have been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time prepared (it being recognized by the Commitment Parties that such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurances are given that any particular Projections will be realized and such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). You agree that if, at any time prior to the Closing Date, you become aware that any of the representations in the preceding sentence is incorrect in any material respect then you will promptly supplement the Information and the Projections so that such representations are correct in all material respects under those circumstances.

4.   Fees

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees to the applicable Commitment Parties described in the Term Sheet including, without limitation, Commitment Fees, Ticking Fees and Early Termination Fee (together with the Commitment Fees and the Ticking Fees, the "Fees"), on the terms and subject to the conditions set forth therein.  You agree that, once paid, the fees or any part thereof payable hereunder shall not be refundable under any circumstances, except as otherwise agreed in writing. All fees payable hereunder shall be paid in immediately available funds and shall be in addition to reimbursement of our out-of-pocket expenses as provided for in this Commitment Letter.

5.   Conditions

Each Commitment Party's commitments and agreements hereunder are subject to the conditions set forth in this letter and in the Term Sheet (a) under the heading "Conditions Precedent to Initial Borrowings" and "Conditions Precedent to Full Availability".

Each Commitment Party's commitments and agreements hereunder are further subject to (a) since December 31, 2012, there  not having been any change, condition, development or event that, individually

2

or in the aggregate, has had or could reasonably be expected to have a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Company and its subsidiaries, taken as a whole, other than as a result of the commencement of the Borrower's chapter 11 proceeding, any events causing the filing of the Cases or any events which customarily occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code, (b) satisfaction of all your obligations hereunder to pay fees and expenses when due and (c) your material compliance with all your obligations in this Commitment Letter and the Restructuring Support Agreement.

6.  Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Commitment Parties, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all actual losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the DIP Facilities, the use of the proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (but limited, in the case of legal fees and expenses, to (i) one primary counsel to such indemnified persons in respect of the NM Lenders and one primary counsel to such indemnified persons in respect of Wells Fargo, (ii) in the event of conflicts of interest, additional counsels to such affected indemnified persons, as necessary and (iii) local counsels as reasonably necessary in any relevant jurisdictions), provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent (x) they are found by a final non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of any indemnified person and (y) any dispute solely among indemnified persons other than any claims against an indemnified person arising out of any act or omission of you or any of your affiliates and (b) regardless of whether the Closing Date occurs, to reimburse within 10 business days of written demand each Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses that have been invoiced (including reasonable and documented out-of-pocket due diligence expenses, travel expenses, reasonable fees and reasonable documented out-of-pocket expenses of professionals engaged in collateral reviews; appraisals and environmental reviews, and reasonable fees, charges and disbursements of counsels; it being agreed that there may be one primary counsel for Wells Fargo (presently Milbank, Tweed, Hadley & McCloy LLP) and one primary counsel for the NM Lenders (presently Kirkland & Ellis LLP), and in each case any additional counsels engaged in the event of conflicts, special counsels and local counsels as reasonably necessary in any relevant jurisdiction) incurred in connection with the DIP Facilities and any related documentation (including this Commitment Letter and the definitive financing documentation) or the administration, amendment, modification, waiver or enforcement thereof. It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other person) and that each Commitment Party shall be liable solely in respect of its own commitment to the DIP Facilities on a several, and not joint, basis with any other Commitment Party. No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of such indemnified person. None of the indemnified persons or you, or any of your affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the DIP

3

Facilities or the transactions contemplated hereby, <u>provided</u> that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 6.

7.  Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party (or an affiliate) may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, or your affiliates. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

8.  Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors on a need-to-know basis, (b) as may be required (or necessary in connection with) in any legal, judicial or administrative proceeding (including, without limitation, as may be required to obtain court approval in connection with any acts or obligations to be taken pursuant to this Commitment Letter or the transactions contemplated hereby (in which case you agree to inform us promptly thereof) and further that you may disclose this Commitment Letter to the official committee of unsecured creditors appointed in any of the Company's and its subsidiaries' bankruptcy cases (collectively, the "<u>Creditors' Committee</u>") and its advisors and to any other official committee appointed in any of the Company's and its subsidiaries' bankruptcy cases (collectively, the "<u>Committees</u>") or as otherwise required by applicable law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof) and (c) upon notice to the Commitment Parties, this Commitment Letter and the existence and contents hereof may be disclosed in connection with any public filing requirement.

4

9. Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein. It is agreed that each of the NM Lenders may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. It is agreed that Wells Fargo may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. The Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part; to their affiliates certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree in their sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter is the only agreement that has been entered into among us and you with respect to the DIP Facilities and set forth the entire understanding of the parties with respect thereto. This Commitment Letter, and any claim, controversy or dispute arising under or related to this Commitment Letter, whether in tort, contract (at law or in equity) or otherwise, shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflict of law principles that would result in the application of any law other than the State of New York.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the bankruptcy court having jurisdiction over the chapter 11 cases of the Company and its subsidiaries or, if such court denies jurisdiction or the Company elects not to file cases under the Bankruptcy Code, then any state or Federal court sitting in the Borough of Manhattan in the City of New York over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the performance of services hereunder or thereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify each Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

The indemnification, fee, expense, jurisdiction and confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive financing documentation shall be

5

executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder.

      If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us executed counterparts of this Commitment Letter not later than the earlier of (a) 10:00 p.m., New York City time, on February 17, 2013 and (b) the time of the filing by the Loan Parties of their petition or petitions under Chapter 11 of the Bankruptcy Code. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In the event that the initial borrowing under the DIP Facilities does not occur on or before February 20, 2013, then this Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our discretion, agree to an extension. In addition, this Commitment Letter and the commitments hereunder shall expire at (a) 5:00 p.m. (New York City time) on February 18, 2013, unless the Loan Parties shall have theretofore filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the Court and (b) if such petitions have been filed by such time, at 11:59 p.m. (New York City time) on the date that is five (5) days after such filing, unless, prior to that time, the Court shall have entered the Interim Order, the Borrower shall have paid to the Commitment Parties the fees that are specified herein to be due upon such entry and the Borrower shall have entered into definitive documentation with respect to the DIP Facilities. In the further event that the Interim Order is entered, this Commitment Letter and the commitments hereunder shall expire 40 days after the entry of the Interim Order unless the Final Order shall have been entered prior to the expiration of such 40-day period.

      [THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

6

Very truly yours,


WELLS FARGO PRINCIPAL LENDING, LLC

By: _____
     Name:  Greg Apkarian
     Title:   Vice President

Very truly yours,

Apollo Senior Floating Rate Fund Inc.
Account 631203

By: _____

Name:
Title:

**JOSEPH MORONEY**
Authorized Signatory

Very truly yours,

EMPYREAN CAPITAL PARTNERS, LP
on behalf of the funds and accounts managed by it

By: _____
Name: RYAN MAYETANI
Title: CHIEF FINANCIAL OFFICER

Very truly yours,

GOLDENTREE ASSET MANAGEMENT, LP
on behalf of certain funds and accounts managed by
it

By: _____

Name: George HARTIGAN

Title: VP

Accepted and agreed to as of the date first written above:

THE READER'S DIGEST ASSOCIATION, INC.

By: _____

    Name:  Robert Guth

    Title:   President and Chief Executive Officer

Schedule I

New Money Loan Commitments:

| NM Lender | Percentage of Commitment | |
|---|---|---|
| Apollo Senior Floating Rate Fund Inc. | | |
| Empyrean Capital Partners, LP | | |
| GoldenTree Asset Management, LP | | |
| Total | 100% | |

## Term Sheet
February 17, 2013

### <u>Summary of Terms and Conditions for</u>
### <u>Senior Secured Priming Debtor-in-Possession Credit Facility</u>

I.      <u>Parties</u>

| | |
|---|---|
| Borrower: | The Reader's Digest Association, Inc., a Delaware corporation (the "<u>Borrower</u>"), which will be a debtor and debtor-in-possession in a case to be filed under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") (the "<u>Borrower's Case</u>") in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "<u>Bankruptcy Court</u>") (the date of the commencement of the Cases, the "<u>Petition Date</u>"). |
| Guarantors: | All obligations of the Borrower under the Definitive Documentation (as defined below) (the "<u>Obligations</u>") will be unconditionally guaranteed by RDA Holding Co., a Delaware corporation ("<u>Holding</u>"), and by each direct and indirect, existing and future domestic subsidiary of the Borrower (collectively and, with Holding, the "<u>Guarantors</u>" and, together with the Borrower, the "<u>Loan Parties</u>" or the "<u>Debtors</u>"), each of which will be a debtor-in-possession in a case to be filed in the Bankruptcy Court (the "<u>Guarantors' Cases</u>"; together with the Borrower's Case, the "<u>Cases</u>"). |
| Administrative Agent and Collateral Agent: | An entity to be selected by the Lenders in consultation with the Borrower (in such capacity, the "<u>Administrative Agent</u>"). |
| DIP Lenders: | Certain Secured Noteholders (as defined below) party to the commitment letter dated February 17, 2013 to which this term sheet is attached (the "<u>Commitment Letter</u>") in respect of the New Money Loan (the "<u>NM Lenders</u>") and Wells Fargo Principal Lending, LLC ("<u>Wells Fargo</u>") in respect of the Refinancing Loan (the "<u>Refinancing Loan Lender</u>", together with the NM Lenders, collectively the "<u>DIP Lenders</u>"). |

II.      <u>Basic Terms</u>

| | |
|---|---|
| Commitments and Availability: | A senior secured priming debtor-in-possession credit facility (the "<u>DIP Facility</u>") comprised of (a) a term loan in the aggregate principal amount of $45 million (the "<u>New Money Loan</u>") and (b) a refinancing term loan and letter of credit facility in the aggregate amount (of approximately $60 million) equal to the sum of (i) $49,625,000 plus (ii) the aggregate amount of all letters of credit outstanding under the Existing Credit Agreement as of February 17, 2013 equal to $9,516,267 plus (iii) the |

1

aggregate amount of all outstanding and unpaid fees, letter of credit standby fees and commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Cases (as defined below) under the Existing Credit Agreement and immediately prior to the date when the Refinancing Loans become effective (collectively, the "<u>Refinancing Loan</u>" and, together with the New Money Loan, the "<u>Loans</u>"), it being understood that the indemnification obligations under the Existing Credit Agreement will survive as obligations under the DIP Facility notwithstanding the refinancing or termination of the facilities under the Existing Credit Agreement. During the period commencing on the Closing Date (as defined below) and ending on the date of entry of the Final Order (as defined below) (such period, the "<u>Interim Period</u>"), a portion of the New Money Loan in an amount equal to $11 million (or such lower amount as may be ordered by the Bankruptcy Court) shall be available to the Borrower and borrowed in one draw on the Closing Date, subject to compliance with the terms, conditions and covenants described in this Summary of Terms and Conditions (this "<u>Term Sheet</u>").

Upon the Bankruptcy Court's entry of the Final Order (such date hereinafter being referred to as the "<u>Final Order Entry Date</u>"), the remaining amount of the New Money Loan and the full amount of the Refinancing Loan shall be borrowed within two (2) business days of the Final Order Entry Date, subject to compliance with the terms, conditions and covenants described in this Term Sheet and the Definitive Documentation.

| | |
|---|---|
| Amortization: | None. |
| Term: | Borrowings shall be repaid in full in cash, and the remaining commitments, if any, shall terminate, at the earliest of (a) October 31, 2013, (b) the 40th day after the entry of the Interim Order (as defined below) (or such later date agreed to by the Required DIP Lenders (as defined below)) if the Final Order has not been entered prior to the expiration of such period, (c) the effective date of a Chapter 11 plan of reorganization that has been confirmed pursuant to an order entered by the Bankruptcy Court or any other court having jurisdiction over the Cases (the "<u>Effective Date</u>") and (d) the acceleration of the Loans or termination of the commitments in accordance with the Credit Agreement (as defined below) (such earliest date, the "<u>Termination Date</u>"). To the extent not otherwise terminated pursuant to the foregoing, the unused Commitments shall terminate on the date that is five (5) business days after the Final Order Entry Date. Any confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the obligations of the Loan Parties to the DIP Lenders under the DIP Facility and the Definitive Documentation other than after the payment in full and in cash to the DIP Lenders of all principal, interest and all other obligations under the DIP Facility and the Definitive Documentation on or before the effective date of a plan of reorganization and the termination of the Commitments (except as |

provided under "Exit Financing" below).

Exit Financing:

The Refinancing Loan Lender agrees that, on the date of consummation of a plan of reorganization, subject to the satisfaction of the applicable conditions set forth in the "First Out Exit Facility Term Sheet" attached to the Commitment Letter as Annex 2 (the "First Out Exit Facility Term Sheet") and otherwise in accordance therewith and pursuant to the terms of the definitive documentation thereof, the Refinancing Loans shall be continued as or converted into, exit financing of the reorganized Debtors (or if the Refinancing Loans are not continued or converted into exit financing such Refinancing Loans shall be paid in full in cash upon consummation of such plan of reorganization). The NM Lenders agree that, on the date of consummation of a plan of reorganization, subject to the satisfaction of the applicable conditions set forth in the "Second Out Exit Facility Term Sheet" attached to the Commitment Letter as Annex 3 (the "Second Out Exit Facility Term Sheet") and otherwise in accordance therewith and pursuant to the terms of the definitive documentation thereof, the New Money Loans shall be continued as or converted into, exit financing of the reorganized Debtors (or if the New Money Loans are not continued or converted into exit financing such New Money Loans shall be paid in full in cash upon consummation of such plan of reorganization).

Notwithstanding the foregoing and that the scheduled final maturity of the Refinancing Loan extends beyond the date that is 180 days after the Petition Date, the commitment of Wells Fargo Principal Lending, LLC under the Restructuring Support Agreement and the First Out Exit Facility Term Sheet to provide the First Out Exit Facility Term Loans (as such terms are defined in the Restructuring Support Agreement) shall automatically terminate on the date that is 180 days after the Petition Date.

It is understood and agreed that each DIP Lender's commitment herein in respect of such exit financing is on a several, and not joint, basis with any other DIP Lenders.

Closing Date:

Closing and initial funding to occur as promptly as is practicable after the entry of the Interim Order but no later than two (2) business days after such entry (the "Closing Date").

Purpose:

The proceeds of the Loans shall be used: (1) in respect of the New Money Loan, (a) for working capital and other general corporate purposes of the Borrower, the other Loan Parties and their respective subsidiaries in accordance with, and subject to the limitations in, the Cash Flow Forecast, (b) to pay transaction costs, fees and expenses incurred in connection with the DIP Facility and the transactions contemplated thereunder and hereby (it being understood and agreed that no proceeds of the Loans may be used to fund any subsidiary that is not a Loan Party) and (c) to pay the Noteholder Protections (as defined below), the Lender Protections (as defined below) and other adequate protection

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

expenses, if any, to the extent set forth in the Interim Order; and (2) in respect of the Refinancing Loan, to repay in full the loans and obligations outstanding under the credit facilities evidenced by that certain Credit and Guarantee Agreement dated as of March 30, 2012, among Holding, the Borrower, the lenders party thereto and Wells Fargo Bank, N.A., as administrative agent for the lenders (as amended, the "Existing Credit Agreement"), including rolling up the aggregate amount of all letters of credit outstanding under the Existing Credit Agreement as of February 17, 2013, the aggregate amount of all outstanding and unpaid fees, letter of credit standby fees and commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Cases under the Existing Credit Agreement and immediately prior to the date when the Refinancing Loans become effective (provided, that, no unused letter of credit commitments will be rolled up; rather all unused commitments shall be deemed to terminate simultaneously with the effectiveness of the Refinancing Loans); it being understood that the indemnification obligations under the Existing Credit Agreement will survive as obligations under the DIP Facility notwithstanding the refinancing or termination of the facilities under the Existing Credit Agreement. The proceeds of Loans may not be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lenders, the Administrative Agent or any of the Secured Noteholders or Wells Fargo.

Priority and Liens:    All borrowings by the Borrower and other Obligations of the Borrower under the DIP Facility (and all guaranties by the Guarantors) shall, subject to the Carve-Out (defined below), at all times:

(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Cases;

(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors' respective estates in the Cases and the proceeds thereof (including, without limitation, inventory, accounts receivable, general intangibles, chattel paper, intercompany loans, notes and balances, owned real estate, real property leaseholds, fixtures and machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements, and other intellectual property, avoidance action claims and the proceeds thereof, and capital stock of subsidiaries (including 100% of the issued and outstanding non-voting equity interests in any first tier foreign subsidiary and no more than 65% of issued and outstanding voting equity interests in any first tier foreign subsidiary) (collectively, the "Collateral") that is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases;

(iii)     pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all Collateral of the Debtors' respective estates in the Cases, that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure obligations under the agreements referred to in clauses (1), (2) and (3) of clause (iv) hereof, which liens shall be primed by the liens to be granted to the Administrative Agent as described in such clause); and

(iv)     pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the Collateral of the Debtors' respective estates in the Cases that is subject to the existing liens that secure the obligations of the Loan Parties under or in connection with the Existing Credit Agreement, and the senior secured notes issued pursuant to that certain indenture, dated February 11, 2010 ("Indenture") by and among the Borrower, certain of its affiliates and the purchasers party thereto from time to time (the "Secured Noteholders") and all of which existing liens (the "Existing Primed Secured Facilities"; the liens thereunder, the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the Administrative Agent, which senior priming liens in favor of the Administrative Agent shall also prime any liens granted after the commencement of the Cases to provide adequate protection in respect of any of the Primed Liens but shall not prime liens, if any, to which the Primed Liens are subject at the time of the commencement of the Cases.

subject, in each case, only to the Carve Out.

For purposes hereof, the term "Carve Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Cases prior to the occurrence of an Event of Default and notice thereof delivered to the Borrower to the extent allowed by the Bankruptcy Court at any time, and (iii) at any time after the occurrence of an Event of Default and notice thereof delivered to the Borrower, to the extent allowed at any time, whether before or after delivery of such notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors and the Committee and allowed by this Court, not in excess of $2,500,000 for the

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

Debtors' professionals and the Committee's professionals (the "Carve
Out Cap"); provided that the Carve Out Cap shall be inclusive of any
professional fees, costs and expenses incurred by any Chapter 7 trustee,
such professional fees, costs and expenses in an amount not to exceed
$25,000 in the aggregate; provided further that the Carve Out shall not be
available to pay any such Professional Fees incurred in connection with
the initiation or prosecution of any claims, causes of action, adversary
proceedings or other litigation against the DIP Agent, the DIP Lenders,
the Secured Noteholders or the lender under the Existing Credit
Agreement and nothing herein shall impair the right of any party to
object to the reasonableness of any such fees or expenses to be paid by
the Debtors' estates.

All of the liens described above shall be effective and perfected as of the
Interim Order Entry Date pursuant to the Interim Order and without the
necessity of possession of any possessory collateral or the execution of
mortgages, security agreements, pledge agreements, financing statements
or other agreements, in each case subject to the terms and conditions set
forth in the Interim Order.

Both the New Money Loan and the Refinancing Loan will be secured
with the same Collateral, with *pari passu* ranking.

| | |
|---|---|
| Payment Priority: | The New Money Loan and the Refinancing Loan shall rank *pari passu* in terms of right to payment. |
| Noteholders Protection: | The noteholders under the Indenture (the "Primed Noteholders") whose liens are primed as described in clause (iv) of "Priority and Liens" above, shall receive adequate protection of their interest in their prepetition collateral pursuant to Sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, in an amount equal to the aggregate diminution in value of the Primed Noteholders' respective prepetition collateral including, without limitation, any such diminution resulting from the imposition of, and payments benefitting from, the Carve-Out, the imposition of the automatic stay, the implementation of the DIP Facility and the priming of the Primed Noteholders' liens on the prepetition collateral, the sale, lease or use by the Debtors (or other decline in value) of the prepetition collateral (including cash collateral), all of which adequate protection must be satisfactory to the NM Lenders, including the following: (i) a superpriority claim as contemplated by Section 507(b) of the Bankruptcy Code immediately junior to the claims under Section 364(c)(1) of the Bankruptcy Code held by the Administrative Agent and the DIP Lenders; provided however that the Primed Noteholders shall have irrevocably agreed, pursuant to Section 1129(a)(9) of the Bankruptcy Code, in any stipulation and/or order granting such adequate protection, that such junior superpriority claims may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of the plan equal to the allowed amount of such claims, (ii) a replacement lien on the Collateral, which adequate protection lien shall have a priority |

immediately junior to the liens granted pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in favor of the Administrative Agent for the benefit of the DIP Lenders, (iii) the payment of the reasonable fees and expenses incurred by (1) one primary counsel (and any conflicts, special or local counsel retained)for Wilmington Trust FSB as the collateral agent under the Existing Primed Secured Facilities, and the continuation of the payment on a current basis of the agency fee (to the extent owing) provided for under the Indenture (and the other related definitive documentation) and (2) one primary counsel (and any conflicts, special or local counsel retained)  and one financial advisor for the ad hoc committee of the Secured Noteholders, and (iv) such other adequate protection as the Bankruptcy Court may order  (collectively, the "Noteholder Protections").

|                    |                    |
|--------------------|--------------------|
| Lender Protections | The lender under the Existing Credit Agreement (the "Primed Lender") in exchange for consenting to having its liens primed as described in clause (iv) of "Priority and Liens" above, consenting to providing Exit Financing on terms and conditions specified herein, consenting to executing the Restructuring Support Agreement and the Restructuring Transactions (as defined in the Restructuring Support Agreement) and adequate protection of their interest in their prepetition collateral pursuant to Sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, in an amount equal to the aggregate diminution in value of the Primed Lender's respective prepetition collateral including, without limitation, any such diminution resulting from the imposition of, and payments benefitting from, the Carve-Out, the imposition of the automatic stay, the implementation of the DIP Facility and the priming of its liens on the prepetition collateral, the sale, lease or use by the Debtors (or other decline in value) of the prepetition collateral (including cash collateral), shall receive the following: (a) upon entry of the Interim Order (i) current cash pay of interest fees and commissions (including, for the avoidance of doubt, any accrued pre- and post-petition interest and letter of credit fees and commissions at the non-default rate under the Existing Credit Agreement, (ii) payment of all unreimbursed reasonable and documented advisor fees and expenses of the Primed Lender including that of former counsel (and any conflicts, special or local counsel retained, if any) whether pre- or post-petition, (iii) current pay of all reasonable fees and expenses of the Primed Lender during the Cases (including for one primary counsel (and any conflicts, special or local counsel retained)), (iv) a superpriority claim as contemplated by Section 507(b) of the Bankruptcy Code immediately junior only to the claims under Section 364(c)(1) of the Bankruptcy Code held by the Administrative Agent, the DIP Lenders and to the New Money Loan, (v) a replacement lien on the Collateral, which adequate protection lien shall have a priority immediately junior to only the liens granted pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in favor of the Administrative Agent for the benefit of the DIP Lenders, (vi) and the continuation of the payment on a current basis of the agency fee (to the extent owing) to Wells Fargo as the administrative agent under the Existing Credit Agreement to the extent provided for under the |

Existing Credit Agreement (and the other related definitive documentation) and (vii) and such other adequate protection as the Bankruptcy Court may order and (b) upon entry of the Final Order (i) the Refinancing Loans and (ii) other Priorities and Liens granted under this Term Sheet (collectively, the "<u>Lender Protections</u>").

Nature of Fees:       Non-refundable and fully earned when paid under all circumstances.

### III.     <u>Prepayment Provisions</u>

Optional Prepayments and
Commitment Reductions:      Loans may be prepaid and commitments may be reduced in minimum amounts to be agreed upon, subject to the Early Termination Fee (referenced below), as applicable. Optional prepayment of the Loans shall be applied ratably to the Loans outstanding. No prepayment of the Loans may be reborrowed.

Mandatory Prepayments:      Subject to the reinvestment exception described below, the following amounts shall be applied to prepay the Loans:

- 100% of the net cash proceeds from the incurrence of indebtedness (other than certain permitted indebtedness to be agreed) after the Closing Date by Holding or any of its subsidiaries; and

- 100% of the net cash proceeds of any sale or other disposition (including (a) by issuance or sale of stock of Holding or any of its subsidiaries, (b) as a result of casualty or condemnation, net of remediation or replacement costs and (c) any extraordinary receipts) by Holding or any of its subsidiaries of any assets (except for sales of inventory in the ordinary course of business and certain other dispositions and exceptions to be agreed on);

*provided* that in the absence of a default or event of default under the Definitive Documentation, the Loan Parties shall be permitted to reinvest (or commit to reinvest) such proceeds not exceeding $15 million in the aggregate within six (6) months after the receipt of the proceeds in each case subject to the terms and conditions of the Definitive Documentation.

The prepayment amounts shall be applied to pay down the New Money Loan and the Refinancing Loan on a pro rata basis.

The DIP Lenders may have the option to decline the mandatory prepayments in their sole discretion.

### IV.     <u>Interest and Certain Fees</u>

Interest Rate:      Refinancing Loan:

LIBO Rate (with a floor of 3.0%) plus 5.0% per annum

Base Rate (with a floor of 4.0%) plus 4.0% per annum

New Money Loan:

LIBO Rate (with a floor of 1.50%) plus 9.50% per annum

Base Rate (with a floor of 2.50%) plus 8.50% per annum

As used herein:

"LIBO Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 3.0% for the Refinancing Loan and 1.50% for the New Money Loan.  "Base Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 4.0% for the Refinancing Loan and 2.50% for the New Money Loan.

| | |
|---|---|
| Default Rate: | Upon the occurrence and during the continuance of an Event of Default under the Credit Agreement, interest shall accrue on the outstanding amount of the obligations under the Credit Agreement and shall be payable on demand at 2.0% per annum above the then applicable rate. |
| Commitment Fees: | The Borrower shall pay to the Administrative Agent for the account of the NM Lenders providing the New Money Loan, commitment fees in an amount equal to 2.0% of the aggregate amount of the commitments in respect of the New Money Loan (i.e., $45 million) on the Closing Date. |
| Ticking Fees: | For the period of time from the 30th day after the Petition Date through and including the date when the Borrower shall borrow the full amount of the New Money Loan (the "Full Funding Date"), the Borrower shall pay a fee equal to 4.75% per annum over the daily average of the undrawn amount of the New Money Loan (i.e., the difference between $45 million and the amount of the New Money Loan borrowed on the Closing Date). |
| Early Termination Fee: | In the event that the Borrower shall prepay the New Money Loan in part or in full, or reduce or terminate any commitment in respect of the NM Loan in part or in full,  prior to 60 days after the Petition Date, the Borrower shall pay the NM Lenders an early termination fee in the amount equal to (a) in the case of prepayment in full or reduction of commitment in full, 2% of the aggregate principal amount of the total commitment for the New Money Loan (i.e., $45 million), and (b) in the case of partial prepayment or commitment reduction, 2% of the aggregate principal amount of the New Money Loan commitment so reduced or the New Money Loan so prepaid; in each case due and payable at the time of such prepayment or reduction. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed, *provided* that computations of interest for Base |

Rate Loans when the Base Rate is determined by the prime rate shall be made on the basis of the number of actual days elapsed in a year of 365 or 366 days, as the case may be.

## V.    Certain Conditions

Conditions Precedent to
Initial Borrowings:

The obligations of the DIP Lenders to make Loans under the DIP Facility will be subject to the following conditions precedent:

(a)  The Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to the DIP Lenders and the Administrative Agent, an interim order no later than five (5) calendar days after the Petition Date (or such later date agreed to by the Required DIP Lenders), approving and authorizing the DIP Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code Section 364(c) and (d), as applicable, in form and substance satisfactory to the Administrative Agent, Wells Fargo and the Secured Noteholders party to the Commitment Letter, in their sole discretion, and including without limitation, provisions (i) modifying the automatic stay to permit the creation and perfection of the liens in favor of the DIP Lenders on the Collateral; (ii) providing for the automatic vacation of such stay to permit the enforcement of the DIP Lenders' remedies under the DIP Facility, including without limitation the enforcement, upon five (5) business days' prior written notice, of such remedies against the Collateral; (iii) prohibiting the incurrence of debt with priority equal to or greater than the DIP Lenders' under the DIP Facility, except as expressly provided in the Definitive Documentation; (iv) prohibiting any granting or imposition of liens other than liens acceptable to the Required DIP Lenders except as expressly provided in the Definitive Documentation; (v) priming the liens of the lenders and holders under the Existing Primed Secured Facilities and granting the Noteholder Protections, the Lender Protections and other adequate protection for such priming in the form of liens, superpriority administrative expense claims and other payments and obligations as described in the "<u>Priority and Liens</u>" section of this Term Sheet and authorizing the use of cash collateral in accordance with the terms hereof; (vi) authorizing and approving the DIP Facility and the transactions contemplated hereby, including without limitation the granting of the superpriority claims, the first-priority and priming security interests and liens upon the Collateral and the payment of all fees and expenses due to the DIP Lenders and the Administrative Agent; (vii) finding that the DIP Lenders are extending credit to the Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code; (viii) authorizing interim extensions of credit in amounts acceptable to the Required NM Lenders and currently expected to be $11 million; and (ix) containing a determination by the Bankruptcy Court that, subject to an investigation period by the official creditors' committee, the liens securing the Existing Primed Secured Facilities are valid and unavoidable (with a finding that the Debtors stipulate and agree that the liens securing the Existing Primed Secured Facilities  are valid

and unavoidable and that the obligations under the Existing Primed Secured Facilities are valid, binding and enforceable in accordance with the terms therein) (such interim order being referred to as the "<u>Interim Order</u>", and the date of entry of the Interim Order being hereinafter referred to as the "<u>Interim Order Entry Date</u>");

(b)  The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the DIP Lenders;

(c)  The Loan Parties shall be in compliance in all respects with the Interim Order;

(d)  The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter, including in respect of amounts of critical vendor payments, if any, shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required DIP Lenders;

(e)  No trustee, receiver, interim receiver or receiver and manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(f)  No material adverse change (to be defined) shall have occurred other than the commencement of the Cases.

(g)  The Administrative Agent and the DIP Lenders shall have received from the Loan Parties forecasts on a consolidated basis of the Borrower and its subsidiaries' income statement, balance sheet and cash flows for each fiscal month of fiscal year 2013 and including the material assumptions on which such forecasts were based (including, but not limited to, future cost reduction initiatives), and setting forth the anticipated disbursements and uses of the Commitments, which forecasts shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required DIP Lenders and certified by a responsible officer (the "<u>Budget</u>");

(h)  The Administrative Agent and the DIP Lenders shall have received from the Loan Parties certified copies of (i) the audited consolidated balance sheets of the Borrower and its subsidiaries as of each of the three (3) fiscal years proceeding the fiscal year ending on December 31, 2012, and the related audited consolidated statements of income, stockholders' equity and cash flows for the Borrower and its consolidated subsidiaries for the corresponding periods, (ii) the unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter ended after the fiscal year ended December 31, 2012 for which

such financial statements are available prior to the Closing Date and (iii) to the extent made available by the Borrower, monthly financial data generated by the Borrower's internal accounting systems for use by senior management for each month ended after the latest fiscal quarter for which unaudited financial statements are delivered pursuant to clause (ii) above and at least 30 days before the Closing Date;

(i) The Administrative Agent and the DIP Lenders shall have received a 13-week cash flow projection of the Borrower and its subsidiaries, which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required DIP Lenders and certified by a responsible officer (the "Cash Flow Forecast");

(j) All costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the Definitive Documentation to be payable to the DIP Lenders and/or the agents shall have been paid, in each case, to the extent due;

(k) No Default or Event of Default under the Definitive Documentation shall have occurred and be continuing;

(l) Representations and warranties shall be true and correct in all material respects;

(m) The Administrative Agent and the Required DIP Lenders shall be satisfied that the Loan Parties have complied with all other customary closing conditions, including, without limitation: (i) the delivery of good standing certificates from the states of formation/incorporation and customary closing certificates and officer's certificates; (ii) evidence of authority; and (iii) obtaining of any material third party and governmental consents necessary in connection with the DIP Facility, the financing thereunder and related transactions;

(n) The Administrative Agent and the DIP Lenders shall have received evidence that all insurance required to be maintained pursuant to the Definitive Documentation has been obtained and is in effect and that the Administrative Agent has been named as loss payee or additional insured, as appropriate, under each insurance policy with respect to such liability and property insurance as to which the Administrative Agent shall have requested to be so named (it being understood and agreed that the deliverables under this clause (n) may be delivered following the Closing Date within a time period the Required DIP Lenders shall consent to);

(o) The Administrative Agent and the DIP Lenders shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act;

(p)  The Administrative Agent and the DIP Lenders shall have received executed definitive loan documentation relating to the DIP Facility (including a credit agreement (the "<u>Credit Agreement</u>") and related security and closing documents (collectively, the "<u>Definitive Documentation</u>"), in each case of the foregoing reasonably satisfactory to the Administrative Agent and the Required DIP Lenders and consistent with the terms of this Term Sheet;

(q) The Administrative Agent and the DIP Lenders shall have received UCC searches (or comparable searches, if any, in the case of foreign jurisdictions) conducted in the jurisdictions in which the Loan Parties are organized (dated as of a date reasonably satisfactory to the Administrative Agent and the Required DIP Lenders), reflecting the absence of liens and encumbrances on the assets of the Loan Parties other than such liens as may be permitted under the Definitive Documentation;

(r)  All corporate and judicial proceedings and all instruments and agreements in connection with the loan transactions among the Loan Parties, the Administrative Agent and the DIP Lenders contemplated by the Credit Agreement shall be reasonably satisfactory in form and substance to the Administrative Agent and the DIP Lenders and the Administrative Agent and the DIP Lenders shall have received all information and copies of all documents or papers  reasonably requested by the Administrative Agent or any Lender;

(s)  The Administrative Agent shall have received a notice of borrowing from the Borrower;

(t)  The Restructuring Support Agreement shall be in full force and effect and shall not have been terminated and no default or event of default (unless as a result of a breach by the NM Lenders party thereto) thereunder shall have occurred or be continuing; and

(u)  The Administrative Agent and the DIP Lenders shall have received such information (financial or otherwise) and documents as may be reasonably requested by the Administrative Agent or the Required DIP Lenders and shall be satisfied with the nature and substance thereof.

As used in this term sheet, the term "<u>Restructuring Support Agreement</u>" shall mean that certain Restructuring Support Agreement dated February 17, 2013 by and among the Borrower, the Borrower's affiliates party thereto, Wells Fargo Principal Lending, LLC, Goldentree Asset Management LP, Apollo Investment Management, L.P. and Empyrean Capital Partners, LP.

| | |
|---|---|
| Conditions Precedent to Full Availability: | The obligations to provide extensions of credit up to the full amount of the Loans shall be subject to the satisfaction of the following conditions precedent: |

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

(a)  Not later than the 40th day following the entry of the Interim Order (or such later date agreed to by the Required DIP Lenders), a final order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Administrative Agent and the DIP Lenders on a motion by the Loan Parties that is in form and substance reasonably satisfactory to Wells Fargo and the Secured Noteholders party to the Commitment Letter, approving and authorizing on a final basis the matters and containing the provisions described in clause (a) in "Conditions Precedent to Initial Borrowings" above, authorizing the DIP Facility (including both the Refinancing Loan and the New Money Loan) and containing a waiver of the Debtors' rights under Section 506(c) of the Bankruptcy Code (such final order being referred to as the "Final Order");

(b)  The Final Order shall not have been reversed, modified, amended, stayed or vacated;

(c)  The Loan Parties shall be in compliance with the Final Order;

(d)  The DIP Lenders shall have received the required periodic updates of the Cash Flow Forecast and variance reports, each in form and substance reasonably satisfactory to the Administrative Agent and the Required NM Lenders; and the Loan Parties shall be in compliance with the updated Cash Flow Forecast;

(e)  No Default or Event of Default shall have occurred and be continuing under the DIP Facility;

(f)  Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent such representations and warranties relate to an earlier date;

(g)  The Loan Parties shall have paid the balance of all fees then payable to the DIP Lenders and the agents as referenced herein, in each case to the extent due;

(h)  The Restructuring Support Agreement shall be in full force and effect and shall not have been terminated and no default or event of default (unless as a result of a breach by the NM Lenders party thereto) thereunder shall have occurred or be continuing; and

(i)  The Administrative Agent shall have received a notice of borrowing from the Borrower.

The acceptance by the Borrower of each extension of credit under the Credit Agreement shall be deemed to be a representation and warranty by the Loan Parties that the conditions specified above have been satisfied.

VI.    Certain Documentation Matters

The Definitive Documentation shall contain representations, warranties, covenants and events of default customary for financings of this type, including, without limitation, those set forth below:

Representations and
Warranties:

The Loan Parties shall make the representations and warranties set forth in the Existing Credit Agreement, modified as necessary to reflect the commencement of the Cases, changes in the financial and other conditions of the Loan Parties resulting therefrom and from events leading up thereto and such other matters as the DIP Lenders shall reasonably require in the Definitive Documentation.

In addition, each of the Loan Parties represents and warrants that they are in material compliance with each material contract entered into by any Loan Party after the Petition Date or entered into prior to the Petition Date and assumed, specific material contracts have been continued, the Interim Order or the Final Order (as applicable) shall continue to be effective, and the Loan Parties have not failed to disclose any material assumptions with respect to the Budget or Cash Flow Forecast and affirm that each of the Budget and Cash Flow Forecast reflects good faith estimates of the matters set forth therein; on the Termination Date the DIP Lenders shall be entitled to immediate payment of the obligations without further application to the Bankruptcy Court.

Affirmative Covenants:

Each of the Loan Parties (with respect to itself and each of its subsidiaries) agrees to the affirmative covenants set forth in the Existing Credit Agreement, modified as necessary to reflect the commencement of the Cases, changes in the financial and other conditions of the Loan Parties resulting therefrom and from events leading up thereto and such other affirmative covenants as the DIP Lenders shall reasonably require in the Definitive Documentation as well as the following affirmative covenants:

(a)  delivery of monthly (in addition to quarterly and annual) consolidated and consolidating financial statements and reports showing variances from the Budget;

(b)  delivery of bi-weekly updates of the Cash Flow Forecast and variance reports, each in form and substance reasonably satisfactory to the Administrative Agent and the Required NM Lenders;

(c)  monthly delivery of a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its subsidiaries (including, without limitation, with respect to asset sales, cost savings, facility closures, litigation, contingent liabilities and other matters as the Administrative Agent or the Required DIP Lenders may reasonably request);

(d)  delivery by dates to be agreed of non-core asset sale plan and progress reports with respect thereto, each in form and substance reasonably satisfactory to the Administrative Agent and the Required NM Lenders;

(e)  delivery to the Administrative Agent and the DIP Lenders as soon as practical in advance of filing with the Bankruptcy Court, (i) all material proposed orders, pleadings and motions which must be in form and substance reasonably satisfactory to the Administrative Agent and the Required DIP Lenders, and (ii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan and any of the foregoing distributed by any Debtor to any Committee;

(f)  access to information (including historical information) and personnel, including, without limitation, regularly scheduled meetings as mutually agreed with senior management and other company advisors and the Administrative Agent, the Required DIP Lenders and Moelis & Company LLC shall be provided with access to all information it shall reasonably request;

(g)  bi-weekly update calls (with question and answer periods) with senior management of the Borrower and the DIP Lenders and their respective representatives and advisors; and

(h)  compliance with and absence of default under the Restructuring Support Agreement and absence of a "Termination Event" (as defined under the Restructuring Support Agreement) thereunder.

The Definitive Documentation will contain provisions relating to disbursement controls reasonably satisfactory to the Administrative Agent, the Required DIP Lenders and the Loan Parties.

| | |
|---|---|
| Financial Covenants: | Compliance with the Budget and the Cash Flow Forecast subject to line item variances to be agreed. |
| Negative Covenants: | Each of the Loan Parties (with respect to itself and each of its subsidiaries) agrees to the negative covenants set forth in the Existing Credit Agreement, modified as necessary to reflect the commencement of the Cases and changes in the financial and other conditions of the Loan Parties resulting therefrom and from events leading up thereto, with such baskets and carve-outs as may be agreed to in the Definitive Documentation by the parties thereto acting in good faith and such other matters as the DIP Lenders shall require in the Definitive Documentation.  Each of the Loan Parties (with respect to itself and each of its subsidiaries) agrees that the following are prohibited (except to the extent otherwise permitted in this Term Sheet or the Definitive Documentation): |

(a)  creating or permitting to exist any liens or encumbrances on any assets, other than liens securing the DIP Facility and any permitted liens

16

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

(which permitted liens shall include scheduled liens in existence on the Closing Date which, in the case of Primed Liens, are subordinated pursuant to the orders, junior liens granted in connection with adequate protection granted by the Loan Parties as required hereunder) and other liens described in "<u>Priority and Liens</u>" above;

(b) creating or permitting to exist any other superpriority claim which is pari passu with or senior to the claims of the DIP Lenders under the DIP Facility, except for the Carve-Out and liens securing the obligations;

(c) disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363) in respect of a transaction for total consideration of more than an aggregate amount to be agreed;

(d) (i) engaging in business different from those lines of business conducted by the Borrower and its subsidiaries on the date of the Credit Agreement or modifying the nature or the type of its business or the manner in which such business is conducted or (ii) modifying or altering in any manner which is adverse to the interests of the DIP Lenders, its organizational documents, except as required by the Bankruptcy Code;

(e) prepaying pre-petition indebtedness, except as expressly provided for herein, or as permitted under the Interim Order or the Final Order, as applicable, or pursuant to "first day" orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent and the Required DIP Lenders;

(f) asserting any right of subrogation or contribution against any other Loan Party until all borrowings under the DIP Facility are paid in full in cash and the Commitments are terminated;

(g) declaring or making any dividend or any distribution on account of capital stock (other than dividends and distributions (x) from non-Loan Parties, (y) from Loan Parties to Loan Parties (other than Holdings) and (z) from non-Loan Parties to non-Loan Parties); and

(h) paying any fees, including management fees, to its affiliates or shareholders (other than any of Holding's subsidiaries that are Loan Parties) or make any other payments or dividends in respect of the capital stock of Holding.

| | |
|---|---|
| Events of Default: | The DIP Facility shall be subject to the events of default (the "<u>Events of Default</u>") (x) set forth in the Existing Credit Agreement, modified as necessary to refer to the DIP Facility and to reflect the commencement of the Cases and changes in the financial and other conditions of the Loan Parties resulting therefrom and from events leading up thereto and (y) the additional customary events of default the DIP Lenders may require in the Definitive Documentation as well as the following events of default (with thresholds and grace periods to be agreed): |

(a)  The occurrence of any insolvency or bankruptcy proceeding with respect to any subsidiary of Holding that is not a debtor in the Cases (other than certain subsidiaries to be agreed);

(b)  The Final Order Entry Date shall not have occurred by the 40th day after the Interim Order Entry Date (or such later date as the Required DIP Lenders may agree);

(c)  Any of the Cases shall be dismissed or converted to a Chapter 7 Case; a trustee, receiver, interim receiver or receiver and manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)); or any other superpriority administrative expense claim or lien (other than the Carve-Out) which is pari passu with or senior to the claims or liens of the DIP Lenders under the DIP Facility shall be granted in any of the Cases without the consent of the Administrative Agent and the Required DIP Lenders;

(d)  Other than payments authorized by the Bankruptcy Court in respect of "first day" or other orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent and the Required DIP Lenders, permitted by the Interim Order or the Final Order (as applicable), as required by the Bankruptcy Code, or as may be permitted in the Definitive Documentation, the Loan Parties shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables of the Debtors or any other debt;

(e)  The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties which have an aggregate value in excess of an amount to be agreed or (ii) to permit other actions that would have a material adverse affect on the Loan Parties or their estates;

(f)  An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Final Order, or any of the Borrower or any of their affiliates shall apply for authority to do so, in each case without the prior written consent of the Required DIP Lenders, or the Interim Order or Final Order with respect to the DIP Facility shall cease to be in full force and effect;

(g)  Any judgments which are in the aggregate in excess of an amount to be agreed as to any post-petition obligation shall be rendered against the Loan Parties or any of its subsidiaries and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants); or there shall be rendered against the Loan Parties or any of its subsidiaries a nonmonetary judgment with respect to a post-petition event which causes

or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Loan Parties or any of its subsidiaries taken as a whole to perform their obligations under the Definitive Documentation;

(h)  Except as provided under "Exit Financing" above, the Debtors shall file any plan in any of the Cases that does not provide for termination of the Commitments under the DIP Facility and payment in full in cash of the Loan Parties' obligations under the Definitive Documentation on the effective date of such plan of reorganization or liquidation or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the Commitments under the DIP Facility and payment in full in cash of the Loan Parties' obligations under the Definitive Documentation, or any of the Debtors shall seek, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(i)  The Loan Parties or any of their subsidiaries shall take any action in support of any of the foregoing or any person other than the Loan Parties or any of their subsidiaries shall do so and such application is not contested in good faith by the Loan Parties or such subsidiaries and the relief requested is granted in an order that is not stayed pending appeal;

(j)  Any of the Loan Parties or their affiliates shall fail to comply with the Interim Order or Final Order, as applicable;

(k) The filing of a motion, pleading or proceeding by any of the Loan Parties or their affiliates which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment; and

(l) The Borrower shall have failed to comply with any of the following: (i) file with the Bankruptcy Court a plan of reorganization and related disclosure statement in form and substance reasonably satisfactory to the Required DIP Lenders on or before the date that is 25 days after the Petition Date (the "Plan of Reorganization" and the "Disclosure Statement"); (ii) obtain an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Required DIP Lenders approving the Disclosure Statement on or before the date that is 75 days after the Petition Date pursuant to Section 1125 of the Bankruptcy Code on or before such time; (iii) commence the solicitation of acceptances of the Plan of Reorganization on or before the date that is 15 days following entry of the order referenced to in clause (ii) above; (iv) file with the Bankruptcy Court on or before July 5, 2013 a supplement to the Plan of Reorganization in form and substance reasonably satisfactory to the Required DIP Lenders; (v) obtain an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Required DIP Lenders confirming the Plan of Reorganization on or before July 15, 2013; (vi)

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

consummate the Plan of Reorganization on or before July 31, 2013; and (v) obtain an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Required DIP Lenders establishing bar dates for submitting proofs of claim and requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code.

**Required Lenders:** As used herein:

The term "Required NM Lenders" shall mean the NM Lenders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of the New Money Loans and (ii) the aggregate unused Commitments in respect of the New Money Loan.

The term "Required DIP Lenders" shall mean the DIP Lenders holding more than 50% of the aggregate amount of the Loans and unused Commitments under the DIP Facility, and for the avoidance of doubt, shall in any event, include Wells Fargo at all times until the making of the Refinancing Loans, *provided* that in any event the Required DIP Lenders shall include the Required NM Lenders.

**Voting:** Amendments and waivers with respect to the Definitive Documentation shall require the approval of the Required NM Lenders, provided that any amendment or waiver with respect to each of the Specified Voting Items referenced below shall also require the consent of the Refinancing Loan Lender. As used herein, the term "Specified Voting Items" refers to each and all of the following:

---

Specified Voting Items:

1. Amendments, changes, postponements, extensions, modifications or waivers relating to any of the following:
   a. either Order
   b. "Lender Protections" (i.e., adequate protection)
   c. maturity of the DIP Loans
   d. principal, interest and fees in respect of the Refinancing Loans, and increase of any principal, interest and fees in respect of the New Money Loans
   e. amount of availability of the New Money Loans
   f. terms on which the Refinancing Loans convert into an exit financing
   g. amendments or changes (including deletions) with respect to the information covenants (but excluding waivers in respect of information covenants which shall only require the consent by the Required NM Lenders)
   h. the amendments section or any other provision requiring the consent of all lenders (including definitions of "Required Lenders", "Required NM Lenders", "Required DIP Lenders", etc.)

---

> i. any scheduled prepayment to the extent the Refinancing Loan Lender is adversely affected
> j. any provision relating to the letters of credit issued under the DIP Facility
> k. pro rata sharing provisions
> l. assignment provisions or otherwise permit assignments to the Borrower or its affiliates
> m. provisions relating to administration of Refinancing Loans (e.g., setting the LIBO Rate or distributing monies)

2. Any waiver of any defaults related to either Order being stayed, reversed etc. for any reason.
3. Any priming of any of the Refinancing Loans or New Money Loans
4. Any amendment or waiver of any condition precedent to effectiveness of the DIP Facility or any extension of credit thereunder.
5. Release any Loan Party (other than in connection with a disposition that is expressly permitted under the terms of the Definitive Documentation (but not a disposition that would not have been permitted if not for a waiver)).
6. Release any portion of the Collateral (other than in connection with a disposition that is expressly permitted under the terms of the Definitive Documentation (but not a disposition that would not have been permitted if not for a waiver)).
7. The assignment or transfer by Borrower or any Loan Party of any of its rights and obligations under any Definitive Documentation.
8. Any change to the required application of repayments or prepayments between classes (i.e., NM Loans and Refinancing Loans).
9. Changes that would add/permit new obligations (in addition to the Loans and other obligations under the Credit Agreement) to be secured by the liens in favor of the DIP Lenders.
10. Changes/amendments/waivers that would permit:
    > a. an asset sale otherwise prohibited under the DIP Facility (as in effect on the Closing Date)
    > b. incurrence of debt that is *pari passu* with the DIP Facility
    > c. a change of control (to be defined in the Definitive Documentation).
11. Any action that disproportionately adversely affects the Refinancing Loans vis-à-vis the New Money Loans.
12. Credit bidding of the Refinancing Loans.
13. Any restriction on transferring the Refinancing Loans.

| | |
|---|---|
| Assignments and Participations: | The DIP Lenders shall be permitted to assign all or a portion of their |

                                 Loans and Commitments (other than to Holding or any of its subsidiaries or any of their respective Affiliates (to be defined in the Definitive Documentation)) with the consent, not to be unreasonably withheld, of the Administrative Agent, unless the Loan is being assigned to a Lender, an affiliate of a Lender or an approved fund; <u>provided</u>, that the assignee becomes a party to the Restructuring Support Agreement.

**Yield Protection:**             The Definitive Documentation shall contain customary provisions, subject to customary mitigation requirements, (a) protecting the DIP Lenders against increased costs or loss of yield resulting from reserve, tax, capital adequacy and other requirements of law and from withholding or other taxes and (b) indemnifying the DIP Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBO Rate Loan on a day other than the last day of an interest period with respect thereto.

**Expenses and Indemnification**   The Borrower shall pay (a) all out-of-pocket expenses of the Administrative Agent and the DIP Lenders associated with the arrangement of the DIP Facility and the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsels, including Kirkland & Ellis LLP and Milbank, Tweed, Hadley & McCloy LLP and financial advisors), (b) all out-of-pocket expenses of the Administrative Agent and the DIP Lenders (including the reasonable and documented fees, disbursements and other charges of counsels and financial advisors) in connection with the enforcement of the Definitive Documentation and (c) all out-of-pocket expenses of the Administrative Agent, the Refinancing Loan Lender and the Specified DIP Lenders incurred in connection with the DIP Facility, the Orders or the Cases (including, without limitation, preparation and filing of all pleadings in the Cases, the on-going monitoring of the Cases, including attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court); it being understood in terms of the legal counsels subject to reimbursement, they should be limited to one primary counsel for the Administrative Agent, one primary counsel for the NM Lenders, and one primary counsel for the Refinancing Loan Lender, together with any additional conflicts counsels, special counsels and local counsels in any relevant jurisdiction the Administrative Agent, the NM Lenders and the Refinancing Loan Lender may retain.  For purposes hereof, "<u>Specified DIP Lenders</u>" shall mean the DIP Lenders from time to time comprising the steering committee designated by the Required NM Lenders in connection with the DIP Facility and the ongoing administration of the Cases.

                                 The Administrative Agent and the DIP Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) (each, an "<u>indemnified person</u>") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated

hereby or the use or the proposed use of proceeds thereof, except to the extent (i) they are found by a final nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of any indemnified person and (ii) such dispute is solely among indemnified persons other than any claims against an indemnified person arising out of any act or omission of any Debtor.

Governing Law and Forum:    The Definitive Documentation will provide that the Loan Parties will submit to the nonexclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county and city of New York, borough of Manhattan; and shall waive any right to trial by jury. New York law and, where applicable, the Bankruptcy Code, shall govern the Definitive Documentation.

Counsel to the
Administrative Agent
and the DIP Lenders:    Kirkland & Ellis LLP and Milbank, Tweed, Hadley & McCloy LLP

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

Annex 2 to the Commitment Letter
Subject to Rule 408 of the Federal Rules of Evidence

**First Out Exit Term Sheet[1]**

| | |
|---|---|
| Borrower: | The Reader's Digest Association, Inc., a Delaware corporation (the "<u>Borrower</u>"). |
| Lender: | Wells Fargo Principal Lending, LLC (and/or an affiliate thereof) and other financial institutions to be agreed (the "<u>Lenders</u>"). |
| Administrative Agent and Issuing Bank: | Wells Fargo Bank, N.A. or an affiliate thereof (in such capacity, the "<u>Administrative Agent</u>" or the "<u>Issuing Bank</u>", as the case may be). |
| First Out Credit Facilities: | Senior secured "first out" credit facilities (the "<u>First Out Credit Facilities</u>") to consist of: |

(a)　　<u>First Out Term Loan Facility</u>.  A first out term loan facility (the "<u>First Out Term Loan Facility</u>"; the loans thereunder, "<u>Loans</u>") in an aggregate amount equal to (i) the DIP Refinancing Loan Amount (as defined below) less any prepayments (if any) of "Refinancing Loans" (as defined below) under the Borrower's debtor-in-possession credit facility prior to the Closing Date minus (ii) the face amount of undrawn letters of credit under the DIP Facility as of the Closing Date.

(b)　　<u>First Out Letter of Credit Facility</u>.  A standby letter of credit facility (the "<u>First Out Letter of Credit Facility</u>") in an aggregate amount equal to the (i) DIP Refinancing Loan Amount less any prepayments (if any) of "Refinancing Loans" under the Borrower's debtor-in-possession credit facility prior to the Closing Date minus (ii) the aggregate amount of the First Out Term Loan Facility as of the Closing Date (the "<u>L/C Commitment</u>"). The letters of credit outstanding under the Existing Credit Agreement shall be deemed usage of the First Out Letter of Credit Facility.

As used herein:  "<u>DIP Refinancing Loan Amount</u>" means an aggregate amount equal to the sum of (i) $49,625,000 plus (ii) the aggregate amount of all letters of credit

---

[1] This term sheet is attached as Annex II to the Commitment Letter (the "<u>Commitment Letter</u>"), dated as of February 17, 2013, with respect to the Borrower's debtor-in-possession credit facility.

outstanding under the Existing Credit Agreement as of February 17, 2013 equal to $9,516,267 plus (iii) the aggregate amount of all outstanding and unpaid fees, letter of credit standby fees and commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Chapter 11 Cases (as defined below) under the Existing Credit Agreement and immediately prior to the date when the Refinancing Loans become effective. It being understood that the indemnification obligations under the Refinancing Loans will survive as obligations under the First Out Term Loan Facility.

Notwithstanding that the scheduled final maturity of the "Refinancing  Loans" under the debtor-in-possession credit facility of the Borrower extends beyond the date that is 180 days after the date on which the chapter 11 petitions are first filed by the Borrower or its affiliates (the date of such filing, the "Petition Date"), the commitment of Wells Fargo Principal Lending, LLC under the Restructuring Support Agreement (as defined below in Annex A hereto) and this term sheet to provide the First Out Credit Facilities shall terminate on the date that is 180 days after the Petition Date.

**Use of Proceeds:**

The First Out Term Loan Facility will be used to refinance all "Refinancing Loans" under the debtor-in-possession credit facility of the Borrower.

The First Out Letter of Credit Facility will provide letters of credit (the "Letter of Credit") to support the general corporate purposes of the Borrower and its subsidiaries.

**Closing Date and Closing Conditions:**

The First Out Credit Facilities shall close and become effective on the date (the "Closing Date") of (i) the execution and delivery of the Financing Documentation (as defined below) by the Borrower, the Guarantors (as defined below), the Administrative Agent and the respective Lenders party thereto, (ii) the satisfaction of the conditions precedent to effectiveness of the First Out Credit Facilities specified herein (including, without limitation, the conditions precedent specified in Annex A hereto) and (iii) the effectiveness of a plan of reorganization (pursuant to a confirmation order that is reasonably satisfactory in form and substance to the Administrative Agent) for the Borrower and the Guarantors, that is reasonably satisfactory in form and substance to the Administrative Agent.

**Availability:**

The First Out Term Loan Facility will be available to the Borrower for borrowing on the Closing Date to refinance

#4832-3991-4002v4

Annex 2 to the Commitment Letter
Subject to Rule 408 of the Federal Rules of Evidence

the "Refinancing Loans" outstanding under the DIP Facility immediately prior to the Closing Date.

The First Out Letter of Credit Facility will be available as set forth under "Letters of Credit" below.

| | |
|---|---|
| Letters of Credit: | The First Out Letter of Credit Facility will be available for letters of credit subject to (x) on the Closing Date, the satisfaction of the conditions under "Conditions Precedent" below, and (y) after the Closing Date, no bankruptcy or payment defaults and receipt of customary letter of credit request.  Each letter of credit shall expire not later than the earlier of 12 months after its date of issuance and the fifteenth day prior to the Maturity Date (the "Letter of Credit Expiration Date"); provided that, subject to the certain customary terms of the Financing Documentation, a letter of credit may provide that it shall automatically renew for additional one year periods but in any event not beyond the Letter of Credit Expiration Date. |

The issuance of all letters of credit shall be subject to the customary procedures of the Issuing Bank.

| | |
|---|---|
| Amortization: | The outstanding principal amount of the First Out Term Loan Facility will be payable in equal quarterly amounts of $0.625 million (with the first such payment date being the end of the first full fiscal quarter of the Borrower occurring after the Closing Date), with the remaining balance, together with all other amounts owed with respect thereto, payable on the Maturity Date.  The First Out Credit Facilities shall be repaid in full on the Maturity Date. |
| Documentation: | The documentation for the First Out Credit Facilities (which shall be satisfactory in form and substance to the Administrative Agent), the definitive terms of which shall be negotiated in good faith, will include, among other items, a credit agreement and guarantees (collectively, the "Financing Documentation"), which shall be based on the Existing Credit Agreement Documentation (as defined below) to the extent possible and will be modified fully, as appropriate, to reflect the terms set forth in this term sheet and agency and other changes reasonably requested by the Administrative Agent. |

"Existing Credit Agreement Documentation" shall mean the documentation relating to that certain Credit and Guarantee Agreement dated as of March 30, 2012  (as amended, the "Existing Credit Agreement"), among

RDA Holding Co. ("Holding"), the Borrower, the lenders party thereto and Wells Fargo Bank, N.A., as administrative agent for the lenders.

Guarantors:

Consistent with the Existing Credit Agreement and the Borrower's debtor-in-possession credit facility, the obligations of the Borrower under the First Out Credit Facilities will be unconditionally guaranteed, on a joint and several basis, by Holding and each existing and subsequently acquired or formed direct and indirect domestic subsidiaries providing guarantees in connection with the Existing Credit Agreement and the Borrower's debtor-in-possession credit facility (each a "Guarantor"; and such guarantee being referred to herein as a "Guarantee"). All Guarantees shall be guarantees of payment and not of collection. The Borrower and the Guarantors are herein referred to as the "Loan Parties" and, individually, as a "Loan Party."

Security:

The First Out Credit Facilities shall be secured by a perfected first priority security interest in all of the present and future tangible and intangible assets of the Loan Parties (including, without limitation, accounts receivable, inventory, intellectual property, real property (whether owned or leased), 100% of the capital stock of the Borrower and the Guarantors and 65% (or, in the absence of material adverse tax consequences to the Borrower, 100%) of the capital stock of each first tier foreign subsidiary of the Borrower, except for those assets excluded from the collateral under the Existing Credit Agreement Documentation (the "Collateral").

On the Closing Date, the Borrower shall enter into a second out term loan facility in an aggregate principal amount equal to the lower of $45 million and the then-outstanding aggregate principal amount of the "new money loans" under the Borrower's debtor-in-possession credit facility (the "Second Out Term Loan Facility"), on terms and conditions reasonably satisfactory to the Administrative Agent, for the purpose of refinancing the "new money loans" owed under the Borrower's debtor-in-possession credit facility. The Second Out Term Loan Facility shall be secured by a perfected first priority security interest in the Collateral. All obligations in connection with the First Out Credit Facilities (other than unasserted indemnification and contingent obligations) shall be paid in full prior to any obligations under the Second Out Term Loan Facility on a "first out" basis on terms substantially similar to those set forth in the Existing Credit Agreement Documentation (for the avoidance of doubt, cash interest payments under the

Second Out Term Loan Facility shall be permitted), including without limitation the security agreement securing the obligations under the Existing Credit Agreement and the Borrower's Prepetition Notes (as defined below).

Final Maturity:

The final maturity of the First Out Credit Facilities will occur on September 30, 2015 (the "Maturity Date").

Interest Rates and Fees:

Interest rates and fees in connection with the First Out Credit Facilities will be as specified on Schedule I attached hereto.

Termination of Exit Commitments:

It is understood that at any time prior to the Closing Date and the effectiveness of a plan of reorganization for the Borrower, the Borrower may obtain alternative exit financing to the First Out Credit Facilities (an "Alternative Exit Financing") and elect in writing to permanently terminate and cancel the commitments for the First Out Credit Facilities without premium or penalty or payment of any fee with respect to the First Out Credit Facilities; provided that such Alternative Exit Financing shall repay in full in cash all the "Refinancing Loans" under the debtor-in-possession financing of the Borrower upon the effectiveness of a plan of reorganization for the Borrower.

Mandatory Prepayments and Commitment Reductions:

Subject to the next paragraph, the First Out Term Loan Facility will be required to be prepaid, without premium or penalty (except LIBOR breakage costs), with:

(a)      100% of the net cash proceeds from the incurrence of indebtedness (other than certain permitted indebtedness to be agreed) after the Closing Date by Holding or any of its subsidiaries; and

(b)      100% of the net cash proceeds of sales or other dispositions (including (a) by issuance or sale of stock of Holding or any of its subsidiaries, (b) as a result of casualty or condemnation, net of remediation or replacement costs, (c) any extraordinary receipts (to be mutually defined) and (d) licensing transactions) by Holding or any of its subsidiaries of any assets (except for sales of inventory in the ordinary course of business and certain other dispositions, thresholds and exceptions to be agreed on), in each case only to the extent such net cash proceeds are received by Holdings or any other

Loan Party; provided that the Borrower and other Loan Parties shall be permitted to reinvest (or commit to reinvest) an aggregate amount for all such sales, casualty events, extraordinary receipts and licensing proceeds not exceeding $15 million within six months.

**Optional Prepayments and Commitment Reductions:**

Loans under the First Out Credit Facilities may be prepaid and unused commitments under the First Out Letter of Credit Facility may be reduced at any time, in whole or in part, at the option of the Borrower, upon notice and in minimum principal amounts and in multiples to be agreed upon, without premium or penalty (except LIBOR breakage costs). Any optional prepayment of the First Out Term Loan Facility will be applied to the remaining scheduled amortization payments as directed by the Borrower.

**Initial Conditions:**

The availability of the First Out Credit Facilities shall be conditioned upon the satisfaction of the conditions precedent set forth in Annex A hereto.

It is hereby understood and agreed that if each condition precedent set forth in Annex A hereto is not satisfied or is determined to be not capable of being satisfied, the "Refinancing Loans" under the debtor-in-possession credit facility of Borrower shall be repaid in full in cash on the effective date of the plan of reorganization for the Borrower.

**Conditions to All Extensions of Credit:**

Each extension of credit under the First Out Credit Facilities will be subject to satisfaction of the following conditions precedent: (a) all of the representations and warranties in the Financing Documentation shall be true and correct in all material respects (except to the extent that such representation and warranty is qualified by materiality) as of the date of such extension of credit and (b) no event of default under the First Out Credit Facilities or unmatured default thereunder shall have occurred and be continuing or would result from such extension of credit.

**Representations and Warranties:**

The Financing Documentation will contain representations and warranties substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Administrative Agent.

| | |
|---|---|
| Affirmative Covenants: | The Financing Documentation will contain affirmative covenants substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Administrative Agent. |
| Negative Covenants: | The Financing Documentation will contain negative covenants substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Administrative Agent (in each case subject to exceptions, carveouts and thresholds to be mutually agreed) including, but not limited to, the following: |

- restriction on dividends, distributions, issuances of equity interests, redemptions and repurchases of equity interests;

- restriction on incurring additional first out or first lien secured indebtedness and limitation on incurring other indebtedness (with customary exceptions to be agreed; any additional second lien or unsecured indebtedness shall be on terms satisfactory to the Administrative Agent); it being agreed that there will be a debt carveout for letters of credit up to $5 million and a corresponding lien carveout for the cash collateral for such letters of credit;

- limitation on capital expenditures of $10 million for the first year of the First Out Credit Facilities and $10 million for the second year of the First Out Credit Facilities;

- restriction on (i) amending, supplementing or otherwise modifying the definitive documentation governing the Second Out Term Loan Facility in any manner materially adverse to the Administrative Agent or the Lenders without the consent of the Administrative Agent (it being agreed that any amendments, supplements or other modifications resulting in a shortening of maturity or an increase in interest rates, fees or principal shall be deemed to be materially adverse to the Administrative Agent and the Lenders) and (ii) any optional and mandatory prepayments under the Second Out Term Loan Facility.

| | |
|---|---|
| Financial Covenants: | The Financing Documentation will contain a "First Out Leverage Ratio", pursuant to which the Borrower shall not permit the ratio of total first out funded indebtedness |

|  |  |
|---|---|
|  | plus the total face amount of issued and undrawn first-out letters of credit to last twelve months EBITDA to exceed, as of the last day of any fiscal quarter of the Borrower, a ratio of 2.50 to 1 (which financial covenant shall be first tested as of December 31, 2013).  The definition of "EBITDA", and the related financial definitions, shall be substantially similar to the Existing Credit Agreement, with such changes as may be requested by the Administrative Agent. |
| Events of Default: | The Financing Documentation will contain events of default substantially similar to the Existing Credit Agreement and such others as may be requested by the Administrative Agent. |
| Defaulting Lender Provisions, Yield Protection and Increased Costs: | Customary for facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, cash collateralization for Letters of Credit in the event any lender under the First Out Letter of Credit Facility becomes a Defaulting Lender (as such term shall be defined in the Financing Documentation), changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes. |
| Assignments and Participations: | Lenders will be permitted to make assignments in minimum amounts to be agreed.  Participation will be permitted without the consent of the Borrower or the Administrative Agent. |
|  | No assignment or participation may be made to natural persons, Holding or any of its subsidiaries or their respective affiliates. |
| Required Lenders: | Customary for facilities of this type. |
| Amendments and Waivers: | The Financing Documentation will contain provisions regarding amendments and waivers substantially similar to the Existing Credit Agreement with such changes as the Required Lenders may reasonably request. |
| Indemnification: | The Financing Documentation will contain provisions regarding indemnification substantially similar to the Existing Credit Agreement with such changes as the required Lenders may reasonably request. |

Expenses:
:	The Loan Parties will reimburse the Lenders and Administrative Agent (and the Lenders in the case of enforcement costs and documentary taxes) for all reasonable and documented out-of-pocket costs and expenses in connection with the syndication, negotiation, execution, delivery and administration of the Financing Documentation and any amendment or waiver with respect thereto (including, without limitation, reasonable and documented fees and expenses of counsel thereto, including any conflicts counsel, special counsel and local counsel retained)) and any enforcement of remedies with respect thereto.

Governing Law and Forum:	New York.

Waiver of Jury Trial and
Punitive and Consequential
Damages:	All parties to the Financing Documentation waive the right to trial by jury and the right to claim punitive or consequential damages.

Counsel for the Administrative
Agent:	Milbank, Tweed, Hadley & McCloy LLP.

## SCHEDULE I
## INTEREST AND FEES

| | |
|---|---|
| Interest: | Loans under the First Out Term Loan Facility shall accrue interest at the LIBO Rate plus 6.0% per annum, or Base Rate plus 5.0% per annum. |
| | As used herein: |
| | "LIBO Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 3.0%. |
| | "Base Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 4.00%. |
| Letter of Credit Fees: | The Borrower will pay to the Issuing Bank, for its account, letter of credit fees equal to the applicable interest margin for the First Out Term Loan Facility (with respect to LIBO Rate loans) plus a fronting fee of 1.00% on daily amount available to be drawn under each Letters of Credit. |
| Letter of Credit Utilization Fee: | A utilization fee of 1.0% per annum on the total undrawn amount of Letter of Credit Facility. |
| Upfront Fees: | None |
| Default Interest: | Upon the occurrence and during the continuance of an Event of Default under the Financing Documentation, interest shall accrue on the outstanding amount of the obligations under the Financing Documentation and shall be payable on demand at 2.0% per annum above the then applicable rate. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed; provided that computations of interest for Base Rate Loans when the Base Rate is determined by the prime rate shall be made on the basis of the number of actual days elapsed in a year of 365 or 366 days, as the case may be. |

**SUMMARY OF CONDITIONS PRECEDENT TO EFFECTIVENESS OF
THE FIRST OUT CREDIT FACILITIES**

Closing and the availability of the First Out Credit Facilities will be subject to the satisfaction of conditions precedent usual and customary for facilities of this type including the following:

(a)     <u>Financing Documentation and Customary Closing Documentation.</u>  (i) Financing Documentation reflecting and consistent with the terms and conditions set forth herein and otherwise reasonably satisfactory to the Borrower and the Lenders, will have been executed and delivered, (ii) the Administrative Agent will have received such customary legal opinions (including, without limitation, opinions of special counsel and local counsel as may be reasonably requested by the Administrative Agent) which such opinions shall permit reliance by permitted assigns of each of the Administrative Agent and the Lenders, documents and other instruments as are customary for transactions of this type including, without limitation, a certificate of the chief financial officer of Holding as to the solvency of each Loan Party after giving effect to each element of the restructuring transactions, (iii) all documents, instruments, reports and policies required to perfect or evidence the Administrative Agent's first priority security interest in and liens on the Collateral (including, without limitation, all certificates evidencing pledged capital stock or membership or partnership interests, as applicable, with accompanying executed stock powers, all UCC financing statements to be filed in the applicable government UCC filing offices, all intellectual property security agreements to be filed with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and all deposit account and securities account control agreements) will have been executed and/or delivered and, to the extent applicable, be in proper form for filing (including UCC and other lien searches, intellectual property searches, insurance policies, surveys, title reports and policies, landlord waivers and access letters, appraisals and environmental reports), (iv) all governmental and third party consents and all equityholder and board of directors (or comparable entity management body) authorizations shall have been obtained and shall be in full force and effect, (v) there shall not be any material pending or threatened litigation, bankruptcy or other proceeding, (vi) satisfactory review of all organizational documentation of the Loan Parties and (vii) all fees and expenses due to the Lenders, Administrative Agent and counsel to the Administrative Agent will have been paid.

(b)     <u>Confirmation of Plan of Reorganization.</u>  The restructuring transactions shall be consummated in accordance with the terms of a Chapter 11 plan of reorganization (the "<u>Plan of Reorganization</u>") prepared in accordance with the Restructuring Support Agreement (as defined below) and the exhibits attached thereto and such Plan of Reorganization shall be in all respects reasonably satisfactory to the Administrative Agent and all conditions precedent to the effectiveness of the Plan of Reorganization (other than the funding of the Loans under the First Out Credit Facilities) shall have been satisfied in the judgment of the Administrative Agent (or waived with the prior written consent of the Administrative Agent), and the Plan of Reorganization shall be substantially consummated (as defined in Section 1101 of the Bankruptcy Code), and the effective date thereunder shall occur, concurrently with the effectiveness of the First Out Credit Facilities. No changes, modifications, amendments or waivers (other than those reasonably satisfactory to the Administrative Agent) shall have been made to such Plan of Reorganization since the initial filing thereof with the Bankruptcy Court.  The Plan of Reorganization shall provide that with respect to any and all equity interests or other recoveries that the Existing Noteholders receive thereunder on account of the Prepetition Notes, the Existing Noteholders shall not be entitled to, or shall receive, any distributions, dividends, redemptions or any other payments on account of such equity interests or other recoveries until such time that the First Out Credit Facilities shall have been

paid in full in cash and the L/C Commitment shall have been terminated. As used herein, "Existing Noteholders" means each holder of the senior secured notes (the "Prepetition Notes") issued pursuant to that certain indenture, dated February 11, 2010 by and among the Borrower, certain of its affiliates and the purchasers party thereto from time to time.

(c)     Confirmation Order. The confirmation order (the "Confirmation Order") in respect of the Plan of Reorganization shall (i) have been entered by the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "Bankruptcy Court") and shall not have been reversed, modified, amended, vacated or subject to any stay pending appeal, (ii) provide for terms and conditions substantially similar to those provided in the Plan of Reorganization and otherwise be reasonably satisfactory to the Administrative Agent and (iii) be in full force and effect. All appeals of the Confirmation Order, and the Plan of Reorganization, shall have been dismissed or resolved in a manner reasonably satisfactory to the Administrative Agent. No changes, modifications, amendments or waivers shall have been made to the Confirmation Order since the entry thereof by the Bankruptcy Court (other than those reasonably satisfactory to the Administrative Agent). Notwithstanding anything to the contrary in the Plan of Reorganization or Confirmation Order, the Bankruptcy Court's retention of jurisdiction under the Plan of Reorganization and the Confirmation Order shall not govern the enforcement of the First Out Credit Facilities or the related loan documents or any rights or remedies of the parties related thereto or arising thereunder.

(d)     Effective Date of Plan of Reorganization. The effective date of the Plan of Reorganization shall occur no later than 180 days after the Petition Date. The Closing Date shall have occurred on or prior to the date that is 180 days after the Petition Date.

(e)     Financial Statements. The Administrative Agent will have received, in form and substance reasonably satisfactory to the Administrative Agent, (i) copies of audited consolidated financial statements for the Borrower and its subsidiaries for the three fiscal years most recently ended before the Closing Date (including, for the avoidance of doubt, the fiscal year ended December 31, 2012) and (ii) projections prepared by management of balance sheets, income statements and cashflow statements of the Borrower and its subsidiaries, which will be quarterly for the first year after the Closing Date and annually thereafter for the term of the First Out Credit Facilities.

(f)     No Material Adverse Effect. (i) Since December 31, 2012, there shall not have occurred any event or condition that has had or could be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect. "Material Adverse Effect" means (A) a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower and its subsidiaries, taken as a whole, (B) a material adverse effect on the rights and remedies of the Administrative Agent or any Lender under any Financing Documentation, or of the ability of any Loan Party to perform its obligations under any Financing Documentation to which it is a party or (C) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Financing Documentation to which it is a party, but in each case of the foregoing other than as a result of the commencement of the Borrower's chapter 11 proceeding, any events directly causing the filing of the Cases or any events which customarily occur following the commencement of a reorganization proceeding under Chapter 11 of the Bankruptcy Code.

(g)     Capital Structure. The Administrative Agent will be reasonably satisfied with the terms and amounts of any intercompany loans among the Loan Parties. The Administrative Agent will be satisfied with the flow of funds in connection with the closing. The Administrative Agent will be reasonably satisfied with senior management of the Loan Parties.

(h)     <u>Information Required by Regulatory Authorities</u>.  The Loan Parties will have provided the documentation and other information to the Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(i)     <u>Representations and Warranties</u>. All representations and warranties made by the Loan Parties in the First Out Credit Facilities shall be true and correct in all material respects (unless already qualified by materiality or material adverse effect in which case they shall be true and correct in all respects) and the Administrative Agent shall not have become aware that any information previously delivered is inaccurate or incomplete in any material respect.

(j)     <u>No Default</u>.  No default or event of default under the First Out Credit Facilities shall have occurred or be continuing after giving effect to the closing and funding of the First Out Credit Facilities. Without giving effect to the applicability, if any, of Section 362 of the Bankruptcy Code, immediately prior to closing of the First Out Credit Facilities, the Restructuring Support Agreement shall be in full force and effect and shall not have been terminated and no default or event of default thereunder (other than a default or event of default by Wells Fargo) shall have occurred or be continuing, in each case in accordance with its terms. Furthermore, none of the Termination Events (as defined in the Restructuring Support Agreement) set forth in Sections 4.1(a), 4.1(b), 4.1(c), 4.1(e), 4.1(f), 4.1(g), 4.1(h), 4.1(i), 4.1(j), 4.1(l), 4.1(m), 4.1(n), 4.1(o), 4.1(u) or 4.1(v) shall have occurred (and irrespective of whether or not the occurrence of any of the foregoing has led to a termination of the Restructuring Support Agreement).  Immediately prior to closing the First Out Credit Facilities, no default or event of default shall have occurred and be continuing under the Borrower's debtor-in-possession credit facility.

(k)     <u>Business Plan</u>.  The Administrative Agent shall have received a post-reorganization business plan of Holding and its subsidiaries satisfactory to the Administrative Agent.

(l)     <u>Outstanding Indebtedness</u>.  Immediately following the restructuring transactions, neither Holding, the Borrower nor any of their respective subsidiaries will have any Indebtedness (as defined in the Financing Documentation) outstanding except for the loans under (i) the First Out Credit Facilities and (ii) the Second Out Term Loan Facility and ordinary course Indebtedness to the extent permitted under the Financing Documentation.

(m)     <u>Second Out Term Loan Facility</u>.  The definitive documentation for the Second Out term Loan Facility shall be in form and substance reasonably satisfactory to the Administrative Agent (it being acknowledged and agreed that the terms set forth in the term sheet for the Second Out Term Loan Facility attached as Annex 3 to the commitment letter dated as of February 17, 2013 (the "<u>Commitment Letter</u>"), with respect to the Borrower's debtor-in-possession credit facility (the "<u>Second Out Exit Term Sheet</u>"), are satisfactory).  The Second Out Term Loan Facility shall provide that, prior to the payment in full in cash (other than unasserted indemnification and contingent obligations) of the First Out Credit Facilities and the termination of the L/C Commitment, no payments of principal (whether mandatory, optional, amortizing or others) shall be made under the Second Out Term Loan Facility. The closing and funding of the Second Out Term Loan Facility shall have occurred or shall occur concurrently with the closing of the First Out Term Loan Facility.

(n)     <u>DIP Facility</u>.  The Borrower's debtor-in-possession credit facility (the "<u>DIP Facility</u>") shall be in form and substance reasonably satisfactory to Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>") and shall provide for the refinancing in full (in the form of roll-up term loans and letter of credit facility under the DIP Facility) of all commitments and amounts outstanding (including any and all principal, reimbursement obligations in respect of outstanding letters of credit (assuming drawn), fees, commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the

commencement of the Chapter 11 Cases (as defined below), including to the issuing lender) under the Existing Credit Agreement (the loans and letter of credit facility under the DIP Facility used to refinance in full all amounts outstanding under the Existing Credit Agreement in connection with the entry of the Final Order (as defined below), the "Refinancing Loans"). It is understood that (A) the Refinancing Loans shall be in an aggregate amount equal to the sum of (i) $49,625,000 plus (ii) the aggregate amount of all letters of credit outstanding under the Existing Credit Agreement as of February 17, 2013 equal to $9,516,267 plus (iii) the aggregate amount of all outstanding fees, letter of credit standby fees and commissions, premiums, indemnification amounts and interest accrued prior to, on and after the commencement of the Chapter 11 Cases under the Existing Credit Agreement and immediately prior to the date when the Refinancing Loans become effective and (B) the indemnification obligations under the Existing Credit Agreement will survive as obligations under the DIP Facility notwithstanding the refinancing or termination of the facilities under the Existing Credit Agreement. The DIP Facility shall provide that the Refinancing Loans shall be paid in full in cash if the conditions precedent set forth in this Annex A are not satisfied or waived with the consent of the Administrative Agent.

(o)     Final Order. Not later than 40 days after the Interim Order Entry Date (as defined below), the Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to Wells Fargo, a final order (the "Final Order", and the date of entry of the Final Order being hereinafter referred to as the "Final Order Entry Date"), in form and substance reasonably satisfactory to Wells Fargo, which Final Order shall, among other things, authorize (i) the making of the Refinancing Loans in full on the Final Order Entry Date and (ii) the Borrower using the Refinancing Loans on the Final Order Entry Date to refinance in full all amounts outstanding under the Existing Credit Agreement, which authorization shall be final and irrevocable in all respects and binding on all parties in interest in the Chapter 11 Cases. Each of the foregoing shall have been consummated in a manner reasonably satisfactory to Wells Fargo. The Final Order shall be in full force and effect and shall not have been reversed, vacated, appealed, or made subject to a stay. No changes, modifications, amendments or waivers shall have been made to the Final Order since the Final Order Entry Date (other than those reasonably satisfactory to the Administrative Agent). The Refinancing Loans, the authorization under the Final Order specified in clauses (i) and (ii) above and the consummation thereof shall not have been reversed, vacated, appealed, or made subject to a stay, or otherwise objected to or challenged.

(p)     Interim Order. The Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to Wells Fargo, an interim order (the "Interim Order", and the date of entry of the Interim Order being hereinafter referred to as the "Interim Order Entry Date"), in form and substance reasonably satisfactory to Wells Fargo, no later than five (5) calendar days after the Petition Date (or such later date agreed to by Wells Fargo), which Interim Order shall authorize (i) the "new money loans" under the Borrower's debtor-in-possession credit facility and (ii) in consideration for the consensual priming of the liens securing the Existing Credit Agreement by the liens securing the DIP Facility, that Wells Fargo shall receive prior to the Final Order Entry Date current cash pay interest, fees and commissions in respect of the Existing Credit Agreement at the non-default rate, a superpriority claim, and superpriority replacement liens (in each case ranking junior only to the liens and claims in respect of the DIP Facility) on the collateral securing the DIP Facility and the current payment of the fees and expenses of counsel to Wells Fargo. The Interim Order shall not have been reversed, vacated, appealed, or made subject to a stay. No changes, modifications, amendments or waivers shall have been made to the Interim Order since the Interim Order Entry Date (other than those reasonably satisfactory to the Administrative Agent). The authorization under the Interim Order specified in clauses (i) and (ii) above and the granting and receipt by Wells Fargo of current cash pay interest, fees and commissions in respect of the Existing Credit Agreement at the non-default rate, a superpriority claim, and superpriority replacement liens (in each case ranking junior only to the liens and claims in respect of the DIP Facility) on the collateral securing the DIP Facility and the current payment of the fees and expenses of counsel to

Wells Fargo shall not have been reversed, vacated, appealed, or made subject to a stay, or otherwise objected to or challenged.

(q)     <u>Refinancing Loans</u>.  The Refinancing Loans shall (i) accrue interest at libor plus 5.0% per annum, and the libor rate shall have a floor of 3.0%; (ii) constitute a superpriority claim ranking pari passu with the superpriority claim of all other loans under the DIP Facility and (iii) be secured by first priority liens ranking pari passu with the liens securing all other loans under the DIP Facility.

(r)     <u>Existing Credit Agreement Fees and Expenses</u>.  On or prior to the closing date of the DIP Facility, all fees and expenses of Wells Fargo, and of Milbank, Tweed, Hadley & McCloy LLP shall have been paid in full.

(s)     <u>Certain Documentation</u>.  The following documentation shall be in form and substance reasonably satisfactory to Wells Fargo: (i) the restructuring support agreement (the "<u>Restructuring Supporting Agreement</u>") entered into among the lenders under the DIP Facility in connection with the reorganization of the Borrower and its affiliates pursuant to the chapter 11 cases of the Borrower and its subsidiaries (the "<u>Chapter 11 Cases</u>"); (ii) the definitive loan documentation relating to the DIP Facility (including a credit agreement and related security and closing documents, the term sheet for the DIP Facility attached as Annex 1 to the Commitment Letter (the "<u>DIP Term Sheet</u>") and the Second Out Exit Term Sheet), it being acknowledged and agreed that the DIP Term Sheet and the Second Out Exit Term Sheet are satisfactory; (iii) all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter, including in respect of amounts of critical vendor payments; and (iv) the Plan of Reorganization, the related disclosure statement and the Confirmation Order, including any amendments, modifications or supplements made from time to time thereto.

(t)     <u>Transaction Fees and Expenses</u>.  All fees and expenses of Wells Fargo, and of Milbank, Tweed, Hadley & McCloy LLP, in connection with the transactions hereunder have been paid in full.

All conditions precedent to the effectiveness of the Second Out Term Loan Facility are hereby incorporated herein, <u>mutatis mutandis</u>, as additional conditions precedent to the effectiveness of the First Out Credit Facilities and as so incorporated shall have been satisfied and have not been waived without the consent of Wells Fargo.

Annex 3
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

**Second Out Exit Term Sheet[1]**
February 17, 2013

| | |
|---|---|
| Borrower: | The Reader's Digest Association, Inc., a Delaware corporation (the "<u>Borrower</u>"). |
| Lenders: | The lenders in respect of the New Money Loans under the Borrower's DIP Facility (the "<u>Lenders</u>"). |
| Administrative Agent: | An entity designated by the Lenders in consultation with the Borrower (in such capacity, the "<u>Administrative Agent</u>"). |
| Facility: | Senior secured term loan credit facility (the "<u>Second Out Term Loan Facility</u>") converted from the New Money Loans under the Borrower's DIP Facility in an amount equal to the aggregate amount of the New Money Loans outstanding under the DIP Facility on the date of conversion. |
| Use of Proceeds: | The Second Out Term Loan Facility will be used to refinance the New Money Loans outstanding under the DIP Facility. |
| Closing Date and Closing Conditions: | The Second Out Term Loan Facility shall close and become effective on the date (the "<u>Closing Date</u>") of (i) the execution and delivery of the Financing Documentation (as defined below) by the Borrower, the Guarantors (as defined below), the Administrative Agent and the respective Lenders party thereto, (ii) the satisfaction of the conditions precedent to effectiveness of the Second Out Term Loan Facility specified herein (including, without limitation, the ones specified on Annex A) and in the Commitment Letter and (iii) the |

---

[1]     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the term sheet dated as of the date hereof for the senior secured priming debtor-in-possession credit facility for the Borrower attached to the Commitment Letter as Annex 1 (the "<u>DIP Term Sheet</u>").  As used herein, the term "<u>Commitment Letter</u>" shall mean the commitment letter dated February 17, 2013 by and among the Borrower, the Borrower's affiliates party thereto, Wells Fargo Principal Lending, LLC, Goldentree Asset Management LP, Apollo Investment Management, L.P. and Empyrean Capital Partners, LP; and the term "<u>Restructuring Support Agreement</u>" shall mean that certain Restructuring Support Agreement dated February 17, 2013 by and among the Borrower, the Borrower's affiliates party thereto, Wells Fargo Principal Lending, LLC, Goldentree Asset Management LP, Apollo Investment Management, L.P. and Empyrean Capital Partners, LP.

effectiveness of a plan of reorganization (pursuant to a confirmation order that is reasonably satisfactory in form and substance to the Required Lenders) for the Borrower and the Guarantors, that is reasonably satisfactory in form and substance to the Required Lenders.

Availability:
The Second Out Term Loan Facility will be available to the Borrower upon the Closing Date to refinance (without cash payment) the New Money Loans outstanding under the DIP Facility immediately prior to the Closing Date.

Amortization:
None.

Documentation:
The documentation for the Second Out Term Loan Facility (which shall be satisfactory in form and substance to the Required Lenders), the definitive terms of which shall be negotiated in good faith, will include, among other items, a credit agreement and guarantees (collectively, the "Financing Documentation"), which shall be based on the Existing Credit Agreement Documentation (as defined below) to the extent possible and will be modified fully, as appropriate, to reflect the terms set forth in this term sheet, the Commitment Letter, the First Out Credit Facilities and agency and other changes reasonably requested by the Required Lenders.

"Existing Credit Agreement Documentation" shall mean the documentation relating to that certain Credit and Guarantee Agreement dated as of March 30, 2012 (as amended, the "Existing Credit Agreement"), among RDA Holding Co. ("Holding"), the Borrower, the lenders party thereto and Wells Fargo Bank, N.A., as administrative agent for the lenders.

Guarantors:
Consistent with the Existing Credit Agreement and the DIP Facility, the obligations of the Borrower under the Second Out Term Loan Facility will be unconditionally guaranteed, on a joint and several basis, by Holding and each existing and subsequently acquired or formed direct and indirect domestic subsidiaries providing guarantees in connection with the Existing Credit Agreement and the Borrower's DIP Facility (each a "Guarantor"; and such guarantee being referred to herein as a "Guarantee"). All Guarantees shall be guarantees of payment and not of collection. The Borrower and the Guarantors are herein referred to as the "Loan Parties" and, individually, as a "Loan Party."

| | |
|---|---|
| Security: | The Second Out Term Loan Facility shall be secured by a perfected first priority security interest in all of the present and future tangible and intangible assets of the Loan Parties (including, without limitation, accounts receivable, inventory, intellectual property, real property (whether owned or leased), 100% of the capital stock of the Borrower and the Guarantors and 65% (or, in the absence of material adverse tax consequences to the Borrower, 100%) of the capital stock of each first tier foreign subsidiary of the Borrower, except for those assets excluded from the collateral under the Existing Credit Agreement Documentation (the "Collateral"). |

On the Closing Date, the Borrower shall concurrently enter into senior secured "first out" credit facilities (the "First Out Credit Facilities") converted from the Refinancing Loans under the DIP Facility subject to the terms set forth in the "First Out Exit Term Sheet" attached as Annex 2 to the Commitment Letter (the "First Out Exit Term Sheet") and otherwise on terms and conditions reasonably satisfactory to the Required Lenders. The First Out Credit Facilities shall be secured by first priority security interest in the Collateral, *pari passu* with the liens securing the Second Out Term Loan Facility. All obligations in connection with the First Out Credit Facilities (other than unasserted indemnification and contingent obligations) shall be paid in full prior to any obligations under the Second Out Term Loan Facility on a "first out" basis on terms substantially similar to those set forth in the Existing Credit Agreement Documentation (for the avoidance of doubt, cash interest payments under the Second Out Term Loan Facility shall be permitted).

| | |
|---|---|
| Final Maturity: | September 30, 2015 (the "Maturity Date"). |
| Interest Rates and Fees: | As specified on Schedule I attached hereto. |
| Mandatory Prepayments: | The Second Out Term Loan Facility will be required to be prepaid, without premium or penalty (except LIBOR breakage costs), with: |

(a)     100% of the net cash proceeds from the incurrence of indebtedness (other than certain permitted indebtedness to be agreed) after the Closing Date by Holding or any of its subsidiaries; and

Annex 3
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

(b)     100% of the net cash proceeds of sales or other dispositions (including (a) by issuance or sale of stock of Holding or any of its subsidiaries, (b) as a result of casualty or condemnation, net of remediation or replacement costs, (c) any extraordinary receipts (to be mutually defined) and (d) licensing transactions) by Holding or any of its subsidiaries of any assets (except for sales of inventory in the ordinary course of business and certain other dispositions, thresholds and exceptions to be agreed on), in each case only to the extent such net cash proceeds are received by Holdings or any other Loan Party; provided that the Borrower and other Loan Parties shall be permitted to reinvest (or commit to reinvest) an aggregate amount for all such sales, casualty events, extraordinary receipts and licensing proceeds not exceeding $15 million within six months;

provided that no such mandatory prepayments shall be made prior to the payment in full of the obligations (other than unasserted indemnification and contingent obligations) and the termination of the letter of credit commitment under the First Out Credit Facilities (but not including any refinancing thereof).

| Optional Prepayments: | Loans under the Second Out Term Loan Facility may be prepaid from time to time, in whole or in part, at the option of the Borrower, upon notice and in minimum principal amounts and in multiples to be agreed upon, without premium or penalty (except LIBOR breakage costs and the applicable Early Termination Fee (referenced below)), provided that no such optional prepayments shall be made prior to the payment in full of the obligations (other than unasserted indemnification and contingent obligations) and the termination of the letter of credit commitment under the First Out Credit Facilities (but not including any refinancing thereof). Any optional prepayment of the Second Out Term Loan Facility will be applied to the remaining scheduled amortization payments as directed by the Borrower. |
|---|---|
| Representations and Warranties: | The Financing Documentation will contain representations and warranties substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Required Lenders, but in no event more favorable to the Loan Parties than the equivalent terms under the First Out Credit Facilities. |

Affirmative Covenants:

The Financing Documentation will contain affirmative covenants substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Required Lenders, but in no event more favorable to the Loan Parties than the equivalent terms under the First Out Credit Facilities.

Negative Covenants:

The Financing Documentation will contain negative covenants substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Required Lenders (in each case subject to exceptions, carveouts and thresholds to be mutually agreed), but in no event more favorable to the Loan Parties than the equivalent terms under the First Out Credit Facilities, including, but not limited to, the following:

- restriction on dividends, distributions, issuances of equity interests, redemptions and repurchases of equity interests;

- restriction on incurring addition first out or first lien secured indebtedness and limitation on incurring other indebtedness (with customary exceptions to be agreed; any additional second lien or unsecured indebtedness shall be on terms satisfactory to the Required Lenders; it being agreed that there will be a debt carveout for letters of credit up to $5 million and a corresponding lien carveout for the cash collateral for such letters of credit);

- limitation on capital expenditures of $10 million per 12-month period;

- restriction on (i) amending, supplementing or otherwise modifying the definitive documentation governing the First Out Credit Facilities in any manner materially adverse to the Lenders without the consent of the Required Lenders (it being agreed that any amendments, supplements or other modifications resulting in a change to maturity, an increase in interest rates, fees, principal or scheduled amortization payments, or any amendments, supplements or other modifications changing any payment priority or lien priority of the Second Out Term Loan Facility vis-à-vis the First Out Credit

Annex 3
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

|  | Facilities shall be deemed to be materially adverse to the Lenders) and (ii) any prepayments of junior financing. |
|---|---|
| Financial Covenants: | The Financing Documentation will contain a "Second Out Leverage Ratio", pursuant to which the Borrower shall not permit the ratio of total "second out" funded indebtedness to last twelve months EBITDA to exceed, as of the last day of any fiscal quarter of the Borrower, a ratio to be mutually agreed (which financial covenant shall be first tested as of December 31, 2013). The definition of "EBITDA", and the related financial definitions, shall be substantially similar to the Existing Credit Agreement, with such changes as may be requested by the Required Lenders. |
| Events of Default: | The Financing Documentation will contain events of default substantially similar to the Existing Credit Agreement and such others as may be requested by the Required Lenders. |
| Defaulting Lender Provisions, Yield Protection and Increased Costs: | Customary for facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes. |
| Assignments and Participations: | The Lenders will be permitted to make assignments in minimum amounts to be agreed. Participations will be permitted without the consent of the Borrower or the Administrative Agent. |
|  | No assignment or participation may be made to natural persons, Holding or any of its subsidiaries. |
| Required Lenders: | Lenders holding more than 50% of the outstanding principal amount of the loans under the Second Out Term Loan Facility (the "Required Lenders"). |
| Amendments and Waivers: | The Financing Documentation will contain provisions regarding amendments and waivers substantially similar to the Existing Credit Agreement with such changes as the Required Lenders may reasonably request. |

Indemnification:

The Financing Documentation will contain provisions regarding indemnification substantially similar to the Existing Credit Agreement with such changes as the Required Lenders may reasonably request.

Expenses:

The Loan Parties will reimburse the Lenders and Administrative Agent for all reasonable and documented out-of-pocket costs and expenses in connection with the syndication, negotiation, execution, delivery and administration of the Financing Documentation and any amendment or waiver with respect thereto (including, without limitation, reasonable and documented fees and expenses of counsel thereto, including any conflicts counsel, special counsel and local counsel retained) and any enforcement of remedies with respect thereto.

Governing Law and Forum:

New York.

Waiver of Jury Trial and
Punitive and Consequential
Damages:

All parties to the Financing Documentation waive the right to trial by jury and the right to claim punitive or consequential damages.

Counsel for the Lenders:

Kirkland & Ellis LLP

**SCHEDULE I**
**INTEREST AND FEES**

| | |
|---|---|
| Interest: | Loans under the Second Out Term Loan Facility shall accrue interest at LIBO Rate plus 11.0% per annum, or Base Rate plus 10.0% per annum. |
| | As used herein: |
| | "LIBO Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 1.50%. "Base Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 2.50%. |
| Default Interest: | Upon the occurrence and during the continuance of an Event of Default under the Financing Documentation, interest shall accrue on the outstanding amount of the obligations under the Financing Documentation and shall be payable on demand at 2.0% per annum above the then applicable rate. |
| Upfront Fee: | 2.0% of the aggregate principal amount of the New Money Loans converted into the Second Out Term Loan Facility. |
| Early Termination Fee: | In the event of any prepayment of the New Money Loan, such prepayment shall be subject to an early termination fee equal to (a) 2.0% of the aggregate principal amount of the New Money Loan prepaid, if such prepayment in made prior to the first anniversary of the Closing Date, (b) 1.0% of the aggregate principal amount of the New Money Loan prepaid, if such prepayment in made prior to the second anniversary of the Closing Date but on or after the first anniversary of the Closing Date, and (c) 0.0%, if such prepayment in made on or after the third anniversary. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed, *provided* that computations of interest for Base Rate Loans when the Base Rate is determined by the prime rate shall be made on the basis of the number of actual days elapsed in a year of 365 or 366 days, as the case may be. |

ANNEX A

## SUMMARY OF CONDITIONS PRECEDENT TO EFFECTIVENESS OF
## THE SECOND OUT TERM LOAN FACILITY

Closing and the availability of the Second Out Term Loan Facility will be subject to the satisfaction of conditions precedent usual and customary for facilities of this type including the following:

(a)     <u>Financing Documentation and Customary Closing Documentation.</u>  (i) Financing Documentation reflecting and consistent with the terms and conditions set forth herein and otherwise reasonably satisfactory to the Borrower and the Lenders, will have been executed and delivered, (ii) the Administrative Agent and the Required Lenders will have received such customary legal opinions (including, without limitation, opinions of special counsel and local counsel as may be reasonably requested by the Administrative Agent and the Required Lenders) which such opinions shall permit reliance by permitted assigns of each of the Administrative Agent and the Lenders, documents and other instruments as are customary for transactions of this type including, without limitation, a certificate of the chief financial officer of Holding as to the solvency of each Loan Party after giving effect to each element of the restructuring transactions, (iii) all documents, instruments, reports and policies required to perfect or evidence the Administrative Agent's  and the Lenders' first priority security interest in and liens on the Collateral (including, without limitation, all certificates evidencing pledged capital stock or membership or partnership interests, as applicable, with accompanying executed stock powers, all UCC financing statements to be filed in the applicable government UCC filing offices, all intellectual property security agreements to be filed with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and all deposit account and securities account control agreements) will have been executed and/or delivered and, to the extent applicable, be in proper form for filing (including UCC and other lien searches, intellectual property searches, insurance policies, surveys, title reports and policies, landlord waivers and access letters, appraisals and environmental reports), (iv) all governmental and third party consents and all equityholder and board of directors (or comparable entity management body) authorizations shall have been obtained and shall be in full force and effect, (v) there shall not be any material pending or threatened litigation, bankruptcy or other proceeding, (vi) satisfactory review of all organizational documentation of the Loan Parties and (vii) all fees and expenses due to the Lenders, Administrative Agent and counsels to the Administrative Agent and the Lenders will have been paid.

(b)     <u>Confirmation of Plan of Reorganization.</u>  The restructuring transactions shall be consummated in accordance with the terms of a Chapter 11 plan of reorganization (the "<u>Plan of Reorganization</u>") prepared in accordance with the Restructuring Support Agreement and the exhibits attached thereto  and such Plan of Reorganization shall be in all respects reasonably satisfactory to the Administrative Agent and the Required Lenders and all conditions precedent to the effectiveness of the Plan of Reorganization (other than the funding of the Loans under the First Out Credit Facilities) shall have been satisfied in the judgment of the Administrative Agent and the Required Lenders (or waived with the prior written consent of the Administrative Agent and the Required Lenders), and the Plan of Reorganization shall be substantially consummated (as defined in Section 1101 of the Bankruptcy Code), and the effective date thereunder shall occur, concurrently with the effectiveness of the First Out Credit Facilities and the Second Out Term Loan Facility. No changes, modifications, amendments or waivers (other than those reasonably satisfactory to the Administrative Agent and the Required Lenders) shall have been made to such Plan of Reorganization since the initial filing thereof with the Bankruptcy Court.

(c)     <u>Confirmation Order.</u>  The confirmation order (the "<u>Confirmation Order</u>") in respect of the Plan of Reorganization shall (i) have been entered by the United States Bankruptcy Court

1

for the Southern District of New York, White Plains Division (the "Bankruptcy Court") and shall not have been reversed, modified, amended, vacated or subject to any stay pending appeal, (ii) provide for terms and conditions substantially similar to those provided in the Plan of Reorganization and otherwise be reasonably satisfactory to the Administrative Agent and the Required Lenders and (iii) be in full force and effect. All appeals of the Confirmation Order, and the Plan of Reorganization, shall have been dismissed or resolved in a manner reasonably satisfactory to the Administrative Agent and the Required Lenders. No changes, modifications, amendments or waivers shall have been made to the Confirmation Order since the entry thereof by the Bankruptcy Court (other than those reasonably satisfactory to the Administrative Agent and the Required Lenders). Notwithstanding anything to the contrary in the Plan of Reorganization or Confirmation Order, the Bankruptcy Court's retention of jurisdiction under the Plan of Reorganization and the Confirmation Order shall not govern the enforcement of the Second Out Term Loan Facility or the related loan documents or any rights or remedies of the parties related thereto or arising thereunder.

(d) <u>Effective Date of Plan of Reorganization</u>. The effective date of the Plan of Reorganization shall occur no later than 180 days after the date on which the chapter 11 petitions are first filed by the Borrower or its affiliates.

(e) <u>Financial Statements</u>. The Administrative Agent and the Lenders will have received, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, (i) copies of audited consolidated financial statements for the Borrower and its subsidiaries for the three fiscal years most recently ended before the Closing Date (including, for the avoidance of doubt, the fiscal year ended December 31, 2012) and (ii) projections prepared by management of balance sheets, income statements and cashflow statements of the Borrower and its subsidiaries, which will be quarterly for the first year after the Closing Date and annually thereafter for the term of the Second Out Term Loan Facility.

(f) <u>No Material Adverse Effect</u>. (i) Since December 31, 2012, there shall not have occurred any event or condition that has had or could be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect. "<u>Material Adverse Effect</u>" means (A) a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower and its subsidiaries, taken as a whole, (B) a material adverse effect on the rights and remedies of the Administrative Agent or any Lender under any Financing Documentation, or of the ability of any Loan Party to perform its obligations under any Financing Documentation to which it is a party or (C) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Financing Documentation to which it is a party, but in each case of the foregoing other than as a result of the commencement of the Borrower's chapter 11 proceeding, any events directly causing the filing of the Cases or any events which customarily occur following the commencement of a reorganization proceeding under Chapter 11 of the Bankruptcy Code.

(g) <u>Capital Structure</u>. The Administrative Agent and the Required Lenders will be reasonably satisfied with the terms and amounts of any intercompany loans among the Loan Parties and the flow of funds in connection with the closing. The Administrative Agent and the Required Lenders will be reasonably satisfied with senior management of the Loan Parties.

(h) <u>Information Required by Regulatory Authorities</u>. The Loan Parties will have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(i)      Representations and Warranties. All representations and warranties made by the Loan Parties under the Second Out Term Loan Facility shall be true and correct in all material respects (unless already qualified by materiality or material adverse effect in which case they shall be true and correct in all respects) and the Administrative Agent and the Lenders shall not have become aware that any information previously delivered is inaccurate or incomplete in any material respect.

(j)      No Default.  No default or event of default under the Second Out Term Loan Facility shall have occurred or be continuing after giving effect to the closing and funding of the Second Out Term Loan Facility.  Without giving effect to the applicablitliy, if any, of Section 362 of the Bankruptcy Code, immediately prior to closing of the Second Out Term Loan Facility, the Restructuring Support Agreement shall be in full force and effect and shall not have been terminated and no default or event of default (unless as a result of a breach by the Lenders party thereto) thereunder shall have occurred or be continuing.  Furthermore, none of the Termination Events (as defined in the Restructuring Support Agreement) set forth in Sections 4.1(a), 4.1(b), 4.1(c), 4.1(e), 4.1(f), 4.1(g), 4.1(h), 4.1(i), 4.1(j), 4.1(l), 4.1(m), 4.1(n), 4.1(o), 4.1(u) or 4.1(v) shall have occurred (and irrespective of whether or not the occurrence of any of the foregoing has led to a termination of the Restructuring Support Agreement). Immediately prior to closing the Second Out Term Loan Facility, no default or event of default shall have occurred and be continuing under the Borrower's DIP Facility.

(k)      Business Plan. The Administrative Agent and the Lenders shall have received a post-reorganization business plan of Holding and its subsidiaries satisfactory to the Administrative Agent and the Required Lenders.

(l)      Outstanding Indebtedness.  Immediately following the restructuring transactions, neither Holding, the Borrower nor any of their respective subsidiaries will have any Indebtedness (as defined in the Financing Documentation) outstanding except for the loans under (i) the First Out Credit Facilities and (ii) the Second Out Term Loan Facility and ordinary course Indebtedness to the extent permitted under the Financing Documentation.

(m)      First Out Credit Facilities.  The definitive documentation for the First Out Credit Facilities shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders (it being acknowledged and agreed that the terms set forth in the First Out Exit Term Sheet are satisfactory).  The closing and funding of the First Out Credit Facilities shall have occurred or shall concurrently occur.

(n)      Fees and Expenses.  All fees and expenses of the Lenders, the Administrative Agent and of their respective advisors in connection with the transactions hereunder shall have been paid, to the extent due.

(o)      Other Closing Conditions under the First Out Credit Facilities.  Satisfaction of the conditions precedent to the closing of First Out Credit Facilities (but excluding clause (d) on Annex A to the First Out Exit Term Sheet) which conditions (to the extent the equivalents thereof are not included on this Annex A) are hereby incorporated, mutatis mutandis, as additional conditions precedent to the Second Out Term Loan Facility (as so incorporated shall have been satisfied and have not been waived without the consent of the Required Lenders).

**Exhibit B to Restructuring Support Agreement**

**Lender Joinder**

**LENDER JOINDER**

This Lender Joinder to the Restructuring Support Agreement, dated as of February [  ], 2013, by and among RDA Holding Co., The Reader's Digest Association, Inc. (the "Company"), and certain of the Company's subsidiaries and affiliates set forth on Schedule 1 of the Support Agreement (as defined herein and annexed hereto on Annex I), the Consenting Lender signatory thereto and the Consenting Secured Noteholders signatory thereto (the "Support Agreement), is executed and delivered by [_____] (the "Joining Lender Party") as of [_____], 2013. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1.  Agreement to be Bound. The Joining Lender Party hereby agrees to be bound by all of the terms of the Support Agreement, attached to this Lender Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time). The Joining Party shall hereafter be deemed to be a "Consenting Secured Party" and a party for all purposes under the Support Agreement.

2.  Representations and Warranties. With respect to the aggregate principal amount of prepetition Secured Notes, Credit Agreement obligations and/or DIP Loans held by the Joining Lender Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such prepetition claims, the Joining Lender Party hereby makes the representations and warranties of the Consenting Secured Parties set forth in Section 6 of the Support Agreement to each of the other Parties in the Support Agreement.

3.  Governing Law. This Lender Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

[THE REMAINDER OF THIS PAGE IS
INTENTIONALLY LEFT BLANK]

B-1

IN WITNESS WHEREOF, the Joining Lender Party has caused this Lender Joinder to be executed as of the date first written above.

_____
Entity Name of Joining Lender Party


Authorized Signatory:

By: _____
      Name:
      Title:

      Principal Amount of
      Secured Notes $_____

      Principal Amount of
      Credit Agreement obligations  $_____

      Principal Amount of
      DIP Loans $_____

      Address: _____