UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                      :

In re                     :        Chapter 11 Case No.
                      :

RDA HOLDING CO., *et al.*,[1]    :        13-22233 (RDD)
                      :

Debtors.             :        (Jointly Administered)
                      :

---------------------------------------------------------------x

## DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT PLAN OF REORGANIZATION OF CERTAIN DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Dated:  May 7, 2013

---

[1] The Debtors in these cases, along with the last four digits of their respective federal tax identification numbers, are RDA Holding Co. (7045); The Reader's Digest Association, Inc. (6769); Ardee Music Publishing, Inc. (2291); Direct Entertainment Media Group, Inc. (2306); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); Reiman Manufacturing, LLC (8760); RD Publications, Inc. (9115); Home Service Publications, Inc. (9525); RD Large Edition, Inc. (1489); RDA Sub Co. (f/k/a Books Are Fun, Ltd.) (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica S.A. (5836); WAPLA, LLC (9272); Reader's Digest Sales and Services, Inc. (2377); Taste of Home Media Group, LLC (1190); Reiman Media Group, LLC (1192); Taste of Home Productions, Inc. (1193); World Wide Country Tours, Inc. (1189); W.A. Publications, LLC (0229); WRC Media Inc. (6536); RDCL, Inc. (f/k/a Compass Learning, Inc.) (6535); RDA Digital, LLC (5603); RDWR, Inc. (f/k/a Weekly Reader Corporation) (3780); Haven Home Media, LLC (f/k/a Reader's Digest Sub Nine, Inc.) (2727); Weekly Reader Custom Publishing, Inc. (f/k/a Lifetime Learning Systems, Inc.) (3276); and World Almanac Education Group, Inc. (3781).

# TABLE OF CONTENTS

I. EXECUTIVE SUMMARY ................................................................................................ 1

II. INTRODUCTION ........................................................................................................... 7

    A.    DISCLOSURE STATEMENT EXHIBITS ............................................................ 7

    B.    THE REORGANIZATION PLAN DEBTORS' PROFESSIONALS .................... 8

    C.    IMPORTANT DATES ........................................................................................... 8

    D.    BRIEF OVERVIEW OF THE REORGANIZATION PLAN ............................... 9

    E.    SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY
        UNDER THE REORGANIZATION PLAN ...................................................... 10

    F.    VOTING PROCEDURES .................................................................................. 13

    G.    CONFIRMATION UNDER SECTION 1129(B) ............................................... 13

    H.    CONFIRMATION HEARING ........................................................................... 14

III. OVERVIEW OF THE REORGANIZATION PLAN DEBTORS' OPERATIONS ............. 14

    A.    CURRENT OPERATIONS ................................................................................ 14

        1.    RDA North America ............................................................................ 15

        2.    RDA International ................................................................................ 18

    B.    THE REORGANIZATION PLAN DEBTORS' SUPPLY CHAIN .................... 19

    C.    PREPETITION CAPITAL STRUCTURE ........................................................ 20

        1.    Senior Credit Agreement .................................................................... 20

        2.    Senior Notes ........................................................................................ 20

        3.    Collateral for Senior Credit Agreement and Senior Notes ................ 21

        4.    Unsecured Term Loan ......................................................................... 21

IV. KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11
    CASES ................................................................................................................... 22

    A.    BUSINESS ENVIRONMENT POST 2009 RESTRUCTURING ...................... 22

    B.    FTC CLAIM ...................................................................................................... 23

    C.    TRANSFORMATION EFFORTS .................................................................... 25

        1.    Reduction of Corporate Overhead and Organizational Complexity ... 25

        2.    Revitalizing the Reorganization Plan Debtors' Core Businesses ........ 26

    D.    INTERNATIONAL STRATEGIES ................................................................. 26

    E.    THE RESTRUCTURING SUPPORT AGREEMENT ...................................... 27

V. THE CHAPTER 11 CASES .......................................................................................... 28

    A.    FIRST DAY PLEADINGS ................................................................................ 28

    B.     DIP FACILITY ................................................................................ 28

    C.     CREDITORS COMMITTEE................................................................ 29

    D.    SCHEDULES AND BAR DATES.................................................... 29

    E.    OTHER INTERNATIONAL TRANSACTIONS ............................. 30

         1.    SAPE Transaction ................................................................ 30

         2.    Poland Transaction............................................................. 31

         3.    Other International Transactions........................................ 31

    F.     POTENTIAL CAUSES OF ACTION .............................................. 31

         1.    Share Repurchase ............................................................... 32

         2.    April 2011 Removal of Board............................................. 32

         3.    The Investor Group Loan .................................................... 32

         4.    Sale of Certain Assets ......................................................... 33

         5.    Senior Notes Tender Offer................................................... 33

         6.    Results of Examination ....................................................... 34

VI. THE REORGANIZATION PLAN.................................................................... 34

    A.    INTRODUCTION ............................................................................ 34

    B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND
         INTERESTS UNDER THE CHAPTER 11 PLAN ............................. 35

    C.    UNCLASSIFIED CLAIMS ............................................................. 36

         1.    Administrative Expense Claims........................................... 36

         2.    Fee Claims .......................................................................... 37

         3.    Priority Tax Claims ............................................................. 37

         4.    DIP Claims .......................................................................... 37

         5.    2012 Senior Credit Agreement Claims ............................... 38

         6.    Roll-Up Loans...................................................................... 38

         7.    Indenture Trustee Fees ........................................................ 38

    D.    CLASSIFIED CLAIMS AND INTERESTS .................................... 39

         1.    Class 1 – Other Priority Claims ........................................ 39

         2.    Class 2 – Other Secured Claims......................................... 39

          3.    Class 3 – Senior Noteholder Secured Claims.................... 39

         4.    Class 4 – General Unsecured Claims................................. 40

          5.    Class 5 – Plan Debtor Intercompany Claims ................... 42

         6.    Class 6 – Existing RDA Holding Interests ........................ 42

US_ACTIVE:\44238718\1\69252.0041

7.      Class 7 – Intercompany Interests ............................................ 42

8.      Class 8 – Subordinated Securities Claims ................................ 42

E.      MEANS OF IMPLEMENTATION........................................................ 42

1.      Compromise and Settlement of Claims, Interests, and
        Controversies ........................................................................... 42

2.      First Out Exit Facilities and Second Out Exit Term Loan........................ 43

3.      Authorization and Issuance of Plan Securities.......................... 43

4.      Cancellation of Existing Securities and Agreements................ 44

5.      Reorganized RDA Holding........................................................ 44

6.      International Restructuring Transactions.................................. 45

7.      Other Transactions.................................................................... 45

8.      Cancellation of Liens................................................................ 45

9.      Management Incentive Program ............................................... 45

10.     Employee Matters. .................................................................... 46

11.     Withholding and Reporting Requirements. .............................. 46

12.     Exemption From Certain Transfer Taxes. ................................ 46

13.     Effectuating Documents; Further Transactions. ...................... 47

14.     Closing of the Chapter 11 Cases. ............................................. 47

F.      DISTRIBUTIONS ................................................................................. 47

1.      Distribution Record Date .......................................................... 47

2.      Date of Distributions................................................................. 47

3.      Disbursing Agent ...................................................................... 48

4.      Powers of Disbursing Agent ..................................................... 48

5.      Cancelation of Senior Notes ..................................................... 49

6.      Delivery of Distributions .......................................................... 49

7.      Manner of Payment Under Plan................................................ 49

8.      Fractional Stock ........................................................................ 49

9.      Minimum Cash Distributions..................................................... 50

10.     Setoffs ....................................................................................... 50

11.     Distributions After Effective Date ............................................ 50

12.     Allocation of Distributions Between Principal and Interest ..................... 50

G.      PROCEDURES FOR DISPUTED CLAIMS ........................................ 51

1.      Allowance of Claims................................................................. 51

| | | | |
|---|---|---|---|
| | 2. | Objections to Claims | 51 |
| | 3. | Estimation of Claims | 51 |
| | 4. | No Distributions Pending Allowance | 51 |
| | 5. | Distributions After Allowance | 52 |
| | 6. | Resolution of Claims | 52 |
| | 7. | Disallowed Claims | 52 |
| | 8. | Debtor Affiliate Claims | 52 |
| | 9. | Claims Oversight Procedures | 52 |
| H. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 53 |
| | 1. | General Treatment | 53 |
| | 2. | Payments Related to Assumption of Contracts and Leases | 54 |
| | 3. | Rejection Claims | 54 |
| | 4. | Survival of the Reorganization Plan Debtors' Indemnification Obligations | 55 |
| | 5. | Compensation and Benefit Plans | 56 |
| | 6. | Insurance Policies | 56 |
| | 7. | Intellectual Property Licenses and Agreements | 56 |
| | 8. | Reservation of Rights | 57 |
| I. | | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 57 |
| | 1. | Conditions Precedent to Confirmation | 57 |
| | 2. | Conditions Precedent to the Effective Date | 58 |
| | 3. | Waiver of Conditions Precedent | 59 |
| | 4. | Effect of Failure of Conditions to Effective Date | 60 |
| J. | | EFFECT OF CONFIRMATION | 60 |
| | 1. | Subordinated Claims | 60 |
| | 2. | Vesting of Assets | 60 |
| | 3. | Discharge of Claims and Termination of Interests | 60 |
| | 4. | Term of Injunctions or Stays | 61 |
| | 5. | Injunction Against Interference with Plan | 61 |
| | 6. | Releases by the Reorganization Plan Debtors | 61 |
| | 7. | Releases By Holders of Claims and Interests | 62 |
| | 8. | Exculpation | 63 |
| | 9. | Retention of Causes of Action/Reservation of Rights | 63 |

US_ACTIVE:\44238718\1\69252.0041

|     | 10. | Solicitation of the Reorganization Plan | 64 |
|     | 11. | Section 1145 Exemption | 65 |
|     | 12. | Plan Supplement | 65 |
|     | 13. | Corporate and Limited Liability Company Action | 66 |
| K.  |     | RETENTION OF JURISDICTION | 66 |
| L.  |     | MISCELLANEOUS PROVISIONS | 68 |
|     | 1.  | Payment of Statutory Fees | 68 |
|     | 2.  | Substantial Consummation | 68 |
|     | 3.  | Dissolution of Creditors Committee | 68 |
|     | 4.  | Request for Expedited Determination of Taxes | 69 |
|     | 5.  | Amendments | 69 |
|     | 6.  | Effectuating Documents and Further Transactions | 69 |
|     | 7.  | Revocation or Withdrawal of the Reorganization Plan | 70 |
|     | 8.  | Severability of Plan Provisions upon Confirmation | 70 |
|     | 9.  | Governing Law | 70 |
|     | 10. | Time | 70 |
|     | 11. | Immediate Binding Effect | 71 |
|     | 12. | Successor and Assigns | 71 |
|     | 13. | Entire Agreement | 71 |
|     | 14. | Notices | 71 |

VII. VALUATION OF THE REORGANIZATION PLAN DEBTORS .................................... 73

VIII. CERTAIN FACTORS AFFECTING THE REORGANIZATION PLAN
DEBTORS ........................................................................................................... 76

| A.  |     | CERTAIN BANKRUPTCY LAW CONSIDERATIONS | 76 |
|     | 1.  | Risk of Non-Confirmation of the Reorganization Plan of Reorganization | 76 |
|     | 2.  | Non-Consensual Confirmation | 76 |
|     | 3.  | Risk of Delay in Confirmation of the Reorganization Plan | 77 |
|     | 4.  | Risks Related to the Restructuring Support Agreement and DIP Facility | 77 |
| B.  |     | ADDITIONAL FACTORS TO BE CONSIDERED | 77 |
|     | 1.  | The Reorganization Plan Proponents Have No Duty to Update | 77 |
|     | 2.  | No Representations Outside This Disclosure Statement Are Authorized | 77 |

US_ACTIVE:\44238718\1\69252.0041

    3.    Financial Projections Are Not Assured, Actual Results May Vary,
          and Variances from Financial Projections May Occur .............................. 77

    4.    No Legal or Tax Advice Is Provided to You by This Disclosure
          Statement ................................................................................................... 78

    5.    No Admission Made .................................................................................. 78

    6.    A Liquid Trading Market for the New Common Stock is Unlikely
          to Develop ................................................................................................ 78

    7.    Business Factors and Competitive Conditions ......................................... 79

IX. CERTAIN U. S. FEDERAL INCOME TAX CONSEQUENCES OF THE
    REORGANIZATION PLAN ................................................................................... 81

    A.    CONSEQUENCES TO THE DEBTORS ............................................................. 82

    1.    Cancellation of Debt ................................................................................. 83

    2.    Potential Limitations on NOL Carryforwards and Other Tax
          Attributes .................................................................................................. 83

    3.    Alternative Minimum Tax ......................................................................... 85

    B.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS ............................. 86

    1.    Consequence to Holders of Allowed Senior Noteholder Secured
          Claims ....................................................................................................... 86

    2.    Consequences to Holders of Allowed General Unsecured Claims ........... 89

    3.    Information Reporting and Backup Withholding ...................................... 90

X. CONFIRMATION OF THE REORGANIZATION PLAN .................................... 91

    A.    CONFIRMATION HEARING ............................................................................ 91

    B.    OBJECTIONS .................................................................................................... 91

    C.    REQUIREMENTS FOR CONFIRMATION OF THE
          REORGANIZATION PLAN .............................................................................. 92

    1.    Requirements of Section 1129(a) of the Bankruptcy Code ..................... 92

    2.    Requirements of Section 1129(b) of the Bankruptcy Code ..................... 95

    3.    Alternative to Confirmation and Consummation of the
          Reorganization Plan ................................................................................. 97

    4.    Nonconsensual Confirmation .................................................................... 98

XI. CONCLUSION ....................................................................................................... 100

US_ACTIVE:\44238718\1\69252.0041

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE *SECOND AMENDED JOINT PLAN OF REORGANIZATION OF CERTAIN DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE*, DATED MAY 6, 2013, AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME (THE "**REORGANIZATION PLAN**") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE REORGANIZATION PLAN.[2]   A COPY OF THE REORGANIZATION PLAN IS ANNEXED HERETO AS **EXHIBIT A**.  NO SOLICITATION OF VOTES TO ACCEPT THE REORGANIZATION PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE REORGANIZATION PLAN **IN THEIR ENTIRETY** BEFORE VOTING TO ACCEPT OR REJECT THE REORGANIZATION PLAN. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VIII (CERTAIN FACTORS AFFECTING THE REORGANIZATION PLAN DEBTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE REORGANIZATION PLAN. REORGANIZATION PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE REORGANIZATION PLAN AND THE EXHIBITS ANNEXED TO THE REORGANIZATION PLAN AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. **IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE REORGANIZATION PLAN, THE TERMS OF THE REORGANIZATION PLAN WILL GOVERN**.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

---

[2] Capitalized terms used but not otherwise defined herein, shall have the same meanings ascribed to them in the Reorganization Plan.

US_ACTIVE:\44238718\1\69252.0041

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE REORGANIZATION PLAN DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.  HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE REORGANIZATION PLAN, PRIOR TO VOTING ON THE REORGANIZATION PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

**THE REORGANIZATION PLAN DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "CREDITORS COMMITTEE") URGE THE CREDITORS OF THE REORGANIZATION PLAN DEBTORS TO VOTE TO ACCEPT THE REORGANIZATION PLAN.  THE REORGANIZATION PLAN DEBTORS AND THE CREDITORS COMMITTEE BELIEVE THAT THE REORGANIZATION PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR THE REORGANIZATION PLAN DEBTORS' CREDITORS.**

US_ACTIVE:\44238718\1\69252.0041

**<u>IRS CIRCULAR 230 NOTICE</u>:  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT:  (1) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE REORGANIZATION PLAN DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (3) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

US_ACTIVE:\44238718\1\69252.0041

# I.

## EXECUTIVE SUMMARY

On February 17, 2013 (the "**Commencement Date**"), and continuing immediately thereafter, RDA Holding Co. ("**RDA Holding**"), The Reader's Digest Association, Inc. ("**Reader's Digest**"), and their affiliated debtors and debtors in possession (collectively, the "**Debtors**" and, together with their non-debtor affiliates, "**RDA**"), each commenced with the United States Bankruptcy Court for the Southern District of the United States (the "**Bankruptcy Court**") a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors' chapter 11 cases are being jointly administered for procedural purposes only under the case *In re RDA Holding Co., et al.*, Ch. 11 Case No. 13-22233 (RDD) (the "**Chapter 11 Cases**").  The Reorganization Plan is being proposed by all of the Debtors other than Direct Entertainment Media Group, Inc. ("**DEMG**," and all of the Debtors other than DEMG, collectively, the "**Reorganization Plan Debtors**").  The Reorganization Plan Debtors anticipate that DEMG will file, in the near term, a separate plan to implement a wind down of its estate.

The Reorganization Plan implements a consensual settlement and restructuring agreement negotiated among the Reorganization Plan Debtors, the Creditors Committee and the Reorganization Plan Debtors' major stakeholders, including Wells Fargo Principal Lending, LLC (together with one of its affiliates, "**Wells Fargo**") and an ad hoc committee (the "**Ad Hoc Committee**") comprised of holders of more than two-thirds of the Debtors' Floating Rate Senior Secured Notes due 2017 (the "**Senior Notes**").  The anticipated benefits of the settlement and restructuring agreement include (without limitation):

- Consensual conversion of approximately $475 million of debt to equity;

- $105 million in debtor-in-possession financing, including $45 million in new money provided by certain holders of the Senior Notes, to facilitate operations in chapter 11;

- Conversion of the $105 million of debtor in possession financing to exit financing that will provide ongoing liquidity post-emergence;

- Prompt emergence from chapter 11;

- 80% reduction of prepetition debt burden post-emergence;

- Continued execution of key transformational initiatives including a sharpened focus on strong core publishing brands, building on RDA's digital transformation; and

- As a result of a global settlement and compromise reached among the Reorganization Plan Debtors, the Creditors Committee and the Ad Hoc Committee:  (i) a *Pro Rata* distribution of $3,875,000 to holders of Allowed General Unsecured Claims against Reader's Digest, subject to certain conditions below; and (ii) a *Pro Rata* distribution of $500,000 to holders of Allowed General Unsecured Claims, subject to certain conditions set forth below.

The Reorganization Plan provides for a comprehensive restructuring of the Reorganization Plan Debtors' prepetition obligations, preserves the going-concern value of the Reorganization Plan Debtors' businesses, maximizes creditor recoveries, provides for an equitable distribution to the Reorganization Plan Debtors' stakeholders and protects the jobs of employees.

In developing the Reorganization Plan, the Reorganization Plan Debtors gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives of and/or professionals for the 2012 Credit Agreement Lenders, the Senior Noteholders, and the Creditors Committee.  The Reorganization Plan Debtors also conducted a careful review of their current operations, prospects as an ongoing business and financial projections developed by management and estimated recoveries in a liquidation scenario, and concluded that recoveries to the Reorganization Plan Debtors' stakeholders will be maximized by the Reorganization Plan Debtors' continued operation as a going concern.  The Reorganization Plan Debtors, the Ad Hoc Committee and the Creditors Committee believe that the Reorganization Plan Debtors' businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  Consistent with the valuation, liquidation and other analyses prepared by the Reorganization Plan Debtors with the assistance of their advisors, the value of the Reorganization Plan Debtors is substantially greater as a going concern than in a liquidation.

Substantially all of the Reorganization Plan Debtors' assets are subject to valid and perfected liens held by the DIP Lenders, 2012 Senior Credit Agreement Lenders and the Senior Noteholders, which require payment in full prior to distributions to holders of unsecured claims against the Reorganization Plan Debtors.  Thus, on a going-concern basis, because the obligations owed by the Reorganization Plan Debtors to the DIP Lenders and the Senior Noteholders greatly exceed the value of the Reorganization Plan Debtors, the Reorganization Plan Debtors, Senior Noteholders and the Ad Hoc Committee believe minimal (if any) distributions would be made to any holders of Claims against the Reorganization Plan Debtors other than the DIP Lenders and the Senior Noteholders absent consummation of the proposed Reorganization Plan.  Further, as set forth in the attached Liquidation Analysis, outside of the proposed Reorganization Plan, holders of non-priority unsecured Claims junior to the Claims of the DIP Lenders and the Senior Noteholders would receive no distribution in a liquidation of the Reorganization Plan Debtors' Estates.

The Reorganization Plan Debtors recognize that general unsecured creditors are entitled to receive a distribution from the value of any unencumbered assets after the satisfaction of priority claims and administrative expenses of the Chapter 11 Cases.  Here, the unencumbered assets consist almost entirely of Reader's Digest's one-third (1/3) equity interests in the Reorganization Plan Debtors' first-tier foreign subsidiaries.[3]  The Reorganization Plan Debtors believe there is little realizable value associated with the unencumbered one-third (1/3) equity interest in their direct and indirect international subsidiaries that would be available for general unsecured creditors for several reasons.  First, certain of the international subsidiaries owe significant intercompany loans to the Reorganization Plan Debtors, obligations that are subject to

---

[3] For tax purposes, the Debtors pledged only 65% of the voting stock of their first-tier foreign subsidiaries to secure obligations under the DIP Credit Agreement, the 2012 Senior Credit Agreement and the Indenture.

US_ACTIVE:\44238718\1\69252.0041

liens held by the DIP Lenders and Prepetition Secured Creditors. Further, the international subsidiaries have limited (if any) market value to third-parties as a going-concern. Prior to the Commencement Date, the Reorganization Plan Debtors conducted a lengthy and comprehensive sale process to market the international subsidiaries and were unable to identify any parties willing to ascribe significant value for the Reorganization Plan Debtors' entire international operations as a going-concern.[4] This was, in significant part, due to (a) the lack of any meaningful management or personnel infrastructure for the international operations without the resources and governance of the Reorganization Plan Debtors, (b) the complexities and significant costs associated with the central services infrastructure for the international operations, and (c) the declining performance in many of the Reorganization Plan Debtors' international markets. Additionally, the Reorganization Plan Debtors believe that any unencumbered value must first be applied to satisfy the administrative costs of these Chapter 11 Cases and that the Senior Noteholders may have substantial administrative claims due to the alleged diminution of their collateral during the Chapter 11 Cases that was caused in part by the incurrence of the New Money Loans and that would also take priority in any payment waterfall. Moreover, after taking into account the substantial amount of any unencumbered value allocable to the Senior Noteholders on account of their unsecured deficiency claims (estimated at approximately 65% of the aggregate dollar amount of General Unsecured Claims against Reader's Digest, the owner of the equity), the Reorganization Plan Debtors believe the distributable value remaining for other General Unsecured Claims from the one-third (1/3) equity interest in the international subsidiaries, is negligible at best. The Creditors Committee disagrees with certain of the foregoing assertions and the Reorganization Plan Debtors' valuation of their businesses, including their international subsidiaries. The Creditors Committee believes that some distributable value exists in the unencumbered portion of Reader's Digest's equity interest in its foreign subsidiaries that would provide a recovery to creditors.

Since the appointment of the Creditors Committee, the Reorganization Plan Debtors and the Ad Hoc Committee have engaged in discussions with the Creditors Committee regarding the terms of the Reorganization Plan and the allocation of recoveries. One of the key disagreements between the parties involves the valuation of the one-third (1/3) equity interest in the international subsidiaries that are held directly by Reader's Digest. The parties recognize the difficulties inherent with a contested valuation hearing given the nature of the international subsidiaries and the significant legal costs of such a fight. The Reorganization Plan Debtors and the Creditors Committee have also explored the possibility of receiving additional distributable value from potential Causes of Action but the Reorganization Plan Debtors do not believe at this juncture that any such receivables would be meaningful. The Creditors Committee believes that there may be significant factual and legal impediments to realizing value from such Causes of Action. The parties, therefore, support the retention of the Causes of Action by the Reorganized Debtors as well as the releases provided for in the Reorganization Plan. Accordingly, pursuant to good faith and extensive arm's-length negotiations, the Reorganization Plan Debtors, the Ad Hoc Committee and the Creditors Committee have reached a global settlement and compromise to resolve all disputes among the parties that provides for an enhanced recovery for holders of Allowed General Unsecured Claims against Reader's Digest primarily to settle and avoid

---

[4] For a discussion of the limited number of stand-alone transactions the Reorganization Plan Debtors have entered into during the Chapter 11 Cases for the sale of certain of their international operations *see* Section V.E. below.

US_ACTIVE:\44238718\1\69252.0041

litigating disputes regarding the value of Reader's Digest's one-third (1/3) equity interest in its international subsidiaries as well as to support the releases provided for in the Reorganization Plan.  Specifically, the Reorganization Plan provides (i) the original $500,000 Cash distribution (the "**GUC Distribution**") to be allocated *Pro Rata* among all sub-classes of General Unsecured Claims at each Reorganization Plan Debtor that votes to accept the Reorganization Plan and (ii)  an additional Cash distribution of $3,875,000 (the "**RDA GUC Distribution**") to holders of Allowed General Unsecured Claims against Reader's Digest (the vast majority of the creditors in these cases) if that sub-class votes to accept the Reorganization Plan.  The GUC Distribution and RDA GUC Distribution will be held in a segregated non-interest bearing account(s) maintained by the Reorganized Debtors.  Expenses, if any, of maintaining the account will be borne by the Reorganized Debtors.

Accordingly, the Reorganization Plan provides the following treatment with respect to each sub-class of Allowed General Unsecured Claims that votes to accept the Reorganization Plan of any Reorganization Plan Debtor:

- holders of Allowed General Unsecured Claims in such sub-class will receive their *Pro Rata* share of the GUC Distribution;

- holders of Allowed General Unsecured Claim of Reader's Digest will also receive their *Pro Rata* share of the RDA GUC Distribution; and

- the Senior Noteholder Deficiency Claims in such sub-class shall be deemed waived solely for purposes of participating in the GUC Distribution and the RDA GUC Distribution.

**IN THE EVENT THAT ANY SUB-CLASS OF GENERAL UNSECURED CLAIMS VOTES TO REJECT THE REORGANIZATION PLAN WITH RESPECT TO ANY REORGANIZATION PLAN DEBTOR, THE HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS IN SUCH REJECTING SUB-CLASS WILL NOT RECEIVE OR RETAIN ANY PROPERTY UNDER THE REORGANIZATION PLAN.**

For the avoidance of doubt, to the extent any sub-class of General Unsecured Claims votes to reject the Reorganization Plan and, therefore, is not entitled to receive any portion of the GUC Distribution, such *Pro Rata* portion attributable to the rejecting sub-class shall be reallocated to the holders of Allowed General Unsecured Claims in other sub-classes that have voted to accept the Reorganization Plan.

Further, as a part of the global settlement, a portion of the GUC Distribution and the RDA GUC Distribution will be used to fund a claims oversight committee (the "**Claims Oversight Committee**") that will ensure that distributions to the holders of General Unsecured Claims are made on a fair and equitable basis.[5]

---

[5] *See* Section VI.G below.

US_ACTIVE:\44238718\1\69252.0041

The settlement is in no way an admission or indicative of any party's view as to the value of the one-third (1/3) equity interest in Reader's Digest's international subsidiaries or value allocation related thereto, but instead, is a good faith settlement and compromise calculated primarily to avoid litigation costs and delays that could otherwise consume any recovery for holders of Allowed General Unsecured Claims.

In connection with the global settlement and compromise, the Reorganization Plan Debtors and the Creditors Committee sought a resolution of certain claims filed by Luxor Capital Group, LP ("**Luxor**"), in its capacity as administrative agent under each of the Unsecured Term Loan and the 2011 Secured Term Loan, respectively. Luxor, as Unsecured Administrative Agent, has asserted claims against each of the Reorganization Plan Debtors in amount not less than $10,143,611 on account of, among other things, outstanding prepetition principal and accrued but unpaid interest owed by the Reorganization Plan Debtors under the Unsecured Term Loan. Significantly, Luxor, as Unsecured Administrative Agent, has asserted that it has claims against each of the Reorganization Plan Debtors for the full amount of outstanding principal and interest on account of guarantees granted in connection with the Unsecured Term Loan.[6] As discussed in Section V.F of this Disclosure Statement, the Reorganization Plan Debtors have reviewed and analyzed the Unsecured Term Loan and the 2011 Secured Term Loan and believe that each of the Claims are valid, that there is no basis to subordinate or recharacterize and that there are no viable Causes of Action with respect to the Transactions with Luxor. The Creditors Committee does not necessarily agree with the Reorganization Plan Debtors in this regard and disagrees with a number of assertions made by the Unsecured Administrative Agent including, but not limited to, the Unsecured Administrative Agent's assertion that it is entitled to claims for the full claim amount against each of the Reorganization Plan Debtors. However, rather than incurring the cost and expense of litigating issues with respect to Unsecured Term Loan and claims arising thereunder, the parties have agreed to a resolution of their claims (the "**2011 Financing Settlement**") pursuant to which: (i) Luxor, as Unsecured Administrative Agent, will receive (a) an Allowed Class 4 General Unsecured Claim of $16,939,830.55 against Reader's Digest (which amount represents 1.67 times the amount of the outstanding principal and accrued but unpaid interest under the Unsecured Term Loan), for distribution purposes only, and shall waive any right to seek any further or additional distribution under the Reorganization Plan and (b) Allowed Class 4 General Unsecured Claims in the total aggregate amount of $1.00 against each of the other Reorganization Plan Debtors for voting purposes only; and (ii) the Unsecured Administrative Agent, the Unsecured Lenders, the 2011 Secured Administrative Agent and the 2011 Secured Lenders shall receive general releases by the Reorganization Plan Debtors, the other Released Parties and, to the extent authorized by the Bankruptcy Court, the holders of Claims against, and Interests in, the Reorganization Plan Debtors.

The Reorganization Debtors and the Creditors Committee submit that the global settlement and compromise contemplated under the Reorganization Plan, including the 2011 Financing Settlement, is fair and equitable, will maximize the Reorganization Debtors' value and provides the best recovery to creditors.

---

[6] Luxor has also filed a Claim, in its capacity as 2011 Secured Administrative Agent, for an unliquidated amount on account of certain fees and continuing indemnity obligations arising under the 2011 Secured Term Loan.

> **THE CREDITORS COMMITTEE URGES ALL HOLDERS OF GENERAL UNSECURED CLAIMS IN EVERY SUB-CLASS TO VOTE IN FAVOR OF THE REORGANIZATION PLAN.  THE REORGANIZATION PLAN SETTLEMENT REFLECTS THE CREDITORS COMMITTEE'S BELIEF THAT THE REORGANIZATION PLAN PROVIDES GREATER RECOVERIES THAN HOLDERS OF GENERAL UNSECURED CLAIMS WOULD OTHERWISE BE ENTITLED TO UNDER A STRICT WATERFALL ANALYSIS OR THAT COULD BE OBTAINED THROUGH ANY OTHER MEANS, INCLUDING LITIGATION.**

The Reorganization Plan Debtors and the Creditors Committee believe that any alternative to Confirmation of the Reorganization Plan, such as an attempt by another party to file a competing plan of reorganization, would result in significant delays, litigation and additional costs, and could negatively affect value by causing unnecessary uncertainty with the Reorganization Plan Debtors' key customer and supplier constituencies, which could ultimately lower the recoveries for all holders of Allowed Claims.  Additionally, any resulting breach of the milestones set forth in the Restructuring Support Agreement for confirmation of the Reorganization Plan could jeopardize the Ad Hoc Committee's willingness to fund the GUC Distribution and the RDA GUC Distribution.

The purpose of this Disclosure Statement is to provide holders of Claims entitled to vote to accept or reject the Reorganization Plan with adequate information about (1) the Reorganization Plan Debtors' businesses and certain historical events, (2) the Chapter 11 Cases, (3) the Reorganization Plan, (4) the rights of holders of Claims and Interests under the Reorganization Plan, and (5) other information necessary to enable each holder of a Claim to make an informed judgment as to whether to vote to accept the Reorganization Plan.

**THE REORGANIZATION PLAN DEBTORS AND THE CREDITORS COMMITTEE URGE YOU TO VOTE IN FAVOR OF THE REORGANIZATION PLAN.**

## II.

## INTRODUCTION

Pursuant to section 1125 of the Bankruptcy Code, the Reorganization Plan Debtors submit this Disclosure Statement to all holders of Claims against and Interests in the Estates to provide information in connection with the solicitation of acceptances of the Reorganization Plan.  The Disclosure Statement is organized as follows:

- Section I contains an executive summary.

- Section II includes certain general information.

- Section III provides an overview of the Reorganization Plan Debtors' businesses.

- Section IV sets forth key events leading to the Reorganization Plan Debtors' chapter 11 filings.

- Section V discusses the Chapter 11 Cases.

- Section VI contains a summary of the Reorganization Plan.

- Section VII discusses the valuation of the Reorganization Plan Debtors.

- Section VIII describes certain factors affecting the Reorganization Plan Debtors.

- Section IX discusses certain U.S. federal income tax consequences.

- Section X addresses confirmation of the Reorganization Plan.

- Section XI concludes this Disclosure Statement and recommends that eligible creditors vote to accept the Reorganization Plan.

### A.    <u>DISCLOSURE STATEMENT EXHIBITS</u>

The following exhibits are attached to this Disclosure Statement:

- **EXHIBIT A** – The Reorganization Plan

- **EXHIBIT B** – Debtors' Prepetition Organizational Structure

- **EXHIBIT C** – Projected Financial Information

- **EXHIBIT D** – Liquidation Analysis for the Reorganization Plan Debtors

- **EXHIBIT E** – Proposed Stockholders Agreement Term Sheet

7

B.    **THE REORGANIZATION PLAN DEBTORS' PROFESSIONALS**

Pursuant to separate orders of the Bankruptcy Court, the Reorganization Plan Debtors have retained, in addition to certain other professionals, (1) Weil, Gotshal & Manges LLP, as their legal advisors; (2) Evercore Group L.L.C. ("**Evercore**"), as their investment bankers; (3) FTI Capital Advisors, LLC ("**FTI**"), as their international financial advisor and investment bankers; (4) Duff & Phelps, LLC ("**Duff & Phelps**"), as their valuation services provider; and (5) Epiq Bankruptcy Solutions, LLC ("**Epiq**," or the "**Voting Agent**"), as claims agent and administrative adviser.  Contact information for these advisors is set forth below:

| | |
|---|---|
| **Weil, Gotshal & Manges LLP**<br>767 Fifth Avenue<br>New York, New York 10153<br>(212) 310-8000<br>Attn:  Marcia L. Goldstein, Esq.<br>        Joseph H. Smolinsky, Esq. | **Evercore Group L.L.C.**<br>55 East 52nd Street<br>New York, New York 10055<br>(212) 857-3100<br>Attn:  Qazi Fazal |
| **FTI Capital Advisors, LLC**<br>Three Times Square<br>11th Floor<br>New York, New York 10036<br>(212) 247-1010<br>Attn:  Christopher T. Nicholls | **Duff & Phelps, LLC**<br>55 East 52nd Street<br>New York, New York 10055<br>(212) 871-2000<br>Attn:  Michael H. Dolan |
| **Epiq Bankruptcy Solutions, LLC**<br>757 Third Avenue<br>3rd Floor<br>New York, New York 10017<br>(646) 282-2500<br>Attn:  James Katchadurian | |

C.    **IMPORTANT DATES**

Please take note of the following important dates:

| | |
|---|---|
| Deadline to file and serve any objection or response to the Reorganization Plan (the "**Objection Deadline**") | **June 14, 2013 at 4:00 p.m. (Eastern Time)** |
| Deadline for completed ballots to be received by the Voting Agent (the "**Voting Deadline**") | **June 14, 2013 at 4:00 p.m. (Eastern Time)** |
| Scheduled date and time for the commencement of the hearing to consider confirmation of the Reorganization Plan (the "**Confirmation Hearing**") | **June 28, 2013 at 10:00 a.m. (Eastern Time)** |

8

D.    **BRIEF OVERVIEW OF THE REORGANIZATION PLAN**[7]

The Reorganization Plan described in this Disclosure Statement provides for the Reorganization Plan Debtors' prompt emergence from these Chapter 11 Cases, which the Reorganization Plan Debtors anticipate will occur on or before July 31, 2013.

The Reorganization Plan implements the consensual settlement and restructuring agreement negotiated among the Reorganization Plan Debtors, Wells Fargo, the Ad Hoc Committee, the Creditors Committee and their respective professionals.  The principal terms of the negotiated agreement are embodied in that certain Restructuring Support Agreement, dated February 17, 2013 (as may be amended, supplemented or modified from time to time in accordance with the terms thereof, the "**Restructuring Support Agreement**"), by and among the Reorganization Plan Debtors, DEMG, Wells Fargo, and certain holders of Senior Notes.  A copy of the Restructuring Support Agreement is annexed to the Reorganization Plan as Exhibit A.

Pursuant to the Reorganization Support Agreement, the Reorganization Plan Debtors will restructure their debt obligations and implement a recapitalization with $45 million of new capital being provided pursuant to the DIP Facility that will convert to exit financing.

Under the Reorganization Plan, Senior Noteholders will receive on account of their secured claims all of the equity of the Reorganized Debtors, subject to certain agreed-upon dilutions (as described herein).  The Restructuring Support Agreement contemplated that distributions to holders of General Unsecured Claims would be negotiated at a later date.  As a result of the global settlement and compromise reached with the Creditors Committee, holders of Allowed General Unsecured Claims will receive a *Pro Rata* share of the GUC Distribution and, if applicable, the RDA GUC Distribution, if their applicable sub-class votes to accept the Reorganization Plan.  Existing holders of interests in the Reorganization Plan Debtors (other than each Debtor's interests in another Debtor) will not receive any distribution on account thereof. Section VI of this Disclosure Statement provides a more detailed description of the Reorganization Plan.

---

[7] **This summary is qualified in its entirety by reference to the Reorganization Plan**.  Statements as to the rationale underlying the treatment of Claims and Interests under the Reorganization Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event that the Reorganization Plan is not confirmed.  You should read the Reorganization Plan in its entirety before voting to accept or reject the Reorganization Plan.

US_ACTIVE:\44238718\1\69252.0041

### E.    SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY UNDER THE REORGANIZATION PLAN

The following table briefly summarizes the classification and treatment of Claims and Interests under the Reorganization Plan, and the voting eligibility of the holders of such Claims and Interests:

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIR-MENT | APPROX. ALLOWED AMOUNT[8] | APPROX. % RECOVERY | TREATMENT[9] | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $50,000 | 100% | Each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practical thereafter. | No (presumed to accept) |
| 2 | Other Secured Claims | Impaired[10] | $0 | 100% | Each holder of an Allowed Other Secured Claim will receive, at the option of the Reorganization Plan Debtors or the Reorganized Debtors, (1) payment in full in Cash in full and final satisfaction of such claim, payable on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or, in each case, as soon as reasonably practical thereafter, (2) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under Section 506(b) of the Bankruptcy Code, or (3) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | Yes |
| 3 | Senior Noteholder Secured Claims | Impaired | $231,000,000 [11] | 100% | On the Effective Date, each holder of an Allowed Class 3 Senior Noteholder Secured Claim will be entitled to receive, in full and final satisfaction of such Allowed Senior Noteholder Secured Claim, its *Pro Rata* share of 100% of the New Common Stock on a Fully Diluted Basis. | Yes |

---

[8] The amounts set forth herein are estimates based upon the Debtors' books and records. Actual allowed amounts will depend upon, among other things, final reconciliation and resolution of all Claims, and the negotiation of cure amounts. Consequently, the actual allowed amounts may vary from the approximate amounts set forth herein.

[9] The approximate percentage recovery for each Class set forth in this Disclosure Statement is based upon certain assumptions that are subject to change.

[10] The Reorganization Plan Debtors reserve the right to argue at the Confirmation Hearing that Class 2 (Other Secured Claims) is Unimpaired.

[11] Pursuant to section 506(a) of the Bankruptcy Code, for purposes of the Reorganization Plan, the Senior Noteholders Claims shall be treated as Class 3 Senior Noteholder Secured Claims in the aggregate amount of $231,000,000, and as deficiency claims in Class 4 (General Unsecured Claims) in the aggregate amount of $244,923,799.20.

US_ACTIVE:\44238718\1\69252.0041

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIR-MENT | APPROX. ALLOWED AMOUNT[8] | APPROX. % RECOVERY | TREATMENT[9] | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|---|
| 4 | General Unsecured Claims Against Reader's Digest | Impaired | $135,000,000 | Approx. 3%[12] | For purposes of voting and distributions under the Reorganization Plan, Class 4 General Unsecured Claims against each of the Reorganization Plan Debtors shall be deemed to be in separate sub-classes.  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim, including any holder of FTC Claims, the Unsecured Term Loan Claim, any Non-Debtor Intercompany Claims, any DEMG Intercompany Claims or any Senior Noteholder Deficiency Claims, shall receive the following treatment:<br><br>(i)  for any sub-class of General Unsecured Claims that votes to accept the Reorganization Plan of any individual Reorganization Plan Debtor, each holder of an Allowed General Unsecured Claim in such accepting sub-class shall receive its *Pro Rata* share of the GUC Distribution and any Senior Noteholder Deficiency Claims in such accepting sub-class shall be deemed waived for the purposes of entitling holders of such Senior Noteholder Deficiency Claims to share in any recovery from the GUC Distribution; | Yes |
| | General Unsecured Claims against Reorganization Plan Debtors Other than Reader's Digest | Impaired | $2,000,000[13] | Approx. 0.1% | (ii) in addition to any *Pro Rata* share of the GUC Distribution, provided that the sub-class of General Unsecured Claims of Reader's Digest votes to accept the Reorganization Plan, each holder of an Allowed General Unsecured Claim of Reader's Digest shall receive its *Pro Rata* share of the RDA GUC Distribution and any Senior Noteholder Deficiency Claims in such accepting sub-class shall be deemed waived for the purposes of entitling holders of such Senior Noteholder Deficiency Claims to share in any recovery from the RDA GUC Distribution; and<br><br>(iii) in the event any sub-class of General Unsecured Claims votes to reject the Reorganization Plan with respect to any individual Reorganization Plan Debtor, the holders of Allowed General Unsecured Claims in such a rejecting sub-class shall not receive or retain any property under the Reorganization Plan on account of such Claims, including, for the avoidance of doubt, any *Pro Rata* share of the GUC Distribution or | Yes |

[12] The recovery estimate for Class 4 General Unsecured Claims is calculated with the deemed waiver of the holders of Senior Noteholder Deficiency Claims solely of any entitlement to share in any recovery from the GUC Distribution or the RDA GUC Distribution.

[13] This amount assumes the implementation of the 2011 Financing Settlement and reflects the fact that the GUC Distribution is shared *Pro Rata* along with holders of Allowed General Unsecured Claims against Reader's Digest.

US_ACTIVE:\44238718\1\69252.0041

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIR-MENT | APPROX. ALLOWED AMOUNT[8] | APPROX. % RECOVERY | TREATMENT[9] | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|---|
| | | | | | RDA GUC Distribution. For the further avoidance of doubt, to the extent any sub-class of General Unsecured Claims votes to reject the Reorganization Plan and, therefore, is not entitled to receive any portion of the GUC Distribution, such *Pro Rata* portion attributable to the rejecting sub-class shall be reallocated to the holders of General Unsecured Claims in other sub-classes that have voted to accept the Reorganization Plan. If holders of General Unsecured Claims against Reader's Digest vote to reject the Reorganization Plan as a sub-class, there will be no RDA GUC Distribution. | |
| 5 | Plan Debtor Intercompany Claims | Impaired | NA | NA | On the Effective Date, RDA Holding will, at its discretion, Reinstate or compromise, as the case may be, all Plan Debtor Intercompany Claims between and among RDA Holding and its Reorganization Plan Debtor Affiliates consistent with the Acceptable Business Plan and the International Restructuring Transactions (as such term is used in the Plan Term Sheet) contemplated thereby. | Yes |
| 6 | Existing RDA Holding Interests | Impaired | $0 | 0% | On the Effective Date, all Existing RDA Holding Interests will be deemed canceled, and the holders of Existing RDA Holding Interests will not receive or retain any property under the Reorganization Plan on account of such Interests. | No (deemed to reject) |
| 7 | Intercompany Interests | Unimpaired | NA | NA | NA | No (presumed to accept) |
| 8 | Subordinated Securities Claims | Impaired | NA | NA | NA[14] | No (deemed to reject) |

Section VI.B of this Disclosure Statement provides a more detailed description of the treatment of Claims and Interests under the Reorganization Plan.

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes of claims or interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan. Classes of claims or interests in which the holders of claims are unimpaired under a proposed plan are deemed to have accepted such proposed plan and are not entitled to vote to accept or reject the Reorganization Plan. Classes of claims or interests in which the holders of claims receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote to accept or reject the Reorganization Plan.

---

[14] Holders of the Subordinated Securities Claims will not receive or retain any property under the Reorganization Plan on account of such Claims.

US_ACTIVE:\44238718\1\69252.0041

## F.    VOTING PROCEDURES

As set forth in more detail in Section VI.D of this Disclosure Statement, certain holders of Claims are entitled to vote to accept or reject the Reorganization Plan.  For each holder of a Claim entitled to vote, the Reorganization Plan Debtors have enclosed with the Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote with respect to the Reorganization Plan.  Holders of more than one Claim will receive an individual ballot for each Claim.  The individual ballots must be used to vote each individual Claim.  For detailed voting instructions, please refer to the voting instructions enclosed with this Disclosure Statement and the ballot.

Return completed ballots to:

Via Regular Mail:

Reader's Digest Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5014
New York, New York 10150-5014

Via Overnight Courier or Hand Delivery:

Reader's Digest Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, New York 10017

If you are a holder of a Claim entitled to vote on the Reorganization Plan and you did not receive a ballot, received a damaged ballot, or lost your ballot or if you have any questions concerning the Disclosure Statement, the Reorganization Plan, or the procedures for voting with respect to the Reorganization Plan, please contact the Voting Agent at (866) 800-6639 (or, (503) 597-7673, if calling from outside of the United States).

> **THE VOTING AGENT WILL NOT COUNT
> ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE.**

## G.    CONFIRMATION UNDER SECTION 1129(B)

If a Class of Claims entitled to vote on the Reorganization Plan rejects the Reorganization Plan, the Reorganization Plan Debtors reserve the right to amend the Reorganization Plan or request confirmation of the Reorganization Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  In addition, with respect to the Classes that are deemed to have rejected the Reorganization Plan, the Reorganization Plan Debtors intend to request confirmation of the Reorganization Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminately unfairly" and is "fair and reasonable" with respect to each rejecting class.  A more detailed

13

description of the requirements for confirmation of a nonconsensual plan is set forth in Section X of this Disclosure Statement.

## H.    CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **June 28, 2013 at 10:00 a.m. (Eastern Time)** before the Honorable Robert D. Drain at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, 1st Floor, Room 118, White Plains, New York 10601.

Objections and responses to confirmation of the Reorganization Plan, if any, must be served and filed as to be received on or before the Objection Deadline, **June 14, 2013 at 4:00 p.m. (Eastern Time)**, in the manner described in the Disclosure Statement Order and Section X.B of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## III.

## OVERVIEW OF THE REORGANIZATION PLAN DEBTORS' OPERATIONS

## A.    CURRENT OPERATIONS

RDA is a global media and direct marketing company that educates, entertains and connects consumers around the world with products and services from trusted brands.[15]  For more than 90 years, the flagship brand and the world's most read magazine, Reader's Digest, has simplified and enriched consumers' lives by discovering and expertly selecting the most interesting ideas, stories, experiences and products in health, home, family, food, finance and humor.  In addition, Taste of Home is the largest circulation food publication and is the leading multi-platform producer of information on food, cooking and entertaining.  Other brands include The Family Handyman, Birds & Blooms, Country, and many other enthusiast titles in the United States and internationally.  The company provides content in print; online; via digital editions on iPad, Kindle, Kindle Fire, Nook, Sony Reader, Google Nexus, and Zinio; via mobile apps; in books; and via social media outlets such as Facebook and Twitter.

As more fully described below, RDA's principal operations consist of its multi-brand and multi-platform media content and its direct marketing business.  RDA's media businesses generate revenue primarily from magazine-related products (e.g., subscription revenue, advertising revenue, and newsstand revenue), as well as from certain non-magazine products, including single and series books, music, and video products.  RDA's media products are offered in print and digital formats and are delivered through direct mail, retail, and digital channels.

RDA's direct marketing businesses generate revenue primarily through the sale of print and digital books, home entertainment, and non-published products and services (e.g.,

---

[15] A summary of the Debtors' corporate structure, as of the Commencement Date, is attached hereto as **Exhibit B.**

14

third-party vitamins and related health products, jewelry, merchandise, wine, mailing list rentals), along with magazine subscriptions and advertising.  RDA's promotions to customers in its direct marketing businesses are focused on a customer-centric affinity-driven marketing model, which includes both sweepstakes and targeted promotions based on customers' interests.

RDA operates its global media and direct marketing businesses in three reportable business segments:  North America, Europe, and Asia Pacific and Latin America ("**APLA**").  As more fully described below, the North America segment primarily operates RDA's media and publishing businesses, while the Europe and APLA segments primarily operate RDA's direct marketing businesses.

### 1. RDA North America

The North America segment comprises RDA's businesses operations in the United States and Canada (collectively, "**RDA North America**"), which publish and market various print and digital magazines, books and home entertainment products.  The RDA North America businesses utilize RDA's content creation, curation, and direct marketing expertise.  RDA North America's resources are shared across the RDA brands with centralized consumer marketing and advertising sales efforts.

RDA North America consists of three business units, managed by New York, Milwaukee and Montreal divisions.  The New York division manages operations for the "Reader's Digest,"[16] brand across all platforms in the United States.  The Milwaukee division manages operations for the other two largest RDA brands "Taste of Home" and "The Family Handyman," as well as RDA's enthusiast brands, "Birds and Blooms," "Country," "Country Woman," "Farm & Ranch Living," and "Reminisce," across all platforms.  The Montreal division manages operations for all Canadian businesses and brands through its Canadian subsidiaries, with some corporate functions connected to the U.S. divisions.  Each of the brands is more fully described below.

### (a) Reader's Digest

The Reader's Digest brand identifies and selects compelling ideas, stories, experiences, and products, and presents them in simple, objective, and optimistic ways across the areas of health, home, family, food, finance, and humor.  Reader's Digest content is available in print, online, and in books.

Reader's Digest print content encompasses the articles, book excerpts, and features included in *Reader's Digest* magazine, and covers a broad range of contemporary issues around the topics of health, family, money, work, food, and humor.  *Reader's Digest* magazine is published in several editions in the United States, including the flagship English-language edition, *Reader's Digest Large Print for Easier Reading*, Braille, and recorded editions.  As of December 31, 2012, total United States magazine paid circulation for *Reader's Digest* and *Reader's Digest Large Print for Easier Reading* was approximately 5.9 million.  *Reader's Digest* is the second largest paid-subscription magazine in the United States.

---

[16] The term "Reader's Digest," as used in this section, refers only to the Reader's Digest brand.

Reader's Digest digital content is available through readersdigest.com, which is a leading general interest website that curates content by discovering and selecting compelling ideas, stories, experiences, and products on health, home, family, money, and humor. The website presents such content in simple, objective, and optimistic ways. Readersdigest.com serves as a digital extension of *Reader's Digest* print and digital magazine editions, allowing readers to dive deeper into stories and topics that capture their interest, and engage directly with other Reader's Digest readers through interactive polls and discussion boards. Reader's Digest is consistently among the top downloads on the iPad, Kindle and Nook and has a strong social media presence.

Reader's Digest Books and Home Entertainment publishes books for children and adults, including *Reader's Digest Select Editions*. For adults, it originates and sells books under the Reader's Digest imprint in many illustrated categories, such as health, home, gardening, cooking, humor, history, and reference, including The New York Times bestseller "The Digest Diet". These books are sold through traditional retail channels, the internet, catalogs, and book clubs. Books, games, and other products for children are sold under the Reader's Digest Children's Publishing imprint, many of them in partnership with brands such as Barbie, Disney, Nickelodeon, Sesame Street, Fisher-Price, Marvel Heroes, and Hasbro.

*Reader's Digest Select Editions* is one of America's longest running direct to consumer book programs. This program serves nearly 88,000 subscribers with a new volume six times a year, containing condensed versions of popular fiction books. The *Select Editions* business has been shrinking dramatically as a result of a declining readership and changing consumer appetites. While the Reorganization Plan Debtors have ceased marketing *Select Editions*, the Reorganization Plan Debtors continue to service their long-standing readers.

**(b)    Taste of Home**

*Taste of Home* is an established resource for tried and tested, user-generated information on food, cooking, and entertaining. *Taste of Home*, generally published six times a year, caters to readers who are looking for simple everyday recipes that can be prepared with affordable, everyday ingredients. *Taste of Home* has a circulation of 3.2 million — the highest food and entertaining magazine circulation in the United States — and a readership of approximately 11.1 million people. Taste of Home content is available in print editions, tablet and eReader editions, online at Tasteofhome.com, in books, and through social media outlets.

Taste of Home magazines, including *Simple & Delicious*, have an innovative editorial model that makes extensive use of user-generated content. Taste of Home receives approximately 50,000 reader recipes, stories and tips every year, of which approximately 2,500 are tested in the Taste of Home test kitchen and approximately 1,900 are published across Taste of Home print and digital platforms. Taste of Home draws on approximately 500 contributing field editors from across the United States and Canada. Total paid circulation for Taste of Home, including *Simple & Delicious* is approximately 3.7 million, as of December 31, 2012.

Taste of Home has a strong web presence at Tasteofhome.com. Tasteofhome.com provides user-generated, tried and tested recipes, video cooking tips, chat groups, and newsletters focused on preparing home-cooked meals for every day and holidays. The site consistently

16

ranks among the top-20 food websites and Tasteofhome.com received on average 4.6 million unique visitors per month in 2012. Tasteofhome.com also distributes a broad portfolio of email newsletters to a combined circulation of over 7.2 million readers. More than 500,000 consumers interact with the Taste of Home brand via social media outlets. In addition, approximately 300 Taste of Home Cooking School events are held across the country each year, providing the brand an experiential connection with more than 300,000 consumers.

Additionally, RDA publishes books and special interest newsstand publications based on editorial content derived from material contributed by readers to the *Taste of Home* magazines. The Taste of Home books and special interest newsstand publications are created to complement the magazines and to leverage the magazines' brand names, reader loyalty, and editorial capability, selling over one million books and 5 million special interest newsstand copies in 2012.

### (c)    The Family Handyman

*The Family Handyman*, which gives consumers how-to solutions for home and lifestyle projects, is the highest paid circulation U.S. do-it-yourself magazine, with paid circulation of approximately 1.1 million as of December 31, 2012. Approximately 4.7 million people read *The Family Handyman*, and there are approximately 1,100 contributing field editors that provide user-generated content. The Family Handyman content is available in print editions, tablet and eReader editions, online at FamilyHandyman.com, in books, and through social media outlets. The Family Handyman also publishes a line of special-interest premium magazines and books, which are sold through retail and direct mail.

Familyhandyman.com is a standalone branded website that received on average over 979,000 unique visitors per month in 2012, and more than 50,000 fans are engaged with The Family Handyman on social media sites. It is also a key component of RDA's digital strategy, as a leading national brand anchoring RDA's Haven Home Media network, a vertical advertising network that includes approximately 70 independent do-it-yourself, home improvement, and home design and décor websites that received an average of more than 11.3 million unique visitors per month in 2012.

### (d)    Other Magazines

The enthusiast magazines, described below, include *Birds & Blooms*, *Country*, *Country Woman*, *Farm & Ranch Living*, and *Reminisce*.

- *Birds & Blooms* is the highest paid-circulation magazine for bird enthusiasts in the United States. Readers share ideas with fellow birding enthusiasts and gain easy-to-understand advice from resident bird and garden experts.

- *Country* celebrates the beauty, people, values, and rewarding lifestyle of the American countryside. *Country* exposes readers to impressive scenery, home-style cuisine, and heartwarming stories.

17

- *Country Woman* celebrates the diversity, strength and spirit of women who love the country.  Country Woman content covers, among other things, recipes, decorating, casual entertaining, crafts, gardening, health, and nostalgia.

- *Farm & Ranch Living* features inspiring and entertaining articles and short stories, as well as a wide array of agricultural photos from readers sharing their own experiences with raising livestock, growing crops and gardens, putting up produce for winter consumption, and working to constantly improve their land.  Farm and Ranch Living content is available in print and online at FarmandRanchLiving.com.

- *Reminisce* content focuses on the 1930s, '40s, '50s, '60s and early '70s.  A variety of user-generated stories, vintage black and white photographs and early color slides span a unique array of generational topics that include, among others, automobiles, entertainment, and fashion.

Generally published six times a year, the enthusiast brands magazines have a circulation of more than 4.9 million people.  The magazines also have a substantial online presence:  their websites collectively receive an average of 400,000 unique visitors per month, and they have over 180,000 fans on social media sites, as of December 31, 2012.

2.    **RDA International**

RDA's international segments, including Europe and APLA, (collectively, "**RDA International**") operate under a regional structure that includes six primary international regions:  (1) European, (2) German, (3) Western Europe, (4) Central/Eastern Europe, (5) Russia/Nordic, and (6) APLA.[17]  The European region is comprised of four sub-regions—the German, Western Europe, Central/Eastern Europe and Russia/Nordic regions—which collectively represent the majority of revenues generated by the international segments.  The German region is comprised of Germany, Austria, and Switzerland.  The Western Europe region is comprised of France, Belgium, and the Netherlands.  The Central/Eastern Europe region is principally comprised of the Czech Republic, Poland, Hungary, and Romania.[18]  The Russia/Nordic region is principally comprised of Russia, Finland, and Sweden.  The APLA region includes Australia, New Zealand, Malaysia, Singapore, and Brazil.  With the exception of Malaysia and Singapore, where all products are provided in English, all other products and services are provided in local languages.

RDA International offers its customers Reader's Digest-branded products as well as carefully selected non-branded published products, merchandise, and services that align with their personal interests and needs through direct marketing.  The products and services address lifestyle needs across multiple communities including seniors, health, cooking, gardening, and travel.  Its customer-centric business model is intended to enable RDA International to match

---

[17] RDA's international entities are not debtors in these Chapter 11 Cases.

[18] For a discussion of sales of certain of the Reorganization Plan Debtors' international subsidiaries that have been completed during the Chapter 11 Cases *see* Section V.E below.

US_ACTIVE:\44238718\1\69252.0041

products and promotions to approximately 47 million existing customers and to better serve new customers.  Beyond the flagship Reader's Digest brand, RDA International has built a series of companion brands by adapting brands to local geography, customs and customer niches.  RDA International also offers proprietary marketing services to third parties, such as digital marketing, list rental, promotion design, and database analytical services.

As described below, RDA International is in the midst of a radical change.  An effort to switch to a licensing model is well underway in order to address operations in several countries that are not sufficiently profitable or scaled to warrant an ongoing investment in resources.  A few such licensing transactions have been completed and certain other transactions are in the pipeline.

## B.    THE REORGANIZATION PLAN DEBTORS' SUPPLY CHAIN

The Reorganization Plan Debtors' ability to retain and grow their businesses including growing their customer base (and attracting corresponding advertising dollars) depends on their ability to procure goods and services at competitive prices and fulfill, produce, and distribute their products timely and accurately.  This, in turn, necessitates carefully-choreographed, highly-integrated stages of development, production, and delivery realized through a synchronization of the numerous third-party suppliers, vendors, and service providers within the Reorganization Plan Debtors' global supply chain network.

To achieve cost structure efficiencies, the Reorganization Plan Debtors outsource to unaffiliated third parties certain key business processes, including production, fulfillment, customer care, information technology, and distribution functions.  Outsourcing enables the Reorganization Plan Debtors to capitalize on the relationships, resources, and technological strengths of high-volume vendors to achieve supply chain efficiencies without capital investment or budget increases.  As a result, in many instances, the Reorganization Plan Debtors are able to create, produce, and deliver higher-service products at lower cost points relative to the marketplace, facilitating competitive operations that better position the Reorganization Plan Debtors to increase margins.

The Reorganization Plan Debtors' current management has analyzed RDA's organizational overhead and implemented cost reductions throughout the company, including with respect to the Reorganization Plan Debtors' distribution and other processes.  Specifically, the Reorganization Plan Debtors have been developing and implementing various operational initiatives aimed at maximizing supply chain and production efficiencies by eliminating unused capacities and further consolidation of their supply base.  Notwithstanding the benefits of certain of the Reorganization Plan Debtors' outsourcing arrangements, outsourcing inevitably limits the Reorganization Plan Debtors' ability to exercise direct control over their outsourced operations, including their finished products, which increases the Reorganization Plan Debtors' exposure to supply chain interruptions and other external factors.  Additionally, in some instances, outsourcing relationships historically have constrained the Reorganization Plan Debtors' ability to strategically shrink certain markets due to minimum requirements and other contractual limitations.  This, combined with the inherent nature of the media and marketing industry—a dynamic and time-sensitive global marketplace driven largely by vacillating consumer preferences and influenced, sometimes significantly, by macroeconomic factors—requires the

19

Reorganization Plan Debtors to secure the cooperation of their key vendors, service providers, and outsourcing partners (or secure alternative sources) to ensure a dependable, accountable yet flexible supply chain.

## C.    PREPETITION CAPITAL STRUCTURE

As of the Commencement Date, the Reorganization Plan Debtors had outstanding funded debt obligations in the aggregate amount of approximately $534 million, which amount consists of (1) approximately $60 million in secured borrowings and outstanding letters of credit under the 2012 Senior Credit Agreement (as herein defined), (2) approximately $464 million in principal amount of Senior Notes, and (3) approximately $10 million in principal amount of borrowing under the Unsecured Term Loan Agreement (as herein defined).

### 1.    Senior Credit Agreement

On March 30, 2012, Reader's Digest entered into that certain Credit and Guarantee Agreement with Wells Fargo Bank, N.A., as administrative agent, the Guarantors (as therein defined), and Wells Fargo, as lender and issuing lender (the "**2012 Senior Credit Agreement**"), providing Reader's Digest with a $50.0 million secured term loan (the "**2012 Senior Term Loans**") and an $11.0 million letter of credit facility (the "**Letter of Credit Facility**").

The 2012 Senior Term Loans under the 2012 Senior Credit Agreement bear interest at a variable rate per annum, based upon Reader's Digest's election of a prime rate or LIBOR (subject to a floor of 4.0% and 3.0%, respectively) plus 5.0% in the case of prime rate borrowings and 6.0% in the case of LIBOR borrowings.  The drawn letters of credit under the Letter of Credit Facility bear an interest rate of 7.0% per annum and the Letter of Credit Facility includes a utilization fee of 1.0% per annum, which will accrue on the total undrawn amount of the Letter of Credit Facility.  The obligations under the 2012 Senior Credit Agreement are fully and unconditionally guaranteed on a first-priority secured basis, jointly and severally by Reader's Digest, RDA Holding, and by all the other Debtors.

As of December 31, 2012, there was approximately $49.8 million, in addition to letters of credit totaling approximately $9.5 million, outstanding under the 2012 Senior Credit Agreement.

### 2.    Senior Notes

On February 11, 2010, RD Escrow Corporation entered into an Indenture (the "**Indenture**") with Reader's Digest, RDA Holding, and substantially all of their then-existing wholly-owned direct and indirect domestic subsidiaries, Wells Fargo Bank, N.A., as trustee, and Wilmington Trust, National Association (f/k/a Wilmington Trust FSB), as collateral agent, pursuant to which RDA issued $525.0 million in principal amount of Senior Notes in a private offering under the Securities Act of 1933.  The Senior Notes mature on February 15, 2017, and bear interest at a rate per annum equal to LIBOR (as defined, subject to a three-month LIBOR floor of 3.0%) plus 6.5%.  The LIBOR component of the interest rate is reset quarterly and commenced on May 15, 2010.  As of December 31, 2012, there was approximately $464.4 million outstanding in respect of the Senior Notes.  The obligations under the Indenture are fully

US_ACTIVE:\44238718\1\69252.0041

and unconditionally guaranteed on a first-priority secured basis, jointly and severally by Reader's Digest, RDA Holding, and by all the other Debtors.

On June 15, 2012, in accordance with the requirements under the Indenture, RDA completed a cash tender offer to purchase up to $60.7 million of its Senior Notes,[19] at a purchase price of 95% of the principal amount thereof, plus accrued and unpaid interest thereon to the date of purchase, at a total cost of $58.1 million.

### 3.    Collateral for Senior Credit Agreement and Senior Notes

The Senior Notes and the obligations under the 2012 Senior Credit Agreement are secured by a first-priority security interest in substantially all the assets of Reader's Digest and the Guarantors in addition to holding a pledge of 65% of the equity of the Reorganization Plan Debtors' directly-owned first-tier Foreign Subsidiaries, in each case in accordance with and subject to the terms of that certain Security Agreement dated as of February 19, 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**").

The obligations under the 2012 Senior Credit Agreement and the Indenture are secured by a single collateral package and rank *pari passu* with each other, subject to the provisions of the Prepetition Security Agreement, including section 5.5 thereof.

### 4.    Unsecured Term Loan

On August 12, 2011, the Reorganization Plan Debtors entered into an unsecured term loan and guarantee agreement (the "**Unsecured Credit Agreement**") with Luxor, as administrative agent, the Guarantors (as therein defined), and the other lenders thereunder, consisting of funds affiliated with Luxor and Point Lobos Capital ("**Point Lobos**"),[20] providing the Reorganization Plan Debtors with a $10.0 million unsecured term loan (the "**Unsecured Term Loan**").  The Unsecured Term Loan matures in May 2014 and bears interest at the rate of 11.0% per annum.  As of December 31, 2012, there was $10.0 million outstanding under the Unsecured Term Loan.

In connection with the Unsecured Term Loan, the Reorganization Plan Debtors issued two tranches of warrants to the lenders thereunder.  The estimated fair value of these warrants at December 31, 2012 and at the issuance date was zero and $2.9 million, respectively.

In addition, certain claimholders in the 2009 Restructuring (as herein defined) received warrants, pursuant to the terms of a warrant agreement, to acquire, subject to certain terms and conditions, shares of RDA Holding's common stock.  As of the Commencement Date, the estimated value of such warrants was zero.

---

[19] As discussed in Section IV.F below, on February 29, 2012, RDA sold its Allrecipes.com business, pursuant to the applicable asset sale provision of the Indenture, and used certain of the proceeds from such sale for the tender offer for the Senior Notes.

[20] Luxor and Point Lobos are also holders of RDA Holding's common stock.

US_ACTIVE:\44238718\1\69252.0041

On August 12, 2011, the Reorganization Plan Debtors also entered into a term loan and guarantee agreement (the "**2011 Secured Credit Agreement**") with Luxor and Point Lobos, providing the Company with a $45.0 million secured term loan (the "**2011 Secured Term Loan**").  The 2011 Secured Term Loan would have matured in November 2013 and bore interest at the rate of 7.0% per annum.  On March 6, 2012, the Reorganization Plan Debtors repaid the 2011 Secured Term Loan using net proceeds from the sale of the Allrecipes.com business (in February 2012).  The repayment included $45.0 million to satisfy the principal debt, along with $5.0 million due under the early repayment provisions of the 2011 Secured Credit Agreement.

## IV.

## KEY EVENTS LEADING TO THE
## COMMENCEMENT OF THESE CHAPTER 11 CASES

While RDA benefited from a balance-sheet restructuring that commenced in 2009, the Reorganization Plan Debtors have faced recurring liquidity challenges due to, among other things, negative trends in certain international markets, reduced revenue in certain domestic businesses, and burdensome overhead costs.  As more fully described below, RDA's new management has implemented an array of transformational initiatives to move the company in the right direction.  In 2012, however, it became clear that, under its current capital structure, RDA could not continue its transformation efforts outside of a chapter 11 proceeding.

### A.    BUSINESS ENVIRONMENT POST 2009 RESTRUCTURING

On August 24, 2009, certain of the Reorganization Plan Debtors, and substantially all of their direct and indirect domestic subsidiaries, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**2009 Restructuring**").[21]  At that time, the principal factors that necessitated the commencement of the 2009 Restructuring included, among other things, burdensome debt obligations, reduced advertising and consumer spending, credit shortages, and increased postal and delivery costs.  The 2009 Restructuring implemented a prenegotiated plan of reorganization that provided for, among other things, a 75% reduction of RDA's debt burden.

RDA emerged from chapter 11 in February 2010.  In connection with the emergence, RDA's former management sought to right-size the company by minimizing overhead expenses and reducing headcount.  Despite these efforts, continued downward trends in the publishing and direct marketing industry undermined RDA's ability to stabilize.  Although financial projections anticipated some decline in revenue, the actual declines occurred at rates higher than anticipated, and against factors that RDA was not able to predict, including continued challenging economic environments in the international business segments.  For example, RDA's European segment's operating profit was approximately $53.9 million for the year ended December 31, 2010, and approximately $29.0 million for the year ended December 31, 2011, as restated for subsequent discontinued operations classification.  Similarly,

---

[21] The chapter 11 cases were jointly administered under the caption *In re: The Reader's Digest Association, Inc., et al.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y.).

US_ACTIVE:\44238718\1\69252.0041

RDA International experienced negative revenue trends due to, among other things, a lower active customer base and softer response rates.

**B.    FTC CLAIM**

During and immediately after the 2009 Restructuring, DEMG, a subsidiary of Reader's Digest, generated revenues through sales of the Ab Circle Pro fitness product (the "**Ab Circle Pro**").  On April 19, 2010, the Federal Trade Commission (the "**FTC**") launched an investigation into DEMG's marketing of the Ab Circle Pro.

In connection with a negotiated settlement among DEMG, Direct Holdings Americas, Inc. (together, the "**DEMG Defendants**"),[22] the FTC, and Reader's Digest, on August 22, 2012, the FTC commenced an action in the Southern District of Florida (Case No. 12-23065 (CMA)) by filing a complaint (the "**FTC Complaint**") alleging certain deceptive acts or practices and false advertisements by DEMG related to the marketing and sale of the Ab Circle Pro.  The FTC Complaint did not allege any wrongdoing by Reader's Digest.

The FTC, the DEMG Defendants, and Reader's Digest memorialized their negotiated settlement in that certain *Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief Against Defendants Direct Holdings Americas, Inc. and Direct Entertainment Media Group, Inc., and Relief Defendant The Reader's Digest Association, Inc.*, entered August 28, 2012 (the "**Stipulated Judgment**").  Although the FTC Complaint did not allege any wrongdoing by Reader's Digest, Reader's Digest, nevertheless, agreed to be named in the Stipulated Judgment as a relief defendant, thereby making Reader's Digest jointly responsible for payment of the settlement amount.

Pursuant to the Stipulated Judgment, DEMG, as a direct defendant, and Reader's Digest, as relief defendant, jointly and severally agreed to a judgment of approximately $31.2 million.  The Stipulated Judgment provided, however, that the aggregate amount to be paid by Reader's Digest and the DEMG Defendants would be reduced upon satisfaction of certain payment milestones and deadlines.  By complying with the milestones in the Stipulated Judgment, the DEMG Defendants and Reader's Digest would be responsible to make payments to the FTC in an aggregate amount ranging from approximately $14 million to $24 million based on the level of consumer redress requested by  Ab Circle Pro purchasers.[23]  In the event that Reader's Digest and the DEMG Defendants fail to make a required payment when due, the entire $31.2 million judgment less any sums already paid by Reader's Digest and DEMG would become due.  As of the Commencement Date, the FTC has been paid $5 million pursuant to the Stipulated Judgment.

---

[22] Direct Holdings Americas, Inc., a former subsidiary of the Debtors, was also a party to the Stipulated Judgment herein defined), however, that entity was sold as a part of a transaction that closed prior to the Commencement Date, in July of 2012.

[23] The Stipulated Judgment further provided that the FTC (or its agents) would use the payments for consumer redress or other monetary equitable relief.  If the "Total Redress Amount," which is defined as the total amount of consumer redress plus the costs of administration, is greater than $15 million, Reader's Digest and the DEMG Defendants are required to pay up to $10 million in additional funds to the FTC, which would increase the aggregate amount from $14 million up to a maximum amount of $24 million.

US_ACTIVE:\44238718\1\69252.0041

The Stipulated Judgment also provides that the facts alleged in the FTC Complaint (1) will be taken as true in any nondischargeability proceeding, and (2) establish all elements necessary to sustain an action by the Commission pursuant to section 523(a)(2)(A) of the Bankruptcy Code. As noted, however, the FTC Complaint does not allege any facts that would support a nondischargeability proceeding as against the Reorganization Plan Debtors.

As a result of the commencement of these Chapter 11 Cases, the FTC has a dischargeable General Unsecured Claim against Reader's Digest scheduled as contingent and unliquidated in the minimum amount of $8,753,266 (the "**FTC Claim**").

The FTC disagrees with the Reorganization Plan Debtors' assertions regarding the amount and dischargeability of the FTC Claim. First, the FTC asserts that, pursuant to Section V.C of the Stipulated Judgment, because Readers Digest filed its Chapter 11 petition on February 18, 2013 and failed to make a required $5 million judgment payment due on February 24, the amount of the FTC Claim against Readers Digest is $26,667,200—the difference between the entire judgment amount, $31,667,200, less the $5 million it previously paid to the FTC.

Second, in the FTC Complaint, the agency alleged, inter alia, that: (1) the DEMG Defendants, at a time when both were wholly-owned subsidiaries of Readers Digest, made false or unsubstantiated advertising claims when marketing and selling the Ab Circle Pro exercise device, causing substantial harm to consumers; (2) the DEMG Defendants operated as a common enterprise, with common ownership, employees, business functions, and office locations; and (3) their common parent company, Readers Digest was unjustly enriched because it received funds directly or indirectly from the DEMG Defendants derived from these deceptive advertising practices. As noted above, under Section V.H of the Stipulated Judgment, Readers Digest specifically agreed that the facts as alleged in the FTC Complaint will be taken as true in a nondischargeability proceeding in any bankruptcy case, and establish all elements necessary to sustain an action by the Commission pursuant to section 523(a)(2)(A) of the Bankruptcy Code, the fraud exception to discharge. Readers Digest further agreed that the Stipulated Judgment would have collateral estoppel effect for such purposes. Pursuant to section 1141(d)(6)(A) of the Bankruptcy Code, any debt of a kind specified in section 523(a)(2)(A) owed to a domestic governmental unit is nondischargeable in a corporate Chapter 11 reorganization. Accordingly, the FTC asserts that it may bring an action asking the Bankruptcy Court to determine that the FTC Claim is excepted from discharge.

The Reorganization Plan Debtors disagree with the FTC's assertions. As a threshold matter, the Reorganization Plan Debtors contend that the stipulation contained in Section V.H. of the Stipulated Judgment is not competent to establish the nondischargeability of the FTC Claim because the Bankruptcy Court has exclusive jurisdiction to determine nondischargeability under Section 523(a)(2)(A) of the Bankruptcy Code, and only the Bankruptcy Court, therefore, has the power to determine whether the criteria for nondischargeability under Section 523(a)(2)(A) are met. In all events, however, Reader's Digest did not agree in Section V.H. (or any other provision) of the Stipulated Judgment that the facts as alleged in the FTC Complaint establish all elements necessary to sustain a nondischargeability action under Section 523(a)(2)(A) against Reader's Digest. Rather, the stipulation contained in Section V.H. of the Stipulated Judgment constituted an agreement not to challenge any nondischargeability action brought by the FTC under Section 523(a)(2)(A) against the DEMG

24

Defendants. Indeed, the FTC's contrary interpretation is not consistent with the facts
presented—Reader's Digest consistently has denied any wrongdoing, and the FTC Complaint is
bereft of any allegations that Reader's Digest participated in—or was even aware of—any of the
allegedly false or deceptive claims or advertising practices of the DEMG Defendants described
in the FTC Complaint. To the contrary, the FTC included Reader's Digest in the FTC Complaint
only as a "Relief Defendant," solely for purposes of facilitating collection of the monetary relief
contemplated in the Stipulated Judgment that was sought from the DEMG Defendants. The
Reorganization Plan Debtors further contend that the treatment of Readers' Digest as a "Relief
Defendant" is inconsistent with the position taken now by the FTC that is has the ability to
demonstrate that the criteria for nondischargeability under Section 523(a)(2)(A) could be
satisfied in an action against Reader's Digest. Moreover, given the scant factual allegations in
the FTC Complaint relating to *its* conduct, the stipulation by Reader's Digest that the facts as
alleged in the FTC Complaint may be taken as true, falls significantly short of establishing
nondischargeability of the FTC Claim under Section 523(a)(2)(A), at least as against Reader's
Digest.

        The Reorganization Plan Debtors do not believe that the FTC can now litigate
matters that have been consensually resolved. Moreover, any finding that the FTC Claims are
non-dischargeable as against Reader's Digest would not result in additional distributions for the
FTC as no financing currently exists sufficient to satisfy the obligations under the Stipulated
Judgment and maintain Reader's Digest as a going concern. Were Reader's Digest forced to
liquidate, the FTC would receive no distribution. See Exhibit D (Liquidation Analysis).

## C.    **TRANSFORMATION EFFORTS**

        On September 12, 2011, Robert E. Guth was appointed by the board of directors
as President and Chief Executive Officer. Since the time of Mr. Guth's appointment, RDA's
current management has sought to transform RDA. The transformation has been centered
around three areas: (1) reducing corporate overhead and legacy expenses and complexity,
(2) revitalizing the Reorganization Plan Debtors' core businesses, and (3) selling and/or licensing
the international direct marketing businesses or pursuing alternate solutions.

### 1.    **Reduction of Corporate Overhead and Organizational Complexity**

        In the fall of 2011, RDA's current management began comprehensive cost
reduction measures and organizational streamlining efforts. Specifically, current management
has implemented significant cost-minimization initiatives, including, without limitation,
workforce reductions, vendor evaluations, product rationalization, and business re-engineering.
To date, these efforts have resulted in combined annualized savings of more than $50 million.

        In addition, the Reorganization Plan Debtors' current management has sold
underperforming and non-core businesses in order to develop a leaner, more-efficient
organization. For example, on October 28, 2011, RDA completed the sale of *Every Day with
Rachael Ray*, a publication within its North America operating segment. In addition, during the
first quarter of 2012, RDA sold its Weekly Reader and its Allrecipes.com businesses, for
approximately $3.6 million and $175 million, respectively, and used the majority of those sale
proceeds to retire certain of the company's then-existing debt, including, the $45.0 million 2011

25

Secured Term Loan and $57.6 million principal amount of the Senior Notes.  RDA used the remaining sale proceeds for certain capital expenditures as permitted under the Indenture. Similarly, on July 2, 2012, RDA sold its Lifestyle and Entertainment Direct division for approximately $1.1 million.  Moreover, management recently implemented a plan to eliminate certain unprofitable components of the Reorganization Plan Debtors' book businesses including their series book business, and single sales and catalog business.

### 2. Revitalizing the Reorganization Plan Debtors' Core Businesses

In addition to cost reductions, the Reorganization Plan Debtors' current management is aggressively pursuing increased profitability and refinement of the Reorganization Plan Debtors' core businesses in North America.  Management has implemented an array of initiatives to maximize the profitability of their portfolio of brands.  Over the past eighteen months, management also has implemented certain revenue-enhancing initiatives, including, without limitation, certain strategic partnership and digital initiatives.

The Reorganization Plan Debtors are pursuing growth opportunities by creating new revenue streams through innovative partnership agreements, such as its partnership with a global property-casualty and general insurance organization.  RDA and this partner have a long-standing relationship—over the past eleven years, the companies have worked cooperatively to market insurance solutions in Europe, Asia and Latin America.  In 2012, this relationship was extended to include new insurance solutions and new distributions around the world.

In addition, the Reorganization Plan Debtors have executed a comprehensive digital strategy to make their products available across the spectrum of digital formats.  The Reorganization Plan Debtors have recently achieved substantial growth in the tablet and eReader digital space through strategic partnerships with Amazon.com, Inc. and Apple Inc.  The Reorganization Plan Debtors' websites contribute significantly in the areas of advertisement sales, consumer marketing, and general brand awareness.  The Reorganization Plan Debtors are in the process of developing methods for taking full advantage of traffic on their websites. Similarly, the Reorganization Plan Debtors also intend to release certain mobile apps that are in various stages of development.

While RDA has pursued and in fact achieved growth in advertising revenue, the corresponding adherence to a rate-base structure has put pressure on its once-highly profitable consumer revenue streams.[24]  The Reorganization Plan Debtors are now seeking to achieve a better balance between these revenue sources.

### D. INTERNATIONAL STRATEGIES

In addition to the foregoing efforts, RDA's management has commenced a comprehensive review of its international operations.  RDA International's direct marketing

---

[24] In the ordinary course of securing advertising revenues, the Debtors typically agree to ensure that their products attain a base level of general circulation ("**Rate Base Commitments**").  In the event the Debtors fail to meet the Rate Base Commitments, the Debtors refund or rebate a portion of their advertising revenues to compensate the advertiser for any shortfall in product circulation.

US_ACTIVE:\44238718\1\69252.0041

operations have experienced long-term declines attributable to, among other things, a fundamental shift in international consumers' purchasing habits, high cost structure, and continued economic challenges in Europe. While RDA International's businesses have generated declining revenues, management believes that certain local or regional strategic third parties may be better positioned to extract value from the RDA International assets.

The international businesses and related markets provide growth opportunities for local and regional buyers. Local or regional purchasers can launch new publishing and merchandise affinities that have close linkage and synergy with the Reader's Digest brand and utilize the very large existing customer databases of these businesses. In addition, purchasers may be uniquely positioned to expand the breadth of direct marketing partnerships into new geographies and categories where RDA has been unable to in the past. At least as significantly, the number and declining size of the international businesses has resulted in organizational and infrastructure complexity and expense, including many legacy systems and processes, and the strategy for selling and licensing those businesses will very importantly allow for simplification and significant cost savings.

On July 31, 2012, RDA sold the Reader's Digest Spain and Portugal businesses. Concurrent with the sale agreement, RDA entered into a license agreement with the purchaser to publish the Spain and Portugal editions of *Reader's Digest* magazine and sell other products under the Reader's Digest brand.

In 2012, RDA engaged FTI to act as financial advisor for the sale of the assets or stock of one or more of the RDA International entities. RDA further contemplated that the buyers of such assets would also enter into long-term licensing agreement with RDA for use of the RDA brands and other intellectual property.

Since its engagement, FTI has commenced a global marketing process to sell/license the regional components of RDA International, or the businesses as a whole. As part of this process, FTI solicited bids for the international companies and contacted approximately 600 parties that FTI and the Reorganization Plan Debtors believed could be interested in purchasing some portion of the international business. The parties contacted by FTI ranged from local businesses to financial and strategic purchasers. Despite these and other efforts, management's comprehensive effort to identify parties willing to purchase the Reorganization Plan Debtors' entire international asset as a going concern was met with very limited interest. As a consequence, the Reorganization Plan Debtors have entered into certain smaller transactions described herein in Section V.E to sell their international operations in certain individual countries. The Reorganization Plan Debtors have sought approval of such transactions.

## E.    THE RESTRUCTURING SUPPORT AGREEMENT

Beginning in December 2012, the Reorganization Plan Debtors and their major stakeholders, including Wells Fargo and the Ad Hoc Committee, engaged in extensive prepetition negotiations. Following such negotiations, the Debtors, Wells Fargo and the Ad Hoc Committee, and their respective restructuring professionals, reached a consensual agreement, which is set forth in the Restructuring Support Agreement. The Reorganization Plan Debtors

27

believe that the Restructuring Support Agreement, which is embodied in the Reorganization Plan, not only provides for the Reorganization Plan Debtors' prompt emergence from chapter 11, but also will facilitate the ongoing transformation of the Reorganization Plan Debtors' businesses.

**V.**

**THE CHAPTER 11 CASES**

A.    <u>**FIRST DAY PLEADINGS**</u>

On the Commencement Date, or soon thereafter, the Debtors filed certain "first-day" motions (collectively, the "**First Day Pleadings**") seeking certain immediate relief from the Bankruptcy Court that would allow the Debtors to continue to operate in chapter 11 and avoid immediate and irreparable harm due to the commencement of the Chapter 11 Cases.  A description of the First Day Pleadings is set forth in the *Declaration of Robert E. Guth Pursuant to Local Bankruptcy Rule 1007-2*, dated February 17, 2012 (ECF No. 3).  By separate orders, the Bankruptcy Court granted the relief requested in the First Day Pleadings, on interim and/or final bases, as applicable.

B.    <u>**DIP FACILITY**</u>

On February 18, 2013, the Debtors filed a motion to approve a consensual, priming, debtor-in-possession credit facility (the "**DIP Facility**") in the aggregate principal amount of approximately $105 million, comprised of (1) a term loan in the aggregate principal amount of $45 million (the "**New Money Loan**"), and (2) a refinancing term loan and letter of credit facility in the aggregate amount of approximately $60 million (the "**Roll-Up Facility**" and, together with the New Money Loan, the "**DIP Loans**").  The DIP Facility was contemplated in conjunction with the Restructuring Support Agreement.

The Reorganization Plan Debtors obtained postpetition financing pursuant to that certain Credit and Guarantee Agreement (the "**DIP Loan Agreement**"), dated as of February 22, 2013, by and among Reader's Digest, as borrower, its affiliated debtors, as guarantors, and Wilmington Trust, National Association, as administrative agent for the lenders party thereto (the "**DIP Lenders**").  The DIP Lenders are comprised of (1) certain Senior Noteholders party to a certain commitment letter, dated February 17, 2013, in respect of the New Money Loan, and (2) Wells Fargo, in respect of the Roll-Up Facility.

By order, dated February 21, 2013, the Bankruptcy Court approved the DIP Facility on an interim basis, authorizing the Reorganization Plan Debtors to draw $11 million on account of the New Money Loan.  On March 25, 2013, the Bankruptcy Court entered a final order approving the DIP Facility.  Upon entry of the final order, the Reorganization Plan Debtors drew the remaining $34 million available under the New Money Loan.  All amounts available under the Roll-Up Facility were drawn and used to repay in full all outstanding obligations under the 2012 Senior Credit Agreement.

The proceeds of the New Money Loan were applied to working capital and other general corporate purposes of the Reorganization Plan Debtors, and the proceeds of the Roll-Up

Facility were applied to amounts outstanding under the 2012 Secured Credit Agreement (including a roll-over of the letters of credit issued under the Letter of Credit Facility). The DIP Loans are secured by a perfected first-priority, senior priming lien on all of the Collateral (as defined in the DIP Loan Agreement) of the Reorganization Plan Debtors' respective estates in the Chapter 11 Cases, subject to a limited carve-out for fees pertaining to the cases. Further, the Restructuring Support Agreement provides, and the Reorganization Plan contemplates, that the DIP Loans will be converted into exit financing upon consummation of the Reorganization Plan, in accordance with the terms and conditions set forth in the First Out Exit Term Sheet and the Second Out Exit Term Sheet.

## C.    CREDITORS COMMITTEE

On February 28, 2013, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Creditors Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in these Chapter 11 Cases. The members of the Creditors Committee include: (1) HCL America, Inc., (2) Quad/Graphics, Inc., and (3) Daniel Meehan. The Creditors Committee is represented by Otterbourg, Steindler, Houston & Rosen, P.C.

Since the formation of the Creditors Committee, the Reorganization Plan Debtors and the Ad Hoc Committee have worked cooperatively with the Creditors Committee and its professionals to educate the Creditors Committee about the Reorganization Plan Debtors' businesses and operations, prospects and financial condition. Most importantly, the Reorganization Plan Debtors, the Ad Hoc Committee and the Creditors Committee, and their respective professionals, have engaged in arm's-length discussions and negotiations regarding valuation, distributable value available for all unsecured creditors and allocation of recoveries under the Reorganization Plan and reached a global settlement and compromise that led to the Creditors Committee's agreement to support the Reorganization Plan.

## D.    SCHEDULES AND BAR DATES

On March 14, 2013, the Reorganization Plan Debtors filed a motion for entry of an order (1) establishing (a) May 6, 2013 at 5:00 p.m. (Eastern Time) as the deadline for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts, but not including governmental units to file proofs of claim in respect of a prepetition claims against any of the Reorganization Plan Debtors, and (b) August 16, 2013 at 5:00 p.m. (Eastern Time) as the deadline for governmental units to file proofs of claim in respect of a prepetition claim against any of the Reorganization Plan Debtors; (2) approving May 28, 2013 at 5:00 p.m. (Eastern Time) as the deadline for all parties, including governmental units, to file complaints, pursuant to section 523(c), including as may be incorporated under section 1141(d)(6)(A), of the Bankruptcy Code, to determine or challenge the dischargeability of any claim against, or debt of, any of the Reorganization Plan Debtors; and (3) approving certain other related procedures. The Bankruptcy Court approved the relief set forth in the motion by order dated March 25, 2013 (ECF No. 165) (the "**Bar Date Order**")

On March 18, 2013, the Reorganization Plan Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory

contracts and unexpired leases, and statements of financial affairs (collectively, the
"**Schedules**").

## E.    OTHER INTERNATIONAL TRANSACTIONS

### 1.    SAPE Transaction

On March 29, 2013, the Reorganization Plan Debtors filed a motion requesting
entry of an order (1) approving the sale of Reader's Digest's indirect interest in the equity
securities of Selection du Reader's Digest S.A. ("**RDA France**") pursuant to that certain
*Purchase and Sale Agreement*, dated as of March 29, 2013 (the "**SAPE Purchase Agreement**"),
among Reader's Digest and Pegasus Netherlands Services CV ("**Pegasus**"), a non-debtor foreign
affiliate of the Debtors, as sellers, Cil Inversiones, S.L., as purchaser ("**Purchaser**"), Sociedad
Anónima de Promócion y Ediciones, as purchaser parent ("**SAPE**"), and Uitgeversmaatschappij
The Reader's Digest B.V., as licensor, (2) authorizing the private sale of Reader's Digest's direct
interest in (a) the equity securities of Oy Valitut Palat—Reader's Digest ab ("**RDA Finland**")
and Reader's Digest AB (Aktiebolag) ("**RDA Sweden**," and together with RDA France and
RDA Finland, collectively, the "**Acquired Companies**") pursuant to the terms set forth in the
SAPE Purchase Agreement and (b) actions or remedies, if any, that may be brought by or on
behalf of the Debtors to avoid, recover, or subordinate transfers made to or for the benefit of the
Acquired Companies, including causes of action or defenses arising under chapter 5 of the
Bankruptcy Code or applicable non-bankruptcy law, and (3) authorizing the Debtors, to the
extent applicable, to perform under the SAPE Purchase Agreement and consummate those
transactions contemplated in the SAPE Purchase Agreement (the "**SAPE Transaction**").

The motion sought court approval of the proposed SAPE Transaction, which
included, among other things, the sale of the Reorganization Plan Debtors' interests in equity
securities of their businesses in France, Sweden, and Finland.  In connection with the sale, the
Reorganization Plan Debtors also sought authority to enter into certain ancillary agreements,
including without limitation, a transition services agreement, a license agreement, and a non-
disturbance agreement whereby Reader's Digest and Pegasus, a non-debtor affiliate of the
Debtors, agreed not to disturb or interfere with any intellectual property subject to the license
agreement.  Additionally, to ensure that Purchaser would receive the uninterrupted use of the
trademarks and other intellectual property licensed in connection with the SAPE Transaction, the
Reorganization Plan Debtors agreed that, so long as Purchaser remains in compliance with, and
performs in all material respects under, the terms of the SAPE Purchase Agreement and related
license agreement, the Reorganization Plan Debtors will either (i) cause the licenses included in
connection with the SAPE Transaction to be excluded from the collateral that secures any of the
Reorganization Plan Debtors' existing or future financings and continue to be licensed free and
clear of all liens, or (ii) cause any existing or future secured lender or secured noteholder of the
Reorganization Plan Debtors to consent to the terms of the non-disturbance agreement.

In response to the motion seeking approval of the SAPE Transaction, the
Creditors Committee filed a limited objection requesting that the Bankruptcy Court segregate the
proceeds of the sale into an escrow or restricted account until a proper determination had been
made with respect to the value of certain unencumbered property of Reader's Digest that was
being sold.  At a hearing held before the Bankruptcy Court on April 11, 2013, the Creditors

US_ACTIVE:\44238718\1\69252.0041

Committee withdrew their limited objection based, in part, on an agreement reached with the Reorganization Plan Debtors to include certain language in the sale order approving the SAPE Transaction that reserved the Creditors Committee's rights and claims with respect to the value of any unencumbered property that was being transferred to Purchaser and the amount of consideration from the sale that should inure to the benefit of general unsecured creditors.  The Bankruptcy Court approved the SAPE Transaction by order dated April 11, 2013 and the transaction closed on April 30, 2013.

### 2. Poland Transaction

On April 2, 2013, the Reorganization Plan Debtors filed a motion seeking authority to, among other things, enter into, and perform under that certain *Purchase and Sale Agreement*, dated as of March 27, 2013 (the "**Purchase Agreement**"), which provided for the sale of the equity interests of the Reorganization Plan Debtors' direct and indirect subsidiary operations in Poland, Romania, and Hungary to a team led by one of the members of the Reorganization Plan Debtors' international management (the "**Poland Transaction**").  Similar to the SAPE Transaction, the motion seeks authority to enter into certain ancillary agreements including a transition services agreement, license agreement, and non-disturbance agreement related to the Poland Transaction.

Similar to the SAPE Transaction, the Reorganization Plan Debtors agreed to include certain language in the order approving the Poland Transaction, which language reserved the Creditors' Committee's rights with respect to the value of any unencumbered property of Reader's Digest that is being transferred to the purchaser and the amount of consideration from the sale that should inure to the benefit of general unsecured creditors.  The Bankruptcy Court approved the Poland Transaction at a hearing held on April 25, 2013 and the transaction closed a few days later.

### 3. Other International Transactions

The Reorganization Plan Debtors continue to evaluate proposals with respect to certain of their other international businesses.

## F. POTENTIAL CAUSES OF ACTION

In connection with the formulation of the Reorganization Plan as well as in response to questions from the Creditors Committee, the Reorganized Plan Debtors examined, among other things, certain transactions that occurred after RDA's emergence from bankruptcy in February 2010 and before its filing for bankruptcy in February 2013, and considered potential Causes of Action arising out of the conduct of RDA's current and former officers and members of the Board of Directors (the "**Board**") in connection in connection with these transactions.

In particular, the Reorganization Plan Debtors reviewed (1) RDA's $50 million equity tender offer in the first quarter of 2011 (the "**Share Repurchase**"), (2) the April 2011 replacement of the Board by stockholder written consent, (3) the $45 million 2011 Secured Term Loan and $10 million Unsecured Term Loan that RDA received in August 2011 from certain of RDA's stockholders (collectively, the "**Investor Group Loan**"), (4) certain of RDA's asset sales, and (5) RDA's cash tender offer to purchase approximately $60 million in Senior Notes

31

that was completed in September 2012.  Each of these transactions (collectively, the "**Transactions**") is summarized below.

1.    **Share Repurchase**

Commencing approximately six months after RDA's emergence from bankruptcy in February 2010, it was suggested by a number of stockholders, both in written and oral correspondence, that the Board consider returning excess capital to RDA's stockholders.  In response to these communications, the Board considered various alternatives for possible uses for any excess cash, including strategic initiatives, dividends, share repurchases, and debt buyback or repayment, in light of the needs of RDA, the wishes of investors and the terms of RDA's debt instruments.  In considering the various alternatives, the members of the Board engaged in discussions with members of RDA's senior management and reviewed various presentations and financial materials prepared by management and RDA's outside advisors, including materials detailing RDA's cash forecast.  The Board thereafter concluded that, given RDA's balance sheet and projected cash flows, a return of $50 million to RDA's stockholders would not cause RDA's assets to fall below its liabilities and stated capital and that there would be sufficient liquidity for RDA to meet its obligations.

Following a period of due diligence, and based on advice received both from management and RDA's outside advisors, the Board ultimately decided to pursue a stock repurchase, which was thereafter publicly announced in November 2010.

Following the announcement of the Share Repurchase, the Board engaged in further discussions and, ultimately, established an initial price range of $22 to $25 per share for the Share Repurchase which was later increased, after consultation with management and RDA's outside advisors, to a price range of $27 to $29 following the expiration of the initial tender offer after RDA did not receive any tender offers at the original price range.  The Share Repurchase closed in February 2011.  Upon closing, approximately 1.5 million shares were tendered at a price of $29 per share for a total of approximately $43.3 million.  American Stock Transfer & Trust Company, LLC, acted as depositary in connection with the Share Repurchase.

2.    **April 2011 Removal of Board**

In April 2011, a majority of RDA's stockholders, acting by written consent, replaced the members of the Board.  The Board's replacement was spearheaded by a group of hedge funds, advised by Akin Gump Strauss Hauer & Feld LLP.  There were no allegations of wrongdoing or culpable mismanagement.

The replacement of the Board constituted a change in control and triggered cash payments of approximately $15 million, which included certain payments for taxes in connection with vested equity, severance payments and other related expenses.

3.    **The Investor Group Loan**

With the new Board in place, in mid-2011, RDA engaged outside financial advisors to solicit potential lenders for a new senior credit facility to address certain liquidity concerns arising from the unexpected payments described above as well as accelerated business

US_ACTIVE:\44238718\1\69252.0041

declines.  RDA's then-existing debt instruments consisted of a $50 million revolving credit facility with JPMorgan Chase Bank, N.A. (the "**2010 Senior Credit Facility**") and $525 million in Senior Notes, both secured by a first priority security interest in substantially all of RDA's assets.

After a period of discussion with several potential lenders, RDA, with the assistance of its legal and financial advisors, eventually narrowed its search to two potential financing sources by August 2011:  (1) a third party financial institution, and (2) a consortium of stockholders that included Luxor Capital Partners, Point Lobos Capital and Blackwell Partners, LLC (the "**Investor Group**").  After consulting with their outside legal and financial advisors, it was determined that the Investor Group proposal, which consisted of both secured and unsecured term loans in the total aggregate amount of approximately $55 million, was the superior proposal.  Thereafter, RDA and its advisors approached the third party financing source to discuss certain aspects of their proposal, however, the third party was ultimately unwilling to match the terms of the more favorable Investor Group proposal.

Thereafter, relying on the advice of outside legal and financial advisors in the form of, among other things, discussions, presentations and a fairness opinion, the Board determined, in its business judgment, that the Investor Group Loan was the most favorable financing proposal presented, was in the best interests of the company and approved the transaction.

4.    <u>Sale of Certain Assets</u>

As a part of its examination, the Reorganization Plan Debtors reviewed certain of RDA's asset sales, including the sales of (i) Allrecipes.com ("**ALR**"), (ii) Every Day with Rachael Ray, (iii) Weekly Reader, (iv) Lifestyle and Entertainment Direct and (v) Reader's Digest Spain and Portugal.  It was determined that each of these Transactions involved consultation by the Board with outside financial advisors and legal counsel, and that the form of purchase consideration received by RDA was reasonable under the circumstances.

5.    <u>Senior Notes Tender Offer</u>

Consistent with the terms of the Senior Notes (and a consent obtained by the majority of the Senior Noteholders), RDA completed a cash tender offer to purchase up to $60.7 million of its Senior Notes, using proceeds from the sale of ALR, at a purchase price of 95% of the principal amount thereof, plus accrued and unpaid interest thereon to the date of purchase.  RDA received tenders of approximately $509 million aggregate principal amount of Senior Notes.  Under the terms of the tender offer, holders who tendered Senior Notes that were accepted for payment received approximately 95% principal amount of the Senior Notes.  Consistent with the terms of the Senior Notes, RDA accepted for purchase $60.6 million aggregate principal amount on a pro rata basis, pursuant to the tender offer, at a total cost of $58.1 million, including principal of $57.6 million, along with accrued and unpaid interest to the date of purchase.  Wells Fargo Bank, National Association, acted as depositary in connection with the Senior Notes tender offer.

US_ACTIVE:\44238718\1\69252.0041

6.      **Results of Examination**

Based on the results of the examination of prior Transactions, the Reorganization Plan Debtors believe that the applicable board of directors, in connection with each of the foregoing Transactions, with counsel from outside legal and financial advisors, was entitled to exercise its business judgment in connection with each of the above Transactions and made decisions that were at all times reasonable and appropriate under the circumstances. Similarly, the Reorganization Plan Debtors believe that the conduct of the current and former officers of RDA involved in presenting the information about and executing these transactions was at all times reasonable and appropriate.

The Reorganization Plan Debtors additionally note that both the Share Repurchase and the repurchase of the Senior Notes transactions were facilitated through an intermediary financial institution, and recipients of funds are likely shielded from liability under section 546(e) of the Bankruptcy Code. Moreover, the Senior Noteholders have asserted liens on all potential litigation recoveries, whether arising out of chapter 5 avoidance actions or non-bankruptcy litigation.

The Creditors Committee does not adopt or necessarily agree with the Reorganization Plan Debtors' factual and legal conclusions. However, the Creditors Committee believes that there may be significant factual and legal impediments to pursuing and realizing value from any Causes of Action relating to the aforementioned Transactions. Accordingly, as part of the global settlement and compromise imbedded in the Reorganization Plan, the Creditors Committee has agreed that the Reorganization Plan Debtors will retain all Causes of Action, including those related to the Transactions.

## VI.

## THE REORGANIZATION PLAN

A.      **INTRODUCTION**

This section of the Disclosure Statement summarizes the Reorganization Plan, a copy of which is attached as **Exhibit A** hereto. This summary is qualified in its entirety by reference to the provisions of the Reorganization Plan.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the Reorganization Plan, and contains other provisions necessary to implement the Reorganization Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of Claims and Interests under the Reorganization Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the Reorganization Plan is not confirmed.

US_ACTIVE:\44238718\1\69252.0041

> **YOU SHOULD READ THE REORGANIZATION PLAN IN ITS ENTIRETY
> BEFORE VOTING TO ACCEPT OR REJECT THE REORGANIZATION PLAN.**

**B.     CLASSIFICATION AND TREATMENT OF CLAIMS
AND INTERESTS UNDER THE CHAPTER 11 PLAN**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Reorganization Plan and the descriptions below.  In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.  Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement.  In addition, Rule 3003(c)(2) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are not necessarily classified together, nor are equity interests of a substantially similar legal nature necessarily classified together.  Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the Reorganization Plan) or "unimpaired" (unaffected by the Reorganization Plan).  If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the Reorganization Plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the Reorganization Plan (1) does not alter the legal, equitable and contractual rights of the holders, or (2) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.

US_ACTIVE:\44238718\1\69252.0041

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the Reorganization Plan. Accordingly, their votes are not solicited. Under the Reorganization Plan, the following classes are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Reorganization Plan: Class 1 (Other Priority Claims) and Class 3 (Intercompany Interests).

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan. For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or equity interests in such class do not receive or retain property under the Reorganization Plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, Class 6 (Existing RDA Holding Interests) and Class 8 (Subordinated Securities Claims) are deemed to reject the Reorganization Plan because these Classes will receive no distribution and retain no property interest under the Reorganization Plan. Since Class 6 and Class 8 are deemed to reject the Reorganization Plan, the Reorganization Plan Debtors are required to demonstrate that the Reorganization Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to those Classes. Among these are the requirements that the Reorganization Plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the Interests in Class 6 and the Claims in Class 8.

Class 2 (Other Secured Claims), Class 3 (Senior Noteholder Secured Claims), Class 4 (General Unsecured Claims), and Class 5 (Intercompany Claims) are impaired under the Reorganization Plan and are entitled to vote to accept or reject the Reorganization Plan.

## C.   **UNCLASSIFIED CLAIMS**

### 1.   **Administrative Expense Claims**

Administrative Expense Claims are the actual and necessary costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (1) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Reorganization Plan Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises); (2) Fee Claims; (3) DIP Claims; (4) Restructuring Expenses; and (6) all fees and charges assessed against the Estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-1401.

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Reorganization Plan Debtors or the Reorganized Debtors agrees to different treatment, the Reorganization Plan Debtors (or the Reorganized Debtors, as the case may be) will pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (1) the Effective Date and (2) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, that, all DIP Claims will constitute Allowed Administrative Expense Claims; provided, further, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary

course of business by the Reorganization Plan Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by the Reorganization Plan Debtors, as debtors in possession, whether or not incurred in the ordinary course of business, will be paid by the Reorganization Plan Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

### 2.    Fee Claims

All entities seeking an award by the Bankruptcy Court of Fee Claims (1) will file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, (2) will be paid in full from the Reorganization Plan Debtors' or Reorganized Debtors' Cash on hand in such amounts as are Allowed by the Bankruptcy Court (a) upon the later of (i) the Effective Date and (ii) the date upon which the order relating to any such Allowed Fee Claim is entered or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Reorganization Plan Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors will be authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval, including those of the Creditors Committee for which the Creditors Committee remains in existence after the Effective Date as set forth in Section 12.3 of the Reorganization Plan.

### 3.    Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim will receive, at the sole option of the Reorganization Plan Debtors or the Reorganized Debtors, (1) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (2) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; provided, that the Reorganization Plan Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option.

As of the date hereof, the estimated Allowed amount for Priority Tax Claims is approximately $600,000.

### 4.    DIP Claims

On the Effective Date, the DIP Facility will convert to (1) the First Out Exit Facilities in accordance with the terms and conditions set forth in the First Out Exit Term Sheet and (2) the Second Out Exit Term Loan Agreement in accordance with the terms and conditions in the Second Out Exit Term Sheet (and otherwise on terms and conditions satisfactory to the

37

New Money Lenders), as applicable, or in each case, paid in full in Cash if the terms and conditions required for conversion under the applicable term sheet are not satisfied; provided, however, that the obligations under the First Out Exit Facilities will always be paid in full in Cash by the Reorganization Plan Debtors.  All accrued and unpaid interest, fees (including, without limitation, all fees, charges and disbursements of counsels to the Consenting Lender, the DIP Agent and the New Money Lenders), letter of credit fees and commissions, premiums, expenses and indemnification amounts under the DIP Facility as of the Effective Date will be paid in full in cash on the Effective Date.  Upon compliance with the preceding sentence, all liens and security interests granted to secure the DIP Facility will be deemed cancelled and will be of no further force and effect and each Allowed DIP Claim will be deemed to be fully satisfied, settled, released, and compromised.

### 5.    2012 Senior Credit Agreement Claims

Pursuant to the Reorganization Plan, all obligations and claims in respect of the 2012 Senior Credit Agreement will be treated as follows:  (1) all amounts owing under the 2012 Senior Credit Agreement on the Commencement Date plus the aggregate amount of any outstanding and unpaid "Reimbursement Obligations" incurred under (and as defined in) the 2012 Senior Credit Agreement will have become Roll-Up Loans pursuant to the DIP Order and the DIP Loan Agreement; (2) all outstanding letters of credit under 2012 Senior Credit Agreement will have become letters of credit deemed issued under the DIP Loan Agreement; and (3) all accrued and unpaid interest, fees, letter of credit standby fees and commissions, premium, expenses, indemnification amounts and all other obligations arising under or relating to the 2012 Senior Credit Agreement will have been paid in full in cash on or prior the Second Effective Date (as defined in the DIP Loan Agreement).

### 6.    Roll-Up Loans

On the Effective Date, all Roll-Up Loans, outstanding letters of credit and any related obligations will be converted into the First Out Exit Facilities in accordance with the First Out Exit Term Sheet so long as (and only so long as) the terms and conditions required for such conversion are satisfied in accordance with the provisions of the First Out Exit Term Sheet and otherwise such obligations will be paid in full in Cash on the Effective Date; provided, however, that the Reorganization Plan Debtors may always elect to repay such obligations in full in Cash at any time prior to or after the Effective Date.

Notwithstanding that the scheduled final maturity of the Roll-Up Loans under the DIP Facility extends beyond the date that is 180 days after the Commencement Date, the commitment of the Consenting Lender under the Restructuring Support Agreement and the First Out Exit Term Sheet to provide the First Out Exit Term Loan will terminate on the date that is 180 days after the Commencement Date.

### 7.    Indenture Trustee Fees

On the Effective Date, the Reorganized Debtors will pay in Cash the unpaid and outstanding Indenture Trustee Fees, without the need for the Indenture Trustee to file fee applications with the Bankruptcy Court; provided, however, that the Indenture Trustee will

US_ACTIVE:\44238718\1\69252.0041

provide the Reorganization Plan Debtors and the Creditors Committee with the invoices for which it seeks payment at least ten (10) days prior to the Effective Date.  Notwithstanding anything in the Reorganization Plan to the contrary, each Indenture Trustee Charging Lien will be released and discharged upon (1) payment of any fees and expenses due to any Indenture Trustee under an applicable Indenture in full and (2) the satisfaction of the Indenture Trustee's duties pursuant to the Reorganization Plan (including with respect to Reorganization Plan distributions).

## D.    CLASSIFIED CLAIMS AND INTERESTS

### 1.    Class 1 – Other Priority Claims

Class 1 is Unimpaired by the Reorganization Plan.  Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Reorganization Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Reorganization Plan.

Except to the extent that a holder of an Allowed Other Priority Claim against any of the Reorganization Plan Debtors has agreed to less favorable treatment of such Claim, each such holder will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practical thereafter.

### 2.    Class 2 – Other Secured Claims

Class 2 is Impaired by the Reorganization Plan.  Each holder of an Allowed Other Secured Claim is entitled to vote to accept or reject the Reorganization Plan; provided, however, that the Reorganization Plan Debtors reserve the right to argue at the Confirmation Hearing that any or all of Class 2 (Other Secured Claims) is Unimpaired.

Except to the extent that a holder of an Allowed Other Secured Claim against any of the Reorganization Plan Debtors has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim will receive, at the option of the Reorganization Plan Debtors or the Reorganized Debtors, (1) payment in full in Cash in full and final satisfaction of such claim, payable on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or, in each case, as soon as reasonably practical thereafter, (2) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under Section 506(b) of the Bankruptcy Code, or (3) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

### 3.    Class 3 – Senior Noteholder Secured Claims

Class 3 is Impaired by the Reorganization Plan.  Each holder of an Allowed Senior Noteholder Secured Claim is entitled to vote to accept or reject the Reorganization Plan.

On the Effective Date, each holder of an Allowed Class 3 Noteholder Claim will be entitled to receive, in full and final satisfaction of such Allowed Senior Noteholder Secured

39

Claim, its *Pro Rata* share of 100% of the New Common Stock on a Fully Diluted Basis; provided, however, that no holder of an Allowed Senior Noteholder Secured Claim will receive distributions that aggregate to more than the amount of such holder's Allowed Senior Noteholder Secured Claim; provided further, that no dividends, recoveries, securities, distributions, or other form of payments will be made on account of or in connection with the New Common Stock distributed to the holders of Allowed Senior Noteholder Secured Claims until all amounts owing in connection with the First Out Exit Term Loan have been paid in full in Cash and all commitments thereunder have been terminated.

The Reorganization Plan provides that, pursuant to section 506(a) of the Bankruptcy Code, the Senior Noteholder Secured Claims are Allowed as a Class 3 Claim in the amount of $231,000,000.[25]

## 4.    **Class 4 – General Unsecured Claims**

Class 4 is Impaired by the Reorganization Plan.  Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Reorganization Plan.  For the avoidance of doubt, the holders of Senior Noteholder Deficiency Claims are entitled to vote to accept or reject the Reorganization Plan as holders of General Unsecured Claims in Class 4 regardless of any waiver of recovery from the GUC Distribution or the RDA GUC Distribution. For purposes of voting and distributions under the Reorganization Plan, Class 4 General Unsecured Claims against each of the Reorganization Plan Debtors shall be deemed to be in separate sub-classes.

On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim, including any holder of FTC Claims, the Unsecured Term Loan Claim, any Non-Debtor Intercompany[26] Claims, any DEMG Intercompany Claims[27] or any Senior Noteholder Deficiency Claims, shall receive the following treatment:

(a)    for any sub-class of General Unsecured Claims that votes to accept the Reorganization Plan of any individual Reorganization Plan Debtor, each holder of an Allowed General Unsecured Claim in such accepting sub-class shall receive its *Pro Rata* share of the GUC Distribution and any Senior Noteholder Deficiency Claims in such accepting sub-class shall be deemed waived for the purposes of entitling holders of such Senior Noteholder Deficiency Claims to share in any recovery from the GUC Distribution;

(b)    in addition to any *Pro Rata* share of the GUC Distribution, provided that the sub-class of General Unsecured Claims of Reader's Digest votes to accept the Reorganization Plan, each holder of an Allowed General Unsecured Claim of Reader's Digest

---

[25] *See* Section VII below (Valuation of the Reorganization Plan Debtors).

[26] The Reorganization Plan Debtors estimate that Non-Debtor Intercompany Claims total approximately $39 million.

[27] The Reorganization Plan Debtors estimate that DEMG Intercompany Claims total approximately $7 million.

US_ACTIVE:\44238718\1\69252.0041

shall receive its *Pro Rata* share of the RDA GUC Distribution and any Senior Noteholder Deficiency Claims in such accepting sub-class shall be deemed waived for the purposes of entitling holders of such Senior Noteholder Deficiency Claims to share in any recovery from the RDA GUC Distribution; and

        (c)     in the event any sub-class of General Unsecured Claims votes to reject the Reorganization Plan with respect to any individual Reorganization Plan Debtor, the holders of Allowed General Unsecured Claims in such a rejecting sub-class shall not receive or retain any property under the Reorganization Plan on account of such Claims, including, for the avoidance of doubt, any *Pro Rata* share of the GUC Distribution or the RDA GUC Distribution. For the further avoidance of doubt, to the extent any sub-class of General Unsecured Claims votes to reject the Reorganization Plan and, therefore, is not entitled to receive any portion of the GUC Distribution, such *Pro Rata* portion attributable to the rejecting sub-class shall be reallocated to the holders of General Unsecured Claims in other sub-classes that have voted to accept the Reorganization Plan.  If holders of General Unsecured Claims against Reader's Digest vote to reject the Reorganization Plan as a sub-class, there will be no RDA GUC Distribution.

        Notwithstanding anything to the contrary herein, each Allowed Non-Debtor Intercompany Claim shall be Reinstated or alternatively, at the Reorganization Plan Debtors' reasonable discretion, on or prior to the Effective Date, and in consultation with the Creditors Committee or the Claims Oversight Committee as set forth in Section 7.9 of the Reorganization Plan, as applicable, each holder of an Allowed Non-Debtor Intercompany Claim shall receive either its *Pro Rata* share of the GUC Distribution and the RDA GUC Distribution, if any, or such other treatment as determined by the Reorganization Plan Debtors, which other treatment shall not include a distribution from the GUC Distribution or RDA GUC Distribution.  At this juncture, the Reorganization Plan Debtors are not aware of any Non-Debtor Intercompany Claims that they would treat as Class 4 General Unsecured Claims for distribution purposes. Furthermore, should the Reorganization Plan Debtors elect, in accordance with sections 4.4 and 7.9 of the Reorganization Plan, to treat any Non-Debtor Intercompany Claims as Class 4 General Unsecured Claims for distribution purposes, the Reorganization Plan Debtors do not believe that the inclusion of such Non-Debtor Intercompany Claims would result in any decrease to the projected recoveries for holders of Allowed General Unsecured Claims below those set forth in this Disclosure Statement.  For the avoidance of doubt, in the event the Reorganization Plan Debtors Reinstate any Allowed Non-Debtor Intercompany Claims, such Allowed Non-Debtor Intercompany Claims will not receive any Cash distribution under the Reorganization Plan, including with respect to any *Pro Rata* shares of the GUC Distribution and RDA GUC Distribution, if applicable.

        No holder of an Allowed General Unsecured Claim shall receive distributions that aggregate to more than the amount of such holder's Allowed General Unsecured Claim.  Nothing herein shall prejudice the ability of any party in interest to argue, for purposes of confirming the Reorganization Plan under section 1129 of the Bankruptcy Code, that General Unsecured Claims are not entitled to any value being provided in the Reorganization Plan prior to Confirmation, including the GUC Distribution or the RDA GUC Distribution.

US_ACTIVE:\44238718\1\69252.0041

5.    **Class 5 – Plan Debtor Intercompany Claims**

Class 5 is Impaired by the Reorganization Plan.  Each holder of an Allowed Plan Debtor Intercompany Claim is entitled to vote to accept or reject the Reorganization Plan.

On the Effective Date, RDA Holding will, at its discretion, Reinstate or compromise, as the case may be, all Plan Debtor Intercompany Claims between and among RDA Holding and its Reorganization Plan Debtor Affiliates consistent with the Acceptable Business Plan and the International Restructuring Transactions (as such term is used in the Plan Term Sheet) contemplated thereby.

6.    **Class 6 – Existing RDA Holding Interests**

Class 6 is Impaired by the Reorganization Plan.  Each holder of an Allowed Existing RDA Holding Interest is not entitled to vote to accept or reject the Reorganization Plan and will be conclusively deemed to have rejected the Reorganization Plan.

On the Effective Date, all Existing RDA Holding Interests will be deemed canceled, and the holders of Existing RDA Holding Interests will not receive or retain any property under the Reorganization Plan on account of such Interests.

7.    **Class 7 – Intercompany Interests**

Class 7 is Unimpaired by the Reorganization Plan.  Each holder of an Allowed Intercompany Interest is conclusively presumed to have accepted the Reorganization Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Reorganization Plan.

8.    **Class 8 – Subordinated Securities Claims**

Class 8 is Impaired by the Reorganization Plan.  Each holder of a Subordinated Securities Claim is not entitled to vote to accept or reject the Reorganization Plan and will be conclusively deemed to have rejected the Reorganization Plan.

The holders of the Subordinated Securities Claims will not receive or retain any property under the Reorganization Plan on account of such Claims.

E.    **MEANS OF IMPLEMENTATION**

1.    **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Reorganization Plan, the provisions of the Reorganization Plan will constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such

42

Claims, Interests, and controversies, including without limitation, approval of the Restructuring Support Agreement and the 2011 Financing Settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Reorganization Plan Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Reorganization Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, the Reorganization Plan Debtors and after the Effective Date, the Reorganized Debtors, may compromise and settle Claims against the Reorganization Plan Debtors or the Reorganized Debtors, as applicable, and Causes of Action against other Entities.

## 2. First Out Exit Facilities and Second Out Exit Term Loan

On the Effective Date, subject to Section 2.4 of the Reorganization Plan and the terms and conditions of the First Out Exit Term Sheet and the Second Out Exit Term Sheet, the Reorganization Plan Debtors will enter into (1) the First Out Exit Facilities to refinance the Roll-Up Loans and replace any letters of credit under the DIP Facility and (2) the Second Out Exit Term Loan to refinance the New Money Loans outstanding under the DIP Facility; provided, however, that Reorganized RDA Holding will have not more than $106,000,000 in funded debt under its secured credit facilities immediately following the Effective Date.

On the Effective Date, documentation evidencing the First Out Exit Facilities and the Second Out Exit Term Loan will be executed and delivered, and the Reorganized Debtors will be authorized to execute, deliver, and enter into and perform under the First Out Exit Facilities and the Second Out Exit Term Loan Agreement without the need for any further corporate action and without further action by the holders of Claims or Interests. The definitive documentation relating to the First Out Exit Facilities and Second Out Exit Term Loan will be filed as part of the Plan Supplement.

All Liens and security interests granted pursuant to the First Out Exit Facilities or the Second Out Exit Term Loan Agreement, as applicable to (1) in the case of the First Out Exit Facilities, the Consenting Lender, the Roll-Up Lender and the Issuing Lender, and (2) in the case of the Second Out Exit Term Loan Agreement, the New Money Lenders, are intended to be, and will be (A) valid, binding, perfected, enforceable, Liens, and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (B) not subject to avoidance, recharacterization, or subordination under any applicable law.

## 3. Authorization and Issuance of Plan Securities

The Reorganization Plan Debtors or Reorganized RDA Holding and the other Reorganized Debtors, as applicable, are authorized under the Reorganization Plan to issue all plan-related securities and documents, including, without limitation, the New Common Stock and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership, or limited liability company action.

US_ACTIVE:\44238718\1\69252.0041

On or prior to the Effective Date, Reorganized RDA Holding will contribute the New Common Stock as a capital contribution to Reader's Digest in an amount equal to the shares of New Common Stock to be distributed in respect of Allowed Senior Noteholder Secured Claims pursuant to Section 4.3 of the Reorganization Plan, which shares will then be distributed pursuant to such section and the provisions of the Reorganization Plan.

### 4.    Cancellation of Existing Securities and Agreements

Except as expressly provided in the Reorganization Plan and in connection with the First Out Exit Facilities and the Second Out Exit Term Loan, on the Effective Date, all notes, instruments, certificates evidencing debt to or interests in, the Reorganization Plan Debtors, including, without limitation, the DIP Loan Agreement (only upon and following the effectiveness of the First Out Exit Facilities and the Second Out Exit Loan Agreement or payment in full in cash), the 2012 Senior Credit Agreement, the Security Agreement, the Indenture, and the Unsecured Term Loan will be cancelled and obligations of the Reorganization Plan Debtors thereunder will be discharged; provided, however, that any and all indemnification obligations under the 2012 Senior Credit Agreement (including the indemnities provided in section 4.05 thereunder) will survive as obligations under the DIP Loan Agreement; provided, further, that any and all indemnification obligations (and any other obligations surviving per their express terms) under the DIP Facility will survive as obligations under the First Out Exit Term Loan or Second Out Exit Term Loan, as applicable, notwithstanding in each case the cancellation of the predecessor credit agreement(s); provided, further, that nothing in the Reorganization Plan will be deemed to constitute a cancellation of any rights arising from or in connection with section 5.5 of the Security Agreement.

Notwithstanding confirmation of the Reorganization Plan or the occurrence of the Effective Date, the Indenture will continue in effect solely for purposes of: (1) enabling holders of Allowed Senior Noteholder Secured Claims to receive distributions under the Reorganization Plan; and (2) allowing the Indenture Trustee to make distributions under the Reorganization Plan; provided further, however, that nothing in Section 5.4 of the Reorganization Plan will affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Reorganization Plan or result in any liability or expense to the Reorganized Debtors.

### 5.    Reorganized RDA Holding

Pursuant to the Reorganization Plan, upon and following the Effective Date, the New Board will be a 7-member board comprised of the Chief Executive Officer and six (6) directors designated by the Required Consenting Secured Noteholders in consultation with the Chief Executive Officer. The members of the New Board will be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code. On the Effective Date, the terms of the current members of the boards of directors and the boards of managing members of the Reorganization Plan Debtors will expire.

Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date will serve as the initial officers of each of the respective Reorganized Debtors on or after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-

44

bankruptcy law. After the Effective Date, the selection of officers of the Reorganized Debtors will be as provided by their respective organizational documents. The members of the board of directors and the board of managers for each of the Reorganized Debtor Affiliates will be determined as set forth in the Amended Organizational Documents to be provided in the Plan Supplement.

### 6.    International Restructuring Transactions

On or after the Effective Date, the Reorganized Debtors with the concurrence of the New Board will implement the International Restructuring Transactions and the Reorganized Debtors are authorized to take all actions as may be necessary or appropriate in connection therewith.

### 7.    Other Transactions

On or after the Effective Date, the Reorganization Plan Debtors may (1) cause any or all of the Debtor Affiliates to be liquidated or merged into one or more of the other Debtor Affiliates or any other subsidiaries of the Reorganization Plan Debtors or dissolved all as more specifically described in the Plan Supplement, (2) cause the transfer of assets between or among the Debtor Affiliates, (3) cause any or all of the Amended Organizational Documents of any Reorganized Debtor Affiliates to be implemented, effected, or executed, (4) use the proceeds of the First Out Exit Term Loan and Second Out Exit Term Loan, plus Cash on hand, to pay all Restructuring Expenses, (5) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (6) engage in any other transaction in furtherance of the Reorganization Plan. Subject to the prior written consent of the Required Consenting Secured Parties, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Reorganization Plan Debtors or the Reorganization Plan Debtors in Possession.

### 8.    Cancellation of Liens

Except as otherwise specifically provided in the Reorganization Plan with respect to Class 2, upon the occurrence of the Effective Date, any Lien securing any Secured Claim will be deemed released, and the holder of such Secured Claim will be authorized and directed to release any collateral or other property of the Reorganization Plan Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### 9.    Management Incentive Program

The Reorganization Plan Debtors are not seeking approval of the Management Incentive Program pursuant to the Reorganization Plan. Rather, in accordance with the Reorganization Plan, the Management Incentive Program will be implemented by the New Board and communicated to the participants thereunder promptly following the Effective Date.

45

10. **Employee Matters.**

On or after the Effective Date, the Reorganized Debtors will implement the following employee incentive programs with the concurrence of the New Board:  (1) the Pension Credit, and (2) the Employee Bonus Pool.

11. **Withholding and Reporting Requirements.**

In connection with the Reorganization Plan, any party issuing any instrument or making any distribution described in the Reorganization Plan will comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Reorganization Plan and all related agreements will be subject to any such withholding or reporting requirements.  In the case that a distribution of New Common Stock is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence will be deemed to have been distributed to and received by the applicable recipient for all purposes of the Reorganization Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Reorganization Plan will have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Reorganization Plan will have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

Any party entitled to receive any property as an issuance or distribution under the Reorganization Plan will, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which entity will subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution will irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution will be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

12. **Exemption From Certain Transfer Taxes.**

Pursuant to section 1146 of the Bankruptcy Code, (1) the issuance, transfer or exchange of any securities, instruments or documents, (2) the creation of any Lien, mortgage, deed of trust or other security interest, (3) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Reorganization Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Reorganization Plan or the reinvesting, transfer or sale of any real or personal property of the Reorganization Plan Debtors pursuant to, in implementation of or as

46

contemplated in the Reorganization Plan (whether to one or more of the Reorganized Debtors or otherwise), (4) the grant of collateral under the First Out Exit Term Loan Agreement or the Second Out Exit Term Loan Agreement and (5) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Reorganization Plan, including, without limitation, the Confirmation Order, will not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument under the Reorganization Plan is to be recorded will, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**13.     Effectuating Documents; Further Transactions.**

Pursuant to the Reorganization Plan, on and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Reorganization Plan and the securities issued pursuant to the Reorganization Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Reorganization Plan.

**14.     Closing of the Chapter 11 Cases.**

After an Estate has been fully administered, the Reorganized Debtors will promptly seek authority from the Bankruptcy Court to close each applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

**F.     DISTRIBUTIONS**

**1.     Distribution Record Date**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Reorganization Plan Debtors or their respective agents, will be deemed closed, and there will be no further changes in the record holders of any of the Claims or Interests.  The Reorganization Plan Debtors or the Reorganized Debtors will have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

**2.     Date of Distributions**

Except as otherwise provided in the Reorganization Plan, the Disbursing Agent will make the Initial Distribution to holders of Allowed Claims no later than the Initial

47

Distribution Date and thereafter, the Disbursing Agent will from time to time determine, in consultation with the Claims Oversight Committee, the subsequent Distribution Dates, which will occur no less frequently than semi-annually.  In the event that any payment or act under the Reorganization Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but will be deemed to have been completed as of the required date.

The Disbursing Agent will maintain, in consultation with the Claims Oversight Committee, a reserve of Cash from the GUC Distribution and the RDA GUC Distribution (less the Claims Oversight Committee Reserve) sufficient to pay holders of Disputed General Unsecured Claims the amount such holders would be entitled to receive under the Reorganization Plan if such Claims were to become Allowed General Unsecured Claims.  In the event the holders of Allowed General Unsecured Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Reorganized Debtors will make a final distribution of all remaining Cash out of the GUC Distribution and the RDA GUC Distribution in accordance with Section 4.4 of the Reorganization Plan to all holders of Allowed General Unsecured Claims.

### 3.  Disbursing Agent

All distributions under the Reorganization Plan will be made by Reorganized RDA Holding (or such other entity designated by Reorganized RDA Holding), as Disbursing Agent, on or after the Effective Date or as otherwise provided in the Reorganization Plan; provided, however, that the Senior Notes Indenture Trustee will be the Disbursing Agent for the Senior Noteholder Secured Claims on behalf of Reader's Digest and the Administrative Agent will be the Disbursing Agent for the 2012 Senior Credit Agreement Claims.  A Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents will be reimbursed by the Reorganized Debtors.

Except as otherwise provided in the Reorganization Plan, Reorganized RDA Holding will serve as Disbursing Agent and authorized representative for, and with respect to, each of the Reorganization Plan Debtors.

### 4.  Powers of Disbursing Agent

Pursuant to the Reorganization Plan, a Disbursing Agent will be empowered to (1) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Reorganization Plan, (2) make all distributions contemplated by the Reorganization Plan and (3) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Reorganization Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Reorganization Plan.

48

5.      **Cancelation of Senior Notes**

Pursuant to the Reorganization Plan, each record holder of a Senior Note Claim will be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations will be deemed to be canceled except to the extent otherwise provided in the Reorganization Plan. The Indenture Trustee may (but will not be required to) request that registered holders of the Senior Notes surrender their notes for cancellation. Such surrendered Senior Note will be cancelled solely with respect to the Debtors, and such cancellation will not alter the obligations or rights of any non-Reorganization Plan Debtor third parties vis-à-vis one another with respect to such Senior Note.

6.      **Delivery of Distributions**

Subject to Bankruptcy Rule 9010, all distributions under the Reorganization Plan to any holder of an Allowed Claim will be made to a Disbursing Agent, who will transmit such distribution to the applicable holders of Allowed Claims. In the event that any distribution to any holder is returned as undeliverable, no further distributions will be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions will be made to such holder as soon as reasonably practicable thereafter. Undeliverable distributions or unclaimed distributions will remain in the possession of the Reorganization Plan Debtors until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Reorganization Plan Debtors or Reorganized Debtors, as applicable, and will not be supplemented with any interest, dividends or other accruals of any kind. Such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of distribution. After such date, all unclaimed property or interest in property will revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property will be discharged and forever barred. Distributions of holders of General Unsecured Claims that are deemed unclaimed property pursuant to the preceding sentence shall be redistributed to holders of Allowed General Unsecured Claims in accordance with Section 4.4 of the Reorganization Plan.

7.      **Manner of Payment Under Plan**

At the option of the Reorganization Plan Debtors, any Cash payment to be made under the Reorganization Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

8.      **Fractional Stock**

If any distributions of New Common Stock pursuant to the Reorganization Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up). The total number of shares of New Common Stock to be distributed in connection with the

US_ACTIVE:\44238718\1\69252.0041

Reorganization Plan will be adjusted as necessary to account for the rounding provided for in
Section 6.8 of the Reorganization Plan.

### 9.    Minimum Cash Distributions

The Disbursing Agent will not be required to make any Initial Distribution or
semi-annual distribution of Cash less than $50 to any holder of an Allowed General Unsecured
Claim; *provided, however,* that if any distribution is not made pursuant to Section 6.9 of the
Reorganization Plan, such distribution will be added to any subsequent distribution to be made
on behalf of the holder's Allowed Claim.  The Disbursing Agent will not be required to make
any final distributions of Cash less than $25 to any holder of an Allowed Claim.  If either (a) all
Allowed General Unsecured Claims (other than those whose distributions are deemed
undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to
holders of Allowed General Unsecured Claims would be $25 or less and the aggregate amount of
cash available for distributions to holders of Allowed General Unsecured Claims is less than
$25,000, then no further distribution will be made by the Disbursing Agent and any surplus Cash
will be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the
Disbursing Agent.

### 10.    Setoffs

Pursuant to the Reorganization Plan, the Reorganization Plan Debtors and the
Reorganized Debtors may, but will not be required to, set off against any Claim, any claims of
any nature whatsoever that the Reorganization Plan Debtors or the Reorganized Debtors may
have against the holder of such Claim; provided, that neither the failure to do so nor the
allowance of any Claim under the Reorganization Plan will constitute a waiver or release by the
Reorganization Plan Debtors or the Reorganized Debtors of any such claim the Reorganization
Plan Debtors or the Reorganized Debtors may have against the holder of such Claim.

### 11.    Distributions After Effective Date

Distributions made after the Effective Date pursuant to the Reorganization Plan to
holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later
become Allowed Claims will be deemed to have been made on the Effective Date.

### 12.    Allocation of Distributions Between Principal and Interest

Except as otherwise provided in the Reorganization Plan, to the extent that any
Allowed Claim entitled to a distribution under the Reorganization Plan is comprised of
indebtedness and accrued but unpaid interest thereon, such distribution will be allocated to the
principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and
then to accrued but unpaid interest.

50

## G.    PROCEDURES FOR DISPUTED CLAIMS

### 1.    Allowance of Claims

After the Effective Date, the Reorganized Debtors will have and will retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Reorganization Plan.  Except as expressly provided in the Reorganization Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim will become an Allowed Claim unless and until such Claim is deemed Allowed under the Reorganization Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

### 2.    Objections to Claims

As of the Effective Date, objections to, and requests for estimation of, Claims against the Reorganization Plan Debtors may be interposed and prosecuted only by the Reorganized Debtors subject to the conditions and rights of the Claims Oversight Committee set forth in Section 7.9 of the Reorganization Plan.  Such objections and requests for estimation will be served and filed (1) on or before the ninetieth (90th) day following the later of (a) the Effective Date and (b) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (2) such later date as ordered by the Bankruptcy Court upon motion filed by the Reorganized Debtors.

### 3.    Estimation of Claims

The Reorganization Plan Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Reorganization Plan Debtors or Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganization Plan Debtors or Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4.    No Distributions Pending Allowance

If an objection to a Claim is filed as set forth in Section 7.2 of the Reorganization Plan, no payment or distribution provided under the Reorganization Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

US_ACTIVE:\44238718\1\69252.0041

5. **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the holder of such Allowed Claim in accordance with the provisions of the Reorganization Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent will provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Reorganization Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

6. **Resolution of Claims**

Subject to the conditions and rights of the Claims Oversight Committee set forth in Section 7.9 of the Reorganization Plan, on and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.
.

7. **Disallowed Claims**

All claims held by persons or entities against whom or which any of the Reorganization Plan Debtors or Reorganized Debtors has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code will be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims will not be entitled to vote to accept or reject the Reorganization Plan. Claims that are deemed disallowed pursuant to this section will continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Reorganization Plan Debtors or the Reorganized Debtors from such party have been paid.

8. **Debtor Affiliate Claims**

Notwithstanding anything to the contrary in the Reorganization Plan, all Debtor Affiliates will file proofs of claim in connection with the Chapter 11 Cases in accordance with the Reorganization Plan and any order of the Bankruptcy Court establishing a deadline for, or other procedure regarding, the filing of claims in the Chapter 11 Cases, including the Bar Date Order.

9. **Claims Oversight Procedures**

The Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising or otherwise resolving all Claims against the Reorganization Plan Debtors and shall bear the responsibility for any fees, costs, expenses or other liabilities incurred by the Reorganized Debtors in connection with the claims administration.

On the Effective Date, there will be formed a Claims Oversight Committee.  As detailed below, the Claims Oversight Committee shall monitor the Claims Administration conducted by the Reorganized Debtors, and address the Bankruptcy Court if the Claims

52

Oversight Committee disagrees with the Reorganized Debtors' determinations with respect to Claims resolution; and monitor distributions to holders of General Unsecured Claims and to address the Bankruptcy Court with respect to such matters.  Specifically, the Reorganized Debtors shall consult in good faith with the Claims Oversight Committee prior to settling, compromising or allowing (a) any Claim against any of the Reorganization Plan Debtors in a liquidated amount in excess of $500,000 (including any Claim originally scheduled or filed in an unliquidated amount), (b) any Claim filed in the Chapter 11 Cases against any of the Reorganization Plan Debtors that has a positive variance, if scheduled, of more than $50,000 to the corresponding Claim as identified on the Reorganization Plan Debtors' Schedules or (c) any Non-Debtor Intercompany Claims to the extent such Non-Debtor Intercompany Claims are to be treated as Class 4 General Unsecured Claims for distribution purposes (collectively, "**Oversight Claims**"); *provided, however,* that any fees, costs and expenses incurred in connection with the aforementioned consultation right shall be limited solely to the $300,000 Claims Oversight Resolution Reserve funded by the GUC Distribution and the RDA GUC Distribution, as applicable or such other amount as agreed upon by the Reorganized Debtors, the Claims Oversight Committee and the Consenting Secured Noteholders prior to the Initial Distribution Date.

The Reorganized Debtors shall notify the Claims Oversight Committee prior to entering into any settlement or compromise of any Oversight Claims.  The Claims Oversight Committee shall have a period of three (3) business days after receipt of such notice to review the proposed settlement or compromise and notify the Reorganized Debtors of objections, if any, to the proposed settlement or compromise of such Oversight Claims.  Thereafter, the Claims Oversight Committee shall have ten (10) business days after providing notice to the Reorganized Debtors of any objections to file a motion with the Bankruptcy Court objecting to the proposed settlement or compromise of the Oversight Claims.  In the event the Claims Oversight Committee fails to timely file an objection with the Bankruptcy Court within the proscribed ten (10) day period, the Reorganized Debtors shall be authorized to enter into the settlement or compromise without further order of the Bankruptcy Court.

## H.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    General Treatment

In accordance with the Reorganization Plan, all executory contracts and unexpired leases to which any of the Reorganization Plan Debtors are parties will be rejected, except for an executory contract or unexpired lease that (1) previously has been assumed or rejected pursuant to Final Order of the Bankruptcy Court, (2) is specifically designated by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) as a contract or lease to be assumed on the Schedule of Assumed Contracts to be filed with the Plan Supplement, (3) is otherwise expressly assumed pursuant to the Reorganization Plan, including without limitation, pursuant to Sections 8.4, 8.5, 8.6 and 8.7 of the Reorganization Plan, or (4) is the subject of a separate (a) assumption motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) or (b) rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) under section 365 of the Bankruptcy Code before the Confirmation Date.

US_ACTIVE:\44238718\1\69252.0041

**2.      Payments Related to Assumption of Contracts and Leases**

            Any monetary amounts by which any executory contract and unexpired lease to
be assumed under the Reorganization Plan is in default will be satisfied, under section 365(b)(1)
of the Bankruptcy Code, by the Reorganization Plan Debtors upon assumption thereof.  Any
objection by a counterparty to a proposed assumption of an executory contract or unexpired lease
or amount of any Cure must be filed, served, and actually received by the Reorganization Plan
Debtors on or before thirty (30) days after the Effective Date of the Reorganization Plan
applicable to the Reorganization Plan Debtor that is the counterparty to the executory contract or
unexpired lease.  Any counterparty to an executory contract or unexpired lease that fails to object
timely to the proposed assumption and assignment of such executory contract or unexpired lease
or such Cure amount will be deemed to have assented to such matters and will be forever barred,
stopped and enjoined from asserting such objection against the Reorganization Plan Debtors.  If
there is a dispute regarding (1) the nature or amount of any Cure, (2) the ability of the
Reorganization Plan Debtors or any assignee to provide "adequate assurance of future
performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or
lease to be assumed or (3) any other matter pertaining to assumption, Cure will occur following
the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the
assumption or assumption and assignment, as the case may be; provided, that before the
Effective Date, the Reorganization Plan Debtors or the Reorganized Debtors, as applicable (with
the reasonable consent of the Required Consenting Secured Parties), may settle any dispute
regarding the nature or amount of Cure without any further notice to any party or any action,
order or approval of the Bankruptcy Court.  If there is a dispute as referred to above, the
Reorganization Plan Debtors reserve the right to reject, or nullify the assumption or assignment
of any executory contract or unexpired lease no later than thirty (30) days after a Final Order
determining the Cure, any request for adequate assurance of future performance required to
assume and assign such executory contract or unexpired lease, and any other matter pertaining to
assumption and/or assignment.

            Assumption and assignment of any executory contract or unexpired lease pursuant
to the Reorganization Plan, or otherwise, will result in the full release and satisfaction of any
Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary,
including defaults of provisions restricting the change in control or ownership interest
composition or other bankruptcy-related defaults, arising under any assumed executory contract
or unexpired lease at any time before the effective date of assumption and/or assignment.  Any
proofs of claim filed with respect to an executory contract or unexpired lease that has been
assumed will be deemed disallowed and expunged, without further notice to or action, order or
approval of the Bankruptcy Court or any other entity.

**3.      Rejection Claims**

            Unless a contract or lease is (1) specifically assumed or rejected by order of the
Bankruptcy Court, (2) listed in the Plan Supplement as an executory contract or lease to be
assumed as set forth in Section 8.1, (3) otherwise expressly assumed pursuant to the terms of the
Reorganization Plan, or (4) the subject of a separate assumption or rejection motion filed by the
Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured
Parties), the Confirmation Order will constitute the Bankruptcy Court's approval of the rejection

54

of all the leases and contracts, in accordance with Section 8.1 of the Reorganization Plan, effective as of the Effective Date.  In the event that the rejection of an executory contract or unexpired lease by any of the Reorganization Plan Debtors pursuant to the Reorganization Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages (each, a "**Rejection Claim**"), if not evidenced by a timely filed proof of claim, will be forever barred and will not be enforceable against the Reorganization Plan Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Reorganization Plan Debtors and the Reorganized Debtors no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

The filing of any Rejection Claim may delay distributions to holders of certain Claims, including, without limitation, General Unsecured Claims in Class 5.  To the extent that any Rejection Claim is Allowed, such Claim will be classified as a General Unsecured Claim in Class 5.

### 4.    Survival of the Reorganization Plan Debtors' Indemnification Obligations

Any obligations of the Reorganization Plan Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, other organizational documents, employment agreements or other agreements to indemnify current and former officers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Reorganization Plan Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Reorganization Plan Debtors will not be discharged or impaired by confirmation of the Reorganization Plan provided that the Reorganized Debtors will not indemnify directors of the Reorganization Plan Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud.

All such obligations will be deemed and treated as executory contracts to be assumed by the Reorganization Plan Debtors under the Reorganization Plan and will continue as obligations of the Reorganized Debtors unless any such obligation otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) in accordance with Section 8.1 of the Reorganization Plan.

For the avoidance of doubt, (1) any and all indemnities provided under the Senior Credit Agreement (including the indemnities provided in section 4.05 thereunder) will survive as obligations under the DIP Loan Agreement, and (2) any and all indemnities (and other obligations surviving per their express terms thereunder) provided under the DIP Facility will survive as obligations under the First Out Exit Term Loan or Second Out Exit Term Loan Agreement, as applicable, notwithstanding in each case the cancellation of the predecessor credit agreement(s).

US_ACTIVE:\44238718\1\69252.0041

5.      **Compensation and Benefit Plans**

Except as otherwise provided in the Reorganization Plan, all material employee compensation and Benefit Plans of the Reorganization Plan Debtors in effect as of the Effective Date will be deemed to be, and will be treated as if they were, executory contracts that are to be assumed under the Reorganization Plan.

A detailed description of the Reorganization Plan Debtors' employee compensation and benefit programs and policies in effect as of the Commencement Date is set forth in the *Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. 105(a) and 363(b) (I) Authorizing (A) Payment of Prepetition Wages, Salaries, and Other Compensation and Benefits, (B) Maintenance of Employee Benefits Programs and Payment of Related Administrative Obligations, and (C) Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests, and (II) Modifying the Automatic Stay with Respect to Workers Compensation Claims*, dated February 17, 2013 (ECF No. 12).

Pursuant to the Reorganization Plan, Reorganized Reader's Digest shall assume the Pension Plan on the Effective Date.  The Pension Plan shall be continued in accordance with, and subject to, its terms, and Reorganized Reader's Digest shall satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, be liable for the payment of PBGC premiums in accordance with Title IV of ERISA, subject to any and all applicable rights and defenses of the Reorganized Debtors, and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code.  Notwithstanding any provision of the Reorganization Plan or the Confirmation Order to the contrary, the Pension Plan shall be continued and administered in accordance with, and subject to, its terms and ERISA and the Internal Revenue Code.  All claims related to the Pension Plan and all proofs of claim filed on account thereof shall be deemed withdrawn as of the Effective Date without any further action.

6.      **Insurance Policies**

Pursuant to the Reorganization Plan, all insurance policies pursuant to which the Reorganization Plan Debtors have any obligations in effect as of the date of the Confirmation Order will be deemed and treated as executory contracts pursuant to the Reorganization Plan and will be assumed by the respective Reorganization Plan Debtors and Reorganized Debtors and will continue in full force and effect.  All other insurance policies will revest in the Reorganized Debtors.

7.      **Intellectual Property Licenses and Agreements**

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Reorganization Plan Debtors have any rights or obligations in effect as of the date of the Confirmation Order will be deemed and treated as executory contracts pursuant to the Reorganization Plan and will be assumed by the respective Reorganization Plan Debtors and Reorganized Debtors and will continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected

pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) in accordance with Section 8.1 of the Reorganization Plan.  Unless otherwise noted in the Reorganization Plan, all other intellectual property contracts, licenses, royalties, or other similar agreements will revest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such revesting as contemplated in the Reorganization Plan.

**8.**    **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease by the Reorganization Plan Debtors on any exhibit, schedule or other annex to the Reorganization Plan or in the Plan Supplement, nor anything contained in the Reorganization Plan, will constitute an admission by the Reorganization Plan Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Reorganization Plan Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Nothing in the Reorganization Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Reorganization Plan Debtors and the Reorganized Debtors under any executory or non executory contract or any unexpired or expired lease.

Nothing in the Reorganization Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Reorganization Plan Debtors or the Reorganized Debtors under any executory or non executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganization Plan Debtors or Reorganized Debtors, as applicable, will have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**I.**    **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

**1.**    **Conditions Precedent to Confirmation**

The occurrence of Confirmation is subject to the following conditions precedent:

(a)    the entry of the Disclosure Statement Order;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance satisfactory to the Required Consenting Secured Parties;

(c)    the Bankruptcy Court shall have entered the Confirmation Order;

(d)    the occurrence of the Confirmation Date;

US_ACTIVE:\44238718\1\69252.0041

(e)     an order has been entered (which may be the Confirmation Order) finding that all Claims against the Reorganization Plan Debtors have been forever discharged, including without limitation, any FTC Claims;

(f)     the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect and no defaults or event of default thereunder shall have occurred and remain continuing (to the extent not otherwise cured or waived in accordance with the terms of the Restructuring Support Agreement); and

(g)     the DIP Loan Agreement shall not have been terminated, shall be in full force and effect and no default or event of default thereunder shall have occurred and remain occurring (to the extent not otherwise cured or waived in accordance with the terms of the DIP Loan Agreement).

**2.      Conditions Precedent to the Effective Date**

The occurrence of the Effective Date of the Reorganization Plan is subject to the following conditions precedent:

(a)     the Definitive Documents shall contain terms and conditions consistent in all material respects with this Reorganization Plan and the Restructuring Support Agreement and shall otherwise be reasonably satisfactory in all respects to the Reorganization Plan Debtors and the Required Consenting Secured Parties;

(b)     all actions, documents and agreements necessary to implement and consummate the Reorganization Plan, including, without limitation, entry into the documents contained in the Plan Supplement, including the Definitive Documents with respect to the First Out Exit Term Loan Agreement, the First Out Letter of Credit Facility, the Second Out Exit Term Loan Agreement, and the Amended Organizational Documents, each in form and substance reasonably satisfactory to the Reorganization Plan Debtors and the Required Consenting Secured Parties, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(c)     the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall have become a Final Order;

(d)     the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

US_ACTIVE:\44238718\1\69252.0041

(e)      no material adverse change shall have occurred regarding the feasibility of the Reorganization Plan or the consummation of the Restructuring including with respect to contingent and unliquidated claims;

(f)      all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Reorganization Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(g)      unless on or prior to the Effective Date, (1) the Roll-Up Loans, the New Money Loans and the obligations under the DIP Facility shall have been paid in full in Cash and the letters of credit under the DIP Loan Agreement shall have been terminated, or (2) the conditions precedent to the effectiveness of the First Out Exit Facilities, as set forth in the First Out Exit Term Sheet, shall have been satisfied or waived by the Consenting Lender and the conditions precedent to the effectiveness of the Second Out Term Loan Agreement shall have been satisfied or waived by the New Money Lenders;

(h)      All the conditions precedent to the effectiveness of the Second Out Exit Loan Agreement shall have been satisfied or waived by the requisite New Money Lenders;

(i)      the Non-Dischargeability Deadline shall have expired and (1) no nondischargeability complaint shall have been filed or remain pending, and (2) no Claim in excess of $50,000 shall have been determined by the Bankruptcy Court to be non-dischargeable under the Bankruptcy Code; and

(j)      the DIP Loan Agreement shall not have been terminated, shall be in full force and effect and no default or event of default thereunder shall have occurred.

**3.**    <u>**Waiver of Conditions Precedent**</u>

Each of the conditions precedent in Sections 9.1 and 9.2 of the Reorganization Plan may be waived in writing by the Reorganization Plan Debtors together with the prior written consent of the Required Consenting Secured Parties.

US_ACTIVE:\44238718\1\69252.0041

4.      **Effect of Failure of Conditions to Effective Date**

Unless otherwise extended by the Reorganization Plan Debtors with the consent of the Required Consenting Secured Parties, if the Effective Date does not occur on or before July 31, 2013 or if the Confirmation Order is vacated, (1) no distributions under the Reorganization Plan will be made, (2) the Reorganization Plan Debtors and all holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (3) all the Reorganization Plan Debtors' obligations with respect to the Claims and the Interests will remain unchanged and nothing contained in the Reorganization Plan will be deemed to constitute a waiver or release of any claims by or against the Reorganization Plan Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Reorganization Plan Reorganization Plan Debtors or otherwise.

J.      **EFFECT OF CONFIRMATION**

1.      **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Reorganization Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto (including all rights under the Security Agreement), whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganization Plan Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

2.      **Vesting of Assets**

In accordance with the Reorganization Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Reorganization Plan Debtors' estates, including without limitation, the intellectual property licenses and other agreements set forth in Section 8.7 of the Reorganization Plan, will vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to the Reorganization Plan, the Confirmation Order, the First Out Exit Term Loan Agreement, or the Second Out Exit Term Loan Agreement.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Reorganization Plan.

3.      **Discharge of Claims and Termination of Interests**

Except as otherwise provided in the Reorganization Plan, effective as of the Effective Date:  (1) the rights afforded in the Reorganization Plan and the treatment of all claims and interests will be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims

60

from and after the Commencement Date, against the Reorganization Plan Debtors or any of their assets, property or estates; (2) the Reorganization Plan will bind all holders of claims and interests, notwithstanding whether any such holders failed to vote to accept or reject the Reorganization Plan or voted to reject the Reorganization Plan; (3) all claims and interests will be satisfied, discharged, and released in full, including without limitation, any FTC Claims, and the Reorganization Plan Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (4) all entities will be precluded from asserting against the Reorganization Plan Debtors, the Reorganization Plan Debtors' estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other claims or interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

### 4.   Term of Injunctions or Stays

Unless otherwise provided in the Reorganization Plan, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 5.   Injunction Against Interference with Plan

From and after the Effective Date, all entities will be permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to the Reorganization Plan or the Confirmation Order.

### 6.   Releases by the Reorganization Plan Debtors

**As of the Effective Date, except for the right to enforce the Reorganization Plan and the Definitive Documents that remain in effect after the Effective Date, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Reorganization Plan Debtors and the implementation of the restructuring contemplated by the Reorganization Plan, on and after the Effective Date, the Released Parties will be deemed released and discharged by the Reorganization Plan Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Reorganization Plan Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Reorganization Plan Debtors, the Reorganized Debtors, the Estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Reorganization Plan Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Reorganization Plan Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or**

61

Interest that is treated in the Reorganization Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Reorganization Plan, or related agreements, instruments or other documents, the solicitation of votes with respect to the Reorganization Plan, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud; **provided**, **however**, that nothing in the Reorganization Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

7.      Releases By Holders of Claims and Interests

As of the Effective Date, except for the right to enforce the Reorganization Plan and the Definitive Documents that remain in effect after the Effective Date and the indemnification obligations that survive the Effective Date, each holder of a Claim or an Interest will be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganization Plan Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Reorganization Plan Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Reorganization Plan Debtors, the Reorganization Plan Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Reorganization Plan Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Reorganization Plan, the business or contractual arrangements between any Reorganization Plan Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Reorganization Plan, or related agreements, instruments or other documents, the solicitation of votes with respect to the Reorganization Plan, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud; **provided**, **however**, that no provision of the Reorganization Plan will be deemed to constitute a release or waiver by the Consenting Lender, the Administrative Agent or the Consenting Secured Noteholders of any rights arising from or in connection with Section 5.5 of the Security Agreement; **provided** **further**, **however**, that nothing in the Reorganization Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).  No Person shall be discharged, released or relieved from any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases or the Reorganization Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability arising under ERISA or the Internal

Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases, the Reorganization Plan's provisions or the Reorganization Plan's Confirmation.

**8.**      <u>Exculpation</u>

No Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, the negotiation and pursuit of the Reorganization Plan, or the solicitation of votes for, or confirmation of, the Reorganization Plan, the funding of the Reorganization Plan, the consummation of the Reorganization Plan, or the administration of the Reorganization Plan or the property to be distributed under the Reorganization Plan, or any other transaction contemplated by the foregoing, except for willful misconduct or gross negligence, but in all respects such entities will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Reorganization Plan. The Reorganization Plan Debtors, the Reorganized Debtors, the Creditors Committee, the DIP Lenders, the DIP Agent, the Administrative Agent, the Senior Credit Agreement Lenders, the Consenting Lender, the Consenting Secured Noteholders, the Indenture Trustee, the Unsecured Administrative Agent, the 2011 Secured Administrative Agent, the Unsecured Lenders, and the 2011 Secured Lenders (and each of their respective affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Reorganization Plan, and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Reorganization Plan or such distributions made pursuant to the Reorganization Plan, including the issuance of securities thereunder; <u>provided</u>, <u>however</u>, that no provision of the Reorganization Plan will be deemed to constitute a release or waiver by the Consenting Lender, the Administrative Agent or the Consenting Secured Noteholders of any rights arising from or in connection with Section 5.5 of the Security Agreement; <u>provided</u> <u>further</u>, <u>however</u>, that nothing in the Reorganization Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009). No Person shall be discharged, released or relieved from any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases or the Reorganization Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases, the Reorganization Plan's provisions or the Reorganization Plan's Confirmation.

**9.**      <u>Retention of Causes of Action/Reservation of Rights</u>

Except as otherwise provided in the Reorganization Plan, including Sections 10.6, 10.7, 10.8 and 10.9 of the Reorganization Plan, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Reorganization Plan Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court,

US_ACTIVE:\44238718\1\69252.0041

including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim and/or Claim for setoff which seeks affirmative relief against the Reorganization Plan Debtors, the Reorganized Debtors, their officers, directors or representatives; and (ii) the turnover of any property of the Reorganization Plan Debtors' estates; provided, however, that the Reorganized Debtors will not retain (1) any Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, which Claims or Causes of Action are preserved pursuant to the Reorganization Plan); or (2) any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures).  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

Except as otherwise provided in the Reorganization Plan, including Sections 10.6, 10.7, 10.8 and 10.9 of the Reorganization Plan, nothing contained in the Reorganization Plan or in the Confirmation Order will be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff or other legal or equitable defense which the Reorganization Plan Debtors had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Reorganization Plan; provided, however, that the Reorganized Debtors will not retain (1) any Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, which Claims or Causes of Action will be preserved by the Reorganization Plan); or (2) any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures).  The Reorganized Debtors will have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Reorganization Plan as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Reorganization Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

## 10.    Solicitation of the Reorganization Plan

As of and subject to the occurrence of the Confirmation Date:  (1) the Reorganization Plan Debtors will be deemed to have solicited acceptances of the Reorganization Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (2) the Reorganization Plan Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys will be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and

US_ACTIVE:\44238718\1\69252.0041

issuance of any securities under the Reorganization Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Reorganization Plan or the offer and issuance of any securities under the Reorganization Plan.

## 11.    **Section 1145 Exemption**

The issuance of and the distribution under the Reorganization Plan of the New Common Stock to the holders of Senior Noteholder Secured Claims under Section 4.3 of the Reorganization Plan will be exempt from registration under the Securities Act of 1933 or applicable securities laws without further act or action by any Person pursuant to section 1145(a) of the Bankruptcy Code.

In addition, under section 1145 of the Bankruptcy Code, any securities issued under the Reorganization Plan which are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (2) compliance with any rules and regulations of the Securities and Exchange Commission (the "**SEC**"), if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments; and (4) applicable regulatory approval.

## 12.    **Plan Supplement**

The Plan Supplement will be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at the website of the Reorganization Plan Debtors' notice, claims, and solicitation agent as they become available. Documents to be filed with the Plan Supplement include, but are not limited to, substantially final forms of the Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Reorganization Plan Debtors' existing organizational documents and by laws), the Schedule of Assumed Contracts, the First Out Exit Term Loan Agreement, the Second Out Exit Term Loan Agreement, the Registration Rights Agreement, the Stockholders Agreement, and to the extent known, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; provided, that, through the Effective Date, the Reorganization Plan Debtors will have the right to amend the First Out Exit Term Loan Agreement, the Second Out Exit Term Loan Agreement, the Amended Organizational Documents, the Registration Rights Agreement, the Stockholders Agreement, and any schedules, exhibits or amendments thereto, and the other documents contained in, and exhibits to, the Plan Supplement with the consent of the Required Consenting Secured Parties.

Attached hereto as **Exhibit E** is a copy of a term sheet for the proposed Stockholders Agreement received from the Ad Hoc Committee.  The final form of the Stockholders Agreement will be included in the Plan Supplement and will take into consideration, among other things, the Amended Organizational Documents.

### 13.    Corporate and Limited Liability Company Action

Upon the Effective Date, all actions contemplated by the Reorganization Plan will be deemed authorized and approved in all respects, including (1) the assumption of all employee compensation and Benefit Plans of the Reorganization Plan Debtors as provided in the Reorganization Plan, (2) the selection of the managers, directors, and officers for the Reorganized Debtors, (3) the distribution of the New Common Stock, (4) the entry into the First Out Exit Facilities and the Second Out Exit Term Loan Agreement, (5) the approval of the Restructuring Support Agreement, and (6) all other actions contemplated by the Reorganization Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms of the Reorganization Plan.  All matters provided for in the Reorganization Plan involving the corporate or limited liability company structure of the Reorganization Plan Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Reorganization Plan Debtors or the Reorganized Debtors in connection with the Reorganization Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Reorganization Plan Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Reorganization Plan Debtors or the Reorganized Debtors, as applicable, will be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Reorganization Plan (or necessary or desirable to effect the transactions contemplated by the Reorganization Plan) in the name of and on behalf of the Reorganized Debtors, including (a) the Amended Organizational Documents, (b) the First Out Exit Facilities, (c) the Second Out Exit Term Loan Agreement, and (d) any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by Section 10.13 of the Reorganization Plan will be effective notwithstanding any requirements under non-bankruptcy law.

### K.    RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Reorganization Plan;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

US_ACTIVE:\44238718\1\69252.0041

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Reorganization Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Reorganization Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Reorganization Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Reorganization Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Reorganization Plan or to maintain the integrity of the Reorganization Plan following consummation;

(k)    to hear any disputes arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(l)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)    to adjudicate, decide, or resolve any Causes of Actions;

67

(o)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(p)    to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(q)    to adjudicate any and all disputes arising from or relating to distributions under the Reorganization Plan;

(r)    to hear and determine any other matters related to the Reorganization Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(s)    to enter a final decree closing the Chapter 11 Cases;

(t)    to recover all assets of the Reorganization Plan Debtors and property of the Reorganization Plan Debtors' estates, wherever located; and

(u)    to hear and determine any rights, Claims or causes of action held by or accruing to the Reorganization Plan Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

For the avoidance of doubt, the Bankruptcy Court will not retain jurisdiction over any matters arising in connection with the Exit Financing or any transactions related thereto.

## L.    **MISCELLANEOUS PROVISIONS**

### 1.    **Payment of Statutory Fees**

On the Effective Date and thereafter as may be required, the Reorganized Plan Debtors shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Reorganization Plan Debtor's case, or until such time as a final decree is entered closing a particular Reorganization Plan Debtor's case, a Final Order converting such Reorganization Plan Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing such Reorganization Plan Debtor's case is entered.

### 2.    **Substantial Consummation**

On the Effective Date, the Reorganization Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 3.    **Dissolution of Creditors Committee**

On the Effective Date, the Creditors Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the

US_ACTIVE:\44238718\1\69252.0041

Chapter 11 Cases; *provided, however,* the Creditors Committee shall exist, and its professionals shall be retained, after the Effective Date with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order.

### 4.        Request for Expedited Determination of Taxes

In accordance with the Reorganization Plan, the Reorganized Debtors will have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

### 5.        Amendments

**(a)        Plan Modifications.**  The Reorganization Plan may be amended, modified or supplemented by the Reorganization Plan Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; provided, that such amendments, modifications, or supplements will be satisfactory in all respects to the Reorganization Plan Debtors, the Creditors Committee and the Required Consenting Secured Parties.  In addition, after the Confirmation Date, the Reorganization Plan Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Reorganization Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Reorganization Plan.

**(b)        Other Amendments.**  Before the Effective Date, the Reorganization Plan Debtors may make appropriate technical adjustments and modifications to the Reorganization Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications will be satisfactory to the Required Consenting Secured Parties.

### 6.        Effectuating Documents and Further Transactions

Pursuant to the Reorganization Plan, each of the officers of the Reorganized Debtors will be authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers, to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Reorganization Plan.

For the avoidance of doubt, the Bankruptcy Court will not retain jurisdiction over any matters arising in connection with the Exit Financing or any transactions related thereto.

US_ACTIVE:\44238718\1\69252.0041

**7.**       **Revocation or Withdrawal of the Reorganization Plan**

             The Reorganization Plan Debtors may not revoke or withdraw the Reorganization
Plan before the Effective Date without the consent of the Required Consenting Secured Parties;
provided, however, that the Reorganization Plan Debtors may revoke or withdraw the
Reorganization Plan only if it is in the exercise of the Reorganization Plan Debtors' fiduciary
duty or as otherwise permitted under the Restructuring Support Agreement.  If the
Reorganization Plan Debtors take such action, the Reorganization Plan will be deemed null and
void.  In such event, nothing contained in the Reorganization Plan will constitute or be deemed
to be a waiver or release of any Claims by or against the Reorganization Plan Debtors or any
other person or to prejudice in any manner the rights of the Reorganization Plan Debtors or any
person in further proceedings involving the Reorganization Plan Debtors.

**8.**       **Severability of Plan Provisions upon Confirmation**

             If, before the entry of the Confirmation Order, any term or provision of the
Reorganization Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the
Bankruptcy Court, at the request of the Reorganization Plan Debtors (to be made only with the
consent of the Required Consenting Secured Noteholders), will have the power to alter and
interpret such term or provision to make it valid or enforceable to the maximum extent
practicable, consistent with the original purpose of the term or provision held to be invalid, void
or unenforceable, and such term or provision will then be applicable as altered or interpreted;
provided, however, that any such alteration and interpretation will be acceptable to the Required
Consenting Secured Parties.  Notwithstanding any such holding, alteration or interpretation, the
remainder of the terms and provisions of the Reorganization Plan will remain in full force and
effect and will in no way be affected, impaired or invalidated by such holding, alteration or
interpretation.  The Confirmation Order will constitute a judicial determination and will provide
that each term and provision of the Reorganization Plan, as it may have been altered or
interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms;
(2) integral to the Reorganization Plan and may not be deleted or modified without the consent of
the Reorganization Plan Debtors or the Reorganized Debtors (as the case may be); and
(3) nonseverable and mutually dependent.

**9.**       **Governing Law**

             Except to the extent that the Bankruptcy Code or other federal law is applicable,
or to the extent an exhibit to the Reorganization Plan or a schedule in the Plan Supplement
provides otherwise, the rights, duties and obligations arising under the Reorganization Plan will
be governed by, and construed and enforced in accordance with, the laws of the State of New
York, without giving effect to the principles of conflict of laws thereof.

**10.**      **Time**

             In computing any period of time prescribed or allowed by the Reorganization
Plan, unless otherwise set forth in the Reorganization Plan or determined by the Bankruptcy
Court, the provisions of Bankruptcy Rule 9006 will apply.

US_ACTIVE:\44238718\1\69252.0041

11.    **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Reorganization Plan and Plan Supplement will be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganization Plan Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

12.    **Successor and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Reorganization Plan will be binding on, and will inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

13.    **Entire Agreement**

On the Effective Date, the Reorganization Plan, the Plan Supplement and the Confirmation Order will supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Reorganization Plan.

14.    **Notices**

All notices, requests and demands to or upon the Reorganization Plan Debtors to be effective must be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Reorganization Plan, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i) if to the Reorganization Plan Debtors or Reorganized Debtors:

RDA Holding Co.
750 Third Avenue
New York, New York 10017
Facsimile:  (914) 244-7810
Attn:  Andrea Newborn, Esq.

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Joseph H. Smolinsky, Esq.
       Marcia L. Goldstein, Esq.
       Matthew P. Goren, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

71

(ii) if to the Creditors Committee:

> Otterbourg, Steindler, Houston & Rosen, P.C.
> 230 Park Avenue
> New York, New York 10169
> Attn:  Scott L. Hazan, Esq.
>         David M. Posner, Esq.
> Telephone:  (212) 661-9100
> Facsimile:  (212) 682-6104

(iii) if to the Administrative Agent, the Senior Credit Agreement Lenders, the Issuing Lender, the Consenting Lender, the Roll-Up Lender, or the DIP Lender:

> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, New York 10005
> Attn:   Abhilash M. Raval, Esq.
>         Blair M. Tyson, Esq.
>         Michael E. Comerford. Esq.
> Telephone:  (212) 530-5000
> Facsimile:  (212) 530-5219

(iv) if to the New Money Lenders, the Consenting Secured Noteholders, or the DIP Agent:

> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois 60654
> Attn:  James H.M. Sprayregen, P.C.
> Telephone:  (312) 862-2000
> Facsimile:  (312) 862-2200

> - and -

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attn:   Paul M. Basta, Esq.
>         Nicole L. Greenblatt, Esq.
> Telephone:  (212) 446-4800
> Facsimile:  (212) 446-4900

After the Effective Date, the Reorganization Plan Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganization Plan Debtors are authorized to limit the list of Entities

72

receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## VII.

## VALUATION OF THE REORGANIZATION PLAN DEBTORS

> **THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE FOR THE REORGANIZATION PLAN DEBTORS AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE REORGANIZATION PLAN DEBTORS.**

In connection with developing the Reorganization Plan, the Reorganization Plan Debtors directed Evercore to estimate the going-concern value of the Reorganized Debtors. This analysis has been prepared for the Reorganization Plan Debtors' sole use and is based on information provided to Evercore by the Reorganization Plan Debtors.

In preparing the estimated total enterprise value range for the Reorganized Debtors, Evercore: (1) reviewed certain historical financial information of the Reorganization Plan Debtors for recent years and interim periods; (2) met with certain members of the Reorganization Plan Debtors' senior management to discuss the Reorganization Plan Debtors' operations and future prospects; (3) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Reorganization Plan Debtors; (4) considered certain economic and industry information relevant to the Reorganization Plan Debtors' operating businesses; (5) reviewed certain analyses prepared by other firms retained by the Reorganization Plan Debtors; and (6) conducted such other analyses as Evercore deemed appropriate.

Although Evercore conducted a review and analysis of the Reorganization Plan Debtors' businesses, operating assets and liabilities, and business plans, Evercore relied on the accuracy and completeness of all financial and other information furnished to it by the Reorganization Plan Debtors and by other firms retained by the Reorganization Plan Debtors and publicly available information.

Evercore has relied on the Reorganization Plan Debtors' representation and warranty that financial projections provided by the Reorganization Plan Debtors to Evercore (1) have been prepared in good faith, (2) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflect the Reorganization Plan Debtors' best currently available estimates, and (4) reflect the good faith judgments of the Reorganization Plan Debtors. Evercore does not offer an opinion as to the attainability of the Reorganization Plan Debtors' financial projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Reorganization Plan Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from their financial projections and as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

73

No independent evaluations or appraisals of the Reorganization Plan Debtors' assets were sought or were obtained in connection therewith. Evercore did not conduct an independent investigation into any of the legal, tax, pension or accounting matters affecting the Reorganization Plan Debtors, and therefore makes no representations as to their impact on the Reorganization Plan Debtors from a financial point of view.

The following is a brief summary of certain financial analyses performed by Evercore to arrive at a range of estimated total enterprise values for the Reorganized Debtors. The following summary does not purport to be a complete description of all of the analyses and factors undertaken to support its conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

In performing its analysis, Evercore applied the following standard valuation methodologies as applicable to the operations of the Reorganization Plan Debtors: (1) the discounted cash flow methodology and (2) the peer group company trading multiples methodology. In addition, Evercore has separately considered the net cash proceeds the Reorganization Plan Debtors are projected to receive from businesses the Reorganization Plan Debtors plan to wind-down after the Effective Date.

The discounted cash flow methodology involved deriving the unlevered free cash flows that the Reorganization Plan Debtors' operations would generate assuming the financial projections were realized. To determine the enterprise value range, these cash flows and an estimated enterprise value at the end of the projection period were discounted to an assumed emergence date of July 31, 2013, using the estimated weighted average cost of capital.

The peer group company trading multiples methodology involved identifying a group of publicly-traded companies whose businesses and operating characteristics are generally similar to the Reorganization Plan Debtors' North American operations, although no selected company is either identical or directly comparable to the business of the Reorganized Debtors' North American operations. Evercore then developed a range of valuation multiples to apply to the Reorganization Plan Debtors' North American financial projections to derive a range of implied enterprise values for the Reorganization Plan Debtors' North American operations. Additionally, the Reorganization Plan Debtors' unallocated corporate overhead expenses were valued separately and deducted from the remaining total enterprise value.

Based on the financial projections set forth in **Exhibit C** hereto (the "**Financial Projections**") and subject to the disclaimers and the descriptions of Evercore's methodology set forth herein, and solely for purposes of the Reorganization Plan, Evercore estimates the total enterprise value of the Reorganized Debtors to be between approximately $245 million and $365 million, with an implied midpoint of Debtors' $305 million, as of an assumed Effective Date of July 31, 2013. The range of total equity value, which takes into account the total enterprise value less the estimated average net debt outstanding, based on available cash, for the four quarters following the assumed Effective Date of July 31, 2013, was estimated by Evercore to be between approximately $171 million and $291 million, with an implied midpoint of $231 million. These values do not give effect to the potentially dilutive impact of any New Common Stock, warrants

74

or options that may be granted under any contemplated or future management equity plan. The implied total enterprise value should be considered as a whole, and the underlying analyses should not be considered indicative of the values of any individual operation.

In arriving at its valuation estimate, Evercore did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Evercore believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. Evercore's analysis includes multiple valuation methodologies. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to total enterprise value.

This valuation is based upon information available to, and analyses undertaken by, Evercore as of March 15, 2013, and reflects, among other factors discussed below, the Reorganization Plan Debtors' North American and on-going International operations' income statements and balance sheets, projections regarding future royalty streams, projections regarding unallocated corporate overhead, projections regarding net proceeds from the anticipated wind-down of certain businesses, current financial market conditions and the inherent uncertainty today as to the achievement of the Reorganization Plan Debtors' financial projections prepared by the Reorganization Plan Debtors. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Evercore has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the assumed Effective Date. Events and conditions subsequent to this date, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the Reorganization Plan Debtors' value. Neither Evercore nor the Reorganization Plan Debtors has any obligation to update, revise or reaffirm the valuation.

This valuation also reflects a number of assumptions, including a successful reorganization of the Reorganization Plan Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the financial projections, the amount of available cash, market conditions and the Reorganization Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Reorganization Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

Further, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates; conditions in the financial markets; the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value of the Reorganization Plan Debtors or their securities. Such trading value may be materially different from the total enterprise value

US_ACTIVE:\44238718\1\69252.0041

ranges associated with Evercore's valuation analysis. Indeed, there can be no assurance that any trading market will develop for the New Common Stock. Furthermore, in the event that the actual distributions in these Chapter 11 Cases differ from those the Reorganization Plan Debtors assumed in their recovery analysis, impaired classes Claims holders' actual recoveries could be significantly higher or lower than estimated by the Reorganization Plan Debtors.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Reorganization Plan Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of their businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Reorganization Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Reorganization Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Reorganization Plan Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Evercore's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Reorganization Plan. The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Reorganization Plan or of the terms and provisions of the Reorganization Plan. Because valuation estimates are inherently subject to uncertainties, neither the Reorganization Plan Debtors, Evercore nor any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

## VIII.

### CERTAIN FACTORS AFFECTING THE REORGANIZATION PLAN DEBTORS

**A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

**1.    Risk of Non-Confirmation of the Reorganization Plan of Reorganization**

Although the Reorganization Plan Debtors believe that the Reorganization Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Reorganization Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

**2.    Non-Consensual Confirmation**

In the event any impaired class of claims or interests entitled to vote on a plan of reorganization does not accept a plan of reorganization, a bankruptcy court may nevertheless

76

confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. *See* Section X.C.2 ("Requirements of Section 1129(b) of the Bankruptcy Code"). The Reorganization Plan Debtors believe that the Reorganization Plan satisfies these requirements.

### 3.   Risk of Delay in Confirmation of the Reorganization Plan

Although the Reorganization Plan Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. The Restructuring Support Agreement contemplates an outside exit date of July 31, 2013.

### 4.   Risks Related to the Restructuring Support Agreement and DIP Facility

In the event of a breach or termination of the Restructuring Support Agreement, the Reorganization Plan Debtors' ability to reorganize will be delayed. In addition, in the event of a default under the DIP Loan Agreement, the DIP Lenders may seek, among other things, certain remedies with respect to the Collateral (as defined in the DIP Loan Agreement), and take certain other actions against the Reorganization Plan Debtors.

## B.   ADDITIONAL FACTORS TO BE CONSIDERED

### 1.   The Reorganization Plan Proponents Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Reorganization Plan Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Reorganization Plan Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 2.   No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Reorganization Plan Debtors, the Chapter 11 Cases, or the Reorganization Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Reorganization Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 3.   Financial Projections Are Not Assured, Actual Results May Vary, and Variances from Financial Projections May Occur

The fundamental premise of the Reorganization Plan is the reduction of the Reorganization Plan Debtors' debt levels and the implementation and realization of the Reorganization Plan Debtors' business plan, as reflected in the financial projections set forth in

US_ACTIVE:\44238718\1\69252.0041

the Financial Projections.  The Financial Projections reflect numerous assumptions concerning
the anticipated future performance of the Reorganization Plan Debtors, some of which may not
materialize.  Such assumptions include, among other items, assumptions concerning the
economy, the ability to effectuate management's business plan, and control future operating
expenses.  The Reorganization Plan Debtors believe that the assumptions underlying the
Financial Projections are reasonable.  However, unanticipated events and circumstances
occurring subsequent to the preparation of the Financial Projections may affect the actual
financial results of the Reorganization Plan Debtors.  Therefore, the actual results achieved
throughout the periods covered by the Financial Projections necessarily will vary from the
projected results, and such variations may be material and adverse.

Certain of the information contained in this Disclosure Statement is, by nature,
forward looking, and contains estimates and assumptions which might ultimately prove to be
incorrect, and contains projections including, without limitation, the Financial Projections, which
may be materially different from actual future experiences.  There are uncertainties associated
with any projections and estimates, including, without limitation, the projections and Financial
Projections and estimates herein should not be considered assurances or guarantees of the
amount of funds or the amount of Claims in the various Classes that might be allowed.

### 4.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement

The contents of this Disclosure Statement should **not** be construed as legal,
business or tax advice.  Each holder of a Claim or Interest should consult his, her, or its own
legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or
Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement
may not be relied upon for any purpose other than to determine how to vote on the
Reorganization Plan or object to confirmation of the Reorganization Plan.

### 5.      No Admission Made

Nothing contained in the Reorganization Plan will constitute an admission of, or
be deemed evidence of, the tax or other legal effects of the Reorganization Plan on the
Reorganization Plan Debtors or on holders of Claims or Interests.

### 6.      A Liquid Trading Market for the New Common Stock is Unlikely to Develop

A liquid trading market for the New Common Stock is unlikely to develop.  As of
the Effective Date, the New Common Stock will not be listed for trading on any stock exchange
or trading system and the Reorganized Debtors will not file any reports with the SEC.
Consequently, the trading liquidity of the New Common Stock will be limited as of the Effective
Date.  The future liquidity of the trading markets for New Common Stock will depend, among
other things, upon the number of holders of such securities, whether such securities become
listed for trading on an exchange or trading system at some future time and whether the
Reorganized Debtors begin to file annual and quarterly reports with the SEC.

US_ACTIVE:\44238718\1\69252.0041

7.    **Business Factors and Competitive Conditions**

(a)    **General Economic Environment**

The recent financial crisis and economic downturn has adversely affected economic activity globally.  The Reorganization Plan Debtors' operations and performance depend significantly on worldwide economic conditions.  Customers across all of the Reorganization Plan Debtors' businesses have been delaying and reducing their expenditures in response to deteriorating macroeconomic and industry conditions and uncertainty, which has had a significant negative impact on the demand for the Reorganization Plan Debtors' products and therefore the cash flows of their businesses, and could continue to have a negative impact on the Reorganization Plan Debtors' liquidity and capital resources.  Most of the Reorganization Plan Debtors' products involve discretionary spending on the part of consumers, which is influenced by general economic conditions and the availability of discretionary income.  In particular, economic conditions in Europe could adversely affect the Reorganization Plan Debtors' direct marketing business.  In addition, revenue from advertising has decreased as advertising budgets have been scaled back and advertisers have shifted their advertising dollars to more directed platforms, including the Internet.  The impact of decreasing print advertising revenue may impact the Reorganization Plan Debtors' products that are more heavily dependent on advertising.  In addition, the Reorganization Plan is reliant on the success of strategic partnerships, which are dependent on the Reorganization Plan Debtors' ability to offer products and services that appeal to their customer base.  Additionally, a number of risks that the Reorganization Plan Debtors ordinarily face may increase in likelihood, magnitude and duration.  These risks include, but are not limited to, deferrals or reductions of customer orders, potential deterioration of the Reorganization Plan Debtors' customers' ability to pay, losses or impairment charges, reduced revenue, deterioration in the Reorganization Plan Debtors' cash balances, impaired liquidity due to foreign exchange impacts because the Reorganization Plan Debtors' functional currency is the applicable local currency, an inability to access the capital markets, a further reduction in the amount of money that advertisers have available to spend for advertising in the Reorganization Plan Debtors' products, increases in gas prices, which affect the Reorganization Plan Debtors' costs, increases in postage rates, unfavorable regulations and the Reorganization Plan Debtors' continued ability to achieve cost savings.  The Reorganization Plan Debtors expect to continue facing challenges resulting from global economic conditions.

(b)    **Implementation of Business Plan**

The Reorganization Plan Debtors believe that they will succeed in implementing and executing their business plan and financial restructuring.  However, there are risks that the goals of the Reorganization Plan Debtors' going-forward business plan and financial restructuring strategy will not be achieved.  In such event, the Reorganization Plan Debtors may be unable to refinance maturing term debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.

In the ordinary course of business, the Reorganization Plan Debtors repatriate excess cash from their international operations as repayment for intercompany debts.  However, there is no certainty that the Reorganization Plan Debtors will be able to repatriate excess cash

US_ACTIVE:\44238718\1\69252.0041

from either the wind down or ongoing operations of international operations, which would affect the liquidity of the Reorganization Plan Debtors.

### (c)      Anticipation of Customer Preferences

The Reorganization Plan Debtors operate in highly competitive markets that are subject to rapid change, including changes in customer preferences.  The Reorganization Plan Debtors' success depends on their ability to address the secular shift away from traditional print media and to provide products that appeal to a large number of existing and new customers. There are substantial uncertainties associated with the Reorganization Plan Debtors' efforts to develop successful products and services for the Reorganization Plan Debtors' customers, as well as to adapt their print materials and music and video products to new technologies, including the Internet and digitization.  The Reorganization Plan Debtors cannot be sure that their new ideas and content will have broad appeal and success, or that they will be able to respond quickly to changes in the tastes and preferences of consumers. Adapting to changing consumer preferences has some degree of uncertainty as they test new products and approaches. In addition, the continuing growth and technological expansion of digital and Internet-based services has increased existing competitive pressure on the Reorganization Plan Debtors' media businesses.  As web-based and digital formats attract an increasingly larger share of consumer readership, the Reorganization Plan Debtors may continue to lose customers or fail to attract new customers if they are not able to transition their publications and other products to these new formats.  Furthermore, to the extent that advertisers shift advertising expenditures to new media outlets, the Reorganization Plan Debtors' advertising revenue will decrease even if the Reorganization Plan Debtors are able to maintain their current share of print media advertising dollars.

### (d)      Development of Digital Channels

The competitive environment in which the Reorganization Plan Debtors operate demands, and their future growth strategies incorporate, the development of their digital channels.  The Reorganization Plan Debtors believe there is a trend towards offering supplemental materials to their published products, as well as the opportunity to renew subscriptions electronically and consume media in an electronic form.  The Reorganization Plan Debtors believe that this trend will accelerate as younger, technologically savvy customers make up a greater portion of their potential customer base. In order for the digital channels to succeed, the Reorganization Plan Debtors must significantly invest time and resources in them, including to:  adapt their organization and operating model to implement their multi-channel distribution strategy with strong digital elements; continue to develop and upgrade their digital technologies and supporting processes; sell advertising in significant markets, and be a compelling choice for advertisers online; successfully digitize new and existing content in their global digital library; attract and retain a base of frequent, engaged visitors to their websites; build an e-commerce revenue stream by engaging visitors in product purchasing on their websites; obtain and build digital subscriptions for their products; build partnerships to advance advertising and distribution strategies online and leverage other new technologies; attract and retain talent for critical positions; and continuously advance the Reorganization Plan Debtors' digital offerings based on fast-moving trends that may pose opportunities as well as risks (e.g., e-readers and mobile applications).  The Reorganization Plan Debtors cannot provide assurance that they will be

80

successful in achieving these and other necessary objectives or that the Reorganization Plan Debtors' digital channels will be profitable or successful or be able to effectively compete with competitive products.  The Reorganization Plan Debtors' failure to adapt to new technology or delivery methods, or their choice of one technological innovation over another, may have a material adverse impact on the Reorganization Plan Debtors' ability to compete for new customers or to meet the demands of their existing customers.  Allocation of advertising dollars also is shifting rapidly and dramatically from printed materials towards online advertising.  If the Reorganization Plan Debtors' digital channels are not successful, the Reorganization Plan Debtors could lose significant opportunities for new advertising revenue from digital sources, while also losing advertising revenue from traditional sources due to the reallocation from print to digital advertising.  If the Reorganization Plan Debtors are not successful in achieving these objectives, their business, financial condition and prospects would be adversely affected.

## IX.

## CERTAIN U. S. FEDERAL INCOME TAX CONSEQUENCES OF THE REORGANIZATION PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Reorganization Plan to the Debtors and to holders of Senior Noteholder Secured Claims and General Unsecured Claims.  This discussion does not address the U.S. federal income tax consequences to holders of (1) Claims that are unimpaired, (2) Other Secured Claims, (3) Existing RDA Holding Interests, or (4) Intercompany Interests.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the Treasury regulations promulgated thereunder, judicial authorities, published positions of the Internal Revenue Service ("**IRS**") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties.  The Reorganization Plan Debtors have not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities.  Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, controlled foreign corporations, passive foreign investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, holders that are, or hold Claims through, partnerships or other pass-through entities for U.S. federal income tax purposes, U.S. persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, expatriates and former long-term residents of the United States, persons subject to the alternative minimum tax, and

81

persons holding Claims that are part of a straddle, hedging, constructive sale or conversion transaction).  In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any New Common Stock in the secondary market.

This discussion assumes that the Claims and the New Common Stock are or will be held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.  In addition, this discussion assumes that the form of the transactions contemplated by the Reorganization Plan is respected for U.S. federal income tax purposes.

> **THE FOLLOWING SUMMARY OF CERTAIN
> U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR
> INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL
> TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EXISTING RDA HOLDING INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EXISTING RDA HOLDING INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE REORGANIZATION PLAN DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EXISTING RDA HOLDING INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.      **CONSEQUENCES TO THE DEBTORS**

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (or limited liability companies that are "disregarded entities" wholly owned by members of such group), of which RDA Holding is the common parent, which files a single consolidated U.S. federal income tax return (the "**RDA Group**").  The RDA Group has estimated net operating loss ("**NOL**") carryforwards of approximately $35,000,000 and foreign tax credit carryforwards of approximately $150,000,000 for U.S. federal income tax purposes as of the Commencement Date.  Certain of these tax attributes are subject to existing limitations. The amount of any such NOL carryforwards, foreign tax credit carryforwards and other tax attributes, and the extent to which any limitations apply, remain subject to audit and adjustment by the IRS.

US_ACTIVE:\44238718\1\69252.0041

As discussed below, in connection with the Reorganization Plan, the amount of the RDA Group's NOL may be eliminated, and certain other tax attributes of the RDA Group (such as tax basis in assets and foreign tax credit carryforwards may also be significantly reduced. In addition, the subsequent utilization of any loss and tax credit carryforwards remaining following the Effective Date may be severely restricted.

### 1.    Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan. The amount of COD income incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group must also be reduced. Any reduction in tax attributes in respect of COD income generally does not occur until after the determination of the debtor's income or loss for the taxable year in which the COD is incurred.

The Reorganization Plan Debtors expect to incur substantial COD as a result of the implementation of the Reorganization Plan, with the result that there will be substantial reductions in the tax attributes of the RDA Group, including possible elimination of NOL carryforwards (if not otherwise utilized against current income). The amount of COD incurred will depend primarily on the fair market value of the New Common Stock and the amount of cash, if any, distributed to holders of Claims.

### 2.    Potential Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards, foreign tax credit carryforwards and certain other tax attributes allocable to periods prior to the Effective Date (collectively, "**Pre-Change Losses and Credits**") will be subject to limitation under section 382 of the Tax Code. Any such limitation applies in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from the COD arising in connection with the Reorganization Plan. The Reorganization Plan Debtors believe that there will be tax attributes remaining after the Effective Date to which section 382 of the Tax Code would apply because it is expected that the tax attributes available for reduction will exceed the amount of COD.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its Pre-Change Losses and Credits that may be utilized to offset future taxable income or tax liability is subject to an annual

limitation.  The issuance of the New Common Stock pursuant to the Reorganization Plan will constitute an "ownership change" of the RDA Group for these purposes.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal (in the case of losses and with appropriate adjustments in the case of credits) to the product of (1) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (2) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 2.7% for ownership changes occurring in May 2013).  As discussed below, this annual limitation often may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change.  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, or if certain shareholders claim worthless stock deductions and continue to hold their stock in the corporation at the end of the taxable year, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses and Credits, absent any increases due to recognized built-in gains discussed below.

Accordingly, the impact of an ownership change of the RDA Group pursuant to the Reorganization Plan depends upon, among other things, the amount of Pre-Change Losses and Credits remaining after the reduction of attributes due to the COD, the value of both the stock and assets of the RDA Group at such time, the continuation of its respective business, and the amount and timing of future taxable income.

(a)        **Built in Gains and Losses**

Section 382 of the Tax Code can operate to limit the deduction of certain "built-in" losses recognized subsequent to the date of the ownership change.  If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five (5) years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and Credits and similarly will be subject to the annual limitation.  Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses and Credits against such built-in gain income in addition to its regular annual allowance.  In general, a loss corporation's (or consolidated

84

group's) net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (1) $10,000,000.00 or (2) fifteen percent (15%) of the fair market value of its assets (with certain adjustments) before the ownership change.  It is expected that the RDA Group will be in a net unrealized built-in-gain position as of the Effective Date.

(b)      **Special Bankruptcy Exception**

An exception to the foregoing annual limitation rules generally applies where "qualified creditors" and existing shareholders of a debtor receive, in respect of their claims or equity interests, at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan.  Generally, qualified creditors are creditors who (1) held their claims continuously for at least eighteen (18) months at the time the bankruptcy petition is filed and thereafter or (2) hold claims incurred in the ordinary course of the debtor's business and held those claims continuously since they were incurred.  Under this exception, a debtor's Pre-Change Losses and Credits are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during (at least) the three (3) taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of all debt converted into stock in the reorganization.  Moreover, if this exception applies, any further ownership change of the debtor within a two-year period after the consummation of the chapter 11 plan will preclude the debtor's utilization of any Pre-Change Losses and Credits at the time of the subsequent ownership change against future income.  Although it is possible that the Reorganization Plan Debtors may qualify for this exception, they may, if they so desire, elect not to have the exception apply and instead remain subject to the annual limitation described above.

3.      <u>Alternative Minimum Tax</u>

In general, a U.S. federal alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income at a twenty percent (20%) rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only ninety percent (90%) of a corporation's (or consolidated group's) taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).  Accordingly, usage of the Debtors' NOLs by the Debtors may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

85

B.    **CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS**

As used in this section of the Disclosure Statement, the term "**U.S. Holder**" means a beneficial owner of Senior Noteholder Secured Claims, General Unsecured Claims or New Common Stock that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Senior Noteholder Secured Claims, General Unsecured Claims or New Common Stock, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership.  If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.

1.    **Consequence to Holders of Allowed Senior Noteholder Secured Claims**

(a)    **Gain or Loss**

Pursuant to the Reorganization Plan, and in satisfaction of their respective Claims, holders of Allowed Senior Noteholder Secured Claims will receive their *Pro Rata* share of 100% of the New Common Stock.  In connection with the foregoing, the Reorganization Plan provides that the New Common Stock to be distributed to the holders of Allowed Senior Noteholder Secured Claims is first contributed by RDA Holding to Reader's Digest and then will be distributed by Reader's Digest to the applicable holders of the Allowed Senior Noteholder Secured Claims.

Accordingly, a U.S. Holder of an Allowed Senior Noteholder Secured Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (1) the fair market value of New Common Stock received, other than any amount received in respect of an Allowed Claim for accrued but unpaid interest, and (2) the U.S. Holder's adjusted tax basis in the Allowed Senior Noteholder Secured Claim exchanged therefor (other than any basis attributable to accrued but unpaid interest).  *See* IX.B.1(b) ("Character of Gain or Loss") below. A U.S. Holder will have interest income to the extent of any amount allocable to accrued but unpaid interest not previously included in income.  *See* IX.B.1(c) ("Payment of Accrued Interest") below.

US_ACTIVE:\44238718\1\69252.0041

Generally, a U.S. Holder's adjusted tax basis in an Allowed Senior Noteholder Secured Claim will be equal to the cost of the Claim to such U.S. Holder, increased by any original issue discount ("**OID**") previously included in income. If applicable, a U.S. Holder's tax basis in a Claim will also be (1) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (2) reduced by any cash payments received on the Claim other than payments of qualified stated interest, and by any amortizable bond premium which the U.S. Holder has previously deducted and by the amount of any bad debt deduction claimed with respect to such Claim.

A U.S. Holder's tax basis in the New Common Stock received pursuant to the Reorganization Plan will equal the fair market value of the New Common Stock received. The U.S. Holder's holding period in the New Common Stock received should begin on the day following the exchange date.

Notwithstanding the foregoing, it is possible that the IRS may attempt to treat a holder's receipt of New Common Stock in satisfaction of its Allowed Senior Noteholder Secured Claim as part of a non-recognition transaction. If so treated, such a holder would not be required or permitted to recognize any gain or loss on the exchange of its Allowed Senior Noteholder Secured Claim for New Common Stock. In such case, the holder's tax basis in its New Common Stock should continue to reflect the unrecognized gain or loss. In addition, the holder's holding period in the New Common Stock should include its holding period in its Allowed Senior Noteholder Secured Claim. However, the Reorganization Plan Debtors believe, and the discussion herein assumes, that the satisfaction of the Allowed Senior Noteholder Secured Claims with New Common Stock should be taxable consideration with respect to which gain and loss is recognized as described above.

Holders of Allowed Senior Noteholder Secured Claims are urged to consult their tax advisors regarding the income tax consequences of the exchange of Senior Noteholder Secured Claims for New Common Stock.

**(b)    Character of Gain or Loss**

Except to the extent that any consideration received pursuant to the Reorganization Plan is received in satisfaction of accrued but unpaid interest during its holding period (*see* IX.B.1(c) ("Payment of Accrued Interest") below), where gain or loss is recognized by a U.S. Holder in respect of the satisfaction and exchange of its Claim, such gain or loss will be capital gain or loss except to the extent any gain is recharacterized as ordinary income pursuant to the market discount rules discussed below. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of a capital loss is subject to significant limitations.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (1) its stated principal amount or (2) in the case of a debt instrument

US_ACTIVE:\44238718\1\69252.0041

issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.  The *de minimis* amount is equal to one-quarter of one percent (0.25%) of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity.

Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant interest basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued.  If a U.S. Holder of Claims did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange, up to the amount of gain that the U.S. Holder recognizes in the exchange.

(c)    **Payment of Accrued Interest**

In general, to the extent that any consideration received pursuant to the Reorganization Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income).  Conversely, a U.S. Holder generally incurs a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to its unpaid OID.  Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim would be required to recognize a capital loss upon a taxable exchange of the Claim, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Reorganization Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a *pro rata* allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest).  *See* Section 6.11 of the Reorganization Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  You are urged to consult your own tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

(d)    **Disposition of New Common Stock**

Unless a non-recognition provision applies, and subject to the discussion above with respect to the carryover of market discount (*see* IX.B.1(b) ("Character of Gain or Loss") above) and the discussion of possible ordinary income treatment below, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Common Stock in an

amount equal to the difference between the U.S. Holder's adjusted tax basis in the New Common Stock and the sum of the cash plus the fair market value of any property received from such disposition.  Any such gain or loss generally should be long-term if the U.S. Holder's holding period for its New Common Stock is more than one year at that time.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of a capital loss is subject to significant limitations.

Notwithstanding the above, any gain recognized by a U.S. Holder upon a subsequent taxable disposition of New Common Stock received in exchange for Allowed Senior Noteholder Secured Claims will be treated as ordinary income for U.S. federal income tax purposes to the extent of (1) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Allowed Senior Noteholder Secured Claims and any ordinary loss deductions incurred upon satisfaction of the Allowed Senior Noteholder Secured Claim, less any income (other than interest income) recognized by the U.S. Holder upon satisfaction of the Allowed Senior Noteholder Secured Claim, and (2) with respect to a cash-basis U.S. Holder, in addition to (1), any amounts which would have been included in its gross income if the U.S. Holder's Allowed Senior Noteholder Secured Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### 2. Consequences to Holders of Allowed General Unsecured Claims

On the Effective Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed General Unsecured Claim will receive, in satisfaction of its Claim, its *Pro Rata* share of the GUC Distribution and the RDA GUC Distribution, as applicable, provided that the holders of Allowed General Unsecured Claims against the same Reorganized Debtor, voting as a Class, approve the Reorganization Plan.  Additional distributions may be received from time to time after the Effective Date, *e.g.,* if and when any Disputed Claims are disallowed, and in the event any amounts remain in the Claims Oversight Committee Reserve at the termination of the reserve.

In general, each holder of such an Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference between (1) the amount of cash received by the holder in satisfaction of the Claim (other than any amount received in respect of a Claim for accrued but unpaid interest or, in respect of any amounts received after the Effective Date, treated as imputed interest) and (2) the holder's adjusted tax basis in the Claim (other than any basis attributable to accrued but unpaid interest).  For a discussion of the tax consequences of any Claim for accrued but unpaid interest, *see* IX.B.1(c) ("Payment of Accrued Interest") above.

In the event additional distributions are received by a holder after the Effective Date, the imputed interest provisions of the Tax Code may apply to treat a portion of such additional distributions as imputed interest.  In addition, it is possible that any loss and a portion of any gain realized by a holder may be deferred until all Disputed General Unsecured Claims are resolved (*i.e.*, until the holder has received its final distribution).  Holders are urged to consult their tax advisors regarding the possibility for deferral, and the potential application (and ability to elect out) of the "installment method" of reporting any gain realized in respect of their Claims.

US_ACTIVE:\44238718\1\69252.0041

Where gain or loss is recognized by a holder in respect of its Allowed General Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

### 3.    Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Reorganization Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of twenty-eight percent (28%)) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your own tax advisor regarding these regulations and whether the contemplated transactions under the Reorganization Plan would be subject to these regulations and require disclosure on your tax return.

> **THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS RECEIVING A DISTRIBUTION UNDER THE REORGANIZATION PLAN ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE REORGANIZATION PLAN.**

US_ACTIVE:\44238718\1\69252.0041

## X.

### CONFIRMATION OF THE REORGANIZATION PLAN

**A.**    **CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan.  The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **June 28, 2013 at 10:00 a.m. (Eastern Time)**. The Confirmation Hearing may be adjourned from time-to-time by the Reorganization Plan Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

**B.**    **OBJECTIONS**

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections to confirmation of the Reorganization Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Reorganization Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Reorganization Plan Debtors' estate or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to the chambers of The Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Room 118, White Plains, New York 10601, together with proof of service thereof, and served upon the parties listed below so as to be received no later than the Objection Deadline of **June 14, 2013 at 4:00 p.m. (Eastern Time)**:

US_ACTIVE:\44238718\1\69252.0041

| *Reorganization Plan Debtors* | *Counsel to the Reorganization Plan Debtors* |
|---|---|
| RDA Holding Co. 750 Third Avenue New York, New York 10017 Attn:  Andrea Newborn, Esq. | Weil, Gotshal & Manges LLP, 767 Fifth Avenue New York, New York 10153 Attn: Marcia L. Goldstein, Esq. Joseph H. Smolinsky, Esq. |
| *Office of the U.S. Trustee* | *Counsel to the Creditors Committee* |
| 33 Whitehall Street, 21st Floor New York, New York 10004 Attn: Susan Golden, Esq.  and  271 Cadman Plaza East Suite 4529 Brooklyn, New York 11201 Attn: MaryLou Martin, Esq. | Otterbourg, Steindler, Houston & Rosen, P.C. 230 Park Avenue New York, New York 10169 Attn: Scott L. Hazan, Esq. David M. Posner, Esq. |
| *Counsel to the Ad Hoc Committee* | *Counsel to Wells Fargo* |
| Kirkland & Ellis LLP 601 Lexington Avenue New York, New York 10022 Attn: Paul M. Basta, Esq. Nicole L. Greenblatt, Esq. | Milbank, Tweed, Hadley & McCloy LLP 1 Chase Manhattan Plaza New York, New York 10005 Attn: Abhilash M. Raval, Esq. Blair M. Tyson, Esq. Michael E. Comerford, Esq. |

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

C.    **REQUIREMENTS FOR CONFIRMATION OF THE REORGANIZATION PLAN**

    1.    **Requirements of Section 1129(a) of the Bankruptcy Code**

        (a)    **General Requirements**

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

        (i)    The Reorganization Plan complies with the applicable provisions of the Bankruptcy Code.

US_ACTIVE:\44238718\1\69252.0041

(ii)  The Reorganization Plan Debtors have complied with the applicable provisions of the Bankruptcy Code.

(iii)  The Reorganization Plan has been proposed in good faith and not by any means proscribed by law.

(iv)  Any payment made or promised by the Reorganization Plan Debtors or by a Person issuing securities or acquiring property under the Reorganization Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Reorganization Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Reorganization Plan is reasonable, or if such payment is to be fixed after confirmation of the Reorganization Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)  The Reorganization Plan Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Reorganization Plan, as a Liquidating Trustee under the Reorganization Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy.

(vi)  With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Reorganization Plan or will receive or retain under the Reorganization Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Reorganization Plan Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See* discussion of "Best Interests Test" below.

(vii)  Except to the extent the Reorganization Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Reorganization Plan or is not impaired under the Reorganization Plan.

(viii)  Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Reorganization Plan provides that administrative expenses and priority claims will be paid in full on the Effective Date.

(ix)  At least one class of impaired claims has accepted the Reorganization Plan, determined without including any acceptance

93

of the Reorganization Plan by any insider holding a claim in such class.

(x)    Confirmation of the Reorganization Plan is not likely to be followed by the need for further financial reorganization of the Reorganization Plan Debtors or any successor to the Reorganization Plan Debtors under the Reorganization Plan, unless such liquidation or reorganization is proposed in the Reorganization Plan.  *See* discussion of "Feasibility" below.

(xi)   All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the applicable Plan, have been paid or the applicable Plan provides for the payment of all such fees on the Effective Date of the applicable Plan.

(xii)  The Reorganization Plan Debtors have not obligated themselves to provide such benefits, if any, for the continuation, after the Effective Date, of payment of all "retiree benefits" as defined in Section 1114 of the Bankruptcy Code.

**(b)    Best Interests Test**

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accepts the Reorganization Plan or (2) receives or retains under the Reorganization Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Reorganization Plan Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Reorganization Plan Debtors' assets and properties in a hypothetical chapter 7 liquidation.  The gross amount of Cash available would be the sum of the proceeds from the disposition of the Reorganization Plan Debtors' assets and the Cash held by the Reorganization Plan Debtors at the time of the commencement of the chapter 7 case.  The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Reorganization Plan Debtors' business and the use of chapter 7 for the purposes of liquidation.  Any remaining net Cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code.

The Reorganization Plan Debtors' costs of liquidation under chapter 7 would include the fees payable to chapter 7 trustees in bankruptcy, as well as those that might be payable to attorneys and other professionals that such trustees may engage, plus any unpaid expenses incurred by the Reorganization Plan Debtors during the Chapter 11 Cases and allowed in the chapter 7 cases.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Reorganization Plan Debtors have determined that confirmation of the Reorganization Plan will provide each creditor and shareholder with a recovery that is not less than it would receive pursuant to a liquidation of the Reorganization Plan Debtors under chapter 7 of the Bankruptcy Code.  The Reorganization Plan Debtors' Liquidation Analysis is attached hereto as **Exhibit D**.  Duff & Phelps prepared the Liquidation Analysis, which incorporates certain inputs from FTI relating to the Reorganization Plan Debtors' international businesses.  The Liquidation Analysis shows that in a liquidation of the Reorganization Plan Debtors under chapter 7, there would be no value available to general unsecured creditors.

**The Liquidation Analysis is a comparison of (1) the estimated recoveries for creditors and equity holders of the Reorganization Plan Debtors that may result from the Reorganization Plan and (2) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation.  The Liquidation Analysis is based upon a number of significant assumptions which are described therein.  The Liquidation Analysis does not purport to be a valuation of the Reorganization Plan Debtors' assets and is not necessarily indicative of the values that may be realized pursuant to the Reorganization Plan or in an actual liquidation conducted under chapter 7 of the Bankruptcy Code.**

(c)      <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that the Reorganization Plan is feasible.  A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor.  Since the Reorganization Plan provides for the liquidation of the Reorganization Plan Debtors, the Bankruptcy Court will find that the Reorganization Plan is feasible if it determines that the Reorganization Plan Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Effective Date obligations to pay for the costs of administering and fully consummating the Reorganization Plan and closing the Chapter 11 Cases.

The Reorganization Plan Debtors and the Creditors Committee believe that the Reorganization Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code because the transactions contemplated therein have maximized the value of the Reorganization Plan Debtors' estates, increased the liquid assets available for the satisfaction of Claims, and will enable the distributions contemplated in the Reorganization Plan.

2.      <u>Requirements of Section 1129(b) of the Bankruptcy Code</u>

The Bankruptcy Court may confirm the Reorganization Plan over the rejection or deemed rejection of the Reorganization Plan by a class of claims or equity interests if the Reorganization Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

95

(a)    **No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Reorganization Plan Debtors and the Creditors Committee believe that under the Reorganization Plan all impaired classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Interests having the same priority. Accordingly, the Reorganization Plan Debtors and the Creditors Committee believe the Reorganization Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

(b)    **Fair and Equitable Test**

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is fair and equitable, the Reorganization Plan proponent must demonstrate:

(i)    **Secured Creditors.** With respect to a class of secured claims, the Reorganization Plan provides: (1) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred Cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Reorganization Plan, of at least the value of such holder's interest in the estate's interest in such property, or (2) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (1) or (3) of this paragraph, or (3) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

(ii)    **Unsecured Creditors.** With respect to a class of unsecured claims: (1) the Reorganization Plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the Reorganization Plan, equal to the allowed amount of such claim, or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Reorganization Plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of section 1129.

(iii)    **Holders of Equity Interests**. With respect to a class of equity interests: (1) the Reorganization Plan provides that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the Reorganization Plan, equal to the greatest of the allowed amount of any fixed liquidation

96

preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (2) the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Reorganization Plan on account of such junior interest any property.

The Reorganization Plan Debtors and the Creditors Committee believe the Reorganization Plan will satisfy the "fair and equitable" requirement.

### (c)    Application to the Reorganization Plan

As to any Class that may reject the Reorganization Plan, the Reorganization Plan Debtors believe the Reorganization Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirements, because, as to any such dissenting Class, there is no Class of equal priority receiving more favorable treatment, and such Class will either be paid in full, or no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

### 3.    Alternative to Confirmation and Consummation of the Reorganization Plan

If the Reorganization Plan is not confirmed and consummated, the alternatives to the Reorganization Plan include (1) liquidation of the Reorganization Plan Debtors under chapter 7 of the Bankruptcy Code and (2) an alternative chapter 11 plan.

### (a)    Liquidation Under Chapter 7

If no plan can be confirmed, the Reorganization Plan Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Reorganization Plan Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  Section X.C.1(b) (Best Interests Test) of this Disclosure Statement discusses the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Reorganization Plan Debtors' liquidation analysis.  The Reorganization Plan Debtors and the Creditors Committee believe that liquidation under chapter 7 could result in smaller distributions being made to all creditors and equity holders than those provided for in the Reorganization Plan.

### (b)    Alternative Plan

If the Reorganization Plan is not confirmed, the Reorganization Plan Debtors (or if the Reorganization Plan Debtors' exclusive period in which to file a plan has expired, any other party in interest) could attempt to formulate a different chapter 11 plan.  With respect to an alternative plan, the Reorganization Plan Debtors have explored various alternatives in connection with the formulation and development of the Reorganization Plan.  The Reorganization Plan Debtors and the Creditors Committee believe that the Reorganization Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances.

US_ACTIVE:\44238718\1\69252.0041

4.    **Nonconsensual Confirmation**

If any impaired Class of Claims entitled to vote will not accept the Reorganization Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Reorganization Plan Debtors reserve the right to amend the Reorganization Plan in accordance with section 12.4 of the Reorganization Plan or undertake to have the Bankruptcy Court confirm the Reorganization Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to impaired Classes of Claims that are deemed to reject the Reorganization Plan, the Reorganization Plan Debtors will request that the Bankruptcy Court confirm the Reorganization Plan pursuant to section 1129(b) of the Bankruptcy Code.

The Reorganization Plan Debtors and the Creditors Committee believe the that the treatment afforded to the holders of Allowed Claims in Class 2 (Other Secured Claims), Class 3 (Senior Noteholder Secured Claims), Class 4 (General Unsecured Claims) and Class 5 (Debtor Intercompany Claims) under the Reorganization Plan meet the requirements of section 1129(b) of the Bankruptcy Code and otherwise satisfies all other requirements necessary for confirmation by the Bankruptcy Court.

With respect to Claims in Class 4 (General Unsecured Claims), the Reorganization Plan Debtors and the Creditors Committee believe the treatment afforded to holders of Claims in Class 4 under the Reorganization Plan meets the requirements of section 1129(b).  The Reorganization Plan provides for a *Pro Rata* distribution to holders of allowed General Unsecured Claims if their applicable sub-class votes to accept the Reorganization Plan of any Reorganization Plan Debtor, subject to the conditions of the Reorganization Plan.  The Reorganization Plan Debtors believe this amount reasonably represents or exceeds the value the Reorganization Plan Debtors could hope to realize for any unencumbered assets, such assets consisting entirely of RDA's one-third (1/3) equity interests in the Reorganization Plan Debtors' first-tier foreign subsidiaries.  The Reorganization Plan Debtors believe there is little to no realizable value associated with the unencumbered one-third (1/3) equity interest in their direct and indirect international subsidiaries that would be available to general unsecured creditors, due to, among other reasons: (1) as set forth above in Section IV.D, the inability, after a lengthy and comprehensive marketing process, to identify any parties willing to ascribe significant value for the Reorganization Plan Debtors' international operations as a going-concern; (2) the lack of any meaningful management or personnel infrastructure to oversee and operate the Reorganization Plan Debtors' international operations as an independent going-concern; (3) the complexities and significant costs associated with the Reorganization Plan Debtors' central services infrastructure for their international operations; (4) the intercompany loans owed by the Reorganization Plan Debtors' international operations to the Reorganization Plan Debtors; (5) the declining performance in many of the Reorganization Plan Debtors' international markets; (6) the lack of any other unencumbered assets available for distribution to general unsecured creditors on account of their Claims; and (7) the potential superpriority administrative expense claims granted to the Reorganization Plan Debtors' prepetition senior lenders, pursuant to section 507(b) of the Bankruptcy Code, under the DIP Order to adequately protect the prepetition lenders from any diminution in the value of their collateral.  Accordingly, the Reorganization Plan Debtors and the Creditors Committee believe the Reorganization Plan is fair and equitable with respect to the holders of Class 4 General Unsecured Creditors.

US_ACTIVE:\44238718\1\69252.0041

With respect to Claims in any other impaired Class of Claims entitled to vote on the Reorganization Plan, the Reorganization Plan Debtors and the Creditors Committee believe the Reorganization Plan does not discriminate unfairly, and is fair and equitable, with respect to each such Class of Claims and, therefore, the treatment afforded such claimholders under the Reorganization Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

US_ACTIVE:\44238718\1\69252.0041

## XI.

## CONCLUSION

The Reorganization Plan Debtors and the Creditors Committee believe that confirmation and implementation of the Reorganization Plan is in the best interests of all creditors, and urge holders of impaired Claims in Class 2 (Other Secured Claims), Class 3 (Senior Noteholder Secured Claims), Class 4 (General Unsecured Claims), and Class 5 (Intercompany Claims) to vote to accept the Reorganization Plan and to evidence such acceptance by returning their ballots so that they will be received no later than the Voting Deadline, **June 14, 2013 at 4:00 p.m. (Eastern Time)**.

Dated:  May 7, 2013
        New York, New York

Respectfully submitted,

By:  _____
        Name:  Robert E. Guth
        Title:  President and Chief Executive Officer

## Exhibit A

**Reorganization Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| **RDA Holding Co., *et al.*,**[1] | ) | Case No. 13-22233 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**SECOND AMENDED JOINT PLAN OF REORGANIZATION OF**
**CERTAIN DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**



**WEIL, GOTSHAL & MANGES LLP**

Marcia L. Goldstein
Joseph H. Smolinsky
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

Dated:  May 7, 2013
New York, New York

---

[1] The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the Debtors, are RDA Holding Co. (7045); The Reader's Digest Association, Inc. (6769); Ardee Music Publishing, Inc. (2291); Direct Entertainment Media Group, Inc. (2306); Pegasus Sales, Inc. (3259); Pleasantville Music Publishing, Inc. (2289); R.D. Manufacturing Corporation (0230); Reiman Manufacturing, LLC (8760); RD Publications, Inc. (9115); Home Service Publications, Inc. (9525); RD Large Edition, Inc. (1489); RDA Sub Co. (f/k/a Books Are Fun, Ltd.) (0501); Reader's Digest Children's Publishing, Inc. (6326); Reader's Digest Consumer Services, Inc. (8469); Reader's Digest Entertainment, Inc. (4742); Reader's Digest Financial Services, Inc. (7291); Reader's Digest Latinoamerica S.A. (5836); WAPLA, LLC (9272); Reader's Digest Sales and Services, Inc. (2377); Taste of Home Media Group, LLC (1190); Reiman Media Group, LLC (1192); Taste of Home Productions, Inc. (1193); World Wide Country Tours, Inc. (1189); W.A. Publications, LLC (0229); WRC Media Inc. (6536); RDCL, Inc. (f/k/a CompassLearning, Inc.) (6535); RDA Digital, LLC (5603); RDWR, Inc. (f/k/a Weekly Reader Corporation) (3780); Haven Home Media, LLC (f/k/a Reader's Digest Sub Nine, Inc.) (2727); Weekly Reader Custom Publishing, Inc. (f/k/a Lifetime Learning Systems, Inc.) (3276); and World Almanac Education Group, Inc. (3781).

**Table of Contents**

| | | | |
|---|---|---|---|
| Section 1. | | DEFINITIONS AND INTERPRETATION. | 1 |
| | A. | Definitions. | 1 |
| | 1.1. | *2011 Financing Settlement* | 1 |
| | 1.1. | *2011 Secured Administrative Agent* | 1 |
| | 1.2. | *2011 Secured Lenders* | 1 |
| | 1.3. | *2011 Secured Term Loan* | 1 |
| | 1.4. | *2011 Secured Term Loan Claim* | 2 |
| | 1.5. | *2012 Senior Credit Agreement* | 2 |
| | 1.6. | *2012 Senior Credit Agreement Lenders* | 2 |
| | 1.7. | *Acceptable Business Plan* | 2 |
| | 1.8. | *Administrative Agent* | 2 |
| | 1.9. | *Administrative Expense Claim* | 2 |
| | 1.10. | *Allowed* | 2 |
| | 1.11. | *Amended Organizational Documents.* | 2 |
| | 1.12. | *Bankruptcy Code* | 2 |
| | 1.13. | *Bankruptcy Court* | 3 |
| | 1.14. | *Bankruptcy Rules* | 3 |
| | 1.15. | *Benefit Plans* | 3 |
| | 1.16. | *Business Day* | 3 |
| | 1.17. | *Cash* | 3 |
| | 1.18. | *Causes of Action* | 3 |
| | 1.19. | *Chapter 11 Cases* | 3 |
| | 1.20. | *Claim* | 3 |
| | 1.21. | *Claims Oversight Committee.* | 3 |
| | 1.22. | *Claims Oversight Committee Reserve* | 3 |
| | 1.23. | *Class* | 4 |
| | 1.24. | *Collateral Agent* | 4 |
| | 1.25. | *Commencement Date* | 4 |
| | 1.26. | *Confirmation* | 4 |
| | 1.27. | *Confirmation Date* | 4 |
| | 1.28. | *Confirmation Hearing* | 4 |
| | 1.29. | *Confirmation Order* | 4 |
| | 1.30. | *Consenting Lender* | 4 |

1.31.   *Consenting Secured Noteholders* ....................................................4

1.32.   *Consummation* ....................................................4

1.33.   *Creditors Committee* ....................................................4

1.34.   *Cure* ....................................................4

1.35.   *Debtor Affiliates* ....................................................5

1.36.   *Debtors* ....................................................5

1.37.   *Debtors in Possession* ....................................................5

1.38.   *Definitive Documents* ....................................................5

1.39.   *DEMG* ....................................................5

1.40.   *DEMG Intercompany Claims* ....................................................5

1.41.   *DIP Agent* ....................................................5

1.42.   *DIP Claim* ....................................................5

1.43.   *DIP Commitment Letter* ....................................................5

1.44.   *DIP Facility* ....................................................5

1.45.   *DIP Lenders* ....................................................6

1.46.   *DIP Loan Agreement* ....................................................6

1.47.   *DIP Order* ....................................................6

1.48.   *DIP Term Sheet* ....................................................6

1.49.   *Disbursing Agent* ....................................................6

1.50.   *Disclosure Statement* ....................................................6

1.51.   *Disclosure Statement Order* ....................................................6

1.52.   *Disputed Claim* ....................................................6

1.53.   *Distribution Date* ....................................................6

1.54.   *Distribution Record Date* ....................................................6

1.55.   *Effective Date* ....................................................7

1.56.   *Employee Bonus Pool* ....................................................7

1.57.   *Estate or Estates* ....................................................7

1.58.   *Exculpated Parties* ....................................................7

1.59.   *Existing RDA Holding Interests* ....................................................7

1.60.   *Exit Financing* ....................................................7

1.61.   *Fee Claim* ....................................................7

1.62.   *Final Order* ....................................................7

1.63.   *First Out Exit Term Loan* ....................................................8

1.64.   *First Out Exit Letter of Credit Facility* ....................................................8

1.65.   *First Out Exit Facilities* ....................................................8

1.66.    *First Out Exit Term Sheet* ...................................................................................8

1.67.    *FTC* ..........................................................................................................................8

1.68.    *FTC Action* ..............................................................................................................8

1.69.    *FTC Claims* .............................................................................................................8

1.70.    *FTC Settlement Order* .............................................................................................8

1.71.    *Fully Diluted Basis* ..................................................................................................8

1.72.    *General Unsecured Claim* ........................................................................................8

1.73.    *GUC Distribution* ....................................................................................................8

1.74.    *Impaired* ..................................................................................................................9

1.75.    *Indenture* .................................................................................................................9

1.76.    *Indenture Trustee* ....................................................................................................9

1.77.    *Indenture Trustee Charging Lien* ............................................................................9

1.78.    *Indenture Trustee Fees* ............................................................................................9

1.79.    *Initial Distribution* ..................................................................................................9

1.80.    *Initial Distribution Date* .........................................................................................9

1.81.    *Intercompany Interest* .............................................................................................9

1.82.    *Interests* ...................................................................................................................9

1.83.    *International Restructuring Transactions* ...............................................................9

1.84.    *Issuing Lender* .........................................................................................................9

1.85.    *Lien* ..........................................................................................................................9

1.86.    *Management Incentive Program* ..............................................................................9

1.87.    *New Board* ..............................................................................................................10

1.88.    *New Common Stock* ................................................................................................10

1.89.    *New Money Loans* ..................................................................................................10

1.90.    *New Money Lenders* ...............................................................................................10

1.91.    *Non-Debtor Intercompany Claim* ..........................................................................10

1.92.    *Non-Dischargeability Deadline* .............................................................................10

1.93.    *Other Priority Claim* ..............................................................................................10

1.94.    *Other Secured Claim* ..............................................................................................10

1.95.    *PBGC* .....................................................................................................................10

1.96.    *Pension Credit* ........................................................................................................10

1.97.    *Pension Plan* ..........................................................................................................10

1.98.    *Person* .....................................................................................................................10

1.99.    *Plan Debtor Intercompany Claim* ..........................................................................11

1.100.   *Plan Supplement* ....................................................................................................11

1.101. *Plan Supplement Filing Date*. .................................................................. 11

1.102. *Plan Term Sheet* ......................................................................................... 11

1.103. *Priority Non-Tax Claim* ............................................................................ 11

1.104. *Priority Tax Claim* ..................................................................................... 11

1.105. *Pro Rata* ...................................................................................................... 11

1.106. *RDA GUC Distribution* ............................................................................ 11

1.107. *RDA Holding* .............................................................................................. 11

1.108. *Reader's Digest* .......................................................................................... 11

1.109. *Registration Rights Agreement* ................................................................ 12

1.110. *Reinstate, Reinstated or Reinstatement* .................................................. 12

1.111. *Released Parties* ......................................................................................... 12

1.112. *Reorganization Plan*. ................................................................................. 12

1.113. *Reorganization Plan Debtors*. .................................................................. 12

1.114. *Reorganization Plan Debtor Affiliates*. ................................................... 12

1.115. *Reorganization Plan Debtors in Possession*. .......................................... 13

1.116. *Reorganized Debtors* .................................................................................. 13

1.117. *Reorganized Debtor Affiliates* .................................................................. 13

1.118. *Reorganized RDA Holding* ........................................................................ 13

1.119. *Required Consenting Secured Noteholders*. ........................................... 13

1.120. *Required Consenting Secured Parties* ..................................................... 13

1.121. *Restructuring* ............................................................................................. 13

1.122. *Restructuring Expenses* ............................................................................ 13

1.123. *Restructuring Support Agreement* ........................................................... 13

1.124. *Roll-Up Lender* .......................................................................................... 13

1.125. *Roll-Up Loans* ............................................................................................ 13

1.126. *Schedule of Assumed Contracts* ............................................................... 13

1.127. *Schedules* .................................................................................................... 13

1.128. *Second Out Exit Term Loan* ...................................................................... 14

1.129. *Second Out Exit Term Loan Agreement* ................................................... 14

1.130. *Second Out Exit Term Sheet* ..................................................................... 14

1.131. *Security* ....................................................................................................... 14

1.132. *Secured Claim* ............................................................................................ 14

1.133. *Security Agreement* .................................................................................... 14

1.134. *Senior Noteholder Deficiency Claim* ....................................................... 14

1.135. *Senior Noteholder Secured Claim* ........................................................... 14

|       | 1.136. | *Senior Noteholders* .................................................................. 14 |
| 1.137. | *Senior Notes* ............................................................................. 14 |
| 1.138. | *Stockholders Agreement.* ........................................................ 14 |
| 1.139. | *Subordinated Securities Claims* ............................................. 15 |
| 1.140. | *Subsidiary Interests* ................................................................ 15 |
| 1.141. | *Tax Code* .................................................................................. 15 |
| 1.142. | *Unimpaired* .............................................................................. 15 |
| 1.143. | *Unsecured Administrative Agent* ............................................ 15 |
| 1.144. | *Unsecured Lenders* .................................................................. 15 |
| 1.145. | *Unsecured Term Loan* ............................................................. 15 |
| 1.146. | *Unsecured Term Loan Claim* ................................................... 15 |
| 1.147. | *Voting Record Date* ................................................................. 15 |

B.    Interpretation; Application of Definitions and Rules of Construction .......................... 15

C.    Reference to Monetary Figures ................................................................................ 16

D.    Controlling Document ............................................................................................. 16

Section 2.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS .......................................... 16

2.1.    *Administrative Expense Claims.* ............................................ 16

2.2.    *Fee Claims.* .............................................................................. 16

2.3.    *Priority Tax Claims.* ................................................................ 17

2.4.    *DIP Claims.* .............................................................................. 17

2.5.    *2012 Senior Credit Agreement Claims.* .................................. 17

2.6.    *Roll-Up Loans.* ........................................................................ 18

2.7.    *Indenture Trustee Fees.* ........................................................... 18

Section 3.    CLASSIFICATION OF CLAIMS AND INTERESTS. ............................................... 18

3.1.    *Summary of Classification.* .................................................... 18

3.2.    *Special Provision Governing Unimpaired Claims.* ................ 19

3.3.    *Elimination of Vacant Classes.* .............................................. 19

Section 4.    TREATMENT OF CLAIMS AND INTERESTS. ................................................... 19

4.1.    *Other Priority Claims (Class 1).* ............................................ 19

4.2.    *Other Secured Claims (Class 2).* ............................................ 20

4.3.    *Senior Noteholder Secured Claims (Class 3).* ....................... 20

4.4.    *General Unsecured Claims (Class 4).* ..................................... 20

4.5.    *Plan Debtor Intercompany Claims (Class 5).* ........................ 22

4.6.    *Existing RDA Holding Interests (Class 6).* ............................ 22

4.7.    *Intercompany Interests (Class 7).* ........................................... 22

| | 4.8. | *Subordinated Securities Claims (Class 8).* | 23 |
|---|---|---|---|
| Section 5. | | MEANS FOR IMPLEMENTATION. | 23 |
| | 5.1. | *Compromise and Settlement of Claims, Interests, and Controversies.* | 23 |
| | 5.2. | *First Out Exit Facilities and Second Out Exit Term Loan.* | 23 |
| | 5.3. | *Authorization and Issuance of Plan Securities.* | 24 |
| | 5.4. | *Cancellation of Existing Securities and Agreements.* | 24 |
| | 5.5. | *Reorganized RDA Holding.* | 24 |
| | 5.6. | *International Restructuring Transactions.* | 25 |
| | 5.7. | *Other Transactions.* | 25 |
| | 5.8. | *Cancellation of Liens.* | 25 |
| | 5.9. | *Management Incentive Program.* | 25 |
| | 5.10. | *Employee Matters.* | 26 |
| | 5.11. | *Withholding and Reporting Requirements.* | 26 |
| | 5.12. | *Exemption From Certain Transfer Taxes.* | 26 |
| | 5.13. | *Effectuating Documents; Further Transactions.* | 27 |
| | 5.14. | *Closing of the Chapter 11 Cases.* | 27 |
| Section 6. | | DISTRIBUTIONS. | 27 |
| | 6.1. | *Distribution Record Date.* | 27 |
| | 6.2. | *Date of Distributions.* | 27 |
| | 6.3. | *Disbursing Agent.* | 28 |
| | 6.4. | *Powers of Disbursing Agent.* | 28 |
| | 6.5. | *Cancellation of Senior Notes.* | 28 |
| | 6.6. | *Delivery of Distributions.* | 28 |
| | 6.7. | *Manner of Payment Under Plan.* | 29 |
| | 6.8. | *Fractional Stock.* | 29 |
| | 6.9. | *Minimum Cash Distributions.* | 29 |
| | 6.10. | *Setoffs.* | 29 |
| | 6.11. | *Distributions After Effective Date.* | 29 |
| | 6.12. | *Allocation of Distributions Between Principal and Interest.* | 30 |
| Section 7. | | PROCEDURES FOR DISPUTED CLAIMS. | 30 |
| | 7.1. | *Allowance of Claims.* | 30 |
| | 7.2. | *Objections to Claims.* | 30 |
| | 7.3. | *Estimation of Claims.* | 30 |
| | 7.4. | *No Distributions Pending Allowance.* | 31 |
| | 7.5. | *Distributions After Allowance.* | 31 |

|        | 7.6.  | *Resolution of Claims.* | 31 |
|        | 7.7.  | *Disallowed Claims.* | 31 |
|        | 7.8.  | *Debtor Affiliate Claims.* | 31 |
|        | 7.9.  | *Claims Oversight Procedures* | 31 |
| Section 8. |    | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 32 |
|        | 8.1.  | *General Treatment.* | 32 |
|        | 8.2.  | *Payments Related to Assumption of Contracts and Leases.* | 32 |
|        | 8.3.  | *Rejection Claims.* | 33 |
|        | 8.4.  | *Survival of the Reorganization Plan Debtors' Indemnification Obligations.* | 33 |
|        | 8.5.  | *Compensation and Benefit Plans.* | 34 |
|        | 8.6.  | *Insurance Policies.* | 34 |
|        | 8.7.  | *Intellectual Property Licenses and Agreements.* | 34 |
|        | 8.8.  | *Reservation of Rights.* | 34 |
| Section 9. |    | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. | 35 |
|        | 9.1.  | *Conditions Precedent to Confirmation.* | 35 |
|        | 9.2.  | *Conditions Precedent to the Effective Date.* | 35 |
|        | 9.3.  | *Waiver of Conditions Precedent.* | 37 |
|        | 9.4.  | *Effect of Failure of Conditions to Effective Date.* | 37 |
| Section 10. |   | EFFECT OF CONFIRMATION. | 37 |
|        | 10.1. | *Subordinated Claims.* | 37 |
|        | 10.2. | *Vesting of Assets.* | 37 |
|        | 10.3. | *Discharge of Claims and Termination of Interests.* | 37 |
|        | 10.4. | *Term of Injunctions or Stays.* | 38 |
|        | 10.5. | *Injunction Against Interference with Plan.* | 38 |
|        | 10.6. | *Releases by the Reorganization Plan Debtors.* | 38 |
|        | 10.7. | *Releases By Holders of Claims and Interests.* | 39 |
|        | 10.8. | *Exculpation.* | 39 |
|        | 10.9. | *Retention of Causes of Action/Reservation of Rights.* | 40 |
|        | 10.10. | *Solicitation of the Reorganization Plan.* | 41 |
|        | 10.11. | *Section 1145 Exemption.* | 41 |
|        | 10.12. | *Plan Supplement.* | 41 |
|        | 10.13. | *Corporate and Limited Liability Company Action.* | 41 |
| Section 11. |   | RETENTION OF JURISDICTION. | 42 |
| Section 12. |   | MISCELLANEOUS PROVISIONS. | 44 |

US_ACTIVE:\44191040\16\69252.0040

12.1.   *Payment of Statutory Fees.* ..................................................................................44

12.2.   *Substantial Consummation.* ...................................................................................44

12.3.   *Dissolution of Creditors Committee.* ....................................................................44

12.4.   *Request for Expedited Determination of Taxes.* ...................................................44

12.5.   *Amendments.* ...........................................................................................................44

12.6.   *Effectuating Documents and Further Transactions.* ............................................45

12.7.   *Revocation or Withdrawal of the Reorganization Plan.* ......................................45

12.8.   *Severability of Plan Provisions upon Confirmation.* ...........................................45

12.9.   *Governing Law.* .......................................................................................................45

12.10.  *Time.*   45

12.11.  *Immediate Binding Effect.* .....................................................................................46

12.12.  *Successor and Assigns.* ...........................................................................................46

12.13.  *Entire Agreement.* ..................................................................................................46

12.14.  *Notices.* ...................................................................................................................46

Exhibit A        Restructuring Support Agreement

Each of RDA Holding Co., The Reader's Digest Association, Inc., Ardee Music Publishing, Inc.; Pegasus Sales, Inc.; Pleasantville Music Publishing, Inc.; R.D. Manufacturing Corporation; Reiman Manufacturing, LLC; RD Publications, Inc.; Home Service Publications, Inc.; RD Large Edition, Inc.; RDA Sub Co. (f/k/a Books Are Fun, Ltd.); Reader's Digest Children's Publishing, Inc.; Reader's Digest Consumer Services, Inc.; Reader's Digest Entertainment, Inc.; Reader's Digest Financial Services, Inc.; Reader's Digest Latinoamerica, S.A.; WAPLA, LLC; Reader's Digest Sales and Services, Inc.; Taste of Home Media Group, LLC; Reiman Media Group, LLC;  Taste of Home Productions, Inc.; World Wide Country Tours, Inc.; W.A. Publications, LLC; WRC Media, Inc.; RDCL, Inc. (f/k/a CompassLearning, Inc.); RDA Digital, LLC; RDWR, Inc. (f/k/a Weekly Reader Corporation); Haven Home Media, LLC (f/k/a Reader's Digest Sub Nine, Inc.); Weekly Reader Custom Publishing, Inc. (f/k/a Lifetime Learning Systems, Inc.); and World Almanac Education Group, Inc. (collectively, the "**Reorganization Plan Debtors**") propose the following amended joint chapter 11 plan of reorganization for each of the Reorganization Plan Debtors pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.A.

SECTION 1.    **DEFINITIONS AND INTERPRETATION.**

A.    **Definitions.**

1.1.    ***2011 Financing Settlement*** means that certain settlement agreement among the Reorganization Plan Debtors, the Creditors Committee, the Unsecured Administrative Agent, the 2011 Secured Administrative Agent, the Unsecured Lenders and the 2011 Secured Lenders whereby: (i) the Unsecured Administrative Agent, on its own behalf and on behalf of the Unsecured Lenders, shall receive the 2011 Unsecured Term Loan Claim in the total aggregate amount of $16,939,830.55 against Reader's Digest (which amount represents 1.67 times the amount of the outstanding principal and accrued but unpaid interest under the Unsecured Term Loan), for distribution purposes only, and shall waive any and all right to seek any further or additional distributions, on its own behalf or on behalf of the Unsecured Lenders, pursuant to the Reorganization Plan or otherwise, (ii) the Unsecured Administrative Agent, on its own behalf and on behalf of the Unsecured Lenders, shall receive the 2011 Unsecured Term Loan Claim in the total aggregate amount of $1.00 against each of the other Reorganization Plan Debtors for voting purposes only (and not for distribution purposes), (iii) the Unsecured Administrative Agent, the Unsecured Lenders, the 2011 Secured Administrative Agent and the 2011 Secured Lenders shall receive the exculpations contemplated herein and general releases by the Reorganization Plan Debtors, the other Released Parties and, to the extent authorized by the Bankruptcy Court, the holders of Claims against, and Interests in, the Reorganization Plan Debtors; and (iv) on the Effective Date or promptly thereafter (following the approval of the Bankruptcy Court of all other elements of the 2011 Financing Settlement), the 2011 Secured Administrative Agent shall withdraw the 2011 Secured Term Loan Claim.

1.1.    ***2011 Secured Administrative Agent*** means Luxor Capital Group, LP in its capacity as administrative agent under the 2011 Secured Loan.

1.2.    ***2011 Secured Lenders*** means Luxor Capital Partners, LP, Point Lobos Master Fund, L.P., Blackwell Partners LLC and each of the other lenders (including affiliates) from time to time party to the 2011 Secured Loan as lenders thereunder.

1.3.    ***2011 Secured Term Loan*** means that certain term loan credit and guarantee agreement, dated as of August 12, 2011, among RDA Holding, Reader's Digest, the other guarantors named thereunder, the lenders party thereto, and Luxor Capital Group, LP, as administrative agent.

1.4.    ***2011 Secured Term Loan Claim*** means any proof of Claim filed by the 2011 Secured Administrative Agent on its own behalf and on behalf of any 2011 Secured Lenders, on account of Claims, if any, arising under or relating to the 2011 Secured Term Loan.

1.5.    ***2012 Senior Credit Agreement*** means that certain Credit and Guarantee Agreement, dated as of March 30, 2012, by and among Reader's Digest, as borrower, RDA Holding and each of the guarantors named therein, Wells Fargo Principal Lending, LLC, as issuing lender, each of the other banks and lending institutions as lenders thereunder, and Wells Fargo Bank, National Association, as administrative agent.

1.6.    ***2012 Senior Credit Agreement Lenders*** means Wells Fargo Principal Lending, LLC and each of the lenders from time to time party to the 2012 Senior Credit Agreement as lenders thereunder.

1.7.    ***Acceptable Business Plan*** means that certain revised business plan for the Reorganization Plan Debtors or Reorganized Debtors, as applicable, acceptable to the Required Consenting Secured Parties.

1.8.    ***Administrative Agent*** means Wells Fargo Bank, National Association in its capacity as administrative agent under the 2012 Senior Credit Agreement.

1.9.    ***Administrative Expense Claim*** means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Reorganization Plan Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises); (b) Fee Claims; (c) DIP Claims; (d) Restructuring Expenses; and (e) all fees and charges assessed against the Estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-1401.

1.10.    ***Allowed*** means, with reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof, or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Interest as to which the liability of the Reorganization Plan Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court or (c) any Claim or Interest expressly allowed hereunder; *provided, however*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Reorganization Plan.

1.11.    ***Amended Organizational Documents*** means the forms of certification of incorporation, certificate of formation, limited liability company agreement, or other forms of organizational documents and bylaws for the Reorganized Debtors reasonably satisfactory to the Reorganization Plan Debtors and the Required Consenting Secured Parties.  To the extent such Amended Organization Documents reflect material changes to the Reorganizational Plan Debtors' existing forms of organization documents and by laws, substantially final forms of such Amended Organization Documents will be included in the Plan Supplement.

1.12.    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.13.    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.14.    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.15.    ***Benefit Plans*** means all benefit plans, policies, and programs sponsored by the Reorganization Plan Debtors, including all savings plans and health and welfare plans.

1.16.    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.17.    ***Cash*** means legal tender of the United States of America.

1.18.    ***Causes of Action*** means any action, claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.19.    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Reorganization Plan Debtors on February 17, 2013, and continuing immediately thereafter, in the Bankruptcy Court and styled *In re RDA Holding Co., et. al.*, Case No. 13-22233 (RDD).

1.20.    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.21.    ***Claims Oversight Committee*** means a committee of one or more members approved by the Creditors Committee to represent the interests of holders of General Unsecured Claims in connection with the claims oversight procedures set forth in Section 7.9 herein, which committee shall be entitled to retain, without further order of the Bankruptcy Court, legal counsel or other professionals if necessary, including professionals retained in the Chapter 11 Cases; *provided, however,* that any fees, costs and expenses incurred by the Claims Oversight Committee or their professionals in connection with the claims oversight procedures set forth in Section 7.9 herein shall be paid solely from, and limited to, the Claims Oversight Committee Reserve.

1.22.    ***Claims Oversight Committee Reserve*** means $300,000, or such other amount as agreed upon by the Reorganized Debtors, the Claims Oversight Committee and the Consenting Secured Noteholders prior to the Initial Distribution Date, funded solely from the GUC Distribution and RDA GUC Distribution, with the GUC Distribution funding $500/4{,}375^{th}$ of the amount and the RDA GUC

Distribution funding 3,875/4,375th of the amount, and allocated to the Claims Oversight Committee in an amount determined by the Creditors Committee or the Claims Oversight Committee to satisfy the reasonable costs and expenses of the Claims Oversight Committee and their professionals incurred in connection with the claims oversight procedures set forth in Section 7.9 herein.  Any Cash that is reserved but not used for the costs and expenses of the Claims Oversight Committee shall be returned to the GUC Distribution and RDA GUC Distribution in the same ratio as the initial funding and distributed to holders of Allowed General Unsecured Claims in accordance with Section 4.4 herein.

1.23.    *Class* means any group of Claims or Interests classified by the Reorganization Plan pursuant to section 1122(a)(1) of the Bankruptcy Code, which shall include sub-classes for Class 4 General Unsecured Claims against each of the Reorganization Plan Debtors.

1.24.    *Collateral Agent* means Wilmington Trust, National Association (as successor to Wilmington Trust FSB ) in its capacity as collateral agent under the Indenture, the 2012 Senior Credit Agreement and the related Security Agreement.

1.25.    *Commencement Date* means the date on which each of the respective Debtors filed its voluntary petition for reorganization relief under chapter 11 of the Bankruptcy Code.

1.26.    *Confirmation* means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

1.27.    *Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.28.    *Confirmation Hearing* means the hearing to be held by the Bankruptcy Court regarding confirmation of the Reorganization Plan, as such hearing may be adjourned or continued from time to time.

1.29.    *Confirmation Order* means the order of the Bankruptcy Court confirming the Reorganization Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably satisfactory to the Reorganization Plan Debtors and the Required Consenting Secured Parties.

1.30.    *Consenting Lender* means Wells Fargo Principal Lending, LLC, as issuing lender and lender under the 2012 Senior Credit Agreement and a secured noteholder under the Indenture.

1.31.    *Consenting Secured Noteholders* means those certain holders of Senior Notes party to the Restructuring Support Agreement.

1.32.    *Consummation* means the occurrence of the Effective Date for the Reorganization Plan.

1.33.    *Creditors Committee* means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

1.34.    *Cure* means the payment of Cash by the Reorganization Plan Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Reorganization Plan Debtors in accordance with the terms of an executory contract or unexpired lease of the Reorganization Plan Debtors and (ii) permit the

Reorganization Plan Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.35.    ***Debtor Affiliates*** means the Debtors, other than RDA Holding.

1.36.    ***Debtors*** means RDA Holding, Reader's Digest, Ardee Music Publishing, Inc.; Direct Entertainment Media Group, Inc.; Pegasus Sales, Inc.; Pleasantville Music Publishing, Inc.; R.D. Manufacturing Corporation; Reiman Manufacturing, LLC; RD Publications, Inc.; Home Service Publications, Inc.; RD Large Edition, Inc.; RDA Sub Co. (f/k/a Books Are Fun, Ltd.); Reader's Digest Children's Publishing, Inc.; Reader's Digest Consumer Services, Inc.; Reader's Digest Entertainment, Inc.; Reader's Digest Financial Services, Inc.; Reader's Digest Latinoamerica, S.A.; WAPLA, LLC; Reader's Digest Sales and Services, Inc.; Taste of Home Media Group, LLC; Reiman Media Group, LLC; Taste of Home Productions, Inc.; World Wide Country Tours, Inc.; W.A. Publications, LLC; WRC Media, Inc.; RDCL, Inc. (f/k/a Compasslearning, Inc.); RDA Digital, LLC; RDWR, Inc. (f/k/a Weekly Reader Corporation); Haven Home Media, LLC (f/k/a Reader's Digest Sub Nine, Inc.); Weekly Reader Custom Publishing, Inc. (f/k/a Lifetime Learning Systems, Inc.); and World Almanac Education Group, Inc.

1.37.    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.38.    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated herein and that are otherwise necessary or desirable to implement, or otherwise relate to the restructuring contemplated in the Restructuring Support Agreement, the Reorganization Plan (including the Plan Supplement), any motion seeking the approval thereof, the Confirmation Order, and definitive documentation relating to the DIP Facility, the use of cash collateral and the Exit Financing, Amended Organizational Documents, advisory or management services agreements, shareholder and member related agreements or other related documents, each of which shall contain terms and conditions consistent in all material respects with this Reorganization Plan and shall otherwise be reasonably satisfactory in all respects to the Reorganization Plan Debtors and the Required Consenting Secured Parties.

1.39.    ***DEMG*** means Direct Entertainment Media Group, Inc.

1.40.    ***DEMG Intercompany Claims*** means any Claims against a Reorganization Plan Debtor held by DEMG.

1.41.    ***DIP Agent*** means Wilmington Trust, National Association, as administrative agent for the DIP Lenders under the DIP Loan Agreement, as its permitted successor and assign.

1.42.    ***DIP Claim*** means a Claim of the DIP Lenders or DIP Agent arising under the DIP Financing and the DIP Order.

1.43.    ***DIP Commitment Letter*** means the commitment letter attached to the Restructuring Support Agreement as **Exhibit B** (as may be amended, supplemented or modified from time to time in accordance with the terms thereof).

1.44.    ***DIP Facility*** means that certain consensual, priming, debtor in possession financing facility in the amount of $104,141,267 consisting of the New Money Loans, the Roll-Up Loans and the letters of credit outstanding under the 2012 Senior Credit Agreement and deemed issued thereunder, on the terms and conditions set forth in the DIP Loan Agreement, as approved by the DIP

Order; it being understood that any and all indemnification obligations under the 2012 Senior Credit Agreement will survive as obligations under the DIP Facility and DIP Loan Agreement.

       1.45.    ***DIP Lenders*** means the Issuing Lender, the Roll-Up Lender, and New Money Lenders party to the DIP Loan Agreement.

       1.46.    ***DIP Loan Agreement*** means that certain credit and guarantee agreement, dated as of February 22, 2013, as amended, supplemented, restated or otherwise modified, by and among, Reader's Digest, as borrower, RDA Holding and each of RDA Holding's direct and indirect domestic subsidiaries party thereto, as guarantors, the DIP Agent, Issuing Lender, the Roll-Up Lender and the New Money Lenders.

       1.47.    ***DIP Order*** means the interim and final order(s) of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Loan Agreement, and granting certain rights, protections and liens to and for the benefit of the DIP Lenders.

       1.48.    ***DIP Term Sheet*** means the term sheet attached to the DIP Commitment Letter as Annex 1.

       1.49.    ***Disbursing Agent*** means any entity (including any applicable Reorganization Plan Debtor if it acts in such capacity) in its capacity as a disbursing agent under Section 6.3 hereof.

       1.50.    ***Disclosure Statement*** means the Disclosure Statement for the Reorganization Plan, in form and substance satisfactory to the Required Consenting Secured Parties, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and/or other applicable law.

       1.51.    ***Disclosure Statement Order*** means an order entered by the Bankruptcy Court finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code and otherwise in form and substance satisfactory to the Required Consenting Secured Parties.

       1.52.    ***Disputed Claim*** means with respect to a Claim or Interest, any such Claim or Interest (a) to the extent neither Allowed nor disallowed under the Reorganization Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) for which a proof of claim or interest for payment has been made, to the extent the Reorganization Plan Debtors or any party in interest has interposed a timely objection or request for estimation before the Confirmation Date in accordance with the Reorganization Plan, which objection or request for estimation has not been withdrawn or determined by a Final Order.

       1.53.    ***Distribution Date*** means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of the Reorganization Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

       1.54.    ***Distribution Record Date*** means (i) for Class 3 Senior Noteholder Secured Claims and Class 4 Senior Noteholder Deficiency Claims, the date the Confirmation Order is entered by the Bankruptcy Court or such other date as may be later agreed upon and set forth in the Confirmation Order, and (ii) for all other Allowed Claims, the Effective Date of the Reorganization Plan.

1.55.   **Effective Date** means the date on which all conditions to the effectiveness of the Reorganization Plan set forth in Section 9 hereof have been satisfied or waived in accordance with the terms of the Reorganization Plan.

1.56.   **Employee Bonus Pool** means the Cash bonus pool to be allocated after the Effective Date by the Chief Executive Officer with the concurrence of the New Board.

1.57.   **Estate or Estates** means individually or collectively, the estate or estates of the Reorganization Plan Debtors created under section 541 of the Bankruptcy Code.

1.58.   **Exculpated Parties** means collectively: (a) the Reorganization Plan Debtors; (b) the Creditors Committee; (c) the Administrative Agent, the Unsecured Administrative Agent, the 2011 Secured Administrative Agent and the Collateral Agent; (d) the 2012 Senior Credit Agreement Lenders; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the Consenting Lender; (h) the DIP Agent; (i) the arrangers under each of the DIP Facility and the Exit Financing; (j) the administrative agents, collateral agents, and lenders under the Exit Financing; (k) the Consenting Secured Noteholders; (l) the Unsecured Lenders; (m) the 2011 Secured Lenders; and (n) with respect to each of the foregoing entities in clauses (a) through (m), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such; *provided, however,* that any officer, director, principal, shareholder, member, partner, employee, or agent of the Reorganization Plan Debtors that is scheduled by the Reorganization Plan Debtors in the Plan Supplement and designated in such schedule as a non-exculpated party shall not be an Exculpated Party for purposes of the Reorganization Plan.

1.59.   **Existing RDA Holding Interests** means all Interests in RDA Holding, including common stock, preferred stock and any options, warrants or rights to acquire any such Interests.

1.60.   **Exit Financing** means the First Out Exit Facilities and the Second Out Exit Facility.

1.61.   **Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Reorganization Plan Debtors or the Creditors Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.62.   **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the

Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.63.    ***First Out Exit Term Loan*** means a first out, senior secured exit term loan, in an amount equal to the aggregate amount of the Roll-Up Loans outstanding under the DIP Facility on the Effective Date, in accordance with and subject to the terms and conditions contained in the First Out Exit Term Sheet or otherwise on terms and conditions satisfactory to the Roll-Up Lender; it being understood that any and all indemnification obligations under the DIP Facility and DIP Loan Agreement will survive as obligations under the First Out Exit Term Loan.

1.64.    ***First Out Exit Letter of Credit Facility*** means the aggregate amount of all letters of credit undrawn and outstanding under the DIP Loan Agreement as of the Effective Date, in accordance with and subject to the terms and conditions contained in the First Out Exit Term Sheet or otherwise on terms and conditions satisfactory to the Consenting Lender.

1.65.    ***First Out Exit Facilities*** means the first out**,** senior secured credit facility comprising the First Out Exit Term Loan and the First Out Exit Letter of Credit Facility, in accordance with and subject to the terms and conditions contained in the First Out Exit Term Sheet or otherwise on terms and conditions satisfactory to the Consenting Lender.

1.66.    ***First Out Exit Term Sheet*** means the term sheet for the First Out Exit Term Loan and First Out Exit Letter of Credit Facility attached to the DIP Commitment Letter as Annex 2.

1.67.    ***FTC*** means the United States Federal Trade Commission.

1.68.    ***FTC Action*** means that certain action styled *Federal Trade Commission v. Fitness Brands, Inc., et al.*, Case No. 12-23065-CMA (S.D. Fl. 2012).

1.69.    ***FTC Claims*** means any claims arising under or relating to the FTC Action and the FTC Settlement Order or the subject matter therein.

1.70.    ***FTC Settlement Order*** means the Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief Against Defendants Direct Holdings Americas, Inc., and DEMG, and Relief Defendant Reader's Digest, dated August 27, 2012, entered in the FTC Action.

1.71.    ***Fully Diluted Basis*** means on a fully diluted basis, after taking into account all New Common Stock issued pursuant to the Restructuring, but excluding any New Common Stock issued pursuant to the Management Incentive Program.

1.72.    ***General Unsecured Claim*** means any unsecured Claim against any Reorganization Plan Debtor, other than a Plan Debtor Intercompany Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including without limitation, any FTC Claims, the Unsecured Term Loan Claim, any Non-Debtor Intercompany Claims, any DEMG Intercompany Claim, or any Senior Noteholder Deficiency Claim.

1.73.    ***GUC Distribution*** means, subject to the conditions set forth in Section 4.4, $500,000 to be funded from either the Reorganization Plan Debtors' cash on hand or by the Consenting Secured Noteholders on a *Pro Rata* basis and held in a segregated non-interest bearing account maintained by the Reorganized Debtors, subject to reduction for the Claims Oversight Committee, and distributed *Pro Rata* to the holders of any sub-class of Allowed Class 4 General Unsecured Claims that vote to accept the Reorganization Plan.

1.74. **Impaired** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.75. **Indenture** means that certain Indenture, dated as of February 11, 2010 among RD Escrow Corporation, Reader's Digest, RDA Holding, and the subsidiary guarantors thereunder, the Indenture Trustee, and Wilmington Trust, National Association (as successor to Wilmington Trust FSB), as collateral agent.

1.76. **Indenture Trustee** means Wilmington Trust, National Association (as successor by appointment to Wells Fargo Bank, National Association) in its capacity as the indenture trustee under the Indenture, and its permitted successors and assigns.

1.77. **Indenture Trustee Charging Lien** means any Lien or other priority in payment to which the Indenture Trustees is entitled, pursuant to the Indentures, against distributions to be made to Senior Noteholders for payment of any fees or expenses due to the Indenture Trustee under the Indenture.

1.78. **Indenture Trustee Fees** means the reasonable compensation, fees, expenses, disbursements and indemnity claims arising under the Indenture, including attorneys' and agents' fees, expenses, and disbursements, incurred under the Indenture by the Indenture Trustee, whether prior to or after the Commencement Date and whether prior to or after the Consummation of the Reorganization Plan.

1.79. **Initial Distribution** means the first distribution that the Disbursing Agent makes to holders of Allowed Claims.

1.80. **Initial Distribution Date** means the date occurring on or as soon as reasonably practicable after the Effective Date, but in no event more than sixty (60) days after the Effective Date, on which the Disbursing Agent makes the Initial Distribution to holders of Allowed Claims.

1.81. **Intercompany Interest** means an Interest in a Reorganization Plan Debtor, other than RDA Holding, held by another Reorganization Plan Debtor or an affiliate of a Reorganization Plan Debtor.

1.82. **Interests** means any equity security in a Reorganization Plan Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an ownership interest in any of the Reorganization Plan Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Reorganization Plan Debtor that existed immediately before the Effective Date.

1.83. **International Restructuring Transactions** means those certain transactions with respect to the Reorganization Plan Debtors' direct and indirect foreign subsidiaries and affiliates to be implemented on or after the Effective Date substantially as set forth in the Acceptable Business Plan.

1.84. **Issuing Lender** means Wells Fargo Principal Lending, LLC, as issuing lender, under the DIP Loan Agreement.

1.85. **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.86. **Management Incentive Program** means a post-emergence management incentive program to be approved and implemented by the New Board upon consultation with the Chief Executive Officer, on or after the Effective Date, under which [10%] of the New Common Stock on a

Fully Diluted Basis and after giving effect to the Management Incentive Program shall be reserved for issuance by the New Board to continuing employees of the Reorganization Plan Debtors and members of the New Board, consistent with market terms.

      1.87.    ***New Board*** means the board of directors and/or managers of Reorganized RDA Holding.

      1.88.    ***New Common Stock*** means the shares of common stock, par value $.001 per share, of Reorganized RDA Holding authorized pursuant to the Certificate of Incorporation of Reorganized RDA Holding as set forth in the Plan Supplement.

      1.89.    ***New Money Loans*** means the new money loans in the principal amount of $45,000,000 provided by the New Money Lenders under the DIP Loan Agreement.

      1.90.    ***New Money Lenders*** means the lenders specified on Schedule 2.01 of the DIP Loan Agreement and each other lender that shall become a party thereto from time to time, as NM Lender under the DIP Loan Agreement.

      1.91.    ***Non-Debtor Intercompany Claim*** means any prepetition Claim against a Reorganization Plan Debtor held by one of the Debtors' direct or indirect non-debtor affiliates or subsidiaries.

      1.92.    ***Non-Dischargeability Deadline*** means May 28, 2013 at 5:00 p.m. (Eastern Time) as set pursuant to the Order Pursuant to 11 U.S.C. §§ 502(b)(9) and 105, Fed. R. Bankr. P. 2002, 3003(c)(3) and 4007(c), and Local Rule 3003-1 (i) Establishing Deadline for Filing Proofs of Claim, (ii) Establishing Deadline for Filing Complaints to Determine Dischargeability of Debts and Procedures Relating Thereto, and (iii) Approving Form and Manner of Notice Thereof dated March 25, 2013 (ECF No. 165), by which date complaints to object to the discharge of any Claims against any of the Reorganization Plan Debtors must be filed by all parties in interest, including without limitation, governmental entities, and failure to file such complaints prior to the expiration of the Non-Dischargeability Deadline will result in such Claims being forever discharged against the Reorganization Plan Debtors.

      1.93.    ***Other Priority Claim*** means any Claim against any of the Reorganization Plan Debtors other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

      1.94.    ***Other Secured Claim*** means a Secured Claim, other than an Administrative Expense Claim, a Priority Tax Claim, a 2012 Senior Credit Agreement Claim, or a Senior Noteholder Secured Claim.

      1.95.    ***PBGC*** means the Pension Benefit Guaranty Corporation.

      1.96.    ***Pension Credit*** means the pension credit to be adopted by Reader's Digest after the Effective Date with the concurrence of the New Board.

      1.97.    ***Pension Plan*** means The Reader's Digest Association, Inc. Retirement Plan.

      1.98.    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.99.    ***Plan Debtor Intercompany Claim*** means any Claim against a Reorganization Plan Debtor held by another Reorganization Plan Debtor.

1.100.    ***Plan Supplement*** means a supplemental appendix to the Reorganization Plan, in form and substance satisfactory to the Required Consenting Secured Parties, containing, among other things, substantially final forms of the Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Reorganization Plan Debtors' existing organizational documents and by laws), the Schedule of Assumed Contracts, the First Out Exit Facilities, the Second Out Exit Term Loan Agreement, the Registration Rights Agreement, the Stockholders Agreement, and to the extent known, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided, that*, through the Effective Date, the Reorganization Plan Debtors shall have the right to amend the First Out Exit Facilities, the Second Out Exit Term Loan Agreement, the Amended Organizational Documents, the Registration Rights Agreement, the Stockholders Agreement, and any schedules, exhibits or amendments thereto, and the other documents contained in, and exhibits to, the Plan Supplement with the consent of the Required Consenting Secured Parties.  The Plan Supplement shall be filed with the Bankruptcy Court no later than the Plan Supplement Filing Date.

1.101.    ***Plan Supplement Filing Date*** means June 11, 2013 at 5:00 p.m. (Eastern Time).

1.102.    ***Plan Term Sheet*** means the term sheet attached to the Restructuring Support Agreement as Exhibit A including any schedules and exhibits attached thereto and as may be modified in accordance with Section 9.15 of the Restructuring Support Agreement.

1.103.    ***Priority Non-Tax Claim*** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.104.    ***Priority Tax Claim*** means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.105.    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Class under the Reorganization Plan.

1.106.    ***RDA GUC Distribution*** means, subject to the conditions set forth in Sections 4.4, $3,875,000 to be funded from either the Reorganization Plan Debtors' cash on hand or by the Consenting Secured Noteholders and held in a segregated non-interest bearing account maintained by the Reorganized Debtors, subject to reduction for the Claims Oversight Reserve, to be distributed *Pro Rata* to the holders of Allowed Class 4 General Unsecured Claims of Reader's Digest; *provided, however,* that in the event the holders of General Unsecured Claims against Reader's Digest vote to reject the Reorganization Plan as a sub-class, there will be no RDA GUC Distribution.

1.107.    ***RDA Holding*** means RDA Holding Co.

1.108.    ***Reader's Digest*** means The Reader's Digest Association, Inc.

1.109. **Registration Rights Agreement** means that certain Registration Rights Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Reorganization Plan, the Restructuring Support Agreement and the Plan Term Sheet and which shall otherwise be in a form and substance reasonably acceptable to the Required Consenting Secured Noteholders; *provided, however,* that the Registration Rights Agreement will not adversely impact the First Out Exit Term Loan and the Consenting Lender's rights thereunder in any manner.

1.110. **Reinstate, Reinstated or Reinstatement** means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that occurred before or after the Commencement Date, other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Reorganization Plan or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

1.111. **Released Parties** means collectively and in each case in their capacity as such: (a) the Reorganization Plan Debtors; (b) the Creditors Committee, (c) the Administrative Agent, the Unsecured Administrative Agent, the 2011 Secured Administrative Agent and the Collateral Agent; (d) the 2012 Senior Credit Agreement Lenders; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the Consenting Lender; (h) the DIP Agent; (i) the arrangers under each of the DIP Facility and the Exit Financing; (j) the administrative agents, collateral agents, and lenders under the Exit Financing; (k) the Consenting Secured Noteholders; (l) the Unsecured Lenders; (m) the 2011 Secured Lenders; and (n) with respect to each of the foregoing entities in clauses (a) through (m), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; *provided, however,* that any officer, director, principal, shareholder, member, partner, employee, or agent of the Reorganization Plan Debtors that is scheduled by the Reorganization Plan Debtors in the Plan Supplement and designated in such schedule as a non-released party shall not be a Released Party for purposes of the Reorganization Plan.

1.112. **Reorganization Plan** means this second amended joint chapter 11 plan of reorganization, including the exhibits hereto, as the same may be amended or modified from time to time in accordance with Section 12.4 herein.

1.113. **Reorganization Plan Debtors** has the meaning set forth in the preamble to the Reorganization Plan.

1.114. **Reorganization Plan Debtor Affiliates** means the Reorganization Plan Debtors, other than RDA Holding.

1.115. ***Reorganization Plan Debtors in Possession*** means the Debtors in Possession other than DEMG.

1.116. ***Reorganized Debtors*** means the Reorganization Plan Debtors, as reorganized on the Effective Date in accordance with the Reorganization Plan.

1.117. ***Reorganized Debtor Affiliates*** means the Reorganization Plan Debtor Affiliates, as reorganized on the Effective Date in accordance with the Reorganization Plan.

1.118. ***Reorganized RDA Holding*** means RDA Holding, after giving effect to the consummation of the restructuring transactions under the Reorganization Plan.

1.119. ***Required Consenting Secured Noteholders*** means the Consenting Secured Noteholders holding at such time at least 51% of the Senior Notes that are subject to the terms of the Restructuring Support Agreement.

1.120. ***Required Consenting Secured Parties*** means the Consenting Lender and the Required Consenting Secured Noteholders.

1.121. ***Restructuring*** means the proposed financial restructuring the principal terms of which are set forth in the Plan Term Sheet.

1.122. ***Restructuring Expenses*** means the reasonable and documented fees and expenses incurred by each of the Administrative Agent, the Collateral Agent, the 2012 Senior Credit Agreement Lenders, the Consenting Lender, the Consenting Secured Noteholders, the DIP Agent, and the DIP Lenders in connection with the Restructuring, including the fees and expenses of their respective legal and financial advisors (limited to one primary counsel for the Consenting Lender, and one primary counsel for the DIP Agent and the Consenting Secured Noteholders, as well as any conflicts counsel, special counsel and local counsel for each of the Consenting Lender, the DIP Agent, and the Consenting Secured Noteholders, and one financial advisor for the Consenting Secured Noteholders) without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Cases, which, in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction or credit of any kind whatsoever.

1.123. ***Restructuring Support Agreement*** means that certain Restructuring Support Agreement, dated February 17, 2013, by and among the Reorganization Plan Debtors, DEMG, the Consenting Lender, and the Consenting Secured Noteholders (as may be amended, supplemented or modified from time to time in accordance with the terms thereof) annexed hereto as **Exhibit A**.

1.124. ***Roll-Up Lender*** means Wells Fargo Principal Lending, LLC, as roll-up lender under the DIP Loan Agreement.

1.125. ***Roll-Up Loans*** means the roll-up term loans deemed made by the Roll-Up Lender under the DIP Loan Agreement.

1.126. ***Schedule of Assumed Contracts*** means the schedule of contracts and leases to be assumed by the Reorganized Debtors, with the reasonable consent of the Required Consenting Secured Noteholders, to be filed with the Plan Supplement.

1.127. ***Schedules*** means the schedules of assets and liabilities and the statement of financial affairs filed by the Reorganization Plan Debtors under section 521 of the Bankruptcy Code,

Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended from time to time.

1.128.    **Second Out Exit Term Loan** means a second out, senior secured exit term loan in the an amount equal to the aggregate amount of the New Money Loans outstanding under the DIP Facility on the Effective Date, in accordance with and subject to the terms and conditions contained in the Second Out Exit Term Sheet and otherwise on terms and conditions satisfactory to the New Money Lenders.

1.129.    **Second Out Exit Term Loan Agreement** means the definitive loan agreement evidencing the second out, senior secured exit term loan,  consistent with the Second Out Exit Term Sheet, including all documents, agreements or instruments executed in connection therewith or related thereto, in each case on terms and conditions satisfactory to the New Money Lenders.

1.130.    **Second Out Exit Term Sheet** means the term sheet for the Second Out Exit Term Loan attached to the DIP Commitment Letter as Annex 3.

1.131.    **Security** means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

1.132.    **Secured Claim** means a Claim to the extent (i) secured by property of the estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Reorganization Plan, (B) as agreed to by the holder of such Claim and the Reorganization Plan Debtors or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.133.    **Security Agreement** means that certain Security Agreement, dated as of February 19, 2010, from RDA Holding, Reader's Digest, and the subsidiary guarantors thereunder, to JP Morgan Chase Bank, N.A., as original administrative agent under the "First Priority Agreement" (together with any successor administrative agent), Wells Fargo Bank, National Association (together with any successor trustee), as trustee under the Indenture, and Wilmington Trust FSB (together with any successor collateral agent), as collateral agent for the secured parties thereunder.

1.134.    **Senior Noteholder Deficiency Claim** means the General Unsecured Claims to be Allowed as Class 4 General Unsecured Claims, derived from, based upon, relating to or arising from the Indenture, in the total aggregate amount of $244,923,799.20 against each Reorganization Plan Debtor.

1.135.    **Senior Noteholder Secured Claim** means a Secured Claim, derived from, based upon, relating to or arising from the Indenture, to be Allowed in the total aggregate amount of $231,000,000 against each Reorganization Plan Debtor.

1.136.    **Senior Noteholders** means the respective beneficial holders of the Senior Notes.

1.137.    **Senior Notes** means the Series A and Series B Floating Rate Senior Secured Notes due 2017 issued under the Indenture.

1.138.    **Stockholders Agreement** means that certain Stockholders Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Reorganization Plan, the Restructuring Support Agreement, and the Plan Term Sheet, and which shall otherwise be in a form and substance reasonably acceptable to the required Consenting Secured

Noteholders; *provided, however,* that the Stockholders Agreement will not adversely impact the First Out Exit Term Loan and the Consenting Lender's rights thereunder in any manner.

1.139. ***Subordinated Securities Claims*** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of any of the Debtors, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.140. ***Subsidiary Interests*** means the Interests in the Reorganization Plan Debtors (other than RDA Holding).

1.141. ***Tax Code*** means the Internal Revenue Code of 1986, as amended from time to time.

1.142. ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.143. ***Unsecured Administrative Agent*** means Luxor Capital Group, LP in its capacity as administrative agent under the Unsecured Term Loan.

1.144. ***Unsecured Lenders*** means Luxor Capital Partners, LP, Point Lobos Master Fund, L.P., Blackwell Partners LLC and each of the other lenders (including affiliates) from time to time party to the Unsecured Term Loan as lenders thereunder.

1.145. ***Unsecured Term Loan*** means that certain unsecured term loan credit and guarantee agreement, dated as of August 12, 2011, among RDA Holding, Reader's Digest, the other guarantors named thereunder, the lenders party thereto, and Luxor Capital Group, LP, as administrative agent.

1.146. ***Unsecured Term Loan Claim*** means, pursuant to the 2011 Financing Settlement, the General Unsecured Claims to be Allowed as Class 4 General Unsecured Claims, derived from, based upon, relating to or arising from the Unsecured Term Loan, (i) in the total aggregate amount of $16,939,830.55 against Reader's Digest for distribution purposes only and (ii) in the total aggregate amount of $1.00 against each of the other Reorganization Plan Debtors for voting purposes only (and not for distribution purposes).

1.147. ***Voting Record Date*** means 5:00 p.m. Eastern Time on May 6, 2013.

**B.**      **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Reorganization Plan are to the respective section in, or exhibit to, the Reorganization Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Reorganization Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Reorganization Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and

conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    **Reference to Monetary Figures**

All references in the Reorganization Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

D.    **Controlling Document**

In the event of an inconsistency between the Reorganization Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Reorganization Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, that* if there is determined to be any inconsistency between any Reorganization Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Reorganization Plan and shall control and take precedence.

SECTION 2.    **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

2.1.    ***Administrative Expense Claims.***

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Reorganization Plan Debtors or the Reorganized Debtors agrees to different treatment, the Reorganization Plan Debtors (or the Reorganized Debtors, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided*, *that*, all DIP Claims shall constitute Allowed Administrative Expense Claims; *provided, further*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Reorganization Plan Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by the Reorganization Plan Debtors, as debtors in possession, whether or not incurred in the ordinary course of business, shall be paid by the Reorganization Plan Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

2.2.    ***Fee Claims.***

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is forty-five (45) days after the Effective Date, (b) shall be paid in full from the Reorganization Plan Debtors' or Reorganized Debtors' Cash on hand in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be

mutually agreed upon between the holder of such an Allowed Fee Claim and the Reorganization Plan Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval, including those of the Creditors Committee for which the Creditors Committee remains in existence after the Effective Date as set forth in Section 12.3 herein.

> 2.3.    ***Priority Tax Claims.***

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Reorganization Plan Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (b) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; *provided*, that the Reorganization Plan Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option.

> 2.4.    ***DIP Claims.***

On the Effective Date, the DIP Facility shall convert to (i) the First Out Exit Facilities in accordance with the terms and conditions set forth in the First Out Exit Term Sheet and (ii) the Second Out Exit Term Loan Agreement in accordance with the terms and conditions in the Second Out Exit Term Sheet (and otherwise on terms and conditions satisfactory to the New Money Lenders), as applicable, or in each case, paid in full in Cash if the terms and conditions required for conversion under the applicable term sheet are not satisfied; *provided, however*, that the obligations under the First Out Exit Facilities will always be paid in full in Cash by the Reorganization Plan Debtors.  All accrued and unpaid interest, fees (including, without limitation, all fees, charges and disbursements of counsels to the Consenting Lender, the DIP Agent and the New Money Lenders), letter of credit fees and commissions, premiums, expenses and indemnification amounts under the DIP Facility as of the Effective Date shall be paid in full in cash on the Effective Date.  Upon compliance with the preceding sentence, all liens and security interests granted to secure the DIP Facility shall be deemed cancelled and shall be of no further force and effect and each Allowed DIP Claim shall be deemed to be fully satisfied, settled, released, and compromised.

> 2.5.    ***2012 Senior Credit Agreement Claims.***

All obligations and claims in respect of the 2012 Senior Credit Agreement shall be treated as follows: (i) all amounts owing under the 2012 Senior Credit Agreement on the Commencement Date plus the aggregate amount of any outstanding and unpaid "Reimbursement Obligations" incurred under (and as defined in) the 2012 Senior Credit Agreement shall have become Roll-Up Loans pursuant to the DIP Order and the DIP Loan Agreement; (ii) all outstanding letters of credit under 2012 Senior Credit Agreement shall have become letters of credit deemed issued under the DIP Loan Agreement; and (iii) all accrued and unpaid interest, fees, letter of credit standby fees and commissions, premium, expenses, indemnification amounts and all other obligations arising under or relating to the 2012 Senior Credit Agreement shall have been paid in full in cash on or prior to the Second Effective Date (as defined in the DIP Loan Agreement).

2.6.    ***Roll-Up Loans.***

On the Effective Date, all Roll-Up Loans, outstanding letters of credit and any related obligations shall be converted into the First Out Exit Facilities in accordance with the First Out Exit Term Sheet so long as (and only so long as) the terms and conditions required for such conversion are satisfied in accordance with the provisions of the First Out Exit Term Sheet and otherwise such obligations shall be paid in full in Cash on the Effective Date; *provided, however,* that the Reorganization Plan Debtors may always elect to repay such obligations in full in Cash at any time prior to or after the Effective Date.

Notwithstanding that the scheduled final maturity of the Roll-Up Loans under the DIP Facility extends beyond the date that is 180 days after the Commencement Date, the commitment of the Consenting Lender under the Restructuring Support Agreement and the First Out Exit Term Sheet to provide the First Out Exit Term Loan shall terminate on the date that is 180 days after the Commencement Date.

2.7.    ***Indenture Trustee Fees***.

On the Effective Date, the Reorganized Debtors shall pay in Cash the unpaid and outstanding Indenture Trustee Fees, without the need for the Indenture Trustee to file fee applications with the Bankruptcy Court; *provided, however*, that the Indenture Trustee shall provide the Reorganization Plan Debtors and the Creditors Committee with the invoices for which it seeks payment at least 10 days prior to the Effective Date.  Notwithstanding anything in the Reorganization Plan to the contrary, each Indenture Trustee Charging Lien shall be released and discharged upon (a) payment in full of any fees and expenses due to any Indenture Trustee under an applicable Indenture and (b) the satisfaction of the Indenture Trustee's duties pursuant to the Plan (including with respect to Plan distributions).

SECTION 3.    **CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1.    ***Summary of Classification***.

The following table designates the Classes of Claims against and Interests in each of the Reorganization Plan Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Reorganization Plan, (b) entitled to vote to accept or reject the Reorganization Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Reorganization Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  The classification of Claims and Interests set forth herein shall apply separately to each of the Reorganization Plan Debtors.  All of the potential Classes for the Reorganization Plan Debtors are set forth herein.  Certain of the Reorganization Plan Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.3.

US_ACTIVE:\44191040\16\69252.0040

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Impaired | Yes[2] |
| 3 | Senior Noteholder Secured Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Plan Debtor Intercompany Claims | Impaired | Yes |
| 6 | Existing RDA Holding Interests | Impaired | No (deemed to reject) |
| 7 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 8 | Subordinated Securities Claims | Impaired | No (deemed to reject) |

3.2.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Reorganization Plan, nothing under the Reorganization Plan shall affect the rights of the Reorganization Plan Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.3.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Reorganization Plan for purposes of voting to accept or reject the Reorganization Plan, and disregarded for purposes of determining whether the Reorganization Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

SECTION 4.     **TREATMENT OF CLAIMS AND INTERESTS.**

4.1.     *Other Priority Claims (Class 1).*

(a)     *Classification*:  Class 1 consists of Other Priority Claims against the Reorganization Plan Debtors.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim against any of the Reorganization Plan Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practical thereafter.

(c)     *Voting*:  Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Reorganization Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Reorganization Plan.

---

[2] The Reorganization Plan Debtors reserve the right to argue at the Confirmation Hearing that Class 2 (Other Secured Claims) is Unimpaired.

US_ACTIVE:\44191040\16\69252.0040

4.2.    ***Other Secured Claims (Class 2).***

(a)    *Classification*:  Class 2 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim against any of the Reorganization Plan Debtors has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Reorganization Plan Debtors or the Reorganized Debtors, (i) payment in full in Cash in full and final satisfaction of such claim, payable on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or, in each case, as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under Section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(c)    *Voting*:  Class 2 is Impaired, and holders of Other Secured Claims in Class 2 are entitled to vote to accept or reject the Reorganization Plan; *provided, however,* that the Reorganization Plan Debtors reserve the right to argue at the Confirmation Hearing that Class 2 (Other Secured Claims) is Unimpaired.

4.3.    ***Senior Noteholder Secured Claims (Class 3).***

(a)    *Classification*:  Class 3 consists of Senior Noteholder Secured Claims against the Reorganization Plan Debtors.

(b)    *Allowance*:  The Senior Noteholder Secured Claims are Allowed in the amount of $231,000,000 pursuant to section 506(a) of the Bankruptcy Code.

(c)    *Treatment*:  On the Effective Date, each holder of an Allowed Class 3 Senior Noteholder Secured Claim shall be entitled to receive, in full and final satisfaction of such Allowed Senior Noteholder Secured Claim, its *Pro Rata* share of 100% of the New Common Stock on a Fully Diluted Basis; *provided*, *however*, that no holder of an Allowed Senior Noteholder Secured Claim shall receive distributions that aggregate to more than the amount of such holder's Allowed Senior Noteholder Secured Claim; *provided, further, that* no dividends, recoveries, securities, distributions, or other form of payments shall be made on account of or in connection with the New Common Stock distributed to the holders of Allowed Senior Noteholder Secured Claims until all amounts owing in connection with the First Out Exit Term Loan have been paid in full in Cash and all commitments thereunder have been terminated.

(d)    *Voting*:  Class 3 is Impaired, and holders of Senior Noteholder Secured Claims in Class 3 are entitled to vote to accept or reject the Reorganization Plan.

4.4.    ***General Unsecured Claims (Class 4).***

(a)    *Classification*:  Class 4 consists of General Unsecured Claims against the Reorganization Plan Debtors.  For purposes of voting and distributions under the Reorganization Plan, Class 4 General Unsecured Claims against each of the Reorganization Plan Debtors shall be deemed to be in separate sub-classes.

US_ACTIVE:\44191040\16\69252.0040

20

(b)      *Treatment*:  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim, including any holder of FTC Claims, the Unsecured Term Loan Claim, any Non-Debtor Intercompany Claims, any DEMG Intercompany Claims or any Senior Noteholder Deficiency Claims, shall receive the following treatment:

(i)      for any sub-class of General Unsecured Claims that votes to accept the Reorganization Plan of any individual Reorganization Plan Debtor, each holder of an Allowed General Unsecured Claim in such accepting sub-class shall receive its *Pro Rata* share of the GUC Distribution and any Senior Noteholder Deficiency Claims in such accepting sub-class shall be deemed waived for the purposes of entitling holders of such Senior Noteholder Deficiency Claims to share in any recovery from the GUC Distribution;

(ii)      in addition to any *Pro Rata* share of the GUC Distribution, provided the sub-class of General Unsecured Claims of Reader's Digest votes to accept the Reorganization Plan, each holder of an Allowed General Unsecured Claim of Reader's Digest shall receive its *Pro Rata* share of the RDA GUC Distribution and any Senior Noteholder Deficiency Claims in such accepting sub-class shall be deemed waived for the purposes of entitling holders of such Senior Noteholder Deficiency Claims to share in any recovery from the RDA GUC Distribution; and

(iii)      in the event any sub-class of General Unsecured Claims votes to reject the Reorganization Plan with respect to any individual Reorganization Plan Debtor, the holders of Allowed General Unsecured Claims in such a rejecting sub-class shall not receive or retain any property under the Reorganization Plan on account of such Claims, including, for the avoidance of doubt, any *Pro Rata* share of the GUC Distribution or the RDA GUC Distribution.  For the further avoidance of doubt, to the extent any sub-class of General Unsecured Claims votes to reject the Reorganization Plan and, therefore, is not entitled to receive any portion of the GUC Distribution, such *Pro Rata* portion attributable to the rejecting sub-class shall be reallocated to the holders of General Unsecured Claims in other sub-classes that have voted to accept the Reorganization Plan.

Notwithstanding anything to the contrary herein, each Allowed Non-Debtor Intercompany Claim shall be Reinstated or alternatively, at the Reorganization Plan Debtors' reasonable discretion, on or prior to the Effective Date, and in consultation with the Creditors Committee or the Claims Oversight Committee as set forth in Section 7.9 herein, as applicable, each holder of an Allowed Non-Debtor Intercompany Claim shall receive either its *Pro Rata* share of the GUC Distribution and the RDA GUC Distribution, if any, or such other treatment as determined by the Reorganization Plan Debtors, which other treatment shall not include a distribution from the GUC Distribution or RDA GUC Distribution.  For the avoidance of doubt, in the event the Reorganization Plan Debtors Reinstate any Allowed Non-Debtor Intercompany Claims, such Allowed Non-Debtor Intercompany Claims will not receive any Cash distribution under the Reorganization Plan, including with respect to any *Pro Rata* shares of the GUC Distribution and RDA GUC Distribution, if applicable.  No holder of an Allowed General Unsecured Claim shall receive distributions that aggregate to more than the amount of such holder's Allowed General Unsecured Claim.  Nothing herein shall prejudice the ability of any party in interest to argue, for purposes of confirming the Reorganization Plan under section 1129 of the Bankruptcy Code, that General Unsecured Claims are not entitled to any value being provided in the

Reorganization Plan prior to Confirmation, including the GUC Distribution or the RDA GUC Distribution.

(c)    *Voting*:  Class 4 is Impaired, and holders of General Unsecured Claims in Class 4 are entitled to vote to accept or reject the Reorganization Plan.  For the avoidance of doubt, the holders of Senior Noteholder Deficiency Claims are entitled to vote to accept or reject the Reorganization Plan as holders of General Unsecured Claims in Class 4.

4.5.    ***Plan Debtor Intercompany Claims (Class 5).***

(a)    *Classification*:  Class 5 consists of Plan Debtor Intercompany Claims against the Reorganization Plan Debtors.

(b)    *Treatment*:  On the Effective Date, RDA Holding shall, at its discretion, Reinstate or compromise, as the case may be, all Plan Debtor Intercompany Claims between and among RDA Holding and its Reorganization Plan Debtors Affiliates consistent with the Acceptable Business Plan and the International Restructuring Transactions (as such term is used in the Plan Term Sheet) contemplated thereby.

(c)    *Voting*:  Class 5 is Impaired, and holders of Plan Debtor Intercompany Claims in Class 5 are entitled to vote to accept or reject the Reorganization Plan.

4.6.    ***Existing RDA Holding Interests (Class 6).***

(a)    *Classification*:  Class 6 consists of Existing RDA Holding Interests.

(b)    *Treatment*:  On the Effective Date, all Existing RDA Holding Interests shall be deemed canceled, and the holders of Existing RDA Holding Interests shall not receive or retain any property under the Reorganization Plan on account of such Interests.

(c)    *Voting*:  Class 6 is Impaired by the Reorganization Plan, and the holders of the Allowed Existing RDA Holding Interests are conclusively deemed to have rejected the Reorganization Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of Existing RDA Holding Interests are not entitled to vote to accept or reject the Reorganization Plan.

4.7.    ***Intercompany Interests (Class 7).***

(a)    *Classification*:  Class 7 consists of Intercompany Interests except for Existing RDA Holding Interests.

(b)    *Treatment*:  The Intercompany Interests will be Unimpaired under the Reorganization Plan.

(c)    *Voting*:  Class 7 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Reorganization Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Reorganization Plan.

4.8.    ***Subordinated Securities Claims (Class 8).***

(a)    *Classification*:  Class 8 consists of Subordinated Securities Claims.

(b)    *Treatment*:  The holders of Subordinated Securities Claims shall not receive or retain any property under the Reorganization Plan on account of such Claims.

(c)    *Voting*:  Class 8 is Impaired by the Reorganization Plan, and the holders of the Subordinated Securities Claims are conclusively deemed to have rejected the Reorganization Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Reorganization Plan.

SECTION 5.    **MEANS FOR IMPLEMENTATION.**

5.1.    ***Compromise and Settlement of Claims, Interests, and Controversies.***

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Reorganization Plan, the provisions of the Reorganization Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, including without limitation, approval of the Restructuring Support Agreement and the 2011 Financing Settlement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Reorganization Plan Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Reorganization Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, the Reorganization Plan Debtors and after the Effective Date, the Reorganized Debtors, may compromise and settle Claims against the Reorganization Plan Debtors or the Reorganized Debtors, as applicable, and Causes of Action against other Entities.

5.2.    ***First Out Exit Facilities and Second Out Exit Term Loan.***

On the Effective Date, subject to Section 2.4 of the Reorganization Plan and the terms and conditions of the First Out Exit Term Sheet and the Second Out Exit Term Sheet, the Reorganization Plan Debtors will enter into (i) the First Out Exit Facilities to refinance the Roll-Up Loans and replace any letters of credit under the DIP Facility and (ii) the Second Out Exit Term Loan to refinance the New Money Loans outstanding under the DIP Facility; *provided, however,* that Reorganized RDA Holding shall have not more than $106,000,000 in funded debt under its secured credit facilities immediately following the Effective Date.

On the Effective Date, documentation evidencing the First Out Exit Facilities and the Second Out Exit Term Loan shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the First Out Exit Facilities and the Second Out Exit Term Loan Agreement without the need for any further corporate action and without further action by the holders of Claims or Interests.  The definitive documentation relating to the First Out Exit Facilities and Second Out Exit Term Loan will be filed as part of the Plan Supplement.

All Liens and security interests granted pursuant to the First Out Exit Facilities or the Second Out Exit Term Loan Agreement, as applicable to (A) in the case of the First Out Exit Facilities, the Consenting Lender, the Roll-Up Lender and the Issuing Lender, and (B) in the case of the Second Out Exit Term Loan Agreement, the New Money Lenders, are intended to be, and shall be (i) valid, binding, perfected, enforceable, Liens, and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.

5.3.    ***Authorization and Issuance of Plan Securities*.**

(a)    The Reorganization Plan Debtors or Reorganized RDA Holding and the other Reorganized Debtors, as applicable, are authorized to issue all plan-related securities and documents, including, without limitation, the New Common Stock and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership, or limited liability company action.

(b)    On or prior to the Effective Date, Reorganized RDA Holding shall contribute the New Common Stock as a capital contribution to Reader's Digest in an amount equal to the shares of New Common Stock to be distributed in respect of Allowed Senior Noteholder Secured Claims pursuant to Section 4.3 herein, which shares shall then be distributed pursuant to such section and the provisions herein.

5.4.    ***Cancellation of Existing Securities and Agreements*.**

Except as expressly provided herein and in connection with the First Out Exit Facilities and the Second Out Exit Term Loan, on the Effective Date, all notes, instruments, certificates evidencing debt to or interests in, the Reorganization Plan Debtors, including, without limitation, the DIP Loan Agreement (only upon and following the effectiveness of the First Out Exit Facilities and the Second Out Exit Loan Agreement or payment in full in cash), the 2012 Senior Credit Agreement, the Security Agreement, the Indenture, and the Unsecured Term Loan shall be cancelled and obligations of the Reorganization Plan Debtors thereunder shall be discharged; *provided, however*, that any and all indemnification obligations under the 2012 Senior Credit Agreement (including the indemnities provided in section 4.05 thereunder) shall survive as obligations under the DIP Loan Agreement; *provided, further,* that any and all indemnification obligations (and any other obligations surviving per their express terms) under the DIP Facility shall survive as obligations under the First Out Exit Term Loan or Second Out Exit Term Loan, as applicable, notwithstanding in each case the cancellation of the predecessor credit agreement(s); *provided, further,* that nothing herein shall be deemed to constitute a cancellation of any rights arising from or in connection with section 5.5 of the Security Agreement.

Notwithstanding Confirmation or the occurrence of the Effective Date, the Indenture shall continue in effect solely for purposes of:  (a) enabling holders of Allowed Senior Noteholder Secured Claims to receive distributions under the Reorganization Plan; and (b) allowing the Indenture Trustee to make distributions under the Reorganization Plan; *provided further, however*, that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Reorganization Plan or result in any liability or expense to the Reorganized Debtors.

5.5.    ***Reorganized RDA Holding*.**

(a)    *Board of Directors.*  Upon and following the Effective Date, the New Board shall be a 7-member board comprised of the Chief Executive Officer and 6 directors designated

by the Required Consenting Secured Noteholders in consultation with the Chief Executive Officer.  The members of the New Board will be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.  On the Effective Date, the terms of the current members of the boards of directors and the boards of managers of the Reorganization Plan Debtors shall expire.

(b)      *Directors and Officers of the Reorganized Debtor Affiliates*.  Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on or after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.  The members of the board of directors and the board of managing members for each of the Reorganized Plan Debtor Affiliates shall be determined as set forth in the Amended Organizational Documents.

## 5.6.    *International Restructuring Transactions*.

On or after the Effective Date, the Reorganized Debtors with the concurrence of the New Board shall implement the International Restructuring Transactions and the Reorganized Debtors are authorized to take all actions as may be necessary or appropriate in connection therewith.

## 5.7.    *Other Transactions*.

On or after the Effective Date, the Reorganization Plan Debtors may (a) cause any or all of the Debtor Affiliates to be liquidated or merged into one or more of the other Debtor Affiliates or any other subsidiaries of the Reorganization Plan Debtors or dissolved all as more specifically described in the Plan Supplement, (b) cause the transfer of assets between or among the Debtor Affiliates, (c) cause any or all of the Amended Organizational Documents of any Reorganized Debtor Affiliates to be implemented, effected, or executed, (d) use the proceeds of the First Out Exit Term Loan and Second Out Exit Term Loan, plus Cash on hand, to pay all Restructuring Expenses, (e) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (f) engage in any other transaction in furtherance of the Reorganization Plan.  Subject to the prior written consent of the Required Consenting Secured Parties, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Reorganization Plan Debtors or the Reorganization Plan Debtors in Possession.

## 5.8.    *Cancellation of Liens*.

Except as otherwise specifically provided herein with respect to Class 2, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Reorganization Plan Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

## 5.9.    *Management Incentive Program.*

The Management Incentive Program shall be implemented by the New Board and communicated to the participants thereunder promptly following the Effective Date.

US_ACTIVE:\44191040\16\69252.0040

5.10.    *Employee Matters.*

On or after the Effective Date, the Reorganized Debtors shall implement the following employee incentive programs with the concurrence of the New Board: (i) the Pension Credit and (ii) the Employee Bonus Pool.

5.11.    *Withholding and Reporting Requirements.*

(a)    *Withholding Rights.*    In connection with the Reorganization Plan, any party issuing any instrument or making any distribution described in the Reorganization Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Reorganization Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case that a distribution of New Common Stock is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Reorganization Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Reorganization Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Reorganization Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms.*    Any party entitled to receive any property as an issuance or distribution under the Reorganization Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax Code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

5.12.    *Exemption From Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Reorganization Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Reorganization Plan or the reinvesting, transfer or sale of any real or personal property of the Reorganization Plan Debtors pursuant to, in implementation of or as contemplated in this Reorganization Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the First Out Exit Term Loan Agreement or the Second Out Exit Term Loan Agreement and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Reorganization Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax,

US_ACTIVE:\44191040\16\69252.0040

26

conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 5.13.    *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Reorganization Plan and the securities issued pursuant to the Reorganization Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Reorganization Plan.

### 5.14.    *Closing of the Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors shall promptly seek authority from the Bankruptcy Court to close each applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

SECTION 6.    **DISTRIBUTIONS**.

### 6.1.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Reorganization Plan Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests. The Reorganization Plan Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

### 6.2.    *Date of Distributions.*

Except as otherwise provided herein, the Disbursing Agent shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Disbursing Agent shall from time to time determine, in consultation with the Claims Oversight Committee, the subsequent Distribution Dates, which shall occur no less frequently than semi-annually. In the event that any payment or act under the Reorganization Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Disbursing Agent shall maintain, in consultation with the Claims Oversight Committee, a reserve of Cash from the GUC Distribution and the RDA GUC Distribution (less the Claims Oversight Committee Reserve) sufficient to pay holders of Disputed General Unsecured Claims the amount such holders would be entitled to receive under the Reorganization Plan if such Claims were to become Allowed General Unsecured Claims. In the event the holders of Allowed General Unsecured

Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Reorganized Debtors shall make a final distribution of all remaining Cash out of the GUC Distribution and the RDA GUC Distribution in accordance with Section 4.4 of this Reorganization Plan to all holders of Allowed General Unsecured Claims.

6.3.    ***Disbursing Agent.***

All distributions hereunder shall be made by Reorganized RDA Holding (or such other entity designated by Reorganized RDA Holding), as Disbursing Agent, on or after the Effective Date or as otherwise provided herein; *provided, however*, that the Senior Notes Indenture Trustee shall be the Disbursing Agent for the Senior Noteholder Secured Claims on behalf of Reader's Digest and the Administrative Agent shall be the Disbursing Agent for the 2012 Senior Credit Agreement Claims. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents shall be reimbursed by the Reorganized Debtors.

Except as otherwise herein provided, Reorganized RDA Holding shall serve as Disbursing Agent and authorized representative for, and with respect to, each of the Reorganization Plan Debtors.

6.4.    ***Powers of Disbursing Agent.***

A Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Reorganization Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.5.    ***Cancellation of Senior Notes.***

Each record Holder of a Senior Note Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled except to the extent otherwise provided herein. The Indenture Trustee may (but shall not be required to) request that registered Holders of the Senior Notes surrender their notes for cancellation. Such surrendered Senior Note shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Reorganization Plan Debtor third parties vis-à-vis one another with respect to such Senior Note

6.6.    ***Delivery of Distributions.***

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims. In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter. Undeliverable distributions or unclaimed distributions shall remain in the possession of the Reorganization Plan Debtors until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Reorganization Plan Debtors or Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of

distribution. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred. Distributions of holders of General Unsecured Claims that are deemed unclaimed property pursuant to the preceding sentence shall be redistributed to holders of Allowed General Unsecured Claims in accordance with Section 4.4 herein.

6.7.    ***Manner of Payment Under Plan*.**

At the option of the Reorganization Plan Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

6.8.    ***Fractional Stock*.**

If any distributions of New Common Stock pursuant to the Reorganization Plan would result in the issuance of a fractional share of New Common Stock, then the number of shares of New Common Stock to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up). The total number of shares of New Common Stock to be distributed in connection with the Reorganization Plan shall be adjusted as necessary to account for the rounding provided for in this paragraph.

6.9.    ***Minimum Cash Distributions***.

The Disbursing Agent shall not be required to make any Initial Distribution or semi-annual distribution of Cash less than $50 to any holder of an Allowed General Unsecured Claim; *provided, however,* that if any distribution is not made pursuant to this Section 6.9, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim. The Disbursing Agent shall not be required to make any final distributions of Cash less than $25 to any holder of an Allowed Claim. If either (a) all Allowed General Unsecured Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed General Unsecured Claims would be $25 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Disbursing Agent.

6.10.    ***Setoffs*.**

The Reorganization Plan Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the Reorganization Plan Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided, that* neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganization Plan Debtors or the Reorganized Debtors of any such claim the Reorganization Plan Debtors or the Reorganized Debtors may have against the holder of such Claim.

6.11.    ***Distributions After Effective Date*.**

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.12.    ***Allocation of Distributions Between Principal and Interest.***

Except as otherwise provided in this Reorganization Plan, to the extent that any Allowed Claim entitled to a distribution under the Reorganization Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

SECTION 7.    **PROCEDURES FOR DISPUTED CLAIMS.**

7.1.    ***Allowance of Claims.***

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Reorganization Plan Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under this Reorganization Plan.  Except as expressly provided in this Reorganization Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Reorganization Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

7.2.    ***Objections to Claims.***

As of the Effective Date, objections to, and requests for estimation of, Claims against the Reorganization Plan Debtors may be interposed and prosecuted only by the Reorganized Debtors subject to the conditions and rights of the Claims Oversight Committee set forth in Section 7.9 herein.  Such objections and requests for estimation shall be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Reorganized Debtors.

7.3.    ***Estimation of Claims.***

The Reorganization Plan Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Reorganization Plan Debtors or Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganization Plan Debtors or Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.4.    ***No Distributions Pending Allowance.***

If an objection to a Claim is filed as set forth in Section 7.2, no payment or distribution provided under the Reorganization Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

7.5.    ***Distributions After Allowance.***

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Reorganization Plan. On the next Distribution Date after the date that any Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise), the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Reorganization Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

7.6.    ***Resolution of Claims.***

Subject to the conditions and rights of the Claims Oversight Committee set forth in Section 7.9 of the Reorganization Plan, on and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.7.    ***Disallowed Claims.***

All claims held by persons or entities against whom or which any of the Reorganization Plan Debtors or Reorganized Debtors has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Reorganization Plan. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Reorganization Plan Debtors or the Reorganized Debtors from such party have been paid.

7.8.    ***Debtor Affiliate Claims.***

Notwithstanding anything to the contrary herein, all Debtor Affiliates shall file proofs of claim in connection with the Chapter 11 Cases in accordance with the Reorganization Plan and any order of the Court establishing a deadline for, or other procedure regarding, the filing of claims in the Chapter 11 Cases.

7.9.    ***Claims Oversight Procedures***

Notwithstanding anything herein to the contrary, the Reorganized Debtors shall consult in good faith with the Claims Oversight Committee prior to settling, compromising or allowing (a) any Claim against any of the Reorganization Plan Debtors in a liquidated amount in excess of $500,000 (including any Claim originally scheduled or filed in an unliquidated amount), (b) any Claim filed in the Chapter 11 Cases against any of the Reorganization Plan Debtors that has a positive variance, if scheduled, of more than $50,000 to the corresponding Claim as identified on the Reorganization Plan Debtors' Schedules, or (c) any Non-Debtor Intercompany Claims to the extent such Non-Debtor

Intercompany Claims are to be treated as Class 4 General Unsecured Claims for distribution purposes (collectively, "**Oversight Claims**").

The Reorganized Debtors shall notify the Claims Oversight Committee prior to entering into any settlement or compromise of any Oversight Claims.  The Claims Oversight Committee shall have a period of three (3) Business Days after receipt of such notice to review the proposed settlement or compromise and notify the Reorganized Debtors of objections, if any, to the proposed settlement or compromise of such Oversight Claims.  Thereafter, the Claims Oversight Committee shall have ten (10) Business Days after providing notice to the Reorganized Debtors of any objections to file a motion with the Bankruptcy Court objecting to the proposed settlement or compromise of the Oversight Claims.  In the event the Claims Oversight Committee fails to timely file an objection with the Bankruptcy Court within the proscribed ten (10) Business Day period, the Reorganized Debtors shall be authorized to enter into the settlement or compromise without further order of the Bankruptcy Court.

SECTION 8.    **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.

8.1.    *General Treatment*.

All executory contracts and unexpired leases to which any of the Reorganization Plan Debtors are parties are hereby rejected, except for an executory contract or unexpired lease that (a) previously has been assumed or rejected pursuant to Final Order of the Bankruptcy Court, (b) is specifically designated by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) as a contract or lease to be assumed on the Schedule of Assumed Contracts to be filed with the Plan Supplement, (c) is otherwise expressly assumed pursuant to the Reorganization Plan, including without limitation, pursuant to Sections 8.4, 8.5, 8.6 and 8.7 of the Reorganization Plan, or (d) is the subject of a separate (i) assumption motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) or (ii) rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) under section 365 of the Bankruptcy Code before the Confirmation Date.

8.2.    *Payments Related to Assumption of Contracts and Leases*.

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Reorganization Plan Debtors upon assumption thereof.  Any objection by a counterparty to a proposed assumption of an executory contract or unexpired lease or amount of any Cure must be filed, served, and actually received by the Reorganization Plan Debtors on or before thirty (30) days after the Effective Date of the Reorganization Plan applicable to the Reorganization Plan Debtor that is the counterparty to the executory contract or unexpired lease.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption and assignment of such executory contract or unexpired lease or such Cure amount will be deemed to have assented to such matters and shall be forever barred, stopped and enjoined from asserting such objection against the Reorganization Plan Debtors.  If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of the Reorganization Plan Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; *provided, that* before the Effective Date, the Reorganization Plan Debtors or the Reorganized Debtors, as applicable (with the reasonable consent of the Required Consenting Secured Parties), may settle any dispute regarding the nature or amount of Cure without any further notice to any party or any action, order or approval of the Bankruptcy Court.  If there is a dispute as referred to above, the Reorganization Plan

Debtors reserve the right to reject, or nullify the assumption or assignment of any executory contract or unexpired lease no later than 30 days after a Final Order determining the Cure, any request for adequate assurance of future performance required to assume and assign such executory contract or unexpired lease, and any other matter pertaining to assumption and/or assignment.

Assumption and assignment of any executory contract or unexpired lease pursuant to the Reorganization Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment. Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

8.3.    ***Rejection Claims.***

Unless a contract or lease is (a) specifically assumed or rejected by order of the Bankruptcy Court, (b) listed in the Plan Supplement as an executory contract or lease to be assumed as set forth in Section 8.1, (c) otherwise expressly assumed pursuant to the terms of the Reorganization Plan, or (d) the subject of a separate assumption or rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties), the Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts, in accordance with Section 8.1 of the Reorganization Plan, effective as of the Effective Date. In the event that the rejection of an executory contract or unexpired lease by any of the Reorganization Plan Debtors pursuant to the Reorganization Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Reorganization Plan Debtors or the Reorganized Debtors, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Reorganization Plan Debtors and the Reorganized Debtors no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as Class 4 General Unsecured Claims.

8.4.    ***Survival of the Reorganization Plan Debtors' Indemnification Obligations.***

Any obligations of the Reorganization Plan Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, other organizational documents, employment agreements or other agreements to indemnify current and former officers, directors, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Reorganization Plan Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Reorganization Plan Debtors shall not be discharged or impaired by confirmation of the Reorganization Plan provided that the Reorganized Debtors shall not indemnify directors of the Reorganization Plan Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud.

All such obligations shall be deemed and treated as executory contracts to be assumed by the Reorganization Plan Debtors under the Reorganization Plan and shall continue as obligations of the Reorganized Debtors unless any such obligation otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) in accordance with Section 8.1 herein.

For the avoidance of doubt, (i) any and all indemnities provided under the 2012 Senior Credit Agreement (including the indemnities provided in section 4.05 thereunder) shall survive as obligations under the DIP Loan Agreement, and (ii) any and all indemnities (and other obligations surviving per their express terms thereunder ) provided under the DIP Facility shall survive as obligations under the First Out Exit Term Loan or Second Out Exit Term Loan Agreement, as applicable, notwithstanding in each case the cancellation of the predecessor credit agreement(s).

8.5.    ***Compensation and Benefit Plans***.

Except as otherwise herein provided, all material employee compensation and Benefit Plans of the Reorganization Plan Debtors in effect as of the Effective Date shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Reorganization Plan.

Pursuant to the Reorganization Plan, Reorganized Reader's Digest shall assume the Pension Plan on the Effective Date.  The Pension Plan shall be continued in accordance with, and subject to, its terms, and Reorganized Reader's Digest shall satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, be liable for the payment of PBGC premiums in accordance with Title IV of ERISA, subject to any and all applicable rights and defenses of the Reorganized Debtors, and administer the Pension Plan in accordance with the provisions of ERISA and the Internal Revenue Code.  Notwithstanding any provision of the Reorganization Plan or the Confirmation Order to the contrary, the Pension Plan shall be continued and administered in accordance with, and subject to, its terms and ERISA and the Internal Revenue Code.  All claims related to the Pension Plan and all proofs of claim filed on account thereof shall be deemed withdrawn as of the Effective Date without any further action.

8.6.    ***Insurance Policies***.

All insurance policies pursuant to which the Reorganization Plan Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Reorganization Plan and shall be assumed by the respective Reorganization Plan Debtors and Reorganized Debtors and shall continue in full force and effect.  All other insurance policies shall revest in the Reorganized Debtors.

8.7.    ***Intellectual Property Licenses and Agreements***.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Reorganization Plan Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Reorganization Plan and shall be assumed by the respective Reorganization Plan Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Reorganization Plan Debtors (with the reasonable consent of the Required Consenting Secured Parties) in accordance with Section 8.1 herein. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall revest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such revesting as contemplated herein.

8.8.    ***Reservation of Rights***.

Neither the exclusion nor inclusion of any contract or lease by the Reorganization Plan Debtors on any exhibit, schedule or other annex to the Reorganization Plan or in the Plan Supplement, nor

anything contained in the Reorganization Plan, will constitute an admission by the Reorganization Plan Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Reorganization Plan Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Nothing in the Reorganization Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Reorganization Plan Debtors and the Reorganized Debtors under any executory or non executory contract or any unexpired or expired lease.

Nothing in the Reorganization Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Reorganization Plan Debtors or the Reorganized Debtors under any executory or non executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganization Plan Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

SECTION 9.    **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**

9.1.    *Conditions Precedent to Confirmation.*

The occurrence of Confirmation is subject to the following conditions precedent:

(a)    the entry of the Disclosure Statement Order;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance satisfactory to the Required Consenting Secured Parties;

(c)    the Bankruptcy Court shall have entered the Confirmation Order;

(d)    the occurrence of the Confirmation Date;

(e)    an order shall have been entered (which may be the Confirmation Order) finding that all Claims against the Reorganization Plan Debtors have been forever discharged, including without limitation, any FTC Claims;

(f)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect and no defaults or event of default thereunder shall have occurred and remain continuing (to the extent not otherwise cured or waived in accordance with the terms of the Restructuring Support Agreement); and

(g)    the DIP Loan Agreement shall not have been terminated, shall be in full force and effect and no default or event of default thereunder shall have occurred and remain occurring (to the extent not otherwise cured or waived in accordance with the terms of the DIP Loan Agreement);.

9.2.    *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date of the Reorganization Plan is subject to the following conditions precedent:

(a)    the Definitive Documents shall contain terms and conditions consistent in all material respects with this Reorganization Plan and the Restructuring Support Agreement and shall otherwise be reasonably satisfactory in all respects to the Reorganization Plan Debtors and the Required Consenting Secured Parties;

(b)    all actions, documents and agreements necessary to implement and consummate the Reorganization Plan, including, without limitation, entry into the documents contained in the Plan Supplement, including the Definitive Documents with respect to the First Out Exit Term Loan Agreement, the First Out Letter of Credit Facility, the Second Out Exit Term Loan Agreement, and the Amended Organizational Documents, each in form and substance reasonably satisfactory to the Reorganization Plan Debtors and the Required Consenting Secured Parties, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(c)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall have become a Final Order;

(d)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(e)    no material adverse change shall have occurred regarding the feasibility of the Reorganization Plan or the consummation of the Restructuring including with respect to contingent and unliquidated claims;

(f)    all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Reorganization Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(g)    unless on or prior to the Effective Date, (i) the Roll-Up Loans, the New Money Loans and the obligations under the DIP Facility shall have been paid in full in Cash and the letters of credit under the DIP Loan Agreement shall have been terminated, or (ii) the conditions precedent to the effectiveness of the First Out Exit Facilities, as set forth in the First Out Exit Term Sheet, shall have been satisfied or waived by the Consenting Lender and the conditions precedent to the effectiveness of the Second Out Term Loan Agreement shall have been satisfied or waived by the New Money Lenders;

(h)    All the conditions precedent to the effectiveness of the Second Out Exit Loan Agreement shall have been satisfied or waived by the requisite New Money Lenders;

(i)    the Non-Dischargeability Deadline shall have expired and (i) no non-dischargeability complaint shall have been filed or remain pending, and (ii) no Claim in excess of $50,000 shall have been determined by the Bankruptcy Court to be non-dischargeable under the Bankruptcy Code; and

(j)    the DIP Loan Agreement shall not have been terminated, shall be in full force and effect and no default or event of default thereunder shall have occurred.

9.3. ***Waiver of Conditions Precedent.***

Each of the conditions precedent in Sections 9.1 and 9.2 may be waived in writing by the Reorganization Plan Debtors together with the prior written consent of the Required Consenting Secured Parties.

9.4. ***Effect of Failure of Conditions to Effective Date.***

Unless otherwise extended by the Reorganization Plan Debtors with the consent of the Required Consenting Secured Parties, if the Effective Date does not occur on or before July 31, 2013 or if the Confirmation Order is vacated, (i) no distributions under the Reorganization Plan shall be made, (ii) the Reorganization Plan Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Reorganization Plan Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Reorganization Plan Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Reorganization Plan Reorganization Plan Debtors or otherwise.

SECTION 10.    **EFFECT OF CONFIRMATION.**

10.1. ***Subordinated Claims.***

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Reorganization Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto (including all rights under the Security Agreement), whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganization Plan Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

10.2. ***Vesting of Assets.***

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Reorganization Plan Debtors' estates, including without limitation, the intellectual property licenses and other agreements set forth above in Section 8.7, shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to this Reorganization Plan, the Confirmation Order, the First Out Exit Term Loan Agreement, or the Second Out Exit Term Loan Agreement. The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.

10.3. ***Discharge of Claims and Termination of Interests.***

Except as otherwise provided in the Reorganization Plan, effective as of the Effective Date: (a) the rights afforded in the Reorganization Plan and the treatment of all claims and interests shall be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever (including any FTC Claims), including any interest accrued on such claims from and after the Commencement Date, against the Reorganization Plan Debtors or any of their assets, property or

estates; (b) the Reorganization Plan shall bind all holders of claims and interests, notwithstanding whether any such holders failed to vote to accept or reject the Reorganization Plan or voted to reject the Reorganization Plan; (c) all claims and interests shall be satisfied, discharged, and released in full, including without limitation, any FTC Claims, and the Reorganization Plan Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities shall be precluded from asserting against the Reorganization Plan Debtors, the Reorganization Plan Debtors' estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other claims or interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

### 10.4.    *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5.    *Injunction Against Interference with Plan.*

From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to the Reorganization Plan or the Confirmation Order.

### 10.6.    *Releases by the Reorganization Plan Debtors.*

**As of the Effective Date, except for the right to enforce the Reorganization Plan and the Definitive Documents that remain in effect after the Effective Date, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Reorganization Plan Debtors and the implementation of the restructuring contemplated by the Reorganization Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Reorganization Plan Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Reorganization Plan Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Reorganization Plan Debtors, the Reorganized Debtors, the Estates or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Reorganization Plan Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Reorganization Plan Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Reorganization Plan, the business or contractual arrangements between any Reorganization Plan Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Reorganization Plan, or related agreements, instruments or other documents, the solicitation of votes with respect to the Reorganization Plan, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud; *provided,***

*however*, that nothing in the Reorganization Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

10.7.   *Releases By Holders of Claims and Interests*.

As of the Effective Date, except for the right to enforce the Reorganization Plan and the Definitive Documents that remain in effect after the Effective Date and the indemnification obligations that survive the Effective Date, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganization Plan Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Reorganization Plan Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Reorganization Plan Debtors, the Reorganization Plan Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Reorganization Plan Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Reorganization Plan, the business or contractual arrangements between any Reorganization Plan Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Reorganization Plan, or related agreements, instruments or other documents, the solicitation of votes with respect to the Reorganization Plan, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud; *provided, however,* that nothing herein shall be deemed to constitute a release or waiver by the Consenting Lender, the Administrative Agent or the Consenting Secured Noteholders of any rights arising from or in connection with section 5.5 of the Security Agreement; *provided further, however,* that nothing in the Reorganization Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).  No Person shall be discharged, released or relieved from any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases or the Reorganization Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases, the Reorganization Plan's provisions or the Reorganization Plan's Confirmation.

10.8.   *Exculpation*.

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, the negotiation and pursuit of the Reorganization Plan, or the solicitation of votes for, or confirmation of, the Reorganization Plan, the funding of the Reorganization Plan, the consummation of the Reorganization Plan, or the administration of the Reorganization Plan or the property to be distributed under the Reorganization Plan, or any other transaction contemplated by the foregoing,  except for willful misconduct or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Reorganization Plan.  The Reorganization Plan Debtors, the Reorganized Debtors, the Creditors Committee, the DIP Lenders, the DIP Agent, the Administrative Agent, the Senior Credit Agreement Lenders, the Consenting Lender, the Consenting Secured

US_ACTIVE:\44191040\16\69252.0040

Noteholders, the Indenture Trustee, the Unsecured Administrative Agent, the 2011 Secured Administrative Agent, the Unsecured Lenders, and the 2011 Secured Lenders (and each of their respective affiliates, agents, directors, officers, employees, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Reorganization Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Reorganization Plan or such distributions made pursuant to the Reorganization Plan, including the issuance of securities thereunder; *provided, however,* that nothing herein shall be deemed to constitute a release or waiver by the Consenting Lender, the Administrative Agent or the Consenting Secured Noteholders of any rights arising from or in connection with section 5.5 of the Security Agreement; *provided, however,* that nothing in the Reorganization Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).   No Person shall be discharged, released or relieved from any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases or the Reorganization Plan, nor shall the PBGC, the Pension Plan or any other Person be enjoined or precluded from enforcing any liability arising under ERISA or the Internal Revenue Code solely with respect to the Pension Plan as a result of the Chapter 11 Cases, the Reorganization Plan's provisions or the Reorganization Plan's Confirmation.

10.9.    *Retention of Causes of Action/Reservation of Rights.*

(a)    Except as otherwise provided herein, including Sections 10.6, 10.7, 10.8 and 10.9, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Reorganization Plan Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim and/or Claim for setoff which seeks affirmative relief against the Reorganization Plan Debtors, the Reorganized Debtors, their officers, directors or representatives; and (ii) the turnover of any property of the Reorganization Plan Debtors' estates; *provided, however* that the Reorganized Debtors shall not retain (1) any Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, which Claims or Causes of Action are hereby preserved); or (2) any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures).   The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(b)    Except as otherwise provided herein, including Sections 10.6, 10.7, 10.8 and 10.9, nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff or other legal or equitable defense which the Reorganization Plan Debtors had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Reorganization Plan; *provided, however* that the Reorganized Debtors shall not retain any (1) Claims or Causes of Action against the Released Parties (other than Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, which Claims or Causes of Action are hereby preserved); or (2) any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures).   The Reorganized Debtors

shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Reorganization Plan as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Reorganization Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

10.10.  *Solicitation of the Reorganization Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Reorganization Plan Debtors shall be deemed to have solicited acceptances of the Reorganization Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Reorganization Plan Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Reorganization Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Reorganization Plan or the offer and issuance of any securities under the Reorganization Plan.

10.11.  *Section 1145 Exemption.*

The issuance of and the distribution under the Reorganization Plan of the New Common Stock to the holders of Senior Noteholder Secured Claims under Section 4.3 of this Reorganization Plan shall be exempt from registration under the Securities Act of 1933 or applicable securities laws without further act or action by any Person pursuant to section 1145(a) of the Bankruptcy Code.

In addition, under section 1145 of the Bankruptcy Code, any securities issued under the Reorganization Plan which are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (2) compliance with any rules and regulations of the Securities and Commission, if any, applicable at the time of any future transfer of such securities or instruments; (3) the restrictions, if any, on the transferability of such securities and instruments; and (4) applicable regulatory approval.

10.12.  *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in the Plan Supplement will be posted at the website of the Reorganization Plan Debtors' notice, claims, and solicitation agent as they become available.

10.13.  *Corporate and Limited Liability Company Action.*

Upon the Effective Date, all actions contemplated by the Reorganization Plan shall be deemed authorized and approved in all respects, including (a) the assumption of all employee compensation and Benefit Plans of the Reorganization Plan Debtors as provided herein, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the distribution of the New

Common Stock, (d) the entry into the First Out Exit Facilities and the Second Out Exit Term Loan Agreement, (e) the approval of the Restructuring Support Agreement, and (f) all other actions contemplated by the Reorganization Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Reorganization Plan involving the corporate or limited liability company structure of the Reorganization Plan Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Reorganization Plan Debtors or the Reorganized Debtors in connection with the Reorganization Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Reorganization Plan Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Reorganization Plan Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Reorganization Plan (or necessary or desirable to effect the transactions contemplated by the Reorganization Plan) in the name of and on behalf of the Reorganized Debtors, including (w) the Amended Organizational Documents, (x) the First Out Exit Facilities, (y) the Second Out Exit Term Loan Agreement, and (z) any and all other agreements, documents, securities and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Section 10.13 shall be effective notwithstanding any requirements under non-bankruptcy law.

## SECTION 11.    **RETENTION OF JURISDICTION.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Reorganization Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Reorganization Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Reorganization Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Reorganization Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Reorganization Plan or to maintain the integrity of the Reorganization Plan following consummation;

(k)    to hear any disputes arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(l)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)    to adjudicate, decide, or resolve any Causes of Actions;

(o)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(p)    to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(q)    to adjudicate any and all disputes arising from or relating to distributions under the Reorganization Plan;

(r)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(s)    to enter a final decree closing the Chapter 11 Cases;

(t)    to recover all assets of the Reorganization Plan Debtors and property of the Reorganization Plan Debtors' estates, wherever located; and

(u)    to hear and determine any rights, Claims or causes of action held by or accruing to the Reorganization Plan Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

For the avoidance of doubt, the Bankruptcy Court shall not retain jurisdiction over any matters arising in connection with the Exit Financing or any transactions related thereto.

SECTION 12.    **MISCELLANEOUS PROVISIONS.**

12.1.    ***Payment of Statutory Fees.***

On the Effective Date and thereafter as may be required, the Reorganized Plan Debtors shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Reorganization Plan Debtor's case, or until such time as a final decree is entered closing a particular Reorganization Plan Debtor's case, a Final Order converting such Reorganization Plan Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing such Reorganization Plan Debtor's case is entered.

12.2.    ***Substantial Consummation.***

On the Effective Date, the Reorganization Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.3.    ***Dissolution of Creditors Committee.***

On the Effective Date, the Creditors Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* the Creditors Committee shall exist, and its professionals shall be retained, after the Effective Date with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order.

12.4.    ***Request for Expedited Determination of Taxes.***

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

12.5.    ***Amendments.***

(a)    *Plan Modifications.*    The Reorganization Plan may be amended, modified or supplemented by the Reorganization Plan Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided, that* such amendments, modifications, or supplements shall be satisfactory in all respects to the Reorganization Plan Debtors, the Creditors Committee and the Required Consenting Secured Parties.  In addition, after the Confirmation Date, the Reorganization Plan Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Reorganization Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Reorganization Plan.

(b)    *Other Amendments.*    Before the Effective Date, the Reorganization Plan Debtors may make appropriate technical adjustments and modifications to the Reorganization Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided, however*, that such technical adjustments and modifications shall be satisfactory to the Required Consenting Secured Parties.

12.6.    *Effectuating Documents and Further Transactions*.

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers, to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Reorganization Plan.

12.7.    *Revocation or Withdrawal of the Reorganization Plan*.

The Reorganization Plan Debtors may not revoke or withdraw the Reorganization Plan before the Effective Date without the consent of the Required Consenting Secured Parties; *provided, however*, that the Reorganization Plan Debtors may revoke or withdraw the Reorganization Plan only if it is in the exercise of the Reorganization Plan Debtors' fiduciary duty or as otherwise permitted under the Restructuring Support Agreement.    If the Reorganization Plan Debtors take such action, the Reorganization Plan shall be deemed null and void.    In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Reorganization Plan Debtors or any other person or to prejudice in any manner the rights of the Reorganization Plan Debtors or any person in further proceedings involving the Reorganization Plan Debtors.

12.8.    *Severability of Plan Provisions upon Confirmation*.

If, before the entry of the Confirmation Order, any term or provision of the Reorganization Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Reorganization Plan Debtors (to be made only with the consent of the Required Consenting Secured Parties), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided, however,* that any such alteration and interpretation shall be acceptable to the Required Consenting Secured Parties.    Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Reorganization Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.    The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Reorganization Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Reorganization Plan and may not be deleted or modified without the consent of the Reorganization Plan Debtors or the Reorganized Debtors (as the case may be); and (3) nonseverable and mutually dependent.

12.9.    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Reorganization Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

12.10.    *Time*.

In computing any period of time prescribed or allowed by the Reorganization Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

US_ACTIVE:\44191040\16\69252.0040

45

12.11.  *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Reorganization Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganization Plan Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

12.12.  *Successor and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Reorganization Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.13.  *Entire Agreement.*

On the Effective Date, the Reorganization Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Reorganization Plan.

12.14.  *Notices.*

All notices, requests and demands to or upon the Reorganization Plan Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i) if to the Reorganization Plan Debtors or Reorganized Debtors:

> RDA Holding Co.
> 750 Third Avenue
> New York, NY 10017
> Facsimile:
> Attn:  Andrea Newborn, Esq.
>
>    - and -
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attn:  Joseph H. Smolinsky, Esq.
>      Marcia L. Goldstein, Esq.
>      Matthew P. Goren, Esq.
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007

(ii) if to the Creditors Committee:

Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, NY 10169
Attn:    Scott L. Hazan, Esq.
            David M. Posner, Esq.
Telephone:  (212) 661-9100
Facsimile:  (212) 682-6104

(iii) if to the Administrative Agent, the Senior Credit Agreement Lenders, the Issuing Lender, the Consenting Lender, the Roll-Up Lender, or the DIP Lender:

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Attn:    Abhilash M. Raval, Esq.
            Blair M. Tyson, Esq.
            Michael E. Comerford, Esq.
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

(iv) if to the New Money Lenders,  the Consenting Secured Noteholders, or the DIP Agent:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn: James H.M. Sprayregen, P.C.
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Paul M. Basta, Esq.
            Nicole L. Greenblatt, Esq.
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

After the Effective Date, the Reorganization Plan Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganization Plan Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:  May 7, 2013
        New York, New York

Respectfully submitted,


RDA Holding Co., The Reader's Digest Association,
Inc., and each of the Reorganization Plan Debtors


By:     _____
        Name: Robert E. Guth
        Title: President and Chief Executive Officer

**Exhibit A**

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

     This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of February 17, 2013 (as amended, supplemented or otherwise modified in accordance with the terms hereof, this "<u>Support Agreement</u>", which defined term shall include all exhibits and schedules annexed hereto including, without limitation, the Term Sheets (as defined below) by and among (i) RDA Holding Co. ("<u>Holding</u>"), The Reader's Digest Association, Inc. (the "<u>Company</u>"), and certain of the Company's subsidiaries set forth on <u>Schedule 1</u> annexed hereto (together with Holding and the Company, the "<u>Debtors</u>" and excluding Direct Entertainment Media Group, Inc., the "<u>Plan Debtors</u>"), (ii) Wells Fargo Principal Lending, LLC, as issuing lender and sole lender (Wells Fargo Principal Lending, LLC or one of its affiliates, the "<u>Consenting Lender</u>") under that certain Credit Agreement, dated as of March 30, 2012 (the "Credit Agreement") by and among the Debtors, the Consenting Lender and Wells Fargo Bank, N.A., as administrative agent (in such capacity, the "<u>Administrative Agent</u>") and (iii) the undersigned holders (the "<u>Consenting Secured Noteholders</u>") of the $464 million outstanding senior secured notes of the Company due 2017 (the "<u>Secured Notes</u>") issued pursuant to that certain Indenture, dated as February 11, 2010 (as amended, supplemented or otherwise modified, the "<u>Indenture</u>") by and among the Debtors, the holders from time to time (the "<u>Secured Noteholders</u>") of the Secured Notes, Wells Fargo Bank, N.A., as indenture trustee (in such capacity, the "<u>Indenture Trustee</u>") and Wilmington Trust FSB, as collateral agent (the "<u>Collateral Agent</u>").   The Consenting Lender and the Consenting Secured Noteholders are collectively referred to herein as, the "<u>Consenting Secured Parties</u>," and together with the Debtors, the "<u>Parties</u>."

## WHEREAS

     A.    The Company and the Consenting Secured Parties have engaged in negotiations to consummate a restructuring of the Company's indebtedness and other obligations, including the Debtors' obligations under the Credit Agreement and the Indenture, pursuant to the terms and conditions set forth in the Restructuring Term Sheet attached hereto as <u>Exhibit A</u> (including the DIP Commitment Letter, the related DIP term sheet (the "<u>DIP Term Sheet</u>"), the interim DIP Order (the "<u>Interim Order</u>"), chapter 11 restructuring term sheet (the "<u>Restructuring Term Sheet</u>"), the first out exit term sheet (the "<u>First Out Exit Term Sheet</u>"), the second out exit term sheet (the "<u>Second Out Exit Term Sheet</u>") and all other exhibits thereto, collectively, the "<u>Term Sheets</u>") and incorporated into this Support Agreement (the "<u>Restructuring Transactions</u>").

     B.    The Debtors have requested, and the Consenting Secured Parties have agreed, to provide a debtor-in-possession financing facility under that certain credit agreement (the "<u>DIP Credit Agreement</u>") referred to in the Commitment Letter dated as of February 17, 2013 (the "<u>DIP Commitment Letter</u>", which term shall include the Term Sheets attached thereto) subject to the terms and conditions thereof.

     C.    The Parties anticipate that the Restructuring Transactions will be consummated by all of the Debtors filing voluntary petitions (the "<u>Petitions</u>") under

1

chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "<u>Bankruptcy Court</u>") (the date of filing of such voluntary petitions, the "<u>Petition Date</u>", and such cases being the "<u>Chapter 11 Cases</u>").

D.    This Support Agreement and the Term Sheets set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement and support the Restructuring Transactions.

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, agrees as follows:

**Section 1.   <u>Conditions to Effectiveness of Support Agreement.</u>**

This Support Agreement shall become effective and binding upon each of the Parties at 12:01 a.m. prevailing Eastern Time on the date on which all of the following conditions are satisfied (the "<u>Effective Date</u>"):

(a)    The Consenting Secured Parties or their counsel shall have received duly executed signature pages for this Support Agreement signed by the Debtors;

(b)    The Debtors shall have received duly executed signature pages for this Support Agreement from (i) the Consenting Lender and (ii) Consenting Secured Noteholders holding at least 66 2/3% in principal amount of the prepetition outstanding Secured Notes;

(c)    The DIP Commitment Letter and the related fee letters shall have been executed by the Debtors and the Consenting Secured Parties party thereto; and

(d)    All accrued fees and expenses due to the Consenting Secured Parties and their respective counsel (including one prior counsel for the Consenting Lender) will have been paid.

**Section 2.   <u>Plan of Reorganization.</u>**

**2.1    Support of Acceptable Plan.**

(a)    Subject to Sections 1125 and 1126 of the Bankruptcy Code (if and to the extent applicable), and so long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived or cured in accordance with the terms hereof:

(1) each Plan Debtor severally (and not jointly) agrees to:

113-22223333rd dDoc CDoc F1led F21ed 0217/15/07 EnterecEntered 02/07/05/27/53 024:08M5ain DocumenDocumePiag P7313217 of 3306

EXECUTION COPY

(i)     (A) support and consummate all of the Restructuring Transactions contemplated by the Term Sheets, this Support Agreement and the Acceptable Plan (as defined in Section 2.1(a)(1)(ii)), (B) take any and all necessary and appropriate actions in furtherance of all of the Restructuring Transactions contemplated under this Support Agreement, the Acceptable Plan and the Term Sheets, (C) complete all of the Restructuring Transactions contemplated under this Support Agreement, the Term Sheet and the Acceptable Plan in accordance with the terms hereof and thereof and take all steps necessary and desirable to obtain the Confirmation Order (as defined in Section 2.1.(b)), and (D) obtain any and all required regulatory and/or third-party approvals for such Restructuring Transactions; and

(ii)    not directly or indirectly (a) propose or support any plan of reorganization or liquidation in the Chapter 11 Cases other than a chapter 11 plan of reorganization incorporating the terms of the Term Sheets and which chapter 11 plan of reorganization and related disclosure statement (including all exhibits thereto) are otherwise in all material respects, in form and substance satisfactory to the Required Consenting Secured Parties (as defined in section 9.14 herein) (as amended, supplemented or otherwise modified subject to the terms hereof, the "<u>Acceptable Plan</u>" and the "<u>Acceptable Disclosure Statement,</u>" as applicable) (b) take any action which is inconsistent with, or that would unreasonably delay or impede approval or confirmation of the Acceptable Plan or that is otherwise inconsistent with the express terms of this Support Agreement including, for the avoidance of doubt, any action that does not support or is otherwise inconsistent with the approval of the Lender Protections (as defined in the DIP Term Sheet), or (c) seek, solicit, support, encourage or participate in any discussions regarding any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, consolidation, liquidation or restructuring of any of the Plan Debtors that could reasonably be expected to prevent, delay or impede the confirmation of the Acceptable Plan; and

(iii)   provide written notice to the Consenting Secured Parties, within one (1) Business Day of making any determination that its fiduciary duties require it to consider any plan other than the Acceptable Plan.

3

     (2)  each Consenting Secured Party, severally (and not jointly) agrees to:

         (i)     (A) support and consummate all of the Restructuring Transactions contemplated by the Term Sheets and this Support Agreement and the Acceptable Plan, (B) take any and all necessary and appropriate actions in furtherance of all of the Restructuring Transactions contemplated under this Support Agreement and the Term Sheets and the Acceptable Plan, (C) complete all of the Restructuring Transactions contemplated under this Support Agreement and the Term Sheet and the Acceptable Plan in accordance with the terms hereof and thereof; and

        (ii)    subject to the receipt by such Consenting Secured Party of the Acceptable Disclosure Statement and other solicitation materials in respect of the Acceptable Plan, which Acceptable Disclosure Statement and solicitation materials reflect the agreement set forth in this Support Agreement and the Term Sheets and have been approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and are in all material respects reasonably satisfactory to the Required Consenting Secured Parties (collectively, the "Solicitation Materials"): (a) vote, to the extent such Consenting Secured Party is entitled to vote under the terms of the Acceptable Plan and the Bankruptcy Code, all of its claims against the Debtors to accept the Acceptable Plan by delivering its duly executed and completed ballot(s) accepting such Acceptable Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot(s) and (b) not change or withdraw (or cause to be changed or withdrawn) such vote.

For the avoidance of doubt, each of the Consenting Lender, the Consenting Secured Noteholders, and the Plan Debtors also agrees, severally and not jointly, that, unless this Support Agreement is terminated in accordance with the terms hereof, it will not take any action that would in any material respect interfere with, delay, or postpone the confirmation or consummation of the Acceptable Plan and implementation of the Restructuring Transactions, including, without limitation, objecting to the debtor-in-possession financing set forth in the DIP Commitment Letter or propose any alternative financing.

Nothing contained in this Support Agreement shall be deemed to (1) prevent any Party from taking, or failing to take, any action that it is obligated to take (or fail to take) in the performance of any fiduciary or similar duty which such Party owes to any other person.

(b)     Upon confirmation of the Acceptable Plan pursuant to an order in all material respects in form and substance reasonably satisfactory to the Required Consenting Secured Parties (the "Confirmation Order"), and so long as it is not subject to a stay and the conditions to effectiveness thereof have been satisfied or waived, the Consenting Secured Parties and the Plan Debtors shall use commercially reasonable efforts to consummate the Acceptable Plan; provided that the Consenting Lender and the Consenting Secured Noteholders shall only provide the First Out Exit Term Loan and the Second Out Exit Term Loan, respectively, subject to satisfaction of the terms and conditions set forth in the First Out Exit Term Sheet and the Second Out Exit Term Sheet, respectively; provided further that if the terms and conditions set forth in the First Out Exit Term Sheet or the Second Out Exit Term Sheet are not satisfied, the Refinancing Loans and the New Money Loans (as each is defined in the DIP Term Sheet) must be repaid in full in cash.

(c)     DIP Commitment Letter attached as Exhibit A to the Restructuring Term Sheet as part of the Term Sheets.

## 2.2     Confirmation of Acceptable Plan.

Without limiting any other provision hereof, the Plan Debtors shall each use their reasonable best efforts to have the Acceptable Plan confirmed by the Bankruptcy Court as expeditiously as possible under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the Bankruptcy Court (the federal and local rules being, the "Bankruptcy Rules") and within the timeframes contemplated by this Support Agreement.

## Section 3.  Releases.

The Acceptable Plan will include a full release from liability by the Plan Debtors in favor of the Debtors and their subsidiaries, the Consenting Lender, the Administrative Agent, the Consenting Secured Noteholders and the DIP Lenders (the "Released Parties") and all current and former direct and indirect equityholders, members, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) of the Released Parties from any claims and causes of action related to or arising on or prior to the Effective Date, except for any claims and causes of action relating to unlawful acts; provided, however, that nothing herein shall be deemed to constitute a release or waiver by the Consenting Lender, the Administrative Agent or the Consenting Secured Noteholders of any rights arising from or in connection with that certain Security Agreement dated February 19, 2010 (the "Security Agreement") by and

5

K&E 25245614.7

among the Debtors, the Consenting Secured Parties, the Collateral Agent, the Administrative Agent and the Indenture Trustee, including, without limitation, all rights arising in connection with section 5.5 of such agreement.

## Section 4.  Termination Events.

### 4.1  Termination Events.

The occurrence of any of the following (without the need for the taking of any action) shall be a "Termination Event":

(a)  Upon the effective date of the Acceptable Plan or a written agreement among the Debtors and the Required Consenting Secured Parties terminating this Support Agreement;

(b)  Upon entry of an order by any court of competent jurisdiction or other competent governmental or regulatory authority making illegal or otherwise restricting, preventing or prohibiting the consummation of the Restructuring Transactions contemplated by the Acceptable Plan or this Support Agreement;

(c)  Upon filing of any motion or other pleading by one or more of the Debtors seeking the entry of an order, or upon entry of an order, by any court of competent jurisdiction authorizing the sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or otherwise;

(d)  The occurrence of any breach of this Support Agreement by any of the Parties (to the extent not otherwise cured or waived in accordance with the terms hereof); provided, that if any Party (other than any Plan Debtor) shall breach its obligations pursuant to this Support Agreement, the Termination Date arising as a result of such act or omission shall apply only to such Party and this Support Agreement shall otherwise remain in full force and effect with respect to the Debtors and all such remaining Parties;

(e)  On the date that any Plan Debtor withdraws the Acceptable Plan, publicly announces its intention not to support the Acceptable Plan or files any plan of reorganization or liquidation and/or disclosure statement that is not consistent with the Acceptable Plan or Acceptable Disclosure Statement, respectively, or publicly announces its support for any such inconsistent plan and/or disclosure statement, gives the notice described in Section 2.1(a)(1)(iii) hereof, or otherwise evinces an intention not to proceed with the Acceptable Plan or to proceed with any alternative plan or form of transaction;

(f)  On the date of entry of any order in the Chapter 11 Cases terminating the Plan Debtors' exclusive right to file a plan or plans of reorganization

pursuant to Section 1121 of the Bankruptcy Code; provided that such order is not the result of a motion filed by any Consenting Secured Party;

(g)     On the date any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases or the Debtors shall file a motion or other request for such relief;

(h)     On the date of either (1) a filing by any Debtor of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the obligations referred to in the Credit Agreement, the Indenture and the collateral documents related thereto (collectively, the "Secured Obligations") or any other cause of action against and/or with respect to the Secured Obligations, the prepetition liens securing such Secured Obligations and the Consenting Secured Parties (or if the Debtors support any such motion, application or adversary proceeding commenced by any third party or consent to the standing of any such third party) or (2) the entry of an order of the Bankruptcy Court providing relief against the interests of any Consenting Secured Party with respect to any of the foregoing causes of action or proceedings;

(i)     Upon any material adverse change regarding the feasibility of the Acceptable Plan arising on or after the Effective Date of this Support Agreement, including, without limitations, the assertion of material contingent and/or unliquidated liabilities, as determined by the Required Consenting Secured Parties in their reasonable discretion;

(j)     Upon the amendment, modification of, or the filing of a pleading by any of the Plan Debtors that seeks to amend or modify the Acceptable Plan, the Acceptable Disclosure Statement or any documents related to the Acceptable Plan or Acceptable Disclosure Statement, notices, exhibits or appendices, which amendment, modification or filing is inconsistent with this Support Agreement and not otherwise consented to by the Required Consenting Secured Parties;

(k)     Upon failure of the Debtors to commence the Chapter 11 Cases on or before 11:59 p.m. (New York City time) on February 18, 2013;

(l)     11:59 p.m. (New York City time) on the fifth (5th) Business Day after the Petition Date, unless prior thereto the Bankruptcy Court enters an interim order in the Chapter 11 Cases of the Debtors under, inter alia Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code in form and substance satisfactory to the Required Consenting Secured Parties, authorizing the

7

Debtors to incur postpetition financing and use cash collateral, granting adequate protection to the prepetition Secured Parties, and scheduling a final hearing pursuant to Bankruptcy Rule 4001(B) (the "<u>Interim DIP Order</u>");

(m)    11:59 p.m. (New York City time) on the fortieth (40th) day after the date of entry of the Interim DIP Order, unless prior thereto the Bankruptcy Court enters a final order in the Chapter 11 Cases of the Debtors under, <u>inter alia</u> Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code in form and substance satisfactory to the Required Consenting Secured Parties, authorizing the Debtors to incur postpetition financing and use cash collateral and granting adequate protection to the prepetition Secured Parties (the "<u>Final DIP Order</u>" and together with the Interim DIP Order, the "<u>DIP Orders</u>");

(n)    Upon the entry of an order by a court of competent jurisdiction reversing, modifying, amending, staying or vacating either of the Interim DIP Order or the Final DIP Order;

(o)    11:59 p.m. (New York City time) on the date of the occurrence of an "Event of Default" under, and as such term is defined in, the DIP Credit Agreement and the acceleration of the obligations thereunder;

(p)    11:59 p.m. (New York City time) on the date that is 25 days after the Petition Date, if the Plan Debtors shall not have filed the Acceptable Plan and the Acceptable Disclosure Statement with the Bankruptcy Court on or before such time;

(q)    11:59 p.m. (New York City time), on the date that is 75 days after the Petition Date, unless the Bankruptcy Court has entered an order, in form and substance satisfactory to the Required Consenting Secured Parties, approving the Acceptable Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code on or before such time;

(r)    11:59 p.m. (New York City time), on the date that is 15 days following entry of the order approving the Acceptable Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, unless prior thereto the Company commences the solicitation of acceptances of the Acceptable Plan;

(s)    11:59 p.m. (New York City time), on July 5, 2013, if the Plan Debtors shall not have filed with the Bankruptcy Court on or before such time a supplement to the Acceptable Plan containing documents in form and substance reasonably satisfactory to the Required Consenting Secured Parties as contemplated by the Term Sheet (the "Acceptable Plan Supplement");

(t)    11:59 p.m. (New York City time), on July 15, 2013, unless the Bankruptcy Court has entered the Confirmation Order on or before such time;

(u)     11:59 p.m. (New York City time) on July 31, 2013, unless the "effective date" of the Acceptable Plan has occurred prior thereto;

(v)     Any of the Lender Protections are not approved in the Interim DIP Order or the Final DIP Order of if such protections or any of the other adequate protection provided to the Consenting Lender is unwound or otherwise successfully challenged at any time after entry of such interim or final order;

(w)     The non-payment of any accrued, unpaid and ongoing expenses incurred by the Consenting Secured Parties in connection with the Restructuring Transactions and any agreements related thereto in accordance with section 9.12 of this Support Agreement; or

(x)     11:59 p.m. (New York City time), on the date that is 60 days after the Petition Date, unless the Bankruptcy Court has entered an order establishing bar dates for submitting proofs of claim and requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code.

## 4.2     Additional Debtor Termination Events.

The Debtors may terminate this Support Agreement upon five (5) Business Days prior written notice to the Consenting Secured Parties upon the occurrence of either of the following events:  (i) the breach by any Consenting Secured Party of the representations, warranties, or covenants of such Consenting Secured Party set forth in this Support Agreement that would be reasonably likely to have a material adverse impact on the Debtors, or the consummation of the Restructuring Transactions, that remains uncured for a period of five (5) Business Days after receipt by such Consenting Secured Party of notice of such breach; provided that this Support Agreement shall otherwise remain in effect with respect to non-breaching Consenting Secured Parties; or (ii) the board of directors of the Company reasonably determines based upon the written advice of outside counsel that proceeding with the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties.

Notwithstanding anything to the contrary herein, the releases provided for in Section 3 hereof shall survive the termination of this Support Agreement under either Section 4.1 or 4.2 hereof; provided, that the releases set forth in Section 3 herein shall automatically be null and void and of no further force and effect as if the release had never been granted with respect to any Party that has breached the terms of the penultimate paragraph of Section 2.1(a) hereof or any other terms herein in any material respect.

## 4.3     Termination Event Procedures.

Upon the occurrence of a Termination Event under (i) Section 4.1 (a), (b), (c), (e), (f), (g), (h), (j), (l), (m), (n), (o) or (u) and (v) of this Support Agreement, this Support Agreement shall automatically terminate without any further action or notice, and

9

(ii) Section 4.1 (d), (i), (k), (p), (q), (r), (s), (t), (w) and (x) of this Support Agreement, five (5) Business Days after Consenting Secured Parties or, with respect to a Termination Event under Section 4.1(c) which has occurred as a result of a breach of this Support Agreement by any Party, the other non-breaching Parties, shall have given written notice of the occurrence of such Termination Event to the other parties hereto and such Termination Event shall not have been cured during such five (5) Business Days after receipt of such notice (or otherwise waived in writing by the requisite Parties in accordance with the terms hereof), this Support Agreement shall terminate (the date of termination under clause (i) or (ii) hereof being the "Termination Date"); provided, however, that any waiver of an event of default under the DIP Credit Agreement that has been granted without the consent of the Consenting Lender shall in no way be deemed to constitute a waiver of any Termination Event hereunder. For the avoidance of doubt, the automatic stay arising pursuant to Section 362 of the Bankruptcy Code in the Chapter 11 Cases shall be deemed waived or modified for purposes of providing notice hereunder or terminating this Support Agreement and, in any event, the giving of notice of termination by any Party pursuant to this Support Agreement shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code. For the further avoidance of doubt, the Debtors acknowledge that the foregoing stipulation is a material and necessary inducement for the Consenting Lender's entry into this Support Agreement.

## Section 5. Remedies.

It is understood and agreed by each of the Parties that any breach of this Support Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and, accordingly, the Parties agree that, in addition to any other remedies, each Party shall be entitled, without the requirement of posting a bond or other security, to specific performance and injunctive or other equitable relief. The Debtors each agree that for so long as any Party has not taken any action to prejudice the enforceability of this Support Agreement (including, without limitation, alleging in any pleading that this Support Agreement is unenforceable), and has taken such actions as are reasonably required or desirable for the enforcement hereof, then such Party shall have no liability for damages hereunder in the event a court determines that this Support Agreement is not enforceable. Without limiting the provisions hereof, the Parties hereby agree that if any Party breaches the terms of the penultimate paragraph of Section 2.1(a) hereof or any other terms herein in any material respect (to the extent not otherwise cured or waived in accordance with the terms hereof), the release contemplated in Section 3 hereof shall not be granted to such breaching Party.

## Section 6. Mutual Representations, Warranties and Covenants.

### 6.1 Power and Authority.

Each Party severally, and not jointly, represents to each other Party that, as of the date of this Support Agreement, (i) such Party has all requisite corporate, partnership, or limited liability company power and authority to enter into this Support Agreement and to carry out the Restructuring Transactions contemplated by, and perform its respective obligations under, this Support Agreement, and (ii) the execution and delivery of this

K&E 25245614.7

Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**6.2     Enforceability.**

Each Party severally, and not jointly, represents to each other Party that this Support Agreement is the legally valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability or ruling of the Bankruptcy Court.

**6.3     Representation.**

Each of the Parties to this Support Agreement acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Support Agreement and the Restructuring Transactions contemplated by this Support Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Support Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**6.4     Governmental Consents.**

Each Party severally, and not jointly, represents to each other Party that, as of the date of this Support Agreement, the execution, delivery, and performance by it of this Support Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body, except (i) such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (ii) any filings in connection with the Chapter 11 Cases, including the approval of the Acceptable Disclosure Statement and confirmation of the Acceptable Plan, and (iii) in the case of the Debtors, (A) filings of amended articles of incorporation or formation or other organizational documents with applicable state authorities, and (B) other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Debtors.

**6.5     Ownership.**

(a)     Each Consenting Secured Party severally, and not jointly, represents and warrants that, as of the date hereof, (i) such Consenting Secured Party either (A) is the sole legal and beneficial owner of its share of the obligations under the Credit Agreement or Secured Notes, as applicable or (B) is the legal owner of its share of the prepetition obligations under the Credit Agreement or Secured Notes, as applicable, and has the

11

K&E 25245614.7

EXECUTION COPY

power and authority to bind the legal and beneficial owner(s) of such prepetition Secured
Notes or Credit Agreement obligations to the terms of this Support Agreement, (ii) such
Consenting Secured Party (a) has full power and authority to vote on and consent to or
(b) has received direction from the party having full power and authority to vote on and
consent to such matters concerning its share of the prepetition Secured Notes or Credit
Agreement obligations and to exchange, convert, assign and transfer such prepetition
Secured Notes or Credit Agreement obligations and (iii) other than pursuant to this
Support Agreement, such prepetition Secured Notes or Credit Agreement obligations are
free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy,
voting restriction, right of first refusal or other limitation on disposition, or encumbrances
of any kind, that would adversely affect in any way such Consenting Secured Party's
performance of its obligations contained in this Support Agreement at the time such
obligations are required to be performed.

**6.6    Debtors' Reporting Requirements.**

The Debtors shall promptly deliver to the Consenting Lender (i) all documents
and reports and (ii) any and all other information delivered to the DIP Lenders (as
defined in the DIP Term Sheet) or requested by the DIP Lenders (including scheduling
bi-weekly update calls (with question and answer periods) with senior management of the
Debtors and their respective representatives and advisors), in each instance as set forth in
the section entitled "Affirmative Covenants" in the DIP Term Sheet and within the time
periods specified in the DIP Term Sheet (or, if no time period is specified therein, on a
prompt basis).

**6.7    Acknowledgments Regarding Exit Financing**

Notwithstanding anything herein to the contrary, the Parties hereto acknowledge
and agree that the agreement of the Consenting Lender to provide the financing described
in the First Out Exit Term Sheet shall automatically terminate on the date 180 days after
the Petition Date. The Consenting Lender agrees that, on and after such date, and subject
to the Consenting Lender receiving customary and acceptable indemnification from the
Debtors, the Consenting Lender will use good faith efforts to arrange a credit facility (the
"Replacement Facility") to refinance any Refinancing Loans that have not been paid in
full on the maturity date of the Facility (as defined in the DIP Term Sheet). In connection
therewith, the Debtors agree to assist the Consenting Lender in its arrangement efforts
and to provide such information as the Consenting Lender reasonably requests. It is
understood and agreed that the Replacement Facility shall have terms and conditions
(including without limitation structure, pricing, fees, tenor and covenants, due diligence
conditions, approvals and any other provisions) satisfactory to the Consenting Lender in
its sole discretion and shall be subject to any necessary credit approvals. The Debtors
acknowledge that the foregoing is neither an expressed nor an implied commitment by
the Consenting Lender or any of its affiliates to provide any part of the Replacement
Facility or to provide or purchase loans in connection therewith, which commitment, if
any, will only be set forth in a separate commitment letter in form and substance
satisfactory to the Consenting Lender and approved by the Bankruptcy Court. The
agreement of the Consenting Lender under this Section 6.7 shall automatically terminate

EXECUTION COPY

(without the taking of any action) on the earlier of (i) the date that is 270 days after the Petition Date, (ii) the termination of this Support Agreement and (iii) upon any of the conditions precedent set forth in Annex A to the First Out Exit Term Sheet (other than the conditions set forth in clause (d) thereof) being determined not to have been satisfied or no longer capable of being satisfied.

**Section 7. <u>No Material Misstatement or Omission.</u>**

The Debtors represent that none of the material and information provided by or on behalf of the Debtors to the Consenting Secured Parties in connection with the Restructuring Transactions contemplated in this Support Agreement, when read or considered together, contains any untrue statement of a material fact or omits to state a material fact necessary in order to prevent the statements made therein from being materially misleading.

**Section 8. <u>Acknowledgement.</u>**

This Support Agreement and the Restructuring Transactions contemplated herein are the product of negotiations among the Debtors and the Consenting Secured Parties, together with their respective representatives. This Support Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Acceptable Plan or any plan of reorganization for the purposes of Sections 1125 and 1126 of the Bankruptcy Code or otherwise. The Debtors will not solicit acceptances of the Acceptable Plan from any Consenting Secured Party until such Consenting Secured Party has been provided with copies of the Acceptable Disclosure Statement approved by the Bankruptcy Court.

**Section 9. <u>Miscellaneous Terms.</u>**

**9.1 Assignment; Transfer Restrictions.**

(a)     Each Consenting Secured Party hereby agrees, for so long as this Support Agreement shall remain in effect as to it, not to sell, assign, transfer, hypothecate or otherwise dispose of any of its pro rata share of the prepetition Secured Notes, Credit Agreement obligations or obligations under the DIP Credit Agreement (the "<u>DIP Loans</u>") (if any) unless prior thereto the transferee thereof executes and delivers a Secured Party Joinder (as defined in section 9.3(a)) to the Administrative Agent at least two (2) Business Days prior to the relevant transfer. Thereafter, such transferee shall be deemed to be a Consenting Secured Party for purposes of this Support Agreement.

(b)     Any sale, transfer, assignment, hypothecation or other disposition by any Consenting Secured Party of any or all of its pro rata share of the prepetition Secured Notes, Credit Agreement obligations or DIP Loans (if any) that does not comply with the procedures set forth in Section 9.1(a) shall be deemed void *ab initio*.

(c)     Nothing herein shall be construed to restrict any Consenting Secured Party's right to acquire additional prepetition Secured Notes, Credit Agreement obligations or DIP Loans.  To the extent any Consenting Secured Party acquires as legal owner additional prepetition Secured Notes, Credit Agreement obligations or DIP Loans, the Parties agree that such prepetition Secured Notes, Credit Agreement obligations and DIP Loans shall be deemed to be subject to the terms of this Support Agreement upon the Consenting Secured Party's acquisition of such additional Secured Notes, Credit Agreement obligations or DIP Loans. Notwithstanding the foregoing provisions of this Section 9.1, any Consenting Secured Party may, at any time and without notice to or consent from any other party, pledge or grant a security interest in all or any portion of its rights (including, without limitation, rights to payment of interest and repayment of principal) under the Indenture, the Credit Agreement or the DIP Credit Agreement to secure obligations of such Consenting Secured Party to a Federal Reserve Bank; provided that no such pledge or grant of a security interest shall release such Consenting Secured Party from any of its obligations hereunder or substitute any such pledgee or grantee for such Consenting Secured Party as a party hereto.

**9.2     No Third Party Beneficiaries.**

Unless expressly stated herein, this Support Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third party beneficiary.

**9.3     Joinder.**

(a)     Any person that receives or acquires a portion of the prepetition Secured Notes, Credit Agreement obligations or DIP Loans pursuant to a sale, assignment, transfer, hypothecation or other disposition of such prepetition Secured Notes, Credit Agreement obligations or DIP Loans by a Consenting Secured Party hereby agrees to be bound by all of the terms of the Term Sheet and this Support Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) (a "Joining Secured Party") by executing and delivering a joinder in the form of Exhibit B hereto (the "Secured Party Joinder") to the Administrative Agent.  The Joining Secured Party shall thereafter be deemed to be a "Consenting Secured Party" and a Party for all purposes under this Support Agreement.

(b)     With respect to the aggregate principal amount of prepetition Secured Notes, Credit Agreement obligations or DIP Loans held by the Joining Secured Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such prepetition Secured Notes, Credit Agreement obligations or DIP Loans, the Joining Secured Party hereby makes the representations and warranties of the Consenting

14

Secured Parties set forth in Section 6 of this Support Agreement to each of the other Parties to this Support Agreement.

**9.4     Entire Agreement.**

This Support Agreement constitutes the entire agreement of the Parties with respect to the subject matter of this Support Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Support Agreement.

**9.5     Counterparts.**

This Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.  Delivery of an executed signature page of this Support Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

**9.6     Settlement Discussions.**

This Support Agreement and the Term Sheets attached hereto as <u>Exhibit A</u> are part of a proposed settlement of disputes among the Parties hereto.  Nothing herein shall be deemed to be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Support Agreement and the Term Sheets annexed hereto as <u>Exhibit A</u>, documents and negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Support Agreement.

**9.7     Continued Banking Practices.**

Notwithstanding anything herein to the contrary, each Consenting Secured Party and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Debtor or any affiliate of any Debtor or any other Person, including, but not limited to, any Person proposing or entering into a transaction related to or involving any Debtor or any affiliate thereof.

**9.8     Reservation of Rights.**

(a)     Except as expressly provided in this Support Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Consenting Secured Parties to protect and preserve all of its rights and remedies under the DIP Credit Agreement, the DIP Orders or any other order of the Bankruptcy Court or other court of competent jurisdiction, or its full participation in the Chapter 11 Cases.

15

(b)     Without limiting Section 9.8(a) in any way, if the Restructuring Transactions contemplated by this Support Agreement or otherwise set forth in the Acceptable Plan are not consummated as provided herein, if a Termination Date occurs, or if this Support Agreement is otherwise terminated for any reason, the Consenting Secured Parties each fully reserve any and all of their respective rights, remedies and interests under the Indenture, the Credit Agreement, the DIP Credit Agreement and related post petition loan documents, applicable law and in equity.

(c)     Notwithstanding anything herein to the contrary, the Parties acknowledge that the support of each Consenting Secured Party contained in this Support Agreement relates solely to such Consenting Secured Party's rights and obligations as a lender under the Credit Agreement, the Indenture and/or the DIP Credit Agreement (if applicable) with respect to the principal amounts identified on such Consenting Secured Party's signature page and as provided in Section 9.1 and does not bind such Consenting Secured Party or its affiliates with respect to any other indebtedness, obligations or liabilities owed by the Company or any of its subsidiaries and affiliates to such Consenting Secured Party or any affiliate of such Consenting Secured Party (for the avoidance of doubt, if the Consenting Secured Party is specified on the relevant signature page as a particular group or business within an entity, "Consenting Secured Party" shall mean such group or business and shall not mean the entity or its affiliates, or any other desk or business thereof, or any third party funds advised thereby).  For purposes of this Support Agreement, "Consenting Secured Party" shall not include a holder of Loans under the Indenture or DIP Loans signatory hereto in its capacity or to the extent of its holdings as a public-side broker, dealer or market maker of Loans under the Indenture or DIP Loans or any other claim against or security in the Debtors.

(d)     Notwithstanding anything herein to the contrary, the Parties acknowledge that the support of the Consenting Lender contained in this Agreement (and its rights and obligations hereunder) relates solely to its claims set forth on its signature page or hereafter acquired and does not bind the Consenting Lender or any of its affiliates with respect to any other claims, equity, or other indebtedness of the Debtors or any of their subsidiaries and affiliates.  Notwithstanding anything else herein for purposes of this Support Agreement, (x) claims of the Consenting Lender that are held by it in a fiduciary or similar capacity and (y) claims held by the Consenting Lender in its capacity as a broker, dealer or market maker of loans under the Credit Agreement or with respect to any other claim against or security in the Debtors (including any loans or claims held in inventory with respect to such broker, dealer, or market-making activities, provided that the positions with respect to such loans or claims are separately identified on the internal books and records of such Consenting Lender) shall not, in either case (x) or (y), be bound by or subject to this Support Agreement.

16

For the avoidance of doubt, if the Consenting Lender is specified on its signature page as a particular group or business within an entity, "Consenting Lender" shall mean such group or business and shall not mean the entity or its affiliates, or any other desk or business thereof, or any third party funds advised thereby.

**9.9    Successors.**

This Support Agreement is intended to bind the Parties and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 9.9 shall be deemed to permit any transfer, tender, vote or consent, of any claims other than in accordance with the terms of this Support Agreement.

**9.10    Publicity.**

The Parties agree that all public announcements of the entry into or the terms and conditions of this Support Agreement shall be mutually, reasonably acceptable to each of the Parties and no such announcement shall be made before obtaining the consent of the Required Consenting Secured Parties; provided however that the Plan Debtors may publicly disclose this Support Agreement and the contents hereof in their Chapter 11 Cases or other proceedings under the Bankruptcy Code or as otherwise required by applicable law (including rules and regulations promulgated thereunder); provided that in no event shall any Party disclose the specific holdings under the Credit Agreement and/or the Indenture of any signatory to this Support Agreement without such signatory's express consent.

**9.11    Cooperation; Chapter 11 Related Matters.**

The Parties shall, and the Company shall cause each of the Plan Debtors to, cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.  The Company shall provide draft copies of all "first day" motions or applications and other documents the Debtors intend to file with the Bankruptcy Court (including the Plan, Disclosure Statement and all related documents) to counsel for the Consenting Lender and the Consenting Secured Noteholders, if reasonably practicable, at least two (2) days prior to the date when the Company intends to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.

**9.12    Advisors to the Consenting Secured Parties**

The Company shall pay, when due and payable, the respective accrued, unpaid and ongoing expenses incurred by the Consenting Secured Parties in connection with the Restructuring Transactions and any agreements related thereto, including the fees, charges and disbursements of (a) counsel to such parties limited to (i) one primary

17

K&E 25245614.7

counsel for the Consenting Lender (presently Milbank, Tweed, Hadley & McCloy LLP and previously Cahill Gordon & Reindel LLP), as well as any conflicts counsel, special counsel and local counsel in any relevant jurisdiction retained by the Consenting Lender, and (ii) one primary counsel for the Consenting Secured Noteholders (presently Kirkland & Ellis LLP), as well as any conflicts counsel, special counsel and local counsel in any relevant jurisdiction retained by the Consenting Secured Noteholders, and (b) any financial advisors, investment bankers and other specialty consultants retained by the Consenting Secured Noteholders (presently Moelis & Company for the Consenting Secured Noteholders). All such fees, expenses and reimbursements incurred up to the Petition Date shall be paid in full prior to the Petition Date (without deducting any retainers) so long as estimates for such fees, expenses and reimbursements are presented to the Company by February 15, 2013.

**9.13    Governing Law; Waiver of Jury Trial; Indemnity.**

(a)    The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between the Parties under this Support Agreement, whether sounding in contract, tort or otherwise.

(b)    This Support Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction. By its execution and delivery of this Support Agreement, each Party hereby irrevocably and unconditionally agrees for itself that, subject to the following sentence, any action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Support Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

(c)    Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in Section 9.12(a) or (b) shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Support Agreement.

**9.14    Pending Transfers.**

Notwithstanding anything to the contrary provided herein, if a Consenting Secured Party has assigned all or a portion of the Secured Notes or Credit Agreement obligations that it beneficially owns as of the date hereof but such assignment has not settled as of the date hereof (such Secured Notes or Credit Agreement obligations, "Pending Transfer Obligations"), then such Consenting Secured Party shall be permitted

18

to exclude from the amount of the Secured Notes or Credit Agreement obligations listed on its signature page an amount of Pending Transfer Obligations equal to the Pending Transfer Obligations assigned to any transferee that has instructed such Consenting Secured Party not to execute this Agreement (such excluded Secured Notes or Credit Agreement obligations, the "Excluded Obligations"). Such Consenting Secured Party shall not be bound by the terms hereof with respect to any Excluded Obligations.

### 9.15    Amendments, Modifications, Waivers.

This Support Agreement (including all exhibits and schedules thereto and the Term Sheets) and the Acceptable Plan and the Acceptable Disclosure Statement may only be modified, amended or supplemented, and any of the terms thereof may only be waived, by an agreement in writing signed by each of (i) the Debtors, (ii) the Consenting Lender and (iv) Consenting Secured Noteholders holding at such time at least 51% of the prepetition Secured Notes that are subject to the terms hereof (the "Required Consenting Secured Noteholders," and together with the Consenting Lender, the "Required Consenting Secured Parties").

### 9.16    Consideration.

It is hereby acknowledged by each of the Parties that no consideration shall be due or paid to the Parties for their agreement to support or not interfere with the Acceptable Plan in accordance with the terms and conditions of this Support Agreement, other than the obligations of the other Parties under this Support Agreement. For the avoidance of doubt, the provision of the Lender Protections constitutes a material inducement to the Consenting Lender's entry into this Support Agreement, without which the Consenting Lender would not have entered into this Support Agreement. The Company represents that, as of the Effective Date, no payments have been made to any of the Parties hereto that were not permitted to be made under the terms of the Credit Agreement.

### 9.17    Severability of Provisions.

If any provision of this Support Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Support Agreement.

### 9.18    Notices.

All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given when: (a) delivered personally or by overnight courier to the following address of the other Party hereto; (b) sent by fax to the following fax number of the other Party hereto with the confirmatory copy delivered by overnight courier to the address of such Party listed below; or (c) sent by electronic mail with the confirmatory copy delivered by overnight courier to the address of such Party listed below.

19

If to any Debtor, to counsel at the following address:

    Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, New York 10153
    Attn: Joseph H. Smolinsky, Esq.
    Facsimile: (212) 310-8007

If to any Consenting Secured Noteholder, the address set forth on its signature page, with a copy to:

    Kirkland & Ellis LLP
    601 Lexington Avenue
    New York, New York 10022
    Attn:  Nicole L. Greenblatt, Esq.
    Facsimile: (212) 446-6460

If to the Consenting Lender, the address set forth on its signature page, with a copy to:

    Milbank, Tweed, Hadley & McCloy LLP
    1 Chase Manhattan Plaza
    New York, New York 10005
    Attn: Abhilash M. Raval, Esq.
    Blair M. Tyson, Esq.
    Michael E. Comerford, Esq.
    Facsimile: (212) 822-5123

[SIGNATURE PAGES FOLLOW]

K&E 25245614.7

Very truly yours,

RDA HOLDING CO.

By: _____
Name:   Robert Guth
Title:    President and Chief Executive Officer
Fax Number: (914) 244-7949


THE READER'S DIGEST ASSOCIATION, INC.

By: _____
Name:   Robert Guth
Title:    President and Chief Executive Officer
Fax Number: (914) 244-7949


EACH OF THE GUARANTORS LISTED ON ANNEX
I HERETO

By: _____
Name:   Paul Tomkins
Title:    President or Vice President, as
           applicable
           Fax Number: (914) 244-7949

**ANNEX I**

Ardee Music Publishing, Inc.
Direct Entertainment Media Group, Inc.
Haven Home Media, LLC
Home Service Publications, Inc.
Pegasus Sales, Inc.
Pleasantville Music Publishing, Inc.
R.D. Manufacturing Corporation
RD Publications, Inc.
RD Large Edition, Inc.
RDA Digital, LLC
RDA Sub Co.
RDCL, Inc.
RDWR, Inc. (formerly known as Weekly Reader Corporation)
Reader's Digest Children's Publishing, Inc.
Reader's Digest Consumer Services, Inc.
Reader's Digest Entertainment, Inc.
Reader's Digest Financial Services, Inc.
Reader's Digest Latinoamerica S.A.
Reader's Digest Sales and Services, Inc.
Reiman Media Group, LLC
Reiman Manufacturing, LLC
Taste of Home Media Group, LLC
Taste of Home Productions, Inc.
Travel Publications, Inc.
W.A. Publications, LLC
WAPLA, LLC
Weekly Reader Custom Publishing, Inc.
World Almanac Education Group, Inc.
World Wide Country Tours, Inc.
WRC Media Inc.

**WELLS FARGO PRINCIPAL
LENDING, LLC,** as Issuing Lender and
Lender under the Credit Agreement and
Secured Noteholder under the Indenture

By: _____

Name:  Greg Apkarian
Title:   Vice President

2450 Colorado Avenue, Ste 3000W
Santa Monica, California 90404
Telephone number: 310-453-7393
Facsimile number: 855-813-8309

Very truly yours,


GOLDENTREE ASSET MANAGEMENT, LP
    on behalf of certain funds and accounts managed
    by it

By: _____
    Name: George Hartigan
    Title: VP
    Outstanding Principal Amount of
    Prepetition Secured Notes: ▇▇▇▇▇▇▇▇▇


Restructuring Support Agreement - Signature Page

Very truly yours,


EMPYREAN CAPITAL PARTNERS, LP
   on behalf of the funds managed by it

By: _____
   Name: RYAN MAYBTANI
   Title: CHIEF FINANCIAL OFFICER
   Outstanding Principal Amount of
   Prepetition Secured Notes: ████████

Restructuring Support Agreement - Signature Page

Very truly yours,

ALM IV, Ltd.

By: Apollo Credit Management (CLO), LLC, as
Collateral Manager

By: _____

Name:    JOSEPH MORONEY
Title:     Authorized Signatory

Outstanding Principal Amount of
Prepetition Secured Notes: ████████

Very truly yours,

Apollo Senior Floating Rate Fund Inc.
Account 631203

By: _____
Name:  JOSEPH MORONEY
Title:  Authorized Signatory

Outstanding Principal Amount of
Prepetition Secured Notes: ███████

Very truly yours,

LeverageSource V Sarl

By: _____

Name:
Title:

By: _____

Name:
Title:

Outstanding Principal Amount of
Prepetition Secured Notes: ██████

**Exhibit A to Restructuring Support Agreement**

**Restructuring Term Sheet**

# PROPOSED RESTRUCTURING TERM SHEET

_____

THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY
SECURITIES OF THE COMPANY.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH
ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  THIS
TERM SHEET CONTAINS MATERIAL NON-PUBLIC INFORMATION ABOUT A PUBLIC COMPANY
AND, THEREFORE, IS SUBJECT TO FEDERAL SECURITIES LAWS.

THE TERM SHEET IS PROVIDED IN THE NATURE OF A SETTLEMENT PROPOSAL IN
FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS SUBJECT IN ALL RESPECTS TO THE
NEGOTIATION, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION, INCLUDING
ENTRY INTO AN ACCEPTABLE RESTRUCTURING SUPPORT AGREEMENT (THE "RSA").  THIS
TERM SHEET IS INTENDED TO BE ENTITLED TO THE PROTECTIONS OF RULE 408 OF THE
FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES
PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND
INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.  FURTHER,
NOTHING IN THE TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED
BINDING ON HOLDING, ITS SUBSIDIARIES, THE ADMINISTRATIVE AGENT OR THE
CONSENTING SECURED PARTIES.  THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND MAY
BE DISTRIBUTED ONLY WITH THE EXPRESS WRITTEN CONSENT OF THE REQUIRED
CONSENTING SECURED PARTIES (AS DEFINED IN THE RSA).

| | OVERVIEW |
|---|---|
| **Transaction Summary** | This term sheet (the "Term Sheet") describes the principal terms of a restructuring transaction (the "Restructuring") pursuant to which RDA Holding Co. ("Holding" and once reorganized, "Reorganized Holding") will restructure its capital structure and global operations in connection with a revised business plan acceptable to the Required Secured Parties (as defined below) (the "Acceptable Business Plan").  The Restructuring will be implemented through a pre-negotiated joint plan of reorganization filed in connection with cases  (the "Cases") commenced by Holding, The Reader's Digest Association, Inc., ("RD" or the "Company") and certain of RD's domestic subsidiaries (collectively, the "Debtors"[1] and excluding DEMG, the "Plan Debtors")  under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "Bankruptcy Court"). |
| | This Term Sheet outlines the proposed capital structure, treatment of claims and interests and other material terms and conditions of the Restructuring. The Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation governing the Restructuring, which remain subject to further discussion and negotiation and which must be reasonably acceptable to the Required |

---

[1]    Debtors to specifically include Direct Entertainment Media Group, Inc. ("DEMG").

| | |
|---|---|
| | Consenting Secured Parties (as defined below). The terms and conditions of this Term Sheet are meant to be part of a comprehensive agreement, each element of which is consideration for the other elements and an integral aspect of the proposed Restructuring.<br><br>This Term Sheet is an exhibit to that certain Restructuring Support Agreement dated February 17, 2013 (the "RSA") executed by the Debtors and each of (i) the Consenting Lender (as defined herein) and (ii) the Secured Noteholders party thereto (the "Consenting Secured Noteholders," and together with the Consenting Lender the "Consenting Secured Parties"). Pursuant to the RSA, "Required Consenting Secured Parties" means the Consenting Lender and the Required Consenting Secured Noteholders. "Required Consenting Secured Noteholders" means the Consenting Secured Noteholders holding at such time at least 51% of the Secured Notes that are subject to the terms of the RSA. |
| **Secured Debt to be Restructured** | Secured debt to be restructured under a plan of reorganization and a disclosure statement (including all exhibits thereto) satisfactory to the Required Consenting Secured Parties (the "Acceptable Plan" and the "Acceptable Disclosure Statement," respectively) will include:<br><br>(i) $49,625,000 in principal, plus outstanding letters of credit, plus all other amounts outstanding (including, for the avoidance of doubt, fees, commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Cases) under that certain Credit and Guarantee Agreement dated as of March 30, 2012 (the "Credit Agreement") among RD, Holding and certain of their affiliates, Wells Fargo Bank, N.A., as administrative agent ("Administrative Agent") and sole lender (the "Consenting Lender"); and<br><br>(ii) $464 million in senior secured notes of RD (the "Secured Notes") issued pursuant to that certain indenture, dated February 11, 2010 (the "Indenture") among RD, certain of its subsidiaries and the lenders party thereto from time to time (the "Secured Noteholders"). |
| **DIP Facility** | To facilitate liquidity during the Cases and after, the Consenting Secured Parties will provide an approximate $105 million consensual, priming, debtor in possession financing facility (the "DIP Facility") that will consist of:<br><br>(i) $45 million in new money loans ("New Money Loans") provided by certain Consenting Secured Noteholders; and<br><br>(ii) a refinancing of all commitments and amounts outstanding (including any and all principal, letters of credit, reimbursement obligations in respect of outstanding letters of credit (assuming drawn), fees, commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Cases, including to the issuing lender) under the Credit Agreement (the "Refinancing Loans");<br><br>all of (i) and (ii) to be paid in full in cash or convert to exit financing facilities on the effective date of the Acceptable Plan (the "Effective Date"), as described further below, in the DIP Commitment Letter, attached hereto as Exhibit A, the DIP Term Sheet, the First Out Exit Term Sheet and the Second Out Exit Term Sheet, attached as Annexes 1, 2 and 3, respectively, to the DIP Commitment Letter.<br><br>All Consenting Secured Noteholders may participate in the New Money loans |

2

| | |
|---|---|
| | on a pro-rata basis based on their holdings under the Indenture. |
| **Lender Protections** | Upon entry of the Interim DIP Order the Lender Protections as defined in Annex 1 to the DIP Commitment Letter.<br><br>Upon entry of the Final DIP Order, the Lender Protections as defined in Annex 1 to the DIP Commitment Letter. |
| **Adequate Protection for Secured Noteholders** | See Annex 1 to the DIP Commitment Letter. |
| **Exit Capital Structure** | The Acceptable Plan will provide for the following capital structure for the Reorganized Debtors:<br><br>First Out Exit Term Loan: Subject to and in accordance with the terms and conditions set forth on Annex 2 to the DIP Commitment Letter, the Refinancing Loans and any obligations arising thereunder will be amended and restated as a first out first priority exit term loan, pari passu with the Second Out Exit Term Loan (the "First Out Exit Term Loan").<br><br>Second Out Exit Term Loan: Subject to and in accordance with the terms and conditions of the DIP Facility, the New Money Loans and any claims arising thereunder will convert to a second out, first priority exit term loan of $45 million, with terms and conditions (set forth on Annex 3 to the DIP Commitment Letter) (the "Second Out Exit Term Loan").<br><br>Reorganized Holding shall have no more than $106 million in funded debt immediately following the Effective Date of the Acceptable Plan.<br><br>New Common Stock: On the Effective Date, the Debtors will issue 100% of the new common stock of Reorganized Holding to the Secured Noteholders on a pro rata basis based on their holdings under the Indenture (subject to any dilution for the Management Incentive Plan), which issuance will be exempt from registration with the Securities and Exchange Commission under section 1145 of the Bankruptcy Code. No dividends, recoveries, securities, distributions or other form of payments shall be made on account of or in connection with the new common stock distributed to the Secured Noteholders until all amounts owing in connection with the First Out Exit Term Loan have been paid in full in cash and all commitments thereunder have been terminated. |
| | **Treatment of Claims and Equity Interests** |
| **DIP Claims** | The DIP Facility shall, on the Effective Date, convert to the (i) First Out Exit Term Loan in accordance with the terms and conditions on Annex 2 to the DIP Commitment Letter and (ii) Second Out Exit Term Loan, as applicable, in accordance with the terms and conditions on Annex 3 to the DIP Commitment Letter, or in each case be paid in full in cash if the terms and conditions required for conversion are not satisfied; provided, however, that the obligations under the First Out Exit Term Loan will always be paid in full in cash by the Debtors.<br><br>Unclassified -- Non-Voting |
| **Administrative Claims** | Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) of the Bankruptcy Code, will receive payment in full in cash of the unpaid portion of its allowed administrative claim on the Effective Date or as soon thereafter as practicable (or, if payment is not then |

3

| | due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtors.<br><br>Unclassified -- Non-Voting |
|---|---|
| **Priority Tax Claims** | Priority tax claims will be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.<br><br>Unclassified -- Non-Voting |
| **Other Priority Claims** | All other priority claims will be paid in full (in cash) on the Effective Date, or as soon thereafter as practicable, or treated in any other manner so that such claim will otherwise be rendered unimpaired.<br><br>Unimpaired -- Deemed to Accept |
| **Prepetition Credit Agreement Claims** | All obligations under the Credit Agreement shall become Refinancing Loans as set forth above in connection with entry of the Final DIP Order and all Refinancing Loans and related obligations shall, on the Effective Date, be amended and restated as the First Out Exit Term Loan in accordance with Annex 2 to the DIP Commitment Letter so long as (and only so long as) the terms and conditions required for such conversion are satisfied and otherwise such obligations shall be paid in full in cash; provided, however, that the Debtors may always elect to repay such obligations in full in cash.<br><br>Unclassified -- Non-Voting |
| **Prepetition Secured Notes Claims** | On the Effective Date, the Secured Noteholders shall convert their claims into 100% (subject to dilution by the Management Incentive Plan [and any equity issued to such other creditor classes as may be agreed to by the Required Consenting Secured Noteholders and the Debtors]) of the new common stock of Reorganized Holding (the "New Common Stock") to be issued and outstanding on the Effective Date of the Acceptable Plan, with such New Common Stock to be distributed on a pro rata basis in accordance with the Secured Noteholders' holdings of such prepetition obligations.<br><br>No dividends, recoveries, securities, distributions or other form of payments shall be made on account of or in connection with the new common stock distributed to the Secured Noteholders until all amounts owing in connection with the First Out Exit Term Loan have been paid in full in cash and all commitments thereunder have been terminated.<br><br>Impaired -- Entitled to vote. |
| **Other Secured Claims** | Each holder thereof will receive the following treatment: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (c) such other treatment as is necessary to satisfy section 1129 of the Bankruptcy Code.<br><br>Impaired -- Entitled to vote. The Debtors reserve the right to argue at confirmation that Other Secured Claims are unimpaired. |
| **Unsecured Claims** | Each holder of an unsecured claim (*i.e.*, all claims not otherwise specifically classified herein including any deficiency claim of the Secured Noteholders) will receive their pro rata share of [TBD]. The Debtors may elect to separate general unsecured claims into appropriate subclasses.<br><br>Impaired -- Entitled to vote. |
| **Existing Equity Interests** | All existing common and preferred equity interests in Holding or other |

4

| (including warrants) | existing securities consisting of (or convertible into) equity interests in Holding, including any warrants or vested or unvested options to purchase equity interests in Holding, shall be extinguished as of the Effective Date. All equity interests of Holding's subsidiaries shall continue to be held by Holding and the subsidiaries of Holding that hold such equity interests prior to the commencement of the Cases.<br><br>Impaired; not entitled to vote – deemed to reject. |
|---|---|
| **Intercompany Claims** | On the Effective Date, Holding will, at its discretion, reinstate or compromise, as the case may be, intercompany claims between and among Holding and its subsidiaries consistent with the Acceptable Business Plan and the International Restructuring Transactions contemplated thereby; <u>provided, that</u> each intercompany claim held by a non-debtor shall receive no less favorable treatment than other general unsecured claims.<br><br>Impaired -- Entitled to Vote. |
| **Affiliate Actions** | All subsidiaries and affiliates of Holding shall be required to file proofs of claim in connection with the Cases so that their claims are discharged on the Effective Date. |
| | **General Provisions** |
| **Management Incentive Programs** | The Acceptable Plan will provide that promptly on or after the effective date, equity awards (in the form of restricted stock, options or warrants) for up to 10% of the New Common Stock (on a fully diluted basis) of Reorganized Holding will be granted to continuing employees of the Debtors and members of the new board of directors (consistent with market terms) by the new board of directors of Reorganized Holding, with pricing, vesting and exercise terms to be determined by the new board upon consultation with the CEO. Such equity awards shall be on terms reflective of a policy of rewarding the contribution of management to the long-term financial performance of the reorganized Debtors. |
| **Employee Matters** | The Acceptable Plan will provide that, on or after the Effective Date, Reorganized Holding shall implement the following employee incentive programs on terms and conditions reasonably acceptable to the Required Consenting Secured Noteholders (to be set forth in the Acceptable Plan Supplement): (i) a supplemental pension credit plan, and (ii) a bonus pool to be allocated by the CEO with the concurrence of the newly appointed board. |
| **Cancellation of Instruments, Certificates and Other Documents** | On the Effective Date, except to the extent otherwise provided in the Acceptable Plan, all instruments, certificates and other documents evidencing debt or equity interests in Holding or (as it relates to debt only) RD will be cancelled, and the obligations of RD or Reorganized Holding and its subsidiaries thereunder, or in any way related thereto, will be discharged; <u>provided that</u> any and all indemnities provided in the Credit Agreement (including, for the avoidance of doubt, the indemnities provided at section 4.05 thereunder) shall survive as Refinancing Loans; <u>provided further that</u> any and all indemnities provided in the DIP Facility shall survive as First Out Exit Term Loan obligations or Second Out Exit Term Loan obligations, notwithstanding in each case the cancellation of the predecessor credit agreement(s). |

5

| | |
|---|---|
| **Issuance of New Securities; Execution of Acceptable Plan Documents** | On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized Holding will issue all securities, instruments, certificates and other documents required to be issued pursuant to the Acceptable Plan. |
| **Executory Contracts and Unexpired Leases** | The Acceptable Plan will specify which executory contracts and unexpired leases will be assumed; all contracts not expressly assumed with the consent of the Required Consenting Secured Noteholders will be deemed rejected under the Acceptable Plan.<br><br>Executory contracts will be renegotiated or rejected in a manner consistent with the Debtors' Business Plan and reasonably acceptable to the Required Consenting Secured Noteholders. |
| **Resolution of Disputed Claims** | The Acceptable Plan will provide for the resolution of disputed claims and any reserves therefor. |
| **Avoidance Actions and Other Litigation** | The reorganized Debtors will retain all rights to commence and pursue any and all claims and causes of action arising under the sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions") and other litigation.<br><br>The Acceptable Plan will not provide for any funding of a litigation trust that can be used to fund litigation against the Released Parties. |
| **Exemption from Section 1145** | The issuance of the New Common Stock in Reorganized Holding will be exempted from applicable securities laws and/or from SEC registration under section 1145 of the Bankruptcy Code. |
| **Tax Issues** | The Parties agree to use their commercially reasonable best efforts to complete the financial restructuring of the Debtors contemplated by this Term Sheet and the International Restructuring Transactions in a manner that best preserves the tax attributes of the Debtors in a manner reasonably satisfactory to the Required Consenting Secured Parties. |
| **Retention of Jurisdiction** | The Acceptable Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| | **Corporate Governance/Charter Provisions/Registration Rights** |
| **Board of Directors of Reorganized Holding** | The board of directors of Reorganized Holding shall be comprised of 5 directors, including the CEO. The Required Consenting Secured Noteholders shall designate all such directors in consultation with the CEO. |
| **Reorganized Holding as a private company.** | Reorganized Holding shall be a private company upon the Effective Date. |
| **Description of Capital Stock** | From and after the Effective Date, subject to the right of the stockholders to amend the Certificate of Incorporation of Reorganized Holding after the Effective Date, Reorganized Holding shall have one class and one series of New Common Stock. |
| **Charter; Bylaws** | The charter and bylaws of each Debtor shall be restated consistent with section 1123(a)(6) of the Bankruptcy Code and otherwise in form and substance satisfactory to the Required Consenting Secured Parties. |
| **Registration Rights; Stockholders Agreement** | The supplement to the Acceptable Plan shall provide for a registration rights agreement and stockholders agreement with respect to the New Common Stock in material form and substance reasonably satisfactory to the Required |

6

| | Consenting Secured Noteholders; provided that the registration rights agreement and stockholders agreement shall not adversely impact the Consenting Lender's First Out Exit Term Loan and its rights thereunder in any manner and the Consenting Lender shall have consultation rights for both documents. |
|---|---|
| | **Release and Related Provisions** |
| **Releases** | The Acceptable Plan will provide for the releases contemplated in the RSA and provide for mutual releases among the Administrative Agent, Consenting Lender, the Consenting Secured Noteholders, the DIP Lenders, the Debtors and their respective current and former directors, officers and professional advisors of any and all claims or causes of action, known or unknown, relating to any prepetition date acts or omissions. |
| | The Plan Debtors' release of third parties will be provided for in the Acceptable Plan unless, after investigation, the Board of Directors determines such release is inappropriate. |
| **Exculpation** | The Acceptable Plan will contain ordinary and customary exculpation provisions among the Administrative Agent, Consenting Lender, the Consenting Secured Noteholders, the DIP Lenders, the Debtors and their respective directors, officers and professional advisors of any and all claims or causes of action, known or unknown, relating to any prepetition date acts or omissions. |
| **Indemnification** | The Acceptable Plan (i) will contain ordinary and customary indemnification provisions for indemnification of current and former directors and officers of the Debtors to the extent of available D&O coverage and payable from the proceeds of such D&O policies, including the advancing of defense costs prior to final adjudication; <u>provided</u>, that, to the extent proceeds of such policies are deemed property of the Debtors' estates in the Chapter 11 Cases the Debtors will use reasonable best efforts to seek relief from the Bankruptcy Court to have them advanced and (ii) shall provide that the Debtors shall maintain their current D&O insurance coverage in place as of the date of the RSA for current and former directors and officers of the Debtors. |
| **Discharge** | The Acceptable Plan for all Plan Debtors will contain a full and complete discharge from all claims and liabilities. |
| **Injunction** | The Acceptable Plan will contain ordinary and customary injunction provisions. |
| **Compromise and Settlement** | The Acceptable Plan will contain ordinary and customary compromise and settlement provisions. |

7

| | **Acceptable Plan Implementation** |
|---|---|
| **Restructuring Support Agreement & Definitive Documentation** | The parties to the RSA shall have executed such agreement no later than February 17, 2013. The RSA shall be terminable upon the conditions contained therein and the automatic stay arising pursuant to section 362 of the Bankruptcy Code shall be deemed waived or modified for termination purposes.<br><br>The Company and the Consenting Secured Parties shall, in good faith, negotiate definitive documentation to implement the Restructuring Transactions consistent with this Term Sheet and any related documentation, including the Acceptable Plan, the Acceptable Plan Supplement, the Acceptable Disclosure Statement, all post-Effective Date corporate organization and governance documents and all other documents necessary to effectuate the Restructuring Transactions. |
| **Motions & Other Bankruptcy Filings** | All motions and other filings with the Bankruptcy Court, including any proposed orders (including without limitation the orders authorizing the Debtors' entry into the DIP Facility and approving the Acceptable Disclosure Statement and confirming the Acceptable Plan) shall be in form and substance reasonably acceptable to the Required Consenting Secured Parties.<br><br>The Debtors shall provide draft copies of all "first day" motions or applications and other documents the Debtors intend to file with the Bankruptcy Court (including the Plan, Disclosure Statement and all related documents) to counsel for the Consenting Lender and the Consenting Secured Noteholders, if reasonably practicable, at least two (2) days prior to the date when the Debtors intend to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing). |
| | **Conditions** |
| **Certain Conditions** | In addition to satisfaction of the Milestones set forth in the RSA and the requirement that the RSA be in full force and effect and shall not have terminated, the conditions precedent to confirmation and consummation of the Acceptable Plan shall be set forth in the Acceptable Plan and shall include:<br><br>• That no material adverse change arises regarding the feasibility of the Acceptable Plan on or after the Effective Date of this Support Agreement including, without limitations, the assertion of material contingent and/or unliquidated liabilities, as determined by the Required Consenting Secured Parties in their reasonable discretion; and<br><br>• The negotiation, execution and delivery of definitive documentation with respect to the Restructuring Transactions contemplated by this Term Sheet and the RSA reasonably acceptable to the Required Consenting Secured Parties.<br><br>Milestones set forth in RSA to include:<br><br>• Interim DIP Order within 5 days of Commencement Date;<br><br>• Final DIP Order within 40 days after entry of Interim DIP Order;<br><br>• Bar Date Order within 60 days after Petition Date;<br><br>• Acceptable Plan filed within 25 days of the Commencement Date; |

8

|  | • Acceptable Disclosure Statement is approved by the Bankruptcy Court within 75 days of the Commencement Date; |
|--|--|
|  | • The Acceptable Plan Supplement shall be filed on or before July 5, 2013; |
|  | • Acceptable Plan confirmed by July 15, 2013; and |
|  | • Outside exit date of July 31, 2013. |

K&E 25248023.7

**Exhibit A to Restructuring Term Sheet**

**DIP Commitment Letter**

**Execution Copy**

February 17, 2013

The Reader's Digest Association, Inc.
750 Third Avenue
New York, New York 10017

Attention: Paul Tomkins, Chief Financial Officer

<u>Commitment Letter</u>

Ladies and Gentlemen:

You have advised each of (i) Wells Fargo Principal Lending, LLC ("<u>Wells Fargo</u>") and (ii) Apollo Senior Floating Rate Fund Inc. ("<u>Apollo</u>"), Empyrean Capital Partners, LP ("<u>Empyrean</u>"), GoldenTree Asset Management, LP (together with Apollo and Empyrean, the "<u>NM Lenders</u>" and, together with Wells Fargo, the "<u>Commitment Parties</u>", "<u>us</u>" or "<u>we</u>") that RDA Holding, Inc., The Reader's Digest Association, Inc. together with its direct and indirect domestic subsidiaries (collectively, "<u>you</u>" or the "<u>Company</u>"), are considering filing voluntary petitions under title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

Capitalized terms used but not defined herein are used with the meanings assigned to them in the Summary of Terms and Conditions for Senior Secured Priming Debtor-in-Possession Credit Facility attached hereto as <u>Annex 1</u> (the "<u>Term Sheet</u>" and, together with this letter, collectively, this "<u>Commitment Letter</u>"). As used herein, the term "<u>Transactions</u>" means, collectively, the entering into and funding of a senior secured priming debtor-in-possession financing facility (the "<u>DIP Facilities</u>"), comprised of (a) a term loan in the aggregate principal amount of $45 million (the "<u>New Money Loan</u>") and (b) a "roll-up" term loan and letter of credit facility in the aggregate principal amount specified for the "Refinancing Loans" set forth in clause (b) of the section entitled "Commitments and Availability" in the Term Sheet (collectively, the "<u>Refinancing Loan</u>" and, together with the New Money Loan, the "<u>Loans</u>"), the refinancing of the credit facilities evidenced by the Existing Credit Agreement, the entering into the Restructuring Support Agreement, and all other related transactions, including the payment of fees and expenses in connection therewith.

1.  Commitments

In connection with the Transactions, (i) Wells Fargo is pleased to advise you of its commitment, and hereby commits to provide 100% of the aggregate amount of the Refinancing Loan upon the terms and conditions set forth in this Commitment Letter; and (ii) each of the undersigning NM Lenders is pleased to advise you of its commitment, and hereby commits to provide the percentage of the New Money Loan as set forth next to such NM Lender's name on <u>Schedule I</u> hereto, upon the terms and conditions set forth in this Commitment Letter. Each Commitment Party's commitment hereunder is on a several, and not joint, basis with any other Commitment Party.

2. Titles and Roles

It is agreed that an entity designated by the Commitment Parties (in consultation with the Borrower) will act as sole administrative agent and collateral agent for the DIP Facilities.

You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Term Sheet) will be paid in connection with the DIP Facilities unless you and we shall so reasonably agree.

3. Information

You hereby represent that (a) all information concerning you or any of your subsidiaries, other than the Projections (as defined below), forward looking information and information of a general economic or industry specific nature (the "Information"), that has been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time) and (b) the financial and/or business projections and other forward-looking information (the "Projections") that have been or will be made available to us by you or any of your representatives in connection with the Transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time prepared (it being recognized by the Commitment Parties that such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurances are given that any particular Projections will be realized and such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material). You agree that if, at any time prior to the Closing Date, you become aware that any of the representations in the preceding sentence is incorrect in any material respect then you will promptly supplement the Information and the Projections so that such representations are correct in all material respects under those circumstances.

4. Fees

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees to the applicable Commitment Parties described in the Term Sheet including, without limitation, Commitment Fees, Ticking Fees and Early Termination Fee (together with the Commitment Fees and the Ticking Fees, the "Fees"), on the terms and subject to the conditions set forth therein. You agree that, once paid, the fees or any part thereof payable hereunder shall not be refundable under any circumstances, except as otherwise agreed in writing. All fees payable hereunder shall be paid in immediately available funds and shall be in addition to reimbursement of our out-of-pocket expenses as provided for in this Commitment Letter.

5. Conditions

Each Commitment Party's commitments and agreements hereunder are subject to the conditions set forth in this letter and in the Term Sheet (a) under the heading "Conditions Precedent to Initial Borrowings" and "Conditions Precedent to Full Availability".

Each Commitment Party's commitments and agreements hereunder are further subject to (a) since December 31, 2012, there not having been any change, condition, development or event that, individually

2

or in the aggregate, has had or could reasonably be expected to have a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Company and its subsidiaries, taken as a whole, other than as a result of the commencement of the Borrower's chapter 11 proceeding, any events causing the filing of the Cases or any events which customarily occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code, (b) satisfaction of all your obligations hereunder to pay fees and expenses when due and (c) your material compliance with all your obligations in this Commitment Letter and the Restructuring Support Agreement.

6.   Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Commitment Parties, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "indemnified person") from and against any and all actual losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the DIP Facilities, the use of the proceeds thereof or the Transactions or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (but limited, in the case of legal fees and expenses, to (i) one primary counsel to such indemnified persons in respect of the NM Lenders and one primary counsel to such indemnified persons in respect of Wells Fargo, (ii) in the event of conflicts of interest, additional counsels to such affected indemnified persons, as necessary and (iii) local counsels as reasonably necessary in any relevant jurisdictions), provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent (x) they are found by a final non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of any indemnified person and (y) any dispute solely among indemnified persons other than any claims against an indemnified person arising out of any act or omission of you or any of your affiliates and (b) regardless of whether the Closing Date occurs, to reimburse within 10 business days of written demand each Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses that have been invoiced (including reasonable and documented out-of-pocket due diligence expenses, travel expenses, reasonable fees and reasonable documented out-of-pocket expenses of professionals engaged in collateral reviews, appraisals and environmental reviews, and reasonable fees, charges and disbursements of counsels; it being agreed that there may be one primary counsel for Wells Fargo (presently Milbank, Tweed, Hadley & McCloy LLP) and one primary counsel for the NM Lenders (presently Kirkland & Ellis LLP), and in each case any additional counsels engaged in the event of conflicts, special counsels and local counsels as reasonably necessary in any relevant jurisdiction) incurred in connection with the DIP Facilities and any related documentation (including this Commitment Letter and the definitive financing documentation) or the administration, amendment, modification, waiver or enforcement thereof. It is further agreed that each Commitment Party shall only have liability to you (as opposed to any other person) and that each Commitment Party shall be liable solely in respect of its own commitment to the DIP Facilities on a several, and not joint, basis with any other Commitment Party. No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of such indemnified person. None of the indemnified persons or you, or any of your affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the DIP

3

Facilities or the transactions contemplated hereby, <u>provided</u> that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 6.

7.  Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party (or an affiliate) may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you, or your affiliates. You also acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

8.  Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors on a need-to-know basis, (b) as may be required (or necessary in connection with) in any legal, judicial or administrative proceeding (including, without limitation, as may be required to obtain court approval in connection with any acts or obligations to be taken pursuant to this Commitment Letter or the transactions contemplated hereby (in which case you agree to inform us promptly thereof) and further that you may disclose this Commitment Letter to the official committee of unsecured creditors appointed in any of the Company's and its subsidiaries' bankruptcy cases (collectively, the "<u>Creditors' Committee</u>") and its advisors and to any other official committee appointed in any of the Company's and its subsidiaries' bankruptcy cases (collectively, the "<u>Committees</u>") or as otherwise required by applicable law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof) and (c) upon notice to the Commitment Parties, this Commitment Letter and the existence and contents hereof may be disclosed in connection with any public filing requirement.

4

9.  Miscellaneous

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein. It is agreed that each of the NM Lenders may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. It is agreed that Wells Fargo may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. The Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part; to their affiliates certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree in their sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter is the only agreement that has been entered into among us and you with respect to the DIP Facilities and set forth the entire understanding of the parties with respect thereto. This Commitment Letter, and any claim, controversy or dispute arising under or related to this Commitment Letter, whether in tort, contract (at law or in equity) or otherwise, shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York without regard to conflict of law principles that would result in the application of any law other than the State of New York.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the bankruptcy court having jurisdiction over the chapter 11 cases of the Company and its subsidiaries or, if such court denies jurisdiction or the Company elects not to file cases under the Bankruptcy Code, then any state or Federal court sitting in the Borough of Manhattan in the City of New York over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the performance of services hereunder or thereunder.

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify each Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

The indemnification, fee, expense, jurisdiction and confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive financing documentation shall be

executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us executed counterparts of this Commitment Letter not later than the earlier of (a) 10:00 p.m., New York City time, on February 17, 2013 and (b) the time of the filing by the Loan Parties of their petition or petitions under Chapter 11 of the Bankruptcy Code. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence.  In the event that the initial borrowing under the DIP Facilities does not occur on or before February 20, 2013, then this Commitment Letter and the commitments hereunder shall automatically terminate unless we shall, in our discretion, agree to an extension.  In addition, this Commitment Letter and the commitments hereunder shall expire at (a) 5:00 p.m. (New York City time) on February 18, 2013, unless the Loan Parties shall have theretofore filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the Court and (b) if such petitions have been filed by such time, at 11:59 p.m. (New York City time) on the date that is five (5) days after such filing, unless, prior to that time, the Court shall have entered the Interim Order, the Borrower shall have paid to the Commitment Parties the fees that are specified herein to be due upon such entry and the Borrower shall have entered into definitive documentation with respect to the DIP Facilities. In the further event that the Interim Order is entered, this Commitment Letter and the commitments hereunder shall expire 40 days after the entry of the Interim Order unless the Final Order shall have been entered prior to the expiration of such 40-day period.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

6

Very truly yours,


WELLS FARGO PRINCIPAL LENDING, LLC

By: _____
     Name:  Greg Apkarian
     Title:   Vice President

Very truly yours,

Apollo Senior Floating Rate Fund Inc.
Account 631203

By: _____
     Name:
     Title:

**JOSEPH MORONEY**
Authorized Signatory

Very truly yours,

EMPYREAN CAPITAL PARTNERS, LP
on behalf of the funds and accounts managed by it

By: _____
Name: RYAN MAYETANI
Title: CHIEF FINANCIAL OFFICER

Very truly yours,

GOLDENTREE ASSET MANAGEMENT, LP
on behalf of certain funds and accounts managed by
it

By: _____

Name: George HARDIJIAN

Title: VP

Accepted and agreed to as of the date first written above:

THE READER'S DIGEST ASSOCIATION, INC.

By: _____

     Name: Robert Guth

     Title:    President and Chief Executive Officer

Commitment Letter - Signature Page

Schedule I

New Money Loan Commitments:

| NM Lender | Percentage of Commitment | |
|---|---|---|
| Apollo Senior Floating Rate Fund Inc. | | |
| Empyrean Capital Partners, LP | | |
| GoldenTree Asset Management, LP | | |
| Total | 100% | |

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

**Term Sheet**
February 17, 2013

<u>**Summary of Terms and Conditions for**</u>
<u>**Senior Secured Priming Debtor-in-Possession Credit Facility**</u>

I.   <u>Parties</u>

Borrower:

The Reader's Digest Association, Inc., a Delaware corporation (the "<u>Borrower</u>"), which will be a debtor and debtor-in-possession in a case to be filed under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") (the "<u>Borrower's Case</u>") in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "<u>Bankruptcy Court</u>") (the date of the commencement of the Cases, the "<u>Petition Date</u>").

Guarantors:

All obligations of the Borrower under the Definitive Documentation (as defined below) (the "<u>Obligations</u>") will be unconditionally guaranteed by RDA Holding Co., a Delaware corporation ("<u>Holding</u>"), and by each direct and indirect, existing and future domestic subsidiary of the Borrower (collectively with Holding, the "<u>Guarantors</u>" and, together with the Borrower, the "<u>Loan Parties</u>" or the "<u>Debtors</u>"), each of which will be a debtor-in-possession in a case to be filed in the Bankruptcy Court (the "<u>Guarantors' Cases</u>"; together with the Borrower's Case, the "<u>Cases</u>").

Administrative Agent
and Collateral Agent:

An entity to be selected by the Lenders in consultation with the Borrower (in such capacity, the "<u>Administrative Agent</u>").

DIP Lenders:

Certain Secured Noteholders (as defined below) party to the commitment letter dated February 17, 2013 to which this term sheet is attached (the "<u>Commitment Letter</u>") in respect of the New Money Loan (the "<u>NM Lenders</u>") and Wells Fargo Principal Lending, LLC ("<u>Wells Fargo</u>") in respect of the Refinancing Loan (the "<u>Refinancing Loan Lender</u>", together with the NM Lenders, collectively the "<u>DIP Lenders</u>").

II.   <u>Basic Terms</u>

Commitments and
Availability:

A senior secured priming debtor-in-possession credit facility (the "<u>DIP Facility</u>") comprised of (a) a term loan in the aggregate principal amount of $45 million (the "<u>New Money Loan</u>") and (b) a refinancing term loan and letter of credit facility in the aggregate amount (of approximately $60 million) equal to the sum of (i) $49,625,000 plus (ii) the aggregate amount of all letters of credit outstanding under the Existing Credit Agreement as of February 17, 2013 equal to $9,516,267 plus (iii) the

aggregate amount of all outstanding and unpaid fees, letter of credit standby fees and commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Cases (as defined below) under the Existing Credit Agreement and immediately prior to the date when the Refinancing Loans become effective (collectively, the "<u>Refinancing Loan</u>" and, together with the New Money Loan, the "<u>Loans</u>"), it being understood that the indemnification obligations under the Existing Credit Agreement will survive as obligations under the DIP Facility notwithstanding the refinancing or termination of the facilities under the Existing Credit Agreement.  During the period commencing on the Closing Date (as defined below) and ending on the date of entry of the Final Order (as defined below) (such period, the "<u>Interim Period</u>"), a portion of the New Money Loan in an amount equal to $11 million (or such lower amount as may be ordered by the Bankruptcy Court) shall be available to the Borrower and borrowed in one draw on the Closing Date, subject to compliance with the terms, conditions and covenants described in this Summary of Terms and Conditions (this "<u>Term Sheet</u>").

Upon the Bankruptcy Court's entry of the Final Order (such date hereinafter being referred to as the "<u>Final Order Entry Date</u>"), the remaining amount of the New Money Loan and the full amount of the Refinancing Loan shall be borrowed within two (2) business days of the Final Order Entry Date, subject to compliance with the terms, conditions and covenants described in this Term Sheet and the Definitive Documentation.

| | |
|---|---|
| Amortization: | None. |
| Term: | Borrowings shall be repaid in full in cash, and the remaining commitments, if any, shall terminate, at the earliest of (a) October 31, 2013, (b) the 40th day after the entry of the Interim Order (as defined below) (or such later date agreed to by the Required DIP Lenders (as defined below)) if the Final Order has not been entered prior to the expiration of such period, (c) the effective date of a Chapter 11 plan of reorganization that has been confirmed pursuant to an order entered by the Bankruptcy Court or any other court having jurisdiction over the Cases (the "<u>Effective Date</u>") and (d) the acceleration of the Loans or termination of the commitments  in accordance with the Credit Agreement (as defined below) (such earliest date, the "<u>Termination Date</u>").  To the extent not otherwise terminated pursuant to the foregoing, the unused Commitments shall terminate on the date that is five (5) business days after the Final Order Entry Date.  Any confirmation order entered in the Cases shall not discharge or otherwise affect in any way any of the obligations of the Loan Parties to the DIP Lenders under the DIP Facility and the Definitive Documentation other than after the payment in full and in cash to the DIP Lenders of all principal, interest and all other obligations under the DIP Facility and the Definitive Documentation on or before the effective date of a plan of reorganization and the termination of the Commitments (except as |

provided under "<u>Exit Financing</u>" below).

**Exit Financing:** The Refinancing Loan Lender agrees that, on the date of consummation of a plan of reorganization, subject to the satisfaction of the applicable conditions set forth in the "First Out Exit Facility Term Sheet" attached to the Commitment Letter as Annex 2 (the "<u>First Out Exit Facility Term Sheet</u>") and otherwise in accordance therewith and pursuant to the terms of the definitive documentation thereof, the Refinancing Loans shall be continued as or converted into, exit financing of the reorganized Debtors (or if the Refinancing Loans are not continued or converted into exit financing such Refinancing Loans shall be paid in full in cash upon consummation of such plan of reorganization). The NM Lenders agree that, on the date of consummation of a plan of reorganization, subject to the satisfaction of the applicable conditions set forth in the "Second Out Exit Facility Term Sheet" attached to the Commitment Letter as Annex 3 (the "<u>Second Out Exit Facility Term Sheet</u>") and otherwise in accordance therewith and pursuant to the terms of the definitive documentation thereof, the New Money Loans shall be continued as or converted into, exit financing of the reorganized Debtors (or if the New Money Loans are not continued or converted into exit financing such New Money Loans shall be paid in full in cash upon consummation of such plan of reorganization).

Notwithstanding the foregoing and that the scheduled final maturity of the Refinancing Loan extends beyond the date that is 180 days after the Petition Date, the commitment of Wells Fargo Principal Lending, LLC under the Restructuring Support Agreement and the First Out Exit Facility Term Sheet to provide the First Out Exit Facility Term Loans (as such terms are defined in the Restructuring Support Agreement) shall automatically terminate on the date that is 180 days after the Petition Date.

It is understood and agreed that each DIP Lender's commitment herein in respect of such exit financing is on a several, and not joint, basis with any other DIP Lenders.

**Closing Date:** Closing and initial funding to occur as promptly as is practicable after the entry of the Interim Order but no later than two (2) business days after such entry (the "<u>Closing Date</u>").

**Purpose:** The proceeds of the Loans shall be used: (1) in respect of the New Money Loan, (a) for working capital and other general corporate purposes of the Borrower, the other Loan Parties and their respective subsidiaries in accordance with, and subject to the limitations in, the Cash Flow Forecast, (b) to pay transaction costs, fees and expenses incurred in connection with the DIP Facility and the transactions contemplated thereunder and hereby (it being understood and agreed that no proceeds of the Loans may be used to fund any subsidiary that is not a Loan Party) and (c) to pay the Noteholder Protections (as defined below), the Lender Protections (as defined below) and other adequate protection

expenses, if any, to the extent set forth in the Interim Order; and (2) in respect of the Refinancing Loan, to repay in full the loans and obligations outstanding under the credit facilities evidenced by that certain Credit and Guarantee Agreement dated as of March 30, 2012, among Holding, the Borrower, the lenders party thereto and Wells Fargo Bank, N.A., as administrative agent for the lenders (as amended, the "Existing Credit Agreement"), including rolling up the aggregate amount of all letters of credit outstanding under the Existing Credit Agreement as of February 17, 2013, the aggregate amount of all outstanding and unpaid fees, letter of credit standby fees and commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Cases under the Existing Credit Agreement and immediately prior to the date when the Refinancing Loans become effective (provided, that, no unused letter of credit commitments will be rolled up; rather all unused commitments shall be deemed to terminate simultaneously with the effectiveness of the Refinancing Loans); it being understood that the indemnification obligations under the Existing Credit Agreement will survive as obligations under the DIP Facility notwithstanding the refinancing or termination of the facilities under the Existing Credit Agreement.  The proceeds of Loans may not be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lenders, the Administrative Agent or any of the Secured Noteholders or Wells Fargo.

| | |
|---|---|
| Priority and Liens: | All borrowings by the Borrower and other Obligations of the Borrower under the DIP Facility (and all guaranties by the Guarantors) shall, subject to the Carve-Out (defined below), at all times: |

(i)     pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status in the Cases;

(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors' respective estates in the Cases and the proceeds thereof (including, without limitation, inventory, accounts receivable, general intangibles, chattel paper, intercompany loans, notes and balances, owned real estate, real property leaseholds, fixtures and machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements, and other intellectual property, avoidance action claims and the proceeds thereof, and capital stock of subsidiaries (including 100% of the issued and outstanding non-voting equity interests in any first tier foreign subsidiary and no more than 65% of issued and outstanding voting equity interests in any first tier foreign subsidiary) (collectively, the "Collateral") that is not subject to valid, perfected and non-avoidable liens as of the commencement of the Cases;

        (iii)      pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all Collateral of the Debtors' respective estates in the Cases, that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure obligations under the agreements referred to in clauses (1), (2) and (3) of clause (iv) hereof, which liens shall be primed by the liens to be granted to the Administrative Agent as described in such clause); and

        (iv)      pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the Collateral of the Debtors' respective estates in the Cases that is subject to the existing liens that secure the obligations of the Loan Parties under or in connection with the Existing Credit Agreement, and the senior secured notes issued pursuant to that certain indenture, dated February 11, 2010 ("Indenture") by and among the Borrower, certain of its affiliates and the purchasers party thereto from time to time (the "Secured Noteholders") and all of which existing liens (the "Existing Primed Secured Facilities"; the liens thereunder, the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the Administrative Agent, which senior priming liens in favor of the Administrative Agent shall also prime any liens granted after the commencement of the Cases to provide adequate protection in respect of any of the Primed Liens but shall not prime liens, if any, to which the Primed Liens are subject at the time of the commencement of the Cases.

subject, in each case, only to the Carve Out.

For purposes hereof, the term "Carve Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Cases prior to the occurrence of an Event of Default and notice thereof delivered to the Borrower to the extent allowed by the Bankruptcy Court at any time, and (iii) at any time after the occurrence of an Event of Default and notice thereof delivered to the Borrower, to the extent allowed at any time, whether before or after delivery of such notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors and the Committee and allowed by this Court, not in excess of $2,500,000 for the

Debtors' professionals and the Committee's professionals (the "<u>Carve Out Cap</u>"); <u>provided</u> <u>that</u> the Carve Out Cap shall be inclusive of any professional fees, costs and expenses incurred by any Chapter 7 trustee, such professional fees, costs and expenses in an amount not to exceed $25,000 in the aggregate; <u>provided</u> <u>further</u> that the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, the Secured Noteholders or the lender under the Existing Credit Agreement and nothing herein shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.

All of the liens described above shall be effective and perfected as of the Interim Order Entry Date pursuant to the Interim Order and without the necessity of possession of any possessory collateral or the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, in each case subject to the terms and conditions set forth in the Interim Order.

Both the New Money Loan and the Refinancing Loan will be secured with the same Collateral, with *pari passu* ranking.

Payment Priority: The New Money Loan and the Refinancing Loan shall rank *pari passu* in terms of right to payment.

Noteholders Protection: The noteholders under the Indenture (the "<u>Primed Noteholders</u>") whose liens are primed as described in clause (iv) of "<u>Priority and Liens</u>" above, shall receive adequate protection of their interest in their prepetition collateral pursuant to Sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, in an amount equal to the aggregate diminution in value of the Primed Noteholders' respective prepetition collateral including, without limitation, any such diminution resulting from the imposition of, and payments benefitting from, the Carve-Out, the imposition of the automatic stay, the implementation of the DIP Facility and the priming of the Primed Noteholders' liens on the prepetition collateral, the sale, lease or use by the Debtors (or other decline in value) of the prepetition collateral (including cash collateral), all of which adequate protection must be satisfactory to the NM Lenders, including the following: (i) a superpriority claim as contemplated by Section 507(b) of the Bankruptcy Code immediately junior to the claims under Section 364(c)(1) of the Bankruptcy Code held by the Administrative Agent and the DIP Lenders; <u>provided</u> however that the Primed Noteholders shall have irrevocably agreed, pursuant to Section 1129(a)(9) of the Bankruptcy Code, in any stipulation and/or order granting such adequate protection, that such junior superpriority claims may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of the plan equal to the allowed amount of such claims, (ii) a replacement lien on the Collateral, which adequate protection lien shall have a priority

immediately junior to the liens granted pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in favor of the Administrative Agent for the benefit of the DIP Lenders, (iii) the payment of the reasonable fees and expenses incurred by (1) one primary counsel (and any conflicts, special or local counsel retained)for Wilmington Trust FSB as the collateral agent under the Existing Primed Secured Facilities, and the continuation of the payment on a current basis of the agency fee (to the extent owing) provided for under the Indenture (and the other related definitive documentation) and (2) one primary counsel (and any conflicts, special or local counsel retained) and one financial advisor for the ad hoc committee of the Secured Noteholders, and (iv) such other adequate protection as the Bankruptcy Court may order (collectively, the "Noteholder Protections").

|                     |                                                                                                                                                                                                                                                                                                                                                                                             |
|---------------------|---|
| Lender Protections  | The lender under the Existing Credit Agreement (the "Primed Lender") in exchange for consenting to having its liens primed as described in clause (iv) of "Priority and Liens" above, consenting to providing Exit Financing on terms and conditions specified herein, consenting to executing the Restructuring Support Agreement and the Restructuring Transactions (as defined in the Restructuring Support Agreement) and adequate protection of their interest in their prepetition collateral pursuant to Sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, in an amount equal to the aggregate diminution in value of the Primed Lender's respective prepetition collateral including, without limitation, any such diminution resulting from the imposition of, and payments benefitting from, the Carve-Out, the imposition of the automatic stay, the implementation of the DIP Facility and the priming of its liens on the prepetition collateral, the sale, lease or use by the Debtors (or other decline in value) of the prepetition collateral (including cash collateral), shall receive the following: (a) upon entry of the Interim Order (i) current cash pay of interest fees and commissions (including, for the avoidance of doubt, any accrued pre- and post-petition interest and letter of credit fees and commissions at the non-default rate under the Existing Credit Agreement, (ii) payment of all unreimbursed reasonable and documented advisor fees and expenses of the Primed Lender including that of former counsel (and any conflicts, special or local counsel retained, if any) whether pre- or post-petition, (iii) current pay of all reasonable fees and expenses of the Primed Lender during the Cases (including for one primary counsel (and any conflicts, special or local counsel retained)), (iv) a superpriority claim as contemplated by Section 507(b) of the Bankruptcy Code immediately junior only to the claims under Section 364(c)(1) of the Bankruptcy Code held by the Administrative Agent, the DIP Lenders and to the New Money Loan, (v) a replacement lien on the Collateral, which adequate protection lien shall have a priority immediately junior to only the liens granted pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in favor of the Administrative Agent for the benefit of the DIP Lenders, (vi) and the continuation of the payment on a current basis of the agency fee (to the extent owing) to Wells Fargo as the administrative agent under the Existing Credit Agreement to the extent provided for under the |

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

Existing Credit Agreement (and the other related definitive
documentation) and (vii) and such other adequate protection as the
Bankruptcy Court may order and (b) upon entry of the Final Order (i) the
Refinancing Loans and (ii) other Priorities and Liens granted under this
Term Sheet (collectively, the "Lender Protections").

Nature of Fees:      Non-refundable and fully earned when paid under all circumstances.

### III. Prepayment Provisions

Optional Prepayments and
Commitment Reductions:      Loans may be prepaid and commitments may be reduced in minimum
amounts to be agreed upon, subject to the Early Termination Fee
(referenced below), as applicable. Optional prepayment of the Loans
shall be applied ratably to the Loans outstanding. No prepayment of the
Loans may be reborrowed.

Mandatory Prepayments:      Subject to the reinvestment exception described below, the following
amounts shall be applied to prepay the Loans:

- 100% of the net cash proceeds from the incurrence of
indebtedness (other than certain permitted indebtedness to be
agreed) after the Closing Date by Holding or any of its
subsidiaries; and

- 100% of the net cash proceeds of any sale or other
disposition (including (a) by issuance or sale of stock of
Holding or any of its subsidiaries, (b) as a result of casualty
or condemnation, net of remediation or replacement costs
and (c) any extraordinary receipts) by Holding or any of its
subsidiaries of any assets (except for sales of inventory in
the ordinary course of business and certain other dispositions
and exceptions to be agreed on);

*provided* that in the absence of a default or event of default under the
Definitive Documentation, the Loan Parties shall be permitted to reinvest
(or commit to reinvest) such proceeds not exceeding $15 million in the
aggregate within six (6) months after the receipt of the proceeds in each
case subject to the terms and conditions of the Definitive Documentation.

The prepayment amounts shall be applied to pay down the New Money
Loan and the Refinancing Loan on a pro rata basis.

The DIP Lenders may have the option to decline the mandatory
prepayments in their sole discretion.

### IV. Interest and Certain Fees

Interest Rate:      Refinancing Loan:

LIBO Rate (with a floor of 3.0%) plus 5.0% per annum

Base Rate (with a floor of 4.0%) plus 4.0% per annum

New Money Loan:

LIBO Rate (with a floor of 1.50%) plus 9.50% per annum

Base Rate (with a floor of 2.50%) plus 8.50% per annum

As used herein:

"LIBO Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 3.0% for the Refinancing Loan and 1.50% for the New Money Loan. "Base Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 4.0% for the Refinancing Loan and 2.50% for the New Money Loan.

| | |
|---|---|
| Default Rate: | Upon the occurrence and during the continuance of an Event of Default under the Credit Agreement, interest shall accrue on the outstanding amount of the obligations under the Credit Agreement and shall be payable on demand at 2.0% per annum above the then applicable rate. |
| Commitment Fees: | The Borrower shall pay to the Administrative Agent for the account of the NM Lenders providing the New Money Loan, commitment fees in an amount equal to 2.0% of the aggregate amount of the commitments in respect of the New Money Loan (i.e., $45 million) on the Closing Date. |
| Ticking Fees: | For the period of time from the 30th day after the Petition Date through and including the date when the Borrower shall borrow the full amount of the New Money Loan (the "Full Funding Date"), the Borrower shall pay a fee equal to 4.75% per annum over the daily average of the undrawn amount of the New Money Loan (i.e., the difference between $45 million and the amount of the New Money Loan borrowed on the Closing Date). |
| Early Termination Fee: | In the event that the Borrower shall prepay the New Money Loan in part or in full, or reduce or terminate any commitment in respect of the NM Loan in part or in full,  prior to 60 days after the Petition Date, the Borrower shall pay the NM Lenders an early termination fee in the amount equal to (a) in the case of prepayment in full or reduction of commitment in full, 2% of the aggregate principal amount of the total commitment for the New Money Loan (i.e., $45 million), and (b) in the case of partial prepayment or commitment reduction, 2% of the aggregate principal amount of the New Money Loan commitment so reduced or the New Money Loan so prepaid; in each case due and payable at the time of such prepayment or reduction. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed, *provided* that computations of interest for Base |

Rate Loans when the Base Rate is determined by the prime rate shall be made on the basis of the number of actual days elapsed in a year of 365 or 366 days, as the case may be.

## V.    Certain Conditions

Conditions Precedent to
Initial Borrowings:

The obligations of the DIP Lenders to make Loans under the DIP Facility will be subject to the following conditions precedent:

(a)  The Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to the DIP Lenders and the Administrative Agent, an interim order no later than five (5) calendar days after the Petition Date (or such later date agreed to by the Required DIP Lenders), approving and authorizing the DIP Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code Section 364(c) and (d), as applicable, in form and substance satisfactory to the Administrative Agent, Wells Fargo and the Secured Noteholders party to the Commitment Letter, in their sole discretion, and including without limitation, provisions (i) modifying the automatic stay to permit the creation and perfection of the liens in favor of the DIP Lenders on the Collateral; (ii) providing for the automatic vacation of such stay to permit the enforcement of the DIP Lenders' remedies under the DIP Facility, including without limitation the enforcement, upon five (5) business days' prior written notice, of such remedies against the Collateral; (iii) prohibiting the incurrence of debt with priority equal to or greater than the DIP Lenders' under the DIP Facility, except as expressly provided in the Definitive Documentation; (iv) prohibiting any granting or imposition of liens other than liens acceptable to the Required DIP Lenders except as expressly provided in the Definitive Documentation; (v) priming the liens of the lenders and holders under the Existing Primed Secured Facilities and granting the Noteholder Protections, the Lender Protections and other adequate protection for such priming in the form of liens, superpriority administrative expense claims and other payments and obligations as described in the "Priority and Liens" section of this Term Sheet and authorizing the use of cash collateral in accordance with the terms hereof; (vi) authorizing and approving the DIP Facility and the transactions contemplated hereby, including without limitation the granting of the superpriority claims, the first-priority and priming security interests and liens upon the Collateral and the payment of all fees and expenses due to the DIP Lenders and the Administrative Agent; (vii) finding that the DIP Lenders are extending credit to the Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code; (viii) authorizing interim extensions of credit in amounts acceptable to the Required NM Lenders and currently expected to be $11 million; and (ix) containing a determination by the Bankruptcy Court that, subject to an investigation period by the official creditors' committee, the liens securing the Existing Primed Secured Facilities are valid and unavoidable (with a finding that the Debtors stipulate and agree that the liens securing the Existing Primed Secured Facilities  are valid

and unavoidable and that the obligations under the  Existing Primed Secured Facilities are valid, binding and enforceable in accordance with the terms therein) (such interim order being referred to as the "<u>Interim Order</u>", and the date of entry of the Interim Order being hereinafter referred to as the "<u>Interim Order Entry Date</u>");

(b)  The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the DIP Lenders;

(c)  The Loan Parties shall be in compliance in all respects with the Interim Order;

(d)  The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter, including in respect of amounts of critical vendor payments, if any, shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required DIP Lenders;

(e)  No trustee, receiver, interim receiver or receiver and manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(f)  No material adverse change (to be defined) shall have occurred other than the commencement of the Cases.

(g)  The Administrative Agent and the DIP Lenders shall have received from the Loan Parties forecasts on a consolidated basis of the Borrower and its subsidiaries' income statement, balance sheet and cash flows for each fiscal month of fiscal year 2013 and including the material assumptions on which such forecasts were based (including, but not limited to, future cost reduction initiatives), and setting forth the anticipated disbursements and uses of the Commitments, which forecasts shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required DIP Lenders and certified by a responsible officer (the "<u>Budget</u>");

(h)  The Administrative Agent and the DIP Lenders shall have received from the Loan Parties certified copies of (i) the audited consolidated balance sheets of the Borrower and its subsidiaries as of each of the three (3) fiscal years proceeding the fiscal year ending on December 31, 2012, and the related audited consolidated statements of income, stockholders' equity and cash flows for the Borrower and its consolidated subsidiaries for the corresponding periods, (ii) the unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter ended after the fiscal year ended December 31, 2012 for which

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

such financial statements are available prior to the Closing Date and (iii) to the extent made available by the Borrower, monthly financial data generated by the Borrower's internal accounting systems for use by senior management for each month ended after the latest fiscal quarter for which unaudited financial statements are delivered pursuant to clause (ii) above and at least 30 days before the Closing Date;

(i) The Administrative Agent and the DIP Lenders shall have received a 13-week cash flow projection of the Borrower and its subsidiaries, which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required DIP Lenders and certified by a responsible officer (the "Cash Flow Forecast");

(j)  All costs, fees, expenses (including, without limitation, reasonable legal fees) and other compensation contemplated by the Definitive Documentation to be payable to the DIP Lenders and/or the agents shall have been paid, in each case, to the extent due;

(k)  No Default or Event of Default under the Definitive Documentation shall have occurred and be continuing;

(l)  Representations and warranties shall be true and correct in all material respects;

(m)  The Administrative Agent and the Required DIP Lenders shall be satisfied that the Loan Parties have complied with all other customary closing conditions, including, without limitation: (i) the delivery of  good standing certificates from the states of formation/incorporation and customary closing certificates and officer's certificates; (ii) evidence of authority; and (iii) obtaining of any material third party and governmental consents necessary in connection with the DIP Facility, the financing thereunder and related transactions;

(n) The Administrative Agent and the DIP Lenders shall have received evidence that all insurance required to be maintained pursuant to the Definitive Documentation has been obtained and is in effect and that the Administrative Agent has been named as loss payee or additional insured, as appropriate, under each insurance policy with respect to such liability and property insurance as to which the Administrative Agent shall have requested to be so named (it being understood and agreed that the deliverables under this clause (n) may be delivered following the Closing Date within a time period the Required DIP Lenders shall consent to);

(o)  The Administrative Agent and the DIP Lenders shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act;

(p)  The Administrative Agent and the DIP Lenders shall have received executed definitive loan documentation relating to the DIP Facility (including a credit agreement (the "<u>Credit Agreement</u>") and related security and closing documents (collectively, the "<u>Definitive Documentation</u>"), in each case of the foregoing reasonably satisfactory to the Administrative Agent and the Required DIP Lenders and consistent with the terms of this Term Sheet;

(q) The Administrative Agent and the DIP Lenders shall have received UCC searches (or comparable searches, if any, in the case of foreign jurisdictions) conducted in the jurisdictions in which the Loan Parties are organized (dated as of a date reasonably satisfactory to the Administrative Agent and the Required DIP Lenders), reflecting the absence of liens and encumbrances on the assets of the Loan Parties other than such liens as may be permitted under the Definitive Documentation;

(r)  All corporate and judicial proceedings and all instruments and agreements in connection with the loan transactions among the Loan Parties, the Administrative Agent and the DIP Lenders contemplated by the Credit Agreement shall be reasonably satisfactory in form and substance to the Administrative Agent and the DIP Lenders and the Administrative Agent and the DIP Lenders shall have received all information and copies of all documents or papers  reasonably requested by the Administrative Agent or any Lender;

(s)  The Administrative Agent shall have received a notice of borrowing from the Borrower;

(t)  The Restructuring Support Agreement shall be in full force and effect and shall not have been terminated and no default or event of default (unless as a result of a breach by the NM Lenders party thereto) thereunder shall have occurred or be continuing; and

(u)  The Administrative Agent and the DIP Lenders shall have received such information (financial or otherwise) and documents as may be reasonably requested by the Administrative Agent or the Required DIP Lenders and shall be satisfied with the nature and substance thereof.

As used in this term sheet, the term "<u>Restructuring Support Agreement</u>" shall mean that certain Restructuring Support Agreement dated February 17, 2013 by and among the Borrower, the Borrower's affiliates party thereto, Wells Fargo Principal Lending, LLC, Goldentree Asset Management LP, Apollo Investment Management, L.P. and Empyrean Capital Partners, LP.

Conditions Precedent to Full Availability:

The obligations to provide extensions of credit up to the full amount of the Loans shall be subject to the satisfaction of the following conditions precedent:

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

(a)  Not later than the 40th day following the entry of the Interim Order (or such later date agreed to by the Required DIP Lenders), a final order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Administrative Agent and the DIP Lenders on a motion by the Loan Parties that is in form and substance reasonably satisfactory to Wells Fargo and the Secured Noteholders party to the Commitment Letter, approving and authorizing on a final basis the matters and containing the provisions described in clause (a) in "Conditions Precedent to Initial Borrowings" above, authorizing the DIP Facility (including both the Refinancing Loan and the New Money Loan) and containing a waiver of the Debtors' rights under Section 506(c) of the Bankruptcy Code (such final order being referred to as the "Final Order");

(b)  The Final Order shall not have been reversed, modified, amended, stayed or vacated;

(c)  The Loan Parties shall be in compliance with the Final Order;

(d)  The DIP Lenders shall have received the required periodic updates of the Cash Flow Forecast and variance reports, each in form and substance reasonably satisfactory to the Administrative Agent and the Required NM Lenders; and the Loan Parties shall be in compliance with the updated Cash Flow Forecast;

(e)  No Default or Event of Default shall have occurred and be continuing under the DIP Facility;

(f)  Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent such representations and warranties relate to an earlier date;

(g)  The Loan Parties shall have paid the balance of all fees then payable to the DIP Lenders and the agents as referenced herein, in each case to the extent due;

(h)  The Restructuring Support Agreement shall be in full force and effect and shall not have been terminated and no default or event of default (unless as a result of a breach by the NM Lenders party thereto) thereunder shall have occurred or be continuing; and

(i)  The Administrative Agent shall have received a notice of borrowing from the Borrower.

The acceptance by the Borrower of each extension of credit under the Credit Agreement shall be deemed to be a representation and warranty by the Loan Parties that the conditions specified above have been satisfied.

VI.     <u>Certain Documentation Matters</u>

The Definitive Documentation shall contain representations, warranties, covenants and events of default customary for financings of this type, including, without limitation, those set forth below:

| | |
|---|---|
| Representations and Warranties: | The Loan Parties shall make the representations and warranties set forth in the Existing Credit Agreement, modified as necessary to reflect the commencement of the Cases, changes in the financial and other conditions of the Loan Parties resulting therefrom and from events leading up thereto and such other matters as the DIP Lenders shall reasonably require in the Definitive Documentation. |
| | In addition, each of the Loan Parties represents and warrants that they are in material compliance with each material contract entered into by any Loan Party after the Petition Date or entered into prior to the Petition Date and assumed, specific material contracts have been continued, the Interim Order or the Final Order (as applicable) shall continue to be effective, and the Loan Parties have not failed to disclose any material assumptions with respect to the Budget or Cash Flow Forecast and affirm that each of the Budget and Cash Flow Forecast reflects good faith estimates of the matters set forth therein; on the Termination Date the DIP Lenders shall be entitled to immediate payment of the obligations without further application to the Bankruptcy Court. |
| Affirmative Covenants: | Each of the Loan Parties (with respect to itself and each of its subsidiaries) agrees to the affirmative covenants set forth in the Existing Credit Agreement, modified as necessary to reflect the commencement of the Cases, changes in the financial and other conditions of the Loan Parties resulting therefrom and from events leading up thereto and such other affirmative covenants as the DIP Lenders shall reasonably require in the Definitive Documentation as well as the following affirmative covenants: |
| | (a)  delivery of monthly (in addition to quarterly and annual) consolidated and consolidating financial statements and reports showing variances from the Budget; |
| | (b)  delivery of bi-weekly updates of the Cash Flow Forecast and variance reports, each in form and substance reasonably satisfactory to the Administrative Agent and the Required NM Lenders; |
| | (c)  monthly delivery of a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its subsidiaries (including, without limitation, with respect to asset sales, cost savings, facility closures, litigation, contingent liabilities and other matters as the Administrative Agent or the Required DIP Lenders may reasonably request); |

(d)  delivery by dates to be agreed of non-core asset sale plan and progress reports with respect thereto, each in form and substance reasonably satisfactory to the Administrative Agent and the Required NM Lenders;

(e)  delivery to the Administrative Agent and the DIP Lenders as soon as practical in advance of filing with the Bankruptcy Court, (i) all material proposed orders, pleadings and motions which must be in form and substance reasonably satisfactory to the Administrative Agent and the Required DIP Lenders, and (ii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan and any of the foregoing distributed by any Debtor to any Committee;

(f)  access to information (including historical information) and personnel, including, without limitation, regularly scheduled meetings as mutually agreed with senior management and other company advisors and the Administrative Agent, the Required DIP Lenders and Moelis & Company LLC shall be provided with access to all information it shall reasonably request;

(g)  bi-weekly update calls (with question and answer periods) with senior management of the Borrower and the DIP Lenders and their respective representatives and advisors; and

(h)  compliance with and absence of default under the Restructuring Support Agreement and absence of a "Termination Event" (as defined under the Restructuring Support Agreement) thereunder.

The Definitive Documentation will contain provisions relating to disbursement controls reasonably satisfactory to the Administrative Agent, the Required DIP Lenders and the Loan Parties.

| | |
|---|---|
| Financial Covenants: | Compliance with the Budget and the Cash Flow Forecast subject to line item variances to be agreed. |
| Negative Covenants: | Each of the Loan Parties (with respect to itself and each of its subsidiaries) agrees to the negative covenants set forth in the Existing Credit Agreement, modified as necessary to reflect the commencement of the Cases and changes in the financial and other conditions of the Loan Parties resulting therefrom and from events leading up thereto, with such baskets and carve-outs as may be agreed to in the Definitive Documentation by the parties thereto acting in good faith and such other matters as the DIP Lenders shall require in the Definitive Documentation.  Each of the Loan Parties (with respect to itself and each of its subsidiaries) agrees that the following are prohibited (except to the extent otherwise permitted in this Term Sheet or the Definitive Documentation): |

(a)  creating or permitting to exist any liens or encumbrances on any assets, other than liens securing the DIP Facility and any permitted liens

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

(which permitted liens shall include scheduled liens in existence on the Closing Date which, in the case of Primed Liens, are subordinated pursuant to the orders, junior liens granted in connection with adequate protection granted by the Loan Parties as required hereunder) and other liens described in "<u>Priority and Liens</u>" above;

(b)  creating or permitting to exist any other superpriority claim which is pari passu with or senior to the claims of the DIP Lenders under the DIP Facility, except for the Carve-Out and liens securing the obligations;

(c)  disposing of assets (including, without limitation, any sale and leaseback transaction and any disposition under Bankruptcy Code section 363) in respect of a transaction for total consideration of more than an aggregate amount to be agreed;

(d) (i) engaging in business different from those lines of business conducted by the Borrower and its subsidiaries on the date of the Credit Agreement or modifying the nature or the type of its business or the manner in which such business is conducted or (ii) modifying or altering in any manner which is adverse to the interests of the DIP Lenders, its organizational documents, except as required by the Bankruptcy Code;

(e)  prepaying pre-petition indebtedness, except as expressly provided for herein, or as permitted under the Interim Order or the Final Order, as applicable, or pursuant to "first day" orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent and the Required DIP Lenders;

(f)  asserting any right of subrogation or contribution against any other Loan Party until all borrowings under the DIP Facility are paid in full in cash and the Commitments are terminated;

(g)  declaring or making any dividend or any distribution on account of capital stock (other than dividends and distributions (x) from non-Loan Parties, (y) from Loan Parties to Loan Parties (other than Holdings) and (z) from non-Loan Parties to non-Loan Parties); and

(h)  paying any fees, including management fees, to its affiliates or shareholders (other than any of Holding's subsidiaries that are Loan Parties) or make any other payments or dividends in respect of the capital stock of Holding.

| | |
|---|---|
| Events of Default: | The DIP Facility shall be subject to the events of default (the "<u>Events of Default</u>") (x) set forth in the Existing Credit Agreement, modified as necessary to refer to the DIP Facility and to reflect the commencement of the Cases and changes in the financial and other conditions of the Loan Parties resulting therefrom and from events leading up thereto and (y) the additional customary events of default the DIP Lenders may require in the Definitive Documentation as well as the following events of default (with thresholds and grace periods to be agreed): |

(a)  The occurrence of any insolvency or bankruptcy proceeding with respect to any subsidiary of Holding that is not a debtor in the Cases (other than certain subsidiaries to be agreed);

(b)  The Final Order Entry Date shall not have occurred by the 40th day after the Interim Order Entry Date (or such later date as the Required DIP Lenders may agree);

(c)  Any of the Cases shall be dismissed or converted to a Chapter 7 Case; a trustee, receiver, interim receiver or receiver and manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)); or any other superpriority administrative expense claim or lien (other than the Carve-Out) which is pari passu with or senior to the claims or liens of the DIP Lenders under the DIP Facility shall be granted in any of the Cases without the consent of the Administrative Agent and the Required DIP Lenders;

(d)  Other than payments authorized by the Bankruptcy Court in respect of "first day" or other orders entered upon pleadings in form and substance reasonably satisfactory to the Administrative Agent and the Required DIP Lenders, permitted by the Interim Order or the Final Order (as applicable), as required by the Bankruptcy Code, or as may be permitted in the Definitive Documentation, the Loan Parties shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables of the Debtors or any other debt;

(e)  The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties which have an aggregate value in excess of an amount to be agreed or (ii) to permit other actions that would have a material adverse affect on the Loan Parties or their estates;

(f)  An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Final Order, or any of the Borrower or any of their affiliates shall apply for authority to do so, in each case without the prior written consent of the Required DIP Lenders, or the Interim Order or Final Order with respect to the DIP Facility shall cease to be in full force and effect;

(g)  Any judgments which are in the aggregate in excess of an amount to be agreed as to any post-petition obligation shall be rendered against the Loan Parties or any of its subsidiaries and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants); or there shall be rendered against the Loan Parties or any of its subsidiaries a nonmonetary judgment with respect to a post-petition event which causes

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Loan Parties or any of its subsidiaries taken as a whole to perform their obligations under the Definitive Documentation;

(h)  Except as provided under "Exit Financing" above, the Debtors shall file any plan in any of the Cases that does not provide for termination of the Commitments under the DIP Facility and payment in full in cash of the Loan Parties' obligations under the Definitive Documentation on the effective date of such plan of reorganization or liquidation or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the Commitments under the DIP Facility and payment in full in cash of the Loan Parties' obligations under the Definitive Documentation, or any of the Debtors shall seek, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(i)  The Loan Parties or any of their subsidiaries shall take any action in support of any of the foregoing or any person other than the Loan Parties or any of their subsidiaries shall do so and such application is not contested in good faith by the Loan Parties or such subsidiaries and the relief requested is granted in an order that is not stayed pending appeal;

(j)  Any of the Loan Parties or their affiliates shall fail to comply with the Interim Order or Final Order, as applicable;

(k) The filing of a motion, pleading or proceeding by any of the Loan Parties or their affiliates which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment; and

(l) The Borrower shall have failed to comply with any of the following: (i) file with the Bankruptcy Court a plan of reorganization and related disclosure statement in form and substance reasonably satisfactory to the Required DIP Lenders on or before the date that is 25 days after the Petition Date (the "Plan of Reorganization" and the "Disclosure Statement"); (ii) obtain an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Required DIP Lenders approving the Disclosure Statement on or before the date that is 75 days after the Petition Date pursuant to Section 1125 of the Bankruptcy Code on or before such time; (iii) commence the solicitation of acceptances of the Plan of Reorganization on or before the date that is 15 days following entry of the order referenced to in clause (ii) above; (iv) file with the Bankruptcy Court on or before July 5, 2013 a supplement to the Plan of Reorganization in form and substance reasonably satisfactory to the Required DIP Lenders; (v) obtain an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Required DIP Lenders confirming the Plan of Reorganization on or before July 15, 2013; (vi)

consummate the Plan of Reorganization on or before July 31, 2013; and (v) obtain an order of the Bankruptcy Court in form and substance reasonably satisfactory to the Required DIP Lenders establishing bar dates for submitting proofs of claim and requests for payment pursuant to section 503(b)(9) of the Bankruptcy Code.

| | |
|---|---|
| Required Lenders: | As used herein: |
| | |
| | The term "Required NM Lenders" shall mean the NM Lenders holding more than 50% of the sum of (i) the aggregate outstanding principal amount of the New Money Loans and (ii) the aggregate unused Commitments in respect of the New Money Loan. |
| | |
| | The term "Required DIP Lenders" shall mean the DIP Lenders holding more than 50% of the aggregate amount of the Loans and unused Commitments under the DIP Facility, and for the avoidance of doubt, shall in any event, include Wells Fargo at all times until the making of the Refinancing Loans, *provided* that in any event the Required DIP Lenders shall include the Required NM Lenders. |
| | |
| Voting: | Amendments and waivers with respect to the Definitive Documentation shall require the approval of the Required NM Lenders, provided that any amendment or waiver with respect to each of the Specified Voting Items referenced below shall also require the consent of the Refinancing Loan Lender.  As used herein, the term "Specified Voting Items" refers to each and all of the following: |

> Specified Voting Items:
>
> 1.  Amendments, changes, postponements, extensions, modifications or waivers relating to any of the following:
>     a.  either Order
>     b.  "Lender Protections" (i.e., adequate protection)
>     c.  maturity of the DIP Loans
>     d.  principal, interest and fees in respect of the Refinancing Loans, and increase of any principal, interest and fees in respect of the New Money Loans
>     e.  amount of availability of the New Money Loans
>     f.  terms on which the Refinancing Loans convert into an exit financing
>     g.  amendments or changes (including deletions) with respect to the information covenants (but excluding waivers in respect of information covenants which shall only require the consent by the Required NM Lenders)
>     h.  the amendments section or any other provision requiring the consent of all lenders (including definitions of "Required Lenders", "Required NM Lenders", "Required DIP Lenders", etc.)

Annex 1
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

    i. any scheduled prepayment to the extent the Refinancing Loan Lender is adversely affected
    j. any provision relating to the letters of credit issued under the DIP Facility
    k. pro rata sharing provisions
    l. assignment provisions or otherwise permit assignments to the Borrower or its affiliates
    m. provisions relating to administration of Refinancing Loans (e.g., setting the LIBO Rate or distributing monies)

2. Any waiver of any defaults related to either Order being stayed, reversed etc. for any reason.
3. Any priming of any of the Refinancing Loans or New Money Loans
4. Any amendment or waiver of any condition precedent to effectiveness of the DIP Facility or any extension of credit thereunder.
5. Release any Loan Party (other than in connection with a disposition that is expressly permitted under the terms of the Definitive Documentation (but not a disposition that would not have been permitted if not for a waiver)).
6. Release any portion of the Collateral (other than in connection with a disposition that is expressly permitted under the terms of the Definitive Documentation (but not a disposition that would not have been permitted if not for a waiver)).
7. The assignment or transfer by Borrower or any Loan Party of any of its rights and obligations under any Definitive Documentation.
8. Any change to the required application of repayments or prepayments between classes (i.e., NM Loans and Refinancing Loans).
9. Changes that would add/permit new obligations (in addition to the Loans and other obligations under the Credit Agreement) to be secured by the liens in favor of the DIP Lenders.
10. Changes/amendments/waivers that would permit:
    a. an asset sale otherwise prohibited under the DIP Facility (as in effect on the Closing Date)
    b. incurrence of debt that is *pari passu* with the DIP Facility
    c. a change of control (to be defined in the Definitive Documentation).
11. Any action that disproportionately adversely affects the Refinancing Loans vis-à-vis the New Money Loans.
12. Credit bidding of the Refinancing Loans.
13. Any restriction on transferring the Refinancing Loans.

Assignments
and Participations:      The DIP Lenders shall be permitted to assign all or a portion of their

Loans and Commitments (other than to Holding or any of its subsidiaries or any of their respective Affiliates (to be defined in the Definitive Documentation)) with the consent, not to be unreasonably withheld, of the Administrative Agent, unless the Loan is being assigned to a Lender, an affiliate of a Lender or an approved fund; <u>provided</u>, that the assignee becomes a party to the Restructuring Support Agreement.

| | |
|---|---|
| Yield Protection: | The Definitive Documentation shall contain customary provisions, subject to customary mitigation requirements, (a) protecting the DIP Lenders against increased costs or loss of yield resulting from reserve, tax, capital adequacy and other requirements of law and from withholding or other taxes and (b) indemnifying the DIP Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBO Rate Loan on a day other than the last day of an interest period with respect thereto. |
| Expenses and Indemnification | The Borrower shall pay (a) all out-of-pocket expenses of the Administrative Agent and the DIP Lenders associated with the arrangement of the DIP Facility and the preparation, execution, delivery and administration of the Definitive Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of counsels, including Kirkland & Ellis LLP and Milbank, Tweed, Hadley & McCloy LLP and financial advisors), (b) all out-of-pocket expenses of the Administrative Agent and the DIP Lenders (including the reasonable and documented fees, disbursements and other charges of counsels and financial advisors) in connection with the enforcement of the Definitive Documentation and (c) all out-of-pocket expenses of the Administrative Agent, the Refinancing Loan Lender and the Specified DIP Lenders incurred in connection with the DIP Facility, the Orders or the Cases (including, without limitation, preparation and filing of all pleadings in the Cases, the on-going monitoring of the Cases, including attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court); it being understood in terms of the legal counsels subject to reimbursement, they should be limited to one primary counsel for the Administrative Agent, one primary counsel for the NM Lenders, and one primary counsel for the Refinancing Loan Lender, together with any additional conflicts counsels, special counsels and local counsels in any relevant jurisdiction the Administrative Agent, the NM Lenders and the Refinancing Loan Lender may retain.  For purposes hereof, "<u>Specified DIP Lenders</u>" shall mean the DIP Lenders from time to time comprising the steering committee designated by the Required NM Lenders in connection with the DIP Facility and the ongoing administration of the Cases. |

The Administrative Agent and the DIP Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) (each, an "<u>indemnified person</u>") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated

hereby or the use or the proposed use of proceeds thereof, except to the extent (i) they are found by a final nonappealable judgment of a court of competent jurisdiction to arise from the willful misconduct, bad faith or gross negligence of any indemnified person and (ii) such dispute is solely among indemnified persons other than any claims against an indemnified person arising out of any act or omission of any Debtor.

| | |
|---|---|
| Governing Law and Forum: | The Definitive Documentation will provide that the Loan Parties will submit to the nonexclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county and city of New York, borough of Manhattan; and shall waive any right to trial by jury. New York law and, where applicable, the Bankruptcy Code, shall govern the Definitive Documentation. |
| Counsel to the Administrative Agent and the DIP Lenders: | Kirkland & Ellis LLP and Milbank, Tweed, Hadley & McCloy LLP |

Annex 1

Subject to Rule 408 of the Federal Rules of Evidence

Execution Copy

**First Out Exit Term Sheet[1]**

Borrower:  The Reader's Digest Association, Inc., a Delaware corporation (the "<u>Borrower</u>").

Lender:  Wells Fargo Principal Lending, LLC (and/or an affiliate thereof) and other financial institutions to be agreed (the "<u>Lenders</u>").

Administrative Agent and
Issuing Bank:  Wells Fargo Bank, N.A. or an affiliate thereof (in such capacity, the "<u>Administrative Agent</u>" or the "<u>Issuing Bank</u>", as the case may be).

First Out Credit Facilities:  Senior secured "first out" credit facilities (the "<u>First Out Credit Facilities</u>") to consist of:

(a)  <u>First Out Term Loan Facility</u>. A first out term loan facility (the "<u>First Out Term Loan Facility</u>"; the loans thereunder, "<u>Loans</u>") in an aggregate amount equal to (i) the DIP Refinancing Loan Amount (as defined below) less any prepayments (if any) of "Refinancing Loans" (as defined below) under the Borrower's debtor-in-possession credit facility prior to the Closing Date minus (ii) the face amount of undrawn letters of credit under the DIP Facility as of the Closing Date.

(b)  <u>First Out Letter of Credit Facility</u>. A standby letter of credit facility (the "<u>First Out Letter of Credit Facility</u>") in an aggregate amount equal to the (i) DIP Refinancing Loan Amount less any prepayments (if any) of "Refinancing Loans" under the Borrower's debtor-in-possession credit facility prior to the Closing Date minus (ii) the aggregate amount of the First Out Term Loan Facility as of the Closing Date (the "<u>L/C Commitment</u>"). The letters of credit outstanding under the Existing Credit Agreement shall be deemed usage of the First Out Letter of Credit Facility.

As used herein: "<u>DIP Refinancing Loan Amount</u>" means an aggregate amount equal to the sum of (i) $49,625,000 plus (ii) the aggregate amount of all letters of credit

---

[1] This term sheet is attached as Annex II to the Commitment Letter (the "<u>Commitment Letter</u>"), dated as of February 17, 2013, with respect to the Borrower's debtor-in-possession credit facility.

outstanding under the Existing Credit Agreement as of February 17, 2013 equal to $9,516,267 plus (iii) the aggregate amount of all outstanding and unpaid fees, letter of credit standby fees and commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the commencement of the Chapter 11 Cases (as defined below) under the Existing Credit Agreement and immediately prior to the date when the Refinancing Loans become effective. It being understood that the indemnification obligations under the Refinancing Loans will survive as obligations under the First Out Term Loan Facility.

Notwithstanding that the scheduled final maturity of the "Refinancing Loans" under the debtor-in-possession credit facility of the Borrower extends beyond the date that is 180 days after the date on which the chapter 11 petitions are first filed by the Borrower or its affiliates (the date of such filing, the "Petition Date"), the commitment of Wells Fargo Principal Lending, LLC under the Restructuring Support Agreement (as defined below in Annex A hereto) and this term sheet to provide the First Out Credit Facilities shall terminate on the date that is 180 days after the Petition Date.

Use of Proceeds:                    The First Out Term Loan Facility will be used to refinance all "Refinancing Loans" under the debtor-in-possession credit facility of the Borrower.

The First Out Letter of Credit Facility will provide letters of credit (the "Letter of Credit") to support the general corporate purposes of the Borrower and its subsidiaries.

Closing Date and Closing Conditions:    The First Out Credit Facilities shall close and become effective on the date (the "Closing Date") of (i) the execution and delivery of the Financing Documentation (as defined below) by the Borrower, the Guarantors (as defined below), the Administrative Agent and the respective Lenders party thereto, (ii) the satisfaction of the conditions precedent to effectiveness of the First Out Credit Facilities specified herein (including, without limitation, the conditions precedent specified in Annex A hereto) and (iii) the effectiveness of a plan of reorganization (pursuant to a confirmation order that is reasonably satisfactory in form and substance to the Administrative Agent) for the Borrower and the Guarantors, that is reasonably satisfactory in form and substance to the Administrative Agent.

Availability:                        The First Out Term Loan Facility will be available to the Borrower for borrowing on the Closing Date to refinance

#4832-3991-4002v4

<table>
<tbody>
<tr>
<td></td>
<td>the "Refinancing Loans" outstanding under the DIP Facility immediately prior to the Closing Date.</td>
</tr>
<tr>
<td></td>
<td>The First Out Letter of Credit Facility will be available as set forth under "Letters of Credit" below.</td>
</tr>
<tr>
<td>Letters of Credit:</td>
<td>The First Out Letter of Credit Facility will be available for letters of credit subject to (x) on the Closing Date, the satisfaction of the conditions under "Conditions Precedent" below, and (y) after the Closing Date, no bankruptcy or payment defaults and receipt of customary letter of credit request. Each letter of credit shall expire not later than the earlier of 12 months after its date of issuance and the fifteenth day prior to the Maturity Date (the "Letter of Credit Expiration Date"); provided that, subject to the certain customary terms of the Financing Documentation, a letter of credit may provide that it shall automatically renew for additional one year periods but in any event not beyond the Letter of Credit Expiration Date.</td>
</tr>
<tr>
<td></td>
<td>The issuance of all letters of credit shall be subject to the customary procedures of the Issuing Bank.</td>
</tr>
<tr>
<td>Amortization:</td>
<td>The outstanding principal amount of the First Out Term Loan Facility will be payable in equal quarterly amounts of $0.625 million (with the first such payment date being the end of the first full fiscal quarter of the Borrower occurring after the Closing Date), with the remaining balance, together with all other amounts owed with respect thereto, payable on the Maturity Date. The First Out Credit Facilities shall be repaid in full on the Maturity Date.</td>
</tr>
<tr>
<td>Documentation:</td>
<td>The documentation for the First Out Credit Facilities (which shall be satisfactory in form and substance to the Administrative Agent), the definitive terms of which shall be negotiated in good faith, will include, among other items, a credit agreement and guarantees (collectively, the "Financing Documentation"), which shall be based on the Existing Credit Agreement Documentation (as defined below) to the extent possible and will be modified fully, as appropriate, to reflect the terms set forth in this term sheet and agency and other changes reasonably requested by the Administrative Agent.</td>
</tr>
<tr>
<td></td>
<td>"Existing Credit Agreement Documentation" shall mean the documentation relating to that certain Credit and Guarantee Agreement dated as of March 30, 2012 (as amended, the "Existing Credit Agreement"), among</td>
</tr>
</tbody>
</table>

RDA Holding Co. ("Holding"), the Borrower, the lenders party thereto and Wells Fargo Bank, N.A., as administrative agent for the lenders.

**Guarantors:** Consistent with the Existing Credit Agreement and the Borrower's debtor-in-possession credit facility, the obligations of the Borrower under the First Out Credit Facilities will be unconditionally guaranteed, on a joint and several basis, by Holding and each existing and subsequently acquired or formed direct and indirect domestic subsidiaries providing guarantees in connection with the Existing Credit Agreement and the Borrower's debtor-in-possession credit facility (each a "Guarantor"; and such guarantee being referred to herein as a "Guarantee"). All Guarantees shall be guarantees of payment and not of collection. The Borrower and the Guarantors are herein referred to as the "Loan Parties" and, individually, as a "Loan Party."

**Security:** The First Out Credit Facilities shall be secured by a perfected first priority security interest in all of the present and future tangible and intangible assets of the Loan Parties (including, without limitation, accounts receivable, inventory, intellectual property, real property (whether owned or leased), 100% of the capital stock of the Borrower and the Guarantors and 65% (or, in the absence of material adverse tax consequences to the Borrower, 100%) of the capital stock of each first tier foreign subsidiary of the Borrower, except for those assets excluded from the collateral under the Existing Credit Agreement Documentation (the "Collateral").

On the Closing Date, the Borrower shall enter into a second out term loan facility in an aggregate principal amount equal to the lower of $45 million and the then-outstanding aggregate principal amount of the "new money loans" under the Borrower's debtor-in-possession credit facility (the "Second Out Term Loan Facility"), on terms and conditions reasonably satisfactory to the Administrative Agent, for the purpose of refinancing the "new money loans" owed under the Borrower's debtor-in-possession credit facility. The Second Out Term Loan Facility shall be secured by a perfected first priority security interest in the Collateral. All obligations in connection with the First Out Credit Facilities (other than unasserted indemnification and contingent obligations) shall be paid in full prior to any obligations under the Second Out Term Loan Facility on a "first out" basis on terms substantially similar to those set forth in the Existing Credit Agreement Documentation (for the avoidance of doubt, cash interest payments under the

PAGE 4

#4832-3991-4002v4

Second Out Term Loan Facility shall be permitted), including without limitation the security agreement securing the obligations under the Existing Credit Agreement and the Borrower's Prepetition Notes (as defined below).

**Final Maturity:** The final maturity of the First Out Credit Facilities will occur on September 30, 2015 (the "<u>Maturity Date</u>").

**Interest Rates and Fees:** Interest rates and fees in connection with the First Out Credit Facilities will be as specified on Schedule I attached hereto.

**Termination of Exit Commitments:** It is understood that at any time prior to the Closing Date and the effectiveness of a plan of reorganization for the Borrower, the Borrower may obtain alternative exit financing to the First Out Credit Facilities (an "<u>Alternative Exit Financing</u>") and elect in writing to permanently terminate and cancel the commitments for the First Out Credit Facilities without premium or penalty or payment of any fee with respect to the First Out Credit Facilities; <u>provided</u> that such Alternative Exit Financing shall repay in full in cash all the "Refinancing Loans" under the debtor-in-possession financing of the Borrower upon the effectiveness of a plan of reorganization for the Borrower.

**Mandatory Prepayments and Commitment Reductions:** Subject to the next paragraph, the First Out Term Loan Facility will be required to be prepaid, without premium or penalty (except LIBOR breakage costs), with:

(a) 100% of the net cash proceeds from the incurrence of indebtedness (other than certain permitted indebtedness to be agreed) after the Closing Date by Holding or any of its subsidiaries; and

(b) 100% of the net cash proceeds of sales or other dispositions (including (a) by issuance or sale of stock of Holding or any of its subsidiaries, (b) as a result of casualty or condemnation, net of remediation or replacement costs, (c) any extraordinary receipts (to be mutually defined) and (d) licensing transactions) by Holding or any of its subsidiaries of any assets (except for sales of inventory in the ordinary course of business and certain other dispositions, thresholds and exceptions to be agreed on), in each case only to the extent such net cash proceeds are received by Holdings or any other

PAGE 5

#4832-3991-4002v4

Loan Party; <u>provided</u> that the Borrower and other Loan Parties shall be permitted to reinvest (or commit to reinvest) an aggregate amount for all such sales, casualty events, extraordinary receipts and licensing proceeds not exceeding $15 million within six months.

**Optional Prepayments and Commitment Reductions:**

Loans under the First Out Credit Facilities may be prepaid and unused commitments under the First Out Letter of Credit Facility may be reduced at any time, in whole or in part, at the option of the Borrower, upon notice and in minimum principal amounts and in multiples to be agreed upon, without premium or penalty (except LIBOR breakage costs). Any optional prepayment of the First Out Term Loan Facility will be applied to the remaining scheduled amortization payments as directed by the Borrower.

**Initial Conditions:**

The availability of the First Out Credit Facilities shall be conditioned upon the satisfaction of the conditions precedent set forth in Annex A hereto.

It is hereby understood and agreed that if each condition precedent set forth in Annex A hereto is not satisfied or is determined to be not capable of being satisfied, the "Refinancing Loans" under the debtor-in-possession credit facility of Borrower shall be repaid in full in cash on the effective date of the plan of reorganization for the Borrower.

**Conditions to All Extensions of Credit:**

Each extension of credit under the First Out Credit Facilities will be subject to satisfaction of the following conditions precedent: (a) all of the representations and warranties in the Financing Documentation shall be true and correct in all material respects (except to the extent that such representation and warranty is qualified by materiality) as of the date of such extension of credit and (b) no event of default under the First Out Credit Facilities or unmatured default thereunder shall have occurred and be continuing or would result from such extension of credit.

**Representations and Warranties:**

The Financing Documentation will contain representations and warranties substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Administrative Agent.

Annex 2 to the Commitment Letter
Subject to Rule 408 of the Federal Rules of Evidence

| | |
|---|---|
| Affirmative Covenants: | The Financing Documentation will contain affirmative covenants substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Administrative Agent. |
| Negative Covenants: | The Financing Documentation will contain negative covenants substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Administrative Agent (in each case subject to exceptions, carveouts and thresholds to be mutually agreed) including, but not limited to, the following: |

- restriction on dividends, distributions, issuances of equity interests, redemptions and repurchases of equity interests;

- restriction on incurring additional first out or first lien secured indebtedness and limitation on incurring other indebtedness (with customary exceptions to be agreed; any additional second lien or unsecured indebtedness shall be on terms satisfactory to the Administrative Agent); it being agreed that there will be a debt carveout for letters of credit up to $5 million and a corresponding lien carveout for the cash collateral for such letters of credit;

- limitation on capital expenditures of $10 million for the first year of the First Out Credit Facilities and $10 million for the second year of the First Out Credit Facilities;

- restriction on (i) amending, supplementing or otherwise modifying the definitive documentation governing the Second Out Term Loan Facility in any manner materially adverse to the Administrative Agent or the Lenders without the consent of the Administrative Agent (it being agreed that any amendments, supplements or other modifications resulting in a shortening of maturity or an increase in interest rates, fees or principal shall be deemed to be materially adverse to the Administrative Agent and the Lenders) and (ii) any optional and mandatory prepayments under the Second Out Term Loan Facility.

| | |
|---|---|
| Financial Covenants: | The Financing Documentation will contain a "First Out Leverage Ratio", pursuant to which the Borrower shall not permit the ratio of total first out funded indebtedness |

#4832-3991-4002v4

plus the total face amount of issued and undrawn first-out letters of credit to last twelve months EBITDA to exceed, as of the last day of any fiscal quarter of the Borrower, a ratio of 2.50 to 1 (which financial covenant shall be first tested as of December 31, 2013). The definition of "EBITDA", and the related financial definitions, shall be substantially similar to the Existing Credit Agreement, with such changes as may be requested by the Administrative Agent.

| | |
|---|---|
| **Events of Default:** | The Financing Documentation will contain events of default substantially similar to the Existing Credit Agreement and such others as may be requested by the Administrative Agent. |
| **Defaulting Lender Provisions, Yield Protection and Increased Costs:** | Customary for facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, cash collateralization for Letters of Credit in the event any lender under the First Out Letter of Credit Facility becomes a Defaulting Lender (as such term shall be defined in the Financing Documentation), changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes. |
| **Assignments and Participations:** | Lenders will be permitted to make assignments in minimum amounts to be agreed. Participation will be permitted without the consent of the Borrower or the Administrative Agent.

No assignment or participation may be made to natural persons, Holding or any of its subsidiaries or their respective affiliates. |
| **Required Lenders:** | Customary for facilities of this type. |
| **Amendments and Waivers:** | The Financing Documentation will contain provisions regarding amendments and waivers substantially similar to the Existing Credit Agreement with such changes as the Required Lenders may reasonably request. |
| **Indemnification:** | The Financing Documentation will contain provisions regarding indemnification substantially similar to the Existing Credit Agreement with such changes as the required Lenders may reasonably request. |

| | |
|---|---|
| Expenses: | The Loan Parties will reimburse the Lenders and Administrative Agent (and the Lenders in the case of enforcement costs and documentary taxes) for all reasonable and documented out-of-pocket costs and expenses in connection with the syndication, negotiation, execution, delivery and administration of the Financing Documentation and any amendment or waiver with respect thereto (including, without limitation, reasonable and documented fees and expenses of counsel thereto, including any conflicts counsel, special counsel and local counsel retained)) and any enforcement of remedies with respect thereto. |
| Governing Law and Forum: | New York. |
| Waiver of Jury Trial and Punitive and Consequential Damages: | All parties to the Financing Documentation waive the right to trial by jury and the right to claim punitive or consequential damages. |
| Counsel for the Administrative Agent: | Milbank, Tweed, Hadley & McCloy LLP. |

#4832-3991-4002v4

## SCHEDULE I
### INTEREST AND FEES

| | |
|---|---|
| Interest: | Loans under the First Out Term Loan Facility shall accrue interest at the LIBO Rate plus 6.0% per annum, or Base Rate plus 5.0% per annum. |
| | As used herein: |
| | "LIBO Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 3.0%. |
| | "Base Rate" has the meaning as defined in the Existing Credit Agreement but with a floor of 4.00%. |
| Letter of Credit Fees: | The Borrower will pay to the Issuing Bank, for its account, letter of credit fees equal to the applicable interest margin for the First Out Term Loan Facility (with respect to LIBO Rate loans) plus a fronting fee of 1.00% on daily amount available to be drawn under each Letters of Credit. |
| Letter of Credit Utilization Fee: | A utilization fee of 1.0% per annum on the total undrawn amount of Letter of Credit Facility. |
| Upfront Fees: | None |
| Default Interest: | Upon the occurrence and during the continuance of an Event of Default under the Financing Documentation, interest shall accrue on the outstanding amount of the obligations under the Financing Documentation and shall be payable on demand at 2.0% per annum above the then applicable rate. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed; provided that computations of interest for Base Rate Loans when the Base Rate is determined by the prime rate shall be made on the basis of the number of actual days elapsed in a year of 365 or 366 days, as the case may be. |

#4832-3991-4002v4

ANNEX A

**SUMMARY OF CONDITIONS PRECEDENT TO EFFECTIVENESS OF**
**THE FIRST OUT CREDIT FACILITIES**

Closing and the availability of the First Out Credit Facilities will be subject to the satisfaction of conditions precedent usual and customary for facilities of this type including the following:

(a)      <u>Financing Documentation and Customary Closing Documentation.</u>  (i) Financing Documentation reflecting and consistent with the terms and conditions set forth herein and otherwise reasonably satisfactory to the Borrower and the Lenders, will have been executed and delivered, (ii) the Administrative Agent will have received such customary legal opinions (including, without limitation, opinions of special counsel and local counsel as may be reasonably requested by the Administrative Agent) which such opinions shall permit reliance by permitted assigns of each of the Administrative Agent and the Lenders, documents and other instruments as are customary for transactions of this type including, without limitation, a certificate of the chief financial officer of Holding as to the solvency of each Loan Party after giving effect to each element of the restructuring transactions, (iii) all documents, instruments, reports and policies required to perfect or evidence the Administrative Agent's first priority security interest in and liens on the Collateral (including, without limitation, all certificates evidencing pledged capital stock or membership or partnership interests, as applicable, with accompanying executed stock powers, all UCC financing statements to be filed in the applicable government UCC filing offices, all intellectual property security agreements to be filed with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and all deposit account and securities account control agreements) will have been executed and/or delivered and, to the extent applicable, be in proper form for filing (including UCC and other lien searches, intellectual property searches, insurance policies, surveys, title reports and policies, landlord waivers and access letters, appraisals and environmental reports), (iv) all governmental and third party consents and all equityholder and board of directors (or comparable entity management body) authorizations shall have been obtained and shall be in full force and effect, (v) there shall not be any material pending or threatened litigation, bankruptcy or other proceeding, (vi) satisfactory review of all organizational documentation of the Loan Parties and (vii) all fees and expenses due to the Lenders, Administrative Agent and counsel to the Administrative Agent will have been paid.

(b)      <u>Confirmation of Plan of Reorganization.</u>  The restructuring transactions shall be consummated in accordance with the terms of a Chapter 11 plan of reorganization (the "<u>Plan of Reorganization</u>") prepared in accordance with the Restructuring Support Agreement (as defined below) and the exhibits attached thereto and such Plan of Reorganization shall be in all respects reasonably satisfactory to the Administrative Agent and all conditions precedent to the effectiveness of the Plan of Reorganization (other than the funding of the Loans under the First Out Credit Facilities) shall have been satisfied in the judgment of the Administrative Agent (or waived with the prior written consent of the Administrative Agent), and the Plan of Reorganization shall be substantially consummated (as defined in Section 1101 of the Bankruptcy Code), and the effective date thereunder shall occur, concurrently with the effectiveness of the First Out Credit Facilities. No changes, modifications, amendments or waivers (other than those reasonably satisfactory to the Administrative Agent) shall have been made to such Plan of Reorganization since the initial filing thereof with the Bankruptcy Court.  The Plan of Reorganization shall provide that with respect to any and all equity interests or other recoveries that the Existing Noteholders receive thereunder on account of the Prepetition Notes, the Existing Noteholders shall not be entitled to, or shall receive, any distributions, dividends, redemptions or any other payments on account of such equity interests or other recoveries until such time that the First Out Credit Facilities shall have been

paid in full in cash and the L/C Commitment shall have been terminated. As used herein, "Existing Noteholders" means each holder of the senior secured notes (the "Prepetition Notes") issued pursuant to that certain indenture, dated February 11, 2010 by and among the Borrower, certain of its affiliates and the purchasers party thereto from time to time.

(c)     Confirmation Order. The confirmation order (the "Confirmation Order") in respect of the Plan of Reorganization shall (i) have been entered by the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "Bankruptcy Court") and shall not have been reversed, modified, amended, vacated or subject to any stay pending appeal, (ii) provide for terms and conditions substantially similar to those provided in the Plan of Reorganization and otherwise be reasonably satisfactory to the Administrative Agent and (iii) be in full force and effect. All appeals of the Confirmation Order, and the Plan of Reorganization, shall have been dismissed or resolved in a manner reasonably satisfactory to the Administrative Agent. No changes, modifications, amendments or waivers shall have been made to the Confirmation Order since the entry thereof by the Bankruptcy Court (other than those reasonably satisfactory to the Administrative Agent). Notwithstanding anything to the contrary in the Plan of Reorganization or Confirmation Order, the Bankruptcy Court's retention of jurisdiction under the Plan of Reorganization and the Confirmation Order shall not govern the enforcement of the First Out Credit Facilities or the related loan documents or any rights or remedies of the parties related thereto or arising thereunder.

(d)     Effective Date of Plan of Reorganization. The effective date of the Plan of Reorganization shall occur no later than 180 days after the Petition Date. The Closing Date shall have occurred on or prior to the date that is 180 days after the Petition Date.

(e)     Financial Statements. The Administrative Agent will have received, in form and substance reasonably satisfactory to the Administrative Agent, (i) copies of audited consolidated financial statements for the Borrower and its subsidiaries for the three fiscal years most recently ended before the Closing Date (including, for the avoidance of doubt, the fiscal year ended December 31, 2012) and (ii) projections prepared by management of balance sheets, income statements and cashflow statements of the Borrower and its subsidiaries, which will be quarterly for the first year after the Closing Date and annually thereafter for the term of the First Out Credit Facilities.

(f)     No Material Adverse Effect. (i) Since December 31, 2012, there shall not have occurred any event or condition that has had or could be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect. "Material Adverse Effect" means (A) a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower and its subsidiaries, taken as a whole, (B) a material adverse effect on the rights and remedies of the Administrative Agent or any Lender under any Financing Documentation, or of the ability of any Loan Party to perform its obligations under any Financing Documentation to which it is a party or (C) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Financing Documentation to which it is a party, but in each case of the foregoing other than as a result of the commencement of the Borrower's chapter 11 proceeding, any events directly causing the filing of the Cases or any events which customarily occur following the commencement of a reorganization proceeding under Chapter 11 of the Bankruptcy Code.

(g)     Capital Structure. The Administrative Agent will be reasonably satisfied with the terms and amounts of any intercompany loans among the Loan Parties. The Administrative Agent will be satisfied with the flow of funds in connection with the closing. The Administrative Agent will be reasonably satisfied with senior management of the Loan Parties.

(h)     <u>Information Required by Regulatory Authorities</u>.  The Loan Parties will have provided the documentation and other information to the Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(i)     <u>Representations and Warranties</u>. All representations and warranties made by the Loan Parties in the First Out Credit Facilities shall be true and correct in all material respects (unless already qualified by materiality or material adverse effect in which case they shall be true and correct in all respects) and the Administrative Agent shall not have become aware that any information previously delivered is inaccurate or incomplete in any material respect.

(j)     <u>No Default</u>.  No default or event of default under the First Out Credit Facilities shall have occurred or be continuing after giving effect to the closing and funding of the First Out Credit Facilities. Without giving effect to the applicability, if any, of Section 362 of the Bankruptcy Code, immediately prior to closing of the First Out Credit Facilities, the Restructuring Support Agreement shall be in full force and effect and shall not have been terminated and no default or event of default thereunder (other than a default or event of default by Wells Fargo) shall have occurred or be continuing, in each case in accordance with its terms. Furthermore, none of the Termination Events (as defined in the Restructuring Support Agreement) set forth in Sections 4.1(a), 4.1(b), 4.1(c), 4.1(e), 4.1(f), 4.1(g), 4.1(h), 4.1(i), 4.1(j), 4.1(l), 4.1(m), 4.1(n), 4.1(o), 4.1(u) or 4.1(v) shall have occurred (and irrespective of whether or not the occurrence of any of the foregoing has led to a termination of the Restructuring Support Agreement).  Immediately prior to closing the First Out Credit Facilities, no default or event of default shall have occurred and be continuing under the Borrower's debtor-in-possession credit facility.

(k)     <u>Business Plan</u>.  The Administrative Agent shall have received a post-reorganization business plan of Holding and its subsidiaries satisfactory to the Administrative Agent.

(l)     <u>Outstanding Indebtedness</u>.  Immediately following the restructuring transactions, neither Holding, the Borrower nor any of their respective subsidiaries will have any Indebtedness (as defined in the Financing Documentation) outstanding except for the loans under (i) the First Out Credit Facilities and (ii) the Second Out Term Loan Facility and ordinary course Indebtedness to the extent permitted under the Financing Documentation.

(m)     <u>Second Out Term Loan Facility</u>.  The definitive documentation for the Second Out term Loan Facility shall be in form and substance reasonably satisfactory to the Administrative Agent (it being acknowledged and agreed that the terms set forth in the term sheet for the Second Out Term Loan Facility attached as Annex 3 to the commitment letter dated as of February 17, 2013 (the "<u>Commitment Letter</u>"), with respect to the Borrower's debtor-in-possession credit facility (the "<u>Second Out Exit Term Sheet</u>"), are satisfactory).  The Second Out Term Loan Facility shall provide that, prior to the payment in full in cash (other than unasserted indemnification and contingent obligations) of the First Out Credit Facilities and the termination of the L/C Commitment, no payments of principal (whether mandatory, optional, amortizing or others) shall be made under the Second Out Term Loan Facility. The closing and funding of the Second Out Term Loan Facility shall have occurred or shall occur concurrently with the closing of the First Out Term Loan Facility.

(n)     <u>DIP Facility</u>.  The Borrower's debtor-in-possession credit facility (the "<u>DIP Facility</u>") shall be in form and substance reasonably satisfactory to Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>") and shall provide for the refinancing in full (in the form of roll-up term loans and letter of credit facility under the DIP Facility) of all commitments and amounts outstanding (including any and all principal, reimbursement obligations in respect of outstanding letters of credit (assuming drawn), fees, commissions, premiums, expenses, indemnification amounts and interest accrued prior to, on and after the

commencement of the Chapter 11 Cases (as defined below), including to the issuing lender) under the Existing Credit Agreement (the loans and letter of credit facility under the DIP Facility used to refinance in full all amounts outstanding under the Existing Credit Agreement in connection with the entry of the Final Order (as defined below), the "<u>Refinancing Loans</u>"). It is understood that (A) the Refinancing Loans shall be in an aggregate amount equal to the sum of (i) $49,625,000 plus (ii) the aggregate amount of all letters of credit outstanding under the Existing Credit Agreement as of February 17, 2013 equal to $9,516,267 plus (iii) the aggregate amount of all outstanding fees, letter of credit standby fees and commissions, premiums, indemnification amounts and interest accrued prior to, on and after the commencement of the Chapter 11 Cases under the Existing Credit Agreement and immediately prior to the date when the Refinancing Loans become effective and (B) the indemnification obligations under the Existing Credit Agreement will survive as obligations under the DIP Facility notwithstanding the refinancing or termination of the facilities under the Existing Credit Agreement. The DIP Facility shall provide that the Refinancing Loans shall be paid in full in cash if the conditions precedent set forth in this <u>Annex A</u> are not satisfied or waived with the consent of the Administrative Agent.

(o)     <u>Final Order</u>.  Not later than 40 days after the Interim Order Entry Date (as defined below), the Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to Wells Fargo, a final order (the "<u>Final Order</u>", and the date of entry of the Final Order being hereinafter referred to as the "<u>Final Order Entry Date</u>"), in form and substance reasonably satisfactory to Wells Fargo, which Final Order shall, among other things, authorize (i) the making of the Refinancing Loans in full on the Final Order Entry Date and (ii) the Borrower using the Refinancing Loans on the Final Order Entry Date to refinance in full all amounts outstanding under the Existing Credit Agreement, which authorization shall be final and irrevocable in all respects and binding on all parties in interest in the Chapter 11 Cases. Each of the foregoing shall have been consummated in a manner reasonably satisfactory to Wells Fargo. The Final Order shall be in full force and effect and shall not have been reversed, vacated, appealed, or made subject to a stay. No changes, modifications, amendments or waivers shall have been made to the Final Order since the Final Order Entry Date (other than those reasonably satisfactory to the Administrative Agent). The Refinancing Loans, the authorization under the Final Order specified in clauses (i) and (ii) above and the consummation thereof shall not have been reversed, vacated, appealed, or made subject to a stay, or otherwise objected to or challenged.

(p)     <u>Interim Order</u>.  The Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to Wells Fargo, an interim order (the "<u>Interim Order</u>", and the date of entry of the Interim Order being hereinafter referred to as the "<u>Interim Order Entry Date</u>"), in form and substance reasonably satisfactory to Wells Fargo, no later than five (5) calendar days after the Petition Date (or such later date agreed to by Wells Fargo), which Interim Order shall authorize (i) the "new money loans" under the Borrower's debtor-in-possession credit facility and (ii) in consideration for the consensual priming of the liens securing the Existing Credit Agreement by the liens securing the DIP Facility, that Wells Fargo shall receive prior to the Final Order Entry Date current cash pay interest, fees and commissions in respect of the Existing Credit Agreement at the non-default rate, a superpriority claim, and superpriority replacement liens (in each case ranking junior only to the liens and claims in respect of the collateral securing the DIP Facility) on the collateral securing the DIP Facility and the current payment of the fees and expenses of counsel to Wells Fargo. The Interim Order shall not have been reversed, vacated, appealed, or made subject to a stay. No changes, modifications, amendments or waivers shall have been made to the Interim Order since the Interim Order Entry Date (other than those reasonably satisfactory to the Administrative Agent). The authorization under the Interim Order specified in clauses (i) and (ii) above and the granting and receipt by Wells Fargo of current cash pay interest, fees and commissions in respect of the Existing Credit Agreement at the non-default rate, a superpriority claim, and superpriority replacement liens (in each case ranking junior only to the liens and claims in respect of the DIP Facility) on the collateral securing the DIP Facility and the current payment of the fees and expenses of counsel to

Wells Fargo shall not have been reversed, vacated, appealed, or made subject to a stay, or otherwise objected to or challenged.

        (q)    <u>Refinancing Loans</u>.  The Refinancing Loans shall (i) accrue interest at libor plus 5.0% per annum, and the libor rate shall have a floor of 3.0%; (ii) constitute a superpriority claim ranking pari passu with the superpriority claim of all other loans under the DIP Facility and (iii) be secured by first priority liens ranking pari passu with the liens securing all other loans under the DIP Facility.

        (r)    <u>Existing Credit Agreement Fees and Expenses</u>.  On or prior to the closing date of the DIP Facility, all fees and expenses of Wells Fargo, and of Milbank, Tweed, Hadley & McCloy LLP shall have been paid in full.

        (s)    <u>Certain Documentation</u>.  The following documentation shall be in form and substance reasonably satisfactory to Wells Fargo: (i) the restructuring support agreement (the "<u>Restructuring Supporting Agreement</u>") entered into among the lenders under the DIP Facility in connection with the reorganization of the Borrower and its affiliates pursuant to the chapter 11 cases of the Borrower and its subsidiaries (the "<u>Chapter 11 Cases</u>"); (ii) the definitive loan documentation relating to the DIP Facility (including a credit agreement and related security and closing documents, the term sheet for the DIP Facility attached as Annex 1 to the Commitment Letter (the "<u>DIP Term Sheet</u>") and the Second Out Exit Term Sheet), it being acknowledged and agreed that the DIP Term Sheet and the Second Out Exit Term Sheet are satisfactory; (iii) all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter, including in respect of amounts of critical vendor payments; and (iv) the Plan of Reorganization, the related disclosure statement and the Confirmation Order, including any amendments, modifications or supplements made from time to time thereto.

        (t)    <u>Transaction Fees and Expenses</u>.  All fees and expenses of Wells Fargo, and of Milbank, Tweed, Hadley & McCloy LLP, in connection with the transactions hereunder have been paid in full.

All conditions precedent to the effectiveness of the Second Out Term Loan Facility are hereby incorporated herein, <u>mutatis mutandis</u>, as additional conditions precedent to the effectiveness of the First Out Credit Facilities and as so incorporated shall have been satisfied and have not been waived without the consent of Wells Fargo.

Annex 3
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

**Second Out Exit Term Sheet[1]**
February 17, 2013

| | |
|---|---|
| Borrower: | The Reader's Digest Association, Inc., a Delaware corporation (the "<u>Borrower</u>"). |
| Lenders: | The lenders in respect of the New Money Loans under the Borrower's DIP Facility (the "<u>Lenders</u>"). |
| Administrative Agent: | An entity designated by the Lenders in consultation with the Borrower (in such capacity, the "<u>Administrative Agent</u>"). |
| Facility: | Senior secured term loan credit facility (the "<u>Second Out Term Loan Facility</u>") converted from the New Money Loans under the Borrower's DIP Facility in an amount equal to the aggregate amount of the New Money Loans outstanding under the DIP Facility on the date of conversion. |
| Use of Proceeds: | The Second Out Term Loan Facility will be used to refinance the New Money Loans outstanding under the DIP Facility. |
| Closing Date and Closing Conditions: | The Second Out Term Loan Facility shall close and become effective on the date (the "<u>Closing Date</u>") of (i) the execution and delivery of the Financing Documentation (as defined below) by the Borrower, the Guarantors (as defined below), the Administrative Agent and the respective Lenders party thereto, (ii) the satisfaction of the conditions precedent to effectiveness of the Second Out Term Loan Facility specified herein (including, without limitation, the ones specified on Annex A) and in the Commitment Letter and (iii) the |

---

[1]  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the term sheet dated as of the date hereof for the senior secured priming debtor-in-possession credit facility for the Borrower attached to the Commitment Letter as Annex 1 (the "<u>DIP Term Sheet</u>").  As used herein, the term "<u>Commitment Letter</u>" shall mean the commitment letter dated February 17, 2013 by and among the Borrower, the Borrower's affiliates party thereto, Wells Fargo Principal Lending, LLC, Goldentree Asset Management LP, Apollo Investment Management, L.P. and Empyrean Capital Partners, LP; and the term "<u>Restructuring Support Agreement</u>" shall mean that certain Restructuring Support Agreement dated February 17, 2013 by and among the Borrower, the Borrower's affiliates party thereto, Wells Fargo Principal Lending, LLC, Goldentree Asset Management LP, Apollo Investment Management, L.P. and Empyrean Capital Partners, LP.

|  |  |
|---|---|
|  | effectiveness of a plan of reorganization (pursuant to a confirmation order that is reasonably satisfactory in form and substance to the Required Lenders) for the Borrower and the Guarantors, that is reasonably satisfactory in form and substance to the Required Lenders. |
| Availability: | The Second Out Term Loan Facility will be available to the Borrower upon the Closing Date to refinance (without cash payment) the New Money Loans outstanding under the DIP Facility immediately prior to the Closing Date. |
| Amortization: | None. |
| Documentation: | The documentation for the Second Out Term Loan Facility (which shall be satisfactory in form and substance to the Required Lenders), the definitive terms of which shall be negotiated in good faith, will include, among other items, a credit agreement and guarantees (collectively, the "Financing Documentation"), which shall be based on the Existing Credit Agreement Documentation (as defined below) to the extent possible and will be modified fully, as appropriate, to reflect the terms set forth in this term sheet, the Commitment Letter, the First Out Credit Facilities and agency and other changes reasonably requested by the Required Lenders. |
|  | "Existing Credit Agreement Documentation" shall mean the documentation relating to that certain Credit and Guarantee Agreement dated as of March 30, 2012 (as amended, the "Existing Credit Agreement"), among RDA Holding Co. ("Holding"), the Borrower, the lenders party thereto and Wells Fargo Bank, N.A., as administrative agent for the lenders. |
| Guarantors: | Consistent with the Existing Credit Agreement and the DIP Facility, the obligations of the Borrower under the Second Out Term Loan Facility will be unconditionally guaranteed, on a joint and several basis, by Holding and each existing and subsequently acquired or formed direct and indirect domestic subsidiaries providing guarantees in connection with the Existing Credit Agreement and the Borrower's DIP Facility (each a "Guarantor"; and such guarantee being referred to herein as a "Guarantee"). All Guarantees shall be guarantees of payment and not of collection. The Borrower and the Guarantors are herein referred to as the "Loan Parties" and, individually, as a "Loan Party." |

Annex 3
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

| | |
|---|---|
| Security: | The Second Out Term Loan Facility shall be secured by a perfected first priority security interest in all of the present and future tangible and intangible assets of the Loan Parties (including, without limitation, accounts receivable, inventory, intellectual property, real property (whether owned or leased), 100% of the capital stock of the Borrower and the Guarantors and 65% (or, in the absence of material adverse tax consequences to the Borrower, 100%) of the capital stock of each first tier foreign subsidiary of the Borrower, except for those assets excluded from the collateral under the Existing Credit Agreement Documentation (the "<u>Collateral</u>"). |
| | On the Closing Date, the Borrower shall concurrently enter into senior secured "first out" credit facilities (the "<u>First Out Credit Facilities</u>") converted from the Refinancing Loans under the DIP Facility subject to the terms set forth in the "First Out Exit Term Sheet" attached as Annex 2 to the Commitment Letter (the "<u>First Out Exit Term Sheet</u>") and otherwise on terms and conditions reasonably satisfactory to the Required Lenders. The First Out Credit Facilities shall be secured by first priority security interest in the Collateral, *pari passu* with the liens securing the Second Out Term Loan Facility. All obligations in connection with the First Out Credit Facilities (other than unasserted indemnification and contingent obligations) shall be paid in full prior to any obligations under the Second Out Term Loan Facility on a "first out" basis on terms substantially similar to those set forth in the Existing Credit Agreement Documentation (for the avoidance of doubt, cash interest payments under the Second Out Term Loan Facility shall be permitted). |
| Final Maturity: | September 30, 2015 (the "<u>Maturity Date</u>"). |
| Interest Rates and Fees: | As specified on <u>Schedule I</u> attached hereto. |
| Mandatory Prepayments: | The Second Out Term Loan Facility will be required to be prepaid, without premium or penalty (except LIBOR breakage costs), with: |
| | (a)      100% of the net cash proceeds from the incurrence of indebtedness (other than certain permitted indebtedness to be agreed) after the Closing Date by Holding or any of its subsidiaries; and |

Annex 3
Subject to Rule 408 of the Federal Rules of Evidence
Execution Copy

(b)     100% of the net cash proceeds of sales or other dispositions (including (a) by issuance or sale of stock of Holding or any of its subsidiaries, (b) as a result of casualty or condemnation, net of remediation or replacement costs, (c) any extraordinary receipts (to be mutually defined) and (d) licensing transactions) by Holding or any of its subsidiaries of any assets (except for sales of inventory in the ordinary course of business and certain other dispositions, thresholds and exceptions to be agreed on), in each case only to the extent such net cash proceeds are received by Holdings or any other Loan Party; provided that the Borrower and other Loan Parties shall be permitted to reinvest (or commit to reinvest) an aggregate amount for all such sales, casualty events, extraordinary receipts and licensing proceeds not exceeding $15 million within six months;

provided that no such mandatory prepayments shall be made prior to the payment in full of the obligations (other than unasserted indemnification and contingent obligations) and the termination of the letter of credit commitment under the First Out Credit Facilities (but not including any refinancing thereof).

| | |
|---|---|
| Optional Prepayments: | Loans under the Second Out Term Loan Facility  may be prepaid from time to time, in whole or in part, at the option of the Borrower, upon notice and in minimum principal amounts and in multiples to be agreed upon, without premium or penalty (except LIBOR breakage costs and the applicable Early Termination Fee (referenced below)), provided that no such optional prepayments shall be made prior to the payment in full of the obligations (other than unasserted indemnification and contingent obligations) and the termination of the letter of credit commitment under the First Out Credit Facilities (but not including any refinancing thereof). Any optional prepayment of the Second Out Term Loan Facility will be applied to the remaining scheduled amortization payments as directed by the Borrower. |
| Representations and Warranties: | The Financing Documentation will contain representations and warranties substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Required Lenders, but in no event more favorable to the Loan Parties than the equivalent terms under the First Out Credit Facilities. |

| | |
|---|---|
| Affirmative Covenants: | The Financing Documentation will contain affirmative covenants substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Required Lenders, but in no event more favorable to the Loan Parties than the equivalent terms under the First Out Credit Facilities. |
| Negative Covenants: | The Financing Documentation will contain negative covenants substantially similar to the Existing Credit Agreement and such others as may be reasonably requested by the Required Lenders (in each case subject to exceptions, carveouts and thresholds to be mutually agreed), but in no event more favorable to the Loan Parties than the equivalent terms under the First Out Credit Facilities, including, but not limited to, the following: |

- restriction on dividends, distributions, issuances of equity interests, redemptions and repurchases of equity interests;

- restriction on incurring addition first out or first lien secured indebtedness and limitation on incurring other indebtedness (with customary exceptions to be agreed; any additional second lien or unsecured indebtedness shall be on terms satisfactory to the Required Lenders; it being agreed that there will be a debt carveout for letters of credit up to $5 million and a corresponding lien carveout for the cash collateral for such letters of credit);

- limitation on capital expenditures of $10 million per 12-month period;

- restriction on (i) amending, supplementing or otherwise modifying the definitive documentation governing the First Out Credit Facilities in any manner materially adverse to the Lenders without the consent of the Required Lenders (it being agreed that any amendments, supplements or other modifications resulting in a change to maturity, an increase in interest rates, fees, principal or scheduled amortization payments, or any amendments, supplements or other modifications changing any payment priority or lien priority of the Second Out Term Loan Facility vis-à-vis the First Out Credit

Facilities shall be deemed to be materially adverse to the Lenders) and (ii) any prepayments of junior financing.

**Financial Covenants:**

The Financing Documentation will contain a "Second Out Leverage Ratio", pursuant to which the Borrower shall not permit the ratio of total "second out" funded indebtedness to last twelve months EBITDA to exceed, as of the last day of any fiscal quarter of the Borrower, a ratio to be mutually agreed (which financial covenant shall be first tested as of December 31, 2013). The definition of "EBITDA", and the related financial definitions, shall be substantially similar to the Existing Credit Agreement, with such changes as may be requested by the Required Lenders.

**Events of Default:**

The Financing Documentation will contain events of default substantially similar to the Existing Credit Agreement and such others as may be requested by the Required Lenders.

**Defaulting Lender Provisions, Yield Protection and Increased Costs:**

Customary for facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital requirements or their interpretation, illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes.

**Assignments and Participations:**

The Lenders will be permitted to make assignments in minimum amounts to be agreed. Participations will be permitted without the consent of the Borrower or the Administrative Agent.

No assignment or participation may be made to natural persons, Holding or any of its subsidiaries.

**Required Lenders:**

Lenders holding more than 50% of the outstanding principal amount of the loans under the Second Out Term Loan Facility (the "Required Lenders").

**Amendments and Waivers:**

The Financing Documentation will contain provisions regarding amendments and waivers substantially similar to the Existing Credit Agreement with such changes as the Required Lenders may reasonably request.

| | |
|---|---|
| Indemnification: | The Financing Documentation will contain provisions regarding indemnification substantially similar to the Existing Credit Agreement with such changes as the Required Lenders may reasonably request. |
| Expenses: | The Loan Parties will reimburse the Lenders and Administrative Agent for all reasonable and documented out-of-pocket costs and expenses in connection with the syndication, negotiation, execution, delivery and administration of the Financing Documentation and any amendment or waiver with respect thereto (including, without limitation, reasonable and documented fees and expenses of counsel thereto, including any conflicts counsel, special counsel and local counsel retained) and any enforcement of remedies with respect thereto. |
| Governing Law and Forum: | New York. |
| Waiver of Jury Trial and Punitive and Consequential Damages: | All parties to the Financing Documentation waive the right to trial by jury and the right to claim punitive or consequential damages. |
| Counsel for the Lenders: | Kirkland & Ellis LLP |

**SCHEDULE I**
**INTEREST AND FEES**

| | |
|---|---|
| Interest: | Loans under the Second Out Term Loan Facility shall accrue interest at LIBO Rate plus 11.0% per annum, or Base Rate plus 10.0% per annum.<br><br>As used herein:<br><br>"<u>LIBO Rate</u>" has the meaning as defined in the Existing Credit Agreement but with a floor of 1.50%. "<u>Base Rate</u>" has the meaning as defined in the Existing Credit Agreement but with a floor of 2.50%. |
| Default Interest: | Upon the occurrence and during the continuance of an Event of Default under the Financing Documentation, interest shall accrue on the outstanding amount of the obligations under the Financing Documentation and shall be payable on demand at 2.0% per annum above the then applicable rate. |
| Upfront Fee: | 2.0% of the aggregate principal amount of the New Money Loans converted into the Second Out Term Loan Facility. |
| Early Termination Fee: | In the event of any prepayment of the New Money Loan, such prepayment shall be subject to an early termination fee equal to (a) 2.0% of the aggregate principal amount of the New Money Loan prepaid, if such prepayment in made prior to the first anniversary of the Closing Date, (b) 1.0% of the aggregate principal amount of the New Money Loan prepaid, if such prepayment in made prior to the second anniversary of the Closing Date but on or after the first anniversary of the Closing Date, and (c) 0.0%, if such prepayment in made on or after the third anniversary. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed, *provided* that computations of interest for Base Rate Loans when the Base Rate is determined by the prime rate shall be made on the basis of the number of actual days elapsed in a year of 365 or 366 days, as the case may be. |

**SUMMARY OF CONDITIONS PRECEDENT TO EFFECTIVENESS OF
THE SECOND OUT TERM LOAN FACILITY**

        Closing and the availability of the Second Out Term Loan Facility will be subject to the satisfaction of conditions precedent usual and customary for facilities of this type including the following:

        (a)    <u>Financing Documentation and Customary Closing Documentation.</u>  (i) Financing Documentation reflecting and consistent with the terms and conditions set forth herein and otherwise reasonably satisfactory to the Borrower and the Lenders, will have been executed and delivered, (ii) the Administrative Agent and the Required Lenders will have received such customary legal opinions (including, without limitation, opinions of special counsel and local counsel as may be reasonably requested by the Administrative Agent and the Required Lenders) which such opinions shall permit reliance by permitted assigns of each of the Administrative Agent and the Lenders, documents and other instruments as are customary for transactions of this type including, without limitation, a certificate of the chief financial officer of Holding as to the solvency of each Loan Party after giving effect to each element of the restructuring transactions, (iii) all documents, instruments, reports and policies required to perfect or evidence the Administrative Agent's  and the Lenders' first priority security interest in and liens on the Collateral (including, without limitation, all certificates evidencing pledged capital stock or membership or partnership interests, as applicable, with accompanying executed stock powers, all UCC financing statements to be filed in the applicable government UCC filing offices, all intellectual property security agreements to be filed with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and all deposit account and securities account control agreements) will have been executed and/or delivered and, to the extent applicable, be in proper form for filing (including UCC and other lien searches, intellectual property searches, insurance policies, surveys, title reports and policies, landlord waivers and access letters, appraisals and environmental reports), (iv) all governmental and third party consents and all equityholder and board of directors (or comparable entity management body) authorizations shall have been obtained and shall be in full force and effect, (v) there shall not be any material pending or threatened litigation, bankruptcy or other proceeding, (vi) satisfactory review of all organizational documentation of the Loan Parties and (vii) all fees and expenses due to the Lenders, Administrative Agent and counsels to the Administrative Agent and the Lenders will have been paid.

        (b)    <u>Confirmation of Plan of Reorganization.</u>  The restructuring transactions shall be consummated in accordance with the terms of a Chapter 11 plan of reorganization (the "<u>Plan of Reorganization</u>") prepared in accordance with the Restructuring Support Agreement and the exhibits attached thereto  and such Plan of Reorganization shall be in all respects reasonably satisfactory to the Administrative Agent and the Required Lenders and all conditions precedent to the effectiveness of the Plan of Reorganization (other than the funding of the Loans under the First Out Credit Facilities) shall have been satisfied in the judgment of the Administrative Agent and the Required Lenders (or waived with the prior written consent of the Administrative Agent and the Required Lenders), and the Plan of Reorganization shall be substantially consummated (as defined in Section 1101 of the Bankruptcy Code), and the effective date thereunder shall occur, concurrently with the effectiveness of the First Out Credit Facilities and the Second Out Term Loan Facility. No changes, modifications, amendments or waivers (other than those reasonably satisfactory to the Administrative Agent and the Required Lenders) shall have been made to such Plan of Reorganization since the initial filing thereof with the Bankruptcy Court.

        (c)    <u>Confirmation Order.</u>  The confirmation order (the "<u>Confirmation Order</u>") in respect of the Plan of Reorganization shall (i) have been entered by the United States Bankruptcy Court

for the Southern District of New York, White Plains Division (the "Bankruptcy Court") and shall not have been reversed, modified, amended, vacated or subject to any stay pending appeal, (ii) provide for terms and conditions substantially similar to those provided in the Plan of Reorganization and otherwise be reasonably satisfactory to the Administrative Agent and the Required Lenders and (iii) be in full force and effect. All appeals of the Confirmation Order, and the Plan of Reorganization, shall have been dismissed or resolved in a manner reasonably satisfactory to the Administrative Agent and the Required Lenders. No changes, modifications, amendments or waivers shall have been made to the Confirmation Order since the entry thereof by the Bankruptcy Court (other than those reasonably satisfactory to the Administrative Agent and the Required Lenders). Notwithstanding anything to the contrary in the Plan of Reorganization or Confirmation Order, the Bankruptcy Court's retention of jurisdiction under the Plan of Reorganization and the Confirmation Order shall not govern the enforcement of the Second Out Term Loan Facility or the related loan documents or any rights or remedies of the parties related thereto or arising thereunder.

(d)     Effective Date of Plan of Reorganization. The effective date of the Plan of Reorganization shall occur no later than 180 days after the date on which the chapter 11 petitions are first filed by the Borrower or its affiliates.

(e)     Financial Statements. The Administrative Agent and the Lenders will have received, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, (i) copies of audited consolidated financial statements for the Borrower and its subsidiaries for the three fiscal years most recently ended before the Closing Date (including, for the avoidance of doubt, the fiscal year ended December 31, 2012) and (ii) projections prepared by management of balance sheets, income statements and cashflow statements of the Borrower and its subsidiaries, which will be quarterly for the first year after the Closing Date and annually thereafter for the term of the Second Out Term Loan Facility.

(f)     No Material Adverse Effect. (i) Since December 31, 2012, there shall not have occurred any event or condition that has had or could be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect. "Material Adverse Effect" means (A) a material adverse change in, or a material adverse effect on, the operations, business, assets, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Borrower and its subsidiaries, taken as a whole, (B) a material adverse effect on the rights and remedies of the Administrative Agent or any Lender under any Financing Documentation, or of the ability of any Loan Party to perform its obligations under any Financing Documentation to which it is a party or (C) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Financing Documentation to which it is a party, but in each case of the foregoing other than as a result of the commencement of the Borrower's chapter 11 proceeding, any events directly causing the filing of the Cases or any events which customarily occur following the commencement of a reorganization proceeding under Chapter 11 of the Bankruptcy Code.

(g)     Capital Structure. The Administrative Agent and the Required Lenders will be reasonably satisfied with the terms and amounts of any intercompany loans among the Loan Parties and the flow of funds in connection with the closing. The Administrative Agent and the Required Lenders will be reasonably satisfied with senior management of the Loan Parties.

(h)     Information Required by Regulatory Authorities. The Loan Parties will have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(i)     <u>Representations and Warranties</u>. All representations and warranties made by the Loan Parties under the Second Out Term Loan Facility shall be true and correct in all material respects (unless already qualified by materiality or material adverse effect in which case they shall be true and correct in all respects) and the Administrative Agent and the Lenders shall not have become aware that any information previously delivered is inaccurate or incomplete in any material respect.

(j)     <u>No Default</u>.  No default or event of default under the Second Out Term Loan Facility shall have occurred or be continuing after giving effect to the closing and funding of the Second Out Term Loan Facility.  Without giving effect to the applicablitliy, if any, of Section 362 of the Bankruptcy Code, immediately prior to closing of the Second Out Term Loan Facility, the Restructuring Support Agreement shall be in full force and effect and shall not have been terminated and no default or event of default (unless as a result of a breach by the Lenders party thereto) thereunder shall have occurred or be continuing.  Furthermore, none of the Termination Events (as defined in the Restructuring Support Agreement) set forth in Sections 4.1(a), 4.1(b), 4.1(c), 4.1(e), 4.1(f), 4.1(g), 4.1(h), 4.1(i), 4.1(j), 4.1(l), 4.1(m), 4.1(n), 4.1(o), 4.1(u) or 4.1(v) shall have occurred (and irrespective of whether or not the occurrence of any of the foregoing has led to a termination of the Restructuring Support Agreement). Immediately prior to closing the Second Out Term Loan Facility, no default or event of default shall have occurred and be continuing under the Borrower's DIP Facility.

(k)     <u>Business Plan</u>.  The Administrative Agent and the Lenders shall have received a post-reorganization business plan of Holding and its subsidiaries satisfactory to the Administrative Agent and the Required Lenders.

(l)     <u>Outstanding Indebtedness</u>.  Immediately following the restructuring transactions, neither Holding, the Borrower nor any of their respective subsidiaries will have any Indebtedness (as defined in the Financing Documentation) outstanding except for the loans under (i) the First Out Credit Facilities and (ii) the Second Out Term Loan Facility and ordinary course Indebtedness to the extent permitted under the Financing Documentation.

(m)     <u>First Out Credit Facilities</u>.  The definitive documentation for the First Out Credit Facilities shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders (it being acknowledged and agreed that the terms set forth in the First Out Exit Term Sheet are satisfactory).  The closing and funding of the First Out Credit Facilities shall have occurred or shall concurrently occur.

(n)     <u>Fees and Expenses</u>.  All fees and expenses of the Lenders, the Administrative Agent and of their respective advisors in connection with the transactions hereunder shall have been paid, to the extent due.

(o)     <u>Other Closing Conditions under the First Out Credit Facilities</u>.  Satisfaction of the conditions precedent to the closing of First Out Credit Facilities (but excluding clause (d) on Annex A to the First Out Exit Term Sheet) which conditions (to the extent the equivalents thereof are not included on this Annex A) are hereby incorporated, mutatis mutandis, as additional conditions precedent to the Second Out Term Loan Facility (as so incorporated shall have been satisfied and have not been waived without the consent of the Required Lenders).

## Exhibit B to Restructuring Support Agreement

### Lender Joinder

### LENDER JOINDER

This Lender Joinder to the Restructuring Support Agreement, dated as of February [ ], 2013, by and among RDA Holding Co., The Reader's Digest Association, Inc. (the "Company"), and certain of the Company's subsidiaries and affiliates set forth on Schedule 1 of the Support Agreement (as defined herein and annexed hereto on Annex I), the Consenting Lender signatory thereto and the Consenting Secured Noteholders signatory thereto (the "Support Agreement), is executed and delivered by [_____] (the "Joining Lender Party") as of [_____], 2013. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

       1.    Agreement to be Bound. The Joining Lender Party hereby agrees to be bound by all of the terms of the Support Agreement, attached to this Lender Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time). The Joining Party shall hereafter be deemed to be a "Consenting Secured Party" and a party for all purposes under the Support Agreement.

       2.    Representations and Warranties. With respect to the aggregate principal amount of prepetition Secured Notes, Credit Agreement obligations and/or DIP Loans held by the Joining Lender Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such prepetition claims, the Joining Lender Party hereby makes the representations and warranties of the Consenting Secured Parties set forth in Section 6 of the Support Agreement to each of the other Parties in the Support Agreement.

       3.    Governing Law. This Lender Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

[THE REMAINDER OF THIS PAGE IS
INTENTIONALLY LEFT BLANK]

B-1

IN WITNESS WHEREOF, the Joining Lender Party has caused this Lender Joinder to be
executed as of the date first written above.

 

 

_____
Entity Name of Joining Lender Party

 

Authorized Signatory:

By:      _____
        Name:
        Title:

        Principal Amount of
        Secured Notes $_____

        Principal Amount of
        Credit Agreement obligations   $_____

        Principal Amount of
        DIP Loans $_____

        Address: _____

## **Exhibit B**

**Debtors' Prepetition Organizational Structure**

**RDA U.S. ENTITIES**



A chart illustrating RDA's international corporate strucuture as of the Commencement Date is set forth on the following page.



## Exhibit C

**Projected Financial Information**

# FINANCIAL PROJECTIONS (UNAUDITED)
# FOR THE FISCAL YEARS ENDED 2013 – 2015

The Reader's Digest Association, Inc. ("**Reader's Digest**") and certain of its affiliates (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the Bankruptcy Court for the Southern District of New York on February 17, 2013 (the "**Commencement Date**").

The Debtors, other than Direct Entertainment Media Group, Inc. (collectively, the "**Reorganization Plan Debtors**") are soliciting votes with respect to the *Proposed Joint Chapter 11 Plan of Reorganization of The Reader's Digest Association, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "**Reorganization Plan**") as set forth in the Disclosure Statement for the Reorganization Plan (as may be amended from time to time, the "**Disclosure Statement**"). All capitalized terms used by not defined herein have the meanings set forth in the Disclosure Statement.

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor thereto, unless such liquidation or reorganization is contemplated by the plan. Accordingly, in connection with the planning and development of the Reorganization Plan, and for the purposes of determining whether the Reorganization Plan satisfies this "feasibility" standard, the Reorganization Plan Debtors analyzed their ability, as Reorganized Debtors, to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

Specifically, the Reorganization Plan Debtors developed and refined a bottom-up business plan and prepared these financial projections for the fiscal years 2013 through 2015 (the "**Projection Period**"). These projections are presented on a consolidated and segment basis for the Reorganization Plan Debtors and their Affiliates (the "**Company**"). These projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

The Company does not, as a matter of course, publish its business plans and strategies, projections, anticipated financial position or results of operations. Accordingly, the Reorganization Plan Debtors do not intend to, and disclaim any obligation to, (1) furnish updated business plans or projections to Holders of Claims or Interests after the Confirmation Date, (2) include such information in documents, if any, required to be filed with the Securities and Exchange Commission (the "**SEC**") or (iii) otherwise make such information public consistent with applicable law.

THE PROJECTIONS HAVE BEEN PREPARED EXCLUSIVELY BY THE REORGANIZATION PLAN DEBTORS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT AT THE TIME AND TO THE BEST OF THEIR KNOWLEDGE, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS,

ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF
WHICH ARE BEYOND THE REORGANIZATION PLAN DEBTORS' CONTROL.  THE
REORGANIZATION PLAN DEBTORS CAUTION THAT NO REPRESENTATIONS CAN
BE MADE AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE
PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT
MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT
TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE
DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS
MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE
MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A
GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL
OCCUR.

These projections should be read in conjunction with the assumptions, qualifications,
notes and explanations set forth, referenced or otherwise described in, without limitation:
(1) these projections; (2) the Disclosure Statement; (3) the Reorganization Plan and the Plan
Supplement; and (4) the historical consolidated financial statements (including any notes and
schedules thereto), other financial information and detailed discussion of the various risks and
other factors associated with the Company's businesses and operations generally set forth under
the section entitled "Risk Factors" in Reader's Digest's Annual Report on Form 10-K for the
fiscal year ended December 31, 2011, and Reader's Digest's Quarterly Report on Form 10-Q for
the quarterly period ended September 30, 2012, copies of which can be obtained from the
Reorganization Plan Debtors' investor relations website (http://phx.corporate-
ir.net/phoenix.zhtml?c=71092&p=irol-IRhome) or the SEC's EDGAR system website
(http://www.sec.gov/edgar.shtml).

## Important Accounting and Securities Law Disclosures

### A.    Accounting Disclosure

These projections do not reflect necessary or complete fresh-start reporting adjustments
that may be required to be made on the Effective Date.  The Reorganization Plan Debtors will be
required to estimate the reorganization value of the Reorganized Debtors, the fair value of their
assets and their actual liabilities as of the Effective Date.  Such determinations will be based
upon the fair values as of that date, which could be materially greater or less than the value
assumed in these projections.  Any fresh-start reporting adjustments that may be required in
accordance with *Statement of Position 90-7 – Financial Reporting by Entities in Reorganization*
under the Bankruptcy Code, including any allocation of the Reorganization Plan Debtors'
reorganization value to the Reorganization Plan Debtors' assets in accordance with the
procedures specified in *Financial Accounting Standards Board Statement 141 – Business
Combinations*, will be made when the Reorganization Plan Debtors exit chapter 11.

These projections were not prepared with a view toward compliance with the guidelines
established by the American Institute of Certified Public Accountants, the practices recognized
to be in accordance with Generally Accepted Accounting Principles ("**GAAP**") or the rules and
regulations of the SEC regarding projections.  Furthermore, these projections have not been

audited by independent accountants.

**B.      Safe Harbor Statement Under The Private Securities Litigation Reform Act Of 1995**

These projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**") and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 (the "**Exchange Act**"). "Forward-looking statements" in these projections include the intent, belief or current expectations of the Reorganization Plan Debtors and members of its management team with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing, and debt and equity market conditions and the Reorganization Plan Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Reorganization Plan Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

Important factors currently known to management that could cause actual results to differ materially from those contemplated by the forward-looking statements in these projections include, without limitation:  (1) further adverse developments with respect to the Company's liquidity position or operations of the Reorganization Plan Debtors' businesses; (2) adverse developments in the Reorganization Plan Debtors' efforts to renegotiate their funding; (3) adverse developments in the bank financing or public or private markets for debt or equity securities; (4) adverse developments in the timing or results of the Reorganization Plan Debtors' strategic business plan (including the timeline to emerge from chapter 11); (4) the ability of the Reorganization Plan Debtors to retain and attract new clients and maintain favorable vendor relationships; (5) the difficulty in controlling industry costs and the ability of the Reorganization Plan Debtors to realize the anticipated general and administrative expense savings and overhead reductions presently contemplated in their business plans; (6) the ability of the Reorganization Plan Debtors to return their operations to profitability; (7) the level and nature of any restructuring and other one-time charges; (8) the difficulty in estimating costs relating to exiting certain markets and consolidating and closing certain operations; and/or (9) the possible negative effects of a change in applicable legislation.

## Key Assumptions

These projections were prepared by the Reorganization Plan Debtors in good faith based on various assumptions and estimates believed to be reasonable at the time of preparation, but which are subject to significant contingencies.  These projections are also based upon forecasts of certain key economic variables, such as changes in the competitive environment (including the demand for Company's products), the ability to achieve certain cost reductions and the ability to stabilize and expand the Company's consumer and advertising revenue bases.  Accordingly, because such assumptions, estimates and forecasts underlying these projections are inherently

uncertain and subject to significant business, economic and competitive uncertainties (many of which are beyond the Company's control), actual results may vary, in some instances materially, from those presented herein. These projections assume the Reorganization Plan will be confirmed, consummated and implemented in accordance with its stated terms.

## A.    General Assumptions

1.    **Methodology**.  These projections are based on the Reorganization Plan Debtors' detailed projections for fiscal years 2013-2015 (the Reorganization Plan Debtors operate on a December 31 fiscal year-end).  Projections are developed on an operational rather than legal entity basis.

2.    **Emergence Date**.  These projections are further based on the assumption that the Reorganization Plan Debtors will emerge from chapter 11 on or about July 31, 2013 – the assumed "Effective Date" of the Reorganization Plan.  If the Effective Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted.  In addition, the Reorganization Plan Debtors believe that their businesses will be adversely impacted as a result of being in a prolonged chapter 11 process, particularly with respect to potential trade contraction, both domestically and internationally.

3.    **Macroeconomic & Industry Environment**.  These projections assume there will be no substantial near-term improvement in the global macroeconomic environment.  These projections also assume constant foreign currency exchange rates and stable commodity pricing environments.  These projections further assume a stabilization of the print media sector, stabilization of customer bases, stabilization of response and payment rates in many of the Reorganization Plan Debtors' international markets (especially Europe) and an increasing dependence on expanding the Company's brands through digital platforms.

4.    **Operations**. These projections are aggregated from operating forecasts for the Reorganized Debtors, which assume the Company maintains its global multi-brand media and direct marketing strategy, with an increasing focus on the development of digital media platforms.  These projections incorporate the Company's planned revenue and cost initiatives as well as operational restructuring activities, and assume the wind-down and licensing of select countries.  These projections further assume the Company will be able to retain and attract the employees required to execute its Business Plan.  The Company continually reviews its operations, the economic environment and the markets in which it competes, to evaluate the potential future profitability of each of its product lines.  The actual operations of the Company, as well as the financial results from operations, could vary significantly from the assumptions used to generate these projections as a result of, among other things, changes to the Company's future operations.

5.    **Other Assumptions**. These projections also assume that:  (1) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganization Plan Debtors; (2) there will be no change in GAAP in the United States that will have a material effect on the reported financial results of the Reorganization Plan Debtors; (3) the application of fresh-start reporting will not

materially change the Reorganization Plan Debtors' accounting procedures; and (4) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganization Plan Debtors.

**B.**      **Projected Income Statement**

   **Reader's Digest North America**

   1.      **Revenues**.  Net revenues for North America, which includes the U.S. and Canadian businesses, are forecasted to decline 3.8% from fiscal year 2013 to 2014 and 2.7% through fiscal year 2015.  The decreases are primarily driven by declines in print magazine subscriptions and book and merchandise sales due to the attrition of legacy customers. Advertising increases by 4% from 2013 to 2014, driven by growth in digital advertising offset by decreases in print advertising.  From 2014 to 2015, advertising increases 9% as growth continues in digital and print advertising stabilizes.  Digital advertising and Digital editions combined grow 47.6% and 39.1% in 2014 and 2015, respectively, due to changing customer preferences for consuming media digitally and the movement of advertisers to more digital mediums. Partnership and licensing revenues increase as more focus is placed on developing a pipeline to fully exploit the equity of the North American brands.

- Subscription Revenue.  The Company sells magazine subscriptions to its publications through direct-to-consumer solicitations and third-party marketing agents. The Company uses a variety of direct-to-consumer techniques to sell subscriptions including attached mail, direct mail, insert cards, website and e-mail solicitation. Reader's Digest North America offers the US and Canadian editions of Reader's Digest, as well as Taste of Home, The Family Handyman and 8 enthusiast magazine titles in the US, and Best Health and Our Canada in Canada. Fiscal year 2013 net subscription revenues are forecasted to be approximately $206 million in North America.  Subscription revenues are estimated to constitute approximately 48% of net revenues in 2013, and decrease during the period to 44% by 2015 as legacy customers are either not replaced due to unprofitable circulation acquisition economics or replaced by those with lower rates.  These losses are partially offset by gains in digital subscribers over the Projection Period.

- Advertising Revenue.  Advertising rates and rate structures vary among publications and Internet properties and are based on, among other things, the circulation or audience of the particular property, the readership demographics, the scheduled frequency and the size and placement of the advertisement in the publication or website.  Advertising revenue is influenced by a number of external factors, including the presence and relative positioning of competing publications, the amount and allocation of marketing expenditures by advertising clients and the extent to which customers elect to advertise using print and online media.  The Company believes that it is less reliant on advertising than many of its peers. In the forecast for fiscal year 2013, net advertising revenue accounts for $86 million

or 20% of North American revenue.  Gains in digital advertising revenue (+43% in 2014 and +26% in 2015) offset losses in print advertising revenue in 2014.

- <u>Newsstand Revenue</u>.  The Company estimates approximately 9 million single copies of magazines will be sold through newsstands for the fiscal year 2013.  Generally, the Company receives a percentage of the cover price of an individual magazine sold through the newsstand with the balance of the cover price retained by the magazine's distributors, wholesalers and retailers.  Newsstand revenues are estimated to generate 7-8% of North America's revenues in these projections.

- <u>Book and merchandise revenue</u>.  The Company historically derived significant revenues from a variety of non-magazine products marketed through sweepstakes offers, including single and series book sales, music, video and DVD products, primarily under the Reader's Digest brand names.  These products will no longer be marketed using sweepstakes, but through product-driven offers in our magazines, as well as using publicity through a number of channels including television, radio, internet and social media.  In the Projection Period, this will create a more profitable and predictable business, with a loss of over 70% of the revenue from the Reader's Digest direct mail business compared to 2012.  The remaining books businesses are forecasted to decline 8-11% annually over the Projection Period, consistent with recent trends.

- <u>Licensing / Partnerships</u>.  In addition, the Company derives revenue from a variety of royalty and license agreements.  The Projection Period assumes that these revenues will grow from 2% of total revenues in 2013 to 4% of total revenues in 2015.

2. **Operating Expenses**.

- <u>Product Costs</u>.  The principal components of production costs are magazine paper, manufacturing costs such as paper for books, editorial, fulfillment and delivery (both through the mail and to retail outlets). The supply and prices of paper are subject to volatility and may be significantly affected by many factors, including market and economic conditions.  Delivery costs are subject to local government post office price increases which, in the past, have been significant and difficult to forecast with any reasonable certainty.  For the Projection Period, product costs decline from 42% to 38% of net revenues.  The decline in costs relative to revenues are driven by revenue losses in lower margin businesses such as books and other merchandise coupled with growth in higher margin businesses such as partnerships, digital editions and digital advertising.  Additionally, the Company is increasing unit profitability through higher print consumer and advertising pricing.

- <u>Promotion Costs</u>.  Promotion costs are the costs incurred by the Company to retain or extend existing customers and to acquire new customers.  These include the expenses associated with the production of solicitation materials, the

6

postage/delivery costs for such materials, the cost of inducements or other incentives offered to subscribers and the cost of promoting the Reorganization Plan Debtors' products at retail.  Promotion costs decline from 32% of net revenues to 28% in fiscal years 2013 through 2015.  The decline in costs relative to revenues are driven by revenue losses in business lines with high promotional costs such as books and other merchandise coupled with growth in lower promotional costs businesses such as partnerships, digital editions and digital advertising.  Additionally, the Company is moving away from the use of magazine agents, one of our largest promotional expenses, as well as increasing revenue through higher print consumer and advertising pricing without additional promotional expense.

**Corporate**

The overall corporate organization exists to support multiple businesses in a holding company structure.

1. Overhead Costs.  Overhead includes support functions and infrastructure to support the operations of the Company.  Principal components include management information systems, operations, procurement, executive management, human resources, finance and accounting, and pension income.  Overhead costs remain relatively stable in these projections and include the benefit of facility leases to be renegotiated and anticipated lower outsourced MIS service provider costs.

2. Other Operating Costs.  These projections include other costs that are included in the Company's operating profit.  Other operating costs consist primarily of intangible asset amortization ($15.6 million in fiscal 2013, $27.2 in fiscal 2014 and $8.9 million in fiscal 2015) as well as International management-to-legal reporting adjustments.

3. Income Taxes.  Income tax expense in these projections are derived from the Company's latest tax forecast and assumed to represent cash taxes paid.  The tax forecast assumes that the Debtors' tax attributes will be severely restricted on the Effective Date due to the application of tax rules restricting the use of tax attributes following an ownership change.

**Reader's Digest International**

The International Segment is comprised of the countries the Company is planning to retain ("**Retained Countries**") and countries that are planned to be wound-down or licensed ("**Non-retained Countries**").

1. Projections for Retained Countries are based on the following assumptions:
   - **Retention Rate**.  The Active Customer Base or "ACB" retention rates are projected to trend consistent with experience over the last 3 years.  Generally,

7

customer retention rates range from the mid 40% annually to approximately 60%, with performance varying by region depending upon type of business in each country (e.g., direct debit as opposed to checks at post office).

- **Revenue per Customer**.  The projections assume a modest increase in gross revenue per Books, Home and Entertainment customer based on expected improvements resulting from the Customer Centric and Affinity initiatives. While 2012 results show improvements in many countries, some of this uplift is an immediate result of Company's increased focus on its most productive customers.  As such, the projections reflect modest improvements in revenue per customer consistent with country trends.

- **Revenue Reserve Rates**.  Assumed to remain consistent with historical levels. Reserve rates vary by region but tend to fall in the 20% to 30% of gross revenue range.

- **Product Cost as a % of Net Revenue**.  The Company is working to discontinue unsuccessful / lower margin product programs.  For the forecast the Company has assumed that product margins remain fairly stable.

- **Inside List Promotion Cost as a % of Net Revenue**.  Projections assume that inside list "IL" Promotion Costs remain constant as a percent of revenue in most countries.  While postage costs are anticipated to increase over time, this should be mitigated by reducing the levels of mailing intensity and pursuing the Customer Centric and Affinity programs, which are expected to improve response rates.

- **Overhead**.  In countries with declining revenue trends, the Company intends to proactively reduce overhead by up to 5-7% per year, to maintain stable margins.

2. Projections for Non-retained Countries assume that respective licensing transactions and wind-downs are completed before December 31, 2013.  For the projected period between July 31, 2013 and December 31, 2013, the Company is expecting Non-retained Countries to generate total cash proceeds of $9.4 million net of wind-down costs.

**Royalties**

Represent royalties from countries previously licensed and anticipated to be licensed. Projected royalties based on current signed deals (and expected volumes) as well as offer sheet terms for prospective deals.

**C.    Projected Consolidated Balance Sheet**

1. **Current Assets**.  The Company's significant current assets consist of accounts receivable, cash, prepaid expenses and inventory.  Accounts receivable consist primarily of amounts due from customers and advertisers for subscriptions, advertising and non-magazine

8

products and are net of allowances for returns and bad debts.  Prepaid expenses consist primarily of expenses of subsequent magazine subscription issues, prepaid agent commissions, prepaid promotional expenses and other normal and customary prepaid expenses.  Inventories consist of raw materials, work in process and finished goods inventory (net of customary reserves) primarily for the Company's non-magazine products.

      2.  **Non-Current Assets**.  The Company's significant non-current assets include goodwill, intangible assets such as trademarks and customer lists, pension assets and long-term deferred tax assets.

      3.  **Current Liabilities**.  The Company's significant current liabilities consist of accounts payable, accrued expenses, payroll liabilities and unearned revenue.  Accounts payable and accrued expenses consist primarily of trade payables and customary accruals, respectively.  Unearned revenue is recorded by the Company as a liability to reflect the amount of future subscription revenues not yet earned nor fulfilled and is forecasted to drive significant differences between net income and operating cash flow.

      4.  **Non-Current Liabilities**.  The Company's significant non-current liabilities include the non-current portion of unearned revenue and deferred income taxes and income tax reserves as per *Guidance for Documentation of Uncertain Tax Positions Under ASC 740-10.*

## D.    Post-Effective Date Capital Structure

      1.    **New First Out Exit Term Loan**.  These projections assume the New First Out Exit Term Loan accrues quarterly cash interest at the higher of the annual rate of (a) three-month LIBOR or (b) 3.0% plus 600 basis points.  The New First Out Exit Term Loan has mandatory amortization of $2,500,000 *per annum*, payable quarterly, with the first payment due on September 30, 2013.  Subsequent payments shall be due on the last day of each of December, March, June, and September thereafter, until September 30, 2015 (the maturity date), at which time all outstanding principal and interest is due and payable.

      2.    **New Second Out Exit Term Loan**.  These projections assume the New Second Out Exit Term Loan accrues quarterly cash interest at the higher of the annual rate of (a) three-month LIBOR or (b) 1.5% plus 1,100 basis points.  The New Second Out Exit Term Loan does not amortize prior to the assumed maturity date of September 30, 2015, at which time all outstanding principal and interest is due and payable.

      3.    For illustrative purposes, the Reorganization Plan Debtors have assumed that all debt maturities will be refinanced on substantially similar terms throughout the Projection Period.

## E.    Consolidated Financial Projections

**Confidential – For discussion purposes only and subject to material change**

### Income Statement

| INCOME STATEMENT | Aug - Dec 2013 | FY 2014 | FY 2015 |
|---|---|---|---|
| Net Revenue | $408.9 | $729.4 | $695.0 |
| Product Costs | (162.9) | (292.3) | (272.9) |
| Promotion Costs | (113.1) | (236.4) | (217.3) |
| Total Overhead Costs | (62.6) | (124.0) | (120.8) |
| **Operating Profit** | **$70.3** | **$76.7** | **$83.9** |
| Other Income/(Expense) | (14.6) | (26.1) | (7.7) |
| Interest Expense | (3.8) | (11.7) | (11.5) |
| Income Taxes | (0.9) | (17.1) | (17.7) |
| **Net Income[1]** | **$50.9** | **$21.9** | **$47.0** |

### Balance Sheet

| BALANCE SHEET | Estimated Pre Consummation Jul-13 | Adj. | Estimated Post Consummation Jul-13 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current Assets: | | | | | | |
| Cash and Equivalents[2] | 92.7 | (18.0) | 74.8 | 128.0 | 130.0 | 142.2 |
| Total Other Current Assets | 284.3 | | 284.3 | 253.0 | 230.8 | 220.1 |
| **Total Current Assets** | **$377.0** | **($18.0)** | **$359.1** | **$381.0** | **$360.8** | **$362.3** |
| Fixed Assets, Net | 39.4 | | 39.4 | 36.5 | 31.2 | 25.9 |
| Goodwill and Other Intangible Assets | 419.7 | | 419.7 | 382.7 | 355.6 | 346.7 |
| Total Other Non-Current Assets | 219.7 | | 219.7 | 217.2 | 231.6 | 247.0 |
| **Total Non-Current Assets** | **$678.8** | **$0.0** | **$678.8** | **$636.4** | **$618.4** | **$619.5** |
| **Total Assets** | **$1,055.8** | **($18.0)** | **$1,037.9** | **$1,017.4** | **$979.3** | **$981.9** |
| **LIABILITIES** | | | | | | |
| Current Liabilities: | | | | | | |
| Unearned Revenue - Current | 196.2 | | 196.2 | 172.1 | 128.2 | 92.9 |
| Other Current Liabilities | 179.1 | | 179.1 | 186.1 | 174.9 | 169.7 |
| **Total Current Liabilities** | **$375.3** | **$0.0** | **$375.3** | **$358.3** | **$303.1** | **$262.6** |
| Long-Term Debt | 104.1 | | 104.1 | 103.5 | 101.0 | 98.5 |
| Unearned Revenue | 95.0 | | 95.0 | 95.0 | 95.0 | 95.0 |
| Liabilities Subject to Compromise | 498.6 | (498.6) | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Non-Current Liabilities | 184.3 | | 184.3 | 178.2 | 175.1 | 173.0 |
| **Total Non-Current Liabilities** | **$882.0** | **($498.6)** | **$383.4** | **$376.7** | **$371.1** | **$366.5** |
| **Total Liabilities** | **$1,257.2** | **($498.6)** | **$758.7** | **$735.0** | **$674.2** | **$629.1** |

(1) Before extraordinary/one-time non-cash items such as gains/losses from licensing and country wind-downs.

(2) Includes short-term and long-term restricted cash, including cash from wind-down countries. The Company has a minimum working capital cash requirement of $70 million including restricted and reserved cash; this minimum is expected to decline as countries are licensed and/or wound down.

**Confidential – For discussion purposes only and subject to material change**

| Cash Flow Statement | | | |
|---|---|---|---|
| | Aug - Dec 2013 | FY 2014 | FY 2015 |
| **CASH FLOW STATEMENT** | | | |
| | | | |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| Net Income[1] | 50.9 | 21.9 | 47.0 |
| Adjustments: | | | |
| Depreciation and Amortization | 20.4 | 38.5 | 20.3 |
| Other Non-Cash Charges | 1.2 | 1.9 | 0.8 |
| Total Non-Cash Items | 21.6 | 40.4 | 21.1 |
| Changes in Assets and Liabilities: | | | |
| Unearned Revenues | (19.9) | (43.9) | (35.3) |
| Other Assets and Liabilities | 3.7 | (7.9) | (12.1) |
| Total Changes in Assets and Liabilities | (16.2) | (51.8) | (47.4) |
| **Net Change in Cash from Operations** | **$56.4** | **$10.5** | **$20.7** |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | |
| Capital Expenditures | (2.5) | (6.1) | (6.0) |
| **Net Change in Cash from Investing Activities** | **($2.5)** | **($6.1)** | **($6.0)** |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Debt Borrowings (Payments) | (0.6) | (2.5) | (2.5) |
| **Net Change in Cash from Financing Activities** | **($0.6)** | **($2.5)** | **($2.5)** |
| Effect of Foreign Currency Exchange Rate Fluctuations | 0.0 | 0.1 | (0.0) |
| **Net Change in Cash and Equivalents** | **$53.3** | **$2.0** | **$12.2** |
| Cash & Equivalents, Beginning of Period[2] | 74.8 | 128.0 | 130.0 |
| **Cash & Equivalents, End of Period[2]** | **$128.0** | **$130.0** | **$142.2** |

(1) Before extraordinary/one-time non-cash items such as gains/losses from licensing and country wind-downs.

(2) Includes short-term and long-term restricted cash, including cash from wind-down countries. The Company has a minimum working capital cash requirement of $70 million including restricted and reserved cash; this minimum is expected to decline as countries are licensed and/or wound down.

## F.    Segment Financial Projections

**Confidential – For discussion purposes only and subject to material change**

Segment breakdown is presented here for information purposes and does not reflect the Company's reporting segments or legal entity structure. These projections reflect Company's current cost allocation methodology and are not reflective of projections if the respective segments were managed on a stand-alone basis.

| Net Revenue | | | | |
|---|---|---|---|---|
| Net Revenue | Aug - Dec 2013 | FY 2013 | FY 2014 | FY 2015 |
| North America | $210.3 | $432.3 | $416.4 | $404.9 |
| Unallocated Corporate | (3.4) | (7.9) | (7.9) | (7.9) |
| International - Retained Countries | 159.3 | 350.8 | 319.5 | 295.8 |
| International - Non-Retained Countries | 42.0 | 112.3 | 0.0 | 0.0 |
| Royalties | 0.7 | 1.5 | 1.5 | 2.2 |
| **Consolidated** | **$408.9** | **$888.9** | **$729.4** | **$695.0** |

| EBITDA | | | | |
|---|---|---|---|---|
| EBITDA[1] | Aug - Dec 2013 | FY 2013 | FY 2014 | FY 2015 |
| North America | $50.0 | $65.1 | $79.1 | $89.2 |
| Unallocated Corporate | (12.6) | (33.2) | (28.4) | (28.9) |
| International - Retained Countries[2] | 20.4 | 12.5 | 14.2 | 12.8 |
| International - Non-Retained Countries | 8.4 | 0.6 | 0.0 | 0.0 |
| Royalties | 0.7 | 1.5 | 1.5 | 2.2 |
| **Consolidated** | **$66.9** | **$46.4** | **$66.4** | **$75.3** |

(1) EBITDA metric is not used by Management for the purposes of measuring performance or as a proxy for cash flow. EBITDA is shown here for illustrative purposes as one of the metrics used by the industry. EBITDA used in calculation of covenants pursuant to currently contemplated exit financing, will be calculated based on substantially same basis as presented herein.

(2) Includes International HQ costs.

12

## Exhibit D

### Liquidation Analysis

## LIQUIDATION ANALYSIS

RDA Holding Co. ("**RDA**") and certain of its affiliates (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the Bankruptcy Court for the Southern District of New York on February 17, 2013 (the "**Commencement Date**").

The Debtors, other than Direct Entertainment Media Group, Inc. (collectively, the "**Reorganization Plan Debtors**") soliciting votes with respect to the *Proposed Joint chapter 11 Plan of Reorganization of RDA Holding Co. and Its Debtor Affiliates* (as may be amended from time to time, the "**Reorganization Plan**") as set forth in the Disclosure Statement for the Reorganization Plan (as may be amended from time to time, the "**Disclosure Statement**").  All capitalized terms used but not defined in this liquidation analysis have the meanings set forth in the Disclosure Statement.

A chapter 11 plan cannot be confirmed unless the bankruptcy court determines that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test requires a bankruptcy court to find either that (1) all members of an impaired class of claims or interests have accepted the plan or (2) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date. Accordingly, with the assistance of their advisors, Duff & Phelps, LLC, the Reorganization Plan Debtors prepared this hypothetical liquidation analysis in connection with filing their Disclosure Statement and Reorganization Plan to assist the Court make the findings required under section 1129(a)(7) of the Bankruptcy Code to confirm the Reorganization Plan.

This liquidation analysis indicates the estimated values that may be obtained from a disposition of the Reorganization Plan Debtors' assets under chapter 7 of the Bankruptcy Code as an alternative to the continued operation of the Reorganization Plan Debtors' businesses as contemplated by the Reorganization Plan.  Accordingly, the asset values discussed herein may be different than amounts set forth in the Reorganization Plan.

**Neither the Reorganization Plan Debtors nor their advisors make any representation or warranty that the actual results of a liquidation of the Reorganization Plan Debtors' assets would or would not approximate the assumptions represented herein, and actual results could vary, in some cases materially.**

1

### General Assumptions

The determination of the costs of, and proceeds generated from, a hypothetical chapter 7 liquidation of the Reorganization Plan Debtors' assets is an uncertain process involving the extensive use of estimates and the assumptions described herein and in the Disclosure Statement (including exhibits, where applicable) which, although considered reasonable by the Reorganization Plan Debtors and their advisors, are inherently subject to business, economic and competitive uncertainties and contingencies beyond their control. Inevitably, certain assumptions set forth herein would not materialize in an actual chapter 7 liquidation scenario, and certain unanticipated events and circumstances could materialize, both of which would affect the ultimate results in an actual chapter 7 liquidation. *In light of the foregoing, it is important to read and understand these "General Assumptions" and the "Specific Assumptions and Notes" set forth below.*

This analysis is based on management's good faith assumptions believed to be reasonable in light of the circumstances under which they are based. This analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. The estimates and assumptions, although considered reasonable by management, are inherently subject to significant uncertainties and contingencies beyond management's control. Accordingly, there can be no assurance that the results shown would be realized if the Reorganization Plan Debtors were liquidated, and actual results in such case could vary materially from those presented.

**1. Liquidation Period**. This liquidation analysis is predicated on the assumption that the Reorganization Plan Debtors would commence chapter 7 liquidation on July 31, 2013 (the "**Liquidation Date**"). Except as otherwise set forth herein, this analysis assumes that substantially all of the Reorganization Plan Debtors' U.S. assets will be liquidated over a 12-month period by a chapter 7 trustee (the "**Chapter 7 Trustee**") appointed on the Liquidation Date. With respect to the U.S. businesses, this analysis contemplates the immediate shut down of the Reorganization Plan Debtors' U.S. operations on the Liquidation Date and a distressed liquidation sale of tangible and intangible assets over a 30 to 60 day period for several reasons:

- Because the Reorganization Plan Debtors' editorial, marketing and advertising work force consists of highly trained specialized employees with unique skills that are coveted by the Reorganization Plan Debtors' competitors, these employees could migrate to other employers.

- Approximately 45% of the Reorganization Plan Debtors' revenue in the United States is derived from the subscription sales, which would cease immediately in liquidation. Existing customers could demand refunds for their remaining magazine subscriptions. These circumstances could have an immediate and devastating impact to the Reorganization Plan Debtors' cash flow.

- Approximately 20% of the Reorganization Plan Debtors' revenue in the United States is based on products sold directly to end-user consumers. These are typically small dollar transactions which require solicitation for payment

2

after merchandise has been delivered. Although historical collection rates for these revenue sources are high, in liquidation it could be prohibitively expensive to maintain the personnel to continue efforts to collect the amounts outstanding from each customer.

• A significant portion of the Reorganization Plan Debtors' assets are intangible, being comprised of trademarks, customer lists, brand names and goodwill. The value of these assets could diminish rapidly in a situation in which the assets are no longer functioning as part of going concerns.

• Because most (if not all) of the Reorganization Plan Debtors share various advertising, marketing, information technology, administrative and financial services, it would be difficult to sell individual businesses as a going concern.

**2. Asset Value**. Unless otherwise noted, this liquidation analysis is based on the balance sheet of the Reorganization Plan Debtors as projected at the Liquidation Date, which is consistent with the Reorganization Plan Debtors' Business Plan.

**3. Claims Estimates**. Much of the information regarding the Reorganization Plan Debtors' liabilities was derived from the Statements of Financial Affairs and Schedules filed with the Bankruptcy Court on March 18, 2013 (the "**Schedules**"). In preparing this liquidation analysis, the Reorganization Plan Debtors have estimated an amount of allowed claims for each class based upon a review of the Reorganization Plan Debtors' Schedules. Additional claims were estimated to include certain post-petition obligations. The estimate of all allowed claims in this liquidation analysis is based on the book value of those claims. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of allowed claims set forth in this liquidation analysis. The estimate of the amount of allowed claims set forth in this liquidation analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of allowed claims under the Reorganization Plan. The actual amount of allowed claims could be materially different from the amount of claims estimated in this liquidation analysis.

**4. Liquidation Costs**. Conversion of these chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code likely would result in additional costs to the estates, including, among other things, compensation of the chapter 7 Trustee and retained counsel and professionals, asset disposition expenses, litigations expenses and unpaid administrative expenses incurred during the chapter 11 Cases that are allowed in the chapter 7 cases. Except as otherwise stated, recoveries set forth herein are net of necessary liquidation expenses. If actual results were lower than those shown, or if the assumptions used in formulating this analysis were not realized, distribution to each member of each class of claims could be affected adversely.

**5. Non-Debtor Foreign Subsidiaries**. This analysis assumes that foreign subsidiaries would be forced to file for insolvency upon a chapter 7 filing of the Reorganization Plan Debtors. Since the foreign subsidiaries rely significantly on global support activities provided by the Reorganization Plan Debtors, the continued operations of the foreign subsidiaries as going concerns is assumed to be difficult.  The proceeds from the liquidation of the foreign subsidiaries

3

was estimated by FTI Consultants, and includes the net proceeds from the sale of these entities, as well as the settlement of certain intercompany obligations.   The value of the foreign subsidiaries represents the net proceeds that would be available to the Reorganization Plan Debtors to satisfy claims upon a chapter 7 proceeding.

      **6. Certain Exclusions and Assumptions**. This liquidation analysis does not include estimates for the tax consequences that may be triggered upon the liquidation and sale events of assets in the manner described above. Such tax consequences may be material. In addition, this liquidation analysis does not include recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions.

4

**Calculation of Net Estimated Proceeds Available for Allocation**
*USD in millions*

| | Net Book Value @ 7/31/2013 | Estimated Recovery Rate Range | | | Estimated Recovery | | | See Note |
|---|---|---|---|---|---|---|---|---|
| | | Low | Medium | High | Low | Medium | High | |
| **A. STATEMENT OF ASSETS** | | | | | | | | |
| Cash and Equivalents | $    45.98 | 100% | 100% | 100% | $    45.98 | $    45.98 | $    45.98 | 1 |
| Restricted Cash | 2.03 | 0% | 0% | 0% | - | - | - | 1 |
| Net Accounts Receivable | 16.96 | 56% | 63% | 70% | 9.45 | 10.67 | 11.88 | 2 |
| Net Inventory | 17.12 | 16% | 21% | 25% | 2.75 | 3.53 | 4.30 | 3 |
| Prepaid Promotion Expense | 6.57 | 0% | 0% | 0% | - | - | - | 4 |
| Other Current Assets | 67.51 | 3% | 3% | 3% | 1.87 | 2.08 | 2.29 | 4 |
| Other Non-Current Assets | 20.85 | 0% | 0% | 0% | - | - | - | 4 |
| Land & Buildings | 6.07 | 76% | 89% | 102% | 4.60 | 5.40 | 6.20 | 5 |
| Personal Property | 26.58 | 4% | 5% | 6% | 1.17 | 1.39 | 1.60 | 5 |
| Pension Benefits | 131.77 | 8% | 8% | 8% | 10.00 | 10.00 | 10.00 | 6 |
| Goodwill and Intangibles | 319.83 | 9% | 12% | 16% | 27.80 | 39.10 | 50.40 | 7 |
| Intercompany Receivable | 70.30 | 34% | 37% | 40% | 23.90 | 25.85 | 27.80 | 8 |
| Investment in International Subsidiaries | 820.70 | 1% | 1% | 1% | 5.40 | 5.80 | 6.20 | 8 |
| **TOTAL ASSETS** | $  1,552.29 | 9% | 10% | 11% | $  132.94 | $  149.80 | $  166.66 | |
| **B. Recoveries from Exercise of Avoiding Powers** | | | | | $    - | $    - | $    - | |
| **C. Gross Proceeds** | | | | | $  132.94 | $  149.80 | $  166.66 | |
| **D. Creditor Recovery Expenses** | | | | | | | | |
| Chapter 7 Trustee Fees (3% of Gross Proceeds, net of cash) | | | | | $    (2.61) | $    (3.11) | $    (3.62) | 9 |
| Other G&A | | | | | (1.98) | (1.55) | (1.12) | 9 |
| Severance | | | | | (2.90) | (2.90) | (2.90) | 9 |
| Payroll | | | | | (1.33) | (1.17) | (1.00) | 9 |
| Professional Fees | | | | | (5.25) | (4.88) | (4.50) | 9 |
| Real Estate Broker Fees (5% of sale of real property) | | | | | (0.23) | (0.27) | (0.31) | 9 |
| Investment Banker Fees (2% of proceeds from sale of intangible assets) | | | | | (0.56) | (0.78) | (1.01) | 9 |
| **Total Post-Petition Administrative Expenses** | | | | | $  (14.86) | $  (14.65) | $  (14.45) | |
| **Net Estimated Proceeds Available for Allocation** | | | | | $  118.08 | $  135.14 | $  152.21 | |
| **Proceeds Available for Distribution to Secured Claims** | | | | | $  116.40 | $  133.31 | $  150.22 | 10 |
| **Proceeds Available for Distribution to Admin and Priority Claims** | | | | | $  1.68 | $  1.83 | $  1.98 | 10 |
| **Proceeds Available for Distribution to Unsecured Claims** | | | | | $    - | $    - | $    - | 10 |

| | | Low | Medium | High |
|---|---|---|---|---|
| International Equity Distributions | | $  5.40 | $  5.80 | $  6.20 |
| Value to Secured | 65% | 3.51 | 3.77 | 4.03 |
| Value to Priority and Unsecured | 35% | 1.89 | 2.03 | 2.17 |
| Total Value | 100% | 5.40 | 5.80 | 6.20 |
| Recovery Expenses as % of Gross Proceeds | | -11% | -10% | -9% |
| Pro-rata fees on Priority and Unsecured Proceeds | | (0.21) | (0.20) | (0.19) |
| Proceeds Available for Distribution to Priority and Unsecured Claims | | $  1.68 | $  1.83 | $  1.98 |
| Proceeds Available for Distribution to Admin and Priority Claims | | $  1.68 | $  1.83 | $  1.98 |
| Proceeds Available for Distribution to Unsecured Claims | | $    - | $    - | $    - |

5

**Allocation of Net Estimated Proceeds to Secured Claims**
*USD in millions*

| | Estimated Allowable Claims | | | Estimated Recovery on Administrative and Priority Claims | | | Estimated Recovery Range | | | See Note |
|---|---|---|---|---|---|---|---|---|---|---|
| | Low | Medium | High | Low | Medium | High | Low | Medium | High | |
| Proceeds Available For Distribution to Secured Claims | | | | $ 116.40 $ | 133.31 $ | 150.22 | | | | |
| New Money DIP | $ 45.00 $ | 45.00 $ | 45.00 | $ 45.00 $ | 45.00 $ | 45.00 | 100.0% | 100.0% | 100.0% | 11 |
| Outstanding Term Loan and Letters of Credit | 59.14 | 59.14 | 59.14 | 59.14 | 59.14 | 59.14 | 100.0% | 100.0% | 100.0% | 11 |
| Accrued Interest and Fees | 0.67 | 0.67 | 0.67 | 0.67 | 0.67 | 0.67 | 100.0% | 100.0% | 100.0% | 11 |
| Total DIP Lender Facility | 104.81 | 104.81 | 104.81 | 104.81 | 104.81 | 104.81 | 100.0% | 100.0% | 100.0% | |
| Net Estimated Proceeds Available For Distribution to Secured Claims | | | | $ 11.59 $ | 28.50 $ | 45.41 | | | | |
| Pre-Petition Secured Liabilities | | | | | | | | | | |
| Senior Secured Notes Outstanding | $ 464.40 $ | 464.40 $ | 464.40 | 11.31 | 27.80 | 44.30 | 2.4% | 6.0% | 9.5% | 12 |
| Accrued Interest | 11.64 | 11.64 | 11.64 | 0.28 | 0.70 | 1.11 | 2.4% | 6.0% | 9.5% | 12 |
| Net Secured Distributions | $ 476.05 $ | 476.05 $ | 476.05 | $ 11.59 $ | 28.50 $ | 45.41 | 2.4% | 6.0% | 9.5% | |
| Net Estimated Proceeds After Secured Claims | | | | $ - $ | - $ | - | | | | |
| Secured Lender Deficiency Claim (General Unsecured Claim) | | | | $ 464.46 $ | 447.55 $ | 430.64 | | | | |

6

**Allocation of Net Estimated Proceeds to Administrative, Priority and Unsecured Claims**
*USD in millions*

| | Estimated Allowable Claims | | | Estimated Recovery on Unsecured | | | Estimated Recovery Range | | | See Note |
|---|---|---|---|---|---|---|---|---|---|---|
| | Low | Medium | High | Low | Medium | High | Low | Medium | High | |
| Proceeds Available For Distribution to Administrative, Priority and Unsecured Claims | | | | $ 1.68 | $ 1.83 | $ 1.98 | | | | |
| **Less Admin Claims:** | | | | | | | | | | |
| 503(b)(9) Administrative Priority Claims | $ 0.50 | $ 0.50 | $ 0.50 | $ 0.01 | $ 0.01 | $ 0.01 | 2.4% | 2.6% | 2.8% | 13 |
| Post Petition Accounts Payable | 70.00 | 70.00 | 70.00 | 1.67 | 1.82 | 1.97 | 2.4% | 2.6% | 2.8% | 13 |
| Total Admin Claims Distribution | 70.50 | 70.50 | 70.50 | 1.68 | 1.83 | 1.98 | 2.4% | 2.6% | 2.8% | |
| **Net Estimated Proceeds After Admin Claims** | | | | $ - | $ - | $ - | | | | |
| **Less Priority Claims** | | | | | | | | | | |
| Employee Priority Claims | $ 0.05 | $ 0.05 | $ 0.05 | - | - | - | 0.0% | 0.0% | 0.0% | 14 |
| Consumer Deposits | 236.44 | 236.44 | 236.44 | - | - | - | 0.0% | 0.0% | 0.0% | 14 |
| Total Priority Claims Distributions | 236.49 | 236.49 | 236.49 | - | - | - | 0.0% | 0.0% | 0.0% | |
| **Net Estimated Proceeds After Priority Claims** | | | | $ - | $ - | $ - | | | | |
| _Notes Payable_ | | | | | | | | | | |
| Unsecured Loan | $ 10.00 | $ 10.00 | $ 10.00 | $ - | $ - | $ - | 0.0% | 0.0% | 0.0% | 15 |
| Accrued Interest | 0.14 | 0.14 | 0.14 | - | - | - | 0.0% | 0.0% | 0.0% | |
| Total Note Claims Distributions | $ 10.14 | $ 10.14 | $ 10.14 | $ - | $ - | $ - | 0.0% | 0.0% | 0.0% | |
| _General Unsecured Claims:_ | | | | | | | | | | |
| Unsecured claims | $ 120.00 | $ 120.00 | $ 120.00 | $ - | $ - | $ - | 0.0% | 0.0% | 0.0% | 16 |
| Secured Lender Deficiency Claim | 464.46 | 447.55 | 430.64 | - | - | - | 0.0% | 0.0% | 0.0% | 16 |
| Total General Unsecured Claims Distributions | $ 584.46 | $ 567.55 | $ 550.64 | $ - | $ - | $ - | 0.0% | 0.0% | 0.0% | |
| **Total Notes and General Unsecured Distributions** | $ 594.60 | $ 577.69 | $ 560.78 | $ - | $ - | $ - | 0.0% | 0.0% | 0.0% | |

## Specific Assumptions and Notes

### 1. Note 1 – Cash

As of the Liquidation Date, the Reorganization Plan Debtors are expected to have a U.S. cash balance of $46.0 million. The expected cash amount includes assumed proceeds from sales of certain foreign subsidiaries prior to the Liquidation Date, as well as assumes the non-payment of certain success-based fees related to Chapter 11 advisors. Cash in foreign bank accounts is included within the net proceeds of the assumed liquidation of the foreign subsidiaries. It is also estimated that as of the Liquidation Date cash in the U.S. relating to outstanding checks, credit card deposits, payroll and cash collateralized sweepstakes would be unavailable for distribution to the creditors of the estate.

### 2. Note 2 – Accounts Receivable

The table below shows the composition and roll-forward of accounts receivable ("**A/R**") from December 31, 2012, to the estimated balance at the Liquidation Date:

| *(USD in millions)* | 12/31/2012 | change | 7/31/2013 |
|---|---|---|---|
| Net Trade Product A/R | $ 12.9 | | |
| Net Direct Mail Product A/R | 10.8 | | |
| Net Advertising A/R | 14.7 | | |
| Net Subscription A/R | 1.4 | | |
| Net Newsstand A/R | 3.5 | | |
| Net List Rental A/R | 1.0 | | |
| Total A/R | $ 44.3 | $ (27.3) | $ 17.0 |

7

All amounts above are net of reserves for bad debt and returns. Additionally, newsstand receivables are net of retail display allowances, which would be deducted by the Reorganization Plan Debtors' national distributor prior to remitting funds to the Reorganization Plan Debtors.

The Reorganization Plan Debtors anticipate that a Chapter 7 Trustee would receive a different recovery rate for each type of receivable. It is estimated that the Reorganization Plan Debtors would be able to collect on 75%-90% of their Trade A/R outstanding with a small number of distributors, net of certain allowances for return liabilities. Direct Mail A/R represents a large number of small amounts with individual customers for books and home entertaining products. Collections are managed by a single third party, and recovery is assumed to be 40%-60% net of fees paid to the third party for collection services. Subscription receivables would be uncollectible due to uncertainty surrounding the Reorganization Plan Debtors' ability to serve any future issues of the magazines. Newsstand A/R is anticipated to collect 75%-90% based on incremental charge backs from the Reorganization Plan Debtors' national distributor for promotional programs and distribution charges. Advertising A/R is anticipated to collect 70%-85% of the net receivable due, after adjustment for certain credits that advertisers would apply to their amounts due. List rental is managed through a single third party, and is expected to collect at 75%-90%. A blended recovery rate of 56%-70% was applied to the estimated net A/R balance as of the Liquidation Date assuming a similar composition of A/R as existed on December 31, 2012.

### 3.  Note 3 – Inventory

The table below shows the composition and roll-forward of inventory from December 31, 2012, to the estimated balance at the Liquidation Date:

| (USD in millions) | 12/31/2012 | | change | | 7/31/2013 |
|---|---|---|---|---|---|
| Raw Materials | $ | 0.0 | | | |
| Work In Process | | 1.1 | | | |
| Finished Goods | | 10.4 | | | |
| Total Inventory | $ | 11.5 | $ | 5.6 | $  17.1 |

All amounts above are net of reserves for obsolescence and damages.

The Reorganization Plan Debtors carry an immaterial amount of raw materials as all production and printing operations are done by third parties.

"Work In-Progress" primarily represents books and magazines which are currently in production and have yet to be bound and completed and as such would likely yield no return in value.

The Reorganization Plan Debtors' finished goods are comprised primarily of books, music and other entertainment products. Based on historical liquidations by the Reorganization Plan Debtors of excess inventory, finished goods are estimated to yield between 10%-30% of cost, depending on the type of product, volume of product requiring disposal, and channel of disposal. A blended recovery rate of 16%-25% was applied to the estimated net inventory

8

balance as of the Liquidation Date assuming a similar composition of inventory as existed on December 31, 2012.

### 4.  Note 4 – Prepaid Promotion and Other Current and Non-Current Assets

The table below shows the composition and roll-forward of prepaid promotion and other current assets from December 31, 2012, to the estimated balance at the Liquidation Date:

| *(USD in millions)* | 12/31/2012 | change | 7/31/2013 |
|---|---|---|---|
| Total Prepaid Promotion Expense | $      2.0 | $      4.5 | $      6.6 |

| *(USD in millions)* | 12/31/2012 | change | 7/31/2013 |
|---|---|---|---|
| Expense of Subsequent Issues | $      8.7 | | |
| Prepaid Agent Commissions | 29.6 | | |
| Royalty Advances | 1.1 | | |
| Prepaid Postage & Mailing | 0.9 | | |
| Other Net Receivables | 1.2 | | |
| Other Prepaid Expenses | 5.2 | | |
| Total Other Current Assets | $      46.7 | $      20.8 | $      67.5 |

Prepaid promotion expenses are amounts paid to produce insert cards and other branded marketing materials for the purposes of soliciting the purchase of books, entertainment product and magazine subscriptions. Expenses for subsequent issues relate to prepaid amounts for magazine production, including editorial freelancers and printing costs for certain printers. Prepaid agent commissions represents amounts prepaid to scriber agents for the solicitation of subscription copies from consumers. None of these costs would be recoverable in a liquidation as the services have already have been provided.

Royalty advances represent future payments against future sales of licensed books and other products. These payments represent minimum guarantees paid to licensors in return for the right to sell product. These advances would likely be set-off against sales of product and as such would not be recoverable in liquidation.

Other prepaid expenses include postage deposits, prepaid insurance, advances, prepaid rent and other miscellaneous assets. Most of this balance would be exhausted during the course of the liquidation or offset against other liabilities.  Certain postage deposits, receivables related to the sale of digital products, and various miscellaneous receivables are expected to be recoverable.  On a blended basis, the Reorganization Plan Debtors anticipate a recovery of approximately 3% against Other Current Assets.

As of December 31, 2012 there was $0 net amount of deferred tax assets and tax receivables.  The estimated balance at the Liquidation Date is also $0.

9

Current deferred tax assets represent temporary differences between the treatment of revenues and expenses in a book versus tax methodology, including timing differences for depreciation, bad debt and revenue deferrals. Long-term deferred tax assets represent tax attributes such as net operating losses. The Reorganization Plan Debtors had fully reserved these amounts as of December 31, 2012 and in a liquidation scenario, the Reorganization Plan Debtors expect no recovery from these assets. The Reorganization Plan Debtors also have a potential federal tax refund of approximately $2 million related to the restatement of prior-year tax filings. The IRS has taken exception with regard to the refund, and the Reorganization Plan Debtors believe there is a low probability of ultimately receiving the refund.

Other non-current assets represent various tax assets, capitalized software, and deferred commission expenses, which the Reorganization Plan Debtors estimate would not be recoverable in liquidation.

### 5.  Note 5 – Real and Personal Property Assets

The table below shows the composition and roll-forward of fixed assets from December 31, 2012, to the estimated balance at the Liquidation Date:

| (USD in millions) | 12/31/2012 | | change | | 7/31/2013 |
|---|---|---|---|---|---|
| Land | $ | 1.2 | | | |
| Buildings | | 4.9 | | | |
| Total Real Property | $ | 6.1 | $ | - | $ | 6.1 |
| | | | | | |
| Leasehold Improvements | $ | 7.8 | | | |
| Computer Equipment | | 5.0 | | | |
| Software | | 11.3 | | | |
| Furniture & Fixtures | | 3.0 | | | |
| Printing & Fulfillment | | 0.1 | | | |
| Artwork | | 0.8 | | | |
| Construction In Progress | | 0.6 | | | |
| Other | | 0.0 | | | |
| Total Personal Property | $ | 28.6 | $ | (2.0) | $ | 26.6 |

The above amounts represent the net book value of the various asset classes.

Real property consists of one owned building in the state of Wisconsin. The Reorganization Plan Debtors anticipate a recovery value in liquidation between $4.6 million and $6.2 million, based on a recent broker appraisal of the property and the limited time to market this property.

As of the Liquidation Date, the net book value for personal property is projected to be $26.6 million.  Because of potential difficulty in liquidating construction in process and leasehold improvement assets, the Reorganization Plan Debtors anticipate immaterial recovery

10

value for these assets. The liquidation value of artwork was estimated by the Reorganization Plan Debtors to be between 50%-55% of net book value. The remaining net book value for personal property consisted of computer equipment and furniture and fixtures. The Reorganization Plan Debtors project recovery percentages from the sales of these fixed assets between 5%-25% depending on the nature of the asset. Based on these values, the Reorganization Plan Debtors estimate that the overall recovery for personal property to be 4%-6%.

### 6. Note 6 – Pension Assets

The table below shows the roll-forward of pension assets from December 31, 2012, to the estimated balance at the Liquidation Date:

| *(USD in millions)* | 12/31/2012 | | change | | 7/31/2013 | |
|---|---|---|---|---|---|---|
| Pension Asset | $ | 118.9 | $ | 12.9 | $ | 131.8 |

The Reorganization Plan Debtors estimate a net recovery value of approximately $10.0 million on the overfunded pension plan. In estimation of the recovery amount, the Reorganization Plan Debtors took into consideration the following factors:

- Severance costs that would be paid from plan assets;

- Settlement of pension liability at potentially higher amount than measured under applicable accounting guidelines;

- Significant excise and corporate taxes due upon removal of assets from plan;

- PBGC and other regulatory requirements that would delay timing of recoverability; and

- Additional fees for outside advisors and consultants.

### 7. Note 7 – Goodwill and Intangible Assets

As of the Liquidation Date, the Reorganization Plan Debtors had a net goodwill balance of $243.5 million and a net intangible asset balance of $76.3 million. The Reorganization Plan Debtors assume that the chapter 7 Trustee would terminate the operations of these assets and sell the trademarks and customer lists to maximize value for the estates.

The U.S. trade names were valued under a forced liquidation scenario and the Reorganization Plan Debtors considered an income approach in estimating the value of the Reorganization Plan Debtors' U.S. trade names.

The Reorganization Plan Debtors' U.S. customer list was valued using both an income and a market approach. The income approach estimated the list rental income an acquirer would likely be able to achieve, while the market approach contemplated actual transactions for

11

Reader's Digest customer names and similar customer lists adjusted for a final sale premise as well as the effects of the U.S. liquidation.

The high value of the intangible assets assumes that in a forced liquidation an acquirer of the trade names would likely also acquire the customer list to maximize value of both assets upon a liquidation sale. The net value of the intangible assets is as follows:

| (USD in millions) | Low | | Medium | | High | |
|---|---|---|---|---|---|---|
| Total Intangible Assets | $ | 27.8 | $ | 39.1 | $ | 50.4 |

## 8.  Note 8 – Investment in Foreign Subsidiaries

As of the Liquidation Date, the Reorganization Plan Debtors are assumed to have a net intercompany receivable balance of $70.3 million and a net investment in consolidated foreign subsidiaries of $820.7 million. It is assumed that upon a chapter 7 filing of the Reorganization Plan Debtors, the foreign subsidiaries would also be unable to operate as going concerns and would require liquidation. The Reorganization Plan Debtors would anticipate recovering value from the foreign subsidiary assets through two different realization streams:

1) Equity distributions by direct subsidiaries which, after fulfilling all outstanding claims of creditors of the business, have excess cash for distribution; and

2) Settlement of outstanding trade intercompany liabilities and intercompany loans due to the Reorganization Plan Debtors.

Only 65% of the equity in the foreign subsidiaries is pledged as collateral for the secured debt in the U.S. The following is the breakdown of the benefit to the Reorganization Plan Debtors' secured, priority and unsecured creditors:

| (USD in millions) | | Low | | Medium | | High | |
|---|---|---|---|---|---|---|---|
| Equity Distribution to RDA Inc. | | $ | 5.4 | $ | 5.8 | $ | 6.2 |
| Intercompany Settlements | | | 23.9 | | 25.9 | | 27.8 |
| Total International | | $ | 29.3 | $ | 31.7 | $ | 34.0 |
| | | | | | | | |
| Value to Secured | 65% | $ | 3.5 | $ | 3.8 | $ | 4.0 |
| Value to Priority and Unsecured | 35% | | 1.9 | | 2.0 | | 2.2 |
| Total Value | 100% | $ | 5.4 | $ | 5.8 | $ | 6.2 |

## 9.  Note 9 – Liquidation Costs

Conversion of these chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code likely would result in additional costs to the estates, including, without limitation:

12

- <u>Chapter 7 Trustee Fees</u> – Liquidation expenses include Chapter 7 Trustee fees of 3% of total liquidation proceeds, net of cash on hand.

- <u>Wind-Down Expenses</u> – For purposes of this liquidation analysis, wind-down costs include expenses relating to the New York City, White Plains and Milwaukee locations and estimated costs for 20 employees who would assist the chapter 7 Trustee with the wind down of the estates. The Reorganization Plan Debtors assume 30 to 60 days of rent, utilities and other administrative costs, plus an additional five to six months of off-site cost for the remaining employees to complete the wind down support (250 sq. ft. per employee at a cost of $15.50 sq. ft. per month).

- <u>Severance</u> – Assumes a cash severance cost of $2.9 million. This analysis assumes that severance for certain employees would be covered by excess assets in the Reorganization Plan Debtors qualified pension plan to the extent that they are members of the plan:

| (USD in millions) | Est. Cost |
|---|---|
| Total Severance | $    20.0 |
| Paid from Pension Plan | 17.1 |
| Paid from Cash | $    2.9 |

- <u>Payroll</u> – Estimated cost for 20 employees to assist with the collection of receivables, the liquidation of inventory and general finance functions. High end of the range assumes six months at an average cost of $8,333 per month per employee. Low end of the range assumes eight months.

- <u>Professional Fees</u> – Estimated costs for financial and legal advisors to the chapter 7 Trustee. High end of the range assumes six months at a cost of $0.50 million per month and six months at a cost of $0.25 million per month. Low range assumes an additional $0.75 million of cost during the first three months.

- <u>Real Estate Broker Fees</u> – Real estate brokers will be required to liquidate the Reorganization Plan Debtors' property in Wisconsin. Estimated to be 5% of the net proceeds from the sale of real property.

- <u>Investment Banker Fees</u> – A media investment banker will be required to sell the Reorganization Plan Debtors' intangible assets. Cost estimated to be 2% of the net proceeds from these asset sales.

## 10. Note 10 – Unencumbered Assets

Certain of the amounts recovered for the liquidation of the Reorganization Plan Debtors' assets have not been 100% pledged as collateral to either the DIP Lenders or the Prepetition Lenders. The values of such unencumbered assets, detailed in Note 8, would be reduced by their pro rata share of certain administrative expenses.

13

### 11. Note 11 – DIP Facility

The Debtors obtained $45.0 million of new money from certain of the lenders under its debtor-in-possession financing facility.  Together with the outstanding obligations under the Senior Credit Agreement (as defined herein), which will be rolled up in to the DIP Facility on the Second Effective Date, the Debtors have a $105.0 million debtor-in-possession loan (the "**DIP Facility**"). The DIP Facility is estimated to be fully drawn and has first priority for payment from the liquidation of the Debtors' assets. The DIP Facility is assumed to be fully repaid on the Liquidation Date.

### 12. Note 12 – Prepetition Secured Debt Obligations

On March 30, 2012, Wells Fargo Bank, National Association, as administrative agent, and Wells Fargo Principal Lending, LLC, as lender and issuing lender, provided the Debtors with a $50.0 million secured term loan and an $11.0 million letter of credit facility (the "**Senior Credit Agreement**").  The obligations under the Senior Credit Agreement are fully and unconditionally guaranteed on a first-priority secured basis.  As of the Commencement Date, there was approximately $59.1 million outstanding under the secured term loan and letter of credit facility, along with approximately $0.7 million of accrued interest and unused fees.

On February 11, 2010, the Debtors issued $525.0 million in principal of senior notes (the "**Senior Notes**").  The obligations under the Senior Notes are fully and unconditionally guaranteed on a first-priority secured basis. As of the Commencement Date, the Debtors had $464.4 million outstanding in respect of the Senior Notes, along with $11.6 million of accrued and unpaid interest.

### 13. Note 13 – Administrative Claims

This analysis assumes that as of the Liquidation Date, the Reorganization Plan Debtors would have approximately $70.0 million of post-petition accounts payable as a result of the conversion to chapter 7 cases. Additionally, as of the Commencement Date the Reorganization Plan Debtors had approximately $0.5 million of 503(b)(9) claims. This amount represents the Reorganization Plan Debtors' estimate of vendors who would be granted administrative expense priority for goods received by the Reorganization Plan Debtors within 20 days of the Commencement Date, net of any payments made to vendors in connection with trade agreements entered into during these chapter 11 Cases.  Unpaid chapter 11 professional fees are assumed to be covered by the DIP Facility.

### 14. Note 14 – Priority Claims

As of the Commencement Date, the Reorganization Plan Debtors had approximately $0.1 million of unpaid prepetition severance amounts to employees that would qualify as priority claims up to the $11,725 per employee limit. These amounts are not being covered by the Reorganization Plan Debtors' over funded pension plan.

The Reorganization Plan Debtors also have deferred subscription liabilities for future issues of the Reorganization Plan Debtors magazines and other prepaid products and services,

14

which would be treated as consumer deposits under section 507(a)(7) of the Bankruptcy Code. The estimated value of this liability as of the Liquidation Date is $236.4 million.

### 15. Note 15 – Unsecured Loan

As of the Commencement Date, the Reorganization Plan Debtors had outstanding unsecured debt obligations in the aggregate principal and interest amounts of approximately $10.1 million, including $0.1 million of interest.

### 16. Note 16 – Unsecured Claims

The following amounts represent unsecured claims that are subject to compromise:

- Accounts Payable – Trade payables due to the Reorganization Plan Debtors' vendors, excluding amounts in which the vendor has a possessory lien or a priority claim under section 503(b)(9) of the Bankruptcy Code.

- Accrued Expenses – Estimated expense which the Reorganization Plan Debtors expect to receive an invoice for or expenses incurred which do not flow through payables as well as refunds to customers who have requested refunds for subscriptions.

- Accrued Royalties – Amount due to third parties for licensed products.

- Post Retirement and Other Employee Benefit Plans – Accrued amounts for the Reorganization Plan Debtors' Non-Qualified Retirement Plans and retiree medical plan. The Reorganization Plan Debtors have not contributed any assets towards these plans.

- Real Property Lease Rejections and Rejected Executory Contracts – Estimated amount of lease rejection claims and contract rejection damages.

- Unsecured Tax Liabilities – Contingent tax liabilities at the federal, state and international level. These amounts represent GAAP reserves for potential claims against tax positions.

- Sweepstakes Claims – Claims for previously awarded sweepstakes winners which would require funding in a chapter 7 conversion.

- Prepetition Secured Lender Deficiency Claim – Deficiency claim for insufficient assets to pay pre-petition lender secured claim.

In the event of liquidation, the aggregate amount of general unsecured claims will likely increase significantly. For example, employees likely will file claims for wages, pensions and other benefits, some of which will be entitled to priority. Landlords may file large claims for both unsecured and priority amounts. The resulting increase in both general unsecured and priority claims will decrease percentage recoveries to holders of general unsecured claims.

15

**<u>Exhibit E</u>**

**Proposed Stockholders Agreement Term Sheet**

**TO BE FILED**