**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
**In re:**

| | |
|---|---|
| **DIRECT ENTERTAINMENT MEDIA** | Chapter 11 |
| **GROUP, INC.** | **Case No. 13-22236 (RDD)** |

                    **Debtor.**
-----------------------------------------------------------------x

### DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION
### OF DIRECT ENTERTAINMENT MEDIA GROUP, INC.
### <u>PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE</u>

DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY  10019
Telephone:    (212) 277-6500
Facsimile:    (212) 277-6501

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

*Co-Counsel for Direct Entertainment*
*Media Group, Inc.*

Dated: July 17, 2013

---

**THIS DISCLOSURE STATEMENT IS SUBJECT TO BANKRUPTCY COURT
APPROVAL AND IS NOT SUBMITTED IN SOLICITATION OF ACCEPTANCE
OR REJECTION OF DEMG'S PLAN OF LIQUIDATION.  ACCEPTANCES
OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS
OCTOBER [___], 2013, AT 4:00 P.M., PREVAILING EASTERN TIME.
THE VOTING AGENT MUST ACTUALLY RECEIVE
YOUR BALLOT BEFORE THE VOTING DEADLINE.**

## TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ....................................................................................................1

II.     INTRODUCTION...............................................................................................................3

        A.      DEMG'S PROFESSIONALS ................................................................................3

        B.      IMPORTANT DATES ..........................................................................................4

        C.      BRIEF OVERVIEW OF THE DEMG PLAN ......................................................4

        D.      SUMMARY OF DISTRIBUTIONS AND  VOTING ELIGIBILITY
                UNDER THE DEMG PLAN..................................................................................6

        E.      VOTING PROCEDURES......................................................................................7

        F.      ALTERNATIVES TO CONFIRMATION OF THE PLAN,
                INCLUDING CONFIRMATION UNDER SECTION 1129(b) ........................8

        G.      CONFIRMATION HEARING ..............................................................................8

III.    OVERVIEW OF DEMG .....................................................................................................8

        A.      PREPETITION CAPITAL STRUCTURE ...........................................................8

                1.      Senior Credit Agreement ........................................................................9

                2.      Senior Notes............................................................................................9

                3.      Unsecured Term Loan ..........................................................................10

        B.      DEMG'S PRE-BANKRUPTCY OPERATIONS ...............................................11

IV.     KEY EVENTS LEADING TO THE COMMENCEMENT OF DEMG'S
        CHAPTER 11 CASE .........................................................................................................12

        A.      FTC CLAIM ........................................................................................................12

V.      THE CHAPTER 11 CASES ..............................................................................................14

        A.      FIRST DAY PLEADINGS...................................................................................14

        B.      DIP FACILITY ....................................................................................................14

        C.      CREDITORS COMMITTEE ...............................................................................15

        D.      SCHEDULES AND BAR DATES.......................................................................15

E.    LIQUIDATION AND WIND-DOWN........................................................16

VI.    THE LIQUIDATION PLAN ...............................................................16

A.    INTRODUCTION...................................................................16

B.    CLASSIFICATION AND TREATMENT OF  CLAIMS AND
INTERESTS UNDER THE DEMG PLAN .......................................16

C.    UNCLASSIFIED CLAIMS .......................................................17

1.    Administrative Expense Claims...........................................17

2.    Fee Claims......................................................................18

3.    Priority Tax Claims ..........................................................18

4.    DIP Claims.....................................................................19

5.    2012 Senior Credit Agreement Claims .................................19

6.    Roll-Up Loans................................................................19

7.    Indenture Trustee Fees .....................................................19

8.    Special Provision Governing Unimpaired Claims ...................19

9.    Elimination of Vacant Classes ...........................................19

D.    CLASSIFIED CLAIMS AND INTERESTS ....................................19

1.    Class 1 – Other Priority Claims..........................................19

2.    Class 2 – Secured Claims...................................................20

3.    Class 3 – General Unsecured Claims ...................................20

4.    Class 4 – Equity Interests .................................................21

E.    MEANS OF IMPLEMENTATION OF PLAN .................................21

1.    Compromise and Settlement of Claims, Interests and
Controversies...................................................................21

2.    Wind Down.....................................................................21

3.    Continued Corporate Existence...........................................23

4.    DEMG's Assets................................................................23

5.      Disbursing Agent.................................................................24

6.      Allowance of Claims ...........................................................25

7.      Distributions.......................................................................25

8.      Governance..........................................................................25

9.      Cancellation of Liens .........................................................25

10.     Corporate Action ...............................................................26

11.     Dissolution ..........................................................................26

12.     Withholding and Reporting Requirements ......................26

13.     Effectuating Documents; Further Transactions ..............27

14.     Closing of the DEMG Case ...............................................27

F.      PROVISIONS GOVERNING DISTRIBUTIONS............................27

1.      Distribution Record Date ..................................................27

2.      Date of Distributions .........................................................27

3.      Cancellation of Senior Notes ............................................28

4.      Delivery of Distributions ...................................................28

5.      Manner of Payment Under Plan........................................29

6.      Setoffs..................................................................................29

7.      Distributions After Effective Date....................................29

8.      Allocation of Distributions Between Principal and Interest .................29

9.      Maximum Distributions Allowed ......................................29

10.     Rounding of Payments .......................................................29

11.     Minimum Cash Distributions ............................................29

G.      PROCEDURES FOR DISPUTED CLAIMS .................................30

1.      Allowance of Claims ...........................................................30

2.      Objections to Claims..........................................................30

iv

3.    Estimation of Claims...........................................................................30

4.    No Distributions Pending Allowance ...................................................31

5.    Distributions After Allowance .............................................................31

6.    Resolution of Claims............................................................................31

7.    Disallowed Claims................................................................................31

H.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES .........................31

1.    General Treatment................................................................................31

2.    Rejection Claims ..................................................................................31

3.    Insurance Policies................................................................................32

4.    Reservation of Rights...........................................................................32

I.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.......................32

1.    Conditions Precedent to Confirmation ................................................32

2.    Conditions Precedent to the Effective Date .........................................33

3.    Waiver of Conditions Precedent..........................................................33

4.    Effect of Failure of Conditions to Effective Date .................................33

J.    EFFECT OF CONFIRMATION.....................................................................33

1.    Subordinated Claims ...........................................................................33

2.    Vesting of Assets..................................................................................33

3.    No Discharge of Claims .......................................................................34

4.    Term of Injunctions or Stays ...............................................................34

5.    Injunction Against Interference with Plan ...........................................34

6.    Exculpation..........................................................................................34

7.    Releases ...............................................................................................35

8.    Retention of Causes of Action/Reservation of Rights...........................35

9.    Solicitation of the DEMG Plan ............................................................36

K.      RETENTION OF JURISDICTION .................................................................36

L.      MISCELLANEOUS PROVISIONS...............................................................38

        1.      Payment of Statutory Fees ................................................................38

        2.      Substantial Consummation ...............................................................39

        3.      Dissolution of Creditors Committee..................................................39

        4.      Request for Expedited Determination of Taxes ................................39

        5.      Amendments.......................................................................................39

        6.      Effectuating Documents and Further Transactions...........................39

        7.      Revocation or Withdrawal of the DEMG Plan .................................39

        8.      Severability of Plan Provisions upon Confirmation ...........................40

        9.      Governing Law...................................................................................40

        10.     Time...................................................................................................40

        11.     Immediate Binding Effect .................................................................40

        12.     Successors and Assigns ......................................................................40

        13.     Entire Agreement ...............................................................................41

        14.     Notices ...............................................................................................41

VII.    CERTAIN FACTORS TO BE CONSIDERED .............................................42

A.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS...............................42

        1.      Risk of Non-Confirmation of the DEMG Plan.....................................42

        2.      Non-Consensual Confirmation ..........................................................42

        3.      Risk of Delay in Confirmation of the DEMG Plan .............................42

B.      ADDITIONAL FACTORS TO BE CONSIDERED.........................................42

        1.      DEMG Has No Duty to Update .........................................................42

        2.      No Representations Outside This Disclosure Statement Are
                Authorized .........................................................................................43

|  |  | 3. | No Legal or Tax Advice is Provided to You By This Disclosure Statement | 43 |
|  |  | 4. | No Admission Made | 43 |
| VIII. | TAX CONSEQUENCES OF THE PLAN | | | 43 |
| IX. | CONFIRMATION OF THE PLAN | | | 43 |
|  | A. | CONFIRMATION HEARING | | 43 |
|  | B. | OBJECTIONS | | 44 |
|  | C. | REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER SECTION 1129(a) OF THE BANKRUPTCY CODE | | 45 |
|  |  | 1. | General Requirements | 45 |
|  |  | 2. | Best Interests Test | 46 |
|  |  | 3. | Feasibility | 47 |
| X. | CONCLUSION AND RECOMMENDATION | | | 48 |

EXHIBIT A   Plan of Liquidation of Direct Entertainment Media Group, Inc. Pursuant to Chapter 11 of the Bankruptcy Code

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION OF DIRECT ENTERTAINMENT MEDIA GROUP, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED JULY 17, 2013, AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME (THE "DEMG PLAN") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE DEMG PLAN.[1]   A COPY OF THE DEMG PLAN IS ANNEXED HERETO AS <u>EXHIBIT A</u>.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE DEMG PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE DEMG PLAN.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VIII (CERTAIN FACTORS AFFECTING DEMG) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE DEMG PLAN.   PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE DEMG PLAN AND THE EXHIBIT ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE DEMG PLAN, THE TERMS OF THE DEMG PLAN WILL GOVERN.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement, shall have the same meanings ascribed to them in the DEMG Plan.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE LIQUIDATING DEBTOR OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE DEMG PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, DEMG IN THIS CHAPTER 11 CASE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE DEMG PLAN, PRIOR TO VOTING ON THE DEMG PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

DEMG URGES THE CREDITORS OF DEMG TO VOTE TO ACCEPT THE DEMG PLAN. DEMG BELIEVES THAT THE DEMG PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR DEMG'S CREDITORS.

INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY DEMG OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR TAX ADVISOR.

## I.    EXECUTIVE SUMMARY[2]

On February 17, 2013 (the "**Commencement Date**") and continuing immediately thereafter, Direct Entertainment Media Group, Inc., the above-captioned debtor and debtor in possession ("**DEMG**"), along with RDA Holding Co. ("**RDA Holding**"), The Reader's Digest Association, Inc. ("**Reader's Digest**"), and its other affiliated debtors and debtors in possession (RDA Holding, Reader's Digest and the affiliated debtors and debtors in possession, other than DEMG, are collectively referred to herein as the "**Reorganization Plan Debtors**"), each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). DEMG's and the Reorganization Plan Debtors' chapter 11 cases are being jointly administered for procedural purposes only under the case *In re RDA Holding Co., et al.*, Ch. 11 Case No. 13-22233 (RDD) (collectively, the "**Chapter 11 Cases**"). The Reorganization Plan Debtors have separately proposed a Second Amended Joint Plan of Reorganization of Certain Debtors Under Chapter 11 of the Bankruptcy Code (the "**Reorganization Plan**"). The Reorganization Plan was confirmed by the Bankruptcy Court on June 28, 2013. It is anticipated that the Reorganization Plan will be consummated (the "**Reorganization Plan Effective Date**") on or about July 31, 2013.

DEMG is currently a non-operating subsidiary of RDA Holding having sold certain of its assets and ceased all operations in July 2012. Prior to July 2012, DEMG's primary business included the sale of the Ab Circle Pro (as hereinafter defined) and certain other direct marketed products. As explained in Section III.B., *infra*, the licensing rights to the marketing of the Ab Circle Pro were acquired by DEMG, a newly created sister company to DHA (as herein defined) in 2009. Due to certain economic and business factors, including a substantial decline in the market for the Ab Circle Pro, DEMG ceased all direct marketing of the Ab Circle Pro by the end of 2011. DEMG, thereafter, decided to file its chapter 11 case on the Commencement Date to liquidate its liabilities and maximize its remaining assets, rather than try and reorganize or rehabilitate any ongoing business. Accordingly, DEMG has decided to wind up its business and affairs and proposes the DEMG Plan to effectuate such a wind up of its affairs leading ultimately to DEMG's dissolution as a corporation under applicable law. DEMG proposes its plan of liquidation to maximize distributions to its creditors.

The DEMG Plan implements several consensual settlement agreements negotiated among DEMG, the Reorganization Plan Debtors, the Creditors Committee, the United States Federal Trade Commission ("**FTC**") and DEMG's major stakeholders, including Wells Fargo Principal Lending, LLC (together with one of its affiliates, "**Wells Fargo**") and an ad hoc committee (the "**Ad Hoc Committee**") comprised of holders of more than two-thirds of the Debtors' Floating Rate Senior Secured Notes due 2017 (the "**Senior Notes**"). These agreements provide for, among other things, (a) the allowance of a general unsecured claim in favor of DEMG against Reader's Digest in the amount of $7,290,327.03 (the "**DEMG Allowed Claim**"); (b) an advance

---

[2]     **This Executive Summary is qualified in its entirety by reference to the DEMG Plan**. Any statements as to the rationale underlying the treatment of Claims and Interests under the DEMG Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event that the DEMG Plan is not confirmed. You should read the DEMG Plan in its entirety before voting to accept or reject the DEMG Plan.

from Reader's Digest, if needed, (defined in the DEMG Plan as the "**Parent Advance**") in an amount up to $50,000 to defray the costs of implementing and administering the DEMG Plan and the wind down of DEMG's affairs; and (c) the waiver by the Reorganization Plan Debtors of any and all claims against DEMG based upon the payment by the Reorganization Plan Debtors of DEMG's allocable share of the costs of administering the Chapter 11 Cases incurred prior to the Reorganization Plan Effective Date.

Substantially all of DEMG's assets are subject to valid and perfected liens held by the DIP Lenders (as hereinafter defined), 2012 Senior Credit Agreement Lenders and the Senior Noteholders, which require payment in full prior to distributions to holders of unsecured claims against DEMG.   The Reorganization Plan provides that such liens shall be released on the Reorganization Plan Effective Date.   DEMG's principal asset is its $7,290,327.03 claim against RDA, with respect to which DEMG is expected to receive a cash distribution of approximately $250,000.   That distribution would be subject to the liens of the DIP Lenders, Senior Lenders and Senior Noteholders and would not be available for distribution to DEMG's unsecured creditors except that, pursuant to plan settlements and subject to the occurrence of the Reorganization Plan Effective Date, the Senior Noteholders have agreed to (1) waive their distribution pursuant to the FTC Stipulation (as defined herein) and (2) surrender their Notes under the Reorganization Plan.   Moreover, while the Senior Noteholders have a substantial unsecured claim against DEMG (resulting from the fact that their claims are not being satisfied in full under the Reorganization Plan), they have also agreed to waive their distribution on account of their *Pro Rata* share of cash otherwise distributable to general unsecured creditors of DEMG (but not their voting rights).   While a portion of the cash distribution to be received by DEMG under the Reorganization Plan may be consumed to pay higher priority administrative claims before payments can be made to DEMG's general unsecured creditors, the Parent Advance provides additional assurance that most, if not all, of the anticipated $250,000 distribution will be available for distribution to holders of Allowed General Unsecured Claims against DEMG.

Specifically, the DEMG Plan provides for monetization of DEMG's limited remaining property interests and the distribution of the proceeds to holders of Allowed Claims, including the distribution of all Available Cash (as defined in the DEMG Plan) to holders of Allowed General Unsecured Claims.   The Available Cash will be held in a segregated non-interest bearing account(s) maintained by Reader's Digest as Disbursing Agent.   Reasonable expenses incurred by Reader's Digest, as Disbursing Agent, shall be reimbursed by the Liquidating Debtor.

DEMG believes that Confirmation of the DEMG Plan, will maximize distributions to creditors and that any alternative plan or move to convert the DEMG Case to a case under chapter 7 of the Bankruptcy Code or dismissal of the DEMG Case could result in significant delays, litigation and additional costs.

The purpose of this Disclosure Statement is to provide holders of Claims entitled to vote to accept or reject the DEMG Plan with adequate information about (1) DEMG's business and certain historical events, (2) the DEMG Case and the Chapter 11 Cases, (3) the DEMG Plan, (4) the rights of holders of Claims and Equity Interests under the DEMG Plan, and (5) other information necessary to enable each holder of a Claim to make an informed judgment as to whether to vote to accept the DEMG Plan.

2

---

**THE DEBTOR URGES YOU TO VOTE IN FAVOR OF THE DEMG PLAN.**

---

## II.    INTRODUCTION

Pursuant to section 1125 of the Bankruptcy Code, DEMG submits this Disclosure Statement to all holders of Claims against, and Interests in, DEMG to provide information in connection with the solicitation of acceptances of the DEMG Plan.  The Disclosure Statement is organized as follows:

- Section I contains an executive summary.

- Section II includes certain general information.

- Section III provides an overview of DEMG's business.

- Section IV sets forth key events leading to DEMG's chapter 11 filings.

- Section V discusses the DEMG Case and the Chapter 11 Cases.

- Section VI contains a summary of the DEMG Plan.

- Section VII describes certain factors to be considered.

- Section VIII contains a disclaimer regarding tax consequences.

- Section IX addresses confirmation of the DEMG Plan.

- Section X concludes this Disclosure Statement and recommends that eligible creditors vote to accept the DEMG Plan.

### A.    DEMG'S PROFESSIONALS

Pursuant to separate orders of the Bankruptcy Court, DEMG has retained, in addition to certain other professionals, (1) Dickstein Shapiro LLP and Weil, Gotshal & Manges LLP, as their legal advisors; (2) Evercore Group L.L.C. ("**Evercore**"),[3] as their investment bankers; and (3) Epiq Bankruptcy Solutions, LLC ("**Epiq**," or the "**Voting Agent**"), as claims agent and administrative adviser. Contact information for these advisors is set forth below:

| **Weil, Gotshal & Manges LLP** 767 Fifth Avenue New York, New York 10153 (212) 310-8000 Attn: Marcia L. Goldstein, Esq.         Joseph H. Smolinsky, Esq. | **Dickstein Shapiro LLP** 1633 Broadway New York, New York 10019 (212) 277-6500 Attn: Barry N. Seidel, Esq. |
|---|---|

---

[3]    Evercore's services will be terminated upon the Reorganization Plan Effective Date.

| Epiq Bankruptcy Solutions, LLC | Evercore Group L.L.C. |
|---|---|
| 757 Third Avenue | 55 East 52nd Street |
| 3rd Floor | New York, New York 10055 |
| New York, New York 10017 | (212) 857-3100 |
| (646) 282-2500 | Attn: Qazi Fazal |
| Attn: James Katchadurian | |

## B.    IMPORTANT DATES

Please take note of the following important dates:

| | |
|---|---|
| Deadline to file and serve any objection or response to the DEMG Plan (the "**Objection Deadline**") | **October [___], 2013 at 4:00 p.m. (Eastern Time)** |
| Deadline for completed ballots to be received by the Voting Agent (the "**Voting Deadline**") | **October [___], 2013 at 4:00 p.m. (Eastern Time)** |
| Scheduled date and time for the commencement of the hearing to consider confirmation of the DEMG Plan (the "**Confirmation Hearing**") | **October [___], 2013 at 10:00 a.m. (Eastern Time)** |

## C.    BRIEF OVERVIEW OF THE DEMG PLAN[4]

The DEMG Plan described in this Disclosure Statement provides for the wind down of DEMG's affairs in accordance with Section 5 of the DEMG Plan, including the monetization of all property of the DEMG Estate, the distribution of funds to holders of Allowed Claims in accordance with the terms of the DEMG Plan, and the subsequent dissolution of DEMG.

The DEMG Plan implements several consensual settlement agreements that either fix or otherwise resolve certain Claims held by or asserted against DEMG, or provide funding to assist with the Wind Down of DEMG in accordance with the DEMG Plan. These agreements were negotiated among DEMG, the Reorganization Plan Debtors, the Creditors Committee, the FTC, and DEMG's major stakeholders, including Wells Fargo and the Ad Hoc Committee, and their respective professionals. The terms of the negotiated agreements are embodied in (a) the Stipulation and Order Pursuant to 11 U.S.C. §§ 105 and 502 Fixing and Allowing Claims of Federal Trade Commission and Granting Related Relief, dated May 28, 2013 and approved by the Bankruptcy Court by order dated July 1, 2013 (Case No. 13-22233, ECF No. 489) (the "**FTC Stipulation**"); (b) the Stipulation and Order Pursuant to 11 U.S.C. §§ 105 and 502 Fixing and Allowing Claims Between Direct Entertainment Media Group, Inc. and the Other Debtors, dated June 14, 2013 and approved by the Bankruptcy Court by order dated July 1, 2013 (Case No. 13-22233, ECF No. 407) (the "**DEMG Claim Stipulation**"); and (c) that certain Disbursing Agent

---

[4]    **This summary overview is qualified in its entirety by reference to the DEMG Plan**. Any statements as to the rationale underlying the treatment of Claims and Interests under the DEMG Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event that the DEMG Plan is not confirmed. You should read the DEMG Plan in its entirety before voting to accept or reject the DEMG Plan.

Agreement by and between DEMG and Reader's Digest, dated July 17, 2013 (as may be amended, supplemented or modified from time to time in accordance with the terms thereof, the "**Disbursing Agent Agreement**"). A copy of the Disbursing Agent Agreement is annexed to the DEMG Plan as **Exhibit 1**.

Pursuant to the DEMG Claim Stipulation, the Reorganization Plan Debtors and DEMG agreed that (i) DEMG shall have an allowed general unsecured claim against Reader's Digest in the amount of $7,290,327.03 (the "**DEMG Allowed Claim**"), and (ii) Reader's Digest shall advance up to $50,000 to for the benefit of DEMG to pay for costs and expenses incident to the administration of DEMG's chapter 11 case and/or implementation of the DEMG Plan.

The DEMG Claim Stipulation fully resolves all disputes between DEMG and the Reorganization Plan Debtors and established the DEMG Allowed Claim that will be the primary source of funding for the DEMG Plan. Such disputes include the protective claims filed by DEMG in an unliquidated amount against the Reorganization Plan Debtors that asserted possible claims based on, among other things, (a) potential preference and other avoidance actions pursuant to chapter 5 of the Bankruptcy Code and other applicable nonbankruptcy law, (b) transfers of liabilities related to the Federal Trade Commission and (c) contribution, reimbursement and/or indemnification pursuant to various lending and financing agreement (together with any other claims filed against the Reorganization Plan Debtors by DEMG, the "**DEMG Claims**"). The allowance of the DEMG Allowed Claim is in full and final satisfaction of all amounts due and owing by the Reorganization Plan Debtors or their affiliates with respect to the DEMG Claims, including without limitation, claims, if any, by DEMG against the Reorganization Plan Debtors for indemnification or contribution with respect to the FTC Complaint, the FTC Stipulated Judgment or the FTC Claims and claims for potential avoidance action transfers for, among other things, historic dividends. The DEMG Claim Stipulation further provides that the Reorganization Plan Debtors shall waive any and all claims against DEMG based upon the payment by the Reorganization Plan Debtors of DEMG's allocable share of the costs of administering the Chapter 11 Cases incurred prior to the Reorganization Plan Effective Date. Such stipulation ensures that the DEMG Estate shall have no liability for any Claims asserted under or in connection with the DIP Facility or the 2012 Senior Credit Agreement. Furthermore, pursuant to the FTC Stipulation, the Consenting Secured Noteholders (as defined therein) have agreed to waive any and all right to share in any distribution from the DEMG Estate on account of any claims arising under or relating to the Senior Notes.

Under the DEMG Plan, and except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of "Available Cash." As defined in the DEMG Plan, Available Cash shall be calculated, from to time, as that amount equal to (a) all Cash held, or received in the future, by the Liquidating Debtor and cash received from the disposition of assets or otherwise, minus (b)(i) the Wind Down Reserve ($25,000), (ii) those amounts necessary to pay Allowed Administrative Expense Claims, Allowed Secured Claims, Allowed Other Priority Claims and Allowed Priority Tax Claims in accordance with the DEMG Plan, and (iii) a reserve sufficient to pay Disputed Administrative Expense Claims, Disputed Secured Claims, Disputed Other Priority Claims and Disputed Priority Tax Claims, if such Claims were to be Allowed as

5

asserted, unless a reserve in a different amount is agreed to by DEMG and the affected claimholder or set by order of the Bankruptcy Court.

The proceeds of the DEMG Allowed Claim will be distributed to holders of Allowed Claims pursuant to the DEMG Plan, subject to the rights of administrative expense creditors to be paid in full. DEMG believes that the unused retainer fees held by DEMG's professionals who will provide services in connection with the confirmation and implementation of the DEMG Plan and the Wind Down, together with the Parent Advance will be adequate to pay all or substantially all administrative expenses arising after the Reorganization Plan Effective Date.

Existing holders of Equity Interests in DEMG shall retain such Interests, but will receive no distribution of any property of the Liquidating Debtor unless and until all Allowed General Unsecured Claims are paid in full.

After all distributions under the DEMG Plan have been made, and upon the entry of a Final Decree, the Liquidating Debtor shall be dissolved and all Equity Interests shall be cancelled and of no further effect. Section VI of this Disclosure Statement provides a more detailed description of the DEMG Plan.

### D.    SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY UNDER THE DEMG PLAN

The following table briefly summarizes the classification and treatment of Claims and Interests under the DEMG Plan, and the voting eligibility of the holders of such Claims and Interests:

| Class | Designation | Treatment | Eligible to Vote | Approx. % Recovery |
|-------|-------------|-----------|------------------|--------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) | 100% |
| 2 | Secured Claims | Impaired[5] | Yes | 100% |
| 3 | General Unsecured Claims | Impaired | Yes | 1% |
| 4 | Equity Interests | Impaired | Yes | n/a |

Section VI.B of this Disclosure Statement provides a more detailed description of the treatment of Claims and Interests under the DEMG Plan.

---

[5]    DEMG reserves the right to argue at the Confirmation Hearing that Class 2 (Secured Claims) is Unimpaired.

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes of claims or interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan. Classes of claims or interests in which the holders of claims are unimpaired under a proposed plan are deemed to have accepted such proposed plan and are not entitled to vote to accept or reject the DEMG Plan.

## E.    VOTING PROCEDURES

As set forth in more detail in Section VI.D of this Disclosure Statement, certain holders of Claims are entitled to vote to accept or reject the DEMG Plan. (Reader's Digest as the holder of all the Equity Interests, is the only entity entitled to vote in Class 4. Pursuant to the Disbursing Agent Agreement, Reader's Digest will vote to accept the DEMG Plan.) For each holder of a Claim entitled to vote, DEMG has enclosed with the Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote with respect to the DEMG Plan. Holders of more than one Claim will receive an individual ballot for each Claim. The individual ballots must be used to vote each individual Claim. For detailed voting instructions, please refer to the voting instructions enclosed with this Disclosure Statement and the ballot.

Return completed ballots to:

Via Regular Mail:

Direct Entertainment Media Group, Inc. Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC FDR Station,
P.O. Box 5014
New York, New York 10150-5014

Via Overnight Courier or Hand Delivery:

Direct Entertainment Media Group, Inc. Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, New York 10017

If you are a holder of a Claim entitled to vote on the DEMG Plan and you did not receive a ballot, received a damaged ballot, or lost your ballot or if you have any questions concerning the Disclosure Statement, the DEMG Plan, or the procedures for voting with respect to the DEMG Plan, please contact the Voting Agent at (866) 800-6639 (or, (503) 597-7673, if calling from outside of the United States).

---

**THE VOTING AGENT WILL NOT COUNT
ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE**.

---

F.     **ALTERNATIVES TO CONFIRMATION OF THE PLAN,
         INCLUDING CONFIRMATION UNDER SECTION 1129(b)**

If the DEMG Plan is not confirmed by the requisite majorities in number and amount required by section 1126 of the Bankruptcy Code or if any other requirement for confirmation under the Bankruptcy Code is not satisfied, DEMG may seek to pursue another strategy to wind down its affairs.  Other options that DEMG may consider in the event that the DEMG Plan is not confirmed include an alternative chapter 11 plan, a dismissal of its chapter 11 case and out-of-court dissolution, an assignment for the benefit of creditors or conversion to a chapter 7 case.

If a Class of Claims entitled to vote on the DEMG Plan rejects the DEMG Plan, DEMG reserves the right to amend the DEMG Plan or request confirmation of the DEMG Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and reasonable" with respect to each rejecting class.

G.     **CONFIRMATION HEARING**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **October [____], 2013 at 10:00 a.m. (Eastern Time)** before the Honorable Robert D. Drain at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, 1st Floor, Room 118, White Plains, New York 10601.

Objections and responses to confirmation of the DEMG Plan, if any, must be served and filed as to be received on or before the Objection Deadline, **October [____], 2013 at 4:00 p.m. (Eastern Time)**, in the manner described in the Disclosure Statement Order and Section IX.B of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

III.   **OVERVIEW OF DEMG**

A.     **PREPETITION CAPITAL STRUCTURE**

As of the Commencement Date, the Reorganization Plan Debtors[6] had outstanding funded debt obligations in the aggregate amount of approximately $534 million, which amount consists of (1) approximately $60 million in secured borrowings and outstanding letters of credit under the 2012 Senior Credit Agreement (as hereinafter defined), (2) approximately $464 million in principal amount of Senior Notes, and (3) approximately $10 million in principal amount of borrowing under the Unsecured Term Loan Agreement (as herein defined).  As a guarantor of

---

[6]     A description of the operations of the businesses of the Reorganization Plan Debtors is set forth in the Disclosure Statement for Second Amended Joint Plan of Reorganization of Certain Debtors Under Chapter 11 of the Bankruptcy Code filed by the Reorganization Plan Debtors in Case No. 13-22233 (RDD) (ECF No. 319).

the foregoing credit facilities (more particularly discussed below), DEMG was also liable as of the Commencement Date for approximately $534 million of funded debt obligations.[7]

### 1.    Senior Credit Agreement

On March 30, 2012, Reader's Digest entered into that certain Credit and Guarantee Agreement with Wells Fargo Bank, N.A., as administrative agent, the Guarantors (as therein defined, and including DEMG), and Wells Fargo, as lender and issuing lender (the "**2012 Senior Credit Agreement**"), providing Reader's Digest with a $50.0 million secured term loan (the "**2012 Senior Term Loans**") and an $11.0 million letter of credit facility (the "**Letter of Credit Facility**").

The 2012 Senior Term Loans under the 2012 Senior Credit Agreement bear interest at a variable rate per annum, based upon Reader's Digest's election of a prime rate or LIBOR (subject to a floor of 4.0% and 3.0%, respectively) plus 5.0% in the case of prime rate borrowings and 6.0% in the case of LIBOR borrowings.  The drawn letters of credit under the Letter of Credit Facility bear an interest rate of 7.0% per annum and the Letter of Credit Facility includes a utilization fee of 1.0% per annum, which will accrue on the total undrawn amount of the Letter of Credit Facility.  The obligations under the 2012 Senior Credit Agreement are fully and unconditionally guaranteed on a first-priority secured basis, jointly and severally by Reader's Digest, RDA Holding, by all other Reorganization Plan Debtors, and by DEMG.

As of December 31, 2012, there was approximately $49.8 million, in addition to letters of credit totaling approximately $9.5 million, outstanding under the 2012 Senior Credit Agreement.

### 2.    Senior Notes

On February 11, 2010, RD Escrow Corporation entered into an Indenture (the "**Indenture**") with Reader's Digest, RDA Holding, and substantially all of their then-existing wholly-owned direct and indirect domestic subsidiaries, Wells Fargo Bank, N.A., as trustee, and Wilmington Trust, National Association (f/k/a Wilmington Trust FSB), as collateral agent, pursuant to which RDA issued $525.0 million in principal amount of Senior Notes in a private offering under the Securities Act of 1933. The Senior Notes mature on February 15, 2017, and bear interest at a rate per annum equal to LIBOR (as defined, subject to a three-month LIBOR floor of 3.0%) plus 6.5%. The LIBOR component of the interest rate is reset quarterly and commenced on May 15, 2010.  As of December 31, 2012, there was approximately $464.4 million outstanding in respect of the Senior Notes. The obligations under the Indenture are fully and unconditionally guaranteed on a first-priority secured basis, jointly and severally by Reader's Digest, RDA Holding, by all the other Reorganization Plan Debtors, and by DEMG.

On June 15, 2012, in accordance with the requirements under the Indenture, RDA completed a cash tender offer to purchase up to $60.7 million of its Senior Notes, at a purchase

---

[7]    Since the Reorganization Plan Debtors were the principal beneficiaries of the borrowing under these loan facilities, the Reorganization Plan Debtors have reached an agreement with the holders of such claims (as set forth in the Reorganization Plan and the FTC Stipulation whereby they (and not DEMG) shall be responsible for satisfying such claims.

price of 95% of the principal amount thereof, plus accrued and unpaid interest thereon to the date of purchase, at a total cost of $58.1 million.

The Senior Notes and the obligations under the 2012 Senior Credit Agreement are secured by a first-priority security interest in substantially all of the assets of Reader's Digest and the Guarantors, including DEMG, in addition to a pledge of 65% of the equity of the Reorganization Plan Debtors' directly-owned first-tier Foreign Subsidiaries, in each case in accordance with and subject to the terms of that certain Security Agreement dated as of February 19, 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**").

The obligations under the 2012 Senior Credit Agreement and the Indenture are secured by a single collateral package and rank *pari passu* with each other, subject to the provisions of the Security Agreement, including section 5.5 thereof.  Upon the Reorganization Plan Effective Date, however, all outstanding amounts under the 2012 Senior Credit Agreement will be paid under certain first-out and second-out exit facilities as to which DEMG will not be a guarantor. At such time, the holders of Senior Notes will surrender the Senior Notes, in accordance with the Reorganization Plan, *provided however*, to the extent there exists a deficiency claim, such holders are entitled to vote to accept or reject the DEMG Plan, as a Class 3 (General Unsecured Claim) claimant on account of their Senior Noteholder Deficiency Claim.[8]

### 3.   Unsecured Term Loan

On August 12, 2011, the Reorganization Plan Debtors and DEMG entered into an unsecured term loan and guarantee agreement (the "**Unsecured Credit Agreement**") with Luxor Capital Group, LP ("Luxor"), as administrative agent, the Guarantors (as therein defined), and the other lenders thereunder, consisting of funds affiliated with Luxor and Point Lobos Capital ("**Point Lobos**"),[9] providing the Reorganization Plan Debtors and DEMG with a $10.0 million unsecured term loan (the "**Unsecured Term Loan**").  The Unsecured Term Loan matures in May 2014 and bears interest at the rate of 11.0% per annum.  As of December 31, 2012, there was $10.0 million outstanding under the Unsecured Term Loan.

In connection with the Unsecured Term Loan, the Reorganization Plan Debtors and DEMG issued two tranches of warrants to the lenders thereunder.  The estimated fair value of these warrants at December 31, 2012 and at the issuance date was zero and $2.9 million, respectively.

In addition, certain claimholders in the 2009 Restructuring (as herein defined) received warrants, pursuant to the terms of a warrant agreement, to acquire, subject to certain terms and conditions, shares of RDA Holding's common stock.  As of the Commencement Date, the estimated value of such warrants was zero.

---

[8]      The aggregate amount of Senior Noteholder Deficiency Claims is $244,923,799.20.  *See* Reorganization Plan Section 1.A.1.134.

[9]      Luxor and Point Lobos are also holders of RDA Holding's common stock.

On August 12, 2011, the Reorganization Plan Debtors and DEMG also entered into a term loan and guarantee agreement (the "**2011 Secured Credit Agreement**") with Luxor and Point Lobos, providing the Company with a $45.0 million secured term loan (the "**2011 Secured Term Loan**"). The 2011 Secured Term Loan would have matured in November 2013 and bore interest at the rate of 7.0% per annum. On March 6, 2012, the Reorganization Plan Debtors repaid the 2011 Secured Term Loan using net proceeds from the sale of the Allrecipes.com business (in February 2012). The repayment included $45.0 million to satisfy the principal debt, along with $5.0 million due under the early repayment provisions of the 2011 Secured Credit Agreement.

Pursuant to a settlement negotiated among the Reorganization Plan Debtors, the Creditors Committee and Luxor as administrative agent, the parties have agreed to a resolution of their claims in connection with the Unsecured Term Loan and the 2001 Secured Term Loan (the "**2011 Financing Settlement**") pursuant to which: (i) Luxor, as Unsecured Administrative Agent, will receive (a) an Allowed Class 4 General Unsecured Claim of $16,939,830.55 against Reader's Digest (which amount represents 1.67 times the amount of the outstanding principal and accrued but unpaid interest under the Unsecured Term Loan), for distribution purposes only, and shall waive any right to seek any further or additional distribution under the DEMG Plan, and (b) Allowed Class 4 General Unsecured Claims against Reader's Digest in the total aggregate amount of $1.00 against each of the other Reorganization Plan Debtors for voting purposes only; and (ii) the Unsecured Administrative Agent, the Unsecured Lenders, the 2011 Secured Administrative Agent and the 2011 Secured Lenders shall receive general releases by the Reorganization Plan Debtors, the other Released Parties and, to the extent authorized by the Bankruptcy Court, the holders of Claims against, and Interests in, the Reorganization Plan Debtors. As a consequence of the 2011 Financing Settlement, and based upon the Unsecured Lenders treatment in the confirmed Reorganization Plan, none of the Unsecured Administrative Agent, the Unsecured Lenders, the 2011 Secured Administrative Agent and the 2011 Secured Lenders hold any Claims against the DEMG Estate, and accordingly no such Claims have been classified in the DEMG Plan.

## B.    DEMG'S PRE-BANKRUPTCY OPERATIONS

In 2007, RDA was acquired in a leveraged buyout by Ripplewood, a private equity firm. At the time of the acquisition, Ripplewood owned the assets of Direct Holdings Americas, Inc. ("**DHA**") and certain related entities, and thereby held a worldwide license to market the well-known Time-Life series of books, videos and music offerings, which for many years had been marketed on television as one of the earliest direct response television efforts. After giving effect to the corporate transaction whereby Ripplewood acquired RDA, DHA and related entities became subsidiaries of RDA.

After the RDA acquisition, DHA, which was based in Fairfax, Virginia, continued to market Time-Life products. To achieve efficiencies of scale and eliminate redundancies, RDA provided DHA with back-office functions such as accounting, payroll and vendor payments. RDA did not directly manage the day-to-day operation of DHA, which continued to function largely as it had since 2003 when the Time-Life business was acquired from Time Inc. and Time Warner. In late 2008, some of the DHA executives were presented with the opportunity to license the rights to market the Ab Circle Pro fitness product ("**Ab Circle Pro**") in the United

States. The opportunity was deemed worthy of investigation, because it would leverage the existing direct response television expertise at DHA. Because DHA existed primarily to market books, videos and music under the Time-Life license, a new and independent corporation – DEMG – was created as a subsidiary of RDA to operate this different line of business. Furthermore, because the two direct response businesses conducted by DHA and DEMG were so different than the RDA business, they were placed into their own segment for business and financial reporting, known as Lifestyle and Entertainment Direct. By the end of 2011, all direct marketing of the Ab Circle Pro ceased and certain lifestyle and entertainment direct response product lines (including certain assets of DEMG) were thereafter sold in July 2012.

On August 24, 2009, DEMG and certain of the Reorganization Plan Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**2009 Restructuring**"). At that time, the principal factors that necessitated the commencement of the 2009 Restructuring included, among other things, burdensome debt obligations, reduced advertising and consumer spending, credit shortages, and increased postal and delivery costs. DEMG and the other affiliated debtors in the 2009 Restructuring emerged from chapter 11 in February 2010. Thereafter, continued downward trends in publishing and direct marketing undermined the ability of the affiliated companies, including DEMG, to stabilize. Although financial projections anticipated some decline in revenue, the actual declines occurred at rates higher than anticipated, and against factors the affiliated companies were not able to predict, including challenging economic environments in the international business segments.

## IV.   KEY EVENTS LEADING TO THE COMMENCEMENT OF DEMG'S CHAPTER 11 CASE

### A.   FTC CLAIM

On April 19, 2010, the FTC launched an investigation into DEMG's marketing of the Ab Circle Pro.

In connection with a negotiated settlement among DEMG, DHA (together, the "**DEMG Defendants**"), the FTC, and Reader's Digest, on August 22, 2012, the FTC commenced an action in the Southern District of Florida (Case No. 12-23065 (CMA)) by filing a complaint (the "**FTC Complaint**") alleging certain deceptive acts or practices and false advertisements by DEMG related to the marketing and sale of the Ab Circle Pro. The FTC Complaint did not allege any wrongdoing by Reader's Digest.

The FTC, the DEMG Defendants, and Reader's Digest memorialized their negotiated settlement in that certain *Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief Against Defendants Direct Holdings Americas, Inc. and Direct Entertainment Media Group, Inc., and Relief Defendant The Reader's Digest Association, Inc.*, entered August 28, 2012 (the "**Stipulated Judgment**"). Although the FTC Complaint did not allege any wrongdoing by Reader's Digest, Reader's Digest, nevertheless, agreed to be named in the Stipulated Judgment as a relief defendant, thereby making Reader's Digest jointly responsible for payment of the settlement amount.

Pursuant to the Stipulated Judgment, DEMG, as a direct defendant, and Reader's Digest, as relief defendant, jointly and severally agreed to a judgment of approximately $31.2 million. The Stipulated Judgment provided, however, that the aggregate amount to be paid by Reader's Digest and the DEMG Defendants would be reduced upon satisfaction of certain payment milestones and deadlines.  By complying with the milestones in the Stipulated Judgment, the DEMG Defendants and Reader's Digest would be responsible to make payments to the FTC in an aggregate amount ranging from approximately $14 million to $24 million based on the level of consumer redress requested by Ab Circle Pro purchasers.[10]  In the event that Reader's Digest and the DEMG Defendants failed to make a required payment when due, the entire $31.2 million judgment less any sums already paid by Reader's Digest and DEMG would become due.  As of the Commencement Date, the FTC had been paid $5 million pursuant to the Stipulated Judgment.

As a result of the commencement of the Chapter 11 Cases, the FTC has asserted a general unsecured claim against each of Reader's Digest and DEMG in the amount of $26,667,200. Specifically, the FTC asserts that, pursuant to Section V.C of the Stipulated Judgment, because Readers Digest and DEMG filed their respective Chapter 11 petitions on February 18, 2013 and failed to make a required $5 million judgment payment due on February 24 under the Stipulated Judgment, the amount the FTC is owed pursuant to the Stipulated Judgment is $26,667,200 - the difference between the entire judgment amount, $31,667,200, less the $5 million it previously paid to the FTC.  Inasmuch as DEMG has proposed a plan of liquidation and is not continuing in business, pursuant to section 1141(d)(3) of the Bankruptcy Code, neither the DEMG Plan nor any order confirming such plan will discharge any claims against DEMG.[11]

The FTC's claims against DEMG and the Reorganization Plan Debtors are addressed in the FTC Stipulation.  Pursuant to the FTC Stipulation, the Reorganization Plan Debtors, DEMG, and the FTC agreed that the FTC shall have an allowed, general unsecured claim in the amount of $26,667,200 in the chapter 11 case of DEMG and in the chapter 11 case of Reader's Digest. The Reorganization Plan Debtors further agreed to pay the FTC a one-time cash payment in the amount of $500,000 on the Reorganization Plan Effective Date.

Additionally, as a result of the Stipulated Judgment, Mosaic Media Investment Partners LLC ("**Mosaic**"), which purchased DHA as part of a transaction with RDA in July 2012, has asserted a general unsecured claim against Reader's Digest and DEMG.  Mosaic alleges that Reader's Digest and DEMG are liable to indemnify Mosaic for amounts that Mosaic may be required to pay in connection with the Stipulated Judgment.  Mosaic has asserted general unsecured claims against each of Reader's Digest and DEMG exceeding $31 million.  Pursuant to a certain stipulation entered into between Mosaic, Reader's Digest and DEMG, filed with the

---

[10]    The Stipulated Judgment further provided that the FTC (or its agents) would use the payments for consumer redress or other monetary equitable relief.  If the "Total Redress Amount," which is defined as the total amount of consumer redress plus the costs of administration, is greater than $15 million, Reader's Digest and the DEMG Defendants are required to pay up to $10 million in additional funds to the FTC, which would increase the aggregate amount from $14 million up to a maximum amount of $24 million.

[11]    The FTC would have asserted that the Stipulated Judgment was nondischargeable against DEMG, if DEMG was otherwise entitled to receive a bankruptcy discharge.

Bankruptcy Court on July 16, 2013, Mosaic, among other things, shall have an Allowed Claim against DEMG in the amount of $2,500,000, *if, and only if*, consent is obtained from the FTC with respect to the claim (which consent may be manifested through non-objection).

## V.    THE CHAPTER 11 CASES

### A.    FIRST DAY PLEADINGS

On the Commencement Date, or soon thereafter, the Reorganization Plan Debtors and DEMG filed certain "first-day" motions (collectively, the "**First Day Pleadings**") seeking certain immediate relief from the Bankruptcy Court that would allow the Reorganization Plan Debtors and DEMG to continue to operate in chapter 11 and avoid immediate and irreparable harm due to the commencement of the Chapter 11 Cases.  A description of the First Day Pleadings is set forth in the *Declaration of Robert E. Guth Pursuant to Local Bankruptcy Rule 1007-2*, dated February 17, 2012 (Case No. 13-22233-rdd, ECF No. 3).  By separate orders, the Bankruptcy Court granted the relief requested in the First Day Pleadings, on interim and/or final bases, as applicable.

### B.    DIP FACILITY

On February 18, 2013, the Reorganization Plan Debtors and DEMG filed a motion to approve a consensual, priming, debtor-in-possession credit facility (the "**DIP Facility**") in the aggregate principal amount of approximately $105 million, comprised of (1) a term loan in the aggregate principal amount of $45 million (the "**New Money Loan**"), and (2) a refinancing term loan and letter of credit facility in the aggregate amount of approximately $60 million (the "**Roll-Up Facility**" and, together with the New Money Loan, the "**DIP Loans**").

The Reorganization Plan Debtors and DEMG obtained postpetition financing pursuant to that certain Credit and Guarantee Agreement (the "**DIP Loan Agreement**"), dated as of February 22, 2013, by and among Reader's Digest, as borrower, its affiliated debtors, as guarantors, and Wilmington Trust, National Association, as administrative agent for the lenders party thereto (the "**DIP Lenders**").  The DIP Lenders are comprised of (1) certain Senior Noteholders party to a certain commitment letter, dated February 17, 2013, in respect of the New Money Loan, and (2) Wells Fargo, in respect of the Roll-Up Facility.

By order, dated February 21, 2013, the Bankruptcy Court approved the DIP Facility on an interim basis, authorizing the Reorganization Plan Debtors and DEMG to draw $11 million on account of the New Money Loan.  On March 25, 2013, the Bankruptcy Court entered a final order approving the DIP Facility.  Upon entry of the final order, the Reorganization Plan Debtors and DEMG drew the remaining $34 million available under the New Money Loan.  All amounts available under the Roll-Up Facility were drawn and used to repay in full all outstanding obligations under the 2012 Senior Credit Agreement.

The proceeds of the New Money Loan were applied to working capital and other general corporate purposes of the Reorganization Plan Debtors and DEMG, and the proceeds of the Roll-Up Facility were applied to amounts outstanding under the 2012 Secured Credit Agreement (including a roll-over of the letters of credit issued under the Letter of Credit Facility).  The DIP Loans are secured by a perfected first-priority, senior priming lien on all of the Collateral (as

defined in the DIP Loan Agreement) of the Reorganization Plan Debtors' and DEMG's respective estates in the Chapter 11 Cases, subject to a limited carve-out for fees pertaining to the cases. Further, the Reorganization Plan filed by the Reorganization Plan Debtors contemplates that the DIP Loans will be converted into exit financing upon consummation of the Reorganization Plan, in accordance with the terms and conditions set forth in the First Out Exit Term Sheet and the Second Out Exit Term Sheet.

### C.    CREDITORS COMMITTEE

On February 28, 2013, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed the Creditors Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in these Chapter 11 Cases. The members of the Creditors Committee include: (1) HCL America, Inc., (2) Quad/Graphics, Inc., and (3) Daniel Meehan. The Creditors Committee is represented by Otterbourg, Steindler, Houston & Rosen, P.C. As the Creditors Committee contains no creditors of DEMG it will be dissolved pursuant to the Reorganization Plan upon the Reorganization Plan Effective Date.

### D.    SCHEDULES AND BAR DATES

On March 14, 2013, the Reorganization Plan Debtors and DEMG filed a motion for entry of an order (1) establishing (a) May 6, 2013 at 5:00 p.m. (Eastern Time) as the deadline for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts, but not including governmental units to file proofs of claim in respect of a prepetition claim against any of the Reorganization Plan Debtors or DEMG, and (b) August 16, 2013 at 5:00 p.m. (Eastern Time) as the deadline for governmental units to file proofs of claim in respect of a prepetition claim against any of the Reorganization Plan Debtors or DEMG; (2) approving May 28, 2013 at 5:00 p.m. (Eastern Time) as the deadline for all parties, including governmental units, to file complaints, pursuant to section 523(c), including as may be incorporated under section 1141(d)(6)(A), of the Bankruptcy Code, to determine or challenge the dischargeability of any claim against, or debt of, any of the Reorganization Plan Debtors or DEMG; and (3) approving certain other related procedures. The Bankruptcy Court approved the relief set forth in the motion by order dated March 25, 2013 (Case No. 13-22233, ECF No. 165).

On March 18, 2013, the Reorganization Plan Debtors and DEMG filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "**Schedules**").

On July 2, 2013, DEMG filed an application for entry of an order (1) establishing **August 30, 2013 at 5:00 p.m. (Eastern Time)** as the deadline each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts, and governmental units to file proofs of claim in respect of Administrative Expense Claims against DEMG, and (2) approving certain other related procedures. The Bankruptcy Court approved the relief set forth in the motion by order dated July [_____], 2013 (Case No. 13-22233, ECF No. _____).

### E.   LIQUIDATION AND WIND-DOWN

After careful review, DEMG, in consultation with its advisors, has determined that a chapter 11 plan of liquidation is the best and most efficient way to wind down its business and maximize value for its creditors.

## VI.   THE LIQUIDATION PLAN

### A.   INTRODUCTION

This section of the Disclosure Statement summarizes the DEMG Plan, a copy of which is attached as **Exhibit A** hereto.   This summary is qualified in its entirety by reference to the provisions of the DEMG Plan.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the DEMG Plan, and contains other provisions necessary to implement the DEMG Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of Claims and Interests under the DEMG Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the DEMG Plan is not confirmed.

---

**YOU SHOULD READ THE DEMG PLAN IN ITS ENTIRETY
BEFORE VOTING TO ACCEPT OR REJECT THE DEMG PLAN.**

---

### B.   CLASSIFICATION AND TREATMENT OF
### CLAIMS AND INTERESTS UNDER THE DEMG PLAN

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.   This term is used throughout the DEMG Plan and the descriptions below.   In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.   Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.   However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed.   These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement.   In addition, Rule 3003(c)(2) of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**") prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are not necessarily classified together, nor are equity interests of a substantially similar legal nature necessarily classified together. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the DEMG Plan) or "unimpaired" (unaffected by the DEMG Plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the DEMG Plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the DEMG Plan (1) does not alter the legal, equitable and contractual rights of the holders, or (2) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the DEMG Plan. Accordingly, their votes are not solicited. Under the DEMG Plan, Class 1 (Other Priority Claims) is unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the DEMG Plan.

Class 2 (Secured Claims), Class 3 (General Unsecured Claims) and Class 4 (Equity Interests) are impaired under the DEMG Plan and are entitled to vote to accept or reject the DEMG Plan.

C.    **UNCLASSIFIED CLAIMS**

1.    **Administrative Expense Claims**

Administrative Expense Claims are the actual and necessary costs and expenses of administration during the DEMG Case pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (1) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the DEMG Estate and operating DEMG's business (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (2) Fee Claims and (3) all fees and

charges assessed against the Estates pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-1401.

Except to the extent that a holder of an Allowed Administrative Expense Claim and DEMG agree to different treatment, the Liquidating Debtor shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

## 2.   Fee Claims

All Entities seeking an award by the Bankruptcy Court of Fee Claims against DEMG (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the day that is forty-five (45) days after the Effective Date, (b) shall be paid in full by the Liquidating Debtor in such amounts as Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Liquidating Debtor. The Liquidating Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

## 3.   Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall be paid by the Liquidating Debtor (a) in full, in Cash, in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the day that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim becomes due and payable in the ordinary course, or (b) in equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim commencing on, or as soon thereafter as is reasonably practicable,  the later of the dates specified in clause (a), together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; provided that, in the case of clause (b), such payments must be made in a manner not less favorable than the most favored non-priority unsecured Claim provided for under the Plan, and DEMG reserves the right to prepay all or a portion of such Allowed Priority Tax Claim at any time.

As of the date hereof, the estimated Allowed amount for Priority Tax Claims is approximately $13,000.

18

4.      **DIP Claims**

Any and all DIP Claims against DEMG shall be satisfied in accordance with the provisions of the Reorganization Plan and the Liquidating Debtor shall have no liability with respect to the payment or other satisfaction of such Claims.

5.      **2012 Senior Credit Agreement Claims**

All obligations and claims in respect of the 2012 Senior Credit Agreement shall be satisfied in accordance with the provisions of the Reorganization Plan and the Liquidating Debtor shall have no liability with respect to the payment or other satisfaction of the 2012 Senior Credit Agreement Claims.

6.      **Roll-Up Loans**

The Roll-Up Loans and any related obligations shall be satisfied in accordance with the provisions of the Reorganization Plan and the Liquidating Debtor shall have no liability with respect to the payment or satisfaction of such Claims.

7.      **Indenture Trustee Fees**

Any and all Indenture Trustee Fees shall be satisfied in accordance with the provisions of the Reorganization Plan and the Liquidating Debtor shall have no liability with respect to the payment or other satisfaction of the Indenture Trustee Fees.

8.      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the DEMG Plan, nothing under the DEMG Plan shall affect the rights of DEMG, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

9.      **Elimination of Vacant Classes**

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the DEMG Plan for purposes of voting to accept or reject the DEMG Plan, and disregarded for purposes of determining whether the DEMG Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

D.      **CLASSIFIED CLAIMS AND INTERESTS**

1.      **Class 1 – Other Priority Claims**

Class 1 is Unimpaired by the DEMG Plan. Each holder of an Allowed Other Priority Claim against DEMG is conclusively presumed to have accepted the DEMG Plan pursuant to

section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the DEMG Plan.

Except to the extent that a holder of an Allowed Other Priority Claim against DEMG has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practical thereafter.

As of the date hereof, the estimated Allowed amount of Other Priority Claims is **$0**.

### 2.    Class 2 – Secured Claims

Class 2 consists of the all Secured Claims.  To the extent that Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

Class 2 is Impaired by the DEMG Plan.  Each holder of an Allowed Secured Claim against DEMG is entitled to vote to accept or reject the DEMG Plan; *provided, however,* that DEMG reserves the right to argue at the Confirmation Hearing that any or all of Class 2 (Secured Claims) is Unimpaired.

Except to the extent that a holder of an Allowed Secured Claim against DEMG has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive in full in Cash in full and final satisfaction of such Claim, at DEMG's option, either (i) Cash in an amount equal to such claim, payable on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim, or, in each case, as soon as reasonably practical thereafter, or (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under Section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

As of the date hereof, the estimated Allowed amount of Secured Claims is $0 after giving effect to the FTC Stipulation.

### 3.    Class 3 – General Unsecured Claims

Class 3 is Impaired by the DEMG Plan.  Each holder of an Allowed General Unsecured Claim against DEMG is entitled to vote to accept or reject the DEMG Plan.

On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim, shall receive its *Pro Rata* share of Available Cash; *provided, however*, that pursuant to the FTC Stipulation, the holders of Senior Noteholder Deficiency Claims have agreed to waive their distribution but shall be entitled to vote to accept or reject the DEMG Plan on account of their claims.

As of the date hereof, the estimated Allowed amount of General Unsecured Claims is approximately $30 million.

### 4.     Class 4 – Equity Interests

Class 4 is Impaired by the DEMG Plan.  Each holder of an Allowed Equity Interest is entitled to vote to accept or reject the DEMG Plan.

The holders of the Equity Interests shall retain such Interests, *provided, however*, that no distribution of any property of the Liquidating Debtor shall be made to such holder unless and until all Allowed General Unsecured Claims are paid in full with applicable interest and *provided, further*, that once all distributions under the DEMG Plan have been made, the Liquidating Debtor shall be dissolved and such Interests shall be cancelled and of no further effect.

### E.     MEANS OF IMPLEMENTATION OF PLAN

### 1.     Compromise and Settlement of Claims, Interests and Controversies

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the DEMG Plan, the provisions of the DEMG Plan will constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, including without limitation the Disbursing Agent Agreement, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of DEMG, its Estate, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the DEMG Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, DEMG may compromise and settle Claims against its Estate, and Causes of Action against other Entities.

### 2.     Wind Down

From and after the Effective Date, the Liquidating Debtor, subject to other provisions of the DEMG Plan, shall take such actions as may be reasonably calculated to maximize the recovery to holders of Claims.

The Liquidating Debtor shall have the power and authority to perform the following acts (together, the "**Wind Down**"), in addition to any powers granted by law or conferred by any other provision of the DEMG Plan and orders of the Bankruptcy Court; provided, however, that enumeration of the following powers shall not be considered in any way to limit or control the power of the Liquidating Debtor to act as specifically authorized by any other provision of the DEMG Plan or orders of the Bankruptcy Court, and to act in such manner as may be necessary or desirable to discharge all obligations assumed by the Liquidating Debtor as provided in the DEMG Plan, including without limitation and by example only:

(a)    determine tax issues or liabilities in accordance with section 505 of the Bankruptcy Code;

(b)    resolve any objections to the allowance or priority of Claims, Administrative Expenses Claims or Interests;

(c)    resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense Claims or Interest, pursuant to the DEMG Plan;

(d)    distribute Cash in the DEMG Estate to creditors consistent with the terms of the DEMG Plan;

(e)    perfect and secure the Liquidating Debtor's right, title and interest to property of the DEMG Estate;

(f)    manage and protect property of the DEMG Estate and distribute the net proceeds of the sale of such property consistent with the terms of the DEMG Plan;

(g)    purchase or continuance of insurance to protect the Liquidating Debtor and property of the DEMG Estate;

(h)    deposit DEMG funds, draw checks and make disbursements thereof consistent with the terms of the DEMG Plan;

(i)    employ, retain and compensate, and discharge and dismiss, without further order of the Bankruptcy Court, professionals as the Liquidating Debtor may deem necessary or desirable to assist in fulfilling the purposes of the DEMG Plan, including the continued retention and payment of professionals in connection with any ongoing litigation or other matters pursued or conducted by the Liquidating Debtor whether on an hourly, flat fee or contingency basis;

(j)    commence or prosecute in the name of the Liquidating Debtor any lawsuit or other legal or equitable action (except to the extent released pursuant to the terms of the DEMG Plan), including, without limitation, filing objections to, or estimation of, Claims, in any court of competent jurisdiction, which are necessary to carry out the terms and conditions of the DEMG Plan;

(k)    settle, compromise or adjust any disputes or controversies in favor of, or against, the Liquidating Debtor;

(l)    incur and pay all Plan expenses and reasonable costs and expenses incident to the performance of the duties of the Liquidating Debtor under the DEMG Plan, including without limitation, reasonable rent for office

space and storage, office supplies, travel and expense reimbursement, insurance, and other obligations;

(m)     prepare and file tax returns, as mandated by applicable local, state, federal and foreign law;

(n)     seek entry of a Final Decree at the appropriate time; and

(o)     take such other actions as the Liquidating Debtor may determine to be necessary or desirable to carry out the purpose of the DEMG Plan.

### 3.     Continued Corporate Existence

From and after the Effective Date through and including the date of its dissolution under applicable law, (a) the Liquidating Debtor will continue to exist as a separate corporation. Such corporate and (b) the Liquidating Debtor shall retain all of the powers of corporations under applicable non-bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence, provided that the Liquidating Debtor's sole purpose from and after the Effective Date will be to make distributions to creditors holding Allowed Claims consistent with the DEMG Plan and to otherwise effectuate the Wind Down.

### 4.     DEMG's Assets

(a)     *Assets Remaining in DEMG Estate*

Other than Cash, DEMG believes after reasonable investigation and diligence, that the following assets will remain in the DEMG Estate as of the Effective Date:

|      | Assets | DEMG Book Value | Estimated Realizable Cash Value |
|------|--------|-----------------|--------------------------------|
| i.   | Claims Against RDA and other Reorganization Plan Debtors | $7,290,327.03 | $250,000 |
| ii.  | Accounts Receivable | $0[12] | $0 |
| iii. | Inventory | $0[13] | $0 |
| iv.  | Postage Advance | $722 | $722 |
| v.   | Avoidance Actions | - | $0[14] |

---

[12]     Accounts receivable have a net balance of $0, on DEMG's balance sheet, based on aged accounts receivable with a gross of $230,000 that is fully reserved. From time to time DEMG collects inconsequential amounts of accounts receivables.

[13]     Inventory has a net balance of $0, on DEMG's balance sheet, based on $29,000 in gross inventory that is fully reserved. This inventory consists of Ab Circle Pro units and replacement parts, each respectively represent approximately one-half the gross value. There is minor usage activity in inventory each month for replacement parts.

[14]     Under the terms of the DEMG Plan, DEMG shall not retain any Claims or Causes of Actions arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims.

(b)     ***Disposition of DEMG Assets***

The Liquidating Debtor shall monetize all property of the DEMG Estate, subject to the following conditions:

i.      ***Court approval***.  Bankruptcy Court approval shall not be necessary for any disposition of property of the DEMG Estate if such property is sold for Cash for its fair market value in an arm's length transaction with a party unrelated to the Debtors.  All other dispositions of property of the DEMG Estate shall be subject to the Notice and Hearing Requirements.

ii.     ***Sale Proceeds***.  Except with Bankruptcy Court approval, all sales of property of the DEMG Estate shall be for Cash.

iii.    ***Abandonment***.  The Liquidating Debtor may abandon any property of the DEMG Estate which, in the exercise of its business judgment, the Liquidating Debtor reasonably believes is burdensome to the DEMG Estate or is of inconsequential value and benefit to the DEMG Estate.

## 5.     <u>Disbursing Agent</u>

The Disbursing Agent shall make all distributions required under the DEMG Plan in accordance with the Disbursing Agent Agreement, *provided however*, for the avoidance of doubt the Disbursing Agent shall have no obligation to reconcile claims.  Upon the Effective Date, Reader's Digest shall serve as the initial Disbursing Agent.  Except as otherwise provided in the Disbursing Agent Agreement, the Disbursing Agent shall be entitled to receive from the DEMG Estate reasonable compensation for its services as disbursing agent and shall be entitled to reimbursement of all of its reasonable out-of-pocket expenses incurred in connection with its services as Disbursing Agent.  All payments made to the Disbursing Agent shall be disclosed in the Final Report, but shall not be subject to Bankruptcy Court approval.

The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agent shall be reimbursed by the Liquidating Debtor, except as otherwise provided in the Disbursing Agent Agreement.

The Disbursing Agent shall hold the Available Cash in a segregated non-interest bearing account.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the DEMG Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the DEMG Plan.

Pursuant to the Disbursing Agent Agreement, in consideration for serving as the Disbursing Agent, Reader's Digest shall be entitled to certain indemnifications, exculpations and releases arising out of or relating to the Disbursing Agent Agreement and the services provided thereunder. *See* Section 2(f) of the Disbursing Agent Agreement.

### 6.   Allowance of Claims

(a)   *Generally*

All Claims and Interests asserted against the DEMG Estate shall be subject to allowance or disallowance in accordance with the Bankruptcy Code and Bankruptcy Rules, consistent with the process set forth in Section 7 of the DEMG Plan.

(b)   *The FTC Claim, Mosaic Claim and Senior Noteholder Deficiency Claim*

The principal general unsecured claims against DEMG are those asserted by FTC, Mosaic and the Senior Noteholders. Pursuant to the FTC Stipulation, the FTC's claim against DEMG has been allowed as a General Unsecured Claim in the amount of $26,667,200 and Senior Noteholders shall have a General Unsecured Claim for any deficiency claim arising from the Indenture, to which the Senior Noteholders have agreed to waive any distribution with respect to such claims. Pursuant to an agreement, in principle, reached among the Reorganization Plan Debtors, DEMG and Mosaic, Mosaic's claim against DEMG will be allowed as a General Unsecured Claim in the amount of $2,500,000.

### 7.   Distributions

All distributions to holders of Allowed Claims shall be made by the Disbursing Agent in accordance with Section 6 of the DEMG Plan and the Disbursing Agent Agreement.

### 8.   Governance

From and after the Effective Date, the Liquidating Debtor shall be managed and administered by its board of directors, so long as such board has at least one member. Any vacancies on the board of directors shall be filled in accordance with DEMG's organization documents. As of the Effective Date, the provisions of the DEMG Plan applicable to the corporate governance of the Liquidating Debtor shall supersede any contrary provision of the certificate of incorporation, bylaws, or certificate of incorporation of the Liquidating Debtor, which, pursuant to the DEMG Plan, are deemed amended to so provide.

### 9.   Cancellation of Liens

Except as otherwise specifically provided in the DEMG Plan with respect to Class 2, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Liquidating Debtor (including any Cash collateral) held by such holder and to take such actions as may be requested by the Liquidating Debtor, to evidence

the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Liquidating Debtor.

### 10.   Corporate Action

On the Effective Date, the matters under the DEMG Plan involving or requiring corporate action of DEMG, including but not limited to actions requiring a vote or other approval of DEMG's board of directors or shareholders, or the execution of any documentation incident to or in furtherance of the DEMG Plan shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of DEMG.

On the Effective Date, DEMG's charter shall be amended, if necessary, to include a provision prohibiting the issuance of nonvoting equity securities and such other provisions as may be required pursuant to section 1123(a)(6) of the Bankruptcy Code.  The Liquidating Debtor may prepare, execute and/or file with the Delaware Secretary of State and other state governmental authorities having jurisdiction over the Liquidating Debtor such amendments of its charter as may be necessary or appropriate under applicable non-bankruptcy law to fully effectuate such amendment.

Notwithstanding anything to the contrary in the DEMG Plan, neither the Disbursing Agent nor the Liquidating Debtor nor their respective officers and/or directors shall be liable as a result of any action taken in accordance with the provisions of the DEMG Plan, and after the entry of the Final Decree, neither its officers nor its directors shall have any responsibility for the Liquidating Debtor, including any further responsibility for the management, supervision, administration, liquidation, winding up, or cancellation of the charter of the Liquidating Debtor.

### 11.   Dissolution

Upon the completion of the Wind Down and the entry of a Final Decree, DEMG shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of DEMG or payments to be made in connection therewith; provided, however, that DEMG, or an agent on behalf of DEMG, shall file with the Office of the Delaware Secretary of State a certificate of dissolution which may be executed by an officer of DEMG, or an agent on behalf of DEMG, without the need for approval by any board of directors, stockholders, members, or managers as applicable.  From and after the date of the entry of the Final Decree, DEMG shall not be required to file any document, or take any other action, or obtain any approval from any DEMG board of directors, stockholders, members, or managers to withdraw DEMG's business operations from any state in which DEMG previously conducted business operations.

### 12.   Withholding and Reporting Requirements

(a)   *Withholding Rights.*  In connection with the DEMG Plan, any party issuing any instrument or making any distribution described in the DEMG Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the DEMG Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Each holder of

an Allowed Claim or any other Person that receives a distribution pursuant to the DEMG Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the DEMG Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    ***Forms.***  Any party entitled to receive any property as a distribution under the DEMG Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Liquidating Debtor (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Liquidating Debtor, the Disbursing Agent, or such other Person designated by the Liquidating Debtor and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Liquidating Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Liquidating Debtor or its respective property.

## 13.    **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Liquidating Debtor and the officers and members of the board of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the DEMG Plan in the name of and on behalf of the Liquidating Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the DEMG Plan.

## 14.    **Closing of the DEMG Case**

After the DEMG Estate has been fully administered, the Liquidating Debtor shall promptly seek a Final Decree.

## F.    **PROVISIONS GOVERNING DISTRIBUTIONS**

## 1.    **Distribution Record Date**

As of the close of business on the Distribution Record Date, the transfer register for each of the Classes of Claims or Interests as maintained by DEMG or its agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  DEMG shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

## 2.    **Date of Distributions**

Except as otherwise provided in the DEMG Plan, the Disbursing Agent shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and

thereafter, the Disbursing Agent shall from time to time determine the subsequent Distribution Dates, which shall occur no less frequently than semi-annually.  In the event that any payment or act under the DEMG Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Based upon DEMG's estimate that its general unsecured creditors will receive approximately 1% of their respective Allowed Claims, you should be aware that holders of any General Unsecured Claim Allowed for less than $2,500 will likely not receive a distribution on the Initial Distribution Date (since the DEMG Plan provides for an initial distribution of at least $25) and holders of any General Unsecured Claims Allowed for less than $500 will likely not receive any distribution (since the DEMG Plan provides that no distribution of less than $5 shall be made).  *See* Section 11 below, "Minimum Cash Distributions."

In the event the holders of Allowed General Unsecured Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Disbursing Agent shall make a final distribution of all remaining Available Cash to all holders of Allowed General Unsecured Claims.

### 3.     Cancellation of Senior Notes

Each record holder of a Senior Note Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled except to the extent otherwise provided in the DEMG Plan.  Such surrendered Senior Notes shall be cancelled solely with respect to DEMG, and such cancellation shall not alter the obligations or rights of any third parties vis-à-vis one another with respect to such Senior Notes.

### 4.     Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made by the Disbursing Agent.  In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter.  Undeliverable distributions or unclaimed distributions shall remain in the possession of the Liquidating Debtor until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Liquidating Debtor, as applicable, and shall not be supplemented with any interest, dividends or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of distribution.  After such date, all unclaimed property or interest in property shall revert to the Liquidating Debtor, and the claim of any holder to such property or interest in property shall be discharged and forever barred. Distributions to holders of General Unsecured Claims that are deemed unclaimed property pursuant to the preceding sentence shall be redistributed to the holders of Allowed General Unsecured Claims in accordance with Section 4.4 of the DEMG Plan.

### 5.      Manner of Payment Under Plan

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.      Setoffs

The Liquidating Debtor may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that DEMG may have against the holder of such Claim; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by DEMG of any such claim DEMG may have against the holder of such Claim.

### 7.      Distributions After Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 8.      Allocation of Distributions Between Principal and Interest

Except as otherwise provided in the DEMG Plan, to the extent that any Allowed Claim entitled to a distribution under the DEMG Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 9.      Maximum Distributions Allowed

No holder of an Allowed General Unsecured Claim shall receive distributions that aggregate more than the amount of such holder's Allowed General Unsecured Claim.

### 10.     Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such faction to the nearest whole cent, such Cash shall be treated as unclaimed property under the DEMG Plan.

### 11.     Minimum Cash Distributions

The Disbursing Agent shall not be required to make any Initial Distribution or subsequent distribution of Cash less than $25 to any holder of an Allowed General Unsecured Claim; provided, however, that if any distribution is not made pursuant to this section, such distribution shall be added to any subsequent distribution to be made on account of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $5 to any holder of an Allowed Claim.  If either (a) all Allowed General

Unsecured Claims (other than those whose distributions are deemed undeliverable under the DEMG Plan) have been paid in full or (b) the amount of any final distributions to holders of Allowed General Unsecured Claims would be $5 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $5,000, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Liquidating Debtor.

## G.   PROCEDURES FOR DISPUTED CLAIMS

### 1.   Allowance of Claims

After the Effective Date, DEMG shall have and shall retain any and all rights and defenses that DEMG had with respect to any Claim, except with respect to any Claim deemed Allowed under the DEMG Plan.  Except as expressly provided in the DEMG Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the DEMG Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

### 2.   Objections to Claims

As of the Effective Date, objections to, and requests for estimation of, Claims against DEMG may be interposed and prosecuted only by DEMG.  Such objections and requests for estimation shall be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Liquidating Debtor.

### 3.   Estimation of Claims

DEMG may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether DEMG previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, DEMG may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.    **No Distributions Pending Allowance**

If an objection to a Claim is filed as set forth in Section 7.2 of the DEMG Plan, no payment or distribution provided under the DEMG Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

5.    **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the DEMG Plan.  On the next Distribution Date after the date that any Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise), the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the DEMG Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

6.    **Resolution of Claims**

On and after the Effective Date, the Liquidating Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.    **Disallowed Claims**

All claims held by Persons or Entities against whom or which DEMG has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the DEMG Plan.  Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to DEMG from such party have been paid.

H.    **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.    **General Treatment**

All executory contracts and unexpired leases to which DEMG is a party are rejected as of the Effective Date, except for any executory contract or unexpired lease that is an insurance policy subject to Section 8.3 of the DEMG Plan.

2.    **Rejection Claims**

Unless a contract or lease is (a) specifically assumed or rejected by order of the Bankruptcy Court, (b) otherwise expressly assumed pursuant to the terms of the DEMG Plan, or (c) the subject of a separate assumption or rejection motion filed by DEMG, the Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts, in accordance with Section 8.1 of the DEMG Plan, effective as of the Effective Date. In the event that the rejection of an executory contract or unexpired lease by DEMG pursuant to

the DEMG Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed Proof of Claim, shall be forever barred and shall not be enforceable against DEMG, or its respective properties or interests in property as agents, successors or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Liquidating Debtor no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as Class 3 General Unsecured Claims.

### 3.    Insurance Policies

All insurance policies pursuant to which DEMG has any rights or obligations in effect as of the date of the Confirmation Order shall continue to be enforced and treated as being unaffected by the bankruptcy filing.

### 4.    Reservation of Rights

Nothing contained in the DEMG Plan will constitute an admission by DEMG that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that DEMG has any liability thereunder.

Nothing in the DEMG Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of DEMG under any executory or non executory contract or any unexpired or expired lease.

Nothing in the DEMG Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities DEMG under any executory or non executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, DEMG shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

## I.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### 1.    Conditions Precedent to Confirmation

The occurrence of Confirmation is subject to the following conditions precedent:

    (a)    the entry of the Disclosure Statement Order;

    (b)    the entry of the Confirmation Order; and

    (c)    the execution of the Disbursing Agent Agreement by the parties thereto.

## 2. Conditions Precedent to the Effective Date

The occurrence of the Effective Date of the DEMG Plan is subject to the following conditions precedent:

> (a)   the Confirmation Date shall have occurred and the Confirmation Order shall have become a Final Order; and
>
> (b)   the Reorganization Plan shall have been substantially consummated.

## 3. Waiver of Conditions Precedent

Each of the conditions precedent in Sections 9.1 and 9.2 of the DEMG Plan may be waived in writing by DEMG together with Bankruptcy Court approval.

## 4. Effect of Failure of Conditions to Effective Date

If the Confirmation Order is vacated, (i) no distributions under the DEMG Plan shall be made, (ii) DEMG and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all of DEMG's obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained in the DEMG Plan shall be deemed to constitute a waiver or release of any claims by or against DEMG or any other entity or to prejudice in any manner the rights of DEMG or any other entity in any further proceedings involving the DEMG Plan, DEMG or otherwise.

## J. EFFECT OF CONFIRMATION

### 1. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the DEMG Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, DEMG reserves the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

### 2. Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the DEMG Estate, shall remain vested in DEMG free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided pursuant to the DEMG Plan and the Confirmation Order.

### 3.     No Discharge of Claims

Except as otherwise provided in the DEMG Plan, with respect to unclaimed distributions and late filed Claims, DEMG shall not be discharged, pursuant to section 1141(d)(3)(A) of the Bankruptcy Code, from any Claim.  The Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the DEMG Plan or voted to reject the DEMG Plan.  All Entities shall be precluded from asserting against the Liquidating Debtor and the DEMG Estate, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

### 4.     Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 5.     Injunction Against Interference with Plan

From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, in the Bankruptcy Court or otherwise, on account of or respecting any Claim against, or Interest in, DEMG, except with respect to the allowance of such Claim or Interest in accordance with the DEMG Plan.

### 6.     Exculpation

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the DEMG Case, the negotiation and pursuit of the DEMG Plan, or the solicitation of votes for, or confirmation of, the DEMG Plan, the consummation of the DEMG Plan, or the administration of the DEMG Plan or the property to be distributed under the DEMG Plan, or any other transaction contemplated by the foregoing, except for willful misconduct or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the DEMG Plan; *provided, however*, that nothing in the DEMG Plan shall limit the liability of DEMG's professionals to its client pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009), and any other statutes, rules or regulation dealing with professional conduct to which such professionals are subject.

Additionally, under the terms of the Reorganization Plan the Exculpated Parties have been released from certain claims, obligations, causes of action and liabilities.  Additional information concerning the releases under the Reorganization Plan can be found in Section 10 of the Reorganization Plan.

Furthermore, pursuant to the Disbursing Agent Agreement, upon the Effective Date, the Disbursing Agent is hereby released and exculpated from any claim, obligation, cause of action or liability for any claim arising in connection with its duties under the Disbursing Agent Agreement.

## 7.    Releases

(a)    ***Releases by DEMG***.    Subject to Section 10.7(c) of the DEMG Plan, as of the Effective Date and to the fullest extent permitted by applicable law, for good and valuable consideration, including the services to facilitate the DEMG Plan, the Released Parties will be deemed released and discharged by DEMG, the Liquidating Debtor and the DEMG Estate from any and all Claims, obligations, rights suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that DEMG, the Liquidating Debtor or the DEMG Estate would have been legally entitled to assert, other than any act or omission that is a criminal act or constitutes intentional fraud; *provided, however*, that nothing in the DEMG Plan shall limit the liability of DEMG's professionals to its client pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009), and any other statutes, rules or regulation dealing with professional conduct to which such professionals are subject.

(b)    ***Releases by Holders of Claims.***    Subject to Section 10.7(c) of the DEMG Plan, as of the Effective Date and to the fullest extent permitted by applicable law, for good and valuable consideration, including the waiver by the Consenting Senior Noteholders of their right to receive distributions on account of their Claims, the release an discharge by the Consenting Lender, the Issuing Lender and the Roll-Up Lender of the liens and security interests granted by DEMG in connection with the 2012 Credit Agreement and the DIP Loan Agreement, and the Reorganization Plan Debtors' release of certain claims against DEMG, the Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert arising from, in whole or in part, any transaction with DEMG, the Liquidating Debtor or the DEMG Estate, other than any act or omission that is a criminal act or constitutes intentional fraud.

(c)    ***Obligations Under Plan Not Released.***    Notwithstanding anything in the DEMG Plan to the contrary, the Release provisions set forth above do not release any post-Effective Date obligations of any party under the DEMG Plan or any document, instrument or agreement executed to implement the DEMG Plan

## 8.    Retention of Causes of Action/Reservation of Rights

Although DEMG believes that, as a result of the DEMG Claim Stipulation, there are no Causes of Action of value left to pursue, out of an abundance of caution, the DEMG Plan provides as follows:

(a)      Except as otherwise provided the DEMG Plan, including Section 10.8, pursuant to section 1123(b) of the Bankruptcy Code, DEMG shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that DEMG or the DEMG Estate may hold against any Person or Entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against DEMG, its officers, directors or representatives; and (ii) the turnover of any property of the DEMG Estate; provided, however that DEMG shall not retain any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures).  DEMG or its successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of DEMG or its successor(s) who hold such rights.

(b)      Except as otherwise provided the DEMG Plan, including Section 10.8, nothing contained the DEMG Plan or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff or other legal or equitable defense which DEMG had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the DEMG Plan; *provided, however*, that DEMG shall not retain any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures).  DEMG shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the DEMG Plan as if the DEMG Case had not been commenced, and all of DEMG's legal and equitable rights respecting any Claim left Unimpaired by the DEMG Plan may be asserted after the Confirmation Date to the same extent as if the DEMG Case had not been commenced.

## 9.      Solicitation of the DEMG Plan

As of and subject to the occurrence of the Confirmation Date, DEMG shall be deemed to have solicited acceptances of the DEMG Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

## K.      RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the DEMG Case for, among other things, the following purposes:

(a)      to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases

and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the DEMG Plan;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the DEMG Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the DEMG Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the DEMG Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects the DEMG Plan;

(h)    to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the DEMG Plan or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the DEMG Plan or to maintain the integrity of the DEMG Plan following consummation;

(k)    to hear any disputes arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve

personal injury, employment litigation and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(l)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code for periods through the dissolution of DEMG);

(n)    to adjudicate, decide, or resolve any Causes of Actions;

(o)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(p)    to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(q)    to adjudicate any and all disputes arising from or relating to distributions under the DEMG Plan;

(r)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(s)    to enter a Final Decree closing the DEMG Case;

(t)    to recover all assets of the Liquidating Debtor and property of the DEMG Estates, wherever located; and

(u)    to hear and determine any rights, Claims or causes of action held by or accruing to DEMG pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## L.    **MISCELLANEOUS PROVISIONS**

### 1.    **Payment of Statutory Fees**

On the Effective Date and thereafter as may be required, DEMG shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the DEMG Case or until such time as a Final Decree is entered closing the DEMG Case, a Final Order converting the DEMG Case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing such the DEMG Case is entered.

### 2.    Substantial Consummation

On the Effective Date, the DEMG Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 3.    Dissolution of Creditors Committee

Unless dissolved earlier pursuant to the terms of the Reorganization Plan, the Creditors Committee shall be dissolved as of the Effective Date.

### 4.    Request for Expedited Determination of Taxes

DEMG shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

### 5.    Amendments

(a)    *Plan Modifications*.  The Plan may be amended, modified or supplemented by DEMG in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, DEMG may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the DEMG Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the DEMG Plan.

(b)    *Other Amendments*.  Before the Effective Date, DEMG may make appropriate technical adjustments and modifications to the DEMG Plan without further order or approval of the Bankruptcy Court; *provided, however*, that any such adjustments or modifications shall not materially and adversely affect the economic interests of any holder of a Claim or Interest.  In accordance with the Disbursing Agent Agreement, the Disbursing Agent Agreement may not be amended, modified or supplemented by Reader's Digest and DEMG without the consent of the Consenting Senior Noteholders.

### 6.    Effectuating Documents and Further Transactions

Each of the officers of DEMG is authorized, in accordance with his or her authority under the resolutions of DEMG's board of directors, to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the DEMG Plan.

### 7.    Revocation or Withdrawal of the DEMG Plan

DEMG may revoke or withdraw the DEMG Plan only if it is in the exercise DEMG's fiduciary duty.  If DEMG takes such action, the DEMG Plan shall be deemed null and void.  In such event, nothing contained in the DEMG Plan shall constitute or be deemed to be a waiver or

release of any Claims by or against DEMG or any other person or to prejudice in any manner the rights of DEMG or any person in further proceedings involving DEMG.

### 8. Severability of Plan Provisions upon Confirmation

If, before the entry of the Confirmation Order, any term or provision of the DEMG Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of DEMG, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the DEMG Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the DEMG Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the DEMG Plan and may not be deleted or modified without the consent of DEMG; and (3) nonseverable and mutually dependent.

### 9. Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under the DEMG Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 10. Time

In computing any period of time prescribed or allowed by the DEMG Plan, unless otherwise set forth in the DEMG Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 11. Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the DEMG Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of DEMG, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns.

### 12. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the DEMG Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

13.   **Entire Agreement**

On the Effective Date, the DEMG Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the DEMG Plan.

14.   **Notices**

All notices, requests and demands to or upon DEMG to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the DEMG Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i)   if to DEMG:

DIRECT ENTERTAINMENT MEDIA GROUP, INC.
c/o RDA Holding Co.
44 South Broadway
White Plains, New York 10601
Facsimile:      (914) 244-7810
Attn:   Andrea Newborn, Esq.

– and –

DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY 10019
Attn:   Barry N. Seidel, Esq.
          Katie L. Weinstein, Esq.
          Evan J. Zucker, Esq.
Telephone:   (212) 277-6500
Facsimile:   (212) 277-6501

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Joseph H. Smolinsky, Esq.
          Marcia L. Goldstein, Esq.
          Matthew P. Goren, Esq.
Telephone:   (212) 310-8000
Facsimile:   (212) 310-8007

(ii)   if to the Disbursing Agent:

THE READER'S DIGEST ASSOCIATION, INC.
44 South Broadway
White Plains, New York 10601
Attn:   William Magill, Esq.

After the Effective Date, DEMG has the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, DEMG is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## VII.   CERTAIN FACTORS TO BE CONSIDERED

### A.   CERTAIN BANKRUPTCY LAW CONSIDERATIONS

#### 1.   Risk of Non-Confirmation of the DEMG Plan

Although DEMG believes that the DEMG Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the DEMG Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

#### 2.   Non-Consensual Confirmation

In the event any impaired class of claims or interests entitled to vote on a plan does not accept the plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. *See* Section X.C.2 ("Requirements of Section 1129(b) of the Bankruptcy Code").  DEMG believes that the DEMG Plan satisfies these requirements.

#### 3.   Risk of Delay in Confirmation of the DEMG Plan

Although DEMG believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

### B.   ADDITIONAL FACTORS TO BE CONSIDERED

#### 1.   DEMG Has No Duty to Update

The statements contained in this Disclosure Statement are made by DEMG as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  DEMG has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 2.   No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to DEMG, its Chapter 11 Case, or the DEMG Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the DEMG Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 3.   No Legal or Tax Advice is Provided to You By This Disclosure Statement

The contents of this Disclosure Statement should **not** be construed as legal, business or tax advice. Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the DEMG Plan or object to confirmation of the DEMG Plan.

### 4.   No Admission Made

Nothing contained herein or in the DEMG Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the DEMG Plan on DEMG or on holders of Claims or Interests.

## VIII.  TAX CONSEQUENCES OF THE PLAN

DEMG HAS NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE, OR AN OPINION OF COUNSEL, WITH RESPECT TO ANY FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN. THUS, NO ASSURANCE CAN BE GIVEN AS TO ANY INCOME TAX CONSEQUENCES OF THE PLAN. EACH KNOWN HOLDER OF A CLAIM (OTHER THAN AN ADMINISTRATIVE OR PRIORITY CLAIM) OR EQUITY INTEREST IS A PARTY TO A SETTLEMENT AGREEMENT IMPLEMENTED BY THE PLAN AND IS REPRESENTED BY COUNSEL. ACCORDINGLY, THE TAX CONSEQUENCES OF THE PLAN TO SUCH HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE NOT DISCUSSED HEREIN. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN TAKING INTO ACCOUNT THEIR PARTICULAR CIRCUMSTANCES.

## IX.  CONFIRMATION OF THE PLAN

### A.   CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Court has

scheduled the Confirmation Hearing to commence on **October [___], 2013 at 10:00 a.m. (Eastern Time).** The Confirmation Hearing may be adjourned from time-to-time by DEMG or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.    OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Objections to confirmation of the DEMG Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the DEMG Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against DEMG's Estate or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to the chambers of The Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Room 118, White Plains, New York 10601, together with proof of service thereof, and served upon the parties listed below so as to be received no later than the Objection Deadline of **October [___], 2013 at 4:00 p.m. (Eastern Time)**:

| *Counsel to DEMG* | *Counsel to DEMG* |
|---|---|
| Dickstein Shapiro LLP<br>1633 Broadway<br>New York, New York 10019<br>Attn: Barry N. Seidel, Esq. | Weil, Gotshal & Manges<br>LLP 767 Fifth Avenue<br>New York, New York 10153<br>Attn: Marcia L. Goldstein, Esq.<br>       Joseph H. Smolinsky, Esq. |
| *Office of the U.S. Trustee*<br><br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn: Susan Golden, Esq.<br><br>and<br><br>271 Cadman Plaza East<br>Suite 4529<br>Brooklyn, New York 11201<br>Attn: Marylou Martin, Esq. | *DEMG*<br><br>c/o RDA Holding Co.<br>44 South Broadway<br>White Plains, New York 10601<br>Attn:  Andrea Newborn, Esq. |

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

### C.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER SECTION 1129(a) OF THE BANKRUPTCY CODE

#### 1.     General Requirements

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

<blockquote>

i.    The Plan complies with the applicable provisions of the Bankruptcy Code.

ii.   DEMG has complied with the applicable provisions of the Bankruptcy Code.

iii.  The Plan has been proposed in good faith and not by any means proscribed by law.

iv.   Any payment made or promised by DEMG or by a Person issuing securities or acquiring property under the DEMG Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the DEMG Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the DEMG Plan is reasonable, or if such payment is to be fixed after confirmation of the DEMG Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

v.    DEMG has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the DEMG Plan, as a director, officer or voting trustee of DEMG, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy.

vi.   With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the DEMG Plan or will receive or retain under the DEMG Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if DEMG was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See* discussion of "Best Interests Test" below.

vii.  Except to the extent the DEMG Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the DEMG Plan or is not impaired under the DEMG Plan.

</blockquote>

viii.    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the DEMG Plan provides that administrative expenses and priority claims will be paid in full on the Effective Date.

ix.     At least one class of impaired claims has accepted the DEMG Plan, determined without including any acceptance of the DEMG Plan by any insider holding a claim in such class.

x.      Confirmation of the DEMG Plan is not likely to be followed by the need for further financial reorganization of DEMG or any successor to DEMG under the DEMG Plan, unless such liquidation or reorganization is proposed in the DEMG Plan. *See* discussion of "Feasibility" below.

xi.     All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the applicable Plan, have been paid or the applicable Plan provides for the payment of all such fees on the Effective Date of the applicable Plan.

xii.    DEMG has not obligated themselves to provide such benefits, if any, for the continuation, after the Effective Date, of payment of all "retiree benefits" as defined in Section 1114 of the Bankruptcy Code.

## 2.    Best Interests Test

Notwithstanding acceptance of the DEMG Plan by a voting Impaired Class, in order to confirm the DEMG Plan, the Bankruptcy Court must still independently determine that the DEMG Plan is in the best interests of each Holder of a Claim or Equity Interest in any such Impaired Class which has not voted to accept the DEMG Plan, meaning that the DEMG Plan provides each such Holder with a recovery that has a value at least equal to the value of the recovery that each such Holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. Accordingly, if an Impaired Class does not vote unanimously to accept the DEMG Plan, the best interests test requires the Bankruptcy Court to find that the DEMG Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Equity Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtor was liquidated under chapter 7.

DEMG believes that the DEMG Plan satisfies the best interests test primarily because (i) the recoveries expected to be available to Holders of Allowed Claims under the DEMG Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, and (ii) in a liquidation no distribution would be made to holders of general unsecured creditors as all of DEMG's assets are encumbered by the liens of the Senior Noteholders and, even in the absence

46

of such liens, their claims (aggregating more than $400 million) would significantly dilute the recoveries of DEMG's other general unsecured creditors.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid. As stated above, in a DEMG chapter 7 case, there would be no unencumbered assets for distribution to general unsecured creditors.

Although the DEMG Plan effects a liquidation of DEMG's assets and a chapter 7 liquidation would achieve the same goal, DEMG believes that the DEMG Plan provides a greater recovery to holders of allowed unsecured claims than would a chapter 7 liquidation because the DEMG Plan includes the support of Reader's Digest (which would be withdrawn in a chapter 7 case). Thus, liquidating the assets of the DEMG Estate under the DEMG Plan will likely provide holders of allowed unsecured claims with a more timely, larger recovery because of the fees and expenses which would be incurred in a chapter 7 liquidation, including the potential added time and expense incurred by the trustee and any retained professionals in familiarizing themselves with DEMG's chapter 11 case and DEMG's assets and liabilities.

Accordingly, DEMG believes that the DEMG Plan is in the best interests of creditors.

3.    **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that the DEMG Plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. Since the DEMG Plan provides for the liquidation of DEMG and the wind down of its affairs, the Bankruptcy Court will find that the DEMG Plan is feasible if it determines that DEMG will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet its post-Effective Date obligations to pay for the costs of administering and fully consummating the DEMG Plan and closing its Chapter 11 Case.

DEMG believes that the DEMG Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code because the transactions contemplated in the DEMG Plan have maximized the value of DEMG's estate, increased the liquid assets available for the satisfaction of Claims, and will enable the distributions contemplated in the DEMG Plan. Additionally, it is anticipated that based upon the Parent Advance, the retainers held by DEMG's professionals, and the likelihood that Reader's Digest will agree to fund certain additional costs, that DEMG will not need to reserve any of the Available Cash for the administrative costs of the Wind Down in excess of the $25,000 Wind Down Reserve.

## X.    CONCLUSION AND RECOMMENDATION

DEMG believes that confirmation and implementation of the DEMG Plan is in the best interests of all creditors, and urges all holders of impaired Claims in Class 2 (Secured Claims), Class 3 (General Unsecured Claims) and Class 4 (Equity Interest) to vote to accept the DEMG Plan and to evidence such acceptance by returning their ballots so they will be received no later than the Voting Deadline, **October 11, 2013 at 4:00 p.m. (Eastern Time).**

Dated: White Plains, New York                    Respectfully submitted,
      July 17, 2013

By: _____
     Name: Andrea Newborn
     Title:  Secretary

48

# EXHIBIT A

**PLAN OF LIQUIDATION OF
DIRECT ENTERTAINMENT MEDIA GROUP, INC.
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:

**DIRECT ENTERTAINMENT MEDIA**                    Chapter 11
**GROUP, INC.**                                              Case No. 13-22236 (RDD)

                    **Debtor.**
-------------------------------------------------------------x

# PLAN OF LIQUIDATION OF
## DIRECT ENTERTAINMENT MEDIA GROUP, INC.
### PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**DICKSTEIN SHAPIRO LLP**
1633 Broadway
New York, New York 10019
Telephone:    (212) 277-6500
Facsimile:    (212) 277-6501


– and –


**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007

*Co-counsel for Direct Entertainment*
*Media Group, Inc.*

Dated: July 17, 2013

**THIS PLAN OF LIQUIDATION IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL. THIS PLAN OF LIQUIDATION HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN OF LIQUIDATION. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

## TABLE OF CONTENTS

SECTION 1.    **DEFINITIONS AND INTERPRETATION.** ........................................................1

    **A.**    **DEFINITION.** ......................................................................................1

        1.1.    *2012 Senior Credit Agreement* ...............................1

        1.2.    *Administrative Bar Date Order* ..............................1

        1.3.    *Administrative Expense Claim* ...............................1

        1.4.    *Allowed* ....................................................................1

        1.5.    *Available Cash* .........................................................1

        1.6.    *Bankruptcy Code* .....................................................2

        1.7.    *Bankruptcy Court* ....................................................2

        1.8.    *Bankruptcy Rules* ....................................................2

        1.9.    *Business Day* ............................................................2

        1.10.    *Cash* .........................................................................2

        1.11.    *Causes of Action* ......................................................2

        1.12.    *Chapter 11 Cases* .....................................................2

        1.13.    *Claim* ........................................................................2

        1.14.    *Class* .........................................................................2

        1.15.    *Commencement Date* ...............................................3

        1.16.    *Confirmation* ...........................................................3

        1.17.    *Confirmation Date* ...................................................3

        1.18.    *Confirmation Hearing* .............................................3

        1.19.    *Confirmation Order* .................................................3

        1.20.    *Consummation* .........................................................3

        1.21.    *Creditors Committee* ...............................................3

        1.22.    *Debtors* .....................................................................3

1.23.  *Debtors in Possession* ...................................................................3

1.24.  *DEMG* ......................................................................................3

1.25.  *DEMG Case* ...............................................................................3

1.26.  *DEMG Estate* .............................................................................3

1.27.  *DIP Agent* .................................................................................3

1.28.  *DIP Loan* ..................................................................................3

1.29.  *Disbursing Agent* .......................................................................4

1.30.  *Disbursing Agent Agreement* ......................................................4

1.31.  *Disclosure Statement* .................................................................4

1.32.  *Disclosure Statement Order* ........................................................4

1.33.  *Disputed Claim* ..........................................................................4

1.34.  *Distribution Date* .......................................................................4

1.35.  *Distribution Record Date* ............................................................4

1.36.  *Effective Date* ...........................................................................4

1.37.  *Entity* ......................................................................................4

1.38.  *Equity Interest* ..........................................................................4

1.39.  *Exculpated Parties* ....................................................................4

1.40.  *Fee Claim* .................................................................................5

1.41.  *File, Filed, or Filing* ..................................................................5

1.42.  *Final Decree* .............................................................................5

1.43.  *Final Order* ...............................................................................5

1.44.  *Final Report* .............................................................................5

1.45.  *FTC* .........................................................................................5

1.46.  *FTC Action* ...............................................................................5

1.47.  *FTC Claims* ...............................................................................5

1.48.  *FTC Settlement Order* ...................................................................5

1.49.  *FTC Stipulation* ...........................................................................5

1.50.  *General Unsecured Claim* .............................................................5

1.51.  *Impaired* .....................................................................................6

1.52.  *Indenture* ....................................................................................6

1.53.  *Indenture Trustee* ........................................................................6

1.54.  *Indenture Trustee Fees* ................................................................6

1.55.  *Initial Distribution* ......................................................................6

1.56.  *Initial Distribution Date* ..............................................................6

1.57.  *Interests* ......................................................................................6

1.58.  *Lien* ............................................................................................6

1.59.  *Liquidating Debtor* ......................................................................6

1.60.  *Notice and Claims Agent* .............................................................6

1.61.  *Notice and Hearing Requirements* ...............................................6

1.62.  *Other Priority Claim* ....................................................................6

1.63.  *Parent Advance* ...........................................................................7

1.64.  *RDA Holding* ...............................................................................7

1.65.  *Person* .........................................................................................7

1.66.  *Plan* ............................................................................................7

1.67.  *Priority Tax Claim* .......................................................................7

1.68.  *Proof of Claim* .............................................................................7

1.69.  *Proof of Interest* ..........................................................................7

1.70.  *Pro Rata* ......................................................................................7

1.71.  *Reader's Digest* ...........................................................................7

1.72.  *Released Parties* ..........................................................................7

1.73.   *Releasing Parties* ...................................................................8

1.74.   *Reorganization Plan* ..............................................................8

1.75.   *Reorganization Plan Debtors* ................................................8

1.76.   *Security* ...................................................................................8

1.77.   *Secured Claim* .........................................................................8

1.78.   *Senior Credit Agreement Claim* ...........................................8

1.79.   *Senior Noteholder Deficiency Claim* ....................................8

1.80.   *Senior Noteholders* .................................................................9

1.81.   *Senior Notes* ............................................................................9

1.82.   *Subordinated Securities Claims* ............................................9

1.83.   *Tax Code* ..................................................................................9

1.84.   *Unimpaired* ..............................................................................9

1.85.   *Unsecured Term Lenders* .......................................................9

1.86.   *Unsecured Term Loan* ............................................................9

1.87.   *Unsecured Term Loan Claim* .................................................9

1.88.   *Wind Down* ..............................................................................9

1.89.   *Wind Down Reserve* ...............................................................9

B.      **Interpretation; Application of Definitions and Rules of Construction.** ...........9

C.      **Reference to Monetary Figures.** ...................................................10

D.      **Controlling Document.** ..................................................................10

SECTION 2.   **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.** ...................10

2.1.    *Administrative Expense Claims.* ...........................................10

2.2.    *Fee Claims.* .............................................................................11

2.3.    *Priority Tax Claims.* ..............................................................11

2.4.    *Indenture Trustee Fees.* .........................................................11

iv

SECTION 3.    **CLASSIFICATION OF CLAIMS AND INTERESTS.** ...................................11

    3.1.    ***Summary of Classification.*** ........................................................11

    3.2.    ***Special Provision Governing Unimpaired Claims.*** ...................................12

    3.3.    ***Elimination of Vacant Classes.*** ........................................12

SECTION 4.    **TREATMENT OF CLAIMS AND INTERESTS.** ...........................................12

    4.1.    ***Other Priority Claims (Class 1).*** ...............................................12

    4.2.    ***Secured Claims (Class 2).*** ........................................................13

    4.3.    ***General Unsecured Claims (Class 3).*** ........................................13

    4.4.    ***Equity Interests (Class 4).*** ........................................................13

SECTION 5.    **MEANS FOR IMPLEMENTATION.** ...........................................14

    5.1.    ***Wind Down.*** ........................................................14

    5.2.    ***Continued Corporate Existence.*** ........................................15

    5.3.    ***Disposition of Assets.*** ........................................................16

    5.4.    ***Disbursing Agent.*** ........................................................16

    5.5.    ***Allowance of Claims.*** ........................................................17

    5.6.    ***Distributions.*** ........................................................17

    5.7.    ***Governance.*** ........................................................17

    5.8.    ***Cancellation of Liens.*** ........................................................17

    5.9.    ***Corporate Action.*** ........................................................17

    5.10.    ***Dissolution.*** ........................................................18

    5.11.    ***Withholding and Reporting Requirements.*** ...............................18

    5.12.    ***Effectuating Documents; Further Transactions.*** ...................................19

    5.13.    ***Closing of the DEMG Case.*** ........................................................19

SECTION 6.    **DISTRIBUTIONS.** ........................................................19

    6.1.    ***Distribution Record Date.*** ........................................................19

v

6.2.  *Date of Distributions.* ...................................................................19

6.3.  *Cancellation of Senior Notes.* ........................................................20

6.4.  *Delivery of Distributions.* ..............................................................20

6.5.  *Manner of Payment Under Plan.* ....................................................20

6.6.  *Setoffs.* ..........................................................................................20

6.7.  *Distributions After Effective Date.* ................................................20

6.8.  *Allocation of Distributions Between Principal and Interest.* .................21

6.9.  *Maximum Distributions Allowed.* ..................................................21

6.10.  *Rounding of Payments.* .................................................................21

6.11.  *Minimum Cash Distributions* .........................................................21

SECTION 7.  **PROCEDURES FOR DISPUTED CLAIMS.** ...............................21

7.1.  *Allowance of Claims.* .....................................................................21

7.2.  *Objections to Claims.* ....................................................................22

7.3.  *Estimation of Claims.* ....................................................................22

7.4.  *No Distributions Pending Allowance.* .............................................22

7.5.  *Distributions After Allowance.* ......................................................22

7.6.  *Resolution of Claims.* ....................................................................22

7.7.  *Disallowed Claims.* ........................................................................23

SECTION 8.  **EXECUTORY CONTRACTS AND UNEXPIRED LEASES.** .........23

8.1.  *General Treatment.* ........................................................................23

8.2.  *Rejection Claims.* ..........................................................................23

8.3.  *Insurance Policies.* ........................................................................23

8.4.  *Reservation of Rights.* ...................................................................23

SECTION 9.  **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.** ........24

9.1.  *Conditions Precedent to Confirmation.* ..........................................24

9.2.   *Conditions Precedent to the Effective Date.* ...........................................24

9.3.   *Waiver of Conditions Precedent.* ................................................24

9.4.   *Effect of Failure of Conditions to Effective Date.* .................................24

SECTION 10. **EFFECT OF CONFIRMATION.**..........................................................25

10.1.   *Subordinated Claims.* ..........................................................25

10.2.   *Vesting of Assets.* .............................................................25

10.3.   *No Discharge of Claims.* ......................................................25

10.4.   *Term of Injunctions or Stays.* .................................................25

10.5.   *Injunction Against Interference with Plan.* ...................................25

10.6.   *Exculpation.* ..................................................................26

10.7.   **Releases** ....................................................................26

10.8.   *Retention of Causes of Action/Reservation of Rights.*..........................27

10.9.   *Solicitation of the Plan.* ......................................................27

SECTION 11. **RETENTION OF JURISDICTION.**....................................................28

SECTION 12. **MISCELLANEOUS PROVISIONS.**...................................................30

12.1.   *Payment of Statutory Fees.* ....................................................30

12.2.   *Substantial Consummation.* ...................................................30

12.3.   *Dissolution of Creditors Committee.* ...........................................30

12.4.   *Request for Expedited Determination of Taxes.* ................................30

12.5.   *Amendments.* ..................................................................30

12.6.   *Effectuating Documents and Further Transactions.* ............................31

12.7.   *Revocation or Withdrawal of the Plan.* ........................................31

12.8.   *Severability of Plan Provisions upon Confirmation.* ...........................31

12.9.   *Governing Law.* ................................................................31

12.10.  *Time.* ..........................................................................31

12.11.  *Immediate Binding Effect.* ........................................................................32

12.12.  *Successor and Assigns.* ............................................................................32

12.13.  *Entire Agreement.* ...................................................................................32

12.14.  *Notices.* .................................................................................................32

**EXHIBIT 1    Disbursing Agent Agreement**

Direct Entertainment Media Group, Inc. (hereinafter either "**DEMG**" or the "**Liquidating Debtor**") proposes the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code.[1]

## SECTION 1.    DEFINITIONS AND INTERPRETATION.

### A.    DEFINITION.

1.1.    ***2012 Senior Credit Agreement*** means that certain Credit and Guarantee Agreement, dated as of March 30, 2012, by and among Reader's Digest as borrower, RDA Holding and each of the guarantors named therein including DEMG, Wells Fargo Principal Lending, LLC, as issuing lender, each of the other banks and lending institutions as lenders thereunder, and Wells Fargo Bank, National Association, as administrative agent.

1.2.    ***Administrative Bar Date Order*** means an order of the Bankruptcy Court fixing the deadline by which all Proofs of Claim for Administrative Expense Claims must be Filed.

1.3.    ***Administrative Expense Claim*** means any Claim against DEMG for costs and expenses of administration arising during the DEMG Case pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the DEMG Estate and operating the business of DEMG (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) Fee Claims; and (c) all fees and charges assessed against the DEMG Estate pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-1401.

1.4.    ***Allowed*** means, with reference to any Claim against or Interest in DEMG, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof, or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Interest as to which the liability of DEMG and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court or (c) any Claim or Interest expressly allowed hereunder; *provided, however*, that notwithstanding the foregoing, DEMG shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan.

1.5.    ***Available Cash*** means that Cash available for distribution to holders of Allowed General Unsecured Claims and shall be calculated, from to time, as that amount equal to (a) all Cash held, or received in the future by the Liquidating Debtor and cash received through the disposition of assets or otherwise, minus (b)(i) the Wind Down Reserve, (ii) those amounts necessary to pay Allowed Administrative Expense Claims, Allowed Secured Claims, Allowed Other Priority Claims and Allowed Priority Tax Claims in accordance with the Plan, and (iii) a reserve sufficient to pay Disputed Administrative Expense Claims, Disputed Secured

---

[1]        Capitalized terms used herein shall have the meanings set forth in Section 1.A.

Claims, Disputed Other Priority Claims and Disputed Priority Tax Claims, if such Claims were to be Allowed as asserted, unless a reserve in a different amount is agreed to by DEMG and the affected claimholder or set by order of the Bankruptcy Court.

1.6.     ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.7.     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.8.     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.9.     ***Business Day*** means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.10.     ***Cash*** means legal tender of the United States of America.

1.11.     ***Causes of Action*** means any action, claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.12.     ***Chapter 11 Cases*** means the Debtors' jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on or about February 17, 2013, and continuing immediately thereafter, in the Bankruptcy Court and styled *In re RDA Holding Co., et. al.*, Case No. 13- 22233 (RDD).

1.13.     ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code

1.14.     ***Class*** means any group of Claims or Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code.

1.15.   ***Commencement Date*** means February 17, 2013 the date on which DEMG filed its voluntary petition for reorganization relief under chapter 11 of the Bankruptcy Code.

1.16.   ***Confirmation*** means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

1.17.   ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.18.   ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.19.   ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.20.   ***Consummation*** means the occurrence of the Effective Date of the Plan.

1.21.   ***Creditors Committee*** means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

1.22.   ***Debtors*** means collectively, the Reorganization Plan Debtors and DEMG.

1.23.   ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.24.   ***DEMG*** means Direct Entertainment Media Group, Inc., in its capacity as debtor, Debtor in Possession or the Liquidating Debtor, as the case may be.

1.25.   ***DEMG Case*** means DEMG's case under chapter 11 of the Bankruptcy Code, designated as Case No. 13-22236 (RDD), and jointly administered as one of the Chapter 11 Cases.

1.26.   ***DEMG Estate*** means the estate of DEMG created under section 541 of the Bankruptcy Code.

1.27.   ***DIP Agent*** means Wilmington Trust, National Association, as administrative agent for the DIP Lenders under the DIP Loan Agreement, as its permitted successor and assign.

1.28.   ***DIP Loan*** means that certain credit and guarantee agreement, dated as of February 22, 2013, as amended, supplemented, restated or otherwise modified, by and among, Reader's Digest, as borrower, RDA Holding and each of RDA Holding's direct and indirect domestic subsidiaries party thereto, as guarantors, the DIP Agent, Issuing Lender, the Roll-Up Lender and the New Money Lenders (each as defined in the Reorganization Plan).

3

1.29. **_Disbursing Agent_** means Reader's Digest acting in its capacity as a disbursing agent under Section 5.4 hereof or such other designee named by DEMG, *provided however*, that any such designee must be approved by the Bankruptcy Court.

1.30. **_Disbursing Agent Agreement_** means that certain agreement entered into by and between DEMG and Reader's Digest, dated July 17, 2013, and attached to the Plan as Exhibit 1, wherein Reader's Digest, inter alia, agreed to accept responsibility for acting as Disbursing Agent under the Plan.

1.31. **_Disclosure Statement_** means the Disclosure Statement for the Plan, which is prepared and distributed in accordance with sections 1125, 1126(b), and/or 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and/or other applicable law.

1.32. **_Disclosure Statement Order_** means an order entered by the Bankruptcy Court finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code.

1.33. **_Disputed Claim_** means with respect to a Claim or Interest, any such Claim or Interest (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503, or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Interest for payment has been made, to the extent DEMG or any party in interest has interposed a timely objection or request for estimation before the Confirmation Date in accordance with the Plan, which objection or request for estimation has not been withdrawn or determined by a Final Order.

1.34. **_Distribution Date_** means such date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.35. **_Distribution Record Date_** means the Effective Date of the Plan.

1.36. **_Effective Date_** means the date on which all conditions to the effectiveness of the Plan as set forth in Section 9.2 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.37. **_Entity_** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.38. **_Equity Interest_** means any Interest in DEMG that existed immediately before the Commencement Date.

1.39. **_Exculpated Parties_** means collectively: (a) DEMG; (b) the Creditors Committee; and (c) with respect to each of the foregoing entities, such entities' predecessors, successors and assigns, subsidiaries and affiliates, and current and former officers and directors, principals, shareholders, members, agents, financial advisors, attorneys, accountants, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

1.40.   **Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by DEMG or the Creditors Committee pursuant to sections 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.41.   **File, Filed, or Filing** means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or with respect to the filing of a Proof of Claim or Proof of Interests, the Notice and Claims Agent.

1.42.   **Final Decree** has the meaning set forth in Bankruptcy Rule 3022.

1.43.   **Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.44.   **Final Report** means the report Filed after the DEMG Estate is fully administered in furtherance of the Liquidating Debtor's motion for a Final Decree.

1.45.   **FTC** means the United States Federal Trade Commission.

1.46.   **FTC Action** means that certain action styled *Federal Trade Commission v. Fitness Brands, Inc., et al.*, Case No. 12-23065-CMA (S.D. Fl. 2012).

1.47.   **FTC Claims** means a General Unsecured Claim in the amount of $26,667,200, allowed pursuant to the FTC Stipulation.

1.48.   **FTC Settlement Order** means the Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief Against Defendants Direct Holdings Americas, Inc., and DEMG, and Relief Defendant Reader's Digest, dated August 27, 2012, entered in the FTC Action.

1.49.   **FTC Stipulation** means a certain stipulation dated May 28, 2013 and approved by an order of the Bankruptcy Court dated June 28, 2013.

1.50.   **General Unsecured Claim** means any unsecured Claim against DEMG that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including without limitation, any FTC Claims and any Senior Noteholder Deficiency Claims.

1.51.    ***Impaired*** means, with respect to a Claim, Interest or Class of Claims or Class of Interests, "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.52.    ***Indenture*** means that certain Indenture, dated as of February 11, 2010 among RD Escrow Corporation, Reader's Digest, RDA Holding, and the subsidiary guarantors thereunder, the Indenture Trustee, and Wilmington Trust, National Association (as successor to Wilmington Trust FSB), as collateral agent.

1.53.    ***Indenture Trustee*** means Wilmington Trust, National Association (as successor by appointment to Wells Fargo Bank, National Association) in its capacity as the indenture trustee under the Indenture, and its permitted successors and assigns.

1.54.    ***Indenture Trustee Fees*** means the reasonable compensation, fees, expenses, disbursements and indemnity claims arising under the Indenture, including attorneys' and agents' fees, expenses, and disbursements, incurred under the Indenture by the Indenture Trustee, whether prior to or after the Commencement Date and whether prior to or after the Consummation of the Reorganization Plan.

1.55.    ***Initial Distribution*** means the first distribution that the Disbursing Agent makes to holders of Allowed Claims.

1.56.    ***Initial Distribution Date*** means the date occurring on or as soon as reasonably practicable after the Effective Date on which the Disbursing Agent makes the Initial Distribution to holders of Allowed Claims, but in no event more than sixty (60) days after DEMG receives a distribution pursuant to the Reorganization Plan on account of its allowed, general unsecured claim against the Reorganization Plan Debtors.

1.57.    ***Interests*** means any equity security in DEMG as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an ownership interest in DEMG, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in DEMG that existed immediately before the Effective Date.

1.58.    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.59.    ***Liquidating Debtor*** means DEMG on and after the Effective Date.

1.60.    ***Notice and Claims Agent*** means Epiq Bankruptcy Solutions, Inc., in its capacity as notice and claims agent for the Debtors.

1.61.    ***Notice and Hearing Requirements*** has the meaning set forth in section 102(1) of the Bankruptcy Code.

1.62.    ***Other Priority Claim*** means any Claim against DEMG, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.63.    ***Parent Advance*** means such amounts advanced by Reader's Digest, pursuant to the FTC Stipulation, to or for the benefit of DEMG for the purpose of paying DEMG's costs and expenses of implementing or administering the Plan or in effectuating the Wind Down, *provided, however*, that Reader's Digest's obligation to make such advances shall be limited to, and capped at, $50,000 in the aggregate, and shall be conditional on DEMG having insufficient cash or other resources (excluding (i) distributions made or to be made to DEMG pursuant to the Reorganization Plan, and (ii) the proceeds of any sale or other disposition of any DEMG assets) to pay such costs and expenses in full. Nothing herein contained shall limit or otherwise impair Reader's Digest's ability, in its sole discretion, to make advances to DEMG in excess of $50,000. To the extent that the proceeds of any Parent Advances held by DEMG have not been disbursed upon the entry of a Final Decree, such undisbursed proceeds shall be immediately turned over to Reader's Digest.

1.64.    ***RDA Holding*** means RDA Holding Co.

1.65.    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.66.    ***Plan*** means this chapter 11 plan of liquidation, including the attached exhibit, as the same may be amended or modified from time to time in accordance with Section 12.5 herein.

1.67.    ***Priority Tax Claim*** means any secured or unsecured Claim against DEMG of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.68.    ***Proof of Claim*** means a proof of Claim Filed against DEMG in the Chapter 11 Cases.

1.69.    ***Proof of Interest*** means a proof of Interest Filed against DEMG in the Chapter 11 Cases.

1.70.    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Class under the Reorganization Plan.

1.71.    ***Reader's Digest*** means The Reader's Digest Association, Inc.

1.72.    ***Released Parties*** means, collectively, (a) the Disbursing Agent, (b) the Reorganization Plan Debtors, (c) the Consenting Senior Noteholders, (d) the Consenting Lender, (e) the Issuing Lender, (f) the Roll-Up Lender, (g) the Creditors Committee, and (h) with respect to each of (a) through (h) above, their respective directors, officers, shareholders, partners, members, employees, agents, affiliates, parents, predecessors, successors, attorneys, financial

7

advisors, investment bankers, accountants and other professionals or representatives when acting in such capacities.[2]

1.73.    ***Releasing Parties*** means, collectively (a) the Creditors Committee and the members thereof and (b) each holder of a Claim that affirmatively votes to accept the DEMG Plan, each solely in its capacity as such.

1.74.    ***Reorganization Plan*** means the Second Amended Joint Plan of Reorganization of Certain Debtors Under Chapter 11 of the Bankruptcy Code, Filed by the Reorganization Plan Debtors, as amended or modified from time to time, and as confirmed by the Bankruptcy Court by order dated June 28, 2013.

1.75.    ***Reorganization Plan Debtors*** means RDA Holding Co., The Reader's Digest Association, Inc., Ardee Music Publishing, Inc.; Pegasus Sales, Inc.; Pleasantville Music Publishing, Inc.; R.D. Manufacturing Corporation; Reiman Manufacturing, LLC; RD Publications, Inc.; Home Service Publications, Inc.; RD Large Edition, Inc.; RDA Sub Co. (f/k/a Books Are Fun, Ltd.); Reader's Digest Children's Publishing, Inc.; Reader's Digest Consumer Services, Inc.; Reader's Digest Entertainment, Inc.; Reader's Digest Financial Services, Inc.; Reader's Digest Latinoamerica, S.A.; WAPLA, LLC; Reader's Digest Sales and Services, Inc.; Taste of Home Media Group, LLC; Reiman Media Group, LLC; Taste of Home Productions, Inc.; World Wide Country Tours, Inc.; W.A. Publications, LLC; WRC Media, Inc.; RDCL, Inc. (f/k/a CompassLearning, Inc.); RDA Digital, LLC; RDWR, Inc. (f/k/a Weekly Reader Corporation); Haven Home Media, LLC (f/k/a Reader's Digest Sub Nine, Inc.); Weekly Reader Custom Publishing, Inc. (f/k/a Lifetime Learning Systems, Inc.); and World Almanac Education Group, Inc.

1.76.    ***Security*** means any security, as such term is defined in section 101(49) of the Bankruptcy Code.

1.77.    ***Secured Claim*** means a Claim against DEMG (other than an Administrative Expense Claim, a Priority Tax Claim or a 2012 Senior Credit Agreement Claim) to the extent (i) secured by property of the DEMG Estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and DEMG, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.78.    ***Senior Credit Agreement Claim*** means a Secured Claim, derived from, based upon, relating to or arising from the 2012 Senior Credit Agreement.

1.79.    ***Senior Noteholder Deficiency Claim*** means the General Unsecured Claims of the Senior Noteholders relating to or arising from the Indenture, in the total aggregate amount of $244,923,799.20.

---

[2]     With respect to (c) through (f), above, such terms used but not defined herein, are each defined in the Reorganization Plan.

1.80.    ***Senior Noteholders*** means the respective beneficial holders of the Senior Notes.

1.81.    ***Senior Notes*** means the Series A and Series B Floating Rate Senior Secured Notes due 2017 issued under the Indenture.

1.82.    ***Subordinated Securities Claims*** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of DEMG, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.83.    ***Tax Code*** means the Internal Revenue Code of 1986, as amended from time to time.

1.84.    ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.85.    ***Unsecured Term Lenders*** means the holders of Unsecured Term Loan Claims.

1.86.    ***Unsecured Term Loan*** means that certain unsecured term loan credit and guarantee agreement, dated as of August 12, 2011, among RDA Holding, Reader's Digest, the other guarantors named thereunder, the lenders party thereto, and Luxor Capital Group, LP, as administrative agent.

1.87.    ***Unsecured Term Loan Claim*** means, pursuant to the 2011 Financing Settlement (as such term is defined in the Reorganization Plan), the General Unsecured Claims to be Allowed as Class 3 General Unsecured Claims, derived from, based upon, relating to or arising from the Unsecured Term Loan.

1.88.    ***Wind Down*** means the wind down of DEMG's affairs in accordance with the Plan, as such term is defined in Section 5.1.

1.89.    ***Wind Down Reserve*** means the sum of (a) $25,000 or such other amount determined by the Bankruptcy Court, subject to the Notice and Hearing Requirement, for the purpose of determining Available Cash until the final Distribution Date, and (b) thereafter, zero ($0) dollars.

B.    **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes of the Plan: (1) in the appropriate

9

context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

D.    **Controlling Document.**

In the event of an inconsistency between the Plan and the Disclosure Statement, the Plan shall control in all respects (unless stated otherwise in the Plan). The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, that* if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

SECTION 2.  **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

2.1.    *Administrative Expense Claims.*

(a)    ***Bar Date.***   Any Entity that has and wishes to assert an Administrative Expense Claim (other than a Fee Claim) against DEMG shall be obligated to timely file a Proof of Claim therefor in accordance with the procedures set forth by the Bankruptcy Court in the Administrative Bar Date Order, failing which such Entity shall be forever barred from seeking payment of such Claim or otherwise seeking to enforce its rights with respect to such Claim against DEMG.

(b)    ***Payment.***   Except to the extent that a holder of an Allowed Administrative Expense Claim and DEMG agree to different treatment, the Liquidating Debtor shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

### 2.2.    *Fee Claims.*

All Entities seeking an award by the Bankruptcy Court of Fee Claims against DEMG (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the day that is forty-five (45) days after the Effective Date, (b) shall be paid in full by the Liquidating Debtor in such amounts as Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the date upon which the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Liquidating Debtor. The Liquidating Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall be paid by the Liquidating Debtor (a) in full, in Cash, in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the day that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim becomes due and payable in the ordinary course, or (b) in equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim commencing on, or as soon thereafter as is reasonably practicable,   the later of the dates specified in clause (a), together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; provided that, in the case of clause (b), such payments must be made in a manner not less favorable than the most favored non-priority unsecured Claim provided for under the Plan, and DEMG reserves the right to prepay all or a portion of such Allowed Priority Tax Claim at any time.

### 2.4.    *Indenture Trustee Fees.*

Any and all Indenture Trustee Fees shall be satisfied in accordance with the provisions of the Reorganization Plan and the Liquidating Debtor shall have no liability with respect to the payment or other satisfaction of the Indenture Trustee Fees.

## SECTION 3.    **CLASSIFICATION OF CLAIMS AND INTERESTS.**

### 3.1.    *Summary of Classification.*

The following table designates the Classes of Claims against, and Interests in, DEMG and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  All of the potential Classes of Claims and Interests are set forth herein.  Based upon the confirmation of the Reorganization Plan and the treatment provided thereunder to the Claims of Senior Noteholders

and the Claims of the Unsecured Term Lenders, Senior Noteholders do not have a Secured Claim, and the Unsecured Term Lenders do not have a General Unsecured Claim, against DEMG, and, accordingly, no such Claims have been classified.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Secured Claims | Impaired[3] | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4 | Equity Interests | Impaired | Yes |

### 3.2.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of DEMG, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.3.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### SECTION 4.    **TREATMENT OF CLAIMS AND INTERESTS.**

### 4.1.    *Other Priority Claims (Class 1).*

(a)    *Classification*: Class 1 consists of all Other Priority Claims.

(b)    *Treatment*: Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim,

---

[3]    DEMG reserves the right to argue at the Confirmation Hearing that Class 2 (Secured Claims) is Unimpaired.

payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practical thereafter.

(c)    *Voting*: Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

### 4.2.    *Secured Claims (Class 2).*

(a)    *Classification*: Class 2 consists of all Secured Claims. To the extent that Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)    *Treatment*: Except to the extent that a holder of an Allowed Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Secured Claim shall receive in full and final satisfaction of such Claim, at DEMG's option, either (i) Cash in amount equal to such Claim, payable on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim, or, in each case, as soon as reasonably practical thereafter, or (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under Section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(c)    *Voting*: Class 2 is Impaired, and holders of Secured Claims in Class 2 are entitled to vote to accept or reject the Plan; *provided, however*, that DEMG reserves the right to argue at the Confirmation Hearing that Class 2 (Secured Claims) is Unimpaired.

### 4.3.    *General Unsecured Claims (Class 3).*

(a)    *Classification*: Class 3 consists of all General Unsecured Claims.

(b)    *Treatment*: On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim, shall receive its *Pro Rata* share of Available Cash, *provided, however*, that the holders of Senior Noteholder Deficiency Claims have waived their distribution pursuant to the FTC Stipulation.

(c)    *Voting*: Class 3 is Impaired, and holders of General Unsecured Claims in Class 3 are entitled to vote to accept or reject the Plan. For the avoidance of doubt, the holders of Senior Noteholder Deficiency Claims are entitled to vote to accept or reject the Plan as holders of General Unsecured Claims in Class 3.

### 4.4.    *Equity Interests (Class 4).*

(a)    *Classification*: Class 4 consists of all Equity Interests.

(b)    *Treatment*: The holder of the Equity Interests shall retain such Interests, *provided, however,* that no distribution of any property of the Liquidating Debtor shall be made to such holder unless and until all General Unsecured Claims are paid in full with applicable interest and *provided, further*, that once all distributions under the Plan have been made, the Liquidating Debtor shall be dissolved and such Interests shall be cancelled and of no further effect.

(c)    *Voting*: Class 4 is Impaired, and holders of Equity Interests in Class 4 are entitled to vote to accept or reject the Plan.

SECTION 5.    **MEANS FOR IMPLEMENTATION.**

5.1.    ***Wind Down.***

From and after the Effective Date, the Liquidating Debtor, subject to other provisions of this Plan, shall take such actions as may be reasonably calculated to maximize the recovery to holders of Claims.

The Liquidating Debtor shall have the power and authority to perform the following acts (together, the "**Wind Down**"), in addition to any powers granted by law or conferred by any other provision of the Plan and orders of the Bankruptcy Court; *provided, however,* that enumeration of the following powers shall not be considered in any way to limit or control the power of the Liquidating Debtor to act as specifically authorized by any other provision of the Plan or orders of the Bankruptcy Court, and to act in such manner as may be necessary or desirable to discharge all obligations assumed by the Liquidating Debtor as provided herein, including without limitation and by example only:

(a)    determine tax issues or liabilities in accordance with section 505 of the Bankruptcy Code;

(b)    resolve any objections to the allowance or priority of Claims, Administrative Expenses Claims or Interests;

(c)    resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense Claims or Interests pursuant to the Plan;

(d)    distribute Cash in the DEMG Estate to creditors consistent with the terms of the Plan;

(e)    perfect and secure the Liquidating Debtor's right, title and interest to property of the DEMG Estate;

(f)    manage and protect property of the DEMG Estate and distribute the net proceeds of the sale of such property consistent with the terms of the Plan;

(g) purchase or continue insurance to protect the Liquidating Debtor and property of the DEMG Estate;

(h) deposit DEMG funds, draw checks and make disbursements thereof consistent with the terms of the Plan;

(i) employ, retain and compensate, and discharge and dismiss, without further order of the Bankruptcy Court, professionals as the Liquidating Debtor may deem necessary or desirable to assist in fulfilling the purposes of the Plan, including the continued retention and payment of professionals in connection with any ongoing litigation or other matters pursued or conducted by the Liquidating Debtor whether on an hourly, flat fee or contingency basis;

(j) commence or prosecute in the name of the Liquidating Debtor any lawsuit or other legal or equitable action (except to the extent released pursuant to the terms of the Plan), including, without limitation, filing objections to, or estimation of, Claims, in any court of competent jurisdiction, which are necessary to carry out the terms and conditions of the Plan;

(k) settle, compromise or adjust any disputes or controversies in favor of, or against, the Liquidating Debtor;

(l) incur and pay all Plan expenses and reasonable costs and expenses incident to the performance of the duties of the Liquidating Debtor under the Plan, including without limitation, reasonable rent for office space and storage, office supplies, travel and expense reimbursement, insurance, and other obligations;

(m) prepare and file tax returns, as mandated by applicable local, state, federal and foreign law;

(n) seek entry of a Final Decree at the appropriate time; and

(o) take such other actions as the Liquidating Debtor may determine to be necessary or desirable to carry out the purpose of the Plan.

5.2.    ***Continued Corporate Existence.***

From and after the Effective Date through and including the date of its dissolution under applicable law, (a) the Liquidating Debtor will continue to exist as a separate corporation, and (b) the Liquidating Debtor shall retain all of the powers of corporations under applicable non-bankruptcy law, and without prejudice to any right to amend its charter, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence, provided that the Liquidating Debtor's sole purpose from and after the Effective Date will be to make

distributions to creditors holding Allowed Claims consistent with the Plan and to otherwise effectuate the Wind Down.

### 5.3. *Disposition of Assets.*

The Liquidating Debtor shall monetize all property of the DEMG Estate, subject to the following conditions:

(a) *Court approval.* Bankruptcy Court approval shall not be necessary for any disposition of property of the DEMG Estate if such property is sold for Cash for its fair market value in an arm's length transaction with a party unrelated to the Debtors. All other dispositions of property of the DEMG Estate shall be subject to the Notice and Hearing Requirements.

(b) *Sale Proceeds.* Except with Bankruptcy Court approval, all sales of property of the DEMG Estate shall be for Cash.

(c) *Abandonment.* The Liquidating Debtor may abandon any property of the DEMG Estate which, in the exercise of its business judgment, the Liquidating Debtor reasonably believes is burdensome to the DEMG Estate or is of inconsequential value and benefit to the DEMG Estate.

### 5.4. *Disbursing Agent.*

The Disbursing Agent shall make all distributions required under this Plan in accordance with the Disbursing Agent Agreement, *provided however*, for the avoidance of doubt the Disbursing Agent shall have no obligation to reconcile claims. Upon the Effective Date, Reader's Digest shall serve as the initial Disbursing Agent pursuant to the Disbursing Agent Agreement. Except as otherwise provided in the Disbursing Agent Agreement, the Disbursing Agent shall be entitled to receive from the DEMG Estate reasonable compensation for its services as disbursing agent and shall be entitled to reimbursement of all of its reasonable out-of-pocket expenses incurred in connection with its services as Disbursing Agent. All payments made to the Disbursing Agent shall be disclosed in the Final Report, but shall not be subject to Bankruptcy Court approval.

The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agent shall be reimbursed by the Liquidating Debtor, except as otherwise provided in the Disbursing Agent Agreement.

The Disbursing Agent shall hold the Available Cash in a segregated non-interest bearing account.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Pursuant to the Disbursing Agent Agreement, in consideration for serving as the Disbursing Agent, Reader's Digest shall be entitled to certain indemnifications, exculpations and releases arising out of or relating to the Disbursing Agent Agreement and the services provided thereunder. *See* Section 2(f) of the Disbursing Agent Agreement.

### 5.5. *Allowance of Claims.*

All Claims and Interests asserted against the DEMG Estate shall be subject to allowance or disallowance in accordance with the Bankruptcy Code and Bankruptcy Rules, consistent with the process set forth in Section 7 of this Plan.

### 5.6. *Distributions.*

All distributions to holders of Allowed Claims shall be made by the Disbursing Agent in accordance with Section 6 of this Plan and the Disbursing Agent Agreement.

### 5.7. *Governance.*

From and after the Effective Date, the Liquidating Debtor shall be managed and administered by its board of directors, so long as such board has at least one member. Any vacancies on the board of directors shall be filled in accordance with DEMG's organization documents. As of the Effective Date, the provisions of this Plan applicable to the corporate governance of the Liquidating Debtor shall supersede any contrary provision of the certificate of incorporation, bylaws, or certificate of incorporation of the Liquidating Debtor, which are hereby deemed amended to so provide.

### 5.8. *Cancellation of Liens.*

Except as otherwise specifically provided herein with respect to Class 2, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Liquidating Debtor (including any Cash collateral) held by such holder and to take such actions as may be requested by the Liquidating Debtor, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Liquidating Debtor.

### 5.9. *Corporate Action.*

On the Effective Date, the matters under the Plan involving or requiring corporate action of DEMG, including but not limited to actions requiring a vote or other approval of DEMG's board of directors or shareholders, or the execution of any documentation incident to or in furtherance of the Plan shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of DEMG.

On the Effective Date, DEMG's charter shall be amended, if necessary, to include a provision prohibiting the issuance of nonvoting equity securities and such other provisions as may be required pursuant to section 1123(a)(6) of the Bankruptcy Code. The Liquidating Debtor

may prepare, execute and/or file with the Delaware Secretary of State and other state governmental authorities having jurisdiction over the Liquidating Debtor such amendments of its charter as may be necessary or appropriate under applicable non-bankruptcy law to fully effectuate such amendment.

Notwithstanding anything to the contrary in the Plan, neither the Disbursing Agent nor the Liquidating Debtor nor their respective officers and/or directors shall be liable as a result of any action taken in accordance with the provisions of the Plan, and after the entry of the Final Decree, neither its officers nor its directors shall have any responsibility for the Liquidating Debtor, including any further responsibility for the management, supervision, administration, liquidation, winding up, or cancellation of the charter of the Liquidating Debtor.

### 5.10. *Dissolution.*

Upon the completion of the Wind Down and the entry of a Final Decree, DEMG shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of DEMG or payments to be made in connection therewith; *provided, however,* that DEMG, or an agent on behalf of DEMG, shall file with the Office of the Delaware Secretary of State a certificate of dissolution which may be executed by an officer of DEMG, or an agent on behalf of DEMG, without the need for approval by any board of directors, stockholders, members, or managers as applicable.  From and after the date of the entry of the Final Decree, DEMG shall not be required to file any document, or take any other action, or obtain any approval from any DEMG board of directors, stockholders, members, or managers to withdraw DEMG's business operations from any state in which DEMG previously conducted business operations.

### 5.11. *Withholding and Reporting Requirements.*

(a)    ***Withholding Rights.***    In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.   Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    ***Forms.***    Any party entitled to receive any property as a distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Liquidating Debtor (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Liquidating Debtor, the Disbursing Agent, or such other Person designated by the Liquidating Debtor and the holder

fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Liquidating Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Liquidating Debtor or its respective property.

### 5.12.    *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Liquidating Debtor and the officers and members of the board of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Liquidating Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 5.13.    *Closing of the DEMG Case.*

After the DEMG Estate has been fully administered, the Liquidating Debtor shall promptly seek a Final Decree.

## SECTION 6.    DISTRIBUTIONS.

### 6.1.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the transfer register for each of the Classes of Claims or Interests as maintained by DEMG or its agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  DEMG shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

### 6.2.    *Date of Distributions.*

Except as otherwise provided herein, the Disbursing Agent shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Disbursing Agent shall from time to time determine, the subsequent Distribution Dates, which shall occur no less frequently than semi-annually.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

In the event the holders of Allowed General Unsecured Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Disbursing Agent shall make a final distribution of all remaining Available Cash to all holders of Allowed General Unsecured Claims.

6.3.    ***Cancellation of Senior Notes.***

Each record holder of a Senior Note Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled except to the extent otherwise provided herein.  Such surrendered Senior Notes shall be cancelled solely with respect to DEMG, and such cancellation shall not alter the obligations or rights of any third parties vis-à-vis one another with respect to such Senior Notes.

6.4.    ***Delivery of Distributions.***

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made by the Disbursing Agent.  In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter.  Undeliverable distributions or unclaimed distributions shall remain in the possession of the Liquidating Debtor until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Liquidating Debtor, as applicable, and shall not be supplemented with any interest, dividends or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of distribution.  After such date, all unclaimed property or interest in property shall revert to the Liquidating Debtor, and the claim of any holder to such property or interest in property shall be discharged and forever barred.  Distributions to holders of General Unsecured Claims that are deemed unclaimed property pursuant to the preceding sentence shall be redistributed to the holders of Allowed General Unsecured Claims in accordance with Section 4.4 herein.

6.5.    ***Manner of Payment Under Plan.***

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

6.6.    ***Setoffs.***

The Liquidating Debtor may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that DEMG may have against the holder of such Claim; *provided, that* neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by DEMG of any such claim DEMG may have against the holder of such Claim.

6.7.    ***Distributions After Effective Date.***

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

20

6.8.    ***Allocation of Distributions Between Principal and Interest.***

Except as otherwise provided in this Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

6.9.    ***Maximum Distributions Allowed.***

No holder of an Allowed General Unsecured Claim shall receive distributions that aggregate more than the amount of such holder's Allowed General Unsecured Claim.

6.10.    ***Rounding of Payments.***

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such faction to the nearest whole cent, such Cash shall be treated as unclaimed property under the Plan.

6.11.    ***Minimum Cash Distributions***

The Disbursing Agent shall not be required to make any Initial Distribution or subsequent distribution of Cash less than $25 to any holder of an Allowed General Unsecured Claim; *provided, however*, that if any distribution is not made pursuant to this section, such distribution shall be added to any subsequent distribution to be made on account of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $5 to any holder of an Allowed Claim.   If either (a) all Allowed General Unsecured Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed General Unsecured Claims would be $5 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $5,000, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Liquidating Debtor.

SECTION 7.   **PROCEDURES FOR DISPUTED CLAIMS.**

7.1.    ***Allowance of Claims.***

After the Effective Date, DEMG shall have and shall retain any and all rights and defenses that DEMG had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

21

### 7.2.   *Objections to Claims.*

As of the Effective Date, objections to, and requests for estimation of, Claims against DEMG may be interposed and prosecuted only by DEMG.  Such objections and requests for estimation shall be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Liquidating Debtor.

### 7.3.   *Estimation of Claims.*

DEMG may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether DEMG previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, DEMG may pursue supplementary proceedings to object to the allowance of such Claim.    All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 7.4.   *No Distributions Pending Allowance*.

If an objection to a Claim is filed as set forth in Section 7.2, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7.5.   *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  On the next Distribution Date after the date that any Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise), the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

### 7.6.   *Resolution of Claims.*

On and after the Effective Date, the Liquidating Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.7.    ***Disallowed Claims.***

All claims held by Persons or Entities against whom or which DEMG has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Plan.  Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to DEMG from such party have been paid.

SECTION 8.    **EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

8.1.    ***General Treatment.***

All executory contracts and unexpired leases to which DEMG is a party are rejected as of the Effective Date, except for any executory contract or unexpired lease that is an insurance policy subject to Section 8.3 of the Plan.

8.2.    ***Rejection Claims.***

Unless a contract or lease is (a) specifically assumed or rejected by order of the Bankruptcy Court, (b) otherwise expressly assumed pursuant to the terms of the Plan, or (c) the subject of a separate assumption or rejection motion filed by DEMG, the Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts, in accordance with Section 8.1 of the Plan, effective as of the Effective Date.  In the event that the rejection of an executory contract or unexpired lease by DEMG pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed Proof of Claim, shall be forever barred and shall not be enforceable against DEMG, or its respective properties or interests in property as agents, successors or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Liquidating Debtor no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as Class 3 General Unsecured Claims.

8.3.    ***Insurance Policies.***

All insurance policies pursuant to which DEMG has any rights or obligations in effect as of the date of the Confirmation Order shall continue to be enforced and treated as being unaffected by the bankruptcy filing.

8.4.    ***Reservation of Rights.***

Nothing contained in the Plan will constitute an admission by DEMG that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that DEMG has any liability thereunder.

23

Nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of DEMG under any executory or non executory contract or any unexpired or expired lease.

Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities DEMG under any executory or non executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, DEMG shall have thirty (30) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease.

SECTION 9.  **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**

9.1.  *Conditions Precedent to Confirmation.*

The occurrence of Confirmation is subject to the following conditions precedent:

 (a) the entry of the Disclosure Statement Order;

 (b) the entry of the Confirmation Order; and

 (c) the execution of the Disbursing Agent Agreement by the parties thereto.

9.2.  *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

 (a) the Confirmation Date shall have occurred and the Confirmation Order shall have become a Final Order; and

 (b) the Reorganization Plan shall have been substantially consummated.

9.3.  *Waiver of Conditions Precedent.*

Each of the conditions precedent in Sections 9.1 and 9.2 may be waived in writing by DEMG with Bankruptcy Court approval.

9.4.  *Effect of Failure of Conditions to Effective Date.*

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) DEMG and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all of DEMG's obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against DEMG or any other entity or to prejudice in any manner the

rights of DEMG or any other entity in any further proceedings involving the Plan, DEMG or otherwise.

SECTION 10. **EFFECT OF CONFIRMATION.**

    10.1.   ***Subordinated Claims.***

    The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, DEMG reserves the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

    10.2.   ***Vesting of Assets.***

    On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the DEMG Estate, shall remain vested in DEMG free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided pursuant to this Plan and the Confirmation Order.

    10.3.   ***No Discharge of Claims.***

    Except as otherwise provided in the Plan, with respect to unclaimed distributions and late filed Claims, DEMG shall not be discharged, pursuant to section 1141(d)(3)(A) of the Bankruptcy Code, from any Claim.  The Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan.  All Entities shall be precluded from asserting against the Liquidating Debtor and the DEMG Estate, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

    10.4.   ***Term of Injunctions or Stays.***

    Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

    10.5.   ***Injunction Against Interference with Plan.***

    From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, in the Bankruptcy Court or otherwise, on account of or respecting any Claim against, or Interest in, DEMG, except with respect to the allowance of such Claim or Interest in accordance with the Plan.

10.6.  ***Exculpation.***

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the DEMG Case, the negotiation and pursuit of the Plan, or the solicitation of votes for, or confirmation of, the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, or any other transaction contemplated by the foregoing, except for willful misconduct or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan; *provided, however,* that nothing in the Plan shall limit the liability of DEMG's professionals to its client pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009), and any other statutes, rules or regulation dealing with professional conduct to which such professionals are subject.

Furthermore, pursuant to the Disbursing Agent Agreement, upon the Effective Date, the Disbursing Agent is hereby released and exculpated from any claim, obligation, cause of action or liability for any claim arising in connection with its duties under the Disbursing Agent Agreement.

10.7.  **Releases**

(a)  ***Releases by DEMG.***  Subject to Section 10.7(c), as of the Effective Date and to the fullest extent permitted by applicable law, for good and valuable consideration, including the services to facilitate the Plan, the Released Parties will be deemed released and discharged by DEMG, the Liquidating Debtor and the DEMG Estate from any and all Claims, obligations, rights suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that DEMG, the Liquidating Debtor or the DEMG Estate would have been legally entitled to assert, other than any act or omission that is a criminal act or constitutes intentional fraud; *provided, however,* that nothing in the Plan shall limit the liability of DEMG's professionals to its client pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009), and any other statutes, rules or regulation dealing with professional conduct to which such professionals are subject.

(b)  ***Releases by Holders of Claims.***  Subject to Section 10.7(c), as of the Effective Date and to the fullest extent permitted by applicable law, for good and valuable consideration, including the waiver by the Consenting Senior Noteholders of their right to receive distributions on account of their Claims, the release an discharge by the Consenting Lender, the Issuing Lender and the Roll-Up Lender of the liens and security interests granted by DEMG in connection with the 2012 Credit Agreement and the DIP Loan Agreement, and the Reorganization Plan Debtors' release of certain claims against DEMG, the Releasing Parties will be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert arising from, in whole or in part, any transaction with DEMG, the

26

Liquidating Debtor or the DEMG Estate, other than any act or omission that is a criminal act or constitutes intentional fraud.

(c)    *Obligations Under Plan Not Released.*  Notwithstanding anything in the Plan to the contrary, the Release provisions set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument or agreement executed to implement the Plan.

## 10.8.   *Retention of Causes of Action/Reservation of Rights.*

(a)    Except as otherwise provided herein, including Sections 10.6 and 10.7, pursuant to section 1123(b) of the Bankruptcy Code, DEMG shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that DEMG or the DEMG Estate may hold against any Person or Entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against DEMG, its officers, directors or representatives; and (ii) the turnover of any property of the DEMG Estate; *provided, however* that DEMG shall not retain any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures). DEMG or its successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of DEMG or its successor(s) who hold such rights.

(b)    Except as otherwise provided herein, including Sections 10.6 and 10.7, nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff or other legal or equitable defense which DEMG had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan; *provided, however* that DEMG shall not retain any Claims or Causes of Action arising under chapter 5 of the Bankruptcy Code against holders of Allowed General Unsecured Claims (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures). DEMG shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Plan as if the Chapter 11 Cases had not been commenced, and all of DEMG's legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the DEMG Case had not been commenced.

## 10.9.   *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date, DEMG shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a)

and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation.

SECTION 11. **RETENTION OF JURISDICTION.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the DEMG Case for, among other things, the following purposes:

(a)     to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)     to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(c)     to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)     to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)     to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the

Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(j)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(k)     to hear any disputes arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(l)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code for periods through the dissolution of DEMG);

(n)     to adjudicate, decide, or resolve any Causes of Actions;

(o)     to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(p)     to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(q)     to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(r)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(s)     to enter a Final Decree closing the DEMG Case;

(t)     to recover all assets of the Liquidating Debtor and property of the DEMG Estates, wherever located; and

(u)     to hear and determine any rights, Claims or causes of action held by or accruing to DEMG pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

29

SECTION 12. **MISCELLANEOUS PROVISIONS.**

### 12.1. *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, DEMG shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the DEMG Case or until such time as a Final Decree is entered closing the DEMG Case, a Final Order converting the DEMG Case to a case under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing such the DEMG Case is entered.

### 12.2. *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3. *Dissolution of Creditors Committee.*

Unless dissolved earlier pursuant to the terms of the Reorganization Plan, the Creditors Committee shall be dissolved as of the Effective Date.

### 12.4. *Request for Expedited Determination of Taxes.*

DEMG shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

### 12.5. *Amendments.*

(a)    ***Plan Modifications***.   The Plan may be amended, modified or supplemented by DEMG in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, DEMG may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    ***Other Amendments***.  Before the Effective Date, DEMG may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that any such adjustments or modifications shall not materially and adversely affect the economic interests of any holder of a Claim or Interest. In accordance with the Disbursing Agent Agreement, the Disbursing Agent Agreement may not be amended, modified or supplemented by Reader's Digest and DEMG without the consent of the Consenting Senior Noteholders.

12.6.   ***Effectuating Documents and Further Transactions.***

Each of the officers of DEMG is authorized, in accordance with his or her authority under the resolutions of DEMG's board of directors, to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.7.   ***Revocation or Withdrawal of the Plan.***

DEMG may revoke or withdraw the Plan only if it is in the exercise DEMG's fiduciary duty. If DEMG takes such action, the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against DEMG or any other person or to prejudice in any manner the rights of DEMG or any person in further proceedings involving DEMG.

12.8.   ***Severability of Plan Provisions upon Confirmation.***

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of DEMG, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of DEMG; and (3) nonseverable and mutually dependent.

12.9.   ***Governing Law.***

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

12.10.   ***Time.***

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.11.  *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of DEMG, the holders of Claims and Interests, the Exculpated Parties and each of their respective successors and assigns.

12.12.  *Successor and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.13.  *Entire Agreement.*

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

12.14.  *Notices*.

All notices, requests and demands to or upon DEMG to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(i)  if to DEMG:

DIRECT ENTERTAINMENT MEDIA GROUP, INC.
c/o RDA Holding Co.
44 South Broadway
White Plains, New York 10601
Facsimile:  (914) 244-7810
Attn:  Andrea Newborn, Esq.

– and –

DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY 10019
Attn:  Barry N. Seidel, Esq.
       Katie L. Weinstein, Esq.
       Evan J. Zucker, Esq.
Telephone:  (212) 277-6500
Facsimile:  (212) 277-6501

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Joseph H. Smolinsky, Esq.
            Marcia L. Goldstein, Esq.
            Matthew P. Goren, Esq.
Telephone:      (212) 310-8000
Facsimile:      (212) 310-8007

(ii)     if to the Disbursing Agent:

THE READER'S DIGEST ASSOCIATION, INC.
44 South Broadway
White Plains, New York 10601
Attn:   William Magill

        After the Effective Date, DEMG has the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.   After the Effective Date, DEMG is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Dated:   White Plains, New York
         July 17, 2013

Respectfully submitted,

Direct Entertainment Media Group, Inc.

By: _____

Name: Andrea Newborn
Title: Secretary

[Signature Page to DEMG Plan]

34

# __Exhibit 1__

**Disbursing Agent Agreement**

## DISBURSING AGENT AGREEMENT

This DISBURSING AGENT AGREEMENT (this "**Agreement**"), dated as of July __, 2013, is made and entered into between Direct Entertainment Media Group, Inc. (the "**Company**") and Reader's Digest Association, Inc. ("**RDA**"). Each of the Company and RDA are sometimes referred to herein as a "**Party**" and collectively as the "**Parties**."

## RECITALS

A.    RDA owns all of the issued and outstanding equity interests of the Company;

B.    RDA and the Company both filed petitions for relief under Chapter 11 of the Bankruptcy Code on February 17, 2013 and their respective Chapter 11 cases are pending in the United States Bankruptcy Court For the Southern District of New York (the "**Court**");

C.    RDA, together with its Chapter 11 filing affiliates other than the Company (collectively, the "**Reorganization Debtors**"), filed their Second Amended Joint Plan of Reorganization dated May 7, 2013 which was confirmed by order of the Court dated June 28, 2013. The Company intends to propose its own plan of liquidation. The Company has provided RDA with a draft of such plan. (As used herein, "**Liquidation Plan**" shall mean (i) a plan of liquidation containing terms and conditions substantially similar to the Company's July 15, 2013 draft plan of liquidation or (ii) such other plan acceptable to RDA). All terms not defined herein shall have the respective meanings ascribed to such terms in the Liquidation Plan;

D.    RDA and the Company are parties to a certain stipulation (the "**Stipulation**") approved by order of the Court dated July 1, 2013, which resolves, *inter alia*, the claims between the Company, on the one hand, and the Company and RDA and its corporate affiliates, on the other hand. Pursuant to the Stipulation, RDA has agreed to provide at least $50,000 of financial support to defray the Company's costs of implementing and/or administering the Liquidation Plan or otherwise winding up its affairs (the "**Parent Advances**"); and

E.    The Parties wish to memorialize RDA's agreement to serve as disbursing agent under the Liquidation Plan.

NOW, THEREFORE, in consideration of the foregoing and the promises, mutual covenants and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

Section 1.    Support of Liquidation Plan.

(a)    RDA. So long as the Company shall seek confirmation of the Liquidation Plan, RDA shall, and shall cause its representatives, agents and employees to: (i) use its and their respective commercially reasonable efforts to facilitate the solicitation, approval, confirmation and consummation of the Liquidation Plan on a timely basis; and (ii) not object to, challenge, vote to reject, or otherwise take any action or commence or participate, directly or indirectly, in any proceeding opposing any of the terms of the Liquidation Plan; provided, however, prior to voting on the Liquidation Plan (whether in

accordance with the provisions of this Section 2(b) or any other provision of this Agreement), RDA shall have received a disclosure statement in compliance with 11 U.S.C. § 1125.

(b)  Company.  So long as it shall seek confirmation of the Liquidation Plan, the Company shall, and shall (i) use its and their respective commercially reasonable efforts to facilitate the solicitation, approval, confirmation and consummation of the Liquidation Plan on a timely basis; (ii) use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the Liquidation Plan at the earliest date practicable.

Section 2.    Disbursing Agent.

(a)  Agreement to Serve.  RDA hereby agrees to serve as the Disbursing Agent under the Liquidation Plan.  RDA acknowledges and agrees that in its capacity as Disbursing Agent it shall be acting in a representative capacity as agent of the Company and shall make only those distributions and payments set forth in the Liquidation Plan, as directed by the Company.

(b)  Compensation and Reimbursement.   RDA agrees to serve, without compensation, as the Disbursing Agent under the Liquidation Plan.  RDA shall be entitled to reimbursement from the Company for all of its reasonable and customary out-of-pocket expenses incurred in connection with RDA's service as Disbursing Agent under the Liquidation Plan.  All payments made to RDA, as Disbursing Agent, shall be disclosed in the Final Report, but shall not be subject to Court approval.

(c)  No Bond.  As Disbursing Agent, RDA shall have fiduciary duties to the Company and the Company's creditors who shall be entitled to receive distributions under the Liquidation Plan.  However, RDA shall not be required to give any bond or surety or other security for the performance of its duties.

(d)  Establishment of Accounts.  RDA shall establish and maintain separate, segregated non-interest bearing accounts for: (i) Available Cash, and (ii) all reserves (collectively) established by the Company in accordance with the Liquidation Plan.

(e)  Accounting.  RDA shall provide the Company with statements every calendar quarter (or more frequently if reasonably requested by Company), in reasonable detail, setting forth all payments and other disbursements made by RDA as Disbursing Agent.

(f)  Indemnification, Exculpation and Release.  Upon the Effective Date of the Liquidation Plan, as consideration for RDA serving as the Disbursing Agent, the Company hereby agrees to indemnify, exculpate and release RDA, together with its officers, directors and agents, solely with respect to the actions contemplated by this Agreement from and against all liabilities that may be imposed on, incurred by or asserted against RDA, its officers, directors and agents, in any matter relating to or

2

arising out of, in connection with or as a result of this Agreement, *provided however*, that DEMG shall not indemnify RDA, its officers, directors and agents, for any liability to the extent such liability has resulted primarily from the gross negligence, willful misconduct or fraud of RDA, its officers, directors and agents, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Nothing contained in this Section shall preclude or impair any holder of an Allowed Claim from bringing an action in the Court against RDA to compel making of distributions contemplated by the Liquidation Plan on account of such Claim.

Section 3.    Parent Advances.

(a)    Procedure.  RDA agrees that it shall not make any Parent Advances to the Company, or charge (or seek to charge) any payment by RDA of any costs or expenses incident to the implementation or administration of the Liquidation Plan or the Company's Wind Down to the Company or against RDA's obligation to make Parent Advances, without the consent of the Company (which consent shall be in writing for any cost or expense greater than $7,500).

(b)    Accounting.  At the Company's request, RDA shall provide the Company with monthly statements, in reasonable detail, of the Parent Advances.

Section 4.    Miscellaneous.

(a)    This Agreement shall be construed in accordance with, and governed by, the laws of the State of New York.  Each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement shall be commenced and maintained in the Court, and the Court shall have exclusive jurisdiction over any such proceeding.  By its execution and delivery of this Agreement, each Party (i) submits to the exclusive jurisdiction of the Court and (ii) hereby waives and agrees not to assert in any such dispute, to the fullest extent permitted by applicable law, any claim that (A) such Party is not personally subject to the jurisdiction of such court, (B) such Party and such Party's property is immune from any legal process issued by such court or (C) any litigation or other proceeding commenced in such court is brought in an inconvenient forum. The Parties agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 4(f), or in such other manner as may be permitted by applicable law, shall be valid and sufficient service thereof and hereby waive any objections to service accomplished in the manner herein provided.

(b)    Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

(c)    Complete Agreement, Interpretation and Modification.

3

(i)     This Agreement, the Liquidation Plan and the Stipulation constitute the complete agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between or among the Parties with respect thereto.

(ii)     This Agreement is the product of negotiation by and among the Parties.  There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

(iii)     This Agreement may only be modified, altered, amended or supplemented by an agreement in writing signed by RDA and the Company, and upon the consent of the Consenting Senior Noteholders (as defined in the Reorganization Plan).  No waiver of any provision of this Agreement or any default, or breach of any covenant hereunder, whether intentional or unintentional, shall be valid unless the same is made in a writing signed by the Party making such waiver, nor will such waiver be deemed to extend to any prior or subsequent default, or breach of any covenant hereunder, or affect in any manner any rights arising by virtue of any prior or subsequent default, or breach of any covenant. The Parties expressly agree that this Agreement may not be modified, revised, or amended by the exchange of electronic messages, including, but not limited to, e-mail and text messaging.

(d)     Execution of Agreement.  This Agreement may be executed and delivered (by facsimile, electronic transmission or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same Agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of such Party.

(e)     No Solicitation.  While RDA agrees herein to vote in favor of the Liquidation Plan, this Agreement is not and shall not be deemed to be a solicitation for votes in favor of any chapter 11 plan or consent to the Liquidation Plan in contravention of applicable non-bankruptcy law or section 1125(b) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, RDA's vote with respect to the Liquidation Plan shall not be solicited until, and any obligation to support confirmation of the Plan is expressly conditioned on, the receipt by RDA of the Liquidation Plan and a copy of the disclosure statement that shall have previously been approved by the Court, after notice and a hearing, as containing adequate information as required by section 1125 of the Bankruptcy Code.  Notwithstanding the foregoing provisions, nothing in this Agreement shall require any Party to take any action prohibited by the Bankruptcy Code, the Securities Act of 1933 (as amended), the Securities Exchange Act of 1934 (as amended), any rule or regulations promulgated thereunder, or by any other applicable law or regulation or by an order or direction of any court or any state or federal governmental authority.

4

    (f)   <u>Notices.</u> All notices hereunder shall be deemed given if in writing and delivered, if sent by telecopy, courier or by registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as shall be specified by like notice):

    (i)    If to the Company:

DIRECT ENTERTAINMENT MEDIA GROUP, INC.
c/o RDA Holding Co.
44 South Broadway
White Plains, New York 10601
Telephone:   (914) 244-5262
Facsimile:    (914) 244-7810
Attn:  Andrea Newborn, Esq.

with copies to:

DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY 10019
Attn:  Barry N. Seidel, Esq.
Telephone:   (212) 277-6500
Facsimile:    (212) 277-6501

    (ii)   If to RDA:

THE READER'S DIGEST ASSOCIATION, INC.
44 South Broadway
White Plains, New York 10601
Attn:  William Magill
Telephone:   (914) 244-5439
Facsimile:    (914) 244-7949

with copies to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Joesph H. Smolinsky, Esq.
      Marcia L. Goldstein, Esq.
      Matthew P. Goren, Esq.
Telephone:   (212) 310-8000
Facsimile:    (212) 310-8007

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by telecopier shall be effective upon oral or machine confirmation of transmission.

5

     (g)     <u>Severability.</u>  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable term, provision, covenant or restriction or any portion thereof had never been contained herein.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first written above.

DIRECT ENTERTAINMENT MEDIA GROUP, INC.

By: _Andrea Liles_____
    Name: Andrea Newbors
    Title: Secretary

READERS DIGEST ASSOCIATION, INC.

By: _____
    Name:
    Title:

[Signature Page to Disbursing Agent Agreement]

7

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first written above.

DIRECT ENTERTAINMENT MEDIA GROUP, INC.

By: _____
     Name:
     Title:

READERS DIGEST ASSOCIATION, INC.

By: _____
     Name:        William H. Magill
     Title:       Vice President and Treasurer

[Signature Page to Disbursing Agent Agreement]

7